# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| South Carolina Electric & Gas Company, | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| | ) | Civil Action No. 2:06-cv-02627-CWH |
| v. | ) | |
| | ) | |
| UGI Utilities, Inc., | ) | |
| | ) | |
| Defendant/Counterclaim-Plaintiff. | ) | |
| | ) | |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Elizabeth B. Partlow, Federal ID # 2992
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1320 Main Street, Suite 600
Columbia, South Carolina 29201
Telephone:   (803) 252-1300
beth.partlow@ogletreedeakins.com

Bruce W. Felmly
Barry Needleman
Cathryn E. Vaughn
McLane, Graf, Raulerson & Middleton,
 Professional Association
900 Elm Street, P.O. Box 326
Manchester, New Hampshire 03105
Telephone:    (603) 625-6464
bruce.felmly@mclane.com

# TABLE OF CONTENTS

**Section**                                                                                                    **Page**

TABLE OF AUTHORITIES ................................................................................................ xi

I.    INTRODUCTION ........................................................................................................... 1

II.   CONCISE STATEMENT OF CONTESTED FACTS, PURSUANT TO
      LCR 7.05(A)(5). ........................................................................................................ 11

      A.    Contested Facts Relating to UGI's Engineering and Operational Control of
            the Charleston MGP ....................................................................................... 12

      B.    Contested Facts Relating to UGI's Control Over the Governance of the
            Charleston MGP .............................................................................................. 15

      C.    Contested Facts Relating to UGI's Control Over the Charleston MGP's
            Appropriations and Finance ........................................................................... 17

      D.    Contested Facts Relating to the Applicable Statute of Limitations in
            this Matter ....................................................................................................... 18

      E.    Contested Facts Relating to the NCP Compliance of the Clean Up Efforts
            at the Charleston MGP Site ........................................................................... 19

III.  STANDARD OF REVIEW ............................................................................................ 19

IV.   UGI OPERATED THE CHARLESTON MGP FROM 1910-1926. ............................. 21

      A.    The *Bestfoods* Test ....................................................................................... 21

      B.    UGI's History and Its MGP Empire ............................................................... 23

      C.    UGI's Control of the Charleston MGP ........................................................... 31

            1.    The Gas Making Process Inherently Leads to The Creation and Release
                  of Tar and Other Contaminants ........................................................... 31

            2.    The Evidence Indisputably Demonstrates that UGI Controlled The Gas
                  Making Processes and Release of Contamination At The Charleston
                  MGP Within The Meaning of *Bestfoods* ............................................ 33

            3.    Engineering and Operations ................................................................. 34

                  a.    Equipment Design and Installation ............................................ 34

                  b.    Waste Handling .......................................................................... 36

                  c.    Inspections ................................................................................. 38

|   |   | d. | Plant Superintendent/Manager and Other Engineering Personnel | 39 |
|   |   | e. | Raw Materials | 41 |
|   | 4. |   | Corporate Governance | 43 |
|   |   | a. | UGI Dominance of CCR&L Board Actions | 43 |
|   |   | b. | Policies and Procedures | 44 |
|   |   | c. | Committees | 45 |
|   |   | d. | Key Management | 45 |
|   | 5. |   | Finance and Appropriations | 47 |
|   |   | a. | General Control | 47 |
|   |   | b. | Budgeting | 47 |
|   |   | c. | Donations | 48 |
|   |   | d. | Expenditures | 49 |
|   |   | e. | Audits | 49 |
| D. |   |   | Conclusion | 49 |
| V. |   |   | DEFENDANT'S CLAIM THAT VARIOUS STATUTES OF LIMITATION BAR PLAINTIFF'S ACTIONS PRESENTS AN INTENSE FACTUAL DISPUTE, IS CONTRARY TO LAW AND IS INAPPROPRIATE FOR DISPOSITION BY SUMMARY JUDGMENT | 50 |
| A. |   |   | The Claim That SCE&G's Actions are Time-Barred Presents Intense Controversy Regarding Material Facts And Is Inappropriate for Summary Judgment | 50 |
|   | 1. |   | The Clean-Up At This Site Has Continued To Evolve Over Time | 52 |
|   | 2. |   | In 1998 It Was Specifically Contemplated That More Work Would Be Needed To Design And Implement A Permanent Remedy | 53 |
|   | 3. |   | Key Clean-Up Measures Were Not Even Selected Back At The Point UGI Argues The Limitations Period Began Running | 53 |
|   | 4. |   | It May Not Even Be Technically Possible To Address All The Contamination | 55 |

     5.     Conclusions ........................................................................................ 55

    B.    The Clean-Up Of The Charleston Facility Is A Complicated, Interrelated Remedial And Removal Action, But The Categorization Of The Facility Can Only Represent One Removal And One Remedial Action With No Permanent Remedy In Place.................................................................................... 56

VI.    UGI'S CLAIM THAT THE RESPONSE COSTS PLAINTIFF INCURRED ARE NOT CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN IS FACTUALLY DISPUTED AND WITHOUT MERIT........................................................................ 62

VII.    UGI IS LIABLE AS AN OWNER UNDER CERCLA BECAUSE THE UNDISPUTED FACTS AND REASONABLE INFERENCES, ALL VIEWED IN A LIGHT MOST FAVORABLE TO PLAINTIFF, SUPPORT PIERCING THE CORPORATE VEIL .... 65

    A.    The Applicable Law Supports Plaintiff's Veil-Piercing Claim........................... 65

    B.    Based On The Totality Of The Circumstances, UGI Failed To Observe Corporate Formalities and Therefore Summary Judgment Is Inappropriate. ....... 67

    C.    UGI's Actions Were Unjust and Fundamentally Unfair and Therefore, UGI Cannot Meet Its Burden Under The Second Part of The Veil-Piercing Test ....... 70

    D.    Summary of Veil-Piercing Analysis................................................................ 73

VIII.    CONCLUSION.................................................................................................. 74

## LIST OF EXHIBITS

| EXH. NO. | DESCRIPTION |
|---|---|
| 1 | Factual Support and Documentation of Plaintiff's Contentions That UGI Controlled Operations at the Charleston MGP, Including Waste Generation and Release of Contamination |
| 2 | Effinger Cost Spreadsheet |
| 3 | Diagram: The Control Mechanisms |
| 4 | Affidavit of Bruce Felmly, Esquire |
| 5 | Case Law<br><br>a. *Atlanta Gas Light Company v. UGI Utilities, Inc., et al.*, 2005 U.S. Dist. LEXIS 43592 (2005)<br>b. *Prioleau v. Potter*, 2007 U.S. Dist. LEXIS 66893 (2007)<br>c. *Fiber-Lite Corporation v. Molded Acoustical Products of Easton, Inc.*, 186 B.R. 603 (1994)<br>d. *In the Matters of The United Gas Improvement Company and Subsidiary Companies*, 1943 SEC LEXIS 606 (March 18, 1943)<br>e. *U.S. v. Allen*, 1990 WL 339488 (W.D.Ark.)(1990)<br>f. *Douglas Auto Tech v. Scott Fetzer Co.*, 2008 WL 205217 (W.D. Mich. 2008)<br>g. *Norfolk Southern Railway v. Gee Co.*, 2002 U.S. Dist. LEXIS 18980 (2002)<br>h. *Baker v. Equitable Leasing Corp.*,  275 S.C. 359 (S.C. Ct. App. 1980)<br>i. *Sturkie v. Sifly*, 280 S.C. 453 (S.C. Ct. App. 1984)<br>j. *Dumas v. Infosafe Corp.*, 320 S.C. 188 (S.C. Ct. App. 1995)<br>k. *Multimedia Publ'g of S.C. v. Mullins*, 314 S.C. 551 (S.C. Ct. App. 1993)<br>l. *Lumpkin v. Envirodyne Indus.*, 159 B.R. 814 (N.D. Ill. 1993)<br>m. *Breyer v. Meissner*, 2002 WL 922160 (E.D. Pa. 2002)<br>n. *C.T. Lowndes & Co. v. Suburban Gas & Appliance Co., Inc.*, 307 S.C. 394 (S.C. Ct. App. 1991)<br>o. *In the Matter of Manchester Gas Company*, 57 S.E.C. 57, 1940 SEC LEXIS 563 (April 4, 1940) |
| 6 | CCR&L Minutes<br><br>SCANA000264, 000266, 000394, 000405-06, 000422, 000427, 000445, 000552, 000567, 000610, 001257, 001333-34, 001357-59, 001361-62, 001370-72, 001379-82, 001383-86, 001394-96, 001463-66, 001469-70, 001527, 001533, 001544-45, 001550-51, 001556-58, 001577, 001590, 001624-25, 001628-29, 001639-40, 001649, 001665-66, 001680-81, 001707, 001710, 001725-26, 001733, 001737-39, 001749-50, 001771-72, 002522, 002573, 002661-62, 034692-93, 034702, 034787, 034810, 034820, 035321, 035322, 035363, 035373, 035391, 035396, 035425, 035439, 035464, 035487 |

| EXH. NO. | DESCRIPTION |
|---|---|
| 7 | CCR&L Journal Entries<br><br>SCANA001876-77, SCANA002477, SCANA002487, SCANA002830, SCANA032524, SCANA032562, SCANA032606, SCANA032637, SCANA032681, SCANA032822, SCANA032869, SCANA032874, SCANA032919, SCANA032923, SCANA032964, SCANA033009, SCANA036047, SCANA036077, SCANA036306, SCANA036354, SCANA036571, SCANA036586, SCANA036633, SCANA037732-34 |
| 8 | UGI Minutes<br><br>a.  UGIMAN000245, 000709-10, 001491-1510, 2611, 002880-1, 002889, 007301, 007308, 007414, 007427, 007444, 012265, 012266, 012381, 015209, 018757-58, 018902, 018922, 018961<br><br>b.  UGICT004269, 004300-03, 004269<br><br>c.  UGI-Minutes-001382, 001385, 003056, 003695, 003838, 006417, 006799, 007107, 007186, 007211, 007241, 007346, 008055, 008063, 008076-77, 008079, 008166, 008300-02, 008765, 008766, 008833, 009281, 009914, 010059-61, 010066, 010144, 010193, 010386, 010557, 011775, 015746<br><br>d.  1.  UGISC00001-0400<br>　　2.  UGISC0401-0848, 2235-36 |
| 9 | UGI Circle articles<br><br>a.  UGI-Circle-00074, 000103, 000601, 000616, 000621-623, 000632, 000640-642, 000866, 000875, 001314, 001318, 001379, 001698, 001709-10, 004206, 004212, 004302, 004326, 004398, 004412, 004582, 004599, 004614, 004641, 004775, 004804, 004806, 004825-26, 004870, 004902, 005014, 005022-24, 005087, 005097-98, 005195, 005234, 005235, 005250, 005423, 005424, 005425, 005459, 005496, 005498, 005646, 005665, 006275, 006281, 006322, 006326, 007114, 007160, 007642, 007657-59, 007675, 007676, 008845-46, 009109-10<br><br>b.  UGISC001172-74, 001182-83, 001215, 001218-19, 001247-62, 001327-28, 001640, 001643<br><br>c.  UGI000335, UGICT003901-03, 004080-83 |
| 10 | Transcript of Telephone Conference In *Yankee Gas Services Company and The Connecticut Light and Power Company v. UGI Utilities, Inc.*, Oct. 16, 2007 (Judge Kravitz) |

| EXH. NO. | DESCRIPTION |
|---|---|
| 11 | Articles from The Gas Industry:<br><br>February 1927, p. 59.  91014.<br>May 1926, p. 168. 91052.<br>February 1922, vol. 22, p. 76. 090979. |
| 12 | Article from American Gas Association Monthly<br><br>January, 1926, p. 61. (SCANA104515-16) |
| 13 | Articles from American Gas Engineering Journal<br><br>October 13, 1917, p. 343. 090936.<br>March 29, 1919, p. 281, 90946. |
| 14 | CCR&L Sundry Small Donations Form (SCANA000058, SCANA000090) |
| 15 | Neil Shifrin Expert Report – to be sent hardcopy |
| 16 | Neil Shifrin Supplemental Report – to be sent hardcopy |
| 17 | Blake Expert Report |
| 18 | Blake Supplemental Report |
| 19 | Jonathan Macey Expert Report |
| 20 | Manchester Trial Transcript Excerpts |
| 21 | Manchester Motion Hearing Transcript |
| 22 | Walter Africa Letters (Manchester case)<br><br>a.    February 6<br>b.    March 6 |
| 23 | Blake Affidavit with Supporting Documentation |
| 24 | Annual Report of CCR&L to the ICC (1911) (SCANA000122-194) |
| 25 | Lease-  June 21, 1910 (SCANA035617-035658) |
| 26 | Dolan Letter- May, 1903  (UGIMAN000047-57) |
| 27 | Preliminary Report by Werba, June 15, 1929 (SCANA000099-120) |

| EXH. NO. | DESCRIPTION |
|---|---|
| 28 | Maps- General Layout of Plant (SCANA001794); Map of Gas Works (SCANA001797) |
| 29 | The UGI Corporation: The First Hundred Years (UGICT005708-5803) |
| 30 | The First Hundred Years (The movie) |
| 31 | 1896 Daily Philadelphia Stockholder  (UGIMAN18061-63) |
| 32 | 1894 Daily Philadelphia Stockholder (UGIMAN014797-99) |
| 33 | UGI Engineering & Operating Notes (Excerpts) |
| 34 | "The Company and its History,"  UGI, 1882-1941 (UGICT005226-5247) |
| 35 | South Carolina Electric and Gas Company, by Nell, C. Pogue (1964) (SCANA002313-19) |
| 36 | UGI: Data relative to certain former subsidiaries and other companies (UGISC007224-225) |
| 37 | "A Century of Public Service" (Excerpts) - SCANA001927, 001948, 001952 |
| 38 | Gas Sales Division Ledger (Excerpts) (UGISC002830, 002841) |
| 39 | Forty-Five Years of Public Service (UGISC002488-2524) |
| 40 | Outline of Services Rendered to Operating Companies (Excerpt) (UGICT005589-96) |
| 41 | 3rd CTA Transcript (Excerpt) (UGISC003523, UGISC003760, UGISC003789) |
| 42 | 1904 Superintendents' Meeting (Excerpts) (UGI-CT14345, 014347) |
| 43 | History of the United Gas Improvement Company (UGI-CT20976-80) |
| 44 | Newspaper articles- SCANA001908-1909, 001912, 001920, 002472 |
| 45 | Letter to Lillie from Gadsden dated August 10, 1922 (SCANA002291-92) |
| 46 | Letter to Hagood from Gadsden dated August 11, 1922 (SCANA066902) |
| 47 | Inventory of CCR&L (1910) (SCANA037018, 037055-56, 037058-59) |

| EXH. NO. | DESCRIPTION |
|---|---|
| 48 | Concord Gas Plant Inspection Reports<br>a. April, 1940<br>b. Sept, 1941 |
| 49 | Shifrin Deposition Testimony |
| 50 | Blake Deposition Testimony |
| 51 | Macey Deposition Testimony |
| 52 | DOJ Memorandum |
| 53 | Deposition Testimony of Thomas N. Effinger, May 8, 2008 |
| 54 | Deposition Testimony of Andrew Contrael, April 1, 2008 |
| 55 | Deposition Testimony of Ishwar Murarka, April 1, 2008 |
| 56 | Plaintiff's Responses to UGI's First Set of Interrogatories to Plaintiff SCE&G |
| 57 | Plaintiff's Responses to UGI s Second Set of Interrogatories to Plaintiff SCE&G |
| 58 | Record of Decision for Operable Unit #1, 1998 |
| 59 | Record of Decision for Operable Unit #2, 2002 |
| 60 | Explanation of Significant Difference, 2005 |
| 61 | Interim Remedial Action Report, 2006 |
| 62 | Voorhees, Utility Holding Companies and Manufactured Gas Plant Sites |
| 63 | Letter to Thomas Effinger, from Kenneth Lucas, EPA dated October 19, 2006  re: Approval of IRAR |
| 64 | Deposition Testimony of David Mauro |
| 65 | UGI-Minutes-003709 (relating to Vicksburg) |
| 66 | The Nation, Dec. 18, 1935 |
| 67 | August, 1922 Letter to Passailaigue- (SCANA066899) |
| 68 | August, 1922 Letter. to Lillie-  (SCANA002291-92) |

| EXH. NO. | DESCRIPTION |
|---|---|
| 69 | American Gas Light Journal- August 8, 1910 (91126-27) |
| 70 | Thompson Speech, 1927  (UGIMAN001491-1500) |
| 71 | FTC Memorandum |

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Atlanta Gas Light, Co. v. UGI Utils., Co.*, No. 3:03-cv-614-J, 2005 WL. 5660476, 2005 U.S. Dist. LEXIS 43592 (M.D.Fl. Mar. 22, 2005), aff'd 463 F.3d 1201 (11th Cir. 2006)..................................................................................................... 8

*Alan-Toyo America v. Northern Illinois Gas Co.,* 904 F. Supp. 833 (N.D. Ill. 1995).................................................................................................................... 65

*American Fidelity v. London and Edinburgh*, 354 F.2d 214 (4th Cir. 1965).................... 3

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)................................................. 2, 19

*Avery v. County of Burke,* 660 F.2d 111 (4th Cir. 1981) ............................................ 2, 68

*Breyer v. Meissner*, 2002 WL. 922160 (E.D.Pa. 2002) .................................................. 68

*Burton v. R.J. Reynolds Tobacco Co.,* 183 F. Supp. 2d 1308 (D.Kan. 2002)................. 68

*California Dept. of Toxic Substances v. Alco Pacific, Inc.,* 308 F. Supp. 2d 1124 (C.D. Cal. 2004)...............................................................................................57, 59

*California v. Celtor Chemical Corp.,* 901 F. Supp. 1481 (N.D. Cal. 1995) ................... 60

*California v. Hyampom Lumber*, 903 F. Supp.1389 (E.D. Cal. 1995) ........................... 61

*California v. Neville Chemical*, 358 F.3d 661 (9th Cir. 2004)....................................... 60

*City of Wichita v. Aero Holdings, Inc.,* 177 F. Supp. 2d 1153 (D. Kan. 2000)...........59, 60

*Colorado v. Sunoco, Inc.,* 337 F.3d 1233 (10th Cir. 2003)................................57, 58, 61

*Consol. Edison Co. of N.Y. v. UGI Utils., Inc.,* 310 F. Supp. 2d 592 (S.D.N.Y. 2004)......................................................................................................................... 8

*Douglas Auto Tech v. Scott Fetzer Co.,* 2008 WL. 205217 (W.D. Mich. 2008)............. 61

*In re French*, 499 F.3d 345 (4th Cir. 2007)...................................................................... 2

*Geraghty and Miller v. Conoco, Inc.,* 234 F.3d 917 (5th Cir. 2000)............................. 57

*Hillsborough County v. A & E Road Oiling Service*, 853 F. Supp. 1402 (M.D. Fl. 1994)................................................................................................................... 60

*Illinois v. Grigoleit Company*, 104 F. Supp. 2d 967 (C.D. Ill. 2000) .............................. 60

*Kelly v. E.I. Dupont*, 17 F.3d 836 (6th Cir. 1994) .......................................................... 57

*Lettieri v. Equant Inc.,* 478 F.3d 640 (4th Cir. 2007) ........................................................ 2

*Louisiana-Pacific Corp v. Ascarco Inc.,* 6 F.3d 1323 (9th Cir. 1993)............................. 65

*Lumpkin v. Envirodyne Indus.,* 159 B.R. 814 (N.D.Ill. 1993).......................................... 67

*Manchester Gas Company*, 7 S.E.C. 57 (April 4, 1940).................................................. 26

*Norfolk Southern Railway v. Gee Co.,* 2002 U.S. Dist. LEXIS 18980 (2002)................. 65

*NutraSweet v. X-L Engineering Corp.,* 926 F. Supp. 767 (N.D. Ill. 1996)...................... 60

*One Wheeler Road Associates v. Foxboro Co.,* 843 F. Supp. 792 (D. Mass. 1994) ........ 60

*Pneumo-Abex v. Bessmer and Lake Erie Railroad Co.,* 936 F. Supp. 1250 (E.D.
    Va. 1996) ..................................................................................................... 57

*Prioleau v. Potter*, 2007 U.S. Dist. LEXIS 66893 (D.S.C. September 10, 2007)............ 19

*Public Service of Colorado v. Gates Rubber Company*, 175 F.3d 1177 (10th Cir.
    1999)............................................................................................................. 57

*Shaefer v. Town of Victor*, 457 F.3d 188 (2d Cir. 2006)................................................. 61

*Sherwin-Williams v. Artra Group*, 125 F. Supp. 2d 739 (D. Md. 2001)......................... 60

*U.S. v. Aberdeen*, 929 F. Supp. 989 (N.D. Miss. 1996) .................................................. 57

*U.S. v. Allen*, 1990 WL.339488 (D. Ark. 1990) .......................................................57, 60

*U.S. v. Bestfoods et Al.,* 524 U.S. 51 (1998)...................................7, 21, 22, 23, 65, 66, 68

*U.S. v. Chromatex*, 832 F. Supp. 900 (M.D. Penn. 1993) *aff'd* 39 F.3d 1174 (3rd
    Cir. 1994)..................................................................................................... 60

*U.S. v. Corbett*, 785 F. Supp. 81 (E.D. Tex. 1990)........................................................ 60

*U.S. v. Kayser-Roth*, 272 F.3d 89 (1st Cir. 2001)........................................................... 65

*U.S. v. Navistar*, 152 F.3d 702 (7th Cir. 1998)............................................................... 61

*U.S. v. Peterson Sand and Gravel*, 824 F. Supp. 751 (N.D. Ill. 1991) ........................... 60

*U.S. v. Poly-Carb*, 951 F. Supp. 1518 (D. Nev. 1996) .................................................. 60

*U.S. v. Rohm and Haas Co.*, 790 F. Supp. 1255 (E.D. Penn. 1994)............................... 60

*U.S. v. Union Corp.,* 259 F. Supp. 2d 356 (E.D. Pa. 2003).........................................66, 67

*U.S. v. United Nuclear Corporation*, 814 F. Supp. 1552 (D.N.M. 1992)....................... 60

*United Gas Improvement Co. v. Securities and Exchange Commission*, 138 F.2d
    1010 (3d Cir. 1943) ................................................................................................. 30

*World Wide Rights Ltd. v. Combe Inc.,* 955 F.2d 242 (4th Cir. 1992) ............................ 3

*Young v. United States*, 394 F.3d 858 (10th Cir. 2005) ................................................. 65

## STATE CASES

*Baker v. Equitable Leasing Corp.*, 275 S.C. 359 (S.C. Ct. App. 1980).......................... 65

*C.T. Lowndes & Co. v. Suburban Gas & Appliance Co., Inc.*, 307 S.C. 394 (S.C.
    Ct. App. 1991) ......................................................................................................... 70

*Cumberland Wood Prods. v. Bennett*, 308 S.C. 268 (S.C. Ct. App. 1992)..................... 66

*Dumas v. Infosafe Corp.,* 320 S.C. 188 (S.C. Ct. App. 1995)..................................66, 70

*Multimedia Publ'g of S.C. v. Mullins*, 314 S.C. 551 (S.C. Ct. App. 1993)...............66, 70

*Sturkie v. Sifly*, 280 S.C. 453 (S.C. Ct. App. 1984) ...................................................... 66

## DOCKETED CASES

*Yankee Gas Services Co. and The Connecticut Light & Power Co. v. UGI
    Utilities, Inc.,* Civil Docket No. 03:06CV1369 (D. Ct.)............................................. 3

## FEDERAL STATUTES AND REGULATIONS

42 U.S.C. § 9601 *et seq* ............................................................................................ 9, 56

42 U.S.C. § 9607(a) ................................................................................................20, 21

42 U.S.C. § 9613(g)(2)................................................................................................. 56

Federal Rule of Civil Procedure 56(c) .......................................................................... 19

40 C.F.R. 300.7009 (c)(3)(i)......................................................................................... 65

# I.    INTRODUCTION

In 1982, UGI described its historic operations to the public as follows:

*From the outset, UGI had a very broad concept of its role in the gas business. Not only did it manufacture, sell and install Lowe process equipment in cities across America, but it also leased and operated existing gas works and profited from the sale of gas. UGI formed new gas companies and built new gas works too and in the process it became America's first public utility holding company.*[1]

The Charleston Manufactured Gas Plant ("Charleston MGP") made gas for the city of Charleston from 1855 to 1954.  The gas was used to heat homes, light streets, and operate appliances.  Plaintiff, South Carolina Electric & Gas Company ("SCE&G"), successor to the Charleston Consolidated Railway and Lighting Company ("CCR&L"), is cleaning up the contamination at the site that resulted from the gas-making operations.  SCE&G has spent in excess of $45 million dollars to date in this effort and will likely incur $60 million by the time the clean-up is complete.[2]  Defendant, UGI Utilities, Inc. ("UGI"), is the successor to the United Gas Improvement Company, the entity that controlled CCR&L and operated the Charleston MGP from 1910 to 1926.  This case is about UGI paying its fair share for the clean-up.

It is hard to imagine a case less appropriate for summary judgment.  The Court will try this action as a bench trial.  The duplication of judicial effort in assessing the positions of the parties, first in this dispositive motion, and then as the Court reviews the evidence on the merits, is enormous.  Further, the United States District Court for the District of New Hampshire denied

---

[1] UGI 100 Year History Movie, at 1.42, Exhibit ("Exh.") 30.  Apparently UGI made this movie in conjunction with the publishing of its 1982 written history, *UGI Corporation: The First Hundred Years*.  *See* Exh. 29.

[2] *See* Effinger Costs Spreadsheet, attached as Exh. 2.

a comparable UGI Motion for Summary Judgment.[3]  That Court directly addressed the critical

issue regarding the <u>inferences</u> which must be drawn from the historic documents:

> But at the summary judgment stage, it seems to me I'm required to draw all reasonable inferences from the evidence in [the Plaintiff's] favor, and this case turns on what inferences should be drawn from evidence that is old and not supported by testimony, and that evidence can be interpreted multiple ways.  I have given you the benefit of every reasonable way of interpreting that evidence to favor you, and in doing so, I conclude that you are entitled to proceed to trial on these claims.

Transcript of Motions Hearing, *EnergyNorth* ("Man. Mot. Tr.") at 181-82, attached as Exh. 21.

UGI now entirely ignores this issue.  Here, as in the Manchester case, there are many material

disputes about the factual record and both cases heavily revolve around the inferences drawn

from historic facts.

SCE&G is entitled to the benefit of all reasonable inferences.  *Anderson v. Liberty Lobby*

*Inc.,* 477 U.S. 242, 255 (1986) ("[t]he evidence of the nonmovant … and all justifiable

inferences are to be drawn in his favor").[4]  In circumstances where inferences play a central role,

summary judgment is not appropriate.  *Avery v. County of Burke*, 660 F.2d 111, 116 (4th Cir.

1981).  This point is significant in cases based exclusively on historic record:  for summary

judgment to be appropriate, "not only must the historic facts not be in genuine issue…there must

---

[3] In *EnergyNorth National Gas, Inc. v. UGI Utils., Inc.,* Docket No. C-00-500-B, EnergyNorth alleged that UGI was an owner and operator of the Manchester, NH MGP.  The time period of control between the two cases overlapped (1887 to 1944 in that case and 1910 to 1926 in this case), the evidence was quite similar, the plaintiffs' experts were the same in both cases (and one of the two defense experts here also testified in that case), and counsel for SCE&G in this case represented EnergyNorth in that case.  EnergyNorth defeated UGI's Motion for Summary Judgment there and after 8 days of trial, the matter settled.  *See* Exhibits 20 and 21.

[4] *See also Lettieri v. Equant Inc.,* 478 F.3d 640, 642 (4th Cir. 2007); *In re French* 499 F.3d 345, 357 n. 10 (4th Cir. 2007) (noting a district court is "not authorized to weigh the evidence, make credibility determinations or draw inferences unfavorable [to the nonmoving party]").

2

be no genuine issue as to the inferences to be drawn from them." *World Wide Rights Ltd. v. Combe Inc.* 955 F.2d 242, 244 (4th Cir. 1992).[5]

*Yankee Gas Services Co. and The Connecticut Light & Power Co. v. UGI Utilities, Inc.,* Civil Docket No. 03:06CV1369 (MRK) (D.Ct.), involves similar claims against UGI, the same plaintiff and defense counsel, and almost all of the same expert witnesses. There, the District Court set a hearing for July 15, 2008 on the subject of whether UGI's proposed dispositive motion in that case will even be entertained:

> But the last thing I ever, ever want to do in a non-jury case is to try the case twice, first at the summary judgment stage, familiarize myself with it, only to find that there is a material issue of fact somewhere, and then have to sit through and be re-educated about the case, you know nine months later, when I have a slot for trial. . . .

Transcript of Telephone Conference, October 16, 2007, page 25 (Judge Mark Kravitz), attached as Exh. 10.

UGI argues that because there are no live witnesses, the Court should simply review hundreds of historic documents (many of which were created by UGI or its controlled companies) and allow the documents to "speak for themselves." Def.'s Memo at 3. Yet UGI has defended this case by spending in excess of $300,000 on expert witnesses retained to analyze and testify as to this complex corporate, engineering, and accounting record. Affidavit of Bruce W. Felmly, Esq. ("Felmly Aff.") at ¶ 5, attached as Exh. 4. UGI makes its motion without any citation to its 67 pages of expert reports, which supposedly rebut Plaintiff's expert reports.[6]

---

[5] *See also American Fidelity v. London and Edinburgh* 354 F.2d 214, 216 (4th Cir. 1965) (notes that where the "basic [historic] facts are not in dispute, [and] the parties…disagree as to the inferences which may…be drawn…the case is not one to be decided on…summary judgment").

[6] Plaintiff's expert reports contain a total of 217 pages of detailed opinions, extensively supported with hundreds of footnoted evidentiary citations to the historic record in support of the Plaintiff's claims. The approximate expert costs to SCE&G for the analysis and assembly of these opinions through February 2008 is $656,000. Felmly Aff. at ¶ 4, Exh. 4. All of the

3

When one considers the magnitude of UGI's expert rebuttal effort and UGI's expenditure of hundreds of thousands of dollars on expert witness fees, and then measures that expenditure against UGI's failure to make substantive citations to its expert witnesses, it becomes clear that even UGI does not seriously expect to circumvent trial in this case.

It is equally remarkable that UGI moved to dramatically expand the page limit for briefing in this case to a total of 110 pages (75 pages for its initial brief and 35 pages for its Reply), all in a matter that it argues does not have even one material fact in dispute. UGI's approach is inconsistent with the goals of summary judgment: to efficiently and effectively resolve cases where no material facts are contested. Instead, UGI filed its Motion in an attempt to sterilize this case by eliminating crucial expert testimony. UGI seeks to limit the Court's essential role in weighing the evidence and testimony presented in context, to decide critical inferences, and to assess the credibility of UGI's claims that it did not operate the Charleston MGP. Further, since UGI abandoned reliance on its experts, it should be precluded from relying on them in its Reply brief, thus unfairly denying Plaintiff any chance to address their opinions.

Plaintiff has not offered mere conclusory allegations, as UGI claims. Def.'s Memo at 3. Rather, Plaintiff has provided a meticulous analysis, supported by hundreds of evidentiary references, demonstrating the reality of UGI's control.[7] For example, Plaintiff's expert, Thomas Blake, assembled a detailed comparison of UGI's Executive Committee Minutes and the Board of Directors Minutes of CCR&L. Blake Rpt. at 16-30, Exh. 17. This compelling comparison

---

disclosed experts in this case for both parties have been deposed, resulting in 1,760 pages of testimony and approximately 224 marked exhibits. *Id.* at ¶ 6.

[7] Traditional interrogatories and document requests (including amended responses) total roughly 167 pages. Felmly Aff. at ¶ 7, Exh. 4. The parties have also exchanged detailed contention interrogatories, the responses to which total approximately 191 pages. *Id.* at ¶ 7. Plaintiff's responses to UGI's contention interrogatories set forth many of the factual references contained in this Brief and should have precluded filing of this Motion. *See also* Exhibits 56 and 57.

demonstrates that UGI would repeatedly "recommend" CCR&L take some action and CCR&L would do it, in lockstep. UGI would have the Court believe that it was simply offering "advice" to CCR&L. But in the Manchester case the Court observed, regarding virtually identical facts, the inference can be drawn here that these UGI "recommendations" were more than just advice:

> Shouldn't I ask myself whether it's significant that although you [UGI] have access to all of the minutes of the board of directors of UGI and all of the minutes of the board of directors of EnergyNorth's predecessor and you've had a chance to put together and see whether there are any instances in which advice is given and advice is disregarded, and you have not presented me with a single instance in which that has occurred, that I should infer from that that this is more than advice?[8]

Transcripts of Bench Trial, *EnergyNorth*, ("Man. Tr."), Day 1, Afternoon, at p. 65, attached as Exh. 20. Mr. Blake and the other experts here do far more than just catalogue these facts. Rather, they painstakingly assess this enormous factual record and then draw on their expertise to explain the context of the times in which these events occurred and illuminate the many inferences that should be drawn from the record regarding UGI's control of its MGPs.

The notion that these "documents speak for themselves" is further undercut by the reality that UGI deliberately sought to create an illusion of local control.[9] UGI's arguments rely heavily on broad generalities and cherry-picked snippets, often taken out of context. By contrast, Plaintiff has set forth at Section II of this Memorandum its "Statement of Contested Facts Pursuant to LCR 7.05(A)(5)", which contains a summary of many of the key facts which are sharply disputed. Standing alone, this statement makes it clear that any consideration of summary judgment in this case is plainly inappropriate.

---

[8] Plaintiff's experts draw similar inferences here. *See* Section IV.

[9] *See* Sections IV and VII; *See also* Macey Rpt. ¶¶ 26-27, Exh. 19. There are some remarkable documents in this evidentiary record that cut through UGI's effort to mask that control. On occasion, UGI would actually acknowledge the fact that it controlled these MGPs. *See, e.g.*, SCANA000130, Exh. 24 (CCR&L states that UGI's control over the company is "direct" and "sole").

In further support of its assertion that there are many material facts in sharp dispute, SCE&G has provided the Expert Report and Supplemental Expert Report of Dr. Neil Shifrin, attached as Exhs. 15 and 16, respectively. Dr. Shifrin is an engineer and scientist with extensive expertise regarding the historic operation of MGPs and the manner in which operational decisions and practices directly led to contamination of the environment. Dr. Shifrin's expert reports contains eleven tables, eleven figures and seven ultimate opinions supported by countless factual evidentiary points, many of which are at direct odds with UGI's contentions that it did not control or direct the operations of the MGP.

Mr. Blake's Expert Report, attached as Exh. 17, on accounting and financial matters, recordkeeping, and other methods of control applicable to UGI's operation of the MGP, is based on many years of experience, and extensive prior examination of UGI's methods of control. Mr. Blake's Expert Report and his Supplemental Report, attached as Exh. 18, which responds to UGI's un-cited but disclosed expert witnesses, contains a total of 70 pages and in excess of 289 specific references relating to UGI's accounting, financial and operational control.

Jonathan Macey, Professor of Law and Deputy Dean of Yale Law School, has provided opinions on corporate governance and control. Mr. Macey's 33 page report, attached as Exh. 19, contains numerous factual references. In the face of this presentation, UGI's claim that Plaintiff relies only on conclusory allegations, Def.'s Memo of Law at 3, is simply astonishing.[10]

---

[10] UGI claims that in the Manchester case, Judge Barbadoro rejected, or did not appreciate, the expert testimony. Def.'s Memo at 22. UGI is mistaken. In fact, Judge Barbadoro expressly found Dr. Shifrin's opinions on UGI's engineering and operational controls " . . . very helpful and useful to me in explaining how the gas business works. He said some things that I consider to be relevant and potentially useful on the extent to which there was direction by UGI." Man. Tr., Day 4, Morning, at p. 33, Exh. 20. The Judge went on to reference Dr. Shifrin as a "very helpful, informative, valuable witness . . .". Man. Tr., Day 4, Morning, at p. 37, Exh. 20. He also noted that the Court "profited from [his] testimony in many respects." Man. Tr., Day 4, Afternoon, at p. 92, Exh. 20. While it is true that Judge Barbadoro questioned the role of the law

This case turns on the extent to which UGI controlled the gas making process, or in the parlance of *United States v. Bestfoods*, the "operations specifically related to pollution" at the Charleston MGP.[11]  524 U.S. 51, 66-67 (1998).  In that context, experts play a vital role.  For example, there may be no factual dispute as to who was the superintendent of the Charleston MGP at a particular time.  But there is a significant dispute about whether that superintendent was a UGI puppet who followed UGI's direction.[12]  Moreover, while the record contains little information about the precise daily tasks that superintendent performed, Dr. Shifrin will testify in detail about that issue and other matters related to gas plant operation and pollution.

Linking UGI through the superintendent to those gas-making functions is one key feature of Plaintiff's case.  Yet UGI urges the Court to ignore that critical information.  However, the Court cannot decide this case without understanding how gas was made, the specific machinery that was used, how the choice of feedstocks related to the generation of waste, where in the process waste was produced, how it may have entered the environment and who would have had

---

professors as witnesses, and sharply criticized UGI's offered law professor Dale Oesterle, as to Plaintiff's expert, Professor Macey, Judge Barbadoro stated, "I appreciate the witness; you had some interesting testimony, very helpful to me."  Man. Tr., Day 5, Afternoon, at p. 8, Exh. 20.

[11] UGI offers a red herring argument on this issue, claiming there is no evidence about UGI directing "leakage or disposal of waste."  Def.'s Memo at 42.  Leakage is an accidental event so of course nobody would direct it to occur.  But UGI designed, inspected, maintained and operated the equipment.  UGI selected the feedstocks, tested and managed the wastes and controlled every aspect of the production process.  As the experts have testified here, gas-making inherently includes the making and handling of the residual byproduct - tar.  It is thus inescapable that UGI controlled the instrumentality that led to the pollution.  *See* Section IV(C).

[12] For example, in the Manchester case, Plaintiff's position was bolstered by letters written by Walter G. Africa, Superintendent of the Manchester MGP, to UGI, attached as Exhibit 22, that indicate Africa was working at the behest of UGI.  Africa wrote to UGI's Treasurer, Lewis Lillie, and stated "[t]here is no question but that you should have one of your men elected.  I look on it that all of the directors are your men and they are perfectly willing to carry out your wishes."  *Id.*  In another letter, written to Samuel T. Bodine, UGI's General Manager at the time, Africa wrote regarding a suggested replacement to Manchester's Board of Directors and stated "I told him that the selection of a new director would have to be referred to you."  *Id.*

control over those matters leading to the contaminant release.  Notwithstanding UGI's assertions, the documents do not speak to these issues.

Throughout its brief, UGI works assiduously to rewrite its own history.   UGI would have the Court believe that its 1910 acquisition of the Charleston MGP was simply another corporate investment.  The facts dispel that benign image.  UGI was not a mere investor and advisor.  UGI was an aggressive acquirer and micromanager of gas plants.  From its inception, UGI created a management structure geared toward iron-fisted control of its MGPs.  No detail escaped its attention.[13]  The record is replete with materials illustrating this point.  Based on the hundreds of examples of control he found in the record, Mr. Blake stated that "UGI's level of operational control was significantly greater than the level of control that I would expect from a company which has an ownership investment in another company."  Blake Rpt. at 36, Exh. 17.

UGI's acquisition of the Charleston MGP was meticulously planned and part of a pattern that began in the 1880s (and continued until the 1940s, when the United States Government finally dismantled UGI).  After the Charleston acquisition, UGI followed its typical strategy of installing the Lowe carbureted water gas machinery and thereafter providing decades of Philadelphia-based day-to-day control.  This is not a case simply about UGI's control of the Board of Directors, overlapping officers, or other general parent-subsidiary business practices, such as the cases UGI touts in New York and Florida.[14]  Those cases were situations where the plaintiffs apparently did not come to grips with the obligation under *Bestfoods* to show direct

---

[13] For example, in 1905 the UGI Executive Committee actually authorized the UGI MGP in Vicksburg, Mississippi to shoot a "worn-out horse, thirty years old." UGI-Minutes-003709, attached as Exh. 65.

[14] *Consol. Edison Co. of N.Y. v. UGI Utils., Inc.*, 310 F.Supp.2d 592 (S.D.N.Y. 2004), *aff'd in part* 153 Fed.App. 749 (2d Cir. 2005); *Atlanta Gas Light, Co. v. UGI Utils., Co.*, No. 3:03-cv-614-J, 2005 WL 5660476, 2005 U.S. Dist. LEXIS 43592 (M.D.Fl. Mar. 22, 2005), *aff'd* 463 F.3d 1201 (11th Cir. 2006), Ex. 5.

operational involvement in the processes that led to contamination.  When comparing the Briefs filed in this case to those filed in *Con. Ed.* and *Atlanta Gas*, there is a clear difference between SCE&G's heavy reliance on the material facts at issue here versus those cases where the plaintiffs relied on differences of legal interpretation.

In substance and process, this case is much more akin to the Manchester MGP case. Here, as in Manchester, SCE&G's claims rest squarely on rigorous analysis and documentation of UGI operational control that resulted in leakage and/or discharge of contaminants, precisely as required by *Bestfoods*.  As noted, UGI's Summary Judgment Motion was denied in Manchester for these precise reasons, and the case then settled after eight days of trial.[15]

Following the presentation of Plaintiff's concise Statement of Contested Facts and consideration of the Standard of Review, Plaintiff's brief addresses the operator liability claim. The crux of this argument is that UGI's control over the Charleston MGP from 1910 to 1926 was pervasive and directly relates to operations regarding waste handling as required under *Bestfoods*.  UGI assumed control of the Charleston MGP with a clear plan and placed its own people in positions of authority.  UGI designed, built, inspected, maintained, and operated the equipment that caused the pollution.  Every significant aspect of plant operations was under UGI's control.  Consequently, UGI was unquestionably an "operator" within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA") and under the test articulated in *Bestfoods*.

---

[15] UGI's remarkable and consistent refrain that the Court should follow the *Con. Ed.* and *Atlanta Gas* route, ignoring the rejection of summary judgment in the Manchester case, is unfair.  The parties settled the Manchester case after eight days of trial on a confidential basis.  If UGI seeks to distinguish or attack that case, Plaintiff would ask the Court to examine not only the evidence presented and rulings of the court, but the settlement result achieved by the parties.

The next section of Plaintiff's Brief will address UGI's technical arguments that SCE&G's claim is time-barred by the statute of limitations that relate to "removal" or "remedial" actions under CERCLA. Def.'s Memo at 59-66. Regarding removal actions, the statute runs from the date of "completion" of the removal. Since that removal is nowhere near complete (tar is being pumped and removed even today), UGI's argument is baseless.

UGI then tries to apply the six year limitations period applicable to "remedial" activities by re-casting the work at the site as all remedial. However, even today there is no "permanent remedy" for the site and selecting a permanent remedy is a necessary predicate for the six year "remedial" limitations period to begin to run. This issue has also been the subject of days of deposition testimony by consultants directly involved in the clean-up. The Court's assessment of the credibility of these witnesses will be vital. Moreover, UGI's legal arguments in support of its statute of limitations claims sharply contrast with the vast body of case law that describes the features of a removal vs. remedial action under CERCLA and the triggering action for both limitations periods to begin to run.

UGI also contends that some of the clean-up work was inconsistent with the National Contingency Plan ("NCP"). Yet SCE&G's employees and consultants involved in the clean-up will testify that all the work complies with the NCP. Moreover, the agency documents dealing with this issue explicitly confirm that fact. There are material issues of fact in dispute here and the credibility of these witnesses is essential to the Court's determination.

Finally, Plaintiff will address its alternative theory of liability, derivative ownership. The facts will show that UGI was the alter-ego of CCR&L and that through its tight control, UGI engaged in acts that were fundamentally unfair and unjust. As a consequence, UGI should be held liable as an "owner" under CERCLA.

In sum, there exists an enormous historical record, replete with documents, events and processes that demand expert assessment in the context of important engineering, accounting, and corporate governance issues.  Critical topics -- such as the intricacies of the gas making process and its relationship to equipment at the MGP and today's pollution – are matters at the core of this case.  Moreover, UGI created much of this historic record to deliberately mask its control.  The assistance of experts is essential to dispel that mist of deception and present a substantial basis for the many reasonable inferences that can be, and must be drawn from this record in Plaintiff's favor.  UGI's almost complete disregard of that issue, together with the other points raised here, and elaborated on more fully in the pages that follow, compel the conclusion that UGI's Motion for Summary Judgment must be denied in its entirety.

## II.    CONCISE STATEMENT OF CONTESTED FACTS, PURSUANT TO LCR 7.05(A)(5).

Pursuant to LCR 7.05(A)(5), Plaintiff provides this statement of contested facts.  There are hundreds of points of contested facts and inferences.  A more detailed listing of the facts in dispute is set forth in Exh. 1, which is incorporated herein by reference.  To be concise, Plaintiff provides here the categories of facts in dispute (which are relied upon to draw inferences through this Opposition) together with representative examples in each category.  The examples are not all-inclusive; to do so is not possible given the page constraints of this Opposition.  While UGI may not contest every fact, it will likely contest the inferences Plaintiff and its experts have drawn from these facts.[16]

---

[16] *See* Def.'s Memo at 16 ("Thus, there are no facts in dispute, only the way each side chooses to characterize those facts").

A.    **Contested Facts Relating to UGI's Engineering and Operational Control of the Charleston MGP**

UGI Controlled Waste Handling and Management

Dr. Shifrin, determined that "[e]nvironmental contamination resulting from UGI's control of the Charleston plant contributed to the vast majority, if not all, of [the Charleston] site remedies."  Shifrin Rpt. at 50, Exh. 15.

UGI had a Residuals Sales Department, created in 1912, and tar is a residual.  UGI-Minutes-006417, Exh. 8.  Later, when UGI created The UGI Contracting Company, it did so in part so that it would handle the residual products of UGI-controlled MGPs.  UGI-Minutes-008766, Exh. 8.  UGI had involvement with the tar sales at the MGPs it controlled.  The UGI Executive Committee, in 1909, "recommended" that four of its subsidiary companies enter into a contract for the sale of water gas tar.  UGI-Minutes-006799, Exh. 8.  The Charleston MGP often shipped its byproducts to UGI for testing.  SCANA036077, SCANA036306, SCANA002487, Exh. 7.  In addition to testing tar samples, UGI was involved in testing emissions from the Charleston MGP.  UGI-Minutes-010144, Exh. 8.  The purchase and selection of feed stocks had a critical and well known relationship to tar production, and tar salability.  UGISC000026, UGISC000113, UGISC000187, Exh. 8.  *See also* UGI Operating and Engineering Notes, Exh. 33 (making significant reference to the relationship between feedstocks and tar, and containing significant discussion regarding tar management); Section IV(C)(1) and (2) *infra.*

UGI Controlled MGP Equipment and Construction

UGI replaced the coal gas plant with the Lowe Water Gas Process at the Charleston MGP.  SCANA001927, Exh. 37; SCANA002472, Exh. 44.  UGI designed the plans for the Charleston MGP and installed UGI equipment.  SCANA001797, SCANA001794, Exh. 28.  The plant originally had 16 coal gas retorts.  SCANA001908, Exh. 44.  It was refit with two UGI

water gas sets that required "the present buildings at the gas plant … [ ] be demolished or remodeled and installed with new and improved apparatus."  UGISC002841, Exh. 38; SCANA001909, Exh. 44.

CCR&L journal entries include purchases related to the installation of UGI water gas and payments for the drawings and initial inspection.  SCANA001797, SCANA001794, Exh. 28.  The UGI Circle (UGI's official company publication) confirms that UGI completed the plant in 1912. UGI-Circle-000642, Exh. 9.

At least three pieces of tar handling equipment were installed by UGI at the Charleston MGP between 1910 and 1926: (1) a tar separator was installed in 1910, SCANA001912, Exh. 44; (2) a tar still was installed in 1916, SCANA001680, Exh. 6; and (3) a "steam driven superventrifuge [sic]" was installed in 1918, SCANA000405, Exh. 6.

In an effort to create a more efficient system for UGI to oversee its subsidiary MGPs, The UGI Contracting Company was created in 1919.  UGI-Circle-000616, Exh. 9.  The UGI Contracting Company was created out of UGI's Construction Department and inherited its business.  UGI-Circle-006326, UGI-Circle-00412, Exh. 9.  UGI referred to The UGI Contracting Company as "our UGI Contracting Company."  UGI-Circle-006281, Exh. 9.  Prior to 1923, The UGI Contracting Company did work only for the companies in which UGI held a financial interest.  UGI-Circle-005250, Exh. 9.  The UGI Contracting Company was "the Construction Department of The United Gas Improvement Company…."  UGI-Circle-005022-24, Exh. 9.  (emphasis added).  UGI conducted regular inspections of the equipment and operations at the Charleston MGP.  *See* SCANA36633, Exh. 7; UGI-Circle-004326, UGI-Circle-004804, UGI-Circle-004825, UGI-Circle-004902, Exh. 9; UGIMAN007308, Exh. 8.  The Charleston MGP was inspected by UGI's Superintendent of Works' Department on May 15, 1911; there was a

February 1915 inspection by UGI's H.R. Cook; there was a November 1920 inspection by UGI's K.M. Irwin; there was an April 1922 inspection by UGI's O.S. Carter; and there were May and July 1922 inspections by UGI's J.A. Messenger.[17]

UGI Controlled Personnel at the MGP

Prior to actual acquisition of Charleston, UGI created a detailed organizational chart of operational control for when UGI "takes over."  UGIMAN018757, UGISC000002, Exh. 8.  G.H. Waring was transferred to Charleston from the Omaha Gas Company, another UGI company, on July 1, 1910, to take charge of the construction process.  UGI-Minutes-007107, UGI-Minutes-007241, Exh. 8.  At the end of his career, he was known as "[a]n old timer in the UGI."  UGI-Circle-04641, Exh. 9.  On June 7, 1910, additional UGI men were brought into the Charleston organization.  Walton Clark became a director and vice president and J.A. Pearson was appointed the purchasing agent.  *See* SCANA001380-81, Exh. 6.  In many cases, the persons working at the Charleston MGP were direct employees of UGI.[18]  UGI authorized and/or "recommended" leaves of absence for personnel working at the Charleston MGP.[19]  UGI often authorized and/or "recommended" salary changes for personnel working at the Charleston MGP, and the transfer of personnel between the companies it controlled.  *See, e.g.,* UGISC000008, UGISC000045, UGISC000291, Exh. 8; SCANA000422, Exh. 6.  On October 3, 1917, George Waring resigned as general manager.  It was then "recommended" that the general manager position be abolished and that C.M. Benedict be elected vice president "in direct charge of

---

[17] UGISC000106, UGIMAN007308, Exh. 8; SCANA36633, Exh. 7; UGI-Circle-004326, UGI-Circle-004804, UGI-Circle-004825, UGI-Circle-004902, Exh. 9.

[18] *See, e.g.,* SCANA002573, SCANA002522, Exh. 6; UGI-Minutes-001385, Exh. 8.

[19] *See, e.g.,* UGISC000285, UGISC000286**,** UGISC00747, Exh. 8; SCANA035487, Exh. 6.

operations".  C.M. Benedict was another long-time UGI Man.  Thus, operational control passed

from one UGI person to another.[20]

Cadet Engineering Program

UGI ran a Cadet Engineer Training Program which trained gas engineers and

indoctrinated them in UGI policies and procedures.  Shifrin Rpt. at 78, Exh. 15.  They would

then be sent to work at UGI MGPs.  UGI-Circle-007830, Exh. 9.  UGI announced in the UGI

Circle its new class of cadets.[21]  Rollin Norris was responsible for the placement of Cadet

Engineers through the UGI system.[22]  UGI approved recommendations concerning the placement

of Cadet Engineers and transferred these Cadets between UGI subsidiary companies.  *See*, e.g.,

UGISC002235-36, UGISC000015, Exh. 8.  UGI recommended employment of twelve additional

Cadets "to be distributed among the various companies in which the UGI Co. is shareholder, to

fill vacancies as they may occur…". UGI-Minutes-010386, Exh. 8.

**B.    Contested Facts Relating to UGI's Control Over the Governance of the Charleston MGP**

UGI Dominance of CCR&L Board Actions

Plaintiff contends that it is reasonable to infer that documents containing UGI's

"recommendations" to CCR&L are actually directives.[23]

On December 14, 1916, the UGI Executive Committee recommended yearly increases in

salaries and wages to all of its companies, to take effect on January 1, 1917.  The Committee

---

[20] *See* SCANA 001737-38, Exh. 6; UGI-Circle-000103, UGI-Circle-00-0875, UGI-Circle-001318, UGI-Circle-005665, UGI-Circle-004826, UGI-Circle-007675, Exh. 9.

[21] UGI explained: " [m]any such men come each year into The UGI Company and the companies in which it is interested to fill the places of other engineers who have moved up the line as their experience has equipped them for greater responsibilities." UGI-Circle-006150, Exh. 9.

[22] *See*, e.g., UGI-Minutes-003838, UGI-Minutes-008077, UGI-Minutes-003695, Exh. 8.

[23] *See* Section IV.  For a more complete listing, see Exhibit 1 and Blake Rpt. at 16-30, Exh. 17.

recommended an annual increase in CCR&L salaries and wages of $1,820. UGISC000405, Exh. 8. On January 9, 1917, CCR&L "approved increases in salaries, effective January 1, 1917" in the amount of an annual increase of $1,820. SCANA001707, Exh. 6. On February 25, 1915, the UGI Executive Committee "recommended that the sale of scrap metal to the Charleston Steel & Metal Co. be approved" at a total amount of $245.00. UGISC000323, Exh. 8. On April 19, 1915, CCR&L "approved sale of scrap metal to the Charleston Steel and Metal Company" at a total amount of $245.00. SCANA001625, Exh. 6. *See also* Exh. 1 (containing additional examples of such directions).

Committees

UGI utilized various internal committees over time to manage its MGPs. The Works Committee, Management Committee, Executive Committee and Operating Committee were a few examples. These committees included the top level of UGI management and were responsible for a wide range of MGP issues, from supply purchases, contracts, extensions, plant betterments, repairs and alterations, to employment issues and a wide variety of matters pertaining to day-to-day operational control. UGI MAN000709-710, UGIMAN002881, Exh. 8.

UGI Controlled and Selected Key Management

From the outset, UGI populated Charleston with its own people. Macey at ¶ 74, Exh. 19. UGI personnel dominated the CCR&L Board. SCANA001379, Exh. 6, 001557-8, Exh. 6; Macey, at ¶ 75, Exh. 19. Throughout its tenure at Charleston, UGI always ensured that its people were in positions of authority. Blake Supp. Rpt. at 13-22, Exh. 18. These positions included at various times the President, Treasurer, Assistant Treasurer, Secretary, Board Members, Superintendent, and General Manager. Blake Rpt. at 7, Exh. 17. P.H. Gadsden was named President of CCR&L when UGI acquired control in 1910. *Id.* at 8. Gadsden was transferred to

Philadelphia in 1919 where he became a Vice President of UGI.  *Id.* at 8-9.  Gadsden remained

President of CCR&L but carried out his duties from his office at UGI in Philadelphia.

UGISC001255, Exh. 9; *see also* Blake Rpt. at 8-9, Exh. 17.  In 1922, P.H. Gadsden, the

President of the Charleston MGP, wrote to Lewis Lillie, Vice President of UGI at the time,

regarding his desire to pay a long-time and valued Charleston employee more money.

SCANA066902, Exh. 46.  The matter was referred UGI's President, Samuel Bodine.  Eventually,

UGI "approved" Gadsden's "suggestion" that this employee receive a raise. SCANA066899,

Exh. 67.  Mr. Macey concluded that the level of UGI's control over Charleston was so absolute

that the President of Charleston could not even authorize a modest salary raise to retain a long-

time Charleston MGP employee without approval from UGI senior management.  Macey Rpt. at

¶ 84, Exh. 19.

## C.    Contested Facts Relating to UGI's Control Over the Charleston MGP's Appropriations and Finance

UGI Exercised General Control Over Operations

UGI approved contracts for coal, oil, coke and cast iron at CCR&L on various dates.[24]

UGI approved the attendance of Gadsden and Waring at the annual meeting of the American Gas

Institute in NYC. UGISC000027, Exh. 8.  UGI authorized membership dues and convention fees

for Gadsden, Benedict, LaPortes. UGISC000042-43, Exh. 8.  UGI authorized advertising

appropriations for CCR&L and approved the renewal of a periodical subscription in the amount

of $12.00.  UGISC000074-75, UGISC000144, Exh. 8.

Budgets, Donations and Expenditures

---

[24] UGISC00014, UGISC000090, UGISC000026, UGISC000189, UGISC000113, UGISC00005, UGISC000140, Exh. 8.

UGI approved capital expenditure budgets at Charleston.  UGISC00014, UGISC000090, UGISC000026, UGISC000189, UGISC000113, UGISC00005, UGISC000140, Exh. 8. UGI specifically directed that certain expenditures would not be made without prior authorization. UGI Minutes 010060-61, Exh. 8.

UGI approved a variety of "sundry small donations" made by the Charleston MGP.  *See* UGIMAN018902, UGIMAN007414, UGIMAN015209, Exh. 8.  UGI required its companies to fill out a small sundry donation sheet to be returned to G.W. Curran, UGI Secretary.  *See* SCANA000090, Exh. 14.  The UGI Operating Committee set maximum donations for the year 1926 of $900.00 for the Charleston MGP.  UGISC000748, Exh. 8.

As UGI president Samuel Bodine said in 1916 regarding UGI's control over the operating companies, "no expenditures of money are made without the approval of the executive committee, which keeps full minutes of its proceedings for submission monthly to the board of directors."  UGIMAN012265, Exh. 8.  Examples of UGI following this policy include approved expenditures for various departments within CCR&L. UGISC000082-83, Exh. 8.

Audits

UGI conducted numerous audits of the Charleston MGP.  *See* UGISC000213-214, UGISC000225, UGISC238, UGISC000241, UGISC000247, UGISC000262, Exh. 8.

**D.    Contested Facts Relating to the Applicable Statute of Limitations in this Matter**

The following are contested facts and/or inferences to draw there from: the extent to which the removal of tar, contaminated groundwater and soils are "removal" activities; whether (1) a permanent remedy has been implemented at the Charleston Site; (2) the EPA and state agencies expressly stated that the 1998 ROD was not a final or permanent remedy; (3) the discovery of new contamination or other modifications made the response action something

18

other than a "permanent remedy"; (4) the potential expansion of the Site to the ship container facility means that there is no permanent remedy; (5) the fact that the regulators will likely confirm that groundwater standards cannot be met, therefore granting a technical impracticability waiver, makes the response action not a permanent remedy. *See* Section V with documents and testimony cited therein.

     **E.**    **Contested Facts Relating to the NCP Compliance of the Clean Up Efforts at the Charleston MGP Site**

     The following are contested facts and/or inferences to draw there from: whether (1) Plaintiff complied with EPA's requirements in conducting the response action; (2) there was direct EPA approval and/or oversight of the excavation; (3) the EPA expressly confirmed Plaintiff's compliance with the NCP; and (4) the ESD was a specific approval of the extent of the excavation at the Site. *See* Section VI with documents and testimony cited therein.

**III.**    **STANDARD OF REVIEW**

     Summary judgment may only be granted "[i]f the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a mater of law." Federal Rule of Civil Procedure 56(c). A fact is deemed 'material' if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson et. Al v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Simply put, "[i]n determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving

party." *Prioleau v. Potter*, 2007 U.S. Dist. LEXIS 66893 at \*10 (D.S.C. September 10, 2007); *see also* cases cited in Section I, Introduction.

In order its Motion to be granted, UGI must show that there are no material issues of fact and based on the uncontested factual record, they should prevail as a matter of law. UGI cannot meet its burden because, as set forth in the Contested Facts section above and as reflected in the expert reports and detailed listing of Exhibit 1, there are a substantial number of material facts in dispute and all the inferences from those facts are contested. Moreover, in a case such as this, where the non-movant contends that the <u>substance</u> of the relationship between the parent and its subsidiary controls rather than the form, summary judgment based on the documentary record alone is inappropriate.[25] Likewise, in an operational control case, one must look beyond the form of the entities to determine the true nature of their relationship. UGI depends solely on the documents in its Motion for Summary Judgment. Yet there is a dispute about whether the form of the relationship between UGI and the Charleston MGP is accurately portrayed in those documents. UGI created a documentary record to obscure its domination of local entities and of course the documents were drafted to accomplish this purpose wherever possible. This contested issue alone must cause UGI's motion to fail.

In addition, as discussed above in the Introduction, by relying exclusively on the documents and ignoring the experts, UGI entirely overlooks the many inferences that must be drawn in SCE&G's favor. UGI's motion is insufficient for that reason as well.

---

[25] In *Kaiser Foundation Health Plan v. Moore*, the Fourth Circuit noted that "courts must not elevate 'form over substance' when addressing the issue of successor liability. 123 F.3d. 201, 205 (4th Cir. 1997) (citing *Fiber-Lite Corporation v. Molded Acoustical Products*, 186 B.R. 603, 609 (E.D. Penn. 1994), *aff'd* 66 F.3d 310 (3rd Cir. 1995)).

**IV.    UGI OPERATED THE CHARLESTON MGP FROM 1910-1926.**

**A.    The *Bestfoods* Test**

Section 107(a) of CERCLA permits potentially responsible parties to recover response costs from former owners and/or operators of facilities. *See* 42 U.S.C. § 9607(a). In relevant part, § 107 provides that "any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of," shall be liable for "any other necessary costs of response incurred by ***any other person*** consistent with the national contingency plan." *Id* (emphasis added). In *Bestfoods*, the United States Supreme Court set forth the standard for determining derivative ownership and operator liability. 524 U.S. at 51.

CERCLA § 107(a) provides that an "operator" of a facility is directly liable for the costs of clean-up. "If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability." *Bestfoods*, 524 U.S. at 65 (citing *Riverside Market Dev. Corp. v. International Bldg. Prods., Inc.*, 931 F.2d 327 (5th Cir. 1991)). Prior to *Bestfoods*, courts were unclear about what degree of control by a parent corporation over a subsidiary would give rise to CERCLA liability. The *Bestfoods* Court addressed that issue:

> So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Bestfoods*, 524 U.S. at 66-67. Accordingly, to establish operator liability, a plaintiff must show that the defendant operated the facility at issue with a specific focus on operations related to waste handling and disposal.

21

The Supreme Court described three scenarios where a parent corporation might be held liable as an operator of its subsidiary facility.[26]  Yet UGI attempts to shoehorn this case into one of those categories -- the dual director and officer category -- presumably because UGI was successful in framing the *Con. Ed.* and *Atlanta Gas* cases in that manner.  However, this is not such a case and the evidentiary record here goes well beyond just that issue.  While the role of dual employees has relevance here, it is one of many facets, and far from the central issue UGI would like it to be.  Moreover, to the extent it is an issue, the legal question is whether "dual officer[s] or director[s] might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." *Bestfoods,* 524 U.S. at 71.  The answer to that important question hardly favors UGI, as UGI would have the Court believe.  Rather, it involves an intense factual inquiry into the broader question of how pervasive UGI's control was in this case.  And, as the totality of the record demonstrates, there are intense factual disputes about that issue, including the myriad <u>inferences</u> the experts draw from the record which UGI never addresses.  Thus, not only does the record clearly rebut the *Bestfoods* presumption about dual officers, but that issue need not even be addressed here because the factual dispute underlying this inquiry renders it unsusceptible to summary judgment.[27]

---

[26] (1) "[T]he parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture;" (2) if a "dual officer or director [departs] so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility;" or (3) "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." *Bestfoods*, 524 U.S. at 71.

[27] In its Memo, UGI contends that *Con. Ed.* and *Atlanta Gas* are akin to this case.  Because summary judgment was granted for UGI in those cases, UGI suggests that summary judgment should be granted here.  The facts and inferences that are to be drawn from the facts of *Con. Ed.* and *Atlanta Gas*, however, are distinguishable from this case.  The most notable distinction between this case and those cases is that here, SCE&G is able to show that UGI's operational

As described more fully below, SCE&G contends that UGI controlled all aspects of the Charleston MGP including the handling and disposal of waste between 1910 and 1926. Indeed, Dr. Shifrin's Report devotes an entire chapter to tying UGI's control to the contamination and today's remediation. *See* Shifrin Rpt. at Chapter 9, Exh. 15. While SCE&G contends that UGI directly operated the Charleston MGP, at a minimum, it was operating the MGP alongside CCR&L as a form of "joint venture." *Bestfoods*, 524 U.S. at 71.

### B.     UGI's History and Its MGP Empire

The history of UGI, which Defendant casts in an overly simplistic manner, is critical in this case because it sheds light on patterns of UGI behavior, replicated at Charleston, which demonstrate how UGI controlled its MGPs.[28]  When UGI's relationship to Charleston is placed in this context, it becomes readily apparent that Charleston was not just an investment where the parent provided occasional advice and support on a take-it-or-leave-it basis, as UGI implies. Rather, it shows that Charleston was a small part of a group of acquired companies, under pervasive UGI control, which UGI itself accurately referred to as its "empire." *See UGI Corporation: The First Hundred Years* ("UGI Hundred Years") at 35, Exh. 29.

UGI was formed in 1882 to exploit a major technological advancement in gas making -- the so-called "Lowe" process -- and to bring tight, centralized control and oversight to a rapidly expanding network of utility companies. *See generally* Shifrin Rpt. at 11-16, Exh. 15; Blake

---

control of the plant led to the contamination at issue.  The plaintiffs in *Con. Ed.* and *Atlanta Gas* did not present a factual record to make that connection.  As discussed herein, the creation, storage and handling of tar was inherent in the operation of an MGP.  Although the Plaintiff in *Atlanta Gas* raised that argument in a cursory manner, it failed to develop it as the Plaintiff has done here, and as EnergyNorth successfully did in the Manchester case.  The record presented here bears no resemblance to *Con. Ed.* or *Atlanta Gas.*

[28] "In order to understand the extent to which UGI dominated and controlled CCR&L, it is necessary to examine carefully the corporate history of the two companies."  Macey Rpt. at ¶ 23, Exh. 19.

Rpt. at 2-5, Exh. 17.  From the outset, UGI sought to create the appearance of local control.

Macey Rpt. at ¶¶ 26-28, Exh. 19.  UGI's method of acquiring control of local gas plants was

described in 1896:

> A town or city of moderate size, with a steadily growing population, and giving
> evidence of thrift and prosperity, may have no gas supply, or it may have an
> inefficient or unprofitable plant.  Either situation gives The United Gas
> Improvement Company its opportunity.  A local company is organized in which
> the parent corporation secures just sufficient stock to exercise control.  This
> promotes local interest in the enterprise, and insures close supervision of its
> operations by interested parties right on the ground. **The United Gas
> Improvement Company then installs its improved system, and places in
> charge a superintending engineer in its own employment, who reports to the
> general superintendent in Philadelphia.  The local operation is thus kept in
> close touch with the home office and at all times under the complete control
> of the home management**.

1896 Daily Philadelphia Stockholder, UGIMAN18061-63 (emphasis added), Exh. 31. [29]

Another contemporaneous report detailed UGI's complete and systematic control over the daily

operations of the manufactured gas plants in its empire:

> On the ground directing the operations of each local company is **a
> superintendent acting under the instructions of the general superintendent
> stationed in [Philadelphia].**  The local superintendents are thus kept in close
> touch with the home office, and **they take no important step which is not
> specifically authorized.**
>                                           *  *  *
> The system is admirable.  Not a dollar is outlayed for its account at any point or
> for any purpose **which is not first approved at the home office**, and there is the
> closest scrutiny into each expense.

---

[29] UGI claims that excerpts from the Daily Philadelphia Stockholder are unreliable and the
documents cannot be authenticated.  UGI's distancing of itself from the Daily Philadelphia
Stockholder is remarkable because UGI produced these documents to the Plaintiff's counsel in
previous litigation with UGI.  In the late 1800s and early 1900s, UGI clearly respected the Daily
Philadelphia Stockholder as UGI paid to subscribe to the publication.  UGI-Minutes-003056,
Exh. 8.  Additionally, in 1904 UGI paid $200, a large sum of money, to have an article published
in the Stockholder, thus implicitly approving its content.  UGI000335, Exh. 8.  Moreover, these
documents were admitted into evidence in the Manchester case.  Accordingly, UGI's attempts to
dismiss the Daily Philadelphia Stockholder's contemporaneous description of UGI are
disingenuous.

Daily Philadelphia Stockholder, April 9, 1894, UGIMAN014797-99 (emphasis added), Exh. 32.

UGI relied on a core group of key people to run both the main company and controlled subsidiaries, like CCR&L.  Many of those people, such as Lewis Lillie, Walton Clark, G.W. Curran, James Ball, Rollin Norris, W.F. Douthirt, and I.W. Morris figure prominently in the history of UGI generally and the Charleston MGP specifically.[30]

By UGI's own account, one way it maintained tight control over subsidiary companies like Charleston was to employ "sophisticated management techniques to direct its far-flung field operations" in order to ensure that all major decisions were made by, or run through UGI's core management.  Such techniques were established and in place before UGI assumed control of Charleston.  *See UGI Corporation: The First Hundred Years* at 38, UGICT005745, Exh. 29.  For example, in 1902, the UGI "Works Committee" was the "key management group" within UGI.

---

[30] On May 19, 1910, the initial Charleston officers were elected.  They included W.F. Douthirt as Vice President and Secretary, Lewis Lillie as Treasurer and James Ball as Assistant Treasurer. *See* SCANA001333, Exh. 6.  These were all "UGI Men," a term that seems politically incorrect today, but was widely used by UGI at the time.  It reflected the reality that they were indeed all male, and had an allegiance to this company that was remarkable, even for that period.  Around that same time, G.H. Waring was designated General Manager at Charleston. On  June 7, 1910, additional UGI people were brought into the Charleston organization.  Walton Clark became a director and vice president and J.A. Pearson was appointed the purchasing agent.  SCANA1380-1381, Exh. 6.  On occasion, UGI people would leave the company.  They were replaced with other UGI people.  For example, when Mr. Douthirt resigned as a director and the secretary, he was replaced by G. W. Curran.  When Lewis Lillie resigned as Treasurer, James Ball was promoted from Assistant Treasurer to Treasurer, and I.W. Morris became Assistant Treasurer. SCANA001556, Exh. 6.  On October 3, 1917, George Waring resigned as general manager.  It was then recommended that the general manager position be abolished and that C.M. Benedict be elected vice president "in direct charge of operations".  C.M. Benedict was another long time UGI Man.  Thus, operational control passed from one UGI person to another.  SCANA 001737-1738, Exh. 6; UGI-Circle-000103, UGI-Circle-00-0875, UGI-Circle-001318, UGI-Circle-005665. UGI-Circle-004826, UGI-Circle-007675, Exh. 9.  On March 22, 1922, Benedict resigned and was transferred to another UGI company.  Stuart Cooper (another UGI Man) was appointed vice president and manager and was put in general charge of all departments of the company's business in Charleston.  Rollin Norris, a virtually life-long UGI Man, was also appointed as the General Superintendent.  *See* SCANA000422, Exh. 6.

*Id.*  In a 1903 letter to UGI shareholders, UGI President Thomas Dolan described UGI's iron-fisted management approach, which included details about how the Works Committee functioned.[31]  UGI referenced this document in its brief but omitted key sections.  Def.'s Memo at 8.

UGI also exercised control over the daily operations of its MGPs through the UGI General Superintendent and his department.  UGI's General Superintendent was responsible for the general engineering and physical operation of gas works, and approved all plans, extensions and betterments of gas works.  UGI Engineering and Operating Notes ("Operating Notes"), RIPP03501, Exh. 33.  A key part of the General Superintendent's job was conducting regular inspections of UGI's gas plants.  *Manchester Gas Company*, 7 S.E.C. 57, 59-60 (April 4, 1940).  These detailed inspections lasted for days and resulted in lengthy reports.  *Id.*; *see also* Exh. 48.

----

[31] The key points in the Dolan letter pertaining to operations, which UGI omitted, illustrate the extent to which this committee managed the affairs of the operating companies, UGIMAN000016, Exh. 26:

- UGI's Works Committee passed favorably upon <u>all</u> property improvements, extensions and contracts for supplies of companies in which UGI was a shareholder before they were authorized.
- UGI's Works Committee met <u>every day</u> and was composed of the core of UGI leadership: President; Vice President; General Manager; General Counsel; General Superintendent and Treasurer.  (emphasis added).
- One member of the Works Committee is an executive officer and the treasurer of UGI is the treasurer of <u>each</u> of the companies in which UGI is interested.  (emphasis added).
- UGI's General Superintendent was in charge of UGI's general engineering and physical operation of gas works and approved all plans, extensions or betterments of gas works in which UGI was interested.
- The UGI Executive Committee approved the creation of a monthly bulletin regarding engineering and operating issues for its subsidiaries with strict instructions to keep the contents of the bulletin confidential.
- UGI's Executive Committee directed that any representative of a subsidiary desiring to write a paper on the business operations of UGI was required to seek explicit approval for the content of the paper from UGI.

As discussed below and in Exhibit 1, there is specific evidence regarding such inspections at Charleston.

The General Superintendent also presided over annual conferences of the local superintendents of UGI's subsidiaries where practical and technical matters were discussed regarding "the operation of the plants that have been entrusted to our care."  RIPP03457, Exh. 33; *See also* Daily Philadelphia Stockholder (1896), UGIMAN018061-63, Exh. 31.  At these meetings, all of the superintendents and commercial agents of UGI's operating companies would convene in Philadelphia to read and discuss carefully prepared papers on various technical and commercial problems, including waste-related issues.

UGI's contention that there is no clear evidence that it engaged in day-to-day operational control of Charleston is disproved by the vast amount of Charleston-specific data presented in this Opposition, and by the opinions and inferences presented by Plaintiff's experts.  In addition, subsequent to UGI filing its Motion, Plaintiff located a remarkable set of original documents in the Philadelphia Public Library.  These documents are a collection of the "UGI Engineering and Operating Notes" ("Operating Notes").[32]  The Operating Notes were highly confidential UGI documents, entrusted to each plant superintendent, to be retained in a "special filing binder."[33] They contained an enormous body of information on gas making, tar and residual handling, equipment improvements, holder repair, distribution practices, policies, manuals and rules.  The

---

[32] Plaintiff's counsel inspected and digitally photographed these records, in part, on June 20, 2008.  Portions of these records were located during June 2008 in a consultant's file in the pending Connecticut UGI litigation, which lead to the inquiry at the Philadelphia library.  UGI has represented it does not have copies of these documents.

[33] The heading on the Operating Notes said "This publication, upon receipt, is to be filed into a special filing binder furnished to the recipient, for the purpose; it is intended only for the perusal of the person to whom it is addressed and such other employees as are deemed by him to be properly qualified to appreciate it contents and to respect its confidential nature.  It is not to be taken from the office.  It should not be accessible to those for whom it is not intended." RIPP03457, Exh. 33.

Operating Notes contain speeches of UGI principals and executives such as Walton Clark, Vice President, which repeatedly reference UGI's operation of the plants "entrusted to our care and . . . direction of employee labor under our charge."  RIPP03457, Exh. 33.

The Operating Notes addressed the topics of tar and waste management, tank and holder cleaning, leak repairs and related issues directly dealing with gas-making and waste-handling. Organizational charts showing the role UGI Men played at multiple MGPs around the country are conveniently presented, painting a clear picture of the UGI empire.  RIPP03466-70, Exh. 33. This system of "Associated Management," RIPP03472, Exh. 33, where UGI provided directly controlled the MGPs within its domain, is set forth in express terms.

UGI will of course reply, claiming that this body of newly discovered evidence[34] actually shows an outside advisor or consultant, providing a forum for the exchange of ideas. Remarkably, in the Operating Notes, UGI refers to the description of people and things beyond its domain as "the outside world," RIPP03501, Exh. 33, helping to dispel the suggestion that it was an independent consultant.  In any case, the language chosen, the labeling of policies or rules, indeed the breadth and detail of topics covered in these volumes, belie any credible suggestion that UGI was simply serving as a typical investor or consultant.

UGI also ran a Cadet Training Program which trained gas engineers and indoctrinated them in UGI policies and procedures.  Shifrin Rep. at 78, Exh. 15.  They would then be sent to work at UGI MGPs.  UGI-Circle-007830, Exh. 9.[35]  As discussed above and below, UGI

---

[34] These booklets were clearly distributed by UGI and confidentially maintained.  UGI should be able to explain why none of these materials were archived, retained, or ended up being available within UGI's enormous system of records.

[35] UGI even announced in the UGI Circle its new class of cadets, explaining that "[m]any such men come each year into The UGI Company and the companies in which it is interested to fill the places of other engineers who have moved up the line as their experience has equipped them

routinely transferred engineers all over its empire.  Evidence such as this also demonstrates that

at the time, UGI did not function as a mere advisor to these companies.  Rather,  UGI treated

them as an integrated family, under close central control, where people could be moved about

freely as the needs of various family members required.  This program was being used during the

time of UGI's control over the Charleston MGP.

UGI's Rollin Norris was later responsible for the placement of Cadet Engineers

throughout the UGI system.  *See, e.g.,* UGI-Minutes-003838, UGI-Minutes-008077, UGI-

Minutes-003695, Exh. 8.  In an article he wrote at the time of his retirement, Norris stated that:

> for many years, it has fallen to my lot to be largely responsible for the selection of
> the Cadet Engineers of the Company, and for shifting them from plant to plant, as
> the opportunity for promotion arose."

UGI-Circle-005424, Exh. 9.  The fact that a central force in UGI was directing the movement of

the engineers who controlled plant operations strongly undercuts the notion that UGI was simply

a consultant to these companies.  Consultants do not "promote" people among "independent"

companies and shift them around the country as the needs of the parent company demand.

In October 1927, less than a year after UGI relinquished control in Charleston, UGI

President Arthur Thompson provided an outline for the UGI Management Committee of the

"underlying principles" that should guide them in their dealings with the controlled companies.

*See* UGIMAN001491-1510, Exh. 70.  President Thompson's comments clearly identify the main

features which characterized UGI's period of control at the Charleston MGP.

♦ He began by noting that the Management Committee needs to focus on "larger and more
   important questions of policies" and should "free itself as much as possible from details
   in connection with the operations of the various companies ...."  *Id.*

---

for greater responsibilities."  UGI-Circle-006150, Exh. 9.  Engineers would be recognized for
their achievement of graduating from the Program. UGI-Circle-004641, Exh. 9.

- Thompson endorsed the practice of having the Management Committee meet occasionally with plant managers so they will know the Management Committee takes "a vital interest in the various companies under its control…." *Id.*
- He explained the value in having local company presidents attend UGI Board of Directors meetings so they could be questioned about their properties "in order that they thus may be stimulated to the greater sense of the responsibility of the properties under their care…." *Id.*
- Finally, "The President called attention to the necessity of having patience with the local presidents or managers" and, rather than do everything for the controlled companies, "it would be much better to take the time necessary to train the local man to think for himself." *Id.*

This speech is especially telling because it shows how UGI's leader viewed its subsidiaries. It demonstrates the eccentricity of this relationship and squarely refutes the fiction that UGI was simply an investor who rendered occasional advice. If that was the case, why would UGI have to "free itself as much as possible from the details in connection with the operations of the various companies?" Moreover, the startling notion that UGI thought it had to "train the local man to think for himself" is not indicative of a normal parent-subsidiary relationship but reflects more of a parent-child relationship.

At its zenith at the end of 1940, UGI "had assets of $846 million and was operating in 11 states." UGICT005716, Exh. 29. In 1943, the federal government, after a comprehensive investigation, offered the following descriptions of the UGI system: "UGI exercises control over, and renders supervisory services to, these subsidiaries from its principal office located in Philadelphia, Pennsylvania." *In the Matter of The United Gas Improvement Company, et al.*, Findings and Opinion of the Securities and Exchange Commission, at 4 (March 18, 1943). The United States Court of Appeals for the Third Circuit found:

> [UGI] operates these outlying companies and businesses in large part from its main office in Philadelphia. Its representatives traveling from Philadelphia make inspection trips, render advice and assistance, receive weekly and monthly reports, use the mails and the long distance telephone to convey orders and suggestions, and in general control the policies and operations of the subsidiaries.

United Gas Improvement Co. v. Securities and Exchange Commission, 138 F.2d 1010, 1019-20
(3rd Cir. 1943).

      **C.**     **UGI's Control of the Charleston MGP**

          1.     The Gas Making Process Inherently Leads to The Creation and Release of
                 Tar and Other Contaminants

There is an intimate correlation between gas manufacturing and the creation of the tar
byproducts that led to the contamination at issue here. *See generally* Shifrin Rpt. at 7-9, Exh. 15.
At all former MGP sites, to some extent, tar was released into the environment. Simply put, to
manufacture gas was to cause tar to enter into the environment. "At any manufactured gas plant,
including the Charleston plant, the manufacture and handling of tar is an intrinsic part of making
gas. It would be impossible to avoid deliberate decisions about tar - production, handling, and
releases – while controlling gas manufacture." Shifrin Rpt. at 5, Exh. 15.

Accordingly, control of an MGP's operations is inextricably linked to control over the
instrumentalities that led to contamination. MGPs, which operated from the 1800s through the
first half of the 1900s, did not employ an "environmental manager." The environmental
management by a parent corporation envisioned in the *Bestfoods* case simply did not exist in the
historic MGP context. Instead, the creation and release of tar at MGPs was the result of the
decisions and actions regarding training, hiring and directing the MGP's superintendent and
employees, and designing, installing, inspecting, maintaining and repairing the equipment used
to manufacture, store and distribute gas and tar at the MGP. In this case:

> UGI had total control over the manufacture of gas, and inherent in that was also
> the manufacture of the byproduct such as tar. It's unavoidable. The two go hand-
> in-hand. And UGI had control over both of these processes as a result as well as
> the fate of whatever the manufactured product and byproducts were.

Shifrin Depo. at 67, Exh. 49.

UGI ignores this relationship, instead alleging that SCE&G makes no specific reference to UGI's control of operations at the Charleston MGP that related to the disposal, handling and/or release of tar.  Def.'s Memo at 39.  Not only is UGI factually wrong, but UGI turns a blind eye to the extensive evidence on this issue contained in the expert materials, including all the inferences drawn from the record.

UGI sees this case as it would like it to be rather than how it really is.  UGI essentially would have the court believe that no evidence will suffice short of Plaintiff showing that someone from UGI Headquarters in Philadelphia came to the Charleston MGP and opened a valve that intentionally released tar into the environment.  Even though intentional conduct is irrelevant, the massive amount of UGI control present here actually satisfies UGI's criteria and puts its argument to rest.  But the reality is that even the absence of documentary or photographic proof of the sort UGI claims must exist in no way inhibits Plaintiff's ability to prove its case under *Bestfoods*.  All aspects of operations at the MGP contributed to the creation and release of contamination and Plaintiff has assembled an enormous record to support its contention that UGI controlled those operations.  Indeed, it is consistent with *Bestfoods* for SCE&G to meet its burden of showing that UGI is liable as a former operator of the Charleston MGP by demonstrating that UGI controlled the operations which directly related to the manufacture of gas and thus inherently related to the handling of tar.  The facts, and more importantly, the inferences revolving around this core issue are hotly contested.  On that basis alone, summary judgment is inappropriate.

2.    The Evidence Indisputably Demonstrates that UGI Controlled The Gas Making Processes and Release of Contamination At The Charleston MGP Within The Meaning of *Bestfoods*.

UGI set out to assume operational control of the Charleston MGP in 1910,[36] announced that control to the industry, and maintained that control until 1926.[37]  As noted previously, UGI created an organizational chart for use when the "Charleston properties are taken over." UGIMAN018757, Exh. 8.  The chart provided the initial blueprint for how UGI would direct the operations of Charleston.  "Taken over", a phrase UGI chose, is hardly ambiguous.

Consistent with patterns and practices UGI followed at numerous other MGPs around the country, UGI employed many mechanisms to control Charleston.[38]  The Expert Reports of Thomas Blake and Dr. Neil Shifrin, incorporated herein by reference, explain these accounting and operational control mechanisms in detail.[39]

---

[36] Mr. Blake opines that "UGI approved the incorporation of the Charleston Consolidated Railway and Light Company in order to lease the gas, electric and traction properties from Charleston Consolidated Railway, Gas and Electric (CCRG&E) at the UGI's Directors meeting held of June 8, 1910.  After UGI incorporated CCR&L, it entered into a ninety-nine year lease fro the properties of CCRG&E, with UGI acting as the guarantor of the lease on behalf of CCR&L."  Blake Rpt. at 5, Exh. 17 (citing SCANA035617-35658; UGISC007224-225, Exh. 36).

[37] In 1926, after sixteen years of controlling CCR&L, UGI sold the property to the Southeastern Power and Light Company.  According to *South Carolina Electric & Gas Company: 1846-1964:* "On December 17, 1926, Charleston Consolidated Railway and Lighting Company, Charleston Consolidated Railway, Gas and Electric Company and its subsidiaries...were consolidated to form the first South Carolina Power Company with controlling stock owned by Southeastern Power and Light Company, a holding company with home office in New York City.  Blake Rpt. at 6, Exh. 17 (citing to SCANA002319, Exh. 35)

[38] Stock ownership is not a dispositive factor in a CERCLA operator claim.  That said, UGI was majority stockholder of CCR&L throughout the period it controlled the Charleston MGP.  Blake Rpt. at 13, Exh. 18.  Over the course of UGI's control of the Charleston MGP, UGI continuously purchased CCR&L stock.  *See* Exhibit 1 for examples of UGI's purchasing of CCR&L stock.

[39] *See* Shifrin Rpt. at 44-49, Exh. 15; Blake Rpt. at 16-31, Exh. 17; *See generally* Deposition of Thomas Blake, Exh. 50, and Dr. Neil Shifrin, Exh. 49.

To provide clarity and assistance to the Court in assessing this enormous volume of information, Plaintiff has prepared a chart that categorizes the factual record regarding this issue. *See* Exh. 3. Plaintiff will address each category and sub-category on the chart. Moreover, although UGI will likely argue that some of these categories do not pertain directly to the control of operations that resulted in the contamination, the fact is that UGI's pervasive control here is an issue on many levels. Consequently, all these control categories are relevant. Plaintiff has also identified many, though not all, reasonable inferences that can and must be drawn from these facts in Plaintiff's favor. As a consequence of UGI abandoning its experts and trying to turn this into a document-only case, *every one of these expert inferences and opinions stand unrebutted by UGI and together, present an overwhelming and compelling basis for denying UGI's Motion.*

   3.    Engineering and Operations

        a.    Equipment Design and Installation[40]

UGI designed and installed much of the Charleston equipment, including gas-making, tar and waste-handling equipment. UGI replaced the coal gas plant at Charleston with the Lowe Water Gas Process when it took over the plant in 1910.[41] UGI designed the plans for the Charleston MGP and installed UGI equipment. SCANA001797, SCANA001794, Exh. 28. The plant originally had only 16 coal gas retorts. SCANA001908, Exh. 44. It was refit with two UGI water gas sets, and necessitated that "the present buildings at the gas plant … [ ] be demolished or remodeled and installed with new and improved apparatus." UGISC002830 Exh. 7; SCANA001909, Exh. 44. CCR&L journal entries include purchases related to the installation

---

[40] *See generally* Statement of Contested Facts and Exhibit 1.

[41] "A new gas works was built which was completed in the fall of 1910, the old plant being abandoned…" SCANA001948, Exh. 37. "The holding company [UGI] had come to the aid of the local company. The combination of ample financing ability and engineering experience resulted in the construction of a new, modern and efficient plant, supplanting the inefficient and obsolete plant." SCANA001952, Exh. 37.

34

of UGI water gas sets as well as payments for the drawings and initial inspection of the

apparatus. SCANA001876-77, Exh. 6; SCANA001394, Exh. 6.  The UGI Circle (UGI's official

company publication) confirms that UGI completed the plant in 1912. UGI-Circle000642 Exh. 9.

UGI's resources financed the rebuilding of the MGP.  General Manager G.H. Waring,

stated, prior to completion of the project, "We are going to spend all that money that is needed to

build an up-to-date gas plant and we plan to put the gas mains, pipes and meters into the best

condition possible."  SCANA001908, Exh. 44.  Waring noted the company's resources "were

practically unlimited."  *Id.*

At least three pieces of tar handling equipment were installed between 1910 and 1926 (a

tar separator in 1910 SCANA001912, Exh. 44, a tar still was installed in 1916, SCANA001680,

Exh. 6, and a centrifuge in 1918, SCANA000405, Exh. 6.   In February 1922, a new UGI purifier

was installed.  *The Gas Industry*, February 1922, vol. 22, p. 76, 090979, Exh. 11.  UGI personnel

directly worked on the Charleston gas-making machinery and tested various substances as fuels.

SCANA037733; SCANA032822; SCANA032923, Exh. 11.  *See also* Shifrin Rpt. 45-49, Exh.

15.

Dr. Shifrin identified each piece of plant equipment which handled contaminants and

identified each piece which was controlled by UGI.  Shifrin Rpt., Figure 3, Ex. 15.  Further, he

directly linked this historically present equipment to the contamination in the environment today.

Shifrin Rpt., Figures 6, 7 and 8; *see also* Shifrin Rpt. at 50-64, Exh. 15.[42]  "[T]he presence of a

---

[42] *See also* Shifrin Rpt. at 50, Exh. 15 ("Environmental contamination resulting from UGI's
control of the Charleston plant contributed to the vast majority, if not all, of CPA site remedies.
US EPA's RODs for Operable Units 01 and 02 … required remediation of 6 NAPL [non-aqueous
phase liquid] source areas … and, in my opinion, UGI's operating period is related to at least 5,
and possibly all 6, of those areas").

tar still, centrifuge and dehydrator suggests that tar emulsions were handled during UGI's

tenure."  Shifrin Rpt. at 48, Exh. 15.  Based on the record he concluded that

> UGI's control of plant equipment that handled tar (e.g. holders) and equipment
> that processed tar lead to environmental releases of tar due to leaks and spills.
> Regardless of the level of wastewater control used, tar was released either
> entrained due to imperfect removal technology or as separate, untreated streams,
> and UGI had control over these operations.

Shifrin Rpt. at 49, Exh. 15.  Likewise, Mr. Blake observed, based on his review of documents

such as the UGI Executive Committee minutes, that up through 1919.

> the UGI Engineering Department performed the engineering plans, supervision,
> construction, and tar residual disposal for the local MGPs.  From 1919 through
> the disposition of CCR&L, the same activities were performed by the same group,
> now a UGI subsidiary, at the Philadelphia laboratory.

Blake Supp. Rpt. at 12, Exh. 18.

b.    Waste Handling[43]

As Plaintiff explained above, this case revolves around the reality that gas making

necessarily involved the creation and release of contamination, and UGI exercised pervasive

control over the entire gas making process.  Notwithstanding that point, there is also evidence

showing specific UGI involvement with waste handling functions.

UGI had a Residuals Committee, sometimes called the "Residuals Sales Department",

that was responsible for selling MGP byproducts, such as tar, and was controlled by a UGI Vice-

President.  RIPP03480, Exh. 33; UGI-Minutes-006417, Exh. 8.  "UGI was involved in the sale of

residuals for system companies."  Blake Supp. Rpt. at 12, Exh. 18.  In 1919, that responsibility

within UGI passed to the UGI Contracting Company.  UGI-Minutes-008766, Exh. 8; RIPP03501

("the marketing of residuals will require a well planned sales organization"), Exh. 33.  Tar was

the primary MGP byproduct and, in fact, sales of these byproducts could have a major effect on

---

[43] *See generally* Statement of Contested Facts and Exhibit 1.

an MGP's financial health.[44]  Shirin Rpt. at 7, Exh. 15.  Consequently, managing byproducts sales was very important.

UGI provided analysis of waste products.  On July 14, 1914, Charleston sent UGI two samples of tar and one sample of coke for analysis.  SCANA036306, Exh. 7.  A similar analysis for tar and coke was performed in February 1918.  SCANA002487, Exh. 7.  UGI was also involved in testing emissions from the Charleston MGP.  SCANA002487, Exh. 8.

Discussions at Superintendents Meetings included topics like the intricacies of tar management in relation to various gas-making techniques, tar removal, technical aspects of tar scrubber location and tar/water emulsion separation.  *See, e.g.,* RIPP03474, RIPP03481-82, RIPP03489, RIPP03492, RIPP03541, Exh. 33.  Entire presentations were devoted to discussing comparisons of tar generation at different UGI MGPs, how to increase revenues through better tar management, and general tars sales and management.  RIPP03475-77, RIPP 03492-94, RIPP03515, RIPP03519, Exh. 33.  Instructions were provided on how to clean holders and tanks, and how to address leaks.  RIPP03495, RIPP03543, 091304 ("Mr. Samuel T. Bodine, after there had been discussion of the rules governing the handling of leaks, …), Exh. 33.

The experts were able to draw clear inferences about these events.[45]  According to Dr. Shifrin: "UGI controlled byproduct tar recovery at the Charleston MGP as evidenced by the

---

[44] Waste handling was a focus at Superintendents Meeting:  "To prevent a decrease in the percentage of profit on volume of business done, it has been necessary for the manufacturer or employer to make a close study of conditions.  This has resulted, among other things, in the growth of the by-products business, which, by making use of raw materials that formerly went to waste, now supplies the market with many new and useful products."  RIPP03462, RIPP03533, Exh. 33 ("The Cost of manufacture of coal gas is, of course, largely dependent upon the value of residuals….).

[45] SCE&G's experts have not reviewed the UGI Engineering and Operating Notes.  Nevertheless, SCE&G's counsel believes that analysis of these newly obtained documents will only strengthen its experts' opinions.

equipment present at the time UGI became involved, as well as the installation of tar handling equipment between 1910-1926."  Shifrin Rpt. at 48, Exh. 15; *see also* Section IV(C)(3)(A).  Dr. Shifrin also stated that UGI "was involved with engineering wastewater control at the Charleston MGP."  *Id.* (citing various primary documents in support).  Mr. Blake concluded that "the records not only show UGI involved in the detailed operating management of the Charleston MGP … but the records also show that UGI was involved in the testing, study, and disposal of the tar and other byproducts generated from the Lowe water gas manufacturing activities at the local companies it controlled."  Blake Supp. Rpt. at 9, Exh. 18.

c.    Inspections[46]

UGI regularly conducted inspections of the Charleston MGP.  Evidence of inspections includes, but is not limited to, a report of an inspection and visit from UGI's Superintendent of Works' Department on May 15, 1911, UGIMAN007308, Exh. 8; a February 1915 inspection by UGI's H.R. Cook, SCANA36633, Exh. 7; a November 1920 inspection by UGI's K.M. Irwin, UGI-Circle-004326, Exh. 9; an April 1922 inspection by UGI's O.S. Carter, UGI-Circle-004804, Exh. 9; and May and July 1922 inspections by UGI's J.A. Messenger, UGI-Circle-004804, Exh. 9.  SCE&G has not been able to locate inspection reports and UGI has not produced such reports relating to the Charleston MGP.  In similar litigation against UGI relating to the Concord, N.H., MGP, however, detailed UGI inspection reports were found.  *See* Exh. 48.  Plaintiff assumes UGI prepared similar reports upon inspecting the Charleston MGP.

Dr. Shifrin developed the following opinions about the relevance of these inspections:

These inspections indicate to me at least 3 important things:  1) UGI's active focus on plant operations; 2) UGI's control provided them sufficient access to perform such inspections; and 3) UGI's inspections would reveal to them any waste-handling and tar release information typically considered during that time period.

---

[46] *See generally* Statement of Contested Facts and Exhibit 1.

Shifrin Rpt. at 47, Exh. 15.

       d.     Plant Superintendent/Manager and Other Engineering Personnel[47]

The plant superintendent/general manager, as noted previously, was always someone UGI selected from its organization.  That person was responsible for all plant operations.[48]

G. H. Waring was general manager at Charleston from 1910 to 1917.  Waring was transferred to Charleston from the Omaha Gas Company, another UGI company, on July 1, 1910 to take charge of the construction process.  UGI-Minutes-007107, UGI-Minutes-007241, Exh. 8; RIPP03492, Exh. 33.  On November 14, 1910, the UGI Executive Committee "recommended payment of moving expenses of Mr. G.H. Waring and family from Omaha to Charleston, amounting to $435.03."  UGISC000044, Exh. 8.  CCR&L followed this directive on January 14, 1913. SCANA001469-470, Exh. 6; UGISC000044, Exh. 8.  Waring planned and oversaw construction of the Charleston MGP's new Lowe water gas sets.  SCANA002472, Exh. 44.  At the end of his career, he was known as "[a]n old timer in the UGI" who "served honorably in several of our companies."  UGI-Circle-04641, Exh. 9.

On October 3, 1917, George Waring resigned as general manager.  That position was abolished and C.M. Benedict became vice president "in direct charge of operations".

> Mr. Waring was sent to Charleston by the United Gas Improvement Company
> from Omaha, where he was the head of a large gas plant.  He has been connected
> with public service companies during his business career, having formerly been
> with corporations in Savannah, Atlanta and Omaha.  C.M. Benedict assistant

---

[47] *See generally* Statement of Contested Facts and Exhibit 1.

[48] SCANA001737, Exh. 6; UGISC003789, UGISC003523, Exh. 41; SCANA000427, SCANA000394, Exh. 6; *see also* RIPP03510, Exh. 33 ("The superintendent will be obliged to determine the right operating heats making changes gradually in conjunction with his observations.  However, when operating on a B.T.U. standard it is possible generally speaking, to obtain good oil efficiencies with the oils we are now receiving but it will necessary to supervise the results from day to day closely").

secretary and treasurer of the company, will succeed Mr. Waring as vice-president.  Mr. Benedict was also a U.G.I. man.

090936, Ex. 13.  Thus, operational control passed from one UGI person to another.[49]  On March 22, 1922, Benedict resigned and was transferred to the UGI company in Des Moines, Iowa. UGI-Circle-000103, Exh. 9.  Stuart Cooper (another UGI Man) was appointed vice president and manager of CCR&L.  Rollin Norris, a life-long UGI Man and one of the masterminds of UGI's Cadet Engineer Program, was appointed as the General Superintendent. SCANA000422, Exh. 6.

On June 14, 1923, UGI "recommended" employment of F.C. Hill as Superintendent of the Gas Department and payment of his moving expenses from Allentown, Pennsylvania, (another UGI MGP). UGISC000652, Exh. 8.  After Hill later transferred to Philadelphia,[50] on January 26, 1926, UGI Recommended employment of George H. Park as Superintendent of the Gas Department and payment of his moving expenses from Consumers Gas Co (another UGI MGP). UGISC000745, Exh. 8.

In addition to transferring plant superintendents, UGI regularly transferred Cadet Engineers and other employees to and from Charleston,[51] and routinely approved payment of

---

[49] *See* SCANA001737-1738, Exh. 6; UGI-Circle-000103, UGI-Circle-00-0875, UGI-Circle-001318, UGI-Circle-005665. UGI-Circle-004826, UGI-Circle-007675, Exh. 9.

[50] "Hill, F.C., Superintendent of the Gas Department of the Charleston Consolidated Railway & Lighting Company, Charleston, S.C., for the past two years, is now connected with the Gas Engineering Department of the United Gas Improvement Company of Philadelphia." 91052, Exh. 11.

[51] As described earlier, the Cadet training program was one way UGI controlled its MGPs. Cadets were trained in UGI plant operations and audits.  UGI-Circle-5098, UGISC001248, Exh. 9; UGISC002502, Exh. 39.  The cadet engineers were the backbone of plant operations and rose through the ranks of UGI to operate MGPs around the UGI empire.  The same held true at Charleston.

40

their moving expenses by CCR&L.[52]  CCR&L complied with UGI's directive to pay such

expenses.  SCANA001395, Exh. 6.  UGI also directed the salaries of CCR&L employees.[53]

Mr. Blake concludes, based on the record, that "UGI recognized the importance of

controlling the operating properties like CCR&L by training key employees in the UGI policies

and operating procedures and transferring them among the operating subsidiaries."  Blake Rpt. at

8, Exh. 17.  With respect to the transfer of employees among various companies, Professor

Macey relied on these facts to draw the inference that "these were not independent companies."

Macey Rpt. at ¶ 39, Exh. 19.  Dr. Shifrin testified about what he could infer regarding a Cadet

Engineer that UGI transferred to Charleston:

> The point is he was trained by UGI; he worked for UGI; he was sent to the plant
> by UGI; he ran the plant the way UGI trained him to run the plant; and then when
> he was done he went to another UGI plant.  That, in my opinion is very clear –
> very clear examples of operational control.

Shifrin Depo. at 79, Exh. 49.  In sum, the meticulous way in which UGI always ensured its

people were in charge of the Charleston MGP, and the constant shuffling of UGI Cadet

Engineers loyal to UGI, and steeped in its policies and procedures, creates the reasonable

inference that these patterns of movement were one mechanism UGI used to control its MGPs.

        e.       Raw Materials[54]

UGI generally directed the selection and purchase of feedstocks for the gas

manufacturing process for all its MGPs.  *See, e.g.,* UGISC00026, Exh. 8.  UGI entered into

---

[52] *See generally* Statement of Contested Facts and Exhibit 1; *see also* Blake Rpt. at 14-17, Exh.
17. A cursory review of the UGI management structure reveals that at any given time,
superintendents and cadet engineers were coming and going from various UGI MGPs, including
Charleston. RIPP03480, Exh. 33.

[53] UGIMAN007301, UGISC000698, UGISC000622, Exh. 8; SCANA35322, Exh. 6; *see also*
List of Salary/Wage examples, Exhibit 1.

[54] *See generally* Statement of Contested Facts and Exhibit 1.

contracts on behalf of Charleston for the purchase of coal;[55] gas oil;[56] and coke throughout its

control period.[57]  *See also* Blake Rpt. at 17, Exh. 17.  UGI monitored and tested the coal and gas

oil used at Charleston.  SCANA032874, SCANA036077, Exh. 7.  UGI sent its representative to

Charleston to test different generator fuels.  SCANA032923, Exh. 7.  Dr. Shifrin testified that a

very specific aspect of waste production and management relates to the feedstocks that are used

and their relation to tar generation.  Control of the selection of feedstocks has an impact on tar

creation which, in turn, also relates to tar disposition.[58]

---

[55] *See* UGISC00014; UGISC000090; UGISC000114; UGISC000140; UGISC000174; UGISC000187; UGISC000239; UGISC000341; UGISC000389; UGISC000476; UGISC000581; UGISC000629; UGISC000700; UGISC000733; UGISC000757, Exh. 8.

[56] *See* UGISC000026; UGISC000189; UGISC000257; UGISC000311; UGISC000345; UGISC000413; UGISC000433; UGISC000557; UGISC000581; UGISC000589; UGISC000596-597; UGISC000603; UGISC000619; UGISC642; UGISC000674; UGISC000679; UGISC000697; UGISC000713; UGISC000729; UGISC000755; UGISC000844-845, Exh. 8.

[57] *See* UGISC000113; UGISC000251; UGISC000306; UGISC000327; UGISC000388; UGISC000533; UGISC000571; UGISC000610; UGISC000630; UGISC000654; UGISC000757; UGISC000845, Exh. 8.

[58] **UGI's Counsel:** But telling someone to use a specific oil – taking your example there.  Telling somebody to use a specific oil is not telling that person to then let your tank leak or turn a valve and let tar run out on the ground, correct?  **SCE&G Counsel**: Let me just note an objection to the form of that question.  **Dr. Shifrin:** It's not as explicit as that, but inherent in the design and specification of that operation is the associated knowledge of the tar production and the tar handling requirements.  And, in fact, when considering converting to bitumen or converting to heavy oil, tar generation is a primary consideration.  **UGI Counsel:** Tar generation for sales though?  **Dr. Shifrin:**  Well, the fact that tar is going to be coming out of those condensers and out of the tar separator.  **UGI Counsel:**  It's not – the tar coming out of those, at least, is the transmission – well, you know, chain is not the problem, correct, it's spilled tar?  **Dr. Shifrin:** The point is, really, it's generated tar.  What happens to that tar is another consideration.  Some gets spilled, some gets sold, some gets stored, some gets burned at the plant.  All of that is inherent in the manufacture of gas, and the engineering control of the gas manufacture must consider the whole tar part of the picture. Shifrin Depo. at 70-71, Exh. 49.

4.    Corporate Governance

a.    UGI Dominance of CCR&L Board Actions[59]

The record is replete with facts showing that UGI regularly and methodically directed Charleston to take some action and Charleston complied, thus illustrating the extent to which Charleston was beholden to and constrained by UGI.  These facts also are consistent with how UGI repeatedly described its own methods of control.  *See, e.g.* UGICT005745, Exh. 29, UGIMAN000047-57, Exh. 26; *see also* UGIMAN 18061-63, Exh. 31.  The Blake report documents this point in detail by giving thirty-two examples.  *See* Blake at 16-31, Exh. 17.

While UGI made "recommendations" and the Charleston MGP approved the action in lockstep, Mr. Blake identified several instances where UGI made "recommendations" and there were no corresponding entries in the Charleston minutes.  Blake Rpt. at 31, Exh. 17.  Mr. Blake, considering these instances as part of the broader record, concluded these "UGI recommendations were in fact binding orders to CCR&L…."  *Id.*  Mr. Blake also identified at least six instances where CCR&L took an action and then UGI "recommended" such action *after it already occurred*.  Mr. Blake inferred from these facts that this was evidence of UGI simply formally documenting its strict approval process because "otherwise there would be no reason for the UGI Board to recommend something to CCR&L that had already been approved by the CCR&L Board in its own minutes."  Blake Rpt. at 32, Exh. 17; *see also* Blake Depo. at 15-30, Exh. 50 (explaining that UGI had likely directed these actions by letter).

In sum, while UGI contends that its "recommendations" and/or "authorizations" were simply suggestions, Mr. Blake made an exhausting examination of the records and drew the following contrary inference: "The result of my review shows that UGI 'recommendations' were

---

[59] *See generally* Statement of Contested Facts and Exhibit 1.

in fact instructions or orders to the CCR&L Board." Blake Rpt. at 16, Exh. 17. Professor Macey drew a similar inference: "to the extent that actions at the Charleston MGP were presented in documents as "recommendations" it is clear that this was a fiction and UGI's actions were, in fact, directions." Macey Rpt. at ¶ 79, Exh. 19. Moreover, Mr. Blake also stated that "the examples discussed above whereby the CCR&L Board of Directors approves literally word for word the UGI "recommendations" represents the most compelling documentation I have seen to date that subsidiary Boards of Directors like CCR&L were completely captive to the wishes of UGI." Blake Rpt. at 36, Exh. 17. In addition, the court in Manchester drew a similar inference. *See* Introduction, p. 2-5, *supra*.

> b.     Policies and Procedures[60]

Another UGI control method was promulgation and enforcement of policies and procedures.[61] Based on his review, Mr. Blake noted that UGI had a "strategy of acquiring gas production facilities and installing its Lowe equipment and then operating the production plant and distribution network in accordance with its specific policies and procedures…." Blake Rpt. at 2, Exh. 17. He concluded "virtually all aspects of the local Charleston operations were then subject to regular audits and plant inspections by UGI personnel to assure complete and precise compliance with the decisions and policies of UGI." *Id.* at 10. Mr. Macey opined that "through the distribution of uniform operating procedures, UGI achieved its goal of having all gas plants operated in a uniform, consistent manner." Macey Rpt. ¶ 37, Exh. 19.

---

[60] *See generally* Statement of Contested Facts and Exhibit 1.

[61] *See, e.g.*, RIPP03491, RIPP03505, RIPP03463, 091304, Exh. 33 ("Mr. Samuel T. Bodine, after there had been discussion of the rules governing the handling of leaks, …).

c.      Committees[62]

UGI used various internal committees to manage its MGPs.  The Works Committee,

Management Committee, Executive Committee and Operating Committee are a few examples.

These committees were comprised of the very top level of UGI management and were

responsible for a wide range of MGP issues, from supply purchases, contracts, extensions, plant

betterments, repairs and alterations, to employment issues and a wide variety of matters

pertaining to day-to-day operational control.  UGIMAN000709-710, UGIMAN002881, Exh. 8.

Mr. Blake, explaining the Works Committee, stated that the decisions that Committee

made "were not the type one would expect of an outside consultant or investor…."  Blake Supp.

Rpt. at 7, Exh. 18.  Rather:

> The Fact that this committee met "every day" and included all of the highest
> ranking UGI officials is a testament to the detailed level of management that UGI
> exerted over each of its subsidiary companies.  Specifically, the president and vice
> presidents of this company were making decisions on a daily basis regarding "the
> purchase of supplies, … construction and operation of plants, … legal and
> financial problems," and other various aspects of day-to-day operations.

*Id.*

d.      Key Management[63]

From the outset, UGI ran the Charleston MGP with its own people.  UGIMAN018757,

Exh. 8; Macey at ¶ 74, Exh. 19.  UGI personnel dominated the CCR&L Board.  SCANA001379,

001557-8, Exh. 6; Macey at ¶ 75, Exh. 19.  Throughout its tenure at Charleston, UGI always

ensured that its people were in positions of authority.  Blake Supp. Rpt. at 13-22, Exh. 18;

RIPP03466-03470, Exh. 33 ( listing various UGI companies and showing repeatedly that the

same UGI men are placed in positions of authority all over the country, such as President, Vice

---

[62] *See generally* Statement of Contested Facts and Exhibit 1.

[63] *See generally* Statement of Contested Facts and Exhibit 1.

President, Treasurer, Secretary, Manager, Purchasing Agent and Directors).  Although there are many examples of these relationships recounted in the Statement of Contested Facts and Exhibit 1 and the Expert Reports, one example merits special attention.  P.H. Gadsden was named President of CCR&L when UGI acquired control in 1910.  At that time, he had no apparent previous connection to UGI.  He was transferred to Philadelphia in 1919 where he became a Vice President of UGI.[64]  Gadsden remained President of CCR&L but carried out his duties from his office at UGI in Philadelphia.  *See* Blake Rpt. at 8-9, Exh. 17; UGISC001255, Exh. 9.

Professor Macey, considering all the circumstances under which Mr. Gadsden was transferred to Philadelphia, made the following observations:

> While Gadsden apparently wore two hats during the time he worked for both the Charleston MGP and UGI, it is clear that UGI's management directed Gadsden's management of the Charleston MGP.  The level of UGI's control over the Charleston MGP was so absolute that the President of the Charleston MGP could not even authorize a modest salary raise to retain a valued and long-time Charleston MGP employee without approval from UGI senior management.  For example, in 1922, P.H. Gadsden, the President of the Charleston MGP, wrote to Lewis Lillie, Vice President of UGI at the time, regarding his desire to pay a long-time and valued employee more money.  [Letter from Mr. Gadsden, SCANA066902, Exh. 46.]  The matter was ultimately referred to UGI's President, Samuel Bodine.  Eventually, UGI "approved" Gadsden's "suggestion" that this employee receive a raise.  [Letter from UGI President, SCANA066899, Exh. 67.]

Macey Rpt. ¶ 84, Exh. 19.  This astonishing set of facts illustrates that the supposed leader of the Charleston MGP had so little authority that he actually required the permission of the President of UGI to secure a small salary increase for a local employee.  There is simply no credible way for UGI to explain this set of facts other than to acknowledge it represents unbridled control of CCR&L.  Regardless of what contortions UGI might try undertaking to re-characterize this situation, one point is clear:  it is eminently reasonable to infer from these facts that the local

---

[64] Gadsden became UGI's Vice President for Public Relations.  RIPP03506, Exh. 33.

company President had virtually no authority even over the most trivial aspects of plant management and that all of that authority rested clearly with UGI.

     5.     Finance and Appropriations

     a.     General Control

As a general matter, UGI exercised broad control over CCR&L finances and appropriations. That control extended to such things as approving contracts, authorizing membership dues, convention fees and periodical expenses, and controlling budgeting and auditing. *See* Exhibit 1. The manner in which UGI dominated these sometimes-mundane features provides a further dimension to the broader portrait of UGI control.[65]

Based on his complete review of the record, Professor Macey reached the following conclusion about the role finances played in this relationship:

> UGI did not treat its subsidiary, the Charleston MGP, as an independent company, but rather, it viewed the Charleston MGP as one small part of a larger, integrated system whose finances were controlled by UGI and could be allocated at UGI's discretion to best serve the needs of a particular company at a particular time.

Macey Rpt. ¶ 87, Exh. 19.

     b.     Budgeting[66]

UGI directly reviewed and approved capital expenditure budgets at Charleston. UGI-Minutes-007346, Exh. 8 (Index of capital expenditure approvals from 1910 to 1918); *see also* UGI-Minutes-010557, Exh. 8 (Index to appropriations for annual expenditures from 1919 to 1923). UGI specifically directed that certain expenditures would not be made without prior authorization. UGI-Minutes-010060-61, Exh. 8. UGI's practice was to authorize expenditures in

---

[65] For example, Charleston was required to pay for "dividend checks and notices used by *the Philadelphia office*." SCANA036077, Exh. 7. Regarding this fact, Professor Macey stated: "The CCR&L journal entry is particularly important because it clearly reflects the reality that CCR&L was just another "office" in the UGI empire." Macey Rpt. at ¶ 32, Exh. 19.

[66] *See generally* Statement of Contested Facts and Exhibit 1.

aggregate based on annual estimates and then forbid the operating company to exceed that limit

without UGI authorization.

> Mr. Blake summarized the budget process based on his extensive review of the record:

> Examination of these capital expenditure authorizations reveals the nature of the UGI budget approval process, in which the UGI Executive Committee "recommends" that the local Board of Directors authorize a specific amount for expenditures and also lists possible additional expenditures which specifically cannot be made without approval of the UGI Executive Committee.

*Id.* at 24.

> c.     Donations[67]

The fact that the leaders of UGI passed judgments about whether companies like CCR&L

could make local charitable donations, in amounts as small as $7.50, UGISC000179,

UGISC00010, Exh. 8, illustrates the depth of UGI control.[68]

UGI also created a standard form, titled "small sundry donations."[69]  Mr. Macey,

focusing on this form, which UGI required Charleston to use, offered the following opinion:

"This document is particularly significant because it shows that, contrary to assertions of the

defendants in this case, UGI was not merely keeping books and records of decisions previously

made by CCR&L.  In fact, pre-approval was necessary."  Macey Rpt. at ¶ 79, Exh. 19.

---

[67] *Id.*

[68] *Id.*

[69] It included a place to fill in the company name and directed that "this sheet to be filled out and returned to F.W. Curran."  The form contained the following instructions: "This statement is for listing donations under $10; all donations in excess of $10 to be formally authorized in advance of payment, and when so approved, should not be included on this form."  It also contained a typed-in provision at the bottom that stated "this statement filed monthly attached to financial report as per letter to G.W. Curran, secretary to Stuart Cooper, VP, 6/26/22."  SCANA000058, Ex. 14.

d.     Expenditures[70]

As UGI president Samuel Bodine said in 1916, "no expenditures of money are made without the approval of the executive committee, which keeps full minutes of its proceedings for submission monthly to the board of directors." UGIMAN012265, Exh. 8. UGI followed through on that philosophy at the Charleston MGP, constantly overseeing expenditures.[71]

e.     Audits[72]

UGI was obsessed with auditing its subsidiaries. As the more than fifty references to audits show, UGI used audits as one mechanism to micromanage the Charleston MGP.[73] Plaintiff's experts, having reviewed this extensive record, conclude that the auditing function was also a method whereby UGI closely controlled Charleston. Blake Rpt. at 10, Exh. 17; Macey Rpt. at ¶ 37, Exh. 19.

### D.     Conclusion

In sum, the control UGI exerted at Charleston was very much like the facts described in the 1894 Daily Philadelphia Stockholder. Exh. 32. UGI designed, installed, inspected, operated and maintained gas making and tar handling equipment. It placed its own people in control of the plant and the gas-making and tar-handling functions. It managed feedstocks and residuals. It tightly controlled the CCR&L Board and dictated actions to the Board on a routine basis. It withheld decision-making power from the local President on the most mundane issues. It viewed the Charleston MGP as a small part of an integrated empire, treating its finances accordingly, and moving engineering talent among the controlled plants like pieces on a chessboard.

---

[70] *See generally* Statement of Contested Facts and Exhibit 1.

[71] *Id.*

[72] *Id.*

[73] *Id.*

This record completely destroys the notion that UGI was simply an advisor or consultant. The totality of UGI control in the first instance, and specific control as it relates to waste in the latter instance, are the centerpieces of this case.  To say there are no material issues of fact or inferences to be drawn from those facts regarding UGI's control of the Charleston MGP is simply not credible.  SCE&G's three experts have thoroughly reviewed the record and, based on their specific areas of expertise, have drawn inferences from that record which demonstrate UGI controlled all aspects of the Charleston MGP'S operations from 1910 to 1926.  UGI was ultimately responsible for the leakage and disposal that happened during the time it controlled the Charleston MGP.  Accordingly, UGI's Motion for Summary Judgment should be denied.

**V.    DEFENDANT'S CLAIM THAT VARIOUS STATUTES OF LIMITATION BAR PLAINTIFF'S ACTIONS PRESENTS AN INTENSE FACTUAL DISPUTE, IS CONTRARY TO LAW AND IS INAPPROPRIATE FOR DISPOSITION BY SUMMARY JUDGMENT.**

**A.    The Claim That SCE&G's Actions are Time-Barred Presents Intense Controversy Regarding Material Facts And Is Inappropriate for Summary Judgment.**

Section 113(g)(2) of CERCLA sets forth the statute of limitations provisions for a cost recovery action and provides in relevant part:

Actions for recovery of costs.  An initial action for recovery of the costs referred to in section 107 must be commenced –

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action, must be brought within 6 years after a determination to grant a waiver under section 104(c)(1)(C) for continued response action; and

(B) for a remedial action, within 6 years after the initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recover action brought under this subparagraph.

Inherent in the application of these statute of limitations are two intertwined, factually intensive and disputed inquiries.  First, to determine whether an action to recover response costs is timely filed, one must determine whether the response action is a "remedial" or a "removal" action.  Second, one must determine what act triggers the starting of the applicable statute of limitations.

UGI's first tries to argue that a "permanent remedy" was selected for the site (which started the 6 year "remedial" limitations period) and the Complaint was not filed within that period.  The testimony of witnesses and the various agency documents describing the clean-up process undercut this argument.  This is another exaggerated, unfair attempt to avoid a trial where the credibility of UGI's un-cited experts and their disputed contentions can be tested.[74]

Four witnesses, who are either employed or retained consultants intimately familiar with the response, were deposed.  *See* Exhs. 53, 54, 55, and 64.  Moreover, the testimony of numerous federal, state and municipal employees who have been involved in the planning, classification, and execution of the clean-up operations may be required at trial.  It is clearly evident that the Court cannot resolve this issue without weighing the testimony of the people involved in the clean-up, as well as drawing inferences which relate to the proper categorization of complicated responses to an unusual environmental site.

SCE&G's principal environmental manager, Thomas Effinger, supervised this clean-up for over ten years and testified for a full day.  He refuted UGI's contention that there was an established permanent remedy which would have started the limitations clock.  He testified that

---

[74] The claim that the statute of limitations has run as to SCE&G legal claims was presented to SCE&G in the report of UGI's engineering expert, Jay Vandeven, and is the subject of a direct response by Plaintiff's expert, Dr. Shifrin, in his Supplemental Report, dated May 2, 2008.  Dr. Shifrin directly contests UGI's factual claims relating as to the nature and timing of the cleanup. Shifrin Supp. Rpt. at 6-10, Exh. 16.

numerous aspects of this supposed "permanent remedy" have not yet even been determined.[75]

Andrew (Rusty) Contreal, the consultant mainly responsible for the response action, dispelled

UGI's argument about the timing of the remediation, and testified at length about the

administrative and engineering work that was done.[76]  SCE&G's consultant, Ishwar Murarka,

testified that the remediation is not complete, and that there still is not a permanent remedy.[77]

These witnesses, together with the clear language of the various agency documents,

unequivocally show that a permanent remedy was not fixed more than six years before filing of

the Complaint.[78]  The key features of this sharp factual dispute are summarized below.

1.    The Clean-Up At This Site Has Continued To Evolve Over Time

The elements of this response action have evolved, and been added to and modified at

numerous times, thus undercutting the notion there is any permanent remedy in place.  There has

been ongoing, extensive interaction between SCE&G and the regulators, and those parties have

differed about approaches to particular issues.  For example, to date, the regulators have been

unable to decide whether a "pump and treat" system is necessary to address groundwater

contamination.  There are other similar uncertainties going forward:  (1) addressing

---

[75] *See* Deposition of Thomas N. Effinger, dated May 8, 2008 ("Effinger Deposition") attached as Exh. 53 at 129-132 and 157-159; *see also* Shifrin Supp. Rpt. at 5, Exh. 16.

[76] *See generally* Deposition of Andrew Contreal, dated April 1, 2008 ("Contreal Deposition") attached as Exh. 54.

[77] *See* Deposition of Ishwar Murarka, dated April 1, 2008 ("Murarka Deposition")  attached hereto as Exh. 55.

[78] UGI contends that SCE&G's claim for the $26 million dollar payment to the City of Charleston is time-barred and not recoverable under SCE&G's § 107(a) claims.  As discussed throughout this section, the $26 million is not time-barred because it is a part of the overall response action and the statute of limitations has not run on either the removal and/or remedial action.  Moreover, in his Supplemental Report, Dr. Shifrin describes the response work performed as a result of SCE&G's payment to the City.  Shifrin Supp. Rpt. at 11-12, Exh. 16.  This is all work SCE&G would have had to do on its own as a part of the response action but for the accelerated timeline because of the City's desire to redevelop this area.  UGI's assertion that this payment related to a franchise agreement with the City of Charleston is wrong.

contaminated sediments in the Cooper River has been deferred while the City of Charleston considers a possible observation deck park in that area; (2) there is no resolution about how to address contamination under or near former Gas Holder Number One; (3) tar pumping at the site continues and there is no way to know when it will be complete; (4) the regulators are contemplating expanding the site to include the adjacent ship container yard and are considering conducting a soil vapor intrusion study; and (5) and the ongoing monitoring and assessment of the groundwater and overall clean-up is projected to continue for many years, if not decades.[79]

> 2.    In 1998 It Was Specifically Contemplated That More Work Would Be Needed To Design And Implement A Permanent Remedy

The work at the site pursuant to the 1998 ROD was limited to "NAPL" (non-aqueous phase liquid) source areas, shallow groundwater contamination and contaminated soils.  It expressly reserved the issues of sediments and surface water contamination in addition to intermediate groundwater contamination for a later ROD.  *See* UGISCEPA018761, Exh. 58.  Accordingly, the establishment of a comprehensive remedy was expressly deferred until at least the establishment of that second ROD in 2002.

> 3.    Key Clean-Up Measures Were Not Even Selected Back At The Point UGI Argues The Limitations Period Began Running

In the 2002 ROD, the plan for groundwater remediation involved injection of oxygen chemical products into contaminated soils (even at that time details about this process had not been determined).  The decision to address groundwater remediation in this manner, which

---

[79] *See* Effinger Deposition at 129-132 and 157-159, Exh. 53; *see also* Shifrin Supp. Rpt. at 6-10, Exh. 16.

represents one of the key components of the site clean-up, was not even determined at the date which UGI argued would establish the time-bar for this claim.[80]

This 2002 ROD also described the need to redo the health risk assessment for the site, and described and discussed the extensive soil excavation which was ongoing.  It contemplated at least twelve (12) years of groundwater monitoring and at least five (5) years of dynamic tar recovery or pumping.[81]  The 2002 ROD described various changes to the actions in the 1988 ROD (such as altering the location of wells, changes in the methods of calculating levels of certain PAH's, and dramatic expansion in cost projections related to the overall response).  Indeed, the 2002 ROD described the challenges of addressing this site, and the need to do the planning and work in phases because of inherent uncertainties.[82]  Those uncertainties, such as the presence of ongoing tar seeps and other contingencies, was a driving force in 1998 that caused the agencies to defer the preparation of a more comprehensive plan.[83]

These facts beg the obvious question:  How could SCE&G have filed its claims on the date UGI says suit should have been filed when the substance and extent of the work required by the regulators had not even been established?

_____

[80] *See* 2002 ROD, Selection of Remedy for Intermediate Groundwater § 12.2.1, SCANA 028582-028183, Exh. 59.

[81] A pumping system has been installed which extracts free tar from under the site.  At its peak in 2002, 400 gallons of tar were being pumped a month.  Currently, pumping averages 160 gallons per month.  Contrael Deposition at 74, Exh. 54.

[82] "Because uncertainty exists regarding the ability of the remedy to achieve groundwater target clean-up goals, due to the presence of residual DNAPL (dense non-aqueous phase liquid) in the intermediate zone, a phased approach has been selected for implementation."  2002 ROD, § 13.2, Exh. 54.

[83] As the 1998 ROD stated: "Environmental risks are presently unresolved due to the ongoing discharge of coal tar from seeps as discussed in Section 4.  The environmental risks resulting from these seeps, in addition to the overall environmental risk associated with this site, will be evaluated under Operable Unit 2, and addressed in a second ROD for this site."  Section 6.0, 1998 ROD, Exh. 58.

4.    It May Not Even Be Technically Possible To Address All The Contamination

From the outset, the environmental agencies and SCE&G recognized that this challenging site will likely require a determination of "Technical Impracticability" under appropriate EPA rules.[84]  This provision governing Technical Impracticability is rarely employed and is largely related to unusually complicated and challenging sites.  At the present time, the regulatory agencies have resisted the formal implementation of such a finding, deferring that decision until virtually all available conventional methodologies have been exhausted.  The reality however is that a "Technical Impracticability" finding is likely in the future and it will dramatically change the nature of the overall response.[85]  This significant contingency exemplifies the fact the no permanent remedy has been selected for this site.

5.    Conclusions

In sum, the response action has continued to evolve and be modified over time; the agencies recognized the early work was not a permanent remedy; key clean-up measures had not even been assessed or selected at the time UGI says the limitations period started running; the removal and remedial components here are completely intertwined; and, it is likely certain contamination may be technically impracticable to address.  These facts negate UGI's argument that physical onsite construction of the final remedy began more than six years before the complaint was filed.

UGI, of course, disputes this history and its implications and inferences.  UGI makes its time-bar argument by selectively culling testimony from Plaintiff's consultants and experts,

---

[84] This eventuality is set forth in the initial Record of Decision and is reiterated in the 2002 Record of Decision.  "Should EPA ultimately make a determination of technical impracticability based on an evaluation of the supporting data, the remedy would be reevaluated and documented by a ROD amendment."  1998 ROD, at 7.1.2, Exh. 58.  *See also* 2002 ROD, Exh. 59.

[85] Effinger Deposition at 191-192, Exh. 53.

ignoring the clear and complete explanations they have provided when their testimony is

weighed in its entirety.  And, of course, UGI has its own un-cited experts who have opined on

this issue, but UGI's tactical plan omits any reference to that body of disputed evidence.  There is

no basis for summary judgment on such a record.

B.    **The Clean-Up Of The Charleston Facility Is A Complicated, Interrelated Remedial And Removal Action, But The Categorization Of The Facility Can Only Represent One Removal And One Remedial Action With No Permanent Remedy In Place**

UGI next attempts a slightly different approach to its time-bar argument.  First, it tries to

segment the clean-up into separate removal or remedial actions and then claim various time bars

apply to each segment.  Almost without exception, courts widely reject this common tactic.

Second, UGI tries to categorize most of the clean-up as "remedial," even to the point of taking

work which unquestionably involves the physical removal of contaminants (such as excavation

of 68,000 tons of impacted soils) and recasting it as "remedial" in nature.  UGI tries this

desperate tactic because the statute of limitations for removal actions begins to run on

<u>completion</u> of the removal activities.  42 U.S.C. § 9613(g)(2).  Completion is very broadly

interpreted to include ongoing monitoring and assessment.  *See* 42 U.S.C. § 9601(23).  Thus, to

the extent there is any removal here, and there is,[86] there is no credible basis to even argue for a

time-bar.

By recasting removal work as remedial, UGI hopes to claim that the "initiation" of

physical construction started the six-year limitations clock running.  The problem with this

approach, as even UGI concedes, *see* Def.'s Memo at 57, is that a "remedial action" under

---

[86] The continued pumping of tar on a daily basis, the continuing work on river sediments, the work yet to be done under Holder Number One, and the ongoing evaluation and monitoring of groundwater, all unquestionably preclude the argument that the work is complete.  These facts should end this inquiry.

CERCLA § 101(24), must be "consistent with permanent remedy" for the site.  Thus, UGI is

back to where it started and, again, it's argument is fatally flawed because from a factual (and

common sense) perspective, there is no permanent remedy.

The judicial authority regarding categorization of remedial vs. removal actions also runs

squarely against UGI.  First, and most critically, no matter how many phases, sequences,

modifications, assessments, revisions, or undertakings of clean-up activities occur, there is only

<u>one</u> removal action and only <u>one</u> remedial action for each "facility"[87] under CERCLA.[88]  Second,

the vast weight of authority dictates that the determination of whether an action is remedial or

removal in nature is based on a review of the facts related to the work, not the labels used by the

parties.  *California Dept. of Toxic Substances v. Alco Pacific*, F. Supp.2d at 1135 N.10.  The

term "removal" applies not only to on-site activities, but ". . . includes the time needed to dispose

of the removed material as well as the time needed to evaluate the need for further activity."

*U.S. v. Aberdeen,* 929 F.Supp. 989, 992 (N.D. Miss. 1996).[89]  How the agency labels an action is

---

[87] It is undisputed, as the 1998 and 2002 RODs, and the ESD state, that there is one "Facility" here.  *See* Exhs. 58, 59, and 60.  UGI does not argue otherwise.

[88] *Colorado v. Sunoco, Inc.,* 337 F3d 1233, 1241 (10th Cir. 2003) ("In our view, this language indicates there will be but one 'removal action' per site or facility, as well as a single 'remedial action' per site or facility"); *Kelly v. E.I. Dupont,* 17 F3d 836, 844 (6th Cir. 1994) (finding a single removal action in the context of multiple removals, multiple contractors, and revisions); *California Dept. of Toxic Substances v. Alco Pacific, Inc.,* 308 F.Supp.2d 1124, 1131 (C.D. Cal. 2004) (noting "[t]here can only be one single removal action"); *Geraghty and Miller v. Conoco, Inc.,* 234 F3d 917 (5th Cir. 2000) (finding one removal action, spanning 12 years); *Pneumo-Abex v. Bessmer and Lake Erie Railroad Co.,* 936 F.Supp. 1250, 1261 (E.D. Va. 1996) (holding that multiple removal activities in 1986, 1992, 1993, and 1994 represented one removal action in a case involving a 1992 ROD, amended in 1994 and a 1995 Explanation of Significant Differences, which revised the permanent remedy and extended the statute of limitations).

[89] *See also, U.S. v. Allen,* 1990 WL339488 (D. Ark. 1990); *Public Service of Colorado v. Gates Rubber Company,* 175 F.3d 1177, 1182 (10th Cir. 1999) (recognizing that there may be overlap between remedial and removal response actions, but noting that "any distinction between 'excavation' of contaminated soil and 'removal' of contaminated soils, is one that eludes us.") (citing *G.E. v. Litton,* 920 F.2d 1415, 1419 (8th Cir. 1990)).

afforded little deference, thus eliminating much of the reliance UGI places on the reference to

"remedial action" within the body or title of the two RODs.  *Sunoco, Inc.*, 337 F.3d at 1243.

UGI tries to resurrect its claim by suggesting that the creation of the 1998 ROD, and the

work undertaken pursuant to it, constitute the first work done under some permanent remedy.

But UGI ignores the express language in the 1998 ROD stating that a major part of the response

action, namely groundwater, was expressly not included in the 1998 ROD.  UGISCEPA018761,

Exh. 58.  Indeed, this issue was reserved for later, and ultimately addressed in the 2002 ROD.

UGISCEPA028505-609, Exh. 59.  It makes no sense that a permanent remedy could have been

in place back in 1998 when major portions of the contamination had not even been addressed.

UGI's time-bar arguments require the court to virtually ignore the plain language of the

2002 ROD and the 2005 Explanation of Significant Differences (ESD).  UGISCEPA024879-

882, Exh. 60.  Indeed, with one notable exception, UGI largely avoids reference to the 2002

ROD.  *See* Def.'s Memo at 69.  Instead, UGI attempts throughout its brief to portray the initial

1998 ROD (dealing with surface soil) as the final "remedy" for the whole site.  UGI then tries

supporting this argument with a few readily distinguishable cases.  As Plaintiff made clear

previously, the factual record demonstrates that there is no permanent remedy here.

The policy reasons underlying the case law in this area do not revolve around giving

responsible parties technical avenues to cutoff meritorious claims.  Rejecting a statute of

limitations argument by parties urging the existence of multiple separate "removal" actions, the

District Court in *Alco Pacific, Inc.* noted:

> On a practical level, this appears to be the correct approach because it is apparent that the
> clean-up of toxic waste can often only be accomplished in phases.  It would defeat the
> purposes of the statute to require the government to sue responsible parties at the
> conclusion of each phase.

308 F.Supp.2d at 1134 (citing *Kelly v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 843 (6th Cir. 1994)).  The court recognized that determining whether a response is remedial or removal also required waiting until the final plan or permanent remedy is established:  "...actions cannot be classified as remedial when the government has yet to issue its final decision and only that decision will define the ultimate remedial strategy."  *Id.* at 1136 (citing *Geraghty and Miller, Inc.*, 254 F.3d at 927).  If the approach is not defined, the time bar date cannot even be determined.

In *City of Wichita v. Aero Holdings, Inc.,* 177 F.Supp.2d 1153 (D. Kan. 2000) the court found installation of groundwater recovery wells, air stripping towers, and related construction did not represent initiation of physical construction six (6) years before the complaint was brought.  The court found that "initiation" of "construction of the remedial action" cannot occur if the design of the final remedy has not been disclosed in some form: "the court concludes that remedial action cannot be "initiated" within the meaning of § 113(g)(2)(B) unless the permanent remedy is disclosed with some certainty . . . " .  *Id.* at 1180.

This reasoning helps eradicate UGI's argument.  UGI essentially makes the same claim, like the defendant in *City of Wichita*, that the ultimate remedy chosen, even if not in existence at the time when the applicable time-bar is set, would likely prove to be "consistent" with the work earlier done.  *City of Wichita* rejected that bootstrap argument: "...the evidence is so vague as to what the final remedy will be that the court could not possibly determine on summary judgment whether the present action was consistent with the final remedy."  *Id.* at p. 1180.  Extinguishing the argument UGI presumably makes here that the earlier physical construction ended up being "consistent" with the plan once it was established, the court goes on to note

> early activities at a facility incorporated into the final remedy cannot be
> considered in the hindsight as remedial action.  Because it fortuitously may be

> consistent with the final remedy . . . cannot form the basis for concluding that
> § 113(g)(2)(B) was triggered."

*Id.* at 1180.

The case law is clear. Whether the court adopts the sensible and practical "bright line"

approach in *California v. Neville Chemical*, 358 F.3d 661 (9th Cir. 2004) (holding that there

must be formal adoption of a final remedial action plan), or some similar concept, it is sound

policy and essential under the statute that a permanent remedy be <u>in place</u> before physical

construction can be said to start the limitations period running. Numerous other cases stress the

essential requirement for there to be finalization of the permanent remedy before a remedial

action can start, and that ongoing work precludes "completion" of a removal action.[90]

---

[90] *Sherwin-Williams v. Artra Group*, 125 F. Supp.2d 739, 747 (D. Md. 2001) (actions preceding the implementation of the permanent remedy considered as one removal action); *Illinois v. Grigoleit Company*, 104 F.Supp.2d 967, 975 (C.D. Ill. 2000) (removal action not complete so long as plaintiff continues to evaluate, assess and monitor the land where the hazardous materials were disposed of ". . . it is clear that the Facility has not been cleaned up and, based upon the case law, the removal action is not completed"); *NutraSweet v. X-L Engineering Corp.*, 926 F.Supp. 767, 770 (N.D. Ill. 1996) (removal is based on and encompasses more than plain meaning. "It is simply inconsistent with CERCLA's essential purpose to require suit on each arguably independent removal activity"); *U.S. v. Poly-Carb*, 951 F.Supp. 1518, 1529 (D. Nev. 1996) (finding that "closing out" of the site, including removal of contamination and disposal, removal of all equipment and electric power, bringing the site to a "final" "intended" condition, satisfy the term "removal"). *See also California v. Celtor Chemical Corp.*, 901 F.Supp. 1481, 1489-90 (N.D. Cal. 1995) (removal option not necessarily complete simply because no new contamination exist in the soil); *Hillsborough County v. A & E Road Oiling Service*, 853 F.Supp. 1402, 1412 (M.D. Fl. 1994) (the limitations period begins to run ". . . when all contamination is removed"); *U.S. v. Rohm and Haas Co.*, 790 F.Supp. 1255, 1264 (E.D. Penn. 1994) (statute did not run even though physical removal complete while EPA monitored and assessed the potential for release and threat of release); *One Wheeler Road Associates v. Foxboro Co.*, 843 F.Supp. 792, 796 (D. Mass. 1994) (". . . the fact that the entire contamination was not removed in one single endeavor does not start the statute of limitations running as to the completed part of the contamination removed. Rather, the contamination is perceived as a whole and removal of one portion is just one piece of the pie. Not until all portions of the contamination are removed can the removal be deemed complete"); *U.S. v. Chromatex*, 832 F.Supp. 900 (M.D. Penn. 1993) *aff'd* 39 F.3d 1174 (3rd Cir. 1994) (continued assessment of prior performed work prevented clock from beginning to run); *U.S. v. United Nuclear Corporation*, 814 F.Supp. 1552, 1562 (D.N.M. 1992) (statute found to have not run because EPA continued to monitor the site); *U.S. v.*

In the face of this compelling, widely accepted precedent, UGI cites a variety of inapplicable, unpersuasive cases. UGI attempts to categorize actions at Charleston as something other than "removal" by focusing on language of cases indicating that removal responses "typically" involve a more short-term or emergency response to environmental contamination. Def.'s Memo at 55-66. Yet even UGI recognizes that labels provided by the parties are not controlling and it is the actual nature of the clean-up that determines the proper characterization. Def.'s Memo at 58; *See also Sunoco, Inc.*, 337 F.3d at 1243.

Indeed, it is sometimes possible that a "removal action" is a short-term response. But UGI's argument in the context of this summary judgment motion is dead on arrival. The facts here, elicited through testimony from SCE&G's employees and consultants, together with the agency documentary record, show this response has included repeated, ongoing removal of contaminants over a long time period. It is common sense to recognize that repeated and ongoing extraction of contamination from the soil, and proper disposal, is a removal action.

UGI's reliance on *Shaefer v. Town of Victor*, 457 F.3d 188 (2d Cir. 2006); *U.S. v. Navistar*, 152 F.3d 702 (7th Cir. 1998); *California v. Hyampom Lumber*, 903 F. Supp.1389 (E.D. Cal. 1995) and *Douglas Auto Tech v. Scott Fetzer Co.*, 2008 WL 205217 (W.D. Mich. 2008) is misplaced. The facts of those cases are distinguishable from the facts here. As discussed more fully above, there is no final remedial plan for this MGP. Elements of the remedy are constantly evolving and work on the site is still being done. Moreover, this is an unusual, complicated site utilizing a phased approach involving two RODs and an ESD. These documents, along with the

---

*Peterson Sand and Gravel*, 824 F.Supp. 751, 755 (N.D. Ill. 1991) (remedial investigation and feasibility removal action study are completed by the EPA's issuance of it's record of decision); *U.S. v. Corbett*, 785 F.Supp. 81, 81-82 (E.D. Tex. 1990) (three major response activities over four years resulted in statute of limitations not running until all actions are complete); *U.S. v. Allen*, 1990 WL 339488 *6 (D. Ark. 1990) (removal not limited to onsite activity but includes time to dispose of materials and to evaluate major further action).

testimony of SCE&G's consultants and experts all demonstrate that this response action is far from over.  Indeed, unlike the cases relied on by UGI, numerous elements of the response action have not even been established.

The Charleston MGP is the clear case: there is no permanent remedy and the removal activities are still, unquestionably, incomplete.  The two RODs and the ESD tell the story of an uncertain, evolving, dramatically revised remedy structure, which six (6) years before the filing of SCE&G's complaint, did not even exist.  Not only did the facts change over time, but the technology and efficiency of proposed actions evolved.  In a case such as this, where response action is clearly evolving and ongoing, it would be unfair for the statute of limitations for either a remedial or a removal action to run when the party had no way of knowing the time clock on its claim had even started.

UGI invites this court to go further than any court has ever gone by looking at the facts in hindsight and declaring that SCE&G should have guessed that all the events subsequent to the 1998 ROD would have occurred.  UGI further invites the court to eradicate the policies underlying the fair and sensible use of statute of limitations, and ignore the extensive, contested factual record which the court would have to address to make such a determination.  The court should decline these invitations.

**VI.    UGI'S CLAIM THAT THE RESPONSE COSTS PLAINTIFF INCURRED ARE NOT CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN IS FACTUALLY DISPUTED AND WITHOUT MERIT.**

The response costs SCE&G incurred in investigating, remediating and monitoring the Charleston MGP to date have involved constant interaction, oversight and approval from EPA

and state regulators.  The witness testimony details SCE&G's conformity to agency directives.[91]
The documents also confirm this fact.  There is simply no basis for UGI's claims that SCE&G
did not substantially comply with the NCP.

As a threshold matter, this issue is unquestionably the subject of material factual disputes
that make it unsuitable for summary judgment.  Moreover, proper resolution of this factual issue
would require not only examination of this testimony, but also weighing the witness' credibility,
and assessment of the many inferences in this record.  Notwithstanding these points, at its heart,
UGI's argument revolves around the assertion that the scope of SCE&G's excavation work was
inconsistent with the plan specified in the 1998 ROD for OU1, and thus it was inconsistent with
the NCP.  UGI is mistaken.

First, the EPA documents at issue expressly recognize and confirm that the work was
undertaken consistent with the NCP.  The ROD for OU#1 provides, "[t]he remedy described has
been selected under the authority granted in CERCLA and is consistent with the requirement of
the NCP."  1998 ROD at § 9.0, Exh. 58.  Likewise, the ROD for OU#2 states: "The remedy has
been selected under the authority granted in CERCLA and is consistent with the requirements of
the NCP.  2002 ROD at § 12.0, Exh. 59.  The 2002 ROD also specifically refers to the
excavation of soils and, in fact, plainly recognizes that the work was consistent with the goals of
the 1998 ROD.  *See* 2002 ROD at SCANA028506-508; SCANA028517-518, Exh. 59.

Second, EPA issued the ESD in 2005, which was expressly designed under EPA
procedures to note, explain and ratify the ways in which the actual work was done.  The ESD
specifically, and conclusively for purposes of UGI's Summary Judgment argument, identifies the

---

[91] "**UGI's Counsel**:  All right.  What, if any, of these costs are consistent with the NCP as
reflected in your prior exhibits?  **Mr. Effinger**:  "I believe they all are."  Effinger Deposition at
197, Exh. 53.

fact that the removal of soil and groundwater at issue was appropriate as an acceptable

modification to the original methodology described in the document.[92]

Third, EPA and the South Carolina Department of Health and Environmental Control's

oversight and approval of the excavation and removal activities was detailed in the 2006 Interim

Remedial Action Report ("IRAR"), which contains a detailed analysis of all the work.[93]  The

EPA approved the IRAR by letter dated October 19, 2007[94] refuting UGI's contention that the

agency did not approve the action, and setting out further factual dispute on this issue.

Fourth, Mr. Effinger testified that EPA representatives aware of the excavation activities,

they were on-site monitoring the work and providing constant confirmation that the work was

proper and consistent with agency directives.  Effinger Deposition at 199-200, Exh. 53.

Private party response costs are consistent with the NCP if the action, evaluated as a

whole, is in <u>substantial compliance</u> with the requirements of the NCP and results in a CERCLA

quality clean-up.  40 C.F.R. 300.7009 (c)(3)(i).[95]  EPA amended the NCP requirements in 1990

---

[92] "This ESD clarifies the remedial clean-up as it has been implemented at the site and explains how it differs from the description that is contained in the OU1 ROD.  The modification does not fundamentally change the selected remedy but provides for an alternate method of achieving and maintaining performance standards."   UGISCEPA024879, Exh. 60.

****

"Concurrent with site-wide redevelopment, a significant volume of NAPL was removed during the excavation of over 63,000 tons of impacted material . . . .  Additionally, during the excavation activities, a perimeter collection and recovery trench was installed with over fifty NAPL recovery wells.  This NAPL recovery is ongoing and to date, over 14,000 gallons of free product (coal tar) have been collected, removed and disposed."   UGISCEPA02480, Exh. 60.

[93] "Furthermore, signature of this Interim Remedial Action Report (IRAR) by the EPA's Chief of Superfund Remedial Site Evaluation Branch documents the completion of the Pre-Final/Final Inspection and provides certification that the remedy for OU#1 is Operational and Functional." SCANA090348, Exh. 61.

[94] *See* letter Kenneth A. Lucas to Thomas N. Effinger, dated October 19, 2006 attached as Exhibit 63 (from Mr. Contrael's files).

[95] *See also Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005) (emphasis added); *Louisiana-Pacific Corp v. Ascarco Inc.*, 6 F.3d 1323, 1342 (9th Cir. 1993).

to avoid the inequitable outcome of allowing a responsible party to avoid reimbursement

obligations for an environmentally sound clean-up by asserting minor procedural discrepancies.[96]

The challenge UGI now makes in attempting to avoid its responsibility here is exactly the type of

tactic the 1990 amendments to the NCP sought to eliminate.  The ESD and the IRAR expressly

approved work that could not have been anticipated in either the 1998 or 2002 ROD, but plainly

were necessary and consistent with the stated and expressed goals of the RODs, and the NCP.

Consequently, UGI's Motion must be denied.

**VII.    UGI IS LIABLE AS AN OWNER UNDER CERCLA BECAUSE THE UNDISPUTED FACTS AND REASONABLE INFERENCES, ALL VIEWED IN A LIGHT MOST FAVORABLE TO PLAINTIFF, SUPPORT PIERCING THE CORPORATE VEIL**

**A.    The Applicable Law Supports Plaintiff's Veil-Piercing Claim**

In a CERCLA case where the parent uses the corporate form "to accomplish certain

wrongful purposes" the corporate veil may be pierced.  *Bestfoods*, 524 U.S. at 62.  "Nothing in

CERCLA purports to rewrite this well-settled, principle, either."  *Id.* at 63.  Plaintiff recognizes

that application of this doctrine requires "substantial reflection."  *Baker v. Equitable Leasing*

*Corp.*, 275 S.C. 359, 367 (S.C. Ct. App. 1980).  However, piercing the veil here is appropriate

because of the significant number of facts and inferences that show UGI was an "owner" under

CERCLA, and Plaintiff is "mindful of the liberal construction CERCLA must be afforded so as

not to frustrate probable legislative intent."  *See U.S. v. Kayser-Roth*, 272 F.3d 89, 93 (1st Cir.

2001) (discussing the District Court's decision to pierce the corporate veil for these reasons).

---

[96]*See Alan-1 America v. Northern Illinois Gas Co.*, 904 F. Supp. 833, 835 (N.D. Ill. 1995); *see also Norfolk Southern Railway v. Gee Co.*, 2002 U.S. Dist. LEXIS 18980 *95 (2002) ("The reduced standard for compliance encourages responsible parties to act promptly to address contamination with confidence that response costs can be recovered later.").

Ultimately, Plaintiff must show that UGI's control over the Charleston MGP was "not consistent with the normal control" that a parent has over its subsidiary. *Bestfoods*, 524 U.S. at 61.

South Carolina courts use a two-prong veil-piercing test. *Sturkie v. Sifly*, 280 S.C. 453, 457-458 (S.C. Ct. App. 1984). The first prong is "an eight factor analysis of the shareholder's relationship to the corporation and looks to the observance of the corporate formalities by the dominant shareholders."[97] The veil piercing inquiry need not rest on a single factor. *Id.*

The second prong requires the plaintiff to prove "an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the [shareholder]." *Sturkie* 280 S.C. at 457-58 (citing *Dewitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685 (4th Cir. 1976)). Fundamental unfairness can exist in the absence of fraud and can be proven by a lesser showing than reckless disregard. *Multimedia Publ'g of S.C. v. Mullins*, 314 S.C. 551, 554 (S.C. Ct. App. 1993).

As UGI pointed out, there is some uncertainty as to whether state law or federal common law should be applied to resolve a CERCLA veil piercing claim. Def.'s Memo at 23. In most respects, the tests are the same and require the *Sturkie* two-pronged approach. However, regarding the first prong, the federal veil piercing inquiry focuses more on "the totality of the circumstances" to assess whether "the parent exercised such pervasive control over the subsidiary that the subsidiary was merely the alter ego of the parent." *U.S. v. Union Corp.*, 259 F.Supp. 2d 356, 389 (E.D.Pa. 2003).

---

[97] *Dumas v. Infosafe Corp.*, 320 S.C. 188, 192 (S.C. Ct. App. 1995) (citing *Sturkie*, 280 S.C. at 457; *Cumberland Wood Prods. v. Bennett*, 308 S.C. 268 (S.C. Ct. App. 1992)). The eight factors are: (1) whether the corporation was grossly undercapitalized; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of the debtor corporation at the time; (5) siphoning of funds of the corporation by the dominant stockholder; (6) non-functioning of officers or directors; (7) absence of corporate records; and (8) the fact that the corporation was merely a façade for the operations of the dominant stockholder. *Dumas*, 320 S.C. at 192.

**B.    Based On The Totality Of The Circumstances, UGI Failed To Observe Corporate Formalities and Therefore Summary Judgment Is Inappropriate.**

Under both the federal and State approaches to this prong, this inquiry centers on the observance of corporate formalities and the "totality of the circumstances." *Union Corp.*, 259 F.Supp.2d at 389. The focus must therefore be, as UGI described it, on whether CCR&L was a "facade for UGI", and thus, its alter ego. Def.'s Memo at 34. The veil piercing inquiry is highly fact-intensive. *Lumpkin v. Envirodyne Indus.*, 159 B.R. 814, 819 (N.D.Ill. 1993). Consequently, resolving issues like this on summary judgment is generally inappropriate.

UGI attempts to meet its high burden here by providing a scant two pages of discussion on facts pertaining to the "facade" issue. Def.'s Memo at 34-35. By so doing, UGI largely ignores the voluminous record showing UGI's total dominance of CCR&L and the activities of the Charleston MGP, and whitewashes the fact that there is a significant amount of other information that supports the contention that CCR&L was merely a facade for UGI.

Rather than confront this extensive factual record, UGI chooses an isolated example to refute the notion that CCR&L was, in essence, UGI's puppet. Specifically, UGI points to the "recommendations" it offered to CCR&L and the false premise that there has been no showing that "CCR&L was unable to properly consider these recommendations before acting in its own best interest." Def.'s Memo at 34. Ironically, as noted previously, the record pertaining to these "recommendations" extensively documents that CCR&L was a facade for UGI. In addition to the fiction that UGI's directives were somehow only "recommendations", Plaintiff has cited dozens of examples illustrating UGI's total dominance of CCR&L. *See* Exhibit 1.

Likewise, the UGI minutes and other various documents in this record cannot be taken at face value and certainly do not "speak for themselves." Def.'s Memo at 3. UGI controlled its MGPs, but attempted to hide this control for many reasons. It is in this context that Plaintiff has

analyzed and interpreted these historical records to determine the true nature of the relationship between UGI and CCR&L.  There are many inferences that can be drawn in Plaintiff's favor from an in-depth review of UGI and CCR&L's minutes.  Most significantly, it can be inferred, as is discussed at length by Plaintiff's experts in their reports, that CCR&L made its decisions based solely on instruction given by UGI and, as such, UGI was in fact the alter ego of CCR&L.

Defendant is attempting to frame Plaintiff's veil-piercing argument as one based on the existence of dual officers. See Def.'s Memo at 21-35.  This is an inaccurate representation of Plaintiff's position.  Under *Bestfoods*, having dual officers is insufficient, <u>by itself</u>, for piercing the corporate veil.  524 U.S. at 69.  However, Plaintiff does not rely solely or even primarily on dual officers for this argument.  Dual officers are one component of UGI acting as the alter ego of CCR&L.  The above examples and documentary evidence show the numerous ways in which UGI acted with total domination over CCR&L.

That the documents in question are ambiguous and use wording that is inaccurate or subject to varying interpretations, such as "recommendations" where "directive" may be more accurate, highlights the need for experts to put in context and explain the true meaning of the documents.  Where the documents "shed light on the character and import of the actions" taken long ago, expert testimony is appropriate to interpret those documents. *Breyer v. Meissner*, 2002 WL 922160 (E.D.Pa. 2002).  Further, any dispute over whether an expert is needed to prove that documents do not speak for themselves is better addressed at trial, rather than beforehand.[98] Because there are significant disagreements over the reasonable inferences to be drawn from the documents, summary judgment should be denied. *See Avery v. County of Burke*, 660 F.2d 111,

---

[98] *See Burton v. R.J. Reynolds Tobacco Co.*, 183 F.Supp.2d 1308, 1314 (D.Kan. 2002) (denying a Motion to Exclude, where Defendants argued that the documents speak for themselves, because the Court was unable to determine the appropriateness of such expert testimony without knowing the "actual circumstances" in which the testimony would be given).

116 (4th Cir. 1981) (vacating summary judgment where "the parties [did] not dispute the basic

facts, [but] they reasonably disagree[d] about the inferences that can be drawn from them").

Aside from the documentary evidence, UGI also ignores evidence that CCR&L was

undercapitalized.  Plaintiff's corporate governance expert, Professor Macey, testified that the

focus here is, in part, on how much capital the subsidiary has, but more importantly "the ability

of the parent company – in this case UGI – freely to transfer money in and out of the subsidiary."

Macey Depo. at 66, Exh. 51.  Therefore:

> critical to the inquiry about capitalization in a case like this is going to be the power of
> the parent to move money around at will among the various components of its enterprise.
> And in this case, in the UGI situation, there's substantial evidence that UGI had the
> ability and did, in fact, exercise the power to move money at will in and out of these
> subsidiaries.

*Id.* at 67.  Professor Macey pointed to the Manchester Transaction as an example.  *Id.* at 68.

Because UGI had the ability to move money at will:

> you can't just look at the balance sheet of the subsidiary and say "Oh, gee, there's a lot of
> capital there" because two minutes later the parent could reach in and pull money out
> shift it around.

*Id.* at 66-67.  Professor Macey also opined that:

> UGI did not treat its subsidiary, the Charleston MGP, as an independent company but
> rather, it viewed the Charleston MGP as one small part of a larger, integrated system
> whose finances were controlled by UGI and could be allocated at UGI's discretion to best
> serve the needs of a particular company at a particular time.

Macey Rpt. ¶¶ 87, 88, Exh. 19.

In sum, given the substantial body of evidence validating the dispute over the totality and

manner of UGI's control and whether that extensive control rendered UGI the alter-ego of

CCR&L, UGI cannot satisfy its summary judgment burden with respect to this first prong.

**C.     UGI's Actions Were Unjust and Fundamentally Unfair and Therefore, UGI Cannot Meet Its Burden Under The Second Part of The Veil-Piercing Test**

The second prong of the veil-piercing test requires injustice or fundamental unfairness. *Dumas*, 320 S.C. at 192.  Fundamental unfairness can exist in the absence of fraud and can be proven by a lesser showing than reckless disregard.  *Multimedia*, 314 S.C. at 572.  Ultimately, in a veil piercing analysis, the court "is concerned with reality, not form."  *C.T. Lowndes & Co. v. Suburban Gas & Appliance Co., Inc.*, 307 S.C. 394, 406 (S.C. Ct. App. 1991).

The "reality" here is that UGI worked diligently to mask its control and create the appearance that companies like CCR&L were independent.  Macey Rpt. at ¶ 26, Exh. 19.  UGI maintained this charade, in part, to avoid inquiry into practices that benefited UGI to the detriment of its subsidiaries.  Eventually however, regulators and legislators became aware of these practices, and "the relationship between UGI and its subsidiary companies became the subject of intense national concern".[99]  Ultimately, FTC investigations and extensive Congressional hearings led to the passage of the 1935 Public Utility Holding Company Act (PUHCA).  Throughout the process, "UGI vigorously protested efforts by the government to break up its tightly managed empire."  Macey Rpt. at ¶ 52, Exh. 19 (citing UGICT005777, Exh. 29).  While all the events leading up to the passage of PUHCA are not entirely relevant here, certain aspects of that long process bear directly on the injustice and unfairness issue central to this inquiry.

Commentators at the time described how UGI benefited to the detriment of subsidiaries like Charleston:  "The same group sits on both sides of the table in fixing management fees, construction costs and financing charges….".  Macey Rpt. at ¶ 34, Exh. 19, *see also* Exh. 66.

---

[99] Macey Rpt. ¶ 34, Exh. 19 (citing Isidor Feinstein, "Corporate Tammany  Halls," *The Nation*, Dec. 18, 1935, at 710, attached as Exhibit 66).

UGI took advantage of its companies by having the UGI Contracting Company perform the majority of their construction work.  UGI-Circle004212, Exh. 9.  As a consequence of these activities, the consumers ended up paying "a premium on inefficient operation, costly management, and a bloated capital structure."  Macey Rpt. at ¶ 34, Exh. 19, *see also* Exh. 66.[100] "UGI's various subsidiaries, Feinstein noted, were providing the parent company with average annual returns ranging from 11 percent to as high as 84 percent."  *Id*.

These types of improprieties were also described in other portions of the record.  In 1921, the United States Justice Department stated that UGI had:

> secretly absorbed its remaining competition and had engaged in collusive bidding which enabled it to secure exorbitant prices.  It continually and successfully sought to restrain and monopolize trade in violation of the Sherman anti-trust act of 1890.[101]

An employee of the UGI Contracting Company acknowledged improprieties to a Federal Trade Commission investigator in 1935, indicating that the costs UGI charged its subsidiaries to do work "far exceeded competitive prices for similar work," and that the work often exceeded estimates.  He indicated that subsidiaries "were forced to pay greatly in excess of the true value of the services" and that the work would have been done much less expensively if it had been bid

---

[100] "The vise of these business practices was that the holding company charges took the form of 'excessive management fees, unreasonable construction costs, excessive payments for supplies and equipment, and unduly high charges for interest and for underwriting services.'"  Voorhees, Utility Holding Companies and Manufactured Gas Plant Sites at 3, *citing* Bonbright and Means, *The Holding Company* (McGraw Hill 1932) at 180, RIPP05001, Exh. 62.

[101] Macey Rpt. at ¶ 52, Exh. 19 (citing James N. Giglio, Attorney General Harry M. Daugherty and the United Gas Improvement Case 1914-1924, accessed on November 29, 2007 at http://cip.cornell.edu/DPubS/Repository/1.0/Disseminate/psu.ph/1130880121/body/pdf; R. Colton Lewis Memorandum, February 3, 1921, DJF 60-156-6; Investigation of the Honorable Harry M. Daughtery, U.S. Senate Select Committee, 68th Cong., Ist Sess. (Washington, D.C., 1924), pp. 2748-49), Exh. 52.

competitively. Blake Rpt. at 18, Exh. 17 (citing 040700-702, Exh. 71).[102] According to

Professor Macey, UGI was required to create the pretense that local companies were controlled

by their boards of directors in order that the lucrative service contracts that these local companies

had with their corporate parents would not be deemed legally void." Macey Rpt. at ¶ 54, Exh.

19.

Another telling example of this behavior involved a transaction UGI orchestrated

between several controlled subsidiaries, including Charleston.[103] This transaction, in which UGI

employed a Robin Hood-like approach to corporate finance – where it transferred funds from a

well-financed subsidiary to an undercapitalized subsidiary (Charleston) – is a striking example of

the power UGI had over its subsidiaries and the disregard it displayed for corporate formalities.

In brief, that transaction involved the following facts. The Peoples Gas Light Company

of Manchester, New Hampshire (PGL) was a UGI subsidiary controlled in the same manner as

Charleston. When UGI acquired Charleston in 1910, capital was needed. Part of that capital

was supplied from the PGL's reserve fund.[104] UGI, *without approval from the PGL Board of*

*Directors*, sold bonds from PGLs reserve fund and used the proceeds to purchase for PGL stock

---

[102] "The FTC and the Senate found that holding companies, while providing services to operating
and subsidiary companies, clearly disadvantaged those companies. They reported that: (1) the
concentration of earnings using preferred and non-voting stock raised earnings in some cases as
high as 138%; (2) often the service charges (management fees) were excessive, as were the
profits earned; (3) in many cases, the charges for services rendered were not based on cost but
rather on excessive and sometimes extortionate rates; (4) profits on services rendered by the
holding companies ranged from 20 to 179%; the excessive profits concentrated earnings further
in the hands of those who controlled the holding companies." Voorhees at 7, RIPP05005, Exh.
62.

[103] This topic was the focus of detailed trial testimony in the Manchester case. It is deeply ironic
for UGI to argue that there is no triable issue presented here when this precise transaction has
already been the subject of a Federal trial.

[104] A Reserve Fund is a "rainy day" fund that a utility maintains. It is held to finance
"replacements and betterments." Blake Depo. at 174, Exh. 50.

in Charleston. Affidavit of Thomas Blake ("Blake Aff.") at 8, attached as Exh. 23. UGI "approved" this transaction before the PGL Board even had a chance to consider it. *Id.* at 9. *It was not until two weeks later that the PGL Board approved this transaction. Id.* at 10. The PGL Board had no opportunity to discuss or evaluate these investments. *Id.* at 11. Remarkably, the investments that UGI forced PGL to sell were bonds that had a guaranteed revenue stream from interest payments. The Charleston stock had no such guaranteed revenue. *Id.* at 12. The "absence of this guaranteed revenue could have put PGL at a cash flow or liquidity risk," *id.*, yet UGI ignored that threat to PGL and never even gave PGL the chance to assess that threat. As Plaintiff's expert testified with respect to PGL's forced purchase of the Charleston stock: "It's a delinquent investment in stock in another company, at this point unproven even, but they [PGL] didn't know that." Blake Depo. at 178, Exh. 50.

UGI may try to dismiss these astonishing facts by claiming Charleston received the unauthorized funds and was not hurt in any way, so it is irrelevant. But by framing the wrong question, UGI will compel the wrong answer. The reality is that this transaction provides an unequivocal example of UGI engaging in activities that are the epitome of corporate wrong-doing. It was no more acceptable for UGI to engineer this transaction than it was for an undercapitalized Charleston company to receive the infusion of ill-gotten proceeds. Viewed in the totality of the circumstances, this is one more example of the manner in which UGI thoroughly dominated companies like CCR&L, and acted in its own best interest, regardless of the negative effect those actions had on the subsidiaries.

### D.    Summary of Veil-Piercing Analysis

UGI fails to mention almost all of the facts Plaintiff relies on to support its veil-piercing claim. Moreover, as noted earlier, UGI chose not to retain its normal corporate governance

expert, Professor Dale Oesterle, to address this issue.  Thus, the record is devoid of any effort to rebut these facts and the many inferences that must be drawn from them in Plaintiff's favor.

Based on UGI's view of this case, these documents (the Feinstein article, the Justice Department memorandum and the testimony of the UGI Contracting Company employee to the Federal Trade Commission investigator) all speak for themselves.  As such, UGI does not want the Court to recognize the need for interpretation based on the historical context of UGI's business dealings.  In that context, UGI has not, and cannot, refute this compelling evidence showing the injustices UGI perpetrated on subsidiaries including Charleston.

Viewed in retrospect, the injustice and unfairness here was UGI using its subsidiaries, like Charleston, as part of a broader scheme to move capital among subsidiaries without any regard for the damage it might cause those companies, to "fix management fees, construction costs, financing", to compel consumers to pay "a premium on inefficient operation, costly management, and a bloated capital structure", to engage in "collusive bidding which enabled it to secure exorbitant prices" and to extract from subsidiaries charges for work "greatly in excess of the true value of the services."  Given this factual record, UGI cannot sustain its burden to obtain summary judgment on the veil-piercing issue.  Consequently, UGI's motion should be denied.

## VIII.  CONCLUSION

For all the above reasons, UGI's Motion for Summary Judgment should be denied.

74

Dated this 1st Day of July 2008.

Respectfully submitted,
South Carolina Electric & Gas Company
By Its Attorneys,

By:    s/Elizabeth B. Partlow, Federal ID # 2992
       Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
       1320 Main Street, Suite 600
       Columbia, South Carolina 29201
       Telephone:    (803) 252-1300
       beth.partlow@ogletreedeakins.com

       s/Bruce W. Felmly
       s/Barry Needleman
       s/Cathryn E. Vaughn
       McLane, Graf, Raulerson & Middleton,
       Professional Association
       900 Elm Street, P.O. Box 326
       Manchester, New Hampshire 03105
       Telephone (603) 625-6464
       bruce.felmly@mclane.com