# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| South Carolina Electric & Gas Company, )<br><br>Plaintiff/Counterclaim-Defendant, )<br><br>v. )<br><br>UGI Utilities, Inc., )<br><br>Defendant/Counterclaim-Plaintiff. ) | Civil Action No. 2:06-cv-02627-CWH |

**OBJECTION TO DEFENDANT UGI UTILITIES, INC'S MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* UNDER *DAUBERT* AND *BESTFOODS* TO EXCLUDE PLAINTIFF'S PROFFERED EXPERT TESTIMONY ON "OPERATIONAL CONTROL" AND "ENGINEERING CONTROL" FROM JONATHAN R. MACEY, THOMAS M. BLAKE, AND NEIL S. SHIFRIN**

Elizabeth B. Partlow, Federal ID # 2992
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1320 Main Street, Suite 600
Columbia, South Carolina 29201
Telephone:   (803) 252-1300
beth.partlow@ogletreedeakins.com


Bruce W. Felmly
Barry Needleman
Cathryn E. Vaughn
McLane, Graf, Raulerson & Middleton,
  Professional Association
900 Elm Street, P.O. Box 326
Manchester, New Hampshire 03105
Telephone:   (603) 625-6464
bruce.felmly@mclane.com

**TABLE OF CONTENTS**

LIST OF EXHIBITS ......................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iv

1.      INTRODUCTION ......................................................................................... 1

2.      LEGAL STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY .......... 9

    A.    *Daubert's* Liberal Standard Necessitates A Finding That The Court Not Limit The Testimony Of The Plaintiff's Experts ............................................... 10

    B.    Because This Matter Will Be Determined Before A Judge, The Standard For Expert Admissibility Is Lowered, And Therefore The Court Should Not Limit The Plaintiff's Experts' Testimony ..................................................... 11

    C.    The Plaintiff's Experts Are Qualified To Testify In This Matter ...................... 12

    D.    The Testimony That The Plaintiff's Experts Will Provide Is Both Relevant And Reliable ............................................................................................. 13

    E.    The Testimony That The Plaintiff's Experts Will Provide Will Assist The Trier Of Fact ....................................................................................................... 16

3.      ARGUMENT .............................................................................................. 17

    A.    Introduction ................................................................................................ 17

    B.    Dr. Neil Shifrin ........................................................................................... 19

        1.    Dr. Shifrin Is Unquestionably Qualified To Testify About "Operational Control" At The Charleston MGP .......................................... 20

        2.    Dr. Shifrin's Opinions Are Highly Dependent On Specialized Knowledge And His Knowledge Is Essential Here To Address The Issues At The Heart Of This Case. ................................................... 22

        3.    Dr. Shifrin's Opinions Are Unquestionably Reliable And Relevant. ....... 24

    C.    Mr. Thomas Blake ...................................................................................... 27

        1.    Mr. Blake Is Qualified To Testify About UGI's Operational Control Of The Charleston MGP .......................................................... 27

        2.    Mr. Blake's Operational Control Opinions Are Based On His Specialized Knowledge ..................................................................... 28

        3.    Mr. Blake's Operational Control Opinions Are Reliable And Relevant .. 30

    D.    Professor Jonathan Macey .......................................................................... 31

        1.    Professor Macey, A Yale Law School Dean And Professor, Is A Highly Regarded Expert On Corporate Governance Qualified To Offer Opinion Testimony On UGI's Operational Control Of The Charleston MGP ....... 31

        2.    Professor Macey's Corporate Governance Expertise Is Specialized Knowledge That Will Assist The Court In Determining Ownership Liability .......................................................................................... 33

        3.    Professor Macey's Opinions Are Reliable And Relevant ........................ 34

**4.    CONCLUSION ........................................................................................................ 35**

# LIST OF EXHIBITS

| Exhibit No. | Document |
|---|---|
| Exhibit 1 | Defendant's Motion for Summary Judgment |
| Exhibit 2 | Transcript of Hearing on Motion for Summary Judgment (Oct. 20, 2008) |
| Exhibit 3 | UGI Corporation:  The First 100 Years (UGICT0508-5742) |
| Exhibit 4 | Order on Motion in Limine (ENI v. UGI, March 14, 2003) |
| Exhibit 5 | Excerpts from Day 4 Morning Session, ENI v. UGI (June 5, 2003) |
| Exhibit 6 | Excerpts from Day 4 Afternoon Session, ENI v. UGI (June 5, 2003) |
| Exhibit 7 | Excerpts from Day 5 Afternoon Session, ENI v. UGI (June 6, 2003) |
| Exhibit 8 | Con Ed Trial Transcript (11/25/03) |
| Exhibit 9 | Opposition to Motion for Summary Judgment |
| Exhibit 10 | Excerpts from Neil Shifrin, Ph.D.'s Expert Report |
| Exhibit 11 | Excerpts from the Deposition of Neil Shifrin, Ph.D. |
| Exhibit 12 | Excerpts from Thomas M. Blake's Expert Report |
| Exhibit 13 | Excerpts from the Deposition of Thomas M. Blake |
| Exhibit 14 | Excerpts from Jonathan Macey's Expert Report |
| Exhibit 15 | Excerpts from the Deposition of Jonathan Macey |
| Exhibit 16 | Curriculum Vitae of Neil Shifrin, Ph.D. |
| Exhibit 17 | Curriculum Vitae of Thomas M. Blake |
| Exhibit 18 | Curriculum Vitae of Jonathan Macey |
| Exhibit 19 | Giglio Article |
| Exhibit 20 | Judgments in Prior Cases |
| Exhibit 21 | Shifrin Testimony (UGI v. Lloyds, et al) |
| Exhibit 22 | Excerpts from Day 2 – ENI v. UGI (June 3, 2003) |
| Exhibit 23 | Excerpts from the Deposition of Thomas M. Blake (Yankee Gas, et al. v. UGI) |
| Exhibit 24 | Excerpts from the Deposition of Creighton Hoffman |
| Exhibit 25 | Rochester Gas Decision (August 8, 2008) |
| Exhibit 26 | Unpublished Case Law |

- *Atlanta Gas Light Co. v. UGI Utilities, Inc., et. al,* 2005 U.S. Dist. LEXIS 43592 (M.D. Fl. March 22, 2005).
- *East Tennessee Natural Gas Co. v. 7.74 Acres in Wythe County, Virginia,* No. 06-1716, 2007 WL 1482000 (4th Cir. May 22, 2007).
- *U.S. v. Farah,* No. 06-4712, 2007 WL 2309749 (4th Cir. 2007).
- *Simo v. Mitsubishi Motors North America, Inc.,* Nos. 06-1529, 06-1570, 2007 WL 2332349 (4th Cir. August 15, 2007).
- *Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc.,* No. 05-1621, 2006 WL 1526131 (4th Cir. May 31, 2006).
- *1325 "G" Street Associates, LP v. Rockwood Pigments NA, Inc.,* No. Civ.A.DKC 2002-1622, 2004 WL 2191709 (D.Md. Sept. 7, 2004).
- *Thompson v. Queen City, Inc.,* No. Civ.A. 2002359-18, 2002 WL 32345733 (D.S.C. July 9, 2002).
- *Cary Oil Co., Inc. v. MG Refining & Mktg., Inc.,* No. 99 Civ. 1725(VM), 2003 WL 1878246 (S.D.N.Y. April 11, 2003).

# TABLE OF AUTHORITIES

## FEDERAL CASES

1325 "G" Street Associates, LP v. Rockwood Pigments NA, Inc., No. Civ.A.DKC 2002-1622, 2004 WL. 2191709 (D.Md. Sept. 7, 2004) ....................................14, 15

Atlanta Gas Light Co. v. UGI Utilities, Inc., et. al, 2005 U.S. Dist. LEXIS 43592 (M.D. Fl. March 22, 2005) ......................................................................... 4

Cary Oil Co., Inc. v. MG Refining & Marketing, Inc., No. 99 Civ. 1725(VM), 2003 WL. 1878246 (S.D.N.Y. April 11, 2003) ........................................ 34

City of Bangor v. Citizens Communications Co., 437 F. Supp. 2d 180 (D. Me. 2006)......................................................................................................... 24

Consolidated Edison of New York v. UGI Utilities, Inc., No. 01-cv-8520 (S.D.N.Y. November 25, 2003) ...................................................................... 4

Cooper v. Smith & Nephew, Inc., 259 F.3d 194 (4th Cir. 2001) ................................... 14

Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993)......................................10, 14

East Tennessee Natural Gas Co. v. 7.74 Acres in Wythe County, Virginia, No. 06-1716, 2007 WL. 1482000 (4th Cir. May 22, 2007) ..................................10, 12, 15

EnergyNorth Natural Gas, Inc. v. American Home Assurance Co., et al, No. 99-cv-502-JD, aff'd 452 F.3d 44 (1st Cir. 2006)............................................ 24

Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624 (E.D.N.C. 2008)..12, 13, 14

General Electric Co. v. Joiner, 522 U.S. 136 (1997) ..................................................... 15

Gonzalez v. Nat'l Board of Medical Examiners, 225 F.3d 620 (6th Cir. 2000) .............. 11

Kopf v. Skyrm, 993 F.2d 374 (4th Cir. 1993) ...........................................................10, 17

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)......................................10, 14

Nimely v. City of New York, 414 F.3d 381 (2nd Cir. 2005).......................................... 16

Oglesby v. General Motors Corp., 190 F.3d 244 (4th Cir. 1999).................................. 15

Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc., No. 05-1621, 2006 WL. 1526131 (4th Cir. May 31, 2006) ....................................................................14, 15

Rochester Gas and Electric Co. v. GPU, Inc., No. 00-cv-6369, 11 (W.D.N.Y. August 8, 2008)........................................................................................ 4

Schultz v. Butcher, 24 F.3d 626 (4th Cir. 1994) ...................................1, 3, 11

Shreve v. Sears, Roebuck, & Co., 166 F. Supp. 2d 378 (D.Md. 2001) ...............12, 14, 16

Simo v. Mitsubishi Motors North America, Inc., Nos. 06-1529, 06-1570, 2007 WL. 2332349 (4th Cir. August 15, 2007) ................................................. 14

Thompson v. Queen City, Inc., No. Civ.A. 2002359-18, 2002 WL. 32345733 (D.S.C. July 9, 2002)........................................................................... 15

United States v. Bestfoods, 524 U.S. 51 (1998)  ............................................8, 25, 26, 29

U.S. v. Bilzerian, 926 F.2d 1285 (2nd Cir. 1991).................................... 17, 20, 21, 22, 23

U.S. v. Farah, No. 06-4712, 2007 WL. 2309749 (4th Cir. 2007)................................... 10

U.S. v. Kayser-Roth Corp., 272 F.3d 89 (1st Cir. 2001) .................................. 8

U.S. v. Prince-Oyibo, 320 F.3d 494 (4th Cir. 2003)........................................ 15

Westberry v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999)......................10, 14, 15

## DOCKETED CASES

EnergyNorth Natural Gas, Inc. v. Century Indemnity Co., et al., No. 99-cv-049-M ....... 24

EnergyNorth Natural Gas., Inc. v. Lloyd's, Underwriters at London, No. 97-cv-064-M .......................................................................................24, 25

EnergyNorth Natural  Gas, Inc. v. UGI Utilities, Inc., No. 00-cv-500-B ("Manchester Case") (D.N.H. March 14, 2003) ........................................ 2

## FEDERAL STATUTES

Fed.R.Evid. 401 ............................................................................. 13

Fed.R.Evid. 702 ..........................................................................10, 12, 16

## 1.      INTRODUCTION

Defendant UGI Utilities, Inc.'s ("UGI" or "the Defendant") Motion In Limine to Exclude Plaintiff's Expert Testimony ("Defendant's Motion") is nothing more than a second summary judgment motion styled as a *Daubert* motion.  There are, in fact, no technical or scientific issues raised here that even merit a *Daubert* review.  Moreover, given that this matter will be handled as a bench trial, conducting a *Daubert* review now is really a "useless procedure."  *See Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994).

It is virtually impossible to understand how UGI can distinguish the gist of its Motion *in Limine* from one of the central arguments in its failed summary judgment motion.  Specifically, UGI argued that the historic documents "speak for themselves" and therefore, experts are not needed in this case.  Defendant's Motion for Summary Judgment at 3, Exh. 1.  The Court rejected that argument.  Transcript of Hearing on Motion for Summary Judgment (October 20, 2008) ("Summary Judgment Hearing") at 71:5-6, 75:11-13, Exh. 2.  UGI has now repackaged that same argument, expanded it and asked the court to consider it again.  This example, among many others, illustrates why this *Daubert* exercise is a poor use of time and resources.  These issues have been addressed, yet the parties and the Court will now have to expend considerable additional resources to re-visit them.  And in the context of this matter being tried as a bench trial, even UGI does not seriously argue that the Court needs to be protected from itself as it hears the expert testimony.  *See* Defendant's Memo at 8 (stating "UGI is well aware that judges in non-jury cases generally exercise great latitude in accepting testimony and witnesses").

There is no question that the expert testimony South Carolina Electric & Gas ("SCE&G") offers here is critical for the Court to understand key elements of this case.  SCE&G elaborated on that point in great detail in its Opposition to the Defendant's Motion for Summary Judgment

("Opposition"). Although these experts will assist the Court in many ways, two areas in particular deserve attention. First, UGI's nationwide empire[1] was subject to a highly organized system of rigorous controls. The scope of this empire, and the depth of UGI's control over it, is illuminated by thousands of data points that the experts have assembled in a coherent manner and explained in the context of the eccentric relationship between UGI and the Charleston MGP. Analyzing UGI's conduct outside the context of its highly integrated system of controlled companies, and without reference to its well honed methods of control, would be a critical oversight. It is unlikely the Court would have prior or general knowledge of this remarkable set of facts. Second, expert testimony here will focus on the details of MGP operations and how the management of the facility directly led to the contamination that is being remediated today. MGPs were highly specialized, complex operations.[2] There are no living fact witnesses to testify about how operational decisions and procedures directly led to how the contaminants were released. The only way to understand this issue (and the manner in which it related to UGI's control and its period of control) is through expert testimony.

The Defendant's Motion also loses sight of several other significant points. First, these same experts have already testified in other identical, or extremely similar, cases. In each case, the courts received the testimony as evidence. In fact, UGI's *Daubert* motion was denied by Judge Barbadoro in the Manchester, New Hampshire case. *See* Order from *EnergyNorth Natural*

---

[1] UGI ridicules the use of the term "empire". *See* UGI's Motion at 33, 34, 39. But it was the term UGI used to describe itself. <u>UGI Corporation: The First 100 Years,</u> UGICT005742, Exh. 3 ("This expansion was concentrated in northern New Jersey, New York, New York, Connecticut, and eastern Pennsylvania, the region which would become the solid base of the company's **public utility empire.**" (emphasis added)) Moreover, it is in fact a perfect description of the nationwide network of manufactured gas plants that UGI once controlled.

[2] As described more fully below in Section III(B)(1), Plaintiff's expert Dr. Shifrin provides a thorough explanation of how MGPs operated and how the contamination being cleaned up today was caused by these operations.

*Gas, Inc. v. UGI Utilities, Inc.*, No. 00-cv-500-B ("Manchester Case") (D.N.H. March 14, 2003), Exh. 4.  Second, the Defendant does not really come to grips with the reality that the Fourth Circuit has found that excluding evidence that may be deemed prejudicial in a bench trial is a "useless procedure." *Schultz*, 24 F.3d at 632.  This is so because exclusion of such evidence is done to "protect the jury from drawing improper inferences," which is not an issue in a bench trial. *Id.* at 631.  Third, UGI repeatedly, and erroneously, argues that SCE&G's witnesses have not addressed what is required under *Bestfoods*.  It is, in fact, impossible to understand how UGI could make such an argument given the meticulous and exhaustive effort SCE&G undertook to address the *Bestfoods* requirements in its Opposition to UGI's Motion for Summary Judgment.

There is no doubt that SCE&G's experts are qualified and offer relevant, reliable, and helpful testimony.  UGI frames its motion as if this question exists in a vacuum when, in fact, it has already been answered.  SCE&G's experts have testified previously in the precise roles for which they are being offered here, and they have unique and extensive knowledge regarding UGI's operations.  As he stated in the Manchester case, Judge Barbadoro expressly found Dr. Shifrin's opinions on UGI's engineering and operational controls ". . . very helpful and useful to me in explaining how the gas business works.  He said some things that I consider to be relevant and potentially useful on the extent to which there was direction and control by UGI." Transcript of Manchester case, Morning of Day 4, at 33, Exh. 5.  The Judge went on to reference Dr. Shifrin as a "very helpful witness . . . ." *Id.* at 37, Exh. 5.  He also noted that the Court "profited from [his] testimony in many respects." *Id.*, Afternoon of Day 4, at 92, Exh. 6.

In that case, Judge Barbadoro also sharply criticized UGI's offered law professor, Dale Oesterle, but as to plaintiff's expert, Professor Macey, Judge Barbadoro stated, "I appreciate the witness; you had some interesting testimony, very helpful to me." *Id.*, Afternoon of Day 5, at 86,

Exh. 7.  Another federal district court also recently commented favorably on Professor Macey's testimony.[3]  As these examples illustrate, these precise issues have been covered elsewhere and resolved in SCE&G's favor.  There is no reason to plow that ground again.

While Judge Barbadoro did comment at various times in the Manchester trial on whether the experts in some cases were straying into areas reserved for his ultimate determinations, UGI cannot seriously argue that the presentation of that expert testimony was not critical to the settlement of the case after eight days of trial.  In addition, UGI's oft-cited references to the *Con Ed* and *Atlanta Gas* summary judgment motions,[4] and the rulings made by the courts in those cases, do little more than illustrate why factually intensive expert examination of UGI's control is so critical.  SCE&G's counsel was not involved in those cases, the evidence of UGI control was limited as presented in those cases, and the courts found that the *Bestfoods* standard was not met.  The evidence presented and the examination by UGI's counsel in this matter bears no relationship to the events in those cases, as the Court seemed to find when it rejected UGI's

---

[3] The Court noted in *Rochester Gas*: "While the ultimate determination whether corporate governance norms were violated by [Associated Gas and Electric Company "AGECO"] is for the Court, Professor Macey's testimony distilling and summarizing the historical documents, providing historical perspective with respect to the public utility industry during the relevant time period, and placing the historical data in context with well established principles of corporate governance was of assistance to the Court."
****************
"Professor Macey's expertise was helpful to the Court in understanding corporate governance issues with respect to the holding company structure generally and specifically with respect to the public utility industry (including the particulars of the relationship between AGECO and [Rochester Gas and Electric Corporation]).  Accordingly, the Court admitted his expert testimony."  *Rochester Gas and Elec. Co. v. GPU, Inc.*, No. 00-cv-6369, 11 (W.D.N.Y. August 8, 2008), Exh. 25.

[4] *Atlanta Gas Light Co. v. UGI Utilities, Inc., et. al,* 2005 U.S. Dist. LEXIS 43592 (M.D. Fl. March 22, 2005); Transcript of *Consolidated Edison of New York v. UGI Utilities, Inc.*, No. 01-cv-8520 (S.D.N.Y. November 25, 2003), Exh. 8.

summary judgment motion here.  It was not that UGI did not exercise control over the MGPs at issue in *Con Ed* and *Atlanta Gas*, but that in those cases the evidence was found insufficient.

Further, as the Court is well aware, on June 2, 2008 UGI filed a comprehensive seventy-four page summary judgment motion.  SCE&G filed an extensive objection to that motion.  The Court heard argument on October 20, 2008, and ruled from the bench in SCE&G's favor at the conclusion of the argument.  Summary Judgment Hearing at 71:5-6, 75:11-13, Exh. 2.  UGI's current Motion is an amazing rehash of the same issues this Court addressed at the summary judgment hearing, as illustrated in the below chart, which compares the arguments made in UGI's Motion for Summary Judgment to this Motion.

| Quotes from Motion for Summary Judgment | Quotes from Motion *In Limine* |
|---|---|
| "If SCE&G or its experts could point to facts consistent with <u>Bestfoods</u> that show UGI **managed** or **conducted** operations at the Charleston MGP, then SCE&G would be able to defeat summary judgment." Defendant's Summary Judgment Memorandum at 49 (emphasis added). | "In particular, SCE&G has *no* direct evidence that UGI **managed**, **directed or conducted** operations at the site specifically 'related to the leakage or disposal of hazardous waste.'" Defendant's Motion *In Limine* at 3 (emphasis added). |
| "In fact, several courts have already dismissed as a matter of law under <u>Bestfoods</u> similar CERCLA claims against UGI that were based on similar evidence and similar theories." Defendant's Summary Judgment Memorandum at  4-5 (discussing *Con Ed* and *Atlanta Gas* decisions). | "SCE&G's 'control' theories have already been rejected as a matter of law in similar CERCLA claims brought against UGI in two federal circuits."  Defendant's Motion *In Limine* at 3-4 (discussing *Con Ed* and *Atlanta Gas* decisions). |
| "[Plaintiff's assertions] merely represent Plaintiff's advocates' interpretation **of a non-technical documentary record** that is properly evaluated by the Court." Defendant's Summary Judgment Memorandum at 3 (emphasis added). | "SCE&G's experts' 'operational control' testimony simply will not assist the Court in deciding this case because this concept has no definition or boundaries and is applied solely based on a review of **non-technical** documents, which the Court is more than well equipped to interpret for itself under the <u>Bestfoods'</u> standards." Defendant's Motion *In Limine* at 4 (emphasis added). |
| "[T]he examples heralded by SCE&G do not constitute involvement **in the day-to-day** operations of the actual Charleston MGP, much less those related to disposal or leakage of hazardous waste."  Defendant's Summary | "Mr. Macey is plainly unqualified to offer opinions about '**day-to-day operations** relating to pollution or waste disposal,' for to do so purports to analyze equipment design, gas-making processes, and waste |

| Quotes from Motion for Summary Judgment | Quotes from Motion *In Limine* |
|---|---|
| Judgment Memorandum at 41 (emphasis added). | handling, areas in which Mr. Macey has no specialized expertise." Defendant's Motion *In Limine* at 5 (emphasis added). |
| "Plaintiff will **no doubt parrot and recite the unsupported conclusions of its experts that UGI managed the waste disposal practices** of the Charleston MGP." Defendant's Summary Judgment Memorandum at  49 (emphasis added). | "Dr. Shifrin **merely parrots the lawyers' argument … that UGI should be viewed as directing the leakage or disposal of hazardous** waste – namely tar – because UGI supposedly 'controlled' gas-making at its various subsidiaries' sites, which Plaintiff then somehow equates to tar disposal…."  Defendant's Motion *In Limine* at 8 (emphasis added). |
| "SCE&G's theories and claims are inconsistent with the landmark United States Supreme Court decision in United States v. Bestfoods, 524 U.S. 51, 68 (1998)." Defendant's Summary Judgment Memorandum at 2. | "The documentary record establishes that CCR&L, not UGI, controlled the making of gas at the Charleston MGP, but UGI maintains that even were this not the case, SCE&G's experts' theory that UGI therefore controlled the disposal of tar is inherently in conflict with Bestfoods…." Defendant's Motion *In Limine* at  22. |
| "…SCE&G consistently underestimates the scope of the ordinary control that accompanies the normal parent-subsidiary relationship…." Defendant's Summary Judgment Memorandum at 34. | "However, all three of SCE&G's experts infer control from precisely this sort of [non-eccentric] parental conduct." Defendant's Motion *In Limine* at 28. |
| "Although each side may characterize the facts differently, **the documents speak for themselves; they cannot be disputed."** Defendant's Summary Judgment Memorandum at  3 (emphasis added).

"[T]he experts merely serve as second line advocates attempting to argue the facts – a role that is plainly unnecessary and unhelpful." Defendant's Summary Judgment Memorandum at 20. | "At the end of the day, expert assistance of this kind is simply unnecessary for the Court to effectively evaluate the facts at hand against the governing Bestfoods standards.  The CERCLA liability issues before the Court ultimately turn on the facts in the documentary records, which can be reviewed by the Court without expert guidance."  Defendant's Motion *In Limine* at  31-32. |
| "The Plaintiff's contentions also **ignore** Bestfoods presumption on **dual officers** and directors…." Defendant's Summary Judgment Memorandum at 34. | "[T]he [*Bestfoods*] Court announced the clear presumption that the actions of **dual officers** and directors were taken properly on behalf of the subsidiary and, absent clear conflicts of interest or other compelling evidence, are not attributable to the parent.  To accept SCE&G's expert's "interpretation" of the record would require the Court to **disregard** these principles." Defendant's Motion *In Limine* at 27. |

There is no reason these resurrected arguments should now have merit.

As noted previously, a centerpiece of UGI's strategy in its failed Motion for Summary Judgment, and now here in this Motion in Limine, has been to try to sterilize the case by severely curtailing or eliminating expert testimony. UGI centered its argument on its standard refrain that the documents "speak for themselves" and therefore, the Court did not need expert assistance to interpret them. Def.'s Memorandum in Support of its Motion for Summary Judgment at 3; Defendant's Motion at 4. In its Opposition to Motion for Summary Judgment, SCE&G countered that argument, making the following points:

> [E]xperts play a vital role. For example, there may be no factual dispute as to who was the superintendent of the Charleston MGP at a particular time. But there is a significant dispute about whether that superintendent was a UGI puppet who followed UGI's direction. Moreover, while the record contains little information about the precise daily tasks that superintendent performed, Dr. Shifrin will testify in detail about that issue and other matters related to gas plant operation and pollution.
>
> Linking UGI through the superintendent to those gas-making functions is one key feature of Plaintiff's case. Yet UGI urges the Court to ignore that critical information. However, the Court cannot decide this case without understanding how gas was made, the specific machinery that was used, how the choice of feedstocks related to the generation of waste, where in the process waste was produced, how it may have entered the environment and who would have had control over those matters leading to the contaminant release. Notwithstanding UGI's assertions, the documents do not speak to these issues.

SCE&G's Opposition to Motion for Summary Judgment at 7, Exh. 9.

UGI also continues to argue that SCE&G's experts are just offering conclusory allegations. SCE&G refuted that argument in its Opposition to Summary Judgment by pointing to the detailed analysis its experts conducted based on the factual record. *Id.* at 4-7 35-36, Exh. 9.

There are many other examples of the similarities between UGI's Motion for Summary Judgment and its Motion in Limine, but suffice it to say these issues have been resolved. Given

the extraordinary amount of effort that went into the summary judgment proceedings, there is no logical reason the outcome here should be any different, especially in the case of a bench trial where there is no concern that the trier of fact will be prejudiced by the testimony.

There is no credible way UGI can argue that SCE&G's experts have not addressed the requirements of *Bestfoods*. *Bestfoods* requires that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." 524 U.S. 51 at 66-67. *Bestfoods* unequivocally focuses on operations. SCE&G's experts have developed their opinions with this precise test very much in mind.[5] In fact, SCE&G's Opposition to UGI's Motion for Summary Judgment expressly addressed the *Bestfoods* requirements, providing many examples of factual evidence that demonstrated UGI's control of all aspects of the Charleston MGP, including gas making and waste handling. UGI simply ignores it.

UGI now makes a strained effort to distinguish this matter from the First Circuit's decision in *U.S. v. Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2001). In that case, the court specifically used the phrase "operational control" in holding a parent liable under CERCLA. UGI must certainly recognize that decision is fatal regarding its misguided argument about *Bestfoods*. The most UGI can do is ask this Court to ignore the heart of that decision and instead adopt the contorted view it was merely used as a "descriptive phrase" that has no bearing on CERCLA liability. The case, however, said no such thing. That a federal court has already

---

[5] For examples of Dr. Shifrin making his opinions with the *Bestfoods* standards in mind, please see his Report at p. 10, 44-49, Exh. 10, and his Deposition Testimony at 67, 77-79, 88-92, Exh. 11. For examples of Mr. Blake making his opinions with the *Bestfoods* standards in mind, please see his Report at 6, 10-15, 15-16, Exh. 12, and his Deposition Testimony at 126, 175-176, 198-199, Exh. 13. For examples of Mr. Macey making his opinions with the *Bestfoods* standards in mind, please see his Report at ¶¶ 35-47, ¶48, ¶64, ¶¶71-90, Exh. 14, and his Deposition Testimony at 26-29, 65, 69, 73-74, 98-99, Exh. 15.

determined that "operational control" is indicative of liability under *Bestfoods* completely negates UGI's argument and, consequently, it relegated this citation to a footnote in its Motion. Motion at 19, n. 10. The *Kayser-Roth* court used this phrase as part of a practical approach to determining liability based on the guidelines of *Bestfoods*. And it can also be used as a guideline for this Court in making its determination at trial.

Throughout its Motion, UGI also criticizes SCE&G's experts for providing reports that are similar to what they submitted in other cases against UGI. Defendant's Motion at 24, 24 n.19. UGI does this despite a defense in those cases that is substantially and procedurally cut from the same cloth. Even this Motion is essentially identical in purpose and argument to one pending in Connecticut. UGI implies that this uniformity is somehow a deficiency. The reality is, however, that this is a strength. The similarity with other cases is not due to laziness or a lack of creativity on the part of the experts. It stems from the fact that UGI employed patterns of control across its empire that were identical from site to site. The MGPs in Manchester, New Hampshire and Waterbury, Connecticut were controlled in the same manner as the MGP in Charleston. UGI systemized its control and created lockstep uniformity in its empire. UGI saw these features as a strength and proudly referenced such control. Times and the liabilities related to historic operations have, of course, changed since 1910. Having seen these patterns repeat themselves, and having studied them as intensely at those sites as they have studied them here, these experts are uniquely qualified to offer their testimony in this matter.

## 2.      LEGAL STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY

The Federal Rules of Evidence set the standards for the admissibility of expert testimony as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

9

an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  Rule 702 and the United States Supreme Court's decision of *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993), requires that district court judges act as gatekeepers "to assess whether the proffered evidence is sufficiently reliable and relevant." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).  This gatekeeping function applies to all expert testimony.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  As noted above and discussed in further detail below, this doctrine is substantially affected by the fact that this case will be presented without a jury.

### A.    *Daubert's* Liberal Standard Necessitates A Finding That The Court Not Limit The Testimony Of The Plaintiff's Experts

Rule 702 was "intended to liberalize the introduction of relevant expert evidence." *East Tennessee Natural Gas Co. v. 7.74 Acres in Wythe County, Virginia*, No. 06-1716, 2007 WL 1482000, at *4 (4th Cir. May 22, 2007).  The witnesses' qualifications are also to be "liberally judged." *Kopf v. Skyrm*, 993 F.2d 374, 277 (4th Cir. 1993).  Experts are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *U.S. v. Farah*, No. 06-4712, 2007 WL 2309749, at *9 (4th Cir. 2007) (citing to *Daubert*, 509 U.S. at 592).  "One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." *Kopf*, 993 F.2d at 277.

SCE&G's experts more than meet *Daubert's* liberal standards for the admissibility of expert testimony.  Each expert has significantly higher than a "minimal level" of education in his respective fields of expertise.  Dr. Shifrin has a Ph.D. in Environmental/Civil Engineering from MIT, Mr. Blake is a certified public accountant and has an MBA from Rutgers University, and

Mr. Macey has a Yale law degree and is an unquestioned expert on corporate governance.  As a practical matter, UGI does not even challenge the experts' knowledge or credentials within their fields.  Each expert has extensive working experience in his selected field, including remarkable experience involving the unique issue of UGI's historic control of its MGPs.  In their expert reports, each expert has explained how they have taken their specialized knowledge, education, and experience, and applied it to this case to provide insight and opinions that will be valuable to the Court.

**B.** **Because This Matter Will Be Determined Before A Judge, The Standard For Expert Admissibility Is Lowered, And Therefore The Court Should Not Limit The Plaintiff's Experts' Testimony**

As a general rule, courts have the authority to exclude evidence they deem prejudicial in an effort to protect the jury.  *Schultz*, 24 F.3d at 631.  This is because the "district court can hear relevant evidence, weigh its probative value and reject any improper inferences."  *Id.* at 632.  While Fourth Circuit decisions have focused on this principle in the context of Rule 403, it is equally true for evidence presented under Rule 702 and *Daubert*.  Other Circuits have also found this to be true.  The Sixth Circuit, in *Gonzalez v. Nat'l Board of Medical Examiners*, explained "district courts have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements of *Kumho Tire Co.* and *Daubert* and deserves to be credited."  225 F.3d 620, 635 (6th Cir. 2000).

UGI claims to recognize these critical differences relating to bench trials, but has not applied them to its Motion.  Because this is a bench trial, the fact finder is particularly qualified to evaluate and weigh the experts' credibility.  Even if there were a danger that the evidence

would be unreliable, the Court can properly analyze the evidence, aided by the Defendant's ability to vigorously cross-examine each expert.

### C.     The Plaintiff's Experts Are Qualified To Testify In This Matter

The Court must initially determine that a witness is "qualified as an expert" to testify regarding a particular matter.  Fed.R.Evid. 702; *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 634 (E.D.N.C. 2008).  "[T]rial courts have broad discretion when deciding whether a witness qualifies as an expert.  The decision necessarily focuses on the specific facts and circumstances of the case." *Gallagher*, 568 F. Supp. 2d at 634.  "[T]he fit between an expert's specialized knowledge and experience and the issues before the court need not be exact." *Shreve v. Sears, Roebuck, & Co.*, 166 F. Supp. 2d 378, 392 (D. Md. 2001).  Rather, "an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion.'" *Id.* (Citations omitted.)  Further, "the court need not determine that the expert testimony a litigant seeks to offer is irrefutable or certainly correct." *East Tennessee*, 2007 WL 1482000, at *4.  This is because "expert testimony is subject to being tested by [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.*

As noted above, UGI does not challenge the credentials of SCE&G's experts.  Each of SCE&G's experts is qualified to testify in this matter, as is demonstrated by their education, work history, and the admission of helpful testimony provided previously in similar lawsuits.[6]  In its Motion to Exclude, UGI's complaints about qualifications are essentially straw men.  They rest on misguided, exaggerated descriptions of the supposed scope of each expert's anticipated

---

[6] *See* Shifrin Report at 1-2, Exh. 10; Shifrin Curriculum Vitae, Exh. 16; Blake Report at 1, Exh. 12; Blake Curriculum Vitae, Exh. 17; Macey Report at 1-7, ¶¶ 1-22, Exh. 14; Macey Curriculum Vitae, Exh. 18.

testimony.  So, for example, UGI raises concerns about Dr. Shifrin commenting on "business operations," accountant and financial expert Mr. Blake referencing MGP operations, or Professor Macey discussing either of these matters.  Yet each expert has made it plain what the limits of his testimony will be.  The Court can easily see from the experts' reports that their opinions are targeted and that all of SCE&G's experts opine in areas of training and experience appropriate to their credentials and background.

What UGI improperly suggests, however, is that matters generally bearing on UGI's history and involvement at MGPs cannot be commented on unless it is limited to a particular expert's core qualifications.  So, for example, despite the fact that financial examiners such as Mr. Blake have to put their expertise into a factual context (e.g. such as assessing the records showing the purchase or repair of tar handling equipment), UGI claims such commentary is inappropriate because Mr. Blake does not have the experience or technical ability to design or operate such equipment.  It is an unreasonable position, designed to set up a road block where no problem exists.  It is also hypocritical since the experts UGI has disclosed here have experience and training comparable to SCE&G's experts and testify about very similar issues.

D.    **The Testimony That The Plaintiff's Experts Will Provide Is Both Relevant And Reliable**

Courts must determine whether the proffered expert testimony is both relevant and reliable.  Fed.R.Evid. 401; *Gallagher*, 568 F. Supp. 2d at 634.  Relevance is found where the evidence "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.  In determining the reliability of testimony, a district court should consider the three factors contained in Federal Rule of Evidence 702, quoted at the beginning of this Section.  However, "The Supreme Court has also emphasized that 'the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (quoting *Kumho Tire*, 526 U.S. at 152).

When making a determination of the relevance and reliability of expert testimony, judges may follow a list of factors provided by the *Daubert* court, although these factors are not exhaustive nor applicable to all cases. *Kumho Tire*, 526 U.S. at 141. *See also Shreve*, 166 F. Supp. 2d at 395 (stating "[t]he *Daubert* factors are meant to be helpful, not definitive, and the court's evaluation is always a flexible one"); *Simo v. Mitsubishi Motors North America, Inc.*, Nos. 06-1529, 06-1570, 2007 WL 2332349, at *5 (4th Cir. August 15, 2007) (stating "[t]he factors do not constitute a definitive checklist or test"). "No established procedure exists for *Daubert* analysis." *Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc.*, No. 05-1621, 2006 WL 1526131, at *4 (4th Cir. May 31, 2006). "The inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the experts, not on the conclusions reached." *Westberry*, 178 F.3d at 261. *See also Gallagher*, 568 F. Supp. 2d at 634 (citing *Kumho Tire*, 526 U.S. at 141-42, and stating "the test of reliability is 'flexible,' and … the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination"). The factors include (1) whether the knowledge can or has been subject to testing; (2) whether it has been subjected to peer review; (3) whether there exist known or potential rates of error; and (4) acceptance within the community. *Daubert*, 509 U.S. at 593-94. Further, "[t]o be considered reliable, an expert opinion 'must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'" *1325 "G" Street Associates, LP v. Rockwood Pigments NA, Inc.*, No. Civ.A.DKC 2002-1622, 2004

WL 2191709, at *11 (D.Md. Sept. 7, 2004) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d

244, 250 (4th Cir. 1999) (emphasis in original)).  However, these factors may not always apply,

and the "court's evaluation is always a flexible one," *Thompson v. Queen City, Inc.*, No. Civ.A.

2002359-18, 2002 WL 32345733, at *2 (D.S.C. July 9, 2002), because "particular factors may or

may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's

particular expertise, and the subject of his testimony," *Pharmanetics*, 2006 WL 1526131, at *4.

Rather than limiting the analysis, "*Daubert* requires that a trial court give broad consideration to

all of the various factors that may illuminate the reliability of proffered expert testimony." *U.S.

v. Prince-Oyibo*, 320 F.3d 494, 498 (4th Cir. 2003).

        In addition to the above factors, the United States Supreme Court, in *General Electric

Co. v. Joiner*, 522 U.S. 136, 146 (1997), stated "that reliability within the meaning of Rule 702

requires a sufficiently rigorous analytical connection between that methodology and the expert's

conclusions."  Ultimately, "an expert must employ in the courtroom the same level of intellectual

rigor that characterizes the practice of an expert in the relevant field." *Rockwood*, 2004 WL

2191709 at *12 (internal quotations and citations omitted).  Further, expert evidence does not

need to be "irrefutable or certainly correct." *Westberry*, 178 F.3d at 261; *East Tennessee*, 2007

WL 1482000, at *4.  This is because, in part, "expert testimony is subject to being tested by

'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof.'" *Westberry*, 178 F.3d at 261; *East Tennessee*, 2007 WL 1482000, at *4.

Where, as here, the party challenging the admissibility of expert testimony is "really challenging

the proper weight to be given the evidence presented at trial," that party "does not mount a true

*Daubert* challenge." *East Tennessee*, 2007 WL 1482000, at *5.

UGI focuses specifically on the *Daubert* factors without regard to the fact that, aside from certain of Dr. Shifrin's technical MGP and site condition opinions that UGI does not challenge, SCE&G's experts are not presenting scientific testimony that is governed by the *Daubert* factors. The *Daubert* factors are not applicable where the methodology cannot be subjected to testing, peer review, error analysis, or community acceptance. None of those concerns are presented in UGI's Motion. Rather, the Court should look to factors that relate to the methods actually used by the experts to reach their conclusions. Where the expert has "good grounds" for the conclusions, an expert's testimony should be admitted. *See Shreve*, 166 F. Supp. 2d at 395 (finding that proposed testimony must have "good grounds"). In SCE&G's expert reports, each of SCE&G's experts details his methodology in such a way as to allow the court to determine the reliability of the testimony, as the case law requires. *Id.* (finding there is a "limitation on when evidence should be excluded accord[ing] with the liberal admissibility standards of the federal rules … recogniz[ing] that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony"). For further discussion on the specifics of each expert's methodologies, please see Sections III(B)(3), III(C)(3), III(D)(3).

### E.    The Testimony That The Plaintiff's Experts Will Provide Will Assist The Trier Of Fact

After determining that an expert is qualified and is providing relevant and reliable testimony, the court must next inquire whether the testimony will "assist the trier of fact." Fed.R.Evid. 702.    "[E]xpert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it by definition does not 'aid the jury in making a decision;' rather, it 'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's.'" *Nimely v. City of New York*, 414 F.3d 381, 397 (2nd Cir. 2005) (internal quotations partially

omitted and citations omitted). An expert's opinion will not be deemed improper merely "because it embraces an ultimate issue to be decided by the trier of fact." *Kopf*, 993 F.2d at 377 (citing Fed.R.Evid 704(a)). *See also U.S. v. Bilzerian*, 926 F.2d 1285, 1294 (2nd Cir. 1991) (finding that "an expert may opine on an issue within the jury's province" as long as he or she does not state ultimate legal conclusions).

Without question, SCE&G's experts' testimony at trial will assist the Court as the trier of fact. The experts have taken their knowledge and applied it to a vast number of documents, transactions and facts that can only be properly presented by drawing on the unique experience of each of the experts. The testimony will be presented at trial so as to avoid offering ultimate conclusions of law. In some instances, such as testimony that correlates to factors used in veil piercing, SCE&G's experts may address mixed questions of fact and law. The experts will be providing testimony that will assist in the decision making process, but will not overstep into impermissible areas. In any case, the Court will easily be able to address any concerns it has in this area and will not be misled or prejudiced.

**3.     ARGUMENT**

    **A.     Introduction**

UGI makes three primary arguments against SCE&G's three retained expert witnesses. First, UGI claims each witness is not qualified to offer the opinions rendered. Defendant's Motion at 12-18. Second, UGI asserts each witness lacks specialized knowledge that would assist the trier of fact. Defendant's Motion at 18-31. Finally, UGI argues that the testimony proffered by the witnesses is unreliable and irrelevant. Defendant's Motion at 31-34.

These arguments are meritless, and assessing them is not a productive use of time given that the Court has already denied UGI's Motion for Summary Judgment dealing with these same

issues. Moreover, UGI casually sidesteps the inherent hypocrisy in its arguments: UGI disclosed two experts in this case who have training and experience similar to SCE&G's experts.

Additionally, UGI fails to address the fact that all three of SCE&G's expert witnesses were permitted to testify (despite motions in limine being filed to limit their testimony) in the almost identical Manchester UGI case. While UGI claims Judge Barbadoro regretted his decision to allow such testimony, this greatly exaggerates his comments, most of which credited and thanked the witnesses for their contributions. *See* Section I.

SCE&G's experts' trial testimony will focus on UGI's control (*i.e.*, operational control) of every aspect of gas making – from policies to actually working at the plant, to inspecting, installing and repairing gas making and storage equipment and having its personnel operating the gas making equipment. SCE&G contends that its experts' examples of UGI's control of the Charleston MGP is clearly sufficient to meet the *Bestfoods* standard.

Central to UGI's claim that SCE&G's experts are not providing evidence consistent with *Bestfoods* is its argument that the standards set forth in that case mandate a verbatim parroting of the court's language. UGI couples this strained reading of *Bestfoods* with a hyper-technical and contorted criticism of the language used by each expert. There is no question that *Bestfoods* teaches that mere stock ownership, commonality of officers and directors, and the general interaction of a parent with its subsidiaries will not alone impose operator liability. Indeed, the decisions on summary judgment in *Atlanta Gas* and *Consolidated Edison* may best be seen as reflecting that conclusion, since the evidence offered in these cases was very limited.

What *Bestfoods* requires is that the parent be involved in controlling or directing those activities relating to the pollution. Here, where the evidence goes dramatically beyond anything developed in *Atlanta Gas* or *Consolidated Edison*, UGI becomes the perfect example of the type

of relationship that the *Bestfoods* Court envisioned would give rise to CERCLA liability. SCE&G has focused on the activities that generated or caused the release of contaminants. It is clear that *Bestfoods* does not require an intentional act of dumping by the parent. Nor is the required level of operational control limited, as UGI claims, to prove that UGI personnel were actually on-site "turning the valves" that released the pollutants into the environment.

SCE&G's evidence focuses on UGI's role in the design, construction, inspection, and maintenance of equipment; the supervision, training and placement of plant personnel; the creation and implementation of protocols, rules, operating standards and specifications; the purchasing and providing of plant feedstocks; the direction and approval of operational details, including those related to managing, handling, storing and disposing/selling of tar as a byproduct; the financial and organizational control of virtually all operational expenses, and the decisions related to budgets, expenditures and purchases at the Charleston MGP. *See* Sections III(B)(2), III(C)(2), and III(D)(3) below for specific citations. In sum, SCE&G focuses on the intrusive day-to-day control over all significant facility decisions and activities. This type of analysis is the core of *Bestfoods*. And each of SCE&G's experts focuses on this analysis.

**B.     Dr. Neil Shifrin**

It is unlikely that any engineering or environmental scientist has as much MGP experience as Dr. Shifrin. He has worked on more than 120 MGP sites and is very familiar with their operations and the manner in which they released pollutants into the environment. Shifrin Report at 1, Exh. 10. UGI cannot really challenge these qualifications and so it spends most of its time complaining that Dr. Shifrin is not addressing the items which are the focus of *Bestfoods*. In addition to UGI being wrong, its approach is more legal argument rather than a true *Daubert* challenge to Dr. Shifrin's ability to provide testimony.

1.    **Dr. Shifrin Is Unquestionably Qualified To Testify About "Operational Control" At The Charleston MGP**

In light of Dr. Shifrin's extensive, highly specific expert reports, which focus intensely on issues of operational control, it is mystifying how UGI can continue to maintain that his opinions are outside the scope of his experience and knowledge. Rather than confront the massive amount of evidence in Dr. Shifrin's reports dealing with operational control, UGI sidesteps that material and instead creates a straw man, claiming that Dr. Shifrin's focus is impermissibly on "business control." Defendant's Motion at 16-18. UGI then attacks this straw man with vigor.

UGI's motion ignores the content of Dr. Shifrin's reports, his deposition testimony and the exhaustive cataloguing of these materials in SCE&G's Opposition to UGI's Summary Judgment Motion.[7] His report, for example, provides great detail about gas plant operations and how UGI controlled those operations. Shifrin Report at 7-16, Exh. 10. It begins with an overview of how MGPs operated and then provides a history of UGI and its leadership role in the MGP industry. *Id.* Next, Dr. Shifrin describes the environmental conditions found today at the site. *Id.* at 28-43, Exh. 10.

Dr. Shifrin then provides numerous examples of UGI's operational control – including waste handling – at the site during the relevant time period, 1910-1926. *Id.* at 44-49, Exh. 10. He discusses the mechanisms of control UGI employed at the Charleston MGP and provides substantial amounts of site-specific evidence to reinforce the opinions regarding UGI's control in the *Bestfoods* context. *Id*, Exh. 10. Dr. Shifrin provides specific examples of UGI controlling

---

[7] UGI also ignores and remarkably does not advise this Court that Plaintiff's same experts in the pending Connecticut case have filed as of November 15, 2008 their entire written direct testimony in that case. That testimony totals 85 pages for Dr. Shifrin, 57 pages for Mr. Blake and 35 pages for Professor Macey. Certainly much of the methodology and discussion of UGI patterns of control is illuminated and detailed in that testimony. UGI therefore knows that these experts are able and prepared to present testimony in rigorous adherence to the *Bestfoods* requirements.

gas making and waste handling that occurred at UGI's subsidiary MGPs throughout the country. *Id.* at 13-16, Exh. 10.

Dr. Shifrin goes on to provide specific examples of UGI's control of gas making and waste handling at Charleston. *Id.* at 44-49, Exh. 10. These detailed examples include instances of installing, maintaining and repairing equipment, UGI's purchasing and approving contracts for raw materials and feedstocks, and examples of UGI employees making gas, and resolving gas making and waste handling problems at the site. *Id.* at 44-49, Exh. 10.

After providing a detailed description of how MGPs were run, and discussing UGI's unparalleled expertise in the MGP industry and its control of the Charleston MGP from 1910-1926, Dr. Shifrin describes the inseparable relationship between control of an MGP's operations and contamination of the environment. *Id.* at 50-64, Exh. 10. He addresses the *Bestfoods* requirement that a nexus exist between the control of the pollution-causing processes, and the release of pollution into the environment. *Id*, Exh. 10. He describes how the process of gas making is inextricably linked to the creation of tar and other MGP byproducts and the clear relationship between the present contamination footprint at the site and the location of the former MGP equipment. *Id*, Exh. 10.

Dr. Shifrin also created maps and figures that show the precise location of the contamination footprint today and how that footprint correlates to the location of gas making and tar handling equipment that was designed, installed, inspected, repaired, maintained and controlled by UGI. *Id.* at Figures 6-9, Exh. 10. In addition, Dr. Shifrin describes the mechanisms UGI used to control the Charleston MGP, including inspections, training and placing cadet engineers, convening conferences to discuss plant operations, and installing tar-handling equipment. *Id.* at 44-49, Exh. 10. UGI ignores all of this and instead pretends that Dr.

Shifrin is primarily focusing on "business control." Defendant's Motion at 16-18. The argument is not supported by the record.

UGI also erroneously claims that Dr. Shifrin is creating an "alternative standard," not contemplated by *Bestfoods,* that would expand the universe of liable parties. Defendant's Motion at 23 n. 16. So, for example, UGI puts words in his mouth by claiming that he is saying a manufacturer who simply supplied equipment that leaked would be liable. *Id.* Of course, Dr. Shifrin is not making such an argument and there is no way, short of stretching his report beyond the breaking point, that any objective reader could conclude he is saying such a thing. What he does say is that if a company, like UGI, designs, installs, inspects, maintains and repairs that equipment; if it controls the choice and acquisition of feedstocks; if it directs methods of operations, and if it places its own people in positions to control the instrumentality that led to the pollution, then they are exactly what *Bestfoods* requires for operator liability to attach.

Dr. Shifrin's testimony goes directly to the heart of the *Bestfoods* test; it speaks precisely to the issue of whether UGI controlled the instrumentality at the Charleston MGP that led to the pollution which is being remediated today. There is nothing more important or relevant in this case than that inquiry.

> **2.    Dr. Shifrin's Opinions Are Highly Dependent On Specialized Knowledge And His Knowledge Is Essential Here To Address The Issues At The Heart Of This Case.**

UGI seeks to negate Dr. Shifrin's testimony by arguing that any lay person can simply look at the documents and draw the same conclusions that Dr. Shifrin draws (i.e., the "documents speak for themselves"). Of course, UGI featured this same argument in its failed Motion for Summary Judgment. This contention also needs to be seen in light of the fact that UGI not only created most of the documents, but did so (even in those times) with the intent of hiding the

extent and impact of its parental control.  It is not an accident that the federal government

dismantled UGI's system of monopolistic control.  *See* Giglio, Exh. 19.

Those points notwithstanding, this case is about MGP operations, who controlled those

operations and how the consequences of those operations contaminated the environment.  All of

these questions, and many others, are integral to the analysis the Court must conduct here, and it

is abundantly clear that these topics involve highly specialized knowledge from a bygone era.

Dr. Shifrin provides that knowledge.

For example, Dr. Shifrin's report discusses the basic aspects of MGP operations; the

basic functions of carbureted water gas production, including the waste products produced; a

summary of the byproducts produced by manufacturing gas; tar recovery and disposal; leaks and

spills; and retirement and plant demolition.  Shifrin Report at 7-10, Exh. 10.  He discusses UGI's

role in the MGP industry and provides a detailed summary of the methodology he used to review

the record and synthesize it with his specialized knowledge of how MGPs were operated. *Id.* at

3-4.  Specific technical issues Dr. Shifrin discusses in his report, which UGI ignores, include:

- Upon review of NAPL source areas, UGI is linked to all, or nearly all, of the pollution remediation.  Shifrin Report at 50, Exh. 10.
- Dr. Shifrin discusses in detail UGI's relationship to each of six NAPL source areas, including a gas holder formerly operated during UGI's tenure, the rail spur likely used to transport tar, a relief holder constructed and operated by UGI, a wood treating area contaminated by coal water gas tar, a steam plant area with both deep and shallow tar contamination, and a sewer likely used by UGI for its tar separator operation.  *Id.* at 51 – 58, Exh. 10.
- Dr. Shifrin discusses the relationship of sediment contamination caused by the entry of contaminated groundwater into the former Calhoun Street storm drain, all traceable to UGI's historic facility. *Id.* at 62, Exh. 10.
- Dr. Shifrin additionally discusses the relationship between soil contamination and UGI's activities, including UGI filling and wastewater charges.  *Id.* at 64, Exh. 10.

In sum, there can be no question that Dr. Shifrin's testimony is dependent on specialized knowledge and that testimony will be a vital component in helping the Court understand some of the most important issues in this case.

### 3.    Dr. Shifrin's Opinions Are Unquestionably Reliable And Relevant.

Dr. Shifrin is a highly knowledgeable expert who has provided a detailed report and rebuttal report that speak directly to the central issues in this case.  The testimony he will offer at trial is precisely the type of testimony he has offered in similar UGI cases.  Courts have repeatedly found his testimony to be reliable and relevant.  *See* Section I.  Moreover, SCE&G's counsel relied on him as a MGP expert in certain cases dealing with insurance recovery. Specifically, SCE&G's counsel tried three separate jury trials in the United States District Court for the District of New Hampshire on behalf of EnergyNorth Natural Gas, Inc. against an array of insurance company defendants.  Dr. Shifrin testified as an expert on MGP operations in all three cases with similar evidentiary presentations based on his analysis of the historic operations of these facilities.  Plaintiffs prevailed in each, twice with jury verdicts and once by directed verdict.  *EnergyNorth Natural Gas., Inc. v. Lloyd's, Underwriters at London*, No. 97-cv-064-M; *EnergyNorth Natural Gas, Inc. v. Century Indemnity Co., et al.*, No. 99-cv-049-M; *EnergyNorth Natural Gas, Inc. v. American Home Assurance Co., et al*, No. 99-cv-502-JD, *aff'd* 452 F.3d 44 (1st Cir. 2006), Exh. 20.  These results further underscore the effectiveness of Dr. Shifrin's testimony.

The soundness of Dr. Shifrin's methodology is readily apparent from a review of his reports.[8]  He employed a coherent, linear approach that went from the basics of gas making to

---

[8] UGI's suggestion that Dr. Shifrin's value and methodology were somehow eroded in the *City of Bangor v. Citizens Communications* case is without merit.  Motion at 21, n. 13 (citing *City of Bangor v. Citizens Communications Co.*, 437 F. Supp. 2d 180, 189, n.3 (D. Me. 2006).  Soon

highly specific examples of how UGI controlled those processes at the Charleston MGP. He

began by drawing on his extensive expertise to describe the gas making process in detail. Shifrin

Report at 7-10, Exh. 10. As detailed above, he then explained how gas making was inextricably

linked to tar making. *Id.* at 5, Exh. 10. He outlined UGI's remarkable history as it pertained to

the dawn and development of the MGP era in the United States. *Id.* at 11-16, Exh. 10. He then

tied UGI to the Charleston MGP, showing how UGI employed a vast array of mechanisms to

control its MGP empire. *Id.* at 44-49, Exh. 10. Finally, he pointed to specific examples linking

UGI to the site and providing detailed scientific analysis establishing that the contamination at

the site is directly linked to UGI. *Id.* at 50-64, Exh. 10. UGI no doubt dislikes the conclusions,

but it has no credible basis to challenge this meticulous and exhaustively documented

methodology.

  In the face of this rigorous analysis, UGI falls back on a strategy it employed in the

*Atlanta Gas Light* and *Con Ed* cases; a strategy that has no relevance to this case. UGI claims

that SCE&G has mistakenly built its case on the fact that UGI and the Charleston Consolidated

Railway and Lighting Company ("CCR&L") had dual officers. UGI then cites to the *Bestfoods*

presumption that dual officers and directors are working toward the best interests of the

subsidiary, rather than the parent. 524 U.S. at 69-70.

  Of course, this case is not, and never has been a case about dual officers and directors,

although UGI tries to limit it to that issue. Rather, this case involves assessing vast numbers of

UGI control mechanisms, of which dual officers and directors are a single facet. The great

majority of the evidence SCE&G relies upon here, and which Dr. Shifrin draws upon to form his

---

after the *Bangor* case, Dr. Shifrin served as a witness in *EnergyNorth Natural Gas, Inc. v.
Lloyd's, Underwriters at London*, No. 97-cv-064-M, Transcript attached as Exh. 21. On cross-
examination and redirect before the jury, this challenge to his testimony or methodology was
raised and rebutted. UGI can raise this again by cross-examination if it chooses.

opinions, has nothing whatsoever to do with dual officers and directors. Yet UGI continues to

focus on this one point and blows it completely out of proportion in order to manufacture the

argument that vast swaths of Dr. Shifrin's testimony are somehow unreliable and irrelevant.

In the end, UGI's criticism of Dr. Shifrin largely rests on semantics. UGI attempts to

take benign descriptive phrases and suggest they demonstrate a fundamental departure from the

*Bestfoods* requirements. *See* Defendant's Motion at 24-26 (devoting substantial criticism to Dr.

Shifrin's use of the phrase "engineering control"). The argument is meritless. The term

"engineering control" was used repeatedly during Dr. Shifrin's testimony in the Manchester case.

Dr. Shifrin was asked if he was able to "formulate opinions with respect to the operational and

engineering control of the plant…." *See* Transcript of Manchester Case, Afternoon of Day 2, at

12, Exh. 22. He initially summarized all his testimony for the court, explaining in part that he

would be addressing "control of those engineering operations." *Id.* at 13, Exh. 22. He was asked

about UGI's "operational and engineering control of the site." *Id.* at 103, Exh. 22. UGI, on some

occasions objected to aspects of the testimony but never to the use of this phrase. The fact that

the evidence regarding engineering and operational control was received by the court in the

Manchester case with no complaint from UGI underscores how UGI has unfairly and

unreasonably presented this argument here, and blown it entirely out of proportion, to distract the

court from focusing on Dr. Shifrin's compelling testimony regarding UGI's day-to-day

management and control of the MGP.

One can refer to the topic as "engineering control," or other similar phrases, but the key is

UGI's direct involvement in matters relating to the pollution. When the monikers are brushed

aside, the fact remains that Dr. Shifrin is a highly qualified expert who has marshaled an

enormous volume of facts and prepared detailed reports about the manner in which pollution was

formed at the Charleston MGP and how it was released into the environment. He provides

extensive detail about who controlled the processes and how they accomplished that control.

That speaks to the heart of the *Bestfoods* analysis and that is the only relevant inquiry here.

C.    **Mr. Thomas Blake**

1.    **Mr. Blake Is Qualified To Testify About UGI's Operational Control Of The Charleston MGP**

Mr. Blake's curriculum vitae demonstrates that he is a highly trained and experienced

accountant and appraiser (and, as noted, UGI has not objected to his qualifications). Blake

curriculum vitae, Exh. 17. Currently he is a vice president of CRA International. During his 23

years at Ernst & Young, where he was a senior partner, he served as managing partner of Ernst &

Young's New England Investigative and Dispute Services practice and national director of its

Securities and Mergers & Acquisitions and Bankruptcy Division. Mr. Blake has worked in the

accounting field for more than 35 years. As set forth in his report, during his many years

working as an accountant, he has audited numerous historic companies and has described how

while at Ernst & Young he likely had the most extensive expertise on historic accounting issues.

Blake Deposition in *Yankee Gas, et al. v. UGI Utilities, Inc.*, November 15, 2007 ("Blake CT

Testimony"), at 79:8-13, Exh. 23.[9]

Not only is Mr. Blake a highly trained and experienced expert on how businesses and

their financial components are run and controlled, but Mr. Blake has been admitted as an expert

and testified on accounting and business valuation in federal district court, bankruptcy court,

state courts and arbitrations. Like Dr. Shifrin, Mr. Blake testified in the Manchester, New

---

[9] SCE&G cites to its experts depositions in *Yankee Gas et al. v. UGI Utilities, Inc.* because UGI's counsel extensively inquired about the experts' backgrounds and qualifications in that case. During depositions in this case, UGI's counsel simply asked if any of the experts' qualifications or experiences had changed since their Connecticut depositions in order to save time.

Hampshire case against UGI. There, Judge Barbadoro deemed Mr. Blake to be qualified to offer expert opinions regarding UGI's operational control of the Manchester MGP. Mr. Blake's testimony in that case, of course, in many respects tracks his opinions here. Specifically, he offers opinion testimony about UGI's pattern and practice of owning and operating local gas companies throughout the country including the MGP at issue here, focusing on the intricacies and reality of that control in providing day-to-day operational control of the facility.

Mr. Blake is not passing himself off as an engineer or technical expert. He knows that he is not the engineering expert in this case and therefore will not be the witness who offers the primary testimony on MGP engineering operations and waste production. Blake CT Testimony at 70-71, Exh. 23. Indeed, Mr. Blake is an expert on historic business and financial operations – not MGP engineering. Thus, there is no testimony to exclude on this issue because there is no issue.

### 2. Mr. Blake's Operational Control Opinions Are Based On His Specialized Knowledge

Mr. Blake has specialized knowledge about how historic businesses were run. This knowledge is based on his training as well as his experience studying historic companies such as railroads, manufacturing companies and UGI itself. Accordingly, while Mr. Blake is not an engineer or gas making expert, he does understand and is qualified to testify about the procedures, control mechanisms, financial oversight and general methods of how the Charleston MGP facility was managed and operated. His training and experience has led him to conclude from the historic record in this case that UGI was involved in every aspect of the former MGP's operation. Mr. Blake was retained to review the historic record and to report on UGI's financial and business control of CCR&L and the MGP at issue here. As expressly stated in his expert report, Mr. Blake's engagement was to "evaluate the business relationship between The United

Gas Improvement Company and/or United Gas Improvement Company (collectively "UGI") and SCE&G predecessor entities."  Blake Report at 1, Exh. 12.

UGI generically attempts to create concerns over his qualifications where none exist.  In his reports, Mr. Blake has provided a detailed description of his background and his expertise in examining business operations in a historic context to determine the reality of their control.  *Id.* Mr. Blake provides a detailed summary of UGI's history and its control of its subsidiary companies.  *Id.* at 2-5, Exh 12.  These initial points place in context UGI's development and lay the groundwork for dissecting UGI's methods of control, beginning here with the general approaches and using this as a platform to transition to specific analysis about control of the Charleston MGP. *Id.* at 2-6, Exh. 12.

Next, Mr. Blake discusses UGI's control of the Charleston MGP.  *Id.* at 6-10, Exh. 12. This discussion includes examples of UGI's practices and procedures with respect to control. *Id.* at 10-36, Exh. 12.  Mr. Blake draws on the general analysis in the first section of his testimony and weaves that into this portion, showing how UGI employed the same control techniques in Charleston, over time, that it used throughout its empire.  *Id*, Exh. 12.

Finally, Mr. Blake discusses the many mechanisms UGI employed to exert operational control over the Charleston site, providing numerous details of UGI's day-to-day control of gas making and waste handling.  *Id*, Exh. 12.  These specific details include examples of UGI controlling purchasing, budgeting, auditing, personnel and general business operations at each of the sites.  *Id*, Exh. 12.  He references specific examples of UGI directing gas making and waste handling. *Id.* at 12-14, 16-18, Exh. 12.

In sum, his methodical, exhaustive analysis leaves no room for UGI's argument that Mr. Blake's opinions are not based on specialized knowledge.

### 3.    Mr. Blake's Operational Control Opinions Are Reliable And Relevant

Mr. Blake summarized the documents he analyzed and his methodology for reviewing the record and developing his opinions in his expert report and during his deposition.  He explained how he worked with associates who did an initial review of the voluminous historic record.  Blake Deposition at 49-50, 54-55, Exh. 13.  SCE&G's counsel provided to him all documents produced by both parties during discovery in this case.  Many of the documents sent to Mr. Blake and his team were not relevant to his scope of inquiry and instead related to highly technical issues.  Counsel did not weed through the documents and make assumptions about what documents would be most relevant for Mr. Blake.  Instead, Mr. Blake's independent team reviewed the documents after he met with them and explained the types of materials he believed would be relevant.  Mr. Blake instructed his team to provide him with all relevant documents – whether they supported SCE&G's position or not.  Accordingly, his associates made initial determinations of what documents were most relevant and responsive to Mr. Blake's requests. Blake Deposition at 55, Exh. 13.

Mr. Blake then reviewed the materials himself and developed the opinions that are set forth in his report.  Blake Deposition at 87-88, Exh. 13.  This methodology is appropriate and consistent with the practices of most testifying experts.  UGI's contention that there is something flawed or out of the ordinary about this methodology is incorrect.  Indeed, Mr. Blake's methodology seems to be completely comparable to that of UGI's accounting expert, Creighton Hoffman, who also worked with a team of associates.  Hoffman Deposition at 36-41, Exh. 24. Moreover, as detailed in the previous section, Mr. Blake then assembled the voluminous amount of information he deemed to be relevant to his inquiry and organized it into a highly detailed,

thoroughly documented analysis of how, precisely, UGI controlled Charleston. There is simply no legitimate basis for UGI to impugn this methodology.

As noted above, Mr. Blake's opinions on operational control support SCE&G's CERCLA ownership and operator liability claims and therefore are clearly relevant. To prove operator liability, *Bestfoods* requires a plaintiff to show that the parent controlled the mechanisms that caused the contamination at the facility. Here, Mr. Blake opines that UGI was extensively involved in every aspect of running the MGP, including gas making and waste handling. His testimony describes UGI's eccentric control of all aspects of the Charleston MGP, including but not limited to personnel decisions, financial decisions, contracts and purchasing. All of these things directly affected the MGP's gas making and waste handling processes. His opinion is based on his thorough review of the historic record, most of which is in UGI's own words.

 **D.**  **Professor Jonathan Macey**

   **1.**  **Professor Macey, A Yale Law School Dean And Professor, Is A Highly Regarded Expert On Corporate Governance Qualified To Offer Opinion Testimony On UGI's Operational Control Of The Charleston MGP**

Professor Macey is the Sam Harris Professor of Corporate Law, Corporate Finance and Securities Law at the Yale Law School and Professor in the Yale School of Management. He teaches and writes about corporate law and corporate governance issues and he serves on corporate boards. All of his experience is set forth in his *curriculum vitae* which is included in his expert report. Exh. 18. Professor Macey is one of the leading authorities on corporate governance. UGI does not dispute that expertise in any meaningful way.

Rather, UGI makes the same arguments here about Professor Macey that have already been rejected elsewhere. Specifically, UGI's contention that Professor Macey is not qualified to

testify about corporate governance and operational control is contrary to numerous other judge's

rulings in similar cases.  Most recently, Professor Macey testified on corporate governance and

control issues in a case similar to this one.  In *Rochester Gas and Elec. Corp. v. GPU, Inc.*, the

Court deemed Professor Macey qualified to testify on corporate governance issues and noted:

> Professor Macey's expertise was helpful to the Court in understanding corporate
> governance issues with respect to the holding company structure generally and
> specifically with respect to the public utility industry (including the particulars of
> the relationship between AGECO and RG&E).  Accordingly, the Court admitted
> his expert testimony.

No. 00-cv-6369, 11 fn. 7 (D.W.N.Y. August 8, 2008), Exh. 25**.**  While UGI claims the facts of

those cases differ from the case at hand, which they may, the nature of Professor Macey's

opinions on control by a parent over a subsidiary was the same as it is here.  As noted above, if

UGI believes Professor Macey's opinions are without basis or that the facts in the Rochester case

are distinguishable from the facts here, it can elicit that information from Professor Macey

during cross-examination.

Likewise, Professor Macey was deemed qualified to offer opinion testimony about

operational control and corporate governance in the Manchester case.  Indeed, UGI filed a

*Daubert* Motion *in Limine* in that case which was denied.  Order of Manchester Case, Mar. 14,

2003, Exh. 4.  After denying that Motion and hearing Professor Macey's testimony, Judge

Barbadoro said to Professor Macey before he left the witness stand: "I appreciate the witness.

You had some interesting testimony, very helpful to me."  Transcript of Manchester Case,

Afternoon of Day 5, at 86, Exh. 7.

Accordingly, UGI's suggestion that Professor Macey is not qualified to offer testimony

on operational control and corporate governance is baseless.  As noted, the issue of corporate

governance often involves some mixed question of fact and law and SCE&G is mindful of the need not to intrude on the Court's role in determining the ultimate questions of law.

> ### 2. Professor Macey's Corporate Governance Expertise Is Specialized Knowledge That Will Assist The Court In Determining Ownership Liability

Professor Macey brings to this case a special understanding of holding companies in the historic context, and UGI's unique role in that history, especially as contrasted to present day corporate norms.[10]  He understands the role of corporate boards and the purpose of corporate formalities.  He has been involved in four cases involving UGI and at least one other case involving MGPs.  Accordingly, he has developed specialized knowledge about how UGI's board operated and how this compared to other companies during that same time period.  This specialized knowledge will assist the Court in determining whether UGI's control of CCR&L and the Charleston MGP was eccentric from both an operator and veil piercing perspective.  The *Bestfoods* analysis bears on the eccentricity of UGI's parental control, a subject that virtually demands a comparison to other historic entities.  This uniquely requires the insight and knowledge offered by Professor Macey's experience and training.

Plaintiff recognizes that courts are sometimes skeptical about having law professors testify at trial.  Judge Barbadoro raised that issue in the Manchester case.  But UGI's discussion of those comments greatly exaggerates the concern and ignores the fact that Judge Barbadoro directed most of his commentary at UGI's corporate governance expert.  Judge Barbadoro denied a similar *Daubert* motion directed at Professor Macey in that case.  Order from Manchester case, Mar. 14, 2003, Exh. 4.  In any event, in many instances courts still permit law professors to

---

[10] UGI argues that parents are always involved in the affairs of their subsidiaries in an attempt to suggest UGI's control of CCR&L was "normal".  Motion at 29, n. 24.  Professor Macey's testimony at trial (coupled with the testimony of Mr. Blake and Dr. Shifrin) will demonstrate that UGI's level of control was far from "normal".  Indeed, it was eccentric.

testify and find that testimony beneficial.  For example, law professors have been allowed to testify to legal matters, so long as they do not address ultimate conclusions of law.  *See Cary Oil Co., Inc. v. MG Refining & Mktg., Inc.*, No. 99 Civ. 1725(VM), 2003 WL 1878246, *6 (S.D.N.Y. April 11, 2003).  The scope of Mr. Macey's testimony is addressed below in Section III(D)(3). Here, in a bench trial, there is no concern that a jury will be prejudiced by Professor Macey's testimony.  Simply put, in this case the Court can ignore any testimony it finds to teeter on being a conclusion of law.

Professor Macey's testimony will provide context for the Court.  As addressed more fully below, Professor Macey's testimony on UGI's pattern and practice of operating subsidiary MGPs will assist the Court to better understand this case.  His specialized knowledge and testimony is relevant not only to SCE&G's veil piercing claim against UGI but it also provides the Court with context for its operational control claim.

### 3.      Professor Macey's Opinions Are Reliable And Relevant

Even if the Court finds Professor Macey qualified, UGI argues that his opinions are unreliable and irrelevant.  As addressed above, it is incomprehensible how his testimony can be deemed irrelevant.  Moreover, Professor Macey's methodology in reviewing the record and forming his opinions in this case is reliable.

Professor Macey described his methodology in reviewing this record during his deposition.  More than 160,000 pages of documents (all of the documents produced by both SCE&G and the Defendant during discovery) were provided to Professor Macey.  Professor Macey does not have an assistant to help with his review of the documents; SCE&G's counsel provided Professor Macey with a list of key documents.  This list included the Federal Trade Commission's reports on UGI, UGI corporate histories, minutes and documents relating to

CCR&L and the Charleston MGP. Professor Macey reviewed these documents, taking notes as he did so, and his notes were converted into his report. Professor Macey's methodology for reviewing the extensive record in this case was reliable. Macey SC Depo. at 18-20, Exh. 15.

A review of Professor Macey's report reveals examples of relevant evidence regarding control, all of which is appropriate for the Court's consideration, and virtually all of which UGI now ignores. Professor Macey begins with a discussion of UGI's history, organization and management structure. Macey Report at 7-14, ¶¶ 23-50, Exh. 14. This section provides important context not only with respect to the manner in which UGI operated at the time, but it helps lay the groundwork for later opinions about the eccentricity of UGI's control. Professor Macey then transitions to a discussion of UGI's management and corporate governance practices including its control of its subsidiary companies. *Id.* at 14-20, ¶¶ 51-70, Exh. 14. This analysis not only bears directly on the control issues that are the focal point here, but provides further context to support Professor Macey's later opinions regarding the eccentricity of UGI's control.

He then discusses UGI's domination of CCR&L and the Charleston MGP. *Id.* at 20-31, ¶¶ 71-90, Exh. 14. This bears directly on the control issues central to the operator liability claim. Finally, Professor Macey describes how UGI's control of CCR&L created unfairness and injustice. *See id.* at 30-31, ¶¶ 87-88, Exh. 14. This testimony supports Plaintiff's veil piercing claim.

In conclusion, there can be no doubt that Professor Macey's testimony is both highly relevant and reliable.

## 4.    CONCLUSION

For all the reasons discussed herein, SCE&G respectfully requests that the Court deny UGI's Motion in its entirety.

Dated this 18th day of February 2009.

Respectfully submitted,

South Carolina Electric & Gas Company

By Its Attorneys,

/s/_____Elizabeth B. Partlow
        Federal ID # 2992
        Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        1320 Main Street, Suite 600
        Columbia, South Carolina 29201
        Telephone:   (803) 252-1300
        beth.partlow@ogletreedeakins.com


        Bruce W. Felmly
        Barry Needleman
        Cathryn E. Vaughn
        McLane, Graf, Raulerson & Middleton,
        Professional Association
        900 Elm Street, P.O. Box 326
        Manchester, New Hampshire 03105
        Telephone (603) 625-6464
        bruce.felmly@mclane.com


## CERTIFICATE OF SERVICE

        This is to certify that the foregoing SCE&G's Response in Opposition to UGI's Motion in Limine is being served via the Court's Electronic Case Filing system to UGI's counsel of record:

R. Scott Wallinger, Jr., Esq.
Federal ID No. 5868
Clawson & Staubes, LLC
126 Seven Farms Dr., Suite 200
Charleston, SC 29492-8144
swallinger@clawsonandstaubes.com

Jay N. Varon, Esq.
Foley & Lardner LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007
jvaron@foley.com

Dated: February 18, 2009                    /s/Elizabeth B. Partlow
                                            Federal ID # 2992
                                            Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                                            1320 Main Street, Suite 600
                                            Columbia, South Carolina 29201
                                            Telephone:    (803) 252-1300
                                            beth.partlow@ogletreedeakins.com