IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

SOUTH CAROLINA ELECTRIC & GAS   :    VOLUME I
COMPANY                          :
                                 :
              vs.                :
                                 :
UGI UTILITIES, INC.              :    2:06 CV 2627


          Trial in the above-captioned matter held on

 Monday, March 16, 2009, commencing at 10:08 a.m., before

 the Hon. C. Weston Houck, in Courtroom IV, United States

 Courthouse, 85 Broad Street, Charleston, South Carolina.


APPEARANCES:

                    BRUCE FELMLY, ESQ., BARRY NEEDLEMAN, ESQ.,
                    and CATHRYN E. VAUGHN, ESQ., P.O. Box 326,
                    Manchester, NH, appeared for plaintiff.

                    ELIZABETH PARTLOW, ESQ., 1320 Main Street,
                    Columbia, SC, appeared for plaintiff.

                    JAY N. VARON, ESQ., 3000 K Street NW,
                    Washington, DC, appeared for defendant.

                    PAUL BARGREN, ESQ., 777 E. Wisconsin Ave.,
                    Milwaukee, WI, appeared for defendant.

                    R. SCOTT WALLINGER, JR., ESQ., P.O. Box 12487,
                    Columbia, SC, appeared for defendant.



          REPORTED BY DEBRA LEE POTOCKI, RMR, RDR, CRR
          Official Reporter for the U.S. District Court
                        P.O. Box 835
                    Charleston, SC  29402
                      843/723-2208

```
 1                          I N D E X

 2

 3     WITNESS:   THOMAS EFFINGER

 4     Direct Examination by Mr. Felmly........................   28
       Cross-Examination by Mr. Bargren.......................  184
 5

 6

 7

 8

 9

10     EXHIBITS:                            Received in Evidence

11     Plaintiff's Exhibit 12                      175
       Plaintiff's Exhibit 14                      176
12     Plaintiff's Exhibit 11                      177
       Plaintiff's Exhibit 33                      177
13     Plaintiff's Exhibit 242                     178

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  This is Civil Action 06-2627, South

2    Carolina Electric and Gas Company, plaintiff, against the UGI

3    Utilities, defendants.

4       The case is called for trial this morning nonjury.  I

5    presume everybody is ready to go?

6          MR. VARON:  Yes, Your Honor.

7          MR. FELMLY:  We are, Your Honor.

8          THE COURT:  We've got some motions outstanding.  I

9    think probably we can dispose of them as we come to them

10   during the trial.  I received the plaintiff's opposition to

11   defendant's motion in limine to exclude plaintiff's proposed

12   Exhibits 196 and 197.  I received that today, this morning,

13   and that's the first time I had seen Judge Barbadoro's order.

14      I'll have to study it a little bit.  Quite frankly, I hate

15   to admit it, but I really was not familiar with Rule 803(16),

16   I never have had that come up in a case.  I'm familiar with

17   the ancient documents authentication under Rule 901.  We had

18   that way back in the asbestos cases.  But as far as the

19   hearsay aspect of it, I really was not -- Is that a new rule

20   or something relatively new?  Has it been around a long time?

21         MR. FELMLY:  I think it's been around awhile, but I

22   don't think it comes up all the time.

23         THE COURT:  I've never had it come up, quite frankly.

24   Okay.  If you'd like to make an opening statement, I think I'm

25   generally familiar with your facts, but if you'd like to make

1    an opening statement, I'll let you do it.  I don't want you to

2    make a real long one, but if you'd like to put it in a

3    nutshell and tell me how you plan to present your case, maybe

4    it might help me understand it a little better.

5              MR. FELMLY:  Shall I proceed, Your Honor?

6              THE COURT:  Let me see what the clerk has.

7         (Discussion held off the record.)

8              MR. FELMLY:  May it please the Court, my name is

9    Bruce Felmly, and together with Attorney Beth Partlow, Kate

10   Vaughn and Barry Needleman, we are the attorneys that

11   represent SCE&G, which is the plaintiff in this matter.  There

12   are also representatives from the company in the courtroom

13   this morning.  Stuckey Stodemeyer, Thomas Effinger and Counsel

14   Hagood Hamilton.

15       As the Court knows, this is an action brought under

16   Section 107 of CERCLA, seeking response costs for the

17   Charleston South Carolina MGP cleanup.

18       For the past 16 years, SCE&G has taken the lead in

19   organizing and performing that cleanup, and has incurred over

20   $48 million.  This action seeks to hold UGI joint and

21   severally liable for the response costs incurred in cleaning

22   up the site.

23       Now, I'm going to be using some of the exhibits that have

24   been marked, and these are all without objection.

25       The Court is probably familiar with the layout here.  This

1    site, this Charleston MGP operated from 1855 to 1957.  During

2    that period of time approximately 21.4 billion cubic feet of

3    gas was produced.  And that gas was, of course, used by the

4    people of Charleston for heating, lighting and cooking.

5       The manufacturing of gas was largely replaced in the

6    modern era when natural gas pipelines came to this region, but

7    during the historic period this was a critical process for the

8    fuel and heating needs of the city.

9       We'll be spending a fair amount of time with the Court on

10   the process of manufacturing gas and evidence on that, but it

11   essentially involves the heating or combustion of a fuel such

12   as coal or coke, commonly mixed with oil or other products, in

13   order to create the gas.

14      The by-product of that process, tar, condenses out of that

15   vapor that's been formed in the combustion, and has potential

16   to accumulate in the various vessels and piping and other

17   parts of the production process.

18      It is such a large part of the process that it's really

19   integral to the process, because the volumes and the amounts

20   of tar are huge, and really have to be dealt with by the

21   company running the manufactured gas plant.

22      In this case, it is obviously the tar that is the

23   contaminant that we're dealing with.  It comes from the

24   manufactured gas plant, it is the residual or the by-product

25   that contaminates the MGP plant, and is really the target of

1    the cleanup.

2        It's estimated that during the years of the operation of

3    the Charleston MGP, approximately 14.1 million gallons of tar

4    were produced.  There are various rates of production based on

5    the exact type of gas that's produced, but it runs between

6    half a gallon to a gallon per 1000 cubic feet of gas.  So the

7    critical element in terms of manufacturing, and as it ties

8    into the pollution here, is going to be that the operator of

9    the manufactured gas plant is not only producing gas, but the

10   production of gas means the production of tar, that means the

11   handling of tar, the storage of tar, the sale of tar, and

12   ultimately, thinking of the technology in a historic era, the

13   leakage and some release of tar into the environment.

14       This is not a case about intentional dumping of tar.

15   SCE&G does not contend that UGI, during the period of its

16   control, was intentionally dumping tar.  There were technical

17   limits on these vessels, the volumes are huge, but this is a

18   case about tar getting into the environment as a direct result

19   of the operations.

20       Now, let me just talk a little bit about the site.  I know

21   the Court again is familiar with it, but let me describe and

22   show --

23           THE COURT:  I'm not.  I'm looking, I see the map

24   here.

25           MR. FELMLY:  Let me take a little more time.  We're

1    talking about an area adjacent to the Cooper River.

2         THE COURT:  Reading the papers, I know it's

3    relatively close to the Aquarium.

4         MR. FELMLY:  It is close to the Aquarium.  And what

5    you see here in the portion of Exhibit 78 that's now being

6    displayed, we've superimposed on this superfund site, some of

7    the modern area structures that are there.  So you can see

8    that down by the water, the area where the Aquarium is, where

9    the Imax theater was, and the electrical substation and the

10   parking garage.  And what we have here is a manufactured gas

11   plant that was on a portion of this area, and then

12   contaminants have spread into these adjacent areas.

13        Almost all of the remediation efforts, Your Honor, involve

14   dealing with tar, either directly as a gooey black product in

15   the subsurface, or the impact that that tar has as groundwater

16   flows under the surface and comes in contact with the tar, and

17   leaches out, if that's the correct word, the contaminants in

18   the tar.

19        And over the past 16 years SCE&G has worked very closely

20   with the EPA and with South Carolina's agency, the

21   environmental agency, DHEC, in what's called a phased approach

22   to this problem.

23        The Court knows from our pretrial brief that we subpoenaed

24   Mr. Zeller from the EPA, who is the manager of that site.

25   After some procedures, we were able to get that deposition

1    videotaped last week, and you'll have that available.  He's

2    the gentleman in charge of the site now from the EPA, and I

3    think the Court will be interested in his testimony.

4        The City of Charleston actually was developing this area

5    of the riverfront, particularly with respect to the Aquarium,

6    when this contamination was found, really in the late 80s.

7        And as a consequence of that, an investigation began, work

8    became underway --

9            THE COURT:  What's on the property now?

10           MR. FELMLY:  Pardon?

11           THE COURT:  What's on the property now?

12           MR. FELMLY:  Well, a variety of things.  There's the

13   Aquarium is on the property, there's an electrical substation,

14   there's a parking garage, there's an area of a park.  The

15   National Parks Service has a facility there where they take

16   the boats out to Fort Sumter, there's a variety of things that

17   are there.

18       But the City wanted this developed on an expedited basis.

19   You will recall that at our motion for summary judgment

20   hearing you raised the question, I think with me, over whether

21   or not the arrangements between SCE&G and the City related to

22   the bus franchise, the sale of the bus arrangement in the City

23   or the franchise for electric service.  There is an

24   arrangement where my client made payments of $24 million to

25   the City for it to do environmental cleanup.  Nothing to do

1    with the bus company, nothing to do with the electric

2    franchise.  There are separate agreements, you'll see them in

3    evidence, you'll hear testimony from the City witnesses and

4    from Mr. Effinger.  But there certainly was a payment made for

5    the City, who wanted to work faster and quicker to take on

6    some of these obligations, and they did, and they actually

7    spent more than $24 million.  But that's a portion of our

8    claim.

9        The other aspect of it is this is a project that has been

10   ongoing this whole period and is nowhere near complete.

11       We have a statute of limitations claim that UGI has raised

12   going back to counting from when the first, you know, work was

13   done on this site.  This is a site that has not been

14   finalized.  Tar is being pumped out of that site as we sit

15   here today, or stand here today.  This is a photo that shows

16   the kind of facilities that take the tar out.  There is

17   subsurface tar under holders, there are portions of the site

18   that have yet to be developed, there are sediments in the

19   river yet to be cleaned up.  There's a host of work that is

20   part of our declaratory judgment request saying that as this

21   future work goes forward, UGI should respond in the costs

22   related to that.

23       There's an issue in this case over whether the work is NCP

24   compliant, does it follow the requisites of protecting

25   workers' safety and health, does it protect the community

1    participation.  All of the work, we believe, is NCP compliant,

2    and you'll hear from several witnesses on that.

3        The heart of this case, and I'm going just take a few

4    minutes on it and be very brief here, the heart of this case

5    is obviously the question of in the interval when UGI was

6    involved with the Charleston MGP, which is 1910 to 1926, did

7    it provide the requisite control, management, direction, so

8    that it is a party that has to be responsible in a joint and

9    several way.  And that's a very intense factual inquiry, and

10   I'm certainly mindful the Court has seen the briefing of the

11   parties on that.

12       UGI arrived in 1910 in Charleston.  Through a series of

13   transactions, it took control of the site.  It described it

14   when it came to town in the organization chart that it would

15   be taking the properties over.  UGI, as the Court knows, was a

16   systemized, nationwide, or at least east coast—wide

17   organization with many plants.  We will be looking at that

18   issue.  And we believe that it is responsible, because that

19   control was dominant, that control certainly was within

20   Bestfoods, and that it is liable.

21       UGI says, well, even if we're liable, we should allocate

22   these damages.  We shouldn't be liable for the whole period.

23   And they have a burden, as you know, and if the Court accepts

24   that approach, we believe that you would find that about

25   23 percent of the gas production over the history of this

1    plant was on the UGI watch.  From 1910 to 1926.  And gas

2    production we think in this case is the most reliable way to

3    fairly allocate, if the Court does allocate it.

4        There are also some periods where there's nobody that is

5    currently in existence or alive as a company, so-called orphan

6    shares, and they add up to about another ten percent.

7        So there's a basis to allocate, if the Court decides to do

8    that.

9        With regard to the evidence and how we're going to present

10   our case with respect to UGI and control, it is not a

11   consultant or an adviser, it was a very eccentric, in the

12   words of Bestfoods, controlling entity that had a system, it

13   came out of Philadelphia, had many of these plants in

14   existence.  In fact, in 1916 UGI had about 40 plants,

15   according to its own papers, scattered throughout the

16   Northeast and into the Midwest.  By the time it got to 1930,

17   just four years after it finished in Charleston, it had about

18   71 plants.  And this is right out of UGI's corporate history.

19   It referred to its operation as an empire.  But this isn't a

20   case about labels, it's a case about looking at very specific

21   information about what they did on a day-to-day basis.

22       And let me tell you what our principal witnesses are going

23   to be, and just a word or two about what each of them are

24   going to say.  And some of them are long witnesses.  Thomas

25   Effinger will be called today as our first witness.  He's the

1    person at SCE&G most responsible for the remediation, worked

2    on it day in and day out for many many years.  Very familiar

3    with the locations, the nature of what's been done, the timing

4    of what's been done, and the costs that have been incurred.

5    He very specifically will discuss the timing and the fact that

6    this has been a planned, staged presentation by the agencies,

7    and an approval, and that this is not something where we've

8    sat on our hands or should be time barred, but rather, there

9    has been a step-by-step approach where we didn't even know

10   what some of the remediation steps were going to be until

11   we're well into the 2000 period.

12       There really has never been a permanent remedy

13   established.  Only until very recently do we even have the

14   inkling of it.  And it's not complete even today as to how

15   this site's going to be cleaned up.  And you'll hear about

16   that.

17       Dr. Neil Shifrin is an environmental scientist and an

18   engineer, probably one of the people in America who has been

19   most involved in manufactured gas plants.  He will discuss

20   with you the nature of the plant, how tar is produced, how it

21   is that management of a plant results in tar, what pieces of

22   equipment and what acts of UGI tie them or link them to the

23   tar and the waste that Bestfoods requires.  And then bringing

24   to bear his environmental experience, will take you through

25   the information that will actually show how that tar today is

1    in the environment and what the link is to UGI's property.

2         And let me just move quickly to that, if I can.  If we go

3    to the historic composite, which is, Denise, Exhibit 78, this

4    map, Your Honor, that Dr. Shrifrin has prepared, identifies

5    the site and identifies the -- in purple or lavender -- the

6    facilities that UGI had involvement with during the day, and

7    that he believes related to their work that would tie into

8    tar.

9         And in the next slide what he does, and of course you

10   cannot read the detail, but you'll get the message, he has

11   then annotated each of those pieces of equipment to identify

12   the sources of information that tie it or link it to UGI's

13   role.

14        And then in the next slide he's taken the issue of what's

15   going on in the environment.  And if I can just orient to

16   this, this is sort of a cross-section, Your Honor, where on

17   the surface you see those UGI purple facilities, and then

18   using the tests and the borings and the wells that have

19   established where the contaminants are, where the tar is,

20   we're able to see the relationship of those contaminants to

21   those same facilities.  And all of that is critical in terms

22   of that linkage between UGI, which is very much a part of our

23   case.

24        This tar has been fingerprinted almost like, you know, a

25   DNA thing, and we can determine within certain ranges which

1    tar was UGI and which tar may not have been UGI.  So that will

2    be an important part of our case.

3        Just to finish up here quickly, two other critical

4    witnesses I want to mention.  Thomas Blake is a CPA, 25 years

5    plus of audit experience, many forensic engagements, very

6    familiar with the relationships of companies, parents,

7    subsidiaries, tremendous amount of experience with regard to

8    determining what is the real substance of transactions, rather

9    than the form of documents.  He has extensively reviewed the

10   records in this case, he's actually got very great experience

11   in prior cases with UGI, and he will be addressing questions

12   like whether or not UGI's statements were recommendations, or

13   in the context of those transactions, were they actually

14   directives.

15       He will go through the breadth and the depth of this.  It

16   will be very detailed testimony, we've created lot of

17   summaries and composites in an effort to present a great deal

18   of information in an efficient way.

19       But just one thing, if you could bring up Exhibit 225,

20   Denise, I want the Court to understand when UGI says, well, we

21   just provide recommendations -- then if you could zoom in on

22   this through the use of our technology, when UGI met and made

23   decisions about its companies, there would commonly be, as you

24   can see here, a number of companies across the country that

25   they would make various rulings on with respect to these

1    items.  And you'll see a lot of this.  This is not a case

2    where they say, well, offered for the consideration of the

3    Charleston plant is maybe you should buy some steel.  There

4    would be listings of their companies.  And they would do them

5    in groups, and they would act in a way that's far more

6    consistent with directives than is the case with an adviser.

7        The last witness that I'll mention is Professor John

8    Macey.  He is a professor at Yale.  He is not here to tell you

9    the law, but he is an expert on corporate governance, he

10    understands the relationships of related companies, he has

11    tremendous experience looking at UGI, he's testified on these

12    matters.  His testimony has been of aid to the Court in a

13    variety of cases.  And he will focus very heavily on our veil

14    piercing claim, on the issues of whether or not this is an

15    abuse of the corporate forum and the companies that are

16    involved in it have been injured.

17        UGI plainly was a technological giant.  It brought

18    technology and tremendous experience and a system to this

19    process back in the historic period.  All of the people who

20    were involved in that are now gone and have been gone for many

21    years, all the leaders of UGI and the leaders in Charleston

22    are gone.  But the record remains, and the interpretation of

23    it, I think, is clear.

24        And we look forward to try to bring that to life for you

25    in the courtroom using the historic record and the experts,

1    and we'll hope to do that efficiently.  That's just a very

2    small thumbnail sketch, but in the time allotted, I hope

3    that's helpful.

4        Thank you.

5            MR. VARON:  Good morning, Your Honor.

6            THE COURT:  Morning.

7            MR. VARON:  I'm Jay Varon from Foley and Lardner on

8    behalf of defendant UGI.  With me at counsel table is Paul

9    Bargren from our firm; Scott Wallinger from Clawson Staubes;

10   and we have UGI representatives Tom Jackal and Michelle Bimson

11   in the courtroom as well.

12       Your Honor, not surprisingly, we have a very different

13   view of what the evidence will show, in particular as to what

14   Mr. Felmly calls the heart of the case, the so-called UGI

15   control period.  And before I preview for you what our view

16   is, I think it might be worth asking for a second why the two

17   sides have such different views of a common documentary

18   record.

19       And as Your Honor hears the trial over the course of the

20   next week or so, I think these issues will come to fore.

21       First of all, as Mr. Felmly alluded, nobody is alive who

22   was watching the way UGI operated or the way CCR&L operated,

23   the subsidiary at issue, Charleston Consolidated Railway.  All

24   you have is the documents.  So when the experts and the

25   witnesses get up, they know only what they could have gathered

1    from the documents.

2        The issue is, what did they read?  Did they read

3    everything?  Was it complete?  And if it was complete, did

4    they interpret it properly?  Were they looking only for

5    certain issues, or did they read everything?  If they read it,

6    did they understand it?  And if they understood it, was their

7    analysis encumbered by making flawed assumptions or

8    inferences?  Sometimes not even articulated.

9        There are lots of illustrations of this problem, but we'll

10    show one right from the outset.  If we could show up

11    Exhibit 212, Defendant's Exhibit 212.

12        One of the things that plaintiffs are doing, Your Honor,

13    is focusing on, as Mr. Felmly indicated, UGI's control through

14    various sources.  One of the things they claim is that UGI

15    audited the Charleston gas plant on numerous occasions.  And

16    if Your Honor sees this, there are eight pages of this exhibit

17    with dozens and dozens of references of supposed audits of the

18    Charleston plant.  But when you actually look at the

19    underlying documents, none of the audits were of the

20    Charleston plant, they were all of the subsidiary, Charleston

21    Consolidated Railway.  If you could show an example.

22        This is from the second page, the exhibit says the

23    Charleston plant was audited, correct, for the dates, but when

24    you look at the exhibit -- maybe you can make that a little

25    bigger, Andrew -- it's not that the plant was audited, it's

1    that the following accounts of the following companies have

2    been audited and found correct.  And yes, the Charleston

3    accounts were correct and UGI, as the parent, audited them.

4        Now, why does the plaintiff talk about the plant being

5    audited as opposed to the company?  It's because they've made

6    an assumption in the case, Your Honor, that the plant and the

7    company are the same thing.  And so when they talk about

8    things happening at the plant, they don't distinguish it from

9    the company, even though Bestfoods and its operator liability

10   section makes a clear point of saying that you have to look at

11   the activities that were conducted at the facility, and those

12   that were conducted with respect to pollution.

13       Plaintiff's case in large part is about what happened at

14   the company, and they don't necessarily articulate it.  This

15   is one of -- first of all, every reference on this exhibit has

16   the same defect, talk about auditing the plant when it's the

17   company, and other exhibits are going to have this same

18   problem.

19       In addition, if you just look at the first page again,

20   you'll see that there are repeated references to the same

21   audit.  They've listed seven times out of ten times on the

22   first page, that the Charleston plant was being audited, for

23   the year of 1912, and you've got eight pages of this.  So

24   obviously they're exaggerating the degree to which it's

25   audited.

 1          Another reason why we have different views of the

 2     evidence, Your Honor, is that there will be assertions about

 3     company X took a particular action.

 4          THE COURT:  I would rather you review your case.

 5     It's inappropriate in opening statement to argue it, and

 6     that's what we've got here.  And the reason it's

 7     inappropriate, because I don't know what evidence is going to

 8     come in, first of all, and secondly, I can't understand your

 9     argument until I see the evidence.  So let's --

10          MR. VARON:  I will move to that.

11          THE COURT:  Nonjury is a lot different, granted, but

12     still, the rule is that you don't argue it, you just state in

13     general terms what your case is all about.

14          MR. VARON:  Okay.  Well, Your Honor, in part

15     though --

16          THE COURT:  Say what now?

17          MR. VARON:  Excuse me?

18          THE COURT:  What did you say?

19          MR. VARON:  I said -- I was just going to continue.

20     I was going to say, in part, part of our case really is trying

21     to prove a negative.  Mr. Felmly and SCE&G are here saying UGI

22     operated, UGI did this, and much of our case is trying to say

23     we didn't.  It's like somebody says there are UFOs.  How do

24     you disprove that?  You kind of show that the evidence that

25     they're coming forward with, doesn't prove what they say.  And

1    that is what a large part of our case is going to be.  That

2    their evidence doesn't meet the test, and that their evidence

3    is going toward a different standard than the standard that is

4    there.  But that's the point, Your Honor, and I will move on.

5        I guess the thing I'd like to show is that because they --

6    I guess the other document, the other point I really want to

7    make is, again, in a defensive posture, they don't have any

8    documents or any evidence that will show UGI managing,

9    directing, conducting disposal at the Charleston site.  There

10    just are no documents.

11        They'll show you a policy about tree trimming that UGI

12    sent all the subsidiaries, but there isn't a single document

13    in the record that shows UGI conducting, managing or directing

14    these waste disposal activities.  That's why they will show

15    you all kinds of other documents and the documents that you

16    will see will show, for example, as Mr. Felmly indicated, that

17    UGI was a holding company that had interests in dozens of

18    subsidiaries during this 1910 to 1926 era.

19        And, of course, Your Honor, the evidence will show that

20    there was no financial state regulatory/federal oversight of

21    investments and securities back then.  So UGI invested in all

22    these companies, and they had to track and monitor their

23    investments.

24        You will see, Mr. Felmly has composite exhibit of a

25    composite exhibit about recommendations that UGI made about

1    equipment, about centralized purchasing, about charitable

2    donations, all of this in an effort to track what its

3    subsidiaries were spending and to monitor its investment.

4    Even today we find that with the sophisticated regulatory

5    oversight we have, people get defrauded even in a

6    sophisticated environment like today. UGI was acting in a

7    very prudent and rational way by following and approving and

8    recommending various expenditures for its subsidiaries to

9    make.

10        The other piece of evidence that I want to focus on, Your

11   Honor, is that you'll hear -- the closest evidence that you

12   will hear about UGI trying to direct or conduct anything about

13   waste -- this is plaintiff's theory, not mine -- they will

14   tell you about annual superintendent and employee conferences

15   that UGI held. These were professional conferences.

16   Plaintiff's theory is that these were centralized meetings

17   where UGI used them to try to instruct its employee -- the

18   employees of its various subsidiaries about how to run a gas

19   plant, how to do waste disposal. Their theory is that these

20   conferences were the vehicle for doing that. Certainly you

21   will see when you look at the UGI committee minutes, that none

22   of those minutes had anything to do with waste disposal. So

23   this is the other source of information that conceivably could

24   have been used for directing waste disposal activities.

25        And when you review them, you will find that there are

1    discussions -- and maybe you could put that waste handling

2    Exhibit up, Andrew, 158.

3        All it was, Your Honor, and plaintiffs seem to acknowledge

4    this, is that there were discussions at these conferences by

5    different local employees at subsidiaries.  And you'll see

6    that plaintiff refers to discussions at superintendent

7    meetings.  They weren't directives, Your Honor, it wasn't a

8    boot camp saying you will do X and Y.  It was a free-wheeling

9    discussion by different local companies facing local market

10   problems, local engineering issues, reciting how they solved

11   particular problems.

12       And not only was it decentralized and free-wheeling

13   discussion, you'll find evidence that Charleston's engineer,

14   CCR&L engineers, the ones that were supposedly being led

15   around by the nose by UGI, were leading many of these

16   discussions and writing articles about important engineering

17   issues.

18       You'll see that Charleston, a guy named E.C. Kollock was

19   the one who developed a system of daily apparatus inspection

20   at the plant to inspect the equipment every day and report on

21   it.  You'll see that Charleston engineers made decisions about

22   whether to increase the capacity of gas holders.  You'll see

23   that there was an analysis about how to deal with the reduced

24   storage capacity at the plant and to fix it.  You'll see that

25   Kollock created his own tar still in a novel way, because of

1    the poor market for tar in Charleston.  All kinds of decisions

2    that UGI made independently.  And so the whole notion of

3    direction and control as a result of these conferences, I

4    think, Your Honor, will be belied.

5        And in general, Your Honor, I think the whole theory that

6    plaintiffs have created here, of UGI trying to direct

7    day-to-day decisions about waste disposal from 700 miles away

8    in Philadelphia, at the end you will see doesn't make sense,

9    and also is belied by a lot of the evidence you will hear.

10        Mr. Vandeven, our environmental expert, will tell you and

11    describe how the gas making process is really a localized

12    process, and the kind of day-to-day, hour-to-hour process.

13    Mr. Vandeven, I think, will cite treatises, and he is a very

14    experienced engineer who has been in a lot of gas plant cases

15    himself.  So we look forward to his testimony.

16        This notion is contradicted by the large work force you'll

17    hear about, Your Honor, at the Charleston gas plant.  The

18    Charleston gas plant had dozens of their own employees,

19    foremen, superintendents, gas makers, gas makers' assistants,

20    fitters, all kinds of people who were the ones that were doing

21    the day-to-day running of the plant.  And you won't find any

22    direction on how to make gas, on how to make tar, on how to

23    dispose of tar.  You'll find papers that were published and

24    disseminated as best practices; that's all you'll find.

25        Another -- I want to highlight two important exhibits,

1    then I'll briefly talk about procedure, and stop, Your Honor.

2         The point about which company took action is a critical

3    one.  When plaintiff says that Dr. Shrifrin is going to show

4    you these very nice maps and point to the source of the

5    equipment, he's going to be making assumptions about who

6    approved the equipment, who is responsible for the equipment,

7    who operated the equipment.  And that is going to depend in

8    large part on how you view the actual employees and the people

9    involved in this matter.

10        We have two biographical exhibits that I think are going

11   to be critical to Your Honor in going forward with the trial.

12        One is 225, which is a list of biographies of all the --

13   not all, but probably most of the key personnel that you'll

14   hear about in the case.  And it's indexed, you'll be able to

15   keep track of who each person is, whether they work for CCR&L,

16   whether they were a UGI person.  And we have a color chart to

17   make it easier, which is Exhibit 226.  And the color chart is

18   up there now, Your Honor, before you as well.

19        So you see that if somebody was a CCR&L employee, there

20   will be a green bar during the applicable time year.  If they

21   were in UGI, you'll see that gold hatch thing, and if they

22   were concurrent, and there were certain employees who were

23   both officers and directors of UGI and CCR&L, you'll see the

24   blue thing.  Maybe just focus on Gadsden for a second.

25        Your Honor, Philip Gadsden was a local Charleston lawyer,

1   former legislator, president of both Charleston Consolidated

2   Railway Gas and Electric, and CCR&L, the subsidiary at issue.

3   And so you can see Gadsden, beginning in 1910, was a CCR&L

4   employee, officer and director; no UGI allegiance whatsoever.

5   In 1919, the second half, he was appointed to be a UGI vice

6   president.

7        A lot of what you will hear in the case, Your Honor,

8   depends on how you view these employees.  Plaintiffs will view

9   people like Mr. Gadsden, Mr. Waring, George Waring, who was

10   the general manager of CCR&L, he was a vice president, he was

11   an officer, a director.  You will hear that Waring oversaw,

12   for example, the construction of the new gas plant that was

13   built in Charleston.

14        Plaintiffs will attribute Waring's supervision to UGI,

15   because Waring used to work at a different UGI company

16   previously.  But key to the case, Your Honor, is when Waring

17   did something, when Mr. Kollock, who created the tar still and

18   who was a CCR&L employee and gas superintendent, did

19   something, when each of the people took action, whose action

20   was that?  We submit to you it was CCR&L's action.  And that

21   when Your Honor hears testimony that UGI did a particular

22   thing, you need to really ask, well, on what basis, who did

23   it?  Was it a UGI person that did it, was it a CCR&L person

24   that did it?  Were they wearing -- were they working for CCR&L

25   in their normal capacity?  That is going to color a lot of

1    what the actions are in the case.

2        Let me just turn quickly to the procedural aspects of the

3    case, Your Honor.  Again, we have a different view.  It may

4    turn in part on the law rather than the facts.  But

5    plaintiff's argument about the statute of limitations is that

6    there was no final remedy, there's still no final remedy

7    today, you can't start the statute of limitations.  But the

8    statute of limitations that we're focused on in particular, is

9    the one that's going to affect the remedial activity at the

10   site that began in 1998 or 1999.  And the statute of

11   limitations that governs that particular activity, remediation

12   activity, is triggered by the beginning of onsite construction

13   that's consistent with a permanent remedy.

14       That activity, in other words, in 1998, the EPA issued a

15   Record of Decision, a ROD, that evaluated the various remedial

16   actions that could occur at the plant.  And it was targeting

17   the problems that it saw, which were basically that there was

18   tar on the -- at the site and needed to be extracted.  And

19   they evaluated the different remedies, came up with -- you'll

20   see it -- 120-page document about what the remedy was going to

21   be, and then everybody started cleaning up the site in

22   connection with that ROD.  They began to extract the tar, they

23   monitored groundwater, they did all the remediation activity.

24   That statute of limitations started running in '98 and '99,

25   and required suit to be filed within six years.  Suit wasn't

1    filed until late 2006; it should have been filed no later than

2    2005; and we think that that action is time barred.

3        The notion that you would never have the statute of

4    limitations begin when -- especially when it focuses on the

5    trigger being the initiation of onsite construction just

6    doesn't make any sense.  And I don't want to argue the law,

7    Your Honor, but I think you'll see that the cases support

8    this.

9        The other comment I'll make about the procedure is that

10   this $26 million payment to the City is, I think, improper for

11   a variety of reasons.  I mean, first of all, the only way it

12   can be brought before Your Honor is as a contribution claim.

13   We don't think it's a valid contribution claim, but if it was,

14   it would be based on conduct that occurred in '96 or '93

15   order, and it would be time barred.  And finally, most of the

16   money was not spent on environmental activity.  You will hear

17   evidence that, you know, some of it was spent to build a

18   tunnel and a wall that was helpful, but none of that work was

19   supervised by the EPA, none of it was done pursuant to a

20   Record of Decision.

21           THE COURT:  This is all argument.

22           MR. VARON:  Well, Your Honor, it's -- I think it's

23   evidence, and this is what you're going to hear.

24           THE COURT:  No, it's purely argument.  You're going

25   to be making the same arguments at the conclusion of the case.

THOMAS EFFINGER – DIRECT EXAMINATION

1    And I just -- it doesn't help me to hear the evidence to

2    receive those arguments twice.

3           MR. VARON:  Okay.  I think that I've essentially

4    said --

5           THE COURT:  And it may be that this is the type case

6    where you don't have an opening statement to make.  Maybe it

7    is all the credibility of the plaintiff's case.  If that's the

8    case, then we'll get to it.

9           MR. VARON:  I will say a lot of our case is

10   defensive.

11          THE COURT:  I understand that.

12          MR. VARON:  Thank you, Your Honor.

13          THE COURT:  Call your first witness.

14          MR. FELMLY:  Thank you, Your Honor, plaintiff will

15   call Thomas Effinger.  Mr. Effinger, can you come forward.

16          THE CLERK:  State your full name.

17   A.  Thomas N. Effinger.

18      THOMAS EFFINGER, a witness called by the plaintiff, first

19   having been duly sworn, testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. FELMLY:

22   Q.  Good morning, sir.

23   A.  Good morning.

24   Q.  Would you please state your full name and your business

25   address for the record?

THOMAS EFFINGER – DIRECT EXAMINATION

1    A.   Thomas N. Effinger, and my office is at 6248 Bush River

2    Road in Columbia, South Carolina.

3    Q.   And what is your occupation, Mr. Effinger?

4    A.   I am a manager of the corporate environmental services

5    department at SCANA.

6    Q.   And what is SCANA?

7    A.   SCANA is the holding company for South Carolina Electric

8    and Gas, SCE&G, and several other subsidiaries.  So SCANA

9    would be the corporate holding company.

10   Q.   So in terms of your position then, your corporate

11   managerial environmental position, who is it that you provide

12   services to within your holding company setup?

13   A.   Within the holding company, our environmental services

14   group acts as an internal consultant to the subsidiaries,

15   throughout the companies, and SCE&G gas operations is one of

16   those customers.  And that's where we provide the service of

17   doing turnkey work at these manufactured gas plants sites and

18   doing -- conducting the remediation.

19   Q.   So can you describe for the Court, for the benefit of the

20   Court, what your principal responsibilities and day-to-day

21   activities are in connection with your job as a environmental

22   manager?

23   A.   Currently I have responsibilities not only with the gas

24   folks, we have a gas company in North Carolina, PSNC, I also

25   provide permitting and licensing, oversight, my group does for

THOMAS EFFINGER – DIRECT EXAMINATION

1   the generation folks, and they're the ones that generate the

2   electricity.  We have a pipeline company.  So there's a lot of

3   compliance, permitting and remediation services that we

4   provide.

5   Q.  And do you do that alone or do you have a team of people

6   that work with you or under you?

7   A.  I have a team of folks that work for me.  I've got five

8   direct reports, and I believe I'm at 13 total in that chain.

9   Q.  Now, to what extent do your duties involving environmental

10  management relate to SCE&G's MGP plant or these legacy MGP

11  plants from the historic era?

12  A.  It's a great deal of work.  Currently I have another

13  person who has accountability for that, but back in the day

14  when all of this remediation, when all of this cleanup work

15  was going on in Charleston, there was a very healthy chunk of

16  time devoted to it, something on the order of 70 percent,

17  depending upon what phase the project was in.

18  Q.  Would that be 70 percent of -- on average, of your time,

19  would you say?

20  A.  Yes, sir.

21  Q.  And how many manufactured gas plant sites do you have that

22  you have been administering or remediating?

23  A.  We have four in South Carolina that we're working with,

24  and those are under SCE&G.  There's also seven in North

25  Carolina that are PSNC's responsibility.  We have split four

THOMAS EFFINGER – DIRECT EXAMINATION

1    of those with Progress Energy, so we're effectively managing

2    five in North Carolina.

3    Q.  And could you describe for the judge your role in

4    Charleston?  To what extent have you had responsibility over

5    the Charleston MGP, which is obviously the subject of this

6    action.

7    A.  Right.  Charleston's been going on for a long time.  My

8    involvement started about the mid 90s, and it became more

9    involved as the project manager who was working for me at the

10   time had open-heart surgery.  So I got more directly involved

11   in the late 90s with it.  And that's continued through today.

12   And it's been a constant dealing with the agencies and

13   managing the work on site.

14   Q.  So from approximately what year have you been the person

15   for SCE&G that has been the manager or the point person on the

16   Charleston cleanup?

17   A.  About '94 or '95 through present.

18   Q.  And in terms of your responsibilities in that interval,

19   and while it may have gone up and down a little bit in terms

20   of your workload, have you stayed involved continuously in

21   that process?

22   A.  I have stayed involved continuously, yes, sir.

23   Q.  Is there anybody at SCE&G that you're aware of that would

24   have more information about the Charleston MGP site from the

25   company point of view, other than you?

THOMAS EFFINGER – DIRECT EXAMINATION

1    A.  No, sir.

2    Q.  Can you provide the Court just a brief background of what

3    your education and training is to be handling these

4    responsibilities and duties?

5    A.  I got a chemistry degree from Duke University, started

6    working, went back to school part-time and got a chemical

7    engineering degree from the University of South Carolina.

8    Beyond that, there's been lots of training in the

9    environmental area dealing with everything from asbestos,

10   USTs, oil spills, lead paint abatement, all of those kinds of

11   activities.  So --

12   Q.  In terms of your engineering experience and your chemical

13   engineering degree, have you gone on to become certified or

14   licensed in any way as an engineer?

15   A.  Yes, I have professional engineering registration in both

16   South Carolina and North Carolina.

17   Q.  How long has the total period of your employment been at

18   SCE&G, or the parent company, SCANA?

19   A.  Come this August, it will be 28 years.

20   Q.  And prior to taking on the environmental site management

21   job, did you have other positions at SCANA or at SCE&G?

22   A.  Yes, sir, for the first ten years at SCE&G I worked in

23   design engineering for the nuclear plant, the V.C. Summer

24   nuclear station at Jenkinsville.

25   Q.  And before you came to SCE&G at all, did you have any

THOMAS EFFINGER – DIRECT EXAMINATION

1    technical or engineering jobs at other companies?

2    A.  Yes, sir, when I first got out of school with the

3    chemistry degree, I started working at RCA Records in the area

4    of research and developments.  Then when recession hit in

5    about 1979, I left and came to South Carolina and worked at

6    Anchor Continental in the adhesive recovery area doing

7    research and development and improvements for toluene

8    recovery, for solvent recovery.

9    Q.  Now, let me turn our attention, Mr. Effinger, to the

10   Charleston MGP site, and I obviously addressed some of this in

11   the remarks I made to the Court before.  But in terms of the

12   location of this site -- and we're putting up a portion of

13   Exhibit 78, which is a map or an aerial -- can you orient the

14   Court by using the photograph here and the ones that I'll be

15   showing you in a moment, as to where the area of this is in

16   connection with the Charleston peninsula?

17   A.  Yes, sir, it's located on the east bank on the Cooper

18   River.  And you can see that light blue area, it started out

19   being about 18 acres and grew to be about a 30-acre site.

20   Right there on the Cooper River.

21        MR. FELMLY:  If you can bring up the next photograph,

22   Denise.

23   Q.  Again, this is from Exhibit 78.  What does this picture

24   depict?  Obviously it's labeled former MGP site.  Maybe you

25   can explain to the Court what we're seeing here in terms of

THOMAS EFFINGER – DIRECT EXAMINATION

1    major structures.

2    A.   Yes, sir.  At the foreground you see the almost house

3    book -- house boat-looking structure, that's the South

4    Carolina Aquarium.  And to the left of that is the Fort Sumter

5    tour boat facility.  Behind those two structures going west is

6    the Liberty Square, and then diagonal and upgradient from that

7    is our electric substation where most of the former MGP

8    structures were located.

9    Q.   The area that is shaded in the sort of aqua or light blue

10   and labeled former MGP site, did the site cover the entirety,

11   did the manufactured gas plant that was there in the historic

12   day, did it cover all of that area?

13   A.   No, it did not.  It was mostly back on the electric

14   substation.  And then the Imax theater that you pointed out in

15   opening, was a former steam plant, and it's been converted to

16   the Imax theater, which is now closed.  So those were the main

17   structures in the day.  But even before that the water, the

18   Cooper River shoreline was actually further inland than what

19   it is shown now.

20         MR. FELMLY:  Let's bring up the next photo, Denise.

21   Q.   We saw this again earlier.  Using the same -- obviously

22   this is now from above -- does this, called ROD site

23   definition, does this describe the area from Exhibit 78 that

24   shows how modern structures are positioned on top of an aerial

25   photo?

THOMAS EFFINGER – DIRECT EXAMINATION

1    A.  Yes, it does.  You can see the electric substation and

2    the -- I think later on we have slides that show that gas

3    holder in the northwest corner of that.  You've got the

4    parking garage, the National Park Service and the South

5    Carolina Aquarium.  And those are bounded by Calhoun Street

6    towards the bottom, Concord Street, Charlotte Street and

7    Washington Street.  And then the cross-hatched areas out of

8    that are the much bigger areas where we had to do a lot of our

9    investigation, groundwater measurements, sampling and

10   analysis.  So those are all part of the site as well.

11   Q.  Now, is this area a federal superfund site?

12   A.  Yes, it is.

13   Q.  And what's the name that EPA has given to this site?

14   A.  They've called it several names.  Typically they refer to

15   it as a Calhoun Park area site.  They've also called it the

16   Charleston Manufactured Gas Plant site.

17   Q.  Is the former footprint of the old Charleston manufactured

18   gas plant that operated there historically, identical in the

19   footprint of the size of the superfund site?

20   A.  The size of the superfund site is much bigger, because it

21   includes the surrounding areas which may have been impacted by

22   operations at the footprint itself.  The electric substation

23   is something on the order of four acres.  Initially they

24   classified it as being 18 acres, and you see later on that

25   grew to about 30 acres.

THOMAS EFFINGER - DIRECT EXAMINATION

1    Q.  So if I understand what you're saying, where we see the

2    label in the left center of the picture, electrical

3    substation, are you saying that's where most of the gas plant

4    buildings and structures were?

5    A.  That's where most of them were, and then you've got that

6    Imax theater, which was also the former steam plant.

7    Q.  And to what extent has it been determined that

8    contaminants from that original structure, the gas plant, have

9    moved or there have been plumes of contaminants that have

10   moved out from the original location?

11   A.  There's tar in various locations of the site, and I

12   believe we'll get to that later on.  But also the dissolve

13   phase.  As the groundwater flows through the tar that's

14   subsurface, it picks up some of those contaminants, and the

15   general direction is southeast towards the Cooper River.  So

16   it's flowing towards the property that the Aquarium is on, and

17   towards the National Park Service property.  So it flows to

18   the southeast.

19       There were also some other structures that facilitated

20   some of the releases, an old brick archway, and I think we'll

21   be talking about that later.  And that discharged into the

22   Cooper River.  And then later on as we were doing the

23   investigation, we found out about -- we had another seep

24   occurred at the end of Charlotte Street.  So that's generally

25   where the contaminants emanated from.

THOMAS EFFINGER – DIRECT EXAMINATION

1   Q.  When this plant -- well, I don't know that I've asked you

2   this.  This plant began operating, based on the history you've

3   obtained, in about what year?

4   A.  1855.

5   Q.  And in 1855 when the plant first began to operate, was the

6   configuration or the proximity to the Cooper River the same as

7   it is today in terms of where the banks and areas which are

8   the margin of the river are?

9   A.  Well, there was a lot of stream channels and drainage

10  areas that came all the way up to Concord Street, and the gas

11  holder itself was up in that northwest corner.  It appears to

12  have been there for a reason.  Looking at old maps, that

13  appears to have been the predominant high ground.  Compared to

14  the marshy areas.

15      MR. FELMLY:  Let me bring up Exhibit 21, Denise, if

16  you'd do that for me.

17  Q.  And this is a document that -- why don't I ask you.  What

18  is the document that we're bringing up the cover sheet up is

19  Exhibit 21 that the Court will have available to it?

20  A.  Later on we commissioned a company to look at the land use

21  history and to examine what happened to the property over the

22  years.  And this was for discussions later on with the folks

23  over at the Park Service and the Department of Justice.  But

24  we were examining what the shoreline and how it was added to

25  over the years.  So this company did that work for us, TRC.

THOMAS EFFINGER – DIRECT EXAMINATION

1           MR. FELMLY:  And, Denise, if could you tick into

2    this --

3    Q.  I'm certainly not going to touch on every page of this

4    report, but does this contain old maps and old drawings that

5    show at various points in history where the manufactured gas

6    plant was in relation to the prior shorelines or these creeks

7    that you were talking about?

8    A.  There -- it shows the shoreline and where a lot of the

9    docks and piers and shipyards and that kind of industrial

10   activity was taking place.  And it shows how the shoreline

11   actually came further inland all the way up, almost all the

12   way up to Washington Street back in the 1700s.  This one is a

13   little fuzzy, but I think some of the later ones actually have

14   the gas holder spotted into the --

15   Q.  But there is -- I gather what you're saying is there is

16   available report -- we've marked it all in evidence -- that

17   sort of outlines what the history was during the very early

18   years when there was dredging and filling going on?

19   A.  Yes, sir.

20   Q.  Okay.  Let me just move to Exhibit 26 and ask you to take

21   a look at that, Mr. Effinger.  Just go ahead to that exhibit

22   there.

23           MR. FELMLY:  And, Denise, maybe you can zoom that up

24   a bit for us so that we can get a better look at it.

25   Q.  This document is from MTR, an MTR record, and it's called

THOMAS EFFINGER – DIRECT EXAMINATION

1    a conceptual site model.  Do you know what this is or can you

2    tell me what this is?

3    A.  Yes, sir, it is a conceptual site model, and this one

4    deals with shallow groundwater, the surficial zone, which is

5    three feet down to ten or 15 feet.  And it shows the former

6    gas holder features above grade, but -- it's hard to see it in

7    black and white -- but then it represents how those

8    contaminants leaked into the ground, sat there in the ground,

9    and through the leaching process that you mentioned, released

10   constituents into the groundwater.

11          MR. FELMLY:  So, Denise, if you could focus in the

12   area where it says former gas holder area, and see if you

13   could bring that up more closely so that Mr. Effinger can look

14   on it.

15   Q.  This drawing, if I understand what you're saying, sort of

16   recreates historically what was there in terms of structures?

17   A.  Yes, sir, it does.

18   Q.  And then it takes it and examines what the subsurface

19   under those areas now consists of in terms of contaminants?

20   A.  Yes, it does.

21   Q.  And for what purpose was this done and who did this

22   analysis as part of this remediation?

23   A.  Our contractors management and technical resources put

24   this document together based upon the investigation that we

25   had done, and knowledge of how the gas plants would typically

THOMAS EFFINGER – DIRECT EXAMINATION

1    operate.  And so we could tie a lot of that tar contamination

2    to the above-grade features, and show how they would have

3    gotten into the ground and led to groundwater contamination

4    issues.

5    Q.  Now, were you able to find or did your company find, as

6    part of your work here, some old photos that actually showed

7    the gas plant operating in the -- essentially the relevant

8    time frame around 1910 or 1911?

9    A.  Yes, sir, we did.

10   Q.  This is Exhibit 78 again.  Let me first ask you, is this

11   one the photos that you found, and if so, can you tell us what

12   the labeling or the information you found with this photo

13   indicated as to what circa of time it was taken?

14   A.  Yes, sir, we found this in our company archives, and it

15   referred to a picture of the structure after the great storm

16   of August 1911.  So we're tying this to the 1911 time frame.

17   It's actually shot from on top of that steam plant.  And

18   you're looking west.  So you're facing the plant from the

19   Cooper River side of the features.

20   Q.  Looking inland?

21   A.  Looking inland, yes, sir.

22   Q.  Now, when you found it, I'm assuming it didn't have all

23   these labels that have been put on, and Dr. Shrifrin will be

24   talking about these features.  But I'm assuming the original

25   photo didn't have the labels on it, is that right?

THOMAS EFFINGER – DIRECT EXAMINATION

1    A.  No, sir, it did not.

2    Q.  Let me just ask the next photo to be brought up.  Was this

3    another one of the photos that was found at that time that

4    related to that 1911 period?

5    A.  Yes, it was.

6    Q.  And this, at least labeled as showing the gas holder

7    together with the purifier chips and purifier tanks --

8            MR. FELMLY:  And let me ask that the third photo

9    historic from 1911 be brought up.

10   Q.  And this shows the generator house and some of the tanks

11   that were there, including some of the tar tanks that were

12   kept there, is that right?

13   A.  Yes, sir.

14   Q.  The years of operation of the plant began in 1855, and

15   when did the plant cease to make gas or stop making gas?

16   A.  There was a transition period, but it was about 1957,

17   according to the record, when they stopped making gas.

18   Q.  And what's been the brief description of the use of the

19   property since it stopped making gas in the period around

20   1957?

21   A.  Immediately thereafter, I believe it was used for natural

22   gas and propane storage and operations, gas operations took

23   place there.  Later on in the late 70s, the electric

24   substation was built, and it's still there today, and it's one

25   of the major electric substations for Charleston and the

THOMAS EFFINGER – DIRECT EXAMINATION

1    outlying areas.  So --

2    Q.  Now, what I would like to do, Mr. Effinger, is turn to the

3    discovery and the initial efforts that took place with regard

4    to the contamination at the site.  Can you tell the Court what

5    your understanding is as to when the tar contamination in this

6    region of the city was first discovered and what were the

7    circumstances of that?

8    A.  Yes, sir.  As the City started focusing on this area for

9    redevelopment, and particularly with the Aquarium, and the

10   mayor was real big on that, from talking with folks and from

11   reading the record, they went out there and they were doing

12   their sampling and analysis, looking at a storm sewer vortex,

13   and observed the tar.  We had already seen the tar back when

14   we built the substation, but folks looked -- pulled out the

15   old Sanborn maps and looked at the features that were there,

16   and came to the realization that this was a manufactured gas

17   plant site and needed to be managed.  And that was about in

18   the late 80, I believe.

19   Q.  We're going to be hearing something more about Sanborn

20   maps, maybe it's a good time to have you explain, what are

21   Sanborn maps and how are they used or how are they important

22   in terms of looking for the location of historic structures?

23   A.  Right.  Sanborn maps were created as a way for insurance

24   companies to keep up with the equipment and features that a

25   company owned, and they would record the information at that

THOMAS EFFINGER – DIRECT EXAMINATION

1    time.  And those maps have -- if they could be found, are
2    pretty good representations of the equipment that was present
3    at the time.
4    Q.  And are they -- have they been found available for the
5    historic period relating to the Charleston MGP?
6    A.  Yes, sir, for over several years.  Several separate years.
7    There were several different Sanborn maps, and you can see how
8    the site has changed and progressed over the years.
9    Q.  Now, after the work that the City was commissioning for
10    the Aquarium brought the presence of tar to the attention of
11    agencies, what were the next steps in terms of various
12    agencies getting involved to deal with the problem?
13    A.  Well, the EPA -- well, DHEC, I guess, was the first one
14    that got involved.  Them, as well as back then it was Coastal
15    Zone Management folks, the Army Corps of Engineers, and they
16    looked at the issue the manufactured gas plant sites.  They
17    were nervous about dealing with it, because of the complexity
18    of the sites.  And they quickly brought in EPA.  There was a
19    lot of discussion about how to -- how to manage the cleanup,
20    but also allow the development to go forward.
21        SCE&G offered to the City and to the folks, let us do the
22    cleanup before you start building on the sites, we want to get
23    the cleanup done right.  Once you put your structures there,
24    we're not going to get an opportunity to go back and do the
25    cleanup right.

THOMAS EFFINGER – DIRECT EXAMINATION

1    But as you mentioned earlier, the City was anxious to get

2  their development work going, and there were agreements worked

3  out on how to manage that.

4  Q.  I think that this is the first time anybody has mentioned

5  DHEC.  Just so the record is clear, we'll call it DHEC from

6  now on, but from -- what's the proper formal name of that

7  acronym?

8  A.  DHEC actually stands for the South Carolina Department of

9  Health and Environmental Control.

10  Q.  And that's been one of the agencies that you've

11  coordinated and cooperated with on the cleanup of this site?

12  A.  Yes, sir.

13  Q.  What is the agency that actually became the prime or lead

14  agency on the Calhoun Park superfund area?

15  A.  DHEC -- well, South Carolina DHEC did some work on the

16  site.  They had investigative studies.  There were also other

17  consultants hired by the City to do studies.  We did some

18  studies on soil and groundwater.  But then that site was

19  turned over to the Environmental Protection Agency to be the

20  lead agency, and under the superfund program.

21  Q.  And in terms of from the time you became involved in

22  the -- I guess the mid 1990s period, at least intensively,

23  were you the person at South Carolina SCE&G that was most

24  responsible as the lead person for your company?

25  A.  Starting about '94, '95, yes, sir.

THOMAS EFFINGER – DIRECT EXAMINATION

1  Q.  And in terms of the interaction that you had with the EPA,

2  can you describe for me the extent or the general description

3  of what that communication and cooperation has been?  And I do

4  mean in general terms.

5  A.  Well, our communication has been direct, all methods,

6  either formal correspondence, e-mail, telephone calls to

7  discuss the issues as they come up and how best to manage

8  those issues and what EPA is expecting to see next.

9  Q.  And in terms of the EPA representatives, has there been

10  one individual that you've dealt with, or have there been a

11  number of people who have come through in various positions?

12  A.  There has been several folks come through as the regional

13  project manager who -- and they have the responsibility for

14  the site.  I think we've been through four of them.  There's

15  also been on-scene coordinators that were named, and I know of

16  at least one of them.  So there's been several folks come

17  through.

18  Q.  The current EPA manager of the site, his name is what,

19  what's that person's name?

20  A.  Current EPA manager is Craig Zeller.  And he is out of

21  Atlanta, region four in Atlanta has responsibility for this

22  area.

23  Q.  And that's the gentleman that I deposed the other day in

24  Atlanta?

25  A.  Yes, sir.

THOMAS EFFINGER – DIRECT EXAMINATION

1        MR. FELMLY:  And the Court will have his video.

2   Q.  Who were the other EPA managers that -- in this period of

3   time since the early or mid 90s, that you've had dealings

4   with, what were the names -- their names will come up.

5   A.  Yes, sir.  Originally it was Bernie Hayes, Rutheford B.

6   Hayes, called him Bernie.  The second guy to come through was

7   Terry Tanner.  And then there was Ken Lucas prior to Craig

8   Zeller now being the regional project manager.

9   Q.  And just to give the Court a sense of the frequency or

10  extent of contact between you, as the responsible party

11  cleaning up the site and that representative role, and these

12  agency representatives, how often would you be in touch with

13  them during the course of the work on this cleanup over these

14  many years?

15  A.  There was quite a bit of contact initially.  And

16  especially when work was going on at the site.  It would be

17  almost daily.  EPA and the State and other regulators would be

18  there to come on site and inspect the work that was going on,

19  to talk to us about what we needed to be doing and how we

20  needed to be doing it, and making sure that we fulfilled the

21  obligations that they had required to us do.

22  Q.  And when they do that, I know your office is up in

23  Columbia area, to what extent would you actually be on the

24  site and have occasion to meet them?

25  A.  I did quite a bit of traveling to Charleston and staying

THOMAS EFFINGER – DIRECT EXAMINATION

1    in town in Charleston as that work was going on.  And

2    particularly when the regulators were going to be on site.

3    Q.  Would they also have to tell you that they were coming on

4    site, or do they have the power to just sort of show up?

5    A.  They have the power to show up at any time unannounced.  A

6    lot of cases, if they had another objective, they would let us

7    know so that we could go ahead and meet and discuss other

8    objectives or other issues that they wanted to get resolved.

9    Q.  And apart from the site visits, what about the level of

10   telephone conferences, how often would you find yourself

11   talking with -- I realize it was a series of these project

12   managers -- but how often, if you give the Court a sense of

13   the contact you're having with the EPA, how often would you

14   talk with them on the phone?

15   A.  Frequently.  It could be on a daily basis.  They would

16   also direct us to talk with DHEC, South Carolina DHEC about

17   their issues, and other regulators that would be involved in

18   this site.  U.S. Fish and Wildlife, Army Corps of Engineers,

19   Office of Coastal Resource Management, OCRM.  So there was

20   very frequent telephone communications.

21   Q.  Now, one of the issues that UGI has raised in criticism of

22   some aspect of the cleanup involves the amount of excavation

23   that your company did of impacted source material.  And in

24   terms of those terms, let's first get some terms out here,

25   impacted source material as that's used in documents and

THOMAS EFFINGER – DIRECT EXAMINATION

1    things related to the cleanup, means what?

2    A.  Well, when we talk about source material, we're primarily

3    talking about the tar.  And the tar would be the main

4    component that would release the constituents in the

5    groundwater.  So if you have -- if you have a candle that

6    burns, it would be the wax.  And the wax is there for the

7    burning to take place.  Without the tar as the source, then

8    you don't have these constituents going in groundwater.  So

9    we're talking about tar.

10   Q.  So if you're excavating source materials, obviously

11   there's some sort of digging in the ground, and what is that

12   material going to look like to somebody like me who is a

13   layperson?  What are we talking with?

14   A.  When we're excavating source material, we're removing the

15   tar, and the soil is there incidental to that.  So the soil

16   would actually be stained with the tar, to be in very thick

17   and gooey and dripping with tar, anywhere in between.  So that

18   would be the source material.

19   Q.  Now, when you did the removal or the excavation of source

20   material, tar, gooed-up soil, if that's the right word, but

21   tar-impacted soils, to what extent would the EPA

22   representatives be commonly present on the site and

23   participate in oversight of that?

24   A.  They would typically be there to observe firsthand how

25   much we had removed, and to make sure that we got down to that

THOMAS EFFINGER - DIRECT EXAMINATION

1    clay layer, which was kind of a confining layer.  That clay

2    would stop the tar migration from going deeper vertically.

3    And so EPA would be there to make sure that they could see a

4    clean clay surface before we backfilled that excavation.  So

5    they made sure that we removed the soil that had the tar, and

6    sometimes they'd ask us to remove more soil, they felt like we

7    needed to do more removal.  So --

8    Q.  Now, I know you didn't probably keep track of exactly how

9    many days, or at least probably don't remember how many days

10   there was source material excavation, but did that happen on a

11   lot of occasions on this site?

12   A.  It happened over the course of about two years.

13   Q.  And in terms of the likelihood or the frequency with which

14   EPA was there, was their presence during soil excavation more

15   common than not?

16   A.  Yes, it was.  And they would ask us to call them and let

17   them know when the soil excavation was taking place, so that

18   if they could work it out with their schedule, they would be

19   there to observe it firsthand.  After awhile we developed a

20   rapport with the EPA and they would trust us, but then they

21   would also come on site, do the spot checks and come to see

22   the work that was going on whenever they had the chance to do

23   that.

24   Q.  Now, just in terms of this discussion about how much soil

25   would be removed, and you mentioned that sometimes they would

THOMAS EFFINGER – DIRECT EXAMINATION

1    say take out a little bit more.  If could you describe for us

2    as an environmental expert in the sense of a manager who

3    handles this construction, how do you determine when you've

4    got an excavation open and you're taking out tar-impacted

5    soils, how do you determine where you're going to stop the

6    excavation?  What are the practical tests or evidence that you

7    use?

8    A.   Right.  We try to get as much of the information as we can

9    beforehand, and more or less predetermine the area that's

10   going to be excavated.  But, of course, when you're there

11   digging it out with a trackhoe, that's when you see the real

12   picture.  What you use is this process called geoprobes,

13   little two-inch holes that you punch in the ground to see

14   where there's tar in the subsurface.  So you're using a one-

15   dimensional tool to try to get a three-dimensional picture

16   what's going on below grade.  And that's pretty difficult.  So

17   we would go out there and punch these holes, and we focus on

18   an area where we knew the tar was, and then move out from

19   those with those one-dimensional soil borings to see where the

20   tar was and where it wasn't.

21      We got out to an area where it wasn't, then we had

22   predefined the area to be excavated, and then that was in our

23   work plan submitted to the regulators to say, all right, this

24   is the area where we're going to dig.

25      Of course, as we went out there and did the digging, we

THOMAS EFFINGER – DIRECT EXAMINATION

1    also had the contingency that we would dig more as dictated by

2    what we see as we remove the soil.

3        So when that backhoe digs out the area, that's when you

4    see what's going on subgrade, and that's when you get the best

5    picture what's going on.  And you can see the staining of the

6    soil, you can see where the clay layer is, and so you have a

7    pretty good visual representation of what's going on.

8    Q.  So you would have done some testing with these probes that

9    would be picking up tar and telling you if there's tar in the

10   subsurface, right?

11   A.  Right, and we would analyze it then.  The problem is, as

12   you're doing the excavation, you don't have time to wait for

13   analytical results to come back.  So by doing the soil borings

14   in advance of the excavation, we would get an analysis of

15   what's in the soil, and a certain parts per million

16   concentration that tells us it's either clean or it's not

17   clean.  But then we would follow that up with the visual as we

18   did the digging.

19   Q.  Now, part of what you described to us was that after you

20   do the probes, there's a work plan that's prepared that

21   somehow describes the area you're going to dig; did I get that

22   right?

23   A.  Yes, sir.

24   Q.  Can you describe again what the function is of the work

25   plan and how the work plan then is communicated, if at all, to

THOMAS EFFINGER – DIRECT EXAMINATION

1   the regulator.

2   A.   Okay.   The work plan was submitted, but the intent of it

3   is to identify how we've delineated the area to be excavated,

4   and we ended up breaking the site into six separate areas that

5   needed to be managed.   But starting with that Luden's area

6   alongside Charlotte Street, we told them, all right, here's

7   how we're going to delineate the area, here's what these

8   results have shown us, so here's the area of the excavation.

9        It also talked about how we were going to conduct the

10  excavation, where we were going to send the soil, how we were

11  going to manage the water, how we were going to protect the

12  health and safety of the construction workers during the work,

13  how we were going to monitor air, all of those things that are

14  required as you do that kind of work.

15  Q.   That's in the work plan?

16  A.   Yes, sir.

17  Q.   And that's to them, to the regulator, before you start

18  doing the digging?

19  A.   Yes, sir.

20  Q.   And so now you've done all that and you've got it

21  delineated and you start doing the excavation, and you're

22  looking at the soils, and what happens if you see there's

23  tarry, gooey soil that's outside the area of the delineation?

24  In other words, the area of impacted soils that's bigger than

25  what your probing led you to believe it would be?

THOMAS EFFINGER – DIRECT EXAMINATION

1   A.  Then we would have to remove those areas as well.  You

2   have to understand that in Charleston, as you get below

3   three feet, now you're into a groundwater saturated zone.  So

4   a lot of times we had to manage water in that excavation, too.

5   So that it would be in the dry.  And as you're digging, you

6   could see that clay surface.  We'd have to get the water out,

7   manage that through a filtration system and release it

8   properly, so that we could see those areas.  But if the

9   sidewall showed more tar, and sometimes you would -- you would

10  open up an old feature, maybe a wooden retaining wall along

11  Charlotte Street, and some tar would ooze out, we'd have to go

12  clean that up, too.  And you wouldn't necessarily see that

13  with your soil borings, because that wooden wall would still

14  be in place, and maybe you've got on the down -- the side of

15  it on the opposite side of what it was holding back.  But as

16  we disturbed it, then the tar would come out.  So you'd have

17  to clean that up, remove that, too.

18  Q.  So in that situation, in that example that I just gave

19  you, if you find more tar, and it's a bigger area than

20  originally delineated, and the EPA representatives are on the

21  site, as you indicated they commonly may be, is there

22  discussion between them and you as to what's going to be done?

23  A.  Yes, sir, there would be.

24  Q.  And what would be the nature in terms of responding to

25  this situation, what would be the topic that needs to be

THOMAS EFFINGER – DIRECT EXAMINATION

1    addressed?

2    A.  Well, digging more, you know, the EPA guy would -- Terry

3    Tanner would come over and say, Tom, I think you need to dig

4    some more over here.  And so that's what we would ask the

5    trackhoe operator to do, remove more of that, move more of

6    that tar, that impacted material, and then we'd manage it.

7    Q.  It's probably obvious, but in terms of the removal of this

8    impacted material, how important is that to the remediation

9    process that you are in the throws of completing?  I mean,

10   what's the significance, if we can be clear on it, of getting

11   that tar out of the ground down that -- in that area where

12   it's coming in contact with groundwater?

13   A.  Yes, sir.  It's critically important to remove the tar.

14   That is the source of the dissolved base contaminant plume.

15   And it's -- to go back to the candle analogy, it's like

16   removing the wax from a candle.  The more wax that you get

17   out, the less that candle's going to burn and cause an issue.

18   So it's critically important to remove that tar.  And the

19   agencies recognized it as being critically important.

20   Q.  Now, this question really goes to your personal

21   recollection as being the manager on the spot for your company

22   when these kinds of incidents occurred.  Did you have

23   experiences yourself where you were there where sort of

24   hypothetical we've been talking about occurred, namely, you

25   found tar in the excavation beyond the area that had

THOMAS EFFINGER – DIRECT EXAMINATION

1    originally been delineated, and a decision was made to take

2    out more of that impacted source material?

3    A.  Yes, sir.  Typically where we get the real gushers would

4    be if there was a palm tree that was buried, you know, it

5    would have a lot of this stuff soaked into it, and we'd have

6    to remove it.  If there was an oyster bed that we'd uncover,

7    it would be kind of -- just be lying in there with those

8    oyster shells.  If there was loose fill for some other feature

9    that maybe had a pipe or a drain, we'd typically find it

10   there.  We'd find old pilings with the tar around it.  But

11   there were many instances where I was personally onsite and

12   removed that phenomenon, where we had to remove more.

13   Q.  And on those incidents where you were personally onsite

14   and observed those phenomenons, what was your experience

15   personally of having interaction with the EPA managers and

16   representatives along the lines you told me happened in a more

17   general way?  What's your personal recollection?

18   A.  They would come right over, stand shoulder to shoulder

19   with me and observe the same phenomenon, and tell me, Tom, you

20   need to dig more.

21   Q.  Did you ever have a situation that you're aware of where

22   as you were doing this source removal and excavating this tar

23   impacted, this gooey soil and tar that was down there in this

24   area of shallow groundwater, did you ever have an experience

25   where the EPA representative said, we don't want you to

THOMAS EFFINGER – DIRECT EXAMINATION

1    excavate any more, you're taking too much of this material

2    out, we want you to leave it?

3    A.   Never.  No, sir, we never had that occur.

4    Q.   Did you ever have any criticism at all, from the beginning

5    of any of the excavation of the soil impacted materials to the

6    present, where the environmental protection service ever was

7    critical of the amount of that gooey tar that you got out of

8    that soil as source material?

9    A.   No, sir, they were never critical.  They were mostly

10   complimentary about our aggressiveness to remove that tar that

11   we had -- we took it as a very serious obligation, and that we

12   recognized it was critically important for us to be able to

13   achieve the standards that we were trying to achieve for

14   groundwater at this site.

15   Q.   In terms of coordinating with the agencies, and I know

16   you've been speaking primarily about the EPA, and some degree

17   about South Carolina DHEC, were there other agencies involved

18   in coordinating or providing oversight to you and your company

19   as this work was proceeding?

20   A.   Yes, sir.

21   Q.   And what were some of the principal other agencies that

22   you had to interact with or respond to their oversight?

23   A.   The Corps of Engineers, because of the Cooper River

24   potential impacts, U.S. Fish and Wildlife, the Office of

25   Coastal Resource Management, again concerned about the

THOMAS EFFINGER – DIRECT EXAMINATION

1  shoreline and the potential impacts to the shore.  NOAA,

2  National Oceanographic Aeronautical -- I can't remember the

3  whole acronym.  But they would also arrive onsite, and they

4  were very concerned about how we were managing sediments and

5  issues that might impact the Cooper River.  Those are the

6  primary ones.

7  Q.  And with regard to those individuals, would you also have

8  been the principal representative from SCE&G that would have

9  been the, at least the point person, the first --

10  A.  Yes, sir.

11  Q.  -- first line person to deal with them?

12  A.  Yes, sir.  And on many occasion I spoke with them

13  directly.

14  Q.  I want to ask you what --

15         THE COURT:  Let's take a little break.  It's 11:30.

16  Let's take about 15 minutes.

17      Someone mentioned to me last week, I don't know who they

18  talked to, but your desire to get a place to sit down?  A

19  conference room or something in the courthouse?

20      (Discussion held off the record.)

21      (A recess was held at this time.)

22         THE COURT:  Go ahead.

23         MR. FELMLY:  Thank you, Your Honor.

24  BY MR. FELMLY:

25  Q.  Mr. Effinger, as this remediation work was done over these

THOMAS EFFINGER – DIRECT EXAMINATION

1  many years, did your company document with photographs, from

2  time to time, the work that was going on?

3  A.  Yes, we did.  We used -- we got our photographs, as well

4  as our contractor took many photographs.

5          MR. FELMLY:  And they've been exchanged as part of

6  the discovery here.

7  Q.  What I would like to do is just show you a photograph, if

8  Denise would bring it up.  This is from Exhibit 35, which is a

9  packet of -- some of the photos?

10          THE COURT:  Mr. Felmly, let me interrupt you just a

11  minute.

12      When did SCE&G become involved with this land?  When did

13  you --

14  A.  Probably in the late 80s, '89, '90.  But we have the

15  substation there.  Is what you're talking about the electric

16  substation?

17          THE COURT:  As far as the gas, the production of the

18  gas, SCE&G never did that?

19  A.  No, there was a time later in the plant life that SCE&G

20  has liability for.  Is that what you're asking?

21          THE COURT:  Yes.

22  A.  Yes, sir.

23          THE COURT:  So your first involvement with the site

24  was with the substation?

25  A.  No, previous to that we had predecessor companies that

THOMAS EFFINGER – DIRECT EXAMINATION

1    operated the gas plants.

2          THE COURT:  During what period of time?

3    A.  That was a tough one to answer, Your Honor.  Because

4    there's a lot of predecessors involved.  We talked about

5    whether or not the Charleston Gas Light Company, who

6    originally built the plant in 1855, was a predecessor or not,

7    and how that relationship occurred.  And I'm not versed well

8    enough in legal to answer that.

9       But then later on there was some other --

10         THE COURT:  We just got into a discussion during the

11   break, and I thought I'd try to clear it up now.  Go ahead.

12         MR. FELMLY:  By the way, Your Honor, there is

13   information, and Mr. Varon and I think probably illuminate

14   that, there is material we have on that subject.  I'm not sure

15   Mr. Effinger is familiar with it as others.

16   BY MR. FELMLY:

17   Q.  Mr. Effinger, the photograph that I've got there --

18         MR. FELMLY:  And, Denise, if you could bring up and

19   enlarge the top frame of that.

20   Q.  What it says is phase six Luden's selective DNAPL removal.

21   Does this -- tell me what this -- tell what this photograph

22   depicts.

23   A.  This shows one of our removal areas.  And we would

24   typically remove a 16-by-16 square going down to that clay-

25   confining layer, which could be ten to 15 feet below grade.

THOMAS EFFINGER – DIRECT EXAMINATION

1    Here you see an old retaining wall that was in place, and it

2    didn't go all the way down to the clay.  So as we removed the

3    soil, you could see at the bottom of that, there was some tar

4    that then seeped out from underneath this wall.  So that had

5    to be cleaned up.  So this just shows one of the areas that

6    was excavated.  It's actually alongside Charlotte Street

7    towards the Cooper River, and we called it Luden's because of

8    the old Luden's ownership of that property where the steam

9    plant was located.

10         MR. FELMLY:  Denise, if you could enlarge just the

11    area at the bottom of the hole.  Top photo, but the -- that's

12    the area.  If you could bring that up.

13    Q.  And focusing the attention on the area where you were

14    talking about, to what extent does this photo depict impacted

15    soils or soil materials affected with tarry product?

16    A.  It does; it's hard to see it in the photo.  It's hard to

17    really get an appreciation for where the tar is, but primarily

18    you can smell it when you're in there working.  We've already

19    pumped water out of this hole.  There's a little bit of water

20    standing there.  But then underneath that, that concrete, you

21    can see where there's more highly impacted material.

22    Q.  And if you now open it up and take a look at the second

23    frame below, does this photo identify or show any of the areas

24    that would have tar-impacted soils?

25    A.  Yes, it does.  You could kind of see it at the bottom.

THOMAS EFFINGER – DIRECT EXAMINATION

1  Again, we're at Luden's.  Some of that material that's kind of

2  granular, there was some slag in there with it.  Slag being

3  what would have been removed from an old boiler.  And the tar

4  residing down in and amongst that.

5  Q.  And the tar is going to be a darker color?

6  A.  Yes.

7  Q.  Is that right?

8  A.  Yes, sir.

9  Q.  When you take that soil out of there, when you're doing

10  this process of removing these impacted soils, just what's the

11  short version on what you have to do with that in order to

12  safely dispose of it?  What's the process you have to go

13  through?

14  A.  To safely manage it?  Well, we had to get it out of the

15  hole, and it would be extremely wet.  You've got a lot of

16  moisture involved in that.  So typically we would take that

17  soil back to a staging area where we would mix it with cement

18  kiln dust to kind of dry it out and make sure it could be

19  transported down the road safely.

20      Initially we were able to do low-temperature thermal

21  desorption, we'd run it through a burner, an old asphalt plant

22  in Summerville.  As this unit shut down, then we had to carry

23  these materials up to another dirt burner and treat soil.  And

24  that was in Pergo -- at Pergo in Virginia, near Doswell,

25  Virginia.

THOMAS EFFINGER – DIRECT EXAMINATION

1    Q.  And in terms of that process of disposing of contaminated

2    soils, is there a fair amount of regulation and rules as to

3    how that has to be done?

4    A.  Oh, yeah.  All of that has to be documented.  Because

5    we're doing this under the federal oversight, so all that has

6    to be documented.  There's manifests, there's weigh tickets,

7    and then there's receipts from the facility as they received

8    the material.  And then that's all assembled and put into a

9    follow-up report.

10   Q.  Now, you said before that the -- because of the proximity

11   to the river, that you've got a pretty high water table there,

12   the groundwater is quite close to the surface?

13   A.  Yes, sir, across the entire site actually.  Once you get

14   to about three feet or so, then you're into what they call the

15   groundwater zone, it's saturated with water in the pour space

16   between the dirt molecules.

17   Q.  So when you dig down here, and it looks like you're below

18   three feet in this picture, how are you dealing with the

19   groundwater with that kind of a situation?

20   A.  As we opened up the hole, then the groundwater would flow

21   into that.  So we would drop a pump suction into the hole, and

22   we used a siphon pump, we called it a Sykes pump, and it would

23   actually be able to draw that water out.  That water would

24   have to be pumped through a tank, a big frac tank that was

25   located on the site, allow the solids to settle out.  We'd run

THOMAS EFFINGER – DIRECT EXAMINATION

1    that through filtration, bag filters, to remove the suspended

2    particles that would be in it just from the soil and sediment.

3    Then we'd run it through activated carbon before it would be

4    released to a POTW.  And had to meet their standards to be

5    able to release it to that sanitary sewer.  POTW stands for

6    publicly-owned treatment works, but it's the sanitary sewer

7    for Charleston.  And we would record the amount that was

8    discharged and report that to them on a frequency and pay them

9    for handling that water for us.

10   Q.  And what's the order of magnitude, if you know, of the

11   total amount of gallonage that has been documented that you

12   treated in that fashion by removing that contaminated water?

13   A.  Something on the order of 3 million gallons over the life

14   of the excavation work that's taken place.

15   Q.  Now, if you did not do the excavation and removed the

16   source material and the gooey tar and dig it right out of

17   there, there's been some talk about pump and treat approach.

18   Could you not put a pump down in that stuff and suck it out or

19   take it out that way?  The impacted soils.

20   A.  Yeah, pump and treat typically refers to treating that

21   dissolved phase that's in the groundwater.  So you're removing

22   the groundwater, and they try to use it to manage it as a

23   hydraulic containment, so that groundwater doesn't go anywhere

24   else.  But as you draw all that groundwater out, then you run

25   that through the filtration system to remove those

THOMAS EFFINGER - DIRECT EXAMINATION

1    contaminants, and try to manage it that way.  But again, it's

2    like trying to manage a flame on a candle that you can't put

3    out without removing the wax.  If you don't remove the wax,

4    that candle's just going to continue to burn indefinitely.

5    And what we've seen is that there's so much tar at this site,

6    that if you didn't get it out, you would be -- you would be

7    running that operation for a very very long time.

8    Q.  All right.  Now what I would like to do is move into some

9    of the formal decisions and documents and things that relate

10    to this remediation.

11        THE COURT:  After you get the dirt out --

12    A.  Yes, sir.

13        THE COURT:  -- you treated it at this plant in

14    Virginia, I think you said.

15    A.  Right.

16        THE COURT:  What do you do with the soil then?

17    A.  They landfill it on site.  It really would be cost

18    prohibitive to bring that soil back.

19        THE COURT:  So it would be okay to bring it back, if

20    it wasn't cost prohibitive?

21    A.  Right.  Right.  So what we do instead is we get clean

22    backfill, we check any contaminants that are in that, and

23    that's what we put back in the hole.  Of course, as we're

24    digging all of these areas, we open up that 16-by-16 area, we

25    don't want to leave that open, so we backfill it before we

THOMAS EFFINGER – DIRECT EXAMINATION

1   move to the next excavation hole.

2   BY MR. FELMLY:

3   Q.  And you're getting your clean backfill from somewhere here

4   locally?

5   A.  Locally, yes, sir, and we check that to make sure it

6   doesn't have contamination in it.

7   Q.  All right.  The first administrative order by consent that

8   I want to bring up, and I'm not going to go through all the

9   pages on this, is Plaintiff's Exhibit 9, which is

10  administrative order of consent from 1993.  And can you tell

11  me, Mr. Effinger, what is this document?  Procedurally what

12  does this document accomplish at that time frame?

13  A.  There was a lot of activity that took place prior to this,

14  where folks were doing their studies, the City did some

15  studies, we went out and checked the soil, but once you get to

16  this point, EPA has come in and they've taken jurisdiction and

17  they've taken the lead over the State agency, which is South

18  Carolina DHEC.

19      And this document kind of lays out the fact that a

20  remedial investigation feasibility study needs to be

21  conducted, and then identifies South Carolina Electric and Gas

22  Company as the responsible party to do that work.  It also

23  identifies the City of Charleston and City of Charleston

24  Housing Authority.  But SCE&G took the lead because it had the

25  expertise to do the work, and the primary features were on our

THOMAS EFFINGER – DIRECT EXAMINATION

1    electric substation.

2        So this lays out how that work needs to be conducted, that

3    it needs to follow a set protocol, QA/QC procedures, how the

4    EPA gets reimbursed for their oversight costs.  And the

5    general format of the report that needs to be submitted.  It

6    talks about the area, talks about the site history, you know,

7    it kind of lays everything out that needs to occur at the

8    site.

9    Q.  So that's contemplating this intense investigation of the

10   site and reporting back on what they find?

11   A.  Yes, sir, it talks about the process and how the process

12   needs to be conducted to comply with superfund.

13   Q.  Now let me bring up another document, it's Exhibit 28, if

14   could you bring that up, it's called a baseline risk

15   assessment.  And I'm going to ask you to define what a

16   baseline risk assessment document is.

17   A.  The baseline risk assessment looks at the contaminants

18   that exist at the site, and it evaluates what the potential

19   health effects would be.  In a lot of cases it not only looks

20   at human health effects, but also ecological effects.  And it

21   evaluates it from a carcinogenic standpoint and looks at how

22   many people out of a million might get cancer if they're

23   exposed to this material over a 70-year life span.

24       It might also look at the hazard quotient, which would be

25   the other health effects that would occur if someone or some

THOMAS EFFINGER – DIRECT EXAMINATION

1   organism were exposed to the contaminants present at the site.

2   And it evaluates whether or not those risks are acceptable per

3   an EPA standard.

4           MR. FELMLY:  Let me ask Denise, if you could, to

5   enlarge the top half of the page and zoom that up, please.

6   Q.  So this document is a February 8th, 1996 reporting or

7   transmission of baseline risk assessment data for the Calhoun

8   Park area, and you've described for us what the nature of the

9   information in this report is.  This is, as I understand what

10  you've said, considering what the human health risks are, is

11  that right?

12  A.  Yes, sir.  And this was transmitting that document to a

13  Mr. Larry Knighter, who was -- had responsibility for the City

14  of Charleston Housing Development.

15  Q.  And do you have an understanding of what types of data was

16  obtained and what types of studies were made in order to

17  determine whether or not people in the area would be at risk

18  from these contaminants?

19  A.  Yes, sir, it used all of the analytical data, which looked

20  at the organic contamination, primarily benzene, toluene,

21  ethylbenzene and xylene.  Also the polyaromatic hydrocarbons

22  which are in the tar.  They make up the tar.  They looked at

23  metals and what those concentrations were, and then they

24  looked at data tables that talked about what exposures create

25  those health effects.  They have to make assumptions regarding

THOMAS EFFINGER - DIRECT EXAMINATION

1    whether or not there is a receptor, a human or an organism

2    that would be exposed to those contaminants in concentrations

3    which exceeded a level which would put them at risk.

4    Q.  I'd like to bring up Exhibit 25, which is entitled the

5    Fluor Daniel GTI draft final remedial investigation report.

6    And this is the actual exhibit, Mr. Effinger, I hold in my

7    hand this hard copy exhibit.  What we see on the screen is

8    obviously the first page of that.  But is this approximately

9    four- or five-inch-thick document the actual report that we're

10   just seeing the first page on the screen?

11   A.  Yes, sir.  But I can assure you there were several draft

12   versions before that, and a lot of comments that needed to be

13   resolved and a lot of -- a lot more paper that was sent back

14   and forth to get to that point.

15   Q.  So now we're not going to go through every page of this

16   investigation report.  In fact, we're going to go through

17   almost none of it.  But what I would appreciate telling the

18   Court is what is the type of information, what's the general

19   nature or description of what by this time in 1996, as

20   Exhibit 25 indicates, has been done in order to assess or

21   investigate the areas of work that need to be done on this

22   site?

23   A.  The purpose of the remedial investigation report is to

24   document all the investigative work that's been done.  We

25   talked about the geoprobe work and the samples that were

THOMAS EFFINGER – DIRECT EXAMINATION

1   obtained from that.  And so that gives you contaminant

2   concentrations in the various media, in soil, in groundwater.

3   We were starting to look at sediments, so all of that is

4   captured and documented in this report.  And then there are

5   some conclusions that are made about where the contamination

6   exists and what needs to be done to manage it.  This is in

7   September of '96.  So we also -- give me just a second here.

8   Yeah.  So we were also, after collecting all of that

9   information, then we evaluated different technologies that

10  could be applied to clean up these issues.

11  Q.  Incidentally, you have on the stand with you a little

12  sheet that has the dates of these reports, sort of indication

13  of the chronology, is that --

14  A.  It came out of the Gradient report which I believe has

15  already been available to everyone, but it just gives the

16  timeline for the different things, so I don't get confused

17  what year we were doing some of this work.  It has taken place

18  over a long period of time, and whether it's '96 versus '98,

19  thinking back that far sometimes gets a little fuzzy for me.

20  Q.  Okay.  So this was a -- was this a major milestone in the

21  investigation work of the site?

22  A.  Yes, sir, it is.  It is.  This was what was required by

23  that original AOC which you mentioned earlier that was issued

24  to us in 1993.  And it required is to go out and conduct this

25  work.  Again, you know, this says draft, because we went

THOMAS EFFINGER – DIRECT EXAMINATION

1    through many many iterations before it was accepted by the

2    agencies and met all of their criteria.  So it's a pretty

3    significant milestone to get through the remedial

4    investigation.

5    Q.  Now I'd like to bring up Exhibit 22, which is entitled an

6    administrative order of consent for removal action.

7         What is an administrative order of consent for removal

8    action, Mr. Effinger?

9    A.  It's a legally binding document, but it lays out a

10   protocol for us to do work that's required by EPA as a

11   response action to this site.  Again, like that earlier AOC,

12   it lays out who the -- who the responsible party is, who the

13   contacts are at EPA, at the agencies, who from our company's

14   standpoint is responsible, where the reports need to be sent,

15   how we conduct the work, the QA, the QC, the worker health and

16   safety protection, stipulated penalties, it -- again, it's a

17   process thing, it lays out the process for conducting the

18   removal action to comply with EPA requirements.

19   Q.  Now, this document is a 1998 document.  What happened in

20   or about '98 that -- as far as you know -- required this

21   particular administrative order on consent to be issued?

22   A.  Give me a second.  Because we had two of them in '98.

23   This is the AOC.  About late '97 there was a seep that was

24   observed at the end of Charlotte Street that put some sheen

25   out into the river.  They also observed some tar discharging

THOMAS EFFINGER – DIRECT EXAMINATION

1    into the river.  So that needed to be immediately contained

2    and then managed.

3        So there was an AOC issued early on to not only effect

4    that mitigation, to mitigate that seep, but then to also do

5    some of the early soil removal action, which was the

6    6000 cubic yards, 6000 tons, it kind of changes from document

7    to document.

8        But this was to allow that early work to take place, to

9    mitigate the seep, and then also manage soil that might

10    eventually be covered as the development took place.

11    Q.  Was there any determination made, Mr. Effinger, as to why,

12    after, you know, many years of this plant having been not

13    operating, in that year a seep of tar began to appear in

14    Charlotte Street?

15    A.  Yes, sir.  We did finally determine what the cause was.

16    But there was an old storm water runoff drain that discharged

17    into the Cooper River right at the end of Charlotte Street.

18    That had some loose backfill around it.  So it had some less

19    packed material around it.  There was a pressurized water line

20    that fed the Ports Authority property which ruptured, and it

21    was subsurface.  So it had a discharge of water from that

22    pressurized line that then put hydraulic pressure on the

23    entire shallow zone.

24        And so any pockets of tar were pushed out from that, that

25    water break, underneath the surface, and it was pushed down

THOMAS EFFINGER – DIRECT EXAMINATION

1    that looser fill material and actually came -- discharged to

2    the river alongside the old storm drain that was there at the

3    end of Charlotte treat.  So we believe that was the root

4    cause.

5        We had to initially jump out there and put in a boom to

6    contain the sheen.  We put in some sheet piling at the end of

7    the street.  We put in some catch basins to collect anything

8    that might travel through the sewer itself, and then we used a

9    long stick excavator to remove sediments that may have

10   accumulated that tar that was out in the Cooper River.

11   Q.  This was not a problem or a seep that you were aware of

12   several years earlier when the remedial process of

13   investigation began?

14   A.  No, sir.  It came on the scene late in '98.  Prior to that

15   Record of Decision being issued.  Or late in '97, excuse me.

16   Q.  And the reference to a removal action, what was removed in

17   connection with trying to remediate this problem of the tar

18   seeping out at Charlotte Street?

19   A.  Well, we had to contain it to stop it from continuing to

20   discharge to the Cooper River, but we removed some sediments

21   with that long stick excavator from the shoreline at the end

22   of Charlotte Street, then we also removed the 6000 cubic yards

23   under this order.

24   Q.  All right.  I'd like to now turn attention to Exhibit 4,

25   which is a document entitled Record of Decision -- Record of

THOMAS EFFINGER – DIRECT EXAMINATION

1    Decision, remedial alternative selection, Calhoun Park
2    superfund site.  What is this document?
3    A.  All right.  This is another huge milestone, and this is a
4    document that EPA issues.  And it takes the results of our
5    remedial investigation and our feasibility study which looked
6    at all these different technologies, and then evaluates them,
7    and it discusses all the community, the public, the agency
8    participation, to arrive at a selected remedy.
9        So it goes through all of the different technologies, it
10   describes the site, it goes through the history of the site,
11   it talks about the contamination, talks about the human health
12   risks, but then it talks about for the various media, what
13   needs to be done, what potentially could be done.  And then it
14   says here is the selected remedy that the agencies have
15   decided needs to be implemented at the site.  It talks about
16   the objectives, and in this document I believe it talks about
17   three objectives for the site.  And talks about the cleanup
18   standards that need to be achieved.  And then the –– several
19   other –– just administrative issues on how you're going to
20   manage it, how you're going to submit reports.
21        MR. FELMLY:  Denise, if you could go forward two
22   pages to 003 on our stamp here.  Well, let me –– Bates number
23   is going to end with 18762.  Okay.  If you could zoom that up,
24   please.
25   Q.  This is two pages into the document, although it says

THOMAS EFFINGER – DIRECT EXAMINATION

1    three, they count the cover page.  This is signed by somebody

2    named Richard Green, the division director.  Is that an EPA

3    official?

4    A.  Yes, sir, it is.

5    Q.  And this appears to have been issued, this ROD is issued

6    September 30th, '98.  Now, you indicated this is a milestone.

7    What is a Record of Decision and why is a Record of Decision a

8    milestone in terms of a cleanup of the site?

9    A.  The Record of Decision is where you take all of the

10   investigative information, the discussion with the agencies,

11   the discussion with us as the responsible party to do the

12   cleanup, and capture all that in a document, which talks about

13   the various remedies that could be applied, it talks about the

14   standards that needs to meet, it talks about the objectives,

15   and here you see it talks about it even needing to be cost

16   effective.  So it captures all of that information, it

17   captures on the record the community participation,

18   concurrence of the State regulator, South Carolina DHEC in

19   this case, and basically says what the objectives are that

20   need to be implemented at the site.

21         MR. FELMLY:  Denise, can you go back one page from

22   that, back to the previous page.

23   Q.  Still a little hard to see it, but in the description of

24   the selected remedy, in this declaration of the front of the

25   report does this fairly describe as a summary of some of the

THOMAS EFFINGER – DIRECT EXAMINATION

1  major objectives or statements in this report?

2  A.  Yes, sir, it does.

3  Q.  It indicates that this remedial action addresses NAPL

4  source areas, shallow groundwater contamination, and

5  contaminated soil as the principal threat at this site.  And

6  then it goes on to say sediment and surface water

7  contamination, in addition to intermediate groundwater

8  contamination will be addressed in a separate Record of

9  Decision or ROD.

10     And let me ask you about a couple of things there to make

11  sure we all understand what we're talking about.  First of

12  all, though we've heard the word NAPL before, what is NAPL as

13  it's used as an acronym in these documents?

14  A.  Yes, sir.  NAPL is an acronym for nonaqueous phase

15  liquids, and that just means it won't mix with water.  So oil

16  sits on top of water, that would be a NAPL.

17     In dealing with tar, we call that a DNAPL, because it's a

18  dense nonaqueous phase liquid and it sinks in water, it

19  separates from the water, but it will sink in the water.  So

20  NAPL is kind of a broader term when we're talking about tar.

21  It might be used interchangeably to mean tar or the main

22  source of contaminant.

23     So that's what NAPL means.  There was an objective

24  described in here, there's three objectives really.  Removal

25  of NAPL to the maximum extent practicable, that was goal

THOMAS EFFINGER – DIRECT EXAMINATION

1    number one was to get as much of that source out as possible.

2    Then to contain the nonrestorable source areas.  And when you

3    contain something, you prevent it from migrating any further

4    and causing any more damage.  So that was goal number two.

5        And then third was restoration of the aqueous phase plume.

6    Once you had removed as much as you could, once you had

7    contained it so it can't spread any further, then the agencies

8    wanted you to restore the aquifer to, in this case, drinking

9    water standards.  So the drinking water standards would lay

10   out what constituent levels could be present, and we needed to

11   make sure we achieved those.

12   Q.  At the top of this paragraph that we're looking at, which

13   is sort of in the executive summary of -- I guess they call it

14   the declaration, they referenced that sediment and surface

15   water contamination, in addition to intermediate groundwater

16   contamination will be addressed in a separate ROD.  Can you

17   explain to me your understanding, then and now, as to what the

18   sequence of events was going to be in terms of the remediation

19   of the site?

20   A.  Yes, sir.  As I said early on, we were -- we had actually

21   offered to the City, you know, let us do all the cleanup work

22   before you start your development.  But they wanted to get

23   their development going, and they felt they could do it under

24   their own mechanism.

25       So as that work's going on, we're moving very fast to try

THOMAS EFFINGER – DIRECT EXAMINATION

1    and collect the data that we need for the remedial

2    investigation, feasibility study, to collect the information

3    for everyone to reach a consensus and agree on what technology

4    is proposed to clean up this site.  And so there was -- you

5    can imagine there was a very robust discussion regarding

6    what's an appropriate technology, from the very very

7    conservative, to folks that were looking at newer methods to

8    do it.

9        So there was still a lot of just professional disagreement

10   on what needed to be implemented.  We still needed to collect

11   more data on sediments, surface waters and intermediate

12   groundwater.  But we needed to move forward quickly if we were

13   going to do the cleanup that needed to get done prior to some

14   of these features being developed and put in place.

15       So there was a sense of urgency that had the ROD -- the

16   Record of Decision to cover soil and the ground -- the shallow

17   groundwater issues, which was really the big threats.

18   Q.  And what was left for this separate ROD or this yet to be

19   done Record of Decision?  What were the areas of work that had

20   not yet been determined to be done?

21   A.  Right.  There was still not agreement reached on what to

22   do with sediment, how much more work needed to be done during

23   the investigation, how much more information needed to be

24   collected, and the same with intermediate groundwater.

25       And I probably should talk about that, because the shallow

THOMAS EFFINGER – DIRECT EXAMINATION

1    zone went down to about ten to 15 feet, wherever that first

2    clay layer was.  And so that impeded the flow.  But underneath

3    that were additional aquifers going down to about 50 to 60

4    feet.  And there was an upper and a middle and a lower

5    aquifer.  So there was -- there was a lot deeper areas that

6    needed more information, needed more sampling, more analysis.

7        And again, we were going through this iterative process.

8    We had collected some data, but the agencies felt like we

9    needed to get more data and have more evaluation on what would

10   be an appropriate technology to treat these other intermediate

11   groundwater and sediment.  And then surface water.

12   Q.  Now, when you talk about this intermediate groundwater,

13   was it known at this time that there were tar impacts on that

14   groundwater?

15   A.  There was some suspicion on site, because of the work that

16   was conducted to build the electric substation.  They had to

17   drive some rods down deep to make grounding rods just for the

18   substation operation.  And they knew that when they withdrew

19   those rods way back when, that there had been some tar on it

20   there.  Had been some discussion with the agencies then.  But

21   there was a general discussion to just that process would

22   punch holes in that confining layer.  And if the DNAPL were

23   sitting there, it might leak down those holes.

24       So there were some wells, maybe a handful of them at that

25   time, that had some impacts that were noted that was dissolved

THOMAS EFFINGER – DIRECT EXAMINATION

1    in the intermediate groundwater.  And those impacts then led

2    us and the agencies to conclude that there is some deeper

3    impacts that would be in the intermediate groundwater.

4    Q.  And what about the sediments, what was it about the river

5    sediments that --

6    A.  Right.

7    Q.  -- was not known at the time of the first ROD and needed

8    to be studied further?

9    A.  Well, they knew that there was that brick archway that ran

10   down Calhoun Street and discharged into the Cooper River, and

11   the brick archway, because it's bricks, they knew that the

12   joints leaked.  And I had mentioned previously that the

13   shallow groundwater actually flowed toward the southeast.  And

14   so if that groundwater, as it flowed, and took these dissolved

15   phase contaminants, it would then go into that brick archway

16   just like a French drain would pick up groundwater, and so

17   that would discharge into the Cooper River.  And it was known

18   that there was impacted sediments in the Cooper River.  There

19   had actually been some studies done by the City's contractors,

20   Killam, PSI and General Engineering, that detected those

21   contaminated sediments in the Cooper River on or about where

22   that tour boat facility sits today.  They knew that there was

23   some areas just north of that where the Aquarium was going to

24   be situated, based on their sediment sampling.  Then they knew

25   because of that seep at the end of Charlotte Street, which

THOMAS EFFINGER – DIRECT EXAMINATION

1    occurred in late '97, that we had issues there that needed to

2    be further studies and evaluated for a remedy.

3            MR. FELMLY:  If we can go back to the next page, the

4    one you had up previously, Denise, 762, where the signature

5    is.  And go to the top paragraph, if you would this time.

6    Q.  Again, this is the place where director, Division Director

7    Green signs it.  The last sentence of the first paragraph

8    says -- well, actually the one before it, the groundwater

9    portion of the remedy was based on EPA's expectation that the

10   remediation of groundwater to MCLs will be challenging, given

11   the presence of NAPLs at this site.  Therefore, a phased

12   approach has been selected consisting of removal or treatment

13   of NAPL to the maximum extent practicable, followed by

14   containment of potentially nonrestorable source areas and

15   restoration of aqueous contaminant plumes.

16       That's a mouthful to me, Mr. Effinger.  Let me try the

17   break it down.  First of all, the discussion of the

18   expectation that remediation to groundwater to MCLs will be

19   challenging, I think you mentioned it before, but what is an

20   MCL that they're aiming at as a standard?

21   A.  Again, that's another environmental acronym which refers

22   to the maximum contaminant levels.  And those are specified in

23   the Safe Drinking Water Act.

24   Q.  And as it applies to this type of remediation and

25   groundwater, is that another way of saying drinking water

THOMAS EFFINGER – DIRECT EXAMINATION

1    standard is what we're looking at, and we're not sure we're

2    going to ever get this to drinking water?

3    A.  Yes, sir, and that was based upon the knowledge that there

4    was a lot of this tar spread across the site in many different

5    areas.  And that even though you do removal, you're not going

6    to be able to get every molecule of tar out of the ground.  So

7    it's going to take awhile for the drinking water standard to

8    be met at the site.

9    Q.  Now, just a moment on groundwater.  And Dr. Shrifrin, the

10   environmental scientist, can talk about this more.  But this

11   is a moving body of water under the surface, is it not?

12   A.  Yes, sir.

13   Q.  And in this area in Charleston, approximately which

14   direction, or how can you best describe to us which way the

15   groundwater under the surface is flowing?

16   A.  Well, the shallow groundwater back at our electric

17   substation would then flow southeast, so it would be kind of

18   diagonal going towards the Cooper River.

19   Q.  And is it the case that the groundwater was then flowing

20   through this contaminated section and picking up contaminants?

21   A.  Yes, sir.  And it's coming from upgradient of our site.

22   As it goes through that tar, it's picking up those

23   contaminants in what we call the dissolved phase.  So it's

24   actually in -- those contaminants are in groundwater, and

25   those are arsenic and metals and the PAHs and all of that.  So

THOMAS EFFINGER – DIRECT EXAMINATION

1    as it flows through our property, picks that up, and then

2    would carry them offsite.  So --

3    Q.  Now, is anybody actually drinking this water in this

4    location?

5    A.  No, sir; two reasons.  No one has drinking water wells on

6    the peninsula of Charleston; and number two, this is a very

7    shallow zone.  So if you put in a drinking water well, you're

8    not going to be in a ten-foot range, you're going to be much

9    deeper than that anywhere, where traditional drinking water

10   wells are installed.  But there are no drinking water wells in

11   this area.  That all had to be examined, and that was

12   confirmed.

13   Q.  But even though there was not the situation where people

14   would be putting wells into this area and drinking it, the

15   MCL, or the standard that you were measured by, was still a

16   drinking water standard?

17   A.  Yes, sir.

18   Q.  And that is still the standard today that is prospectively

19   applied to this site?

20   A.  Yes, sir, it is.

21   Q.  And so then it goes on to say, therefore, a phased

22   approach has been selected.  And it goes on to describe the

23   removal.

24       Can you explain for the benefit of the Court in a general

25   sense, and then we'll get into the document in some detail,

THOMAS EFFINGER – DIRECT EXAMINATION

1    what was the phased approach that applied to this site, in

2    light of what you've told us about the various areas, some of

3    which were not going to be dealt with immediately?

4    A.    Yes, sir.  Again, recognizing that it was going to be

5    challenging, and you couldn't put an exact remedy on paper

6    that was, you know, once you implement it, you're done, no.

7         We argued and with -- with them, that we need to start

8    doing this removal activity and then see how the groundwater

9    responds and gets cleaned up.  As you remove more of that

10   source, you're going to have less contaminants going into the

11   groundwater, but you also have some other processes that help

12   you.  Naturally attenuation as water percolates through the

13   ground, it cleans the water up and removes the contaminants,

14   either through biological processes or other physical chemical

15   mechanisms.

16        So we knew that by removing the source, that would be

17   cleaned up.  We also knew that as we got out there with the

18   trackhoe and dug these areas out, we would learn more about

19   the site and be able to better implement any potential

20   technologies to clean it up.  So the phased approach is

21   arguing -- well, is really them agreeing with us to go out

22   there and to do the removal action starting at the offsite

23   properties and work our way off towards the substation to do

24   those removal actions, but let's leave the other ones to be

25   continued to be investigated and resolved at a later date.

THOMAS EFFINGER – DIRECT EXAMINATION

1   Q.  Are there multiple places in the, I think 64 pages of text

2   of document, where the discussion about a second ROD or a

3   second ROD is mentioned?

4   A.  Yes, there is.  EPA commits in this document to have a

5   second Record of Decision to address intermediate groundwater,

6   surface water and sediments.

7            MR. FELMLY:  Denise, if you could bring me to page

8   771 is the end of the Bates number.

9   Q.  In the bottom portion of this, and maybe just highlight or

10  zoom up on the lower half of this paragraph, this is actually

11  on page 11 of the report which ends with Bates number 18771.

12  It talks about the seeps you've been mentioning, and then it

13  says the mitigation of the source areas responsible for these

14  seeps, the contaminated sediments resulting from the seeps,

15  and the sediment contamination documented in the RI -- I

16  assume that's remedial investigation?

17  A.  Yes, sir.

18  Q.  -- will be addressed in a separate ROD for this site.  And

19  then it discusses that AOC removal, AOC that we talked about

20  earlier.

21  A.  Um-hum.

22  Q.  Is this talking about those Charlotte Street seeps that

23  cropped up in 1997 or 1998?

24  A.  Yes, sir.  And it's referring to that early action and

25  then trying to catch this document up with that earlier

THOMAS EFFINGER – DIRECT EXAMINATION

1   action.

2   Q.  So is this document here saying we have these seeps, we

3   have contaminants in the river and sediments, and we're going

4   to be studying that further and dealing with that in a later

5   ROD or a later remedy Record of Decision?

6   A.  Yes.

7   Q.  And do you know if there indeed was further investigation

8   after September of '98 when this document was issued, to go

9   further and actually check into how to respond to those areas

10  that they're reporting on here?

11  A.  Yes, there were, there were a couple of efforts.  And two

12  records that were submitted.  One dealing with intermediate

13  groundwater, and then another one evaluating sediments and

14  following an EPA protocol and then presenting that

15  information.

16      MR. FELMLY:  Denise, if you could go to the Bates

17  number that ends with 787, please.  And I'm going to be

18  referencing the sediments that -- Thank you very much.

19  Q.  In the top paragraph talking about, again, the river

20  sediments and dealing with some of the same issues, the last

21  two sentences say, of that first paragraph, the extent of

22  contamination associated with this release is under

23  investigation and will ultimately impact any future plans for

24  remediating the sediments.  A second ROD will be issued to

25  address the sediments once the sediment investigation is

THOMAS EFFINGER – DIRECT EXAMINATION

1    complete.

2       And is that consistent with what you just described to the

3    Court?

4    A.  Yes, sir.

5          MR. FELMLY:  If you could go to page 789 as the last

6    three Bates number, Denise, referring to site risks.

7    Q.  First of all, Mr. Effinger, the section that I'm showing

8    you there, which is part of this 1998 ROD called summary of

9    site risks, what generally is covered in the portion of the

10   document called a ROD that discusses site risks?  What are we

11   going to find there?

12   A.  Again, they're using -- there were several studies that

13   were done, but they're evaluating in this area, they're

14   talking about the evaluation that was done for human health

15   risks, and that would be through exposure to these

16   contaminants over a certain time period and assuming a

17   certain -- a certain -- I guess mechanism for the -- either

18   the construction worker or resident or a child or someone like

19   that.  So it goes through all of those different scenarios,

20   based upon the occupation of the person being exposed and

21   evaluating the concentrations of the chemicals, and then

22   through a complicated formula deriving what the incidence of

23   cancer would be per million people.

24         MR. FELMLY:  Now, if you could highlight, Denise, the

25   last three sentences of that top paragraph, start being where

THOMAS EFFINGER – DIRECT EXAMINATION

1    it says environmental risks.

2        I'm interested in the language that starts with

3    environmental risks are presently unresolved due to the

4    ongoing discharge of coal tar from seeps as discussed in

5    section four.

6        That's the seeps you've been talking about that cropped up

7    in '97 and '98?

8    A.  Yes, sir.  We had evaluated the human health risks through

9    the process.  That had been done.  But then because sediments

10   are out in the river, they require you to evaluate the

11   eco-risks, and that would be the risks presented to the

12   animals, the critters that live in the sentiments, they call

13   them benthic organisms, and then the higher organisms that

14   either consume these benthic organisms, or would have exposure

15   to that contaminated sediment.

16   Q.  So the last sentence in this paragraph sites environmental

17   risks resulting from these seeps, in addition to the overall

18   environmental risks associated with this site, will be

19   evaluated under operable unit two and addressed in a second

20   ROD for this site.

21       So that was another topic that was going to be

22   addressed --

23   A.  Yes, sir.

24   Q.  -- when the second ROD came along.

25   A.  They're letting us know that that issue is still open and

THOMAS EFFINGER - DIRECT EXAMINATION

1    needs to be resolved.

2    Q.  And this term operable unit number two, and we've seen

3    references to operable unit number one, can you explain to us

4    that nomenclature?

5    A.  Yeah, that's really a term that EPA likes to use to divide

6    up the media that are being discussed in their Record of

7    Decision.  So operable unit two dealt with the intermediate

8    groundwater as a separate media, sediments as a separate

9    media, and then surface water as a separate media from what

10   was evaluated in the ROD for the Record of Decision for OU-1.

11   Q.  So they're saying we're going to deal with this later on

12   after further studies?

13   A.  They segment it so that we've got to deal with these other

14   three media after conducting work under the Record of Decision

15   for OU-1.

16            MR. FELMLY:  If you could bring that up whole page so

17   we have a context, Denise.

18   Q.  In the area that is at the bottom of the page, actually if

19   you go just highlight the bottom paragraph in this area of

20   site risks, this indicates that they had had that baseline

21   assessment, and what they had done in terms of reviewing

22   various sample locations, is that right?

23   A.  Yes, sir.

24   Q.  So they had done work analyzing this, but now we're going

25   to do more work because of the seeps and the impact of that?

THOMAS EFFINGER - DIRECT EXAMINATION

1  A.  That's right.  They also refer to the Killam report and

2  the PSI report, which were -- those were two companies that

3  did work for the City, and they did that work in the sediments

4  that I had mentioned earlier in looking at the location where

5  the tour boat facility was going to be, boat, and the South

6  Carolina Aquarium.  So they were using other reports from

7  other contractors to kind of pull that into, I guess, this

8  baseline risk assessment.

9       MR. FELMLY:  If you could go to page 798, Denise,

10  Bates ending on 798.  And in terms of the right spot here --

11  excuse me, 796.  Okay.  If you could enlarge the top half of

12  the page down through the -- Right there.

13  Q.  This is a discussion dealing with -- if we've gone back

14  two pages to what starts Section 7.1, this is under the

15  category groundwater slash NAPL, and they're discussing what's

16  going to happen to groundwater and what's going to happen to

17  the NAPL in the groundwater.

18      Now, again we have at the top of the page references to a

19  phased approach for groundwater, and that occurs at the

20  beginning of the second paragraph right under the bulleted

21  items, is that right?

22  A.  Yes.  Yes, sir.

23  Q.  And again, this document says the initial effort will be

24  to concentrate on the removal or treatment of NAPLs previously

25  identified at the former gas holder, the former rail spur and

THOMAS EFFINGER – DIRECT EXAMINATION

1  the former oil tanks.  This would typically consist of

2  prephase NAPL removal aided by pump and treat.  Removal of

3  NAPLs is anticipated to have the effect of mitigating the

4  primary contaminant source responsible for groundwater

5  contamination at this site.  Concurrent with the NAPL,

6  additional actions will be undertaken to restore the aqueous

7  contaminant plumes to meet MCLs.

8      Now, that was the work that you described to us that you

9  were undergoing by the removal of those NAPLs that were down

10  in that shallower zone, is that right?

11  A.  Yes, sir.

12  Q.  So you went on to do that work that's described here?

13  A.  Yes, sir.

14  Q.  And if we go back up to the top of the page and we talk

15  about the objectives, that first bullet says removal or

16  treatment of NAPL to the maximum extent practicable.  Was that

17  the watch word?

18  A.  The watch word?

19  Q.  That's the standard?  Is that --

20  A.  Yeah, again they're focusing on the three objectives,

21  removal, containment and restoration.  But removal is the key.

22  If you don't get the source out of there, you're going to

23  continue to have dissolve phase existent at shallow

24  groundwater for a very long time.

25  Q.  Now, the intermediate groundwater is not part of the ROD,

THOMAS EFFINGER – DIRECT EXAMINATION

1    the first ROD, the 1998 ROD, is that correct?

2    A.   That's correct.

3    Q.   Is that ROD referred to as the OU-1 ROD, the operable unit

4    one ROD?

5    A.   Yes, sir.

6    Q.   And the one they're talking about that's going to come

7    sometime in the future is the OU-2 ROD?

8    A.   That's correct.

9    Q.   At the bottom of the page we have blown up here, or the

10   portion blown up it says the NAPL removal will be monitored to

11   monitor the practicability of such actions.  Should complete

12   source removal or treatment prove impractical, the use of

13   mitigation controls or containment measures will be taken for

14   the nonrestorable source areas.

15        The determination of technical impracticability will be

16   made by EPA in consultation with South Carolina DHEC based on

17   site specific characterization data and remedy performance

18   data.  And then it goes on the say what that data is.

19        I want to ask you about this phrase, the determination of

20   technical impracticability.  What is that process that they

21   are discussing in this ROD?

22   A.   EPA actually has a prescribed process to achieve a

23   technical impracticability waiver.  And what they're waiving

24   is the standard that they have applied in this ROD.  In this

25   case we have to achieve drinking water standards.  So if you

THOMAS EFFINGER – DIRECT EXAMINATION

1   go through the steps to prove technical impracticability, then

2   they will give you some relief on those standards, as long as

3   there is not threatened or imminent harm to human health or

4   the environment.  So that's one of the conditions.

5       The other is you have to try everything technically

6   practicable to try and remove that tar.  So you have to do

7   everything in your power to try and -- to do this removal that

8   they've talked about here.  And to try and achieve the

9   drinking water standards for groundwater, which was their

10  overarching goal.

11  Q.  Now, if we look at the top of the page there's a reference

12  in a portion we didn't really read, to an EPA document called

13  guidance for evaluating the technical impracticability of

14  groundwater restoration.

15      So I'm assuming they have standards, guidelines, booklets

16  and things that tell them how to do this.

17  A.  Yes, sir.

18  Q.  And do I understand you to say this is a process when the

19  EPA is satisfied you cannot get this water to drinking water

20  standards, they may give you this waiver?

21  A.  That's correct.  If you try everything that you can, even

22  though they lay out some technologies in the ROD, there might

23  be other technologies which come along later that they might

24  require you to go do.  So that you have to try everything that

25  you can before you're going to get that waiver.

THOMAS EFFINGER – DIRECT EXAMINATION

1   Q.  Now, they wrote this, or at least it was published out

2   here, as we saw in September of 1998, and they're discussing

3   this procedure and process.  Here we are in 2009.  Have you

4   met the MCL of drinking water standards on the groundwater

5   flowing through this site?

6   A.  Well, we have in some of the outlying areas where we

7   removed the source, and it's actually the plume has gotten

8   smaller and it's coming back towards the electric substation.

9   So as you get to Calhoun Street, before you get over onto some

10  of those properties that at least the majority of groundwater

11  now meets drinking water standards as a result of that

12  removal.  So we've reduced the plume, but it's still exceeding

13  MCLs underneath that electric substation.

14  Q.  So -- and that would be the area that would have been

15  closest to where the historic MGP actually sat?

16  A.  Yes, sir.

17  Q.  And with regard to that area, the area that is more -- I'm

18  not sure the right words -- concentrated, but closer to the

19  original source --

20  A.  Um-hum.

21  Q.  -- there, have you not met the MCL of groundwater that

22  would be suitable for drinking?

23  A.  That's correct.  And a lot of that is because of the above

24  surface equipment, the electric substation that's critical to

25  the electric distribution infrastructure in Charleston, you

THOMAS EFFINGER – DIRECT EXAMINATION

1  know, we can't take that out of service and we can't dig

2  underneath it.  We dug around it as much as we possibly could.

3  And then there's also the roads, and there appears to be

4  material underneath the roads that we could not get to

5  underneath Charlotte Street and underneath Concord Street.  So

6  there -- and then there's an area on the south side of the

7  electric substation where there's underground electric cable.

8  And a duct bank.  And so we couldn't excavate in that area for

9  fear of disturbing that electrical cable and not only shutting

10  down the feed to Mt. Pleasant and outlying areas, but also the

11  safety issues with the guy doing the excavation.

12  Q.  So in terms of the future of the site and what levels of

13  additional work you're going to have to do, before a

14  determination will be made on whether the EPA would issue a

15  technical impracticability waiver, you're not there yet, I

16  gather?

17  A.  No, sir.  We're not by any means.  We're still doing the

18  monitoring and reporting, and we discussed what's happening

19  with the contaminants over time.  EPA has asked us to write

20  several tech memos, one that was recently made final and

21  submitted dealing with things like soil vapor intrusion,

22  changes in the arsenic standard and revisiting that issue,

23  since the original Record of Decision was issued.  Shallow

24  groundwater monitoring protocols, intermediate groundwater

25  monitoring protocols and follow-up reports to the work that

THOMAS EFFINGER – DIRECT EXAMINATION

1   was done.

2   Q.  What is your estimate of the period of time or the

3   interval from this stage forward where you believe this

4   question of whether the MCLs are going to be met or your

5   efforts to further reduce the load of contaminants coming from

6   the subsurface NAPL is going to be addressed for purposes of

7   whether the EPA would issue a technical impracticability

8   waiver?

9   A.  I wouldn't begin to guess that.  I can tell you that I do

10  not believe we will ever meet drinking water MCLs, site-wide.

11  There are areas where we will, but other areas back at the

12  site we -- I don't believe will ever be able to meet those

13  drinking water MCLs.  How long it's going to take us to get a

14  TI waiver, it's a long process that you have to go through.

15  You have to get concurrence from other agencies.  I wouldn't

16  begin to guess how long that might take.

17  Q.  But is this -- are you discussing something that's a

18  matter of years?

19  A.  Yes, sir.  Or decades.

20  Q.  Pardon?

21  A.  Or decades.  I don't know.

22  Q.  So in terms of the groundwater remediation, and of course

23  we've had the second ROD which we're going to talk about in a

24  few minutes here, but you have had other findings and other

25  work done on this remaining work, but even after all that work

THOMAS EFFINGER – DIRECT EXAMINATION

1    has been done, as you sit here in 2009, as to groundwater

2    remediation, you have not been able to get this to the

3    standard of the MCL, is that right?

4            MR. BARGREN:  Objection, leading.

5            THE COURT:  Half the questions he's asked have been

6    leading.  But go ahead, I'll permit it.

7            MR. FELMLY:  I was really trying to summarize.

8            THE COURT:  Well, you know, I'm pretty strict on

9    leading questions when we have a jury here.  I don't think

10   he's going to lead me down any primrose path.  Go ahead, I'll

11   permit the question.

12   BY MR. FELMLY:

13   Q.  In your own words, as to what extent, Mr. Effinger, even

14   in the face of all this work that you've done, where are you

15   in terms of getting this site to the standard that the ROD

16   mandates, which is MCLs, and when do you think, if ever,

17   you're going to get there?

18   A.  We're still pumping tar from some collection areas that we

19   haven't really discussed in much detail.  So we're removing

20   tar from the ground at the rate of about 100 gallons a month

21   now.  And at the maximum, it was about 400 gallons a month.

22   There's still tar in the ground.  And until we get all of that

23   tar out, you're still going to have that dissolved phase

24   leaving the site.

25           And even once you get a great deal of the tar out, if you

THOMAS EFFINGER – DIRECT EXAMINATION

1    get it down to where it's a de minimis level, it's going to

2    take awhile for groundwater to go through that tar and leach

3    out anything that it can leach out from the tar.  So I don't

4    have -- I don't hold out a lot of promise that we'll be able

5    to do that any time soon, if ever.

6              THE COURT:  There's nothing you can put in there with

7    the groundwater to hasten the process?

8    A.   We've tried some things, we've tried that with

9    intermediate groundwater to chew up the contaminants.  It had

10   some limited effectiveness.  We're continuing to look at other

11   technologies to try and do that.  The concern is underneath

12   the electric substation you have to make sure it doesn't

13   affect the subsurface cables and conduits and electrical

14   wires.  But that's a difficult issue, because if you put stuff

15   in there to make it more mobile, you better be ready to catch

16   it.  Because it might migrate off site, and you might cause

17   more harm than good.

18       We've tried some other processes to oxidize it and, you

19   know, break it down into less toxic constituents, but again,

20   that only has limited effectiveness in the dissolved phase.

21   It's not very effective on the tar.  Because this tar is like

22   molasses.  It's very thick, it's like roofing tar, if you've

23   ever smelled them put that on a roof, that's what it smells

24   like, like creosote, and this one has the viscosity of

25   molasses.  It's very thick.  So --

THOMAS EFFINGER – DIRECT EXAMINATION

1    Q.  My understanding is one of the things you did was to

2    actually try using sort of a natural process, sort of a

3    photoremediation process.  Can you describe what that was?

4    A.  Oh, phyto?

5    Q.  Phyto?

6    A.  That was discussed early on, and EPA had a lot of

7    excitement about that technology, and using trees and plants

8    to take the dissolved phase groundwater, and so it would act

9    as a hydraulic containment, at least in that shallow zone, and

10   it would have some effectiveness.  It could also cause some

11   remediation -- some conversion of the contaminants in the root

12   zone to less harmful contaminants.  So that phytoremediation

13   was tried at the site, and it is along the south side of the

14   electric substation between the bus lane for the parking

15   garage and then our electric substation.  And it has had some

16   effectiveness, but the real key is getting that tar out.  And

17   so you're not continuing to discharge those dissolved phase

18   contaminants from the site.

19        But phytoremediation is still being studied.  The USGS,

20   the United States Geological Survey group is monitoring that.

21   They're providing reports on that and they're continuing to

22   look at it and provide data that we put into the records on

23   how effective that has been.

24            MR. FELMLY:  Denise, if you could take us to Bates

25   8811, please.

THOMAS EFFINGER – DIRECT EXAMINATION

1          THE COURT:  We're going to recess at 1:00 for lunch,

2     and so since it's about two minutes to 1:00, let's just recess

3     now.

4          MR. FELMLY:  That's fine.

5          THE COURT:  We'll be in recess until 2:30.

6      (A recess was held at this time.)

7          THE COURT:  All right, sir.

8          MR. FELMLY:  Thank you, Your Honor.

9     BY MR. FELMLY:

10    Q.  Mr. Effinger, I'm still inquiring of you with respect to

11    the 1998 ROD, the Exhibit 4 in our case.

12         MR. FELMLY:  And I'd like to go -- and, Denise, if

13    you could bring up to page Bates 811, which talks about the

14    selected remedy, and -- The selected remedy section, which was

15    section nine, goes on to start here.

16    Q.  But in connection with the portion that I'm referring to

17    in the middle of the page, there's a statement that says the

18    remedy described has been selected under the authority granted

19    in CERCLA and is consistent with the requirements of the NCP.

20         At any point in any of your dealings with the EPA, did

21    anybody at the EPA ever indicate that they had any concern

22    about NCP compliance or whether the remedy was consistent?

23         MR. BARGREN:  Objection, Your Honor, hearsay.

24         THE COURT:  Say what?

25         MR. BARGREN:  Objection as to hearsay.

THOMAS EFFINGER – DIRECT EXAMINATION

1        MR. FELMLY:  First of all, this document is an

2   official record, in terms of the document here, it would be

3   plainly an exception to the hearsay rule.

4        THE COURT:  Well, the question was whether he had any

5   conversation with them.  I don't know that he's attempting to

6   elicit that conversation yet.  It may be hearsay, but let's

7   see what his answer is now.

8   A.  No one at EPA or at the State --

9        THE COURT:  No, no, he asked you -- I'm sorry, he did

10  ask for hearsay.  That would indicate they had any concern

11  about NCP compliance or whether -- I think he can answer that

12  question.  Go ahead.

13  A.  No one ever said that what we were doing at this site was

14  inconsistent with the National Contingency Plan.

15  Q.  In terms of the groundwater response that you've discussed

16  previously --

17       MR. FELMLY:  If we could turn, Denise to page 813,

18  under the section of groundwater in the middle of the page,

19  I'd like you to bring up that center paragraph, if you would,

20  this is under groundwater.

21  Q.  I want to start with the top sentence, which says the

22  full-scale groundwater NAPL remedy shall be monitored,

23  modified or otherwise enhanced where appropriate to

24  demonstrate that best professional efforts have been made to

25  achieve ARAR-based cleanup levels and the applicable

THOMAS EFFINGER – DIRECT EXAMINATION

1    performance standards of this remedy component.

2         Again, just so we can get some of the acronyms, ARAR

3    refers to what, sir?

4    A.  I may get it wrong, but it's Applicable or Relevant and

5    Appropriate Requirements.  Those would refer to other state

6    and federal laws that might apply.  Like the Clean Water Act,

7    Safe Drinking Water Act, those kinds of things, or any other

8    requirements that EPA or the State agencies would impose.

9         And then the performance standards here, referring to the

10   three objectives in achieving the drinking water standard

11   T-III objectives, again, removing the NAPL, the source, to the

12   maximum extent practicable, containment of the nonrestorable

13   source area, and then restoration of the aqueous phase plume.

14   Q.  Down further it says the conceptual remedy applied herein

15   may be modified and enhanced as warranted based on review an

16   analysis of monitoring data generated.  Recovery and treatment

17   enhancements may include the installation of additional

18   extraction wells.  EPA considers the full-scale groundwater

19   NAPL remedy to be an iterative process which must be conducted

20   for a sufficient period of time before its ability to meet

21   applicable cleanup levels and long-term performance standards

22   can be fully evaluated.

23        Now, as to that sentence and that description of this

24   iterative process, what was your understanding of what was

25   going to be the going forward approach to this full-scale

THOMAS EFFINGER – DIRECT EXAMINATION

1  groundwater remedy?

2  A.  Yes, sir, we understood that iterative nature, because as

3  you remove materials, you see how it responds.  You also have

4  the ability to see what else is in the ground and what else

5  might need to be taken care of.  But iterative, you try some

6  things and look for a positive response and look for ways to

7  enhance that and go back and maybe try other things.  And we

8  knew full well and good that the agencies would continue to

9  ask us to try additional measures.

10  Q.  So as you come to the point where you received this first

11  ROD and they've described this conceptual remedy and the NAPL

12  removal and the iterative process, what are, in 1998 when this

13  came down, what are going to be the steps that are then going

14  to be facing you to move towards answering these questions and

15  determining where you go next?

16  A.  Okay.  Well, the steps after this is to prepare a work

17  plan which tells them how we're going to conduct the work, and

18  comply with the requirements in the ROD.  Administrative as

19  well as technical.  So we write that work plan that describes

20  how we're going to do the work, what steps we're going to go

21  through, what information's going to be submitted, how the

22  workers are going to be protected, how the soil is going to be

23  managed, how the materials removed are going to be handled

24  appropriately.  And that work plan has to be submitted and

25  approved before we can actually go out there and do any of the

THOMAS EFFINGER – DIRECT EXAMINATION

1    removal work.

2        You go through iterations with comments back from both EPA

3    and from South Carolina DHEC.  Then we do revisions and we

4    provide the document again in a draft, in a second draft form,

5    until they approve it.  And then we can submit it as final.

6        And then that then allows us to go out and do the work.

7    Q.  And when you say the work, are you talking about the work,

8    that portion of the work that was covered by the first ROD?

9    A.  Yes.  And in this case it's dealing with the shallow

10   groundwater and the soil removal.

11   Q.  But in 1998 when you received the first ROD which had

12   deferred the issue of sediment remediation and the

13   intermediate groundwater, did you have any authority to act

14   with respect to intermediate groundwater or sediments?

15   A.  No, we did not.  Not without going through that second ROD

16   that they set us up for here, and then submitting another work

17   plan that addressed how we would conduct that work and got

18   their approval on conducting that work.

19        MR. FELMLY:  Now, if could you bring up Exhibit 19,

20   Denise, the EPA fact sheet, please.

21   Q.  What I'm showing you is a document called an EPA fact

22   sheet.  And are you familiar with this document?  It's

23   Exhibit 19.

24   A.  Yes, I am.

25   Q.  And just briefly, what is this instrument or what is this

THOMAS EFFINGER – DIRECT EXAMINATION

1   paper?

2   A.  You can see the date on it is March '98, so this is in

3   advance of the Record of Decision being issued.  This is an

4   opportunity for the public to comment and to come in and they

5   listen to EPA.  I believe we also had an opportunity to speak.

6   But this fact sheet puts the information out there and it

7   advertises the public meeting date and it tells the public

8   exactly what's going to be discussed and how the meeting's

9   going to be conducted.

10  Q.  And in terms of that public meeting date, is that --

11          MR. FELMLY:  Let's try to bring that up, Denise, if

12  you can, where it has the date down in the center here.  In

13  that little box.

14  Q.  The public meeting days is March 16th, 1998.

15  A.  Yes, sir.

16  Q.  In part of the ROD that we marked as Exhibit 4, is a

17  transcript, is it not?

18  A.  Yes, it is.

19  Q.  And what is that transcript, sir, what's the purpose of

20  that transcript from your review of the ROD document?

21  A.  Yes, sir, that transcript records the information that was

22  discussed at the public meeting and the comments that were

23  made.  So it becomes a matter of public record as it's

24  attached to the Record of Decision.

25          MR. FELMLY:  And just to save time, can I just

THOMAS EFFINGER – DIRECT EXAMINATION

1   approach the witness?

2           THE COURT:  Sure.

3   BY MR. FELMLY:

4   Q.  This is Exhibit 4, Mr. Effinger, and this is the first

5   page of that transcript.  Is that March 16th, 1998?

6   A.  The date at the top is March 16th, 1998.

7   Q.  And you've seen this before.  The gentleman that's the

8   current project manager of your site for the EPA, his name is

9   Zeller, is it, Craig Zeller?

10  A.  Yes, but not at this public meeting.

11  Q.  Was Mr. Zeller at this public meeting?

12  A.  Yes, yes, he was at the public meeting.

13  Q.  So the part -- describe, if you will, for the Court, how

14  community input and public information is acquired as it

15  relates to these proposals that the federal agencies dealing

16  with your company are.

17  A.  It's one of the requirements under the superfund process,

18  and they have a community liaison type person that makes sure

19  that these things are held, and also sets up the

20  administration of it.  But the idea is that EPA has to

21  communicate to the public about what's been found at the site,

22  what the issues are, and what the proposed remedy is, and get

23  their comments, input to it.  And consider that prior to

24  issuing a Record of Decision.

25  Q.  And leaving aside March 16th, 1998, when we got the

THOMAS EFFINGER – DIRECT EXAMINATION

1   transcript of that hearing, what's your knowledge about other

2   meetings or other information that's been disseminated to the

3   community about the superfund site and the cleanup there?

4   A.  Well, all of the documents that are created were put in a

5   repository which was at the Charleston Public Library for the

6   public to be able to go review those documents.  Things like

7   the remedial investigation, feasibility study, eventually the

8   ROD, and then the follow-up studies and the second ROD for

9   OU-2.  All of those documents that are required to be created

10  under the superfund process have to be made available to the

11  public, and they do that by placing them in the public

12  library.

13  Q.  Let me bring up Exhibit 23, which is entitled a unilateral

14  administrative order for remedial design and remedial action.

15  And this is a document --

16      MR. FELMLY:  If we go to the last page of it, Denise,

17  if you can do that, we can find the exact date of that, if

18  you're able to scroll down to that.  I'm looking for Bates

19  00874.  Don't worry about that, I'll show it to the witness

20  here just to save time.

21  Q.  On page 23 of this Exhibit 23 it indicates, does it not,

22  that on January 13th, 1999, this document was signed by Deputy

23  Director Green?

24  A.  Yes, sir.

25  Q.  And what is this document?  This is now after the ROD.

THOMAS EFFINGER - DIRECT EXAMINATION

1   What is the unilateral administrative order for remedial

2   design?

3   A.  Right.  The Record of Decision captures the technology

4   that needs to be applied to the site and discusses the results

5   of the investigation and all of that.  But then it leaves us

6   with here is your performance objectives that you have to

7   achieve, and here's the technology to be applied.  But then

8   that's followed up with this enforcement piece, which the way

9   I would describe it really has the legal teeth to define how

10  we manage it, what deadlines we need to meet, what protocol we

11  need to follow, what the stipulated penalties are for not

12  being in compliance with the Record of Decision.  Those kind

13  of matters.  So it's a lot -- it has the same function as that

14  administrative order on consent that was signed back in '98

15  for the shallow soil removal and the dealing with the

16  Charlotte Street seep.  This is the legal piece that enforces

17  getting the work done at the site.

18  Q.  Now, on -- in 2002, a second Record of Decision, this one

19  is Exhibit 5 for operable unit two, was issued.  Is that

20  correct?

21  A.  Yes, sir.

22          MR. FELMLY:  And, Denise, if you could go to the

23  third page of that document, actually the -- it's 508, would

24  be 28508; if you could bring that page up.  And I guess

25  enlarge the second half of the page, if you would, so we can

THOMAS EFFINGER - DIRECT EXAMINATION

1    get the date.

2    Q.  This is the second ROD, is it?

3    A.  Yes, sir.

4    Q.  And there have been a total of how many RODs for the

5    superfund site that you've been working to clean up?

6    A.  There's been a two records of decision for the Charleston

7    site.

8    Q.  So is this the Record of Decision that was described in

9    the document that we saw as the first ROD that was the one

10   that was referred to, to be coming along later?

11   A.  Yes, it talked about an additional ROD that would be

12   issued for intermediate groundwater, surface water and

13   sediment.  So this is that document.

14   Q.  And this was issued when?

15   A.  Well, you can see when it was signed, September 24th of

16   2002.

17   Q.  What is the -- just from a summary point of view before we

18   dig into it a little bit, what is the summary, sir, of the

19   remedy that was chosen in this ROD for those portions of the

20   remediation and cleanup that were not addressed earlier in the

21   first ROD?

22   A.  Okay.  In a nutshell, with intermediate groundwater, it

23   was prescribed that we try to effect some removal, if there

24   was free phase tar in the intermediate zone that could be

25   captured, pumped and removed, and then along with that, trying

THOMAS EFFINGER – DIRECT EXAMINATION

1    some technologies to oxidize the dissolve phase contaminants.

2        And so you add a reagent to the subsurface under a control

3    reaction, it converts those organics into CO2 and water, which

4    renders them benign so they don't have the potential toxic

5    effects.

6        There was areas where it prescribed for us to do that in

7    the intermediate zone, and it left the door open for doing

8    repeat treatments.

9        With the sediments it talked about adding additional cap

10   to the sediments.  There was recognition from studies and

11   reports from the study, and its contractors had done that,

12   some of the contaminated sediments, the majority of those

13   areas have been covered with a sand blanket that the City was

14   obligated to use to prevent those sediments from being

15   released to the environment and causing harm.

16       So in a way they had already -- they recognized that the

17   City and its contractors and the tour boat facility, the

18   National Park Service, the owner of that site, had already

19   employed a sand cap to hold those sediments down so that the

20   benthic organisms would not be exposed to it.

21       So then by this order we had to go back out, do some more

22   sampling of those sediment areas to see where the cap still

23   existed.  We had to measure free available organic carbon in

24   the sediments, which would mitigate any toxic effects of the

25   sediments, and then determine where additional capping was

THOMAS EFFINGER – DIRECT EXAMINATION

1    required.  So it talks about this in a general term.

2          MR. FELMLY:  Denise, if you could please go to page

3    8506 at the bottom of the page, couple pages back and bring

4    that up.

5    Q.  This is part of the sort of opening introduction to this

6    document, and I want to focus your attention on the lower

7    portion of this description of the selected remedy.  It

8    references the earlier ROD.  A Record of Decision ROD for

9    operable unit number one at the CPA site was issued by the EPA

10   in September 1998.  The OU-1 ROD addressed NAPL source areas,

11   shallow groundwater impacts and impacted soil.  The impacted

12   soil removal action has been completed, along with significant

13   NAPL removal and initial shallow groundwater treatment

14   activities.  Remedial actions to address the remaining NAPL,

15   shallow NAPL source areas and shallow groundwater impacts --

16          MR. FELMLY:  And if you could go over to the next

17   page, Denise --

18   Q.  -- will continue concurrent with the implementation of the

19   selected remedy for OU-2.

20       Can you explain to us what you understood to be the plan

21   as they described the interaction between OU-1 and OU-2?

22   A.  Well, they were recognizing that we hadn't completed all

23   the work required by OU-1, and we hadn't even decided for some

24   of the areas where that still had source, what needed to be

25   done there.

THOMAS EFFINGER – DIRECT EXAMINATION

1    When we had dug the excavations inside the substation, we

2    recognized those areas where we could not dig because of

3    surface equipment, electrical equipment, Charlotte Street, and

4    then Concord Street.  And then a feeder bay at the back.  So

5    we recognized there were areas where we couldn't dig and

6    couldn't get to.  So we put in a recovery system.  And the

7    recovery system was designed to capture tar that would move

8    through the site and may move from those areas which still

9    contained tar back towards where we had dug.

10    So we put in a trench system, we put some six- and

11    eight-inch wells into the clay, we sumped it into the clay

12    with the cap on the bottom.  A large slot size for the tar to

13    then, if it flowed back, it would flow into these wells where

14    it would collect in the deeper collection well.

15    Once again in the well, then we came up with some pumps

16    that were able to remove that material, and that's what we

17    started removing after we completed the excavation work inside

18    the substation.

19    So we started pumping that tar out and got better and

20    better at it as we gained expertise.  And got to the point

21    where we were removing about 400 gallons a month.

22    Since that time we've removed about 23,000 gallons of pure

23    tar.  We shipped that off to be recycled in a fuel mixing

24    operation, fuels blended and then used as a fuel.  But

25    23,000 gallons of tar was a significant removal, you know,

THOMAS EFFINGER – DIRECT EXAMINATION

1    after the 63,000 tons of impacted soil and debris had been

2    removed.

3        So that's still ongoing.  The regulators expect to us

4    continue that, and we are continuing that.  As we have other

5    areas available to excavate, either through work of other

6    folks or by the City, we remove that soil, too.

7        So all of that associated with the shallow groundwater

8    from OU-1 is still ongoing, and the regulators still have the

9    ability to require us to do more work in those areas.

10   Particularly back at the main gas holder where we have not

11   been able to apply a technology other than putting a pump that

12   draws off the bottom of that holder and is removing tar.  Some

13   of that tar being counted in the 23,000 gallons removed to

14   date.

15   Q.  Now, in addition to the things you just described that

16   really are still in process apart from OU-1, does the section

17   we see here on the screen indicate the following major

18   components of the selected remedy for OU-2, in other words,

19   the new information that they have provided you to perform as

20   a remedy?

21   A.  Yes, sir.

22   Q.  And just quickly on these there's an indication of

23   continuing to remove NAPL in the first one of these, and

24   talking about stationary or portable pumping equipment.  Is

25   that the pumping you were just talking about?

THOMAS EFFINGER – DIRECT EXAMINATION

1    A.  Yes, after seeing the success that we gained with the

2    shallow zone for the wells and actually demonstrated some tar

3    in them, they told to us try and remove that.  And we did

4    install two larger wells, some six-inch wells, because the

5    larger the diameter of the well, the more tar that can collect

6    in it.  A two-inch well wouldn't hold very much.  But with the

7    larger six-inch wells, we put those in to see if tar would

8    collect in them, and we removed those.  And that's in a couple

9    of locations.

10        We had some other groundwater monitoring wells, there was

11   one back at the gas holder that's presumed to be in the

12   intermediate zone.  It's actually in the loose fill around the

13   holder, and we're removing tar from that well.  But it's a

14   little bit here and there, it's a batch recovery.

15        Again, the lion's share of all that tar I mentioned is

16   coming from the shallow zone, but they did ask us to go after

17   that.

18   Q.  The second bullet item under the new portion of the

19   selected remedy talks about in situ treatment of impacted

20   groundwater, and goes on to talk about this dissolved oxygen

21   concentration.  You mentioned that a little bit before, but

22   could you just briefly describe what this program is and

23   describe how you use oxygen to try to break down tar?

24   A.  Yes, sir.  In situ means for treating the groundwater in

25   place, and monitoring it, and this in situ treatment uses a

THOMAS EFFINGER – DIRECT EXAMINATION

1    hydrogen peroxide as the oxidant.  It has some other catalysts

2    that you need to add to make the reaction move forward.  And

3    it's designed to convert the dissolved phase organics back to

4    less benign products, back to $CO_2$ and water at its complete

5    reaction stage.  It's supposed to have a little bit of

6    efficacy with the tar, but you would have to add so much of

7    that material to be effective with the tar, it's pretty

8    difficult, and you just can't push that much material into the

9    ground.  It's like trying to push, you know, ten pounds into a

10   five-pound bag; you just can't do it.

11        So you let the reaction take place.  And in most cases the

12   areas that we treated it was about a two-week period for it to

13   occur.  You monitor the reaction, and then you go away.  There

14   is some subsidence of the reaction over time.  The increased

15   oxygen in the aquifer increases the biological activity, and

16   the organisms have some ability to chew up those organics and

17   make them less benign.

18        So we had to actually do it twice at the Charleston site,

19   and then monitor what happened afterwards.

20   Q.  And the principal impact is not on the tar itself, but the

21   constituents that have leaked out into the groundwater and

22   dissolved in the groundwater?

23   A.  It's on the dissolved phase, but the belief is there's

24   less mass of tar in the intermediate zone than what we're

25   seeing in the shallow zone.  So we're really trying to speed

THOMAS EFFINGER – DIRECT EXAMINATION

1    up the cleanup of the -- of that dissolved phase to try to

2    manage.

3    Q.  And then down at the bottom of this list talks about these

4    sand blankets that you were referencing, and a discussion

5    about the sand blanket may be augmented, depending on the

6    supplemental total organic carbon and PAH data.

7        What actually ended up happening with respect to the

8    sediments and the management of the soils on the edge of the

9    river?

10   A.  Well, to comply with this, we had to go back out there

11   with equipment and a Vibracore, which is another boring device

12   that you use that's mounted to a kind of a platform kind of

13   boat.  And use the Vibracore to see where the sand blanket was

14   and how thick it was and what the underlying sediment looked

15   like, and do an analysis on that sediment for the

16   contaminants, and then also for the organic carbon.  And

17   there's an equation to use the organic carbon and evaluate

18   what the ecological impacts would be.

19       But coming out of that analysis, you identify the areas

20   that could have potential impact, and also do not have a

21   sufficient two-foot thickness of sand blanket.  And so then we

22   were required to go back and add to that.  Add to the sand

23   blanket where it wasn't thick enough, and evaluate if there

24   was additional areas based upon the calculation where you may

25   have impacts to the aquatic organisms.

THOMAS EFFINGER – DIRECT EXAMINATION

1  Q.  And is all of the work on the sediments on the river

2  complete today?

3  A.  It is for two areas.  There's one remaining area that's at

4  the end of Charlotte Street, and it's the same kind of design

5  there that we had had issued in our work plans, but that

6  because the City is installing a park at the end of Charlotte

7  Street which will have an observation deck, all the people

8  involved, all the stakeholders realize we would not be able to

9  put this extra cap out there before the City would need to

10 drive piling through it for their observation deck, and

11 disturb that cap.  So then we'd have to manage it all over

12 again.

13     So what was agreed was that we would integrate, you know,

14 their building of that observation deck associated with the

15 park, we would dovetail that with what we were doing to the --

16 to cap the sediment.

17     So the final design's going to look like we'll go out

18 there, we'll put down some sand to hold the sediment down,

19 then they'll drive their piling through it, then we'll come

20 back and put some geotextile around the pilings that they have

21 in place so that we can put rip rap on top of it to hold that

22 sand down, so that the sand would not be dispersed by natural

23 forces later on, either hurricanes or what have you that could

24 disturb it.

25 Q.  What's the time frame that -- in light of the coordination

THOMAS EFFINGER - DIRECT EXAMINATION

1   of the City, what's the order of magnitude of the time frame

2   when this work that will eventually complete the sediment

3   portion of the river is likely to be done?

4   A.  Well, the City is -- has been working on its funding for

5   this for several years.  And we had hoped that they would have

6   done it a couple of years ago, but that hasn't occurred yet.

7   I'm hopeful it will be within the next two years.

8           MR. FELMLY:  Let me, Denise, if you could go to the

9   bottom of this page under statutory determinations and bring

10  that up.

11  Q.  There's a section of this portion of the second ROD that

12  says because uncertainty exists regarding the availability of

13  the selected remedy to achieve the groundwater target cleanup

14  roles due to the presence of residual NAPL in the intermediate

15  zone, a phased approach has been selected.  The phased

16  approach consists of removal or treatment of NAPL DNAPL to the

17  maximum extent practicable, followed by containment of

18  potentially nonrestorable source areas and restoration of the

19  aqueous constituent plumes.  That's quite a mouthful.

20      Can you explain for us and the Court what that is saying

21  and what your understanding of what it's saying in terms of

22  this phased approach?

23  A.  Yes, sir.  Again, we're seeing this same three objectives

24  that they had in the Record of Decision for OU-1, which is

25  remove source to the maximum extent, containment of the areas

THOMAS EFFINGER – DIRECT EXAMINATION

1   where you can't remove the source, and then restoration of the

2   aqueous constituent plumes, which is what has been dissolved

3   from the tar.  So you've got those three objectives.

4       And then the phased approach is let's try this Fenton's

5   reagent, this oxidant technology to try and destroy the

6   dissolved phase that's in the intermediate zone and see how it

7   responds.

8       We -- like I said, we went through one iteration with

9   that, we had to come back six months to a year later and

10  re-treat the areas, and we're continuing to monitor to see how

11  the intermediate groundwater contamination responds to that.

12  Again, trying to achieve drinking water standards.

13  Q.  In terms of the work and investigations that were done

14  between the first ROD in '98 and the ROD that gets issued in

15  September of '02, and you've indicated a number of

16  investigations were undertaken.  Is there a breakdown of -- in

17  this second ROD that -- at page 513, that we can bring that

18  up, I think where it may be of what those investigations

19  consisted of?  Is there a summary of them?

20  A.  Yes, sir, I believe that there was, where it talks about

21  the two different records that were submitted.  One for

22  intermediate groundwater and then one regarding the sediments.

23  Q.  So at the bottom of page Bates stamp 513 there's a

24  discussion, and we're going to go over to the next page, of

25  some of the investigations done in '98 and '99.

THOMAS EFFINGER – DIRECT EXAMINATION

1      MR. FELMLY:  And then if we can go to the next page

2   at the top, Denise.

3   Q.  Are these additional investigations and testing,

4   monitoring that was undertaken in the interim between the two

5   RODs leading to the second ROD?

6   A.  Yes, sir, what you've captured here talks about the

7   additional work that was done for intermediate groundwater,

8   early and later in the year 2000.  And then follow-up

9   intermediate groundwater assessment done by a couple of

10   different contractors, to evaluate.

11      And in this situation we were looking at areas that were

12   upgradient from our gas holder, so they would be in a

13   hydraulic sense you would be upstream from where the

14   groundwater flow was typically expected to go.  So we were

15   trying to elicit what was causing these accedences up there.

16   We did see evidence of tar, we saw a lot higher concentrations

17   of benzene.  So we were looking at whether or not there was an

18   additional source.

19      And then there was some predesigned characterization work

20   done by management and technical resources and Ish, to talk

21   about how we would manage these other areas for intermediate

22   groundwater.

23      MR. FELMLY:  Now, if I could turn to page 517 at the

24   middle of the top, just above the middle of the page, that

25   paragraph, Denise, that's just above the center part of the

THOMAS EFFINGER – DIRECT EXAMINATION

1   page, right there.

2   Q.  It references the unilateral administrative order that we

3   marked earlier.  Then it says, since March 1999, EPA and SCE&G

4   have resolved technical disagreements regarding the ROD for

5   OU-1.  Currently, SCE&G has implemented significant DNAPL

6   removal activities for OU-1 within the shallow zone and

7   conducted additional assessment activities for OU-2.  If

8   necessary, an explanation of significant differences will be

9   prepared for OU-1 to resolve any significant discrepancies

10  between the ROD and the final remediation plans.

11      What were the disagreements or the issues involving the

12  agencies, and I guess yourself, in connection with the matters

13  described in this paragraph?

14  A.  Well, starting back with the preparation of the initial

15  Record of Decision for OU-1, there was a lot of discussion

16  around conventional technology which was -- is to run a pump

17  and treat system.  You know, you keep pumping water out of

18  these wells and you keep treating it until you don't get any

19  more dissolved phase coming out of your wells.

20      But we determined early on that because of the magnitude

21  of the tar that was there, that was going to take an extremely

22  long time, if not forever.

23      So what we did instead was go after removing that source

24  area.  And folks were generally happy with that result.  The

25  regulators, I believe, were extremely happy about what we were

THOMAS EFFINGER – DIRECT EXAMINATION

1    seeing in those groundwater monitoring wells further out from

2    the site as we removed the source areas, and they saw the

3    plumes starting to shrink.  So they were extremely pleased

4    with that.

5        But because we had not achieved the drinking water MCLs,

6    there was still some discussion about whether or not we needed

7    to install and operate a pump and treat system.

8        Here, I think you see EPA is recognizing the benefit of

9    what we have done, and that it was in the best interests and

10   it helped move the cleanup along much faster than it would

11   have otherwise.  And they're considering whether or not they

12   need to issue the ESD.  If there had been extreme differences,

13   they would have issued a ROD amendment, which they're not

14   proposing here.  But an ESD kind of clarifies the work that

15   was done and how EPA and the regulators believe it's

16   consistent with the requirements in the original Record of

17   Decision for OU-1.

18   Q.  Now, we're going to get to the ESD.  Was an ESD ever

19   issued?

20   A.  Yes, it was.

21   Q.  We'll get to that in a minute.

22        MR. FELMLY:  Denise, if you could go back to the page

23   and pick up the middle of the page where it says community

24   participation, if you would, please.

25   Q.  Just quickly, does this paragraph describe the various

THOMAS EFFINGER – DIRECT EXAMINATION

1    steps that the agency took to publish and provide notice and

2    have a public comment period and have a public meeting with

3    respect to the information that ultimately is utilized in this

4    ROD?

5    A.  Yes, it does.  Just like the same process they went

6    through on the ROD for OU-1, again, they have to go back to

7    the public, talk about these issues, explain to them what was

8    found, and talk about what they're requiring to be done.

9          MR. FELMLY:  And, Denise, if you could go to the

10   bottom of this same page and pick up that paragraph, and then

11   I'm going to take you over to the other page.

12   Q.  This paragraph addresses to some degree the

13   interrelationship of the two RODs.  And at the bottom of it --

14   well, first of all, it obviously bullets out and indicates the

15   two areas they deal with.  But it says at the bottom, EPA has

16   already selected the remedy for operable unit number one in a

17   ROD issued September 30, 1999.  And then it says the remedy

18   for OU-1 was selected under the authority of CERCLA, and

19   was -- if we can go over -- consistent with the requirements

20   of the National Oil and Hazardous Substances Pollution

21   Contingency Plan.  That's the NCP, right?

22   A.  Yes, sir, that's the -- we call it the National

23   Contingency Plan.

24   Q.  And then it goes on to say at the end of that paragraph,

25   remedial actions to address remaining shallow DNAPL source

THOMAS EFFINGER – DIRECT EXAMINATION

1   areas and shallow groundwater impacts will continue concurrent

2   with the implementation of the selected remedy for OU-2, which

3   phrases what you said before that you were going to continue

4   that work.

5   A.  That's correct.

6   Q.  Now, the last thing on this is that if you go down to

7   what's going to happen with OU-2, and we stay at the bottom of

8   that second paragraph it again says, OU-2 continues the phased

9   approach for groundwater cleanup through the removal and

10  treatment of NAPL to the maximum extent practical, followed by

11  containment of the nonrestorable NAPL source areas and

12  restoration of the aqueous phase plume.

13      Language we've seen before, but they're staying on course

14  with respect to that goal.

15  A.  Right.  Right.  With that whole process of removal.

16  Q.  Now, at the time the first ROD came out, did you know what

17  was going to be adopted with respect to the in situ

18  oxygenation program that has been used in OU-2?

19  A.  No, we did not.  We hadn't even done all the investigative

20  work to identify the areas, the extent of the contamination,

21  and where it was vertically.

22  Q.  And in discussions at that time with the agencies, what

23  were the options, other than the oxygen system that were

24  primarily being kicked around and discussed?

25  A.  In 1998 or 2002?

THOMAS EFFINGER – DIRECT EXAMINATION

1   Q.  '98.

2   A.  In 1998, I believe that technology was fairly new at the

3   time.  I don't know that it had been tried in a manufactured

4   gas plant.  This is with the Fenton's reagent, the in situ

5   chemical oxidation, or ISCO, as we sometimes call it.  But it

6   was fairly new technologies.  Hadn't been used.

7       We talk about pump and treat on the intermediate zone, we

8   talked about a lot of other things, but the real key was the

9   agencies felt like we had not completely delineated the area

10  of impacts in the intermediate zone.  So they were holding

11  that until we could at least identify them and understand the

12  extent and the concentration of contaminants in those -- in

13  the intermediate zone.

14       MR. FELMLY:  If you could go to page 8544, Denise,

15  and the first paragraph in the bottom section right there.

16       This is under ecological risk assessment.  There's a

17  reference here that based on findings presented in this

18  interim report on ecologic risk assessment dated April 2002,

19  surface water has been eliminated as a medium of concern for

20  both the former Charlotte Street seep and the brick archway

21  areas.

22       Did they go back and redo the ecological risk assessment,

23  the sort of human risk assessment, after the first ROD?

24  A.  I don't believe they redid the human health risks, but

25  when we were dealing with sediments and surface water they

THOMAS EFFINGER – DIRECT EXAMINATION

1    were focused on the ecological risks and that would be the

2    risks to the organisms that would be impacted in the Cooper

3    River.  So we had to -- we had to follow this protocol as

4    directed by EPA to evaluate those risks and to come up with,

5    again, that calculation that evaluated the cancer effect as

6    well as the hazard quotient and that would be the other health

7    effects you could have from contact with the constituents.

8    Q.  Now, in the Record of Decision we just went through, the

9    second Record of Decision, and I won't go through all of them,

10   are there numerous references to the removal of NAPL by

11   excavation?

12   A.  In the second ROD?

13   Q.  Right.

14   A.  I believe there's -- it's referring back to OU-1, if

15   that's what you mean, it refers back to what was done to get

16   us to where we were with OU-2.  I think there's a whole

17   section titled previous actions at the site.  Previous

18   activities.

19   Q.  And in particular, what that's referencing is the removal

20   of NAPL by excavation.

21   A.  Yes, sir.

22   Q.  There then is issued an explanation of significant

23   differences, and you talked a little bit before about that.

24        MR. FELMLY:  And, Denise, if you could bring that up,

25   this is a document bearing November 2005 date.  It's

THOMAS EFFINGER – DIRECT EXAMINATION

1    Exhibit 6.  And if you could center on the left, for the

2    moment, the left column, Denise, right in that area there.

3    Bring that up larger.  Thank you.  And perhaps I think bring

4    that up in paragraphs, Denise, because it's still very hard to

5    read.  That's fine.

6    Q.  It says this ESD clarifies the remedial cleanup as it has

7    been implemented at the site and explains how it differs from

8    the description that is contained in the OU-1 ROD.  The

9    modification does not fundamentally change the selective

10    remedy but provides an alternate method for achieving and

11    maintaining the performance standards.

12        In what way, as you understood it, did the modifications

13    illuminate or change the remedy that originally had been

14    selected in the OU-1 ROD?

15    A.   Okay.  EPA felt like it was necessary to issue this

16    because of -- even though we achieved the objectives of

17    removal of NAPL, removal of source to the maximum extent

18    practicable, we had done it with excavation.  The original ROD

19    talked about extraction wells, although it never really shows

20    you where to place them, how many to place and all of that.

21        We found additional source areas outside of what was

22    originally known when the ROD for OU-1 was issued.  So we

23    found that area next to the Luden's building, along Charlotte

24    Street.  So there was source areas downgradient of Concord

25    Street.  And this whole removal using excavation, the agents

THOMAS EFFINGER – DIRECT EXAMINATION

1    here, EPA was recognizing it was actually much better at

2    removing the source material.  It didn't exactly use

3    extraction wells, but it did achieve their first objective,

4    which was to remove NAPL to the maximum extent practicable.

5    So they talk about it here.

6        They also, later on in this document, talk about the

7    groundwater that was managed as a result of doing that

8    excavation.  And then the three million gallons of water that

9    was treated and released.  So they're really saying you

10   achieved our objectives, you did it a little bit differently

11   than we thought, but overall we think it's probably been much

12   better and more efficient.  So --

13            MR. FELMLY:  Let me go over to the second page,

14   Denise, if you could take us over to page 4880 on the Bates

15   stamp reference, and highlight the section in the middle left

16   of the page.  That's fine.

17   Q.  Now, in the middle of paragraph of that it says that

18   concurrent with site-wide redevelopment, a significant volume

19   of NAPL was removed during excavation of over 63,000 tons, and

20   impacted materials and debris from the shallow groundwater

21   bearing zone.  Additionally, during the excavation activities

22   a perimeter collection and recovery trench was installed with

23   over 50 NAPL recovery wells.  This NAPL recovery is ongoing to

24   date and over 14,000 gallons of free product, parens, coal

25   tar, have been collected, removed and disposed of.

THOMAS EFFINGER - DIRECT EXAMINATION

1     Is that the modification that you were referencing, sir?

2   A.  Yes, sir.  It is giving us credit for doing that removal

3   and then also installing that perimeter collection and

4   recovery trench.  So --

5          MR. FELMLY:  If you could go to the bottom of the

6   page, there's one more paragraph, Denise, below that down at

7   the bottom.  Thank you.

8   Q.  Is this where they're describing what you were just

9   saying, that there has been improvement in the groundwater

10  plumes as a consequence of what you've done?

11  A.  Yes, sir.  As we've removed tar in those -- the furthest

12  areas away from the site closest to the Cooper River, and

13  worked our way back towards the electric substation, we've

14  also seen the dissolved phase plume shrink in size and move

15  back towards -- the perimeter is moved back towards the

16  electric substation.  And so most of the areas east of Concord

17  Street, which would be closest to the Cooper River, are now

18  meeting drinking water standards.  In that shallow zone.

19         MR. FELMLY:  And finally on this document, Denise, if

20  you go to the right column to the bullets at the top, please.

21  Q.  It describes some of the focus source mitigation efforts,

22  and I think you mentioned one of them, which is that it

23  referenced the fact that you had taken three million gallons

24  of contaminated water out of there and cleaned it?

25  A.  Yes, sir, it does.

THOMAS EFFINGER – DIRECT EXAMINATION

1  Q.  And it references the use of the oxygenation products

2  during backfilling of excavations, is that right?

3  A.  I don't think I had mentioned that, but there is another

4  oxidant that's available in a powdered form, and it releases

5  oxygen when it's in contact with water.

6      But when we put in the clean backfill, especially on the

7  perimeters of the areas that we excavated, we would add this

8  oxygen release compound, kind of a white powdery substance,

9  but we would kind of blend it and put that back into the hole,

10  so that where it was in contact with groundwater, it would

11  help expedite the cleanup of the groundwater for any kind of

12  little residual that might be left behind.

13  Q.  And that's different than the other oxygen injection

14  process with the Fenton's reagent that you were talking about?

15  A.  It has the same function, but it's a little different

16  product that you're placing into the ground, and you're using

17  a different method to get it into the ground, yes, sir.

18  Q.  Now, in terms of the work that's discussed in the ESD, the

19  63,000 tons of impacted soil that was removed with tar in it,

20  and the gallons, three million gallons of water, is this the

21  work that is covered in the ESD that you talked about before

22  to the Court about how the EPA was on site and you know this

23  was occurring?

24  A.  Yes, they knew all along what was going on, how it was

25  being managed, and advising us, giving us their input, and if

THOMAS EFFINGER – DIRECT EXAMINATION

1   there was any disagreement, they would let us know about it.

2   Q.  The next exhibit in this story -- we're coming towards the

3   end -- is Exhibit 24.  And Exhibit 24 is entitled a unilateral

4   administrative order for remedial design and remedial action.

5   That's a 2003 document, Mr. Effinger.  What is that instrument

6   or what does that do?

7   A.  Again, just like we had seen before in the ROD for OU-1,

8   this then is the enforcement piece that EPA uses to require us

9   to do the work, stipulate penalties if we don't do the work,

10  identify the deadlines for getting the work done, talk about

11  the protocol for sending and receiving information.  So all of

12  those administrative things, and enforcement things that go

13  along with the requirements that are in the ROD for OU-2.

14  Q.  So this is the sort of authorizing document that gets you

15  going on doing the work that's in the OU-2 ROD?

16  A.  Yes, sir, but just like before, now we have to prepare a

17  work plan and get their approval for us to go out and do the

18  work.  And in the work plan we describe what we're going to do

19  in more detail on how we're going to do it.  So that they can

20  make sure it's compliant with their Record of Decision, they

21  have to approve it, and there might be a couple of iterations

22  before we go out there and do the work.

23      For OU-2 we elected to divide that up into two pieces.  So

24  we wrote a work plan for the intermediate groundwater work and

25  we wrote a separate work plan for managing the sediments.

THOMAS EFFINGER – DIRECT EXAMINATION

1    Q.  And after you write a work plan like that, do you get

2    feedback from them as to whether it's acceptable or not?

3    A.  Yes, we do, and there's oftentimes many revisions to that.

4    There will be a draft and then resubmittal, and then the other

5    agencies, particularly with sediment, had a lot of input to

6    that.  The Park Service was very concerned about how our

7    remediation or -- and how our capping work over near their

8    tour boat facility might impact the boat traffic coming in and

9    out to the piers that they had there.  So they had input to

10   it.  As well as the folks at the Aquarium concerned about how

11   it might look or how it might affect their exhibits.

12           MR. FELMLY:  Denise, if you could bring up Exhibit 7,

13   which is -- if we could bring up the title so we can see what

14   it is clearer.

15   Q.  This is the interim remedial action report, operative unit

16   number one, remedial action and removal action completion

17   report for the Calhoun Park site.

18       Is this a document that in your profession is sometimes

19   called an IRA?

20   A.  Yes, sir, it is.

21   Q.  And this IRA was issued in August of 2006, is that right?

22   A.  That's correct.

23   Q.  And that's something that -- Who prepares this and who

24   submits this?

25   A.  It was prepared on our behalf by Management Technical

THOMAS EFFINGER – DIRECT EXAMINATION

1    Resources, and they were our consultant.  They were involved

2    in the removal, in the cleanup work that took place for OU-1.

3    This is a document, how much soil was removed, where it was

4    removed from, where it was shipped to, they have all the

5    attachments with the manifest, the weigh tickets, all of that

6    information including, you know, pictures, descriptions,

7    history, all of that to kind of summarize the work after it is

8    done, to convey to the agency.

9        In this case it's called an interim because we recognized

10   that work was still going on, but it was something that the

11   agencies requested from us to kind of ramp up the soil removal

12   work, and then the source removal work conducted for OU-1,

13   even though we were still pumping tar from those perimeter

14   trenches under another plan, the site-wide DNAPL removal plan.

15   Q.  Well, this is -- this document, Exhibit 7 that I have, the

16   IRA here, is several hundred pages long, and I'm not certainly

17   going through very much of it.  But did you receive word back

18   from the EPA as to whether after their review of the document,

19   they approved it or not?

20   A.  Yes.  You have to get concurrence from both EPA and the

21   State.  The State will voice their opinion to EPA who wrote

22   the official letter to approve that document.

23   Q.  And we're going to come back to the IRA in a minute, but

24   let's just deal with Exhibit 8.

25       This is a letter from Kenneth Lucas, the remedial project

THOMAS EFFINGER – DIRECT EXAMINATION

1   manager, bears a date of October 19, 2006.  It's to you.  What

2   is this letter, sir?

3   A.  This is the actual letter which approved that interim

4   remedial action report that we were just discussing.  Ken

5   Lucas is the third project manager coming in after Terry

6   Tanner changed responsibilities.

7   Q.  Now, in this letter, in the second paragraph they talk

8   about continuing obligations will be met by implementation of

9   the ongoing remedial action for operative unit number one.

10  And I gather they're saying you still have to do the work that

11  operative unit required, right?

12  A.  Right, they're recognizing that there's still tar out

13  there in certain areas that we couldn't get to.  Primarily the

14  biggie is at the gas holder, which we couldn't get to, and has

15  yet to be determined what is the final resolution or the final

16  work that we need to do there.

17      And then also other areas that were inaccessible, like the

18  Ports Authority, and then going on back toward that feeder

19  bay.

20      So equipment that comes out, if we have the opportunity to

21  go in there and remove it, they're expecting us to do that.

22  And they're expecting to us continue the dialogue on what we

23  need to do with that gas holder area.

24  Q.  Other than the work that still needed to be performed as

25  part of the earlier order, were there any other

THOMAS EFFINGER – DIRECT EXAMINATION

1  qualifications, criticisms or nonapprovals in the action taken

2  by Mr. Lucas and the EPA?

3  A.  Not to my knowledge, no, sir.

4  Q.  If, based on your experience and your years of work in

5  connection with these remediations, if the EPA had a concern

6  about something in the IRA or didn't agree with something,

7  what's the process they would follow in this type of

8  situation?

9  A.  Well, they have the authority with those unilateral

10  administrative orders to send us a notice of deficiency, and

11  then to impose fines that you incur per day, per deficiency.

12  So they have an enforcement mechanism, if we are not meeting

13  their requirements.

14  Q.  All right.  Now, going back to the IRA, I do have some

15  items on that I want to discuss.

16      If you go to page 356, the Bates stamp 356, at the bottom

17  of the page there's a section called explanation of

18  significant differences.  In this portion of the document does

19  the IRA set out the interaction of the ESD and the original

20  ROD and some of the information you earlier gave us about the

21  way in which various aspects of that was reconciled?

22  A.  Let me read through this.  The -- yes, it does.  And

23  again, the IRA is a document we wrote, and so we're going

24  through the process and trying to explain it here.

25  Q.  I understand you wrote it, but then you submit it to

THOMAS EFFINGER – DIRECT EXAMINATION

1   Mr. Lucas and he approved it?

2   A.  Yes, sir.

3   Q.  And in addition, I'd like to go to page 357, which is a

4   section of the IRA called approvals and inspections and

5   regulatory oversight.  Again, this is your contractor on your

6   behalf describing this, but I want to focus on the description

7   in the second paragraph of this section where it says, for

8   phase one, the soil removal and seep mitigation work, the EPA

9   on-scene coordinator or his representative was on site daily.

10      Now, I'm not sure we've talked about what an OSC is.

11  We've talked about what a remedial project manager is.  What's

12  an on-scene coordinator?

13  A.  The on-scene coordinator is the immediate response guy out

14  of EPA.  And in this case it was Steve Spurlin.  But it's his

15  job, if you're doing an urgent mitigation or soil removal, to

16  come and observe that and more or less supervise the work, or

17  make sure that the work is compliant with their requirements.

18  Q.  And then it goes on to say, for many other source removal

19  activities the EPA remedial project manager was also on site.

20  And that would be the person who at least now would be

21  Mr. Zeller and earlier was Mr. Tanner and others.

22  A.  That's correct.  Although in his role he's not required to

23  be there daily, but in most cases with Terry Tanner, he was on

24  there a great deal of the time when we were actually doing the

25  digging.

THOMAS EFFINGER – DIRECT EXAMINATION

1  Q.  And then it says, additionally, project status meetings

2  and site inspections were conducted at the site with the

3  regulatory agencies.  As appropriate, approval dates are cited

4  within this report, and a copy of the approved correspondence

5  is included in Appendix A.

6     This portion of the report describes the interaction and

7  oversight from the point of view of SCE&G and your contractor

8  with the EPA.

9  A.  That's correct.

10  Q.  Did anybody ever come back and either suggest corrections

11  to this or any changes to it from the EPA?

12  A.  There may have been some minor tweaks to it by the

13  agencies, but as you see it here, it was fully approved by the

14  agencies.

15  Q.  And what about the statements that relate to the fact that

16  EPA representatives were on the site, did anybody --

17  A.  Oh, no, nobody challenged that.  And Appendix A then is

18  the repository of all of those approval letters.

19  Q.  And then if we move down to the next paragraph, which is

20  called removal action overview, again we've seen this number

21  before.  This is where the description of 63,000 tons of

22  impacted soil and sediments and materials impacted with

23  presumably NAPL is discussed in this IRA, is that correct?

24  A.  That's correct.

25  Q.  It talks about during excavation activities over 31 --

THOMAS EFFINGER – DIRECT EXAMINATION

1    3,100,000 gallons of water were removed and transferred to

2    treatment facilities.  So all of that is set out in this IRA

3    as part of the report?

4    A.   Yeah, the report's purpose is to pull all that together

5    and document what was done and make it a part of the record.

6    Q.   That -- there are a number of other documents, these

7    are -- let me just strike that.

8         We've talked about some of these documents as being

9    milestone documents, some of them are perhaps less important.

10   Is the IRA one of the milestone documents, do you think?

11   A.   Typically it is.  It captures everything that was done at

12   the site.  But here it's -- you can see it's still an interim

13   document, so we still have work that's left to do.  But

14   because of the time that the work was implemented, EPA felt it

15   best to go ahead and capture it here.  So at least in a

16   segmented fashion, you know, kind of matching the phased work

17   that was done, it would kind of, you know, tie that phase

18   together.

19   Q.   I have two more things, Mr. Effinger, that I want to --

20   two topics that I want to address with you.  One is to go

21   through what studies and various actions are ongoing now, to

22   the extent we haven't already talked about them, and then the

23   last topic would be matters related to the calculation of the

24   costs that you have incurred.  And let me do the first one,

25   which will not require as much detailed review of the

THOMAS EFFINGER – DIRECT EXAMINATION

1   documents.

2       MR. FELMLY:  Exhibit 20, Denise, you would bring that

3   up.

4   Q.  Is something called the tenth DNAPL removal report, and

5   that document is what?

6   A.  After we put in those -- that recovery well trench, we had

7   a site-wide DNAPL removal plan, which was approved.  But this

8   is a semiannual report that we prepare to document how much

9   tar has been recovered and what process has been used and to

10  try to evaluate how the system is responding.  So it gives the

11  EPA and the regulators an opportunity to see where things are

12  progressing and what's going on with that removal program.

13      Here on this one I can read it, it's we're at

14  19,600 gallons of tar that's been removed.  And this was from

15  through November of '06.  So to date we're at about

16  23,000 gallons of tar removed.

17  Q.  And you continue to do these reports, is that correct?

18  A.  Yes, sir.

19      MR. FELMLY:  If you could bring up Exhibit 10,

20  please, Denise.

21  Q.  This document is entitled a five-year review report, and

22  is this related to work with the Army Corps of Engineers?

23  A.  Yes, it is.  The five-year review report, as Ken Lucas

24  came into the project, there was discussion between he and the

25  State that a five-year review needed to be conducted.  There

THOMAS EFFINGER – DIRECT EXAMINATION

1  was some debate about that, but he elected to proceed.  And so

2  he commissioned the Army Corps of Engineers, and that's who Ed

3  Hanlon works for, to do a five-year review of what had

4  occurred at the site.  It's still in a draft form that's not

5  been finalized.

6  Q.  But this still involves differing agencies making comments

7  on this remediation?

8  A.  Yes, it does.

9         MR. FELMLY:  Denise, if you could bring up

10  Exhibit 16.

11  Q.  Now, this document is entitled a draft, it's a technical

12  memorandum assessment of vapor intrusion.

13     First of all, what does vapor intrusion refer to?

14  A.  Again, as the new guy came in after Ken Lucas left, then

15  Craig Zeller came in and started looking at a lot of issues

16  that needed to be at least closed out before we started

17  getting into a technical impracticability waiver.  And one of

18  those was an evaluation of vapor intrusion.

19     What that is, is if you have groundwater or soils beneath

20  a structure, then vapors could escape from underneath the

21  structure and potentially cause a vapor environment inside the

22  building that would affect -- it would affect people.

23     So we had to go back and evaluate it under new vapor

24  intrusion guidance that is out there within EPA and the State

25  regulators.

THOMAS EFFINGER – DIRECT EXAMINATION

1    Q.  And has that report -- what does that report in summary

2    indicated with respect to the issue of vapor and the

3    possibility of it getting into structures?

4    A.  Again, it's a thick record.  We initially -- we finally

5    submitted it in February of this year, but it talks about

6    different exposure pathways, different contaminants, different

7    media, whether it's groundwater or soil.  And the surrounding

8    buildings.  And it evaluates all the different areas for how

9    much vapor could come into those buildings, what the

10    concentration might be.  And then it does a risk assessment

11    like we had talked about before, to evaluate what the

12    potential cancer impacts might be, or what the human health

13    exposure issues might be.

14         MR. FELMLY:  Exhibit 17, if you could bring that up,

15    Denise, please.  The intermediate groundwater report.  This is

16    coming into the current time frame, this is November of 2008.

17    Q.  Can you describe for the benefit of the Court what this

18    report is and what its significance is?

19    A.  All right.  As a result of implementing the in situ

20    chemical oxidation required by the ROD, the Record of Decision

21    for OU-2, then you have to do follow-up monitoring to see

22    whether or not it's been effective.

23         And so that follow-up monitoring has continued, and it's

24    still going on, on nine-month intervals, to report the

25    constituent levels in the surrounding intermediate groundwater

THOMAS EFFINGER – DIRECT EXAMINATION

1    wells, to see if the concentrations are decreasing in response

2    to the chemical oxidation treatment that was employed there.

3    Q.  At -- that will next be done approximately when?

4    A.  Since this is in June of '08, the next event would be in

5    September '09.  Excuse me, March of '09.

6    Q.  On the subject of monitoring or assessment or looking

7    forward to these various things you have in play and how

8    they're responding, can you give the Court an understanding or

9    a sense as to the periods of time after this work is -- if it

10   is completed and you get the sediments done and the other work

11   done, what's the expectation in a site like this in terms of

12   the years of monitoring that is likely to continue?

13   A.  The expectation is in units of years, you know, how many

14   years is it going to take for this to achieve whatever it's

15   going to achieve after employing the technology.  EPA

16   evaluates it based on a 30-year time frame.  We're hopeful

17   that it won't be 30 years, but I have no way of knowing.

18       And then to throw into that mix is whether or not we'll

19   actually be allowed to submit and get approval for that

20   technical impracticability waiver.

21   Q.  That's the issue of whether you're going to have to bring

22   the water quality to drinking water standards?

23   A.  Whether or not we'll have to bring it to drinking water

24   standards.  Our argument would be, of course, that on the

25   electric substation nobody would be using that for drinking

THOMAS EFFINGER – DIRECT EXAMINATION

1    water, and so as long as it stays on site, there would be no

2    receptor that might be exposed to that.  And we'll continue to

3    monitor it to make sure it doesn't leave the site, and make

4    sure that through deed restrictions, no one is allowed to put

5    in a drinking water well.

6    Q.  If you could bring up Exhibit 15, Denise, please.

7          THE COURT:  Is there any way you can keep it from

8    leaving the site?

9    A.  You could drive sheet piling, but then you have to deal

10   with all the subsurface structures, and you'd have to drive it

11   down, for intermediate groundwater, down to 50, 60 feet, which

12   that's a pretty involved process.  You could install a grout

13   perc, and there's other technologies.  They're pretty labor

14   intensive, and it would require you tearing up the perimeter

15   around -- at the edge of those roads, Charlotte Street,

16   Concord Street, and then even over at that parking garage.  So

17   that's how you'd contain it.  At least intermediate

18   groundwater.

19   BY MR. FELMLY:

20   Q.  The next, and I think it's the last report I'm referencing

21   is Exhibit 15, the shallow groundwater monitoring results,

22   September event, and it's dated December 2008.  And if you

23   could just describe for the benefit of the Court what this

24   particular report is, Mr. Effinger.

25   A.  Again, we're continuing to follow the results of shallow

THOMAS EFFINGER – DIRECT EXAMINATION

1    groundwater to see what effectiveness we've had with all the

2    source removal activities.  So we're following that, we're

3    looking for the shrinkage of the plume, whether or not they're

4    getting smaller, whether or not you see another hit for the

5    benzene or naphthalene that we're concerned about.  Or any of

6    the metals that are at issue at the site.  So that's for the

7    shallow groundwater.  We're also doing that on a nine-month

8    interval, but it's done at a separate timetable than the

9    intermediate zone.  So we're not doing both at the same time.

10   So the next one here would be done in June of '09.

11   Q.  In addition to the photos that I showed before in

12   Exhibit 35, there are some additional photos.

13          MR. FELMLY:  And, Denise, if you could bring up some

14   of the photos that would reflect some of the things you've

15   been talking about.

16   Q.  Now, we saw this photo, which is obviously the photo of

17   the source material removal.  Do you have another --

18          MR. FELMLY:  Denise, if you could bring up 585,

19   please.  And then try to see if you can take them one by one

20   and expand them so the Court can see what we've got here.

21   Q.  This particular photo is identified as substation NAPL

22   removal.  You've talked about the difficulties of working near

23   the substation, Mr. Effinger.  What is happening here in terms

24   of this excavation for NAPL removal?

25   A.  We're inside the substation fence and we're actually doing

THOMAS EFFINGER – DIRECT EXAMINATION

1    the digging.  We would have our electrical folks out there to

2    make sure that we didn't have a contact issue with the

3    trackhoe versus these overhead lines.  These overhead lines.

4        You can see that yellow piece of equipment kind of in

5    front of the trackhoe bucket, and that was our pumping

6    mechanism where we would actually pump the water out of the

7    hole as we're doing the excavation.

8            MR. FELMLY:  Denise, can you zoom in on that the

9    little -- right there.

10   Q.  Is that what you're talking about?

11   A.  Yeah, it's kind of grainy when you blow it up, but yeah,

12   we had a pump on site to remove the water.  And again, we were

13   following a grid pattern to remove this soil and then put

14   clean soil back in, and close it up before we started the next

15   area.  So you can see it's doing that here.

16       The orange fencing to the right wraps around that

17   electrical feeder bay that we could not dig underneath.  And

18   we observed that along that perimeter that there was some tar

19   that would then come out of the sidewall, and so we installed

20   our perimeter trench back there to capture whatever else might

21   move back, you know, into a deeper pocket that we created.  A

22   collection trench so we could pump it out.  And we are

23   recovering some tar from there.  But that's one of the areas

24   we couldn't excavate, and of course we did as much as we could

25   inside the substation, but then just to the left of that off

THOMAS EFFINGER – DIRECT EXAMINATION

1    the picture is the rest of the big electrical equipment at the

2    site.

3              MR. FELMLY:  If could you go to the lower picture

4    now, Denise, and see what that shows.

5    Q.  Maybe this will -- What does that show us; maybe the same

6    thing, Mr. Effinger?

7    A.  It's a little bit further east, you can see Concord Street

8    kind of behind the arm of the trackhoe, and then to the left

9    of that are the frac tanks, which is where we would pump the

10   water to, manage that water, let it settle, go to another frac

11   tank, and then go through the filtration system before we

12   released it to the sanitary sewer.

13       In the foreground you can see the tops of the trees that

14   were used for phytoremediation, and again, this is an electric

15   feeder bay that we couldn't dig underneath.

16   Q.  So that electrical superstructure there, that's the

17   electrical feeder bay you're talking about.

18   A.  Yes, sir.

19   Q.  And you can't get underneath that.

20   A.  Yes, sir, and if it's ever removed, then we'd have to

21   remove the tar that's underneath it.

22             MR. FELMLY:  And the next picture, Denise, please?

23   Q.  Is this the tar pumping or purging process that you

24   described has extracted 20,000 or so gallons of tar?

25   A.  No, actually this is the in situ chemical oxidation work

THOMAS EFFINGER – DIRECT EXAMINATION

1    that has taken place over at the Luden's property.  So this is

2    on someone else's property.  You can see we barricaded their

3    parking lot to work in the parking area in front of the Imax

4    theater.  And as you treat with the chemical oxidant I told

5    you about, you can't push it in too fast.  Well, if you –– as

6    you push in this liquid, you're displacing some groundwater,

7    and we're actually capturing this groundwater in these

8    55-gallon drums to manage it.  So we're putting in the oxidant

9    and we're displacing some of the intermediate zone

10   groundwater.

11         MR. FELMLY:  The next picture, Denise.

12   Q.  What does this picture depict, sir?

13   A.  All right.  We're standing on the observation deck over at

14   the tour boat facility, looking towards the Aquarium, so

15   that's the substructure to the Aquarium in the background.

16   And here we have our contractors, in this case it was Cape

17   Romain, actually installing a cap to keep the –– keep the sand

18   blanket in place, and they're doing this with armor lock,

19   which is a material, it's block, and it's joined by a nylon

20   cable.  But as you put that down, in these 12-by-15 mats,

21   it –– with the geotextile underneath it, it holds that

22   sediment down so it can't be disturbed later by forces of

23   nature, if there's a storm surge or hurricane or what have

24   you, that sand cap is going to stay in place.

25         Now, these blocks are going to fill in with sediment and

THOMAS EFFINGER - DIRECT EXAMINATION

1    eventually become more natural looking.  But the agencies

2    actually desired this over using rip rap or stone to armor it.

3    Q.  And the next picture, I think we have several other

4    pictures of the sediment capping.  This is obviously from

5    looking -- is this up in the Aquarium looking down?

6    A.  Yes, it is, what you're looking at here is some oyster

7    bags, so there was another augmentation for us to add to an

8    existing oyster habitat zone.  It has two functions.  It

9    creates additional habitat for oysters to move in, but it also

10   helped us with capping the area and keeping the sediments

11   down.

12   Q.  And the next picture, if there is one?  And is this both

13   oyster and the armor lock?

14   A.  Yes, it is.  And I think you can see it pretty good there

15   in the picture.

16   Q.  And the point of this is to keep the sand over where the

17   tar deposits are, and have this heavy weight of material on it

18   that will hold even in the form of a storm or in the stress of

19   a storm?

20   A.  That's right, it will hold the sand cap down on top of

21   contaminated sediment so they would not be resuspended.

22   Q.  And before -- the last thing before I move to the costs

23   that have been incurred, and you've talked about some of this

24   and we won't spend much time, but just to recap on the things

25   that are currently underway, more sediment work will be done

THOMAS EFFINGER – DIRECT EXAMINATION

1  out near where the City wants to do its piers.  Is that right?

2  A.  Excuse me, yes.  We have that area remaining to be capped.

3  So when they're able to move forward with their piers

4  construction, then we'll be able to come in at the same time

5  they're driving pilings, to complete that capping work.

6  Q.  Will that be somewhat similar to what we're seeing the

7  capping work here?

8  A.  We'll be able to use rip rap there, because they're not as

9  concerned about how it looks underneath that structure.  But

10  it will still have that black fabric that you could kind of

11  see there, that will be put in place, it will have sand

12  underneath, the geotextile, and then the stone on top of it to

13  prevent that sand from being moved.

14  Q.  You still have an issue inside the substation with tar

15  under the components that can't be disturbed, and is there a

16  plan for what to do about that?

17  A.  That's still being kicked around, but as long as we're

18  still pumping tar with that removal mechanism, and we have

19  that one pump sitting in the gas holder, as long as we

20  continue to pump tar, we are making progress towards that

21  removal, and we've kind of shelved that, you know, whatever

22  the final remedy might be for that, for now.

23  Q.  You're still studying that groundwater moving towards

24  those MCLs?

25  A.  That's correct.

THOMAS EFFINGER - DIRECT EXAMINATION

1   Q.  And the issue of whether you're ever going to get a

2   technical impracticability is still out there?

3   A.  Yes, it is.

4   Q.  What about the issue -- well, let me ask it this way.  Is

5   there an issue about contamination in your neighboring

6   property where the ship container facility is slightly

7   upstream on the Cooper River?

8   A.  Yes, part of our intermediate groundwater work also

9   expanded over into the Ports Authority property, so that would

10  be just north of our site and across Charlotte Street.  So the

11  Ports Authority was gracious to work with.  They gave us

12  access to their property to do some of the in situ chemical

13  oxidation in the intermediate zone that was tacked in the ROD

14  for OU-2.  We did as much as we could over there within

15  practical limits of them being able to operate that shipping

16  container port.

17      When we installed those wells we did observe some remnant

18  issues in the soil that came out.  And the agencies have told

19  us that once the Ports Authority moves, if and when they move

20  off that property, we'll have to do more work on that

21  property.  I believe was the State --

22          THE COURT:  Do they have any plans to move it?

23  A.  Well, I think the mayor would --

24          THE COURT:  I've seen layouts in the paper on what he

25  plans to do to it, but I haven't seen anything where they were

THOMAS EFFINGER - DIRECT EXAMINATION

1    planning on moving.

2    A.  I used to talk with Steve Connor over at the Ports

3    Authority quite a bit, and he would never tell me, you know,

4    if and when they would be planning on moving off of that

5    property.  But I know it's a strong desire by Mayor Riley.

6            THE COURT:  Let's take about 15 minutes.

7            MR. FELMLY:  Okay.

8        (A recess was held at this time.)

9    BY MR. FELMLY:

10   Q.  I want to turn now to the expenditures and response costs

11   that you're claiming on behalf of SCE&G, and in that regard --

12           THE COURT:  I know you say the costs are not

13   warranted under CERCLA, and some are not recoverable, but is

14   there any dispute about whether this money was spent for the

15   purposes he says it was spent for?  When you take a lot of

16   depositions.

17           MR. BARGREN:  We --

18           MR. FELMLY:  I think the answer is we have provided

19   tremendous amount of -- I'm going to answer it very

20   specifically with the exhibit.  There are monies that we

21   cannot find invoices on, that are in records of my client that

22   continue to be looked for, and that amount of the whole in

23   this case, 48 million, is something in the vicinity of

24   $800,000.  I don't know that they're disputing that we didn't

25   pay them.  We haven't provided the documentation --

THOMAS EFFINGER – DIRECT EXAMINATION

1          THE COURT:  Let me see.

2          MR. BARGREN:  We don't dispute the payments or the

3    descriptions; we certainly dispute that some items are

4    eligible for recovery under CERCLA.

5          THE COURT:  So --

6          MR. BARGREN:  We have some questions about some

7    specific items, especially as it relates to the $26 million

8    payment.

9          THE COURT:  You don't have any question that they

10   spent the money for the purposes that they say they spent it

11   for, but you have questions about whether the money that they

12   spent constitutes, in toto, recoverable damages?

13         MR. BARGREN:  That's correct.

14         THE COURT:  Well, do you have a sheet showing it?

15   Let's put it in, see if they agree to it and we'll be on our

16   way.

17         MR. FELMLY:  We'll be doing that.

18         THE COURT:  Unless it needs some type explanation.

19         MR. FELMLY:  Well, the first thing I was going to do

20   is put on the information on the payments to the City and then

21   move on to the other costs.

22         THE COURT:  Let's see if they have any objection to

23   it.  Apparently they don't have any objection to the fact you

24   paid that money to the City; they object to whether or not it

25   went for the purposes that make it recoverable under --

THOMAS EFFINGER – DIRECT EXAMINATION

1          MR. BARGREN:  That's correct, Your Honor.

2          MR. FELMLY:  All right.  Well, in that regard, the --

3          THE COURT:  Seems to me the payment to the City would

4    be the -- one of the most controversial pieces of evidence.

5          MR. FELMLY:  I think that's right.

6          THE COURT:  And would require some serious

7    explanation for reasons that, you know, I've stated earlier.

8    They may not be real reasons, but at least there's -- it will

9    be something I would look for.  But then the actual money they

10   spent for people like Cape Romain, I think you mentioned that,

11   people like that, I mean that should be no question about

12   those amounts.  So let's get those out of the way, then we'll

13   go to the ones that are controversial.

14         MR. FELMLY:  Let me do that.  If I could switch to

15   the ELMO, please.  What I'm showing the Court now is

16   Plaintiff's Exhibit 234, which is something that has been gone

17   over with opposing counsel.  And --

18         THE COURT:  Is it in over objection or without

19   objection or what?

20         MR. FELMLY:  My objection is it will come in without

21   objection on the basis of what Mr. Bargren just said.

22         MR. BARGREN:  Which number are you on?  I have 243.

23         MR. FELMLY:  243.  I'm sorry, if I said 244.  Is that

24   coming up?

25       If I may, Your Honor, let me just ask Mr. Effinger what

THOMAS EFFINGER – DIRECT EXAMINATION

1   this is, and then I'll offer it.  And Mr. Bargren, I

2   understand, doesn't have an objection.

3   BY MR. FELMLY:

4   Q.  What is this document that we've marked as 243 for I.D.,

5   sir?

6   A.  This document captures the response costs for different

7   time periods and shows the money spent to date.  We've got the

8   time period in one of the columns, then the documented costs

9   which shows the invoices that we've been able to provide to

10  opposing counsel.  There's somewhere -- that data recovery is

11  still ongoing, and that shows $883,000 for a total cost out in

12  the right-hand column, and as you add up the cleanup

13  activities, we're at 23 million, and then that 26 million for

14  the City of Charleston, which gets us to the 49 million at the

15  bottom.

16  Q.  So with respect to this, let me just ask you about the 883

17  item.  Data recovery incomplete.  To what extent are you

18  confident that those monies have been properly spent on the

19  remediation?

20  A.  I'm very confident that the monies were spent on

21  remediation.  Not only because of all the work that was

22  involved, but also because starting in about 1994 and

23  thereafter, we've been subject to an annual audit by our

24  utility commission to look at these costs and expenditures and

25  make sure that they were prudently incurred.

THOMAS EFFINGER – DIRECT EXAMINATION

1    Q.  So when you take those other items which you do have the

2    backup, and we've provided it all to the other side, the total

3    for the recovery before we get to the issue of the payment to

4    the City, is 23,201,917, is that right?

5    A.  Yes, sir.

6            MR. FELMLY:  And then we'll be entering these

7    agreements in a minute.

8    Q.  Payments were made to the City of Charleston pursuant to

9    the environmental agreement in the amount of $26 million,

10   which is also reflected here.

11   A.  That's correct.  And that was over a four-year period, as

12   shown in the '96 to '99 time period shown.

13   Q.  And for incurred costs, is this the claim for the amount

14   of response costs that SCE&G is seeking?

15   A.  That would document the amount of response costs to date,

16   and recognizing that there is going to be continuing

17   obligation and expenses to take this site to completion.

18   Q.  And on that subject, just in terms of projected costs that

19   haven't been incurred on the second page of this, does it

20   reflect the estimate that we've also provided to the other

21   side of what is projected for those costs, but has not yet

22   been incurred?

23   A.  We're projecting out until the year 2025, which includes

24   the monitoring and all the other activities that need to take

25   place, which we touched on to reflect $13 million and change

THOMAS EFFINGER – DIRECT EXAMINATION

1    to -- as our best estimate on what it's going to take to

2    finish this site.

3    Q.  And we're also seeking declaratory judgment in this

4    matter.  And as costs are incurred, we would ask that the

5    declaratory judgment provide for that reimbursement?

6    A.  Yes, we would.

7           MR. FELMLY:  As to Plaintiff's Exhibit 243 for I.D.,

8    I'd ask that the I.D. be stricken on that summary.

9           THE COURT:  Any objection?

10           MR. BARGREN:  Yes, we do object to the extent that

11    first of all they're offering $800,000 of undocumented

12    numbers.  Secondly, I have questions about the 26 million, as

13    I just mentioned.  And thirdly, the $13 million future costs,

14    I also have some questions.  If we want to agree these are the

15    numbers to start with, that's fine, but I certainly want to be

16    able to ask Mr. Effinger some questions about these numbers.

17           THE COURT:  Certainly.  As far as the future costs

18    are concerned, I sustain the objection as to those.  No

19    foundation has been laid for them.  He just says that's what

20    it's going to be.  We don't know how he computes them, we

21    don't know whether he's qualified to compute them.  He has a

22    chemistry degree, a chemistry Ph.D.; whether that qualifies

23    him to come up with these figures, I don't know.

24       As far as the City of Charleston is concerned, in light of

25    the fact that they're not someone that you would normally

THOMAS EFFINGER – DIRECT EXAMINATION

1    think would be involved in the remediation business, I don't

2    think that I can assume that payments made to them are

3    recoverable under the Act.  And so absent further foundation

4    evidence concerning that payment, his objection is sustained

5    as to that.  Now --

6            MR. BARGREN:  The other component, Your Honor, that

7    I'm objecting to is the $883,000.

8            THE COURT:  See, I don't see it here.  I don't know

9    what you're talking about.  I haven't committed it to memory.

10   The 800 what now?

11           MR. BARGREN:  In the first line of numbers, $883,516.

12           THE COURT:  You object to that on what ground?

13           MR. BARGREN:  They don't have backup for that.

14           MR. FELMLY:  Well, on that one, Your Honor, those are

15   the items where --

16           THE COURT:  Well, he's objecting to it.  I think that

17   you're going to have to offer additional evidence as to those

18   costs.  It may be that this witness has knowledge of it.  It

19   may be that somehow there's a business record or it comes in

20   that way, I don't know.  But absent additional information,

21   that -- I have to sustain it.  But what we were trying to do

22   was get the items out of the way that he objected to, and then

23   we could deal with the ones -- get them out of the way that he

24   doesn't object to, then we could deal with the objections.

25   Seems to me he objects to the 800,000, he objects to the

THOMAS EFFINGER – DIRECT EXAMINATION

1    City's payment, and he objects to future costs.

2          MR. BARGREN:  That's correct, Your Honor.

3          THE COURT:  At this point, in the condition the

4    record is in at this time, I sustain his objection to those

5    three items of damages.

6          MR. FELMLY:  Okay.  As to the other items, the

7    documented costs of 2295, and the $20 million cost in the

8    second line, and those other ones, I understand they are in

9    evidence, is that correct?

10          THE COURT:  They stipulate that those costs were

11   incurred by the plaintiff in attempting to clean up this site.

12   Now, they don't agree that they're recoverable, because they

13   take a -- they have limited defenses, but they say you don't

14   have to pull out the invoices and get people to say that that

15   money was actually spent.  They've looked at the discovery,

16   they've looked at the documents, and they agree that that has

17   been spent by South Carolina Electric and Gas in good faith to

18   clean this site up.

19          MR. FELMLY:  I'd like to pursue then further

20   questioning on that item, now that we've got the disputed

21   items identified.

22   BY MR. FELMLY:

23   Q.  Let me focus on the 883,516.  As to those monies, can you

24   describe for the Court the way in which this record keeping

25   was kept in those early years?  What I would like to do is

THOMAS EFFINGER – DIRECT EXAMINATION

1    have you explain to the Court how the numbers that are in your

2    records that identify the costs that would include those

3    monies were spent --

4         THE COURT:  Do you know that of your own personal

5    knowledge?

6    A.  Yes, sir, I do.

7         THE COURT:  Okay.

8    BY MR. FELMLY:

9    Q.  And explain to the Court the reason why there is

10   difficulty these years later, from 1993 or '4, in obtaining

11   the actual invoices.  What's the accounting problem or system

12   that's involved in pulling up those invoices to satisfy

13   opposing counsel's request?

14   A.  Okay.  There's a couple of questions there.  Let me start

15   with how I know that the $883,000 is a good number in good

16   faith.

17       We -- I mentioned previously how we're audited by the

18   Utility Commission, and a lot of those costs were rolled up

19   when that process was started.  They came in, they audited

20   those numbers, they verified that the money was spent.

21        THE COURT:  What do you mean by rolled up?

22   A.  From 19 -- from '89 to '90 on up to 1994 when they first

23   started that, so those years were combined, and then they were

24   given copies of invoices and receipts and they were allowed to

25   do an independent audit of those records and verify that they

THOMAS EFFINGER – DIRECT EXAMINATION

1    were accurate, they were prudent and they were wisely spent.

2        So the $883,000 that we have now, we have it on summary

3    sheets from those clerks, but the accounting systems at that

4    time, there was no software that was in place to track those

5    records.  That started a little bit later, and we've gone

6    through three or four different software accounting systems.

7            THE COURT:  What period of time does $883,000 cover?

8    A.  Primarily it's in that 1990 to '97, but we think the

9    majority of that is in the '95 and earlier time period.  And

10   we still have folks that are looking to retrieve those

11   invoices from cold storage.

12   BY MR. FELMLY:

13   Q.  And with regard to that cold storage and the way these are

14   stored, can you describe for the benefit of the Court what

15   that system is and whether it's searchable in terms of the way

16   your accounting records would be searchable today?

17   A.  Yes, sir.  What my understanding is, during the years that

18   those invoices were occurring, they actually put them in boxes

19   by year.  So they weren't sorted by any kind of contractor,

20   project or anything like that.  And they weren't even scanned

21   or microfiched until later on.

22       So those records are just stacked in boxes by year that

23   somebody is going to have to manually go through, pull out the

24   invoices related to these contractors, and then I'll have to

25   look at it and validate that it was for this project, to get

THOMAS EFFINGER – DIRECT EXAMINATION

1    those records.

2            THE COURT:  For $883,000, looks like somebody would

3    be willing to go through it.

4    A.  I'm definitely willing to do it.

5            THE COURT:  I have a couple law clerks.

6    A.  Yes, sir, and I am definitely willing to do it.  But

7    they've got to get those records back, they're supposed to be

8    back in the office early this week, and I believe we have a

9    law clerk that may be working on it as of today.

10           THE COURT:  What is your knowledge about the 883,000;

11   what was that spent on?

12   A.  Some of that was spent on the early soil work that I

13   talked about, so many soil boring work.  We went through

14   couple of different contractors, starting with Keystone and

15   then Chester.  And so the early on work, they were starting to

16   write the work plans that were given to EPA, and I think we

17   talked about the initial administrative order on consent that

18   was issued in 1993, to tell us you need to go out and do this

19   remedial investigation feasibility study.  Obviously there was

20   work leading up to that 1993 order, and that work was

21   conducted by these contractors to get us there, to get the

22   preliminary information so that EPA as well as us, you know

23   what was -- what were the problems.

24           THE COURT:  How do you come up with the $883,000

25   figure?

THOMAS EFFINGER – DIRECT EXAMINATION

1  A.  That number actually came from the number that was used in

2  the gas rate case back in 1994.  They showed the summary of

3  the expenditures on --

4       THE COURT:  They did what with the summary?

5  A.  Yes, sir?

6       THE COURT:  They did what with the summary?

7  A.  They showed the summary of expenses to date in a document

8  that was given to the auditors from the Public Service

9  Commission.

10      THE COURT:  When you say they chose, who do you mean

11  by they?

12  A.  Our rates folks.  So they took information from accounting

13  that was relevant at the time from that time period, and of

14  course they kept, you know, they were able to get those

15  records more readily at that time than what we are now, 14, 15

16  years later.  So they had the numbers which showed how much

17  had been spent to date at that site.  I took that numbers and

18  I put that on my summary sheet and kind of tracked it through

19  the years, as money was spent.  And so by each year we kind of

20  had a record of what money was spent and when it was spent.

21  And we later created another document in good faith estimating

22  by each phase, how much money was spent for each year.  And we

23  got -- we made a good faith effort to show that as accurately

24  as we possibly could.  So --

25      THE COURT:  Do you have any more questions you want

THOMAS EFFINGER – DIRECT EXAMINATION

1    to ask him?

2            MR. FELMLY:  I do.

3    BY MR. FELMLY:

4    Q.  Is the document that is marked Exhibit 1, and it's a very

5    big document, but if you can try to give the Court a sense of

6    what we've got, Exhibit 1 is a spread sheet that is entitled

7    estimated expenditures by major activity, and it describes

8    various years.

9        Can you describe for the Court what this worksheet or what

10   this summary is, and how it relates to the work that you've

11   just been describing to the Court's questions?

12   A.  Yes, sir.  Again, this is our best estimate of when the

13   work took place and how much money was spent.  And we had to

14   go back and recreate it using that summary number to show each

15   phase.

16       But you can see in that far left-hand column, the task

17   description, so what the work activity was, and if you scroll

18   across, that first one is 1990 to 1992, and the primary

19   contractor then was Keystone that did the work, and up until

20   '94 when they became Chester.  Then Chester evolved into GTI,

21   or Groundwater Technologies, and they evolved into Fluor

22   Daniel GTI.  So for each year, for each task description you

23   can see the money that was spent and for what work it was

24   approximately done on.

25   Q.  And in terms of that, you've calculated that down and

THOMAS EFFINGER – DIRECT EXAMINATION

1    brought it down to the totals that reflect the total for the

2    entire period, is that correct, down in this area here?

3    A.  Yes, sir.

4    Q.  And is this part of the backup and information, the

5    summary sheets that you were talking about that you kept year

6    by year and updated?

7    A.  This is not it specifically.  But there was another spread

8    sheet that I used to keep track of where we are with our

9    expenses on the site.  So that we can disclose remaining

10   liability to the Securities and Exchange Commission.

11             THE COURT:  Now, show me where the $883,000 is on

12   this spread sheet.

13   A.  Okay.  You have to go up to the top.  What we did was we

14   took -- if you add up at the bottom, go ahead on down to the

15   bottom, a little bit -- actually you're going too far to the

16   right.  But if you add up that bottom column through 1990

17   through 1997, up until 1998, if you add up those numbers down

18   there and subtract out the invoices that we found and take the

19   difference, that's how we derived the 883,000.

20   Q.  So are you saying if we take these items that are in this

21   column up to '97?

22   A.  Actually go down a little bit with your finger, take those

23   numbers and add them up.

24   Q.  The total by year across the bottom?

25   A.  Right.  Up through 1997, then you add that number out, you

THOMAS EFFINGER – DIRECT EXAMINATION

1  subtract out the dollar amount for the invoices that we have

2  produced, and you'll come up with the 883,000.

3  Q.  And is that math that you were involved in doing?

4  A.  Actually I'm aware of it being done by one of the

5  paralegals.

6  Q.  Okay.  And in terms again of the issue of whether or not

7  you're confident what that 800 some odd thousand dollars was

8  performed and paid, even though it is buried in the microfiche

9  apparently now in terms of the invoices, what's your level of

10  confidence in that, based on personal knowledge?

11  A.  I'm 100 percent confident that we spent at least that

12  money, if not more.  But that matches up with the money that

13  we have kept track of that has been spent for this site.

14        MR. FELMLY:  So as to that, Your Honor, I would ask

15  that the spread sheet that is part of this explanation be

16  marked as an exhibit and the I.D. be stricken on that, and

17  that the additional number that's on the sheet for the

18  883,000, which I think an adequate foundation has been laid,

19  be accepted in as part of the claim in the amount in this

20  case.

21        MR. BARGREN:  Continue to object on the same basis,

22  as well as to now Plaintiff's Exhibit 1 --

23        THE COURT:  What I asked the witness, and I asked the

24  witness where he came up with $883,516.  And he said that an

25  accountant took that off of their records and put it onto a

THOMAS EFFINGER – DIRECT EXAMINATION

1    summary that they used in pleading a rate case before the

2    South Carolina Public Service Authority.  I don't know who

3    that accountant was, I don't know where he got the records.  I

4    don't know if they could possibly be considered business

5    records or anything else.  But there's a gap in there to where

6    he relies on what the accountant told him, and that is not

7    sufficient, in my judgment, for it to come in.

8         Now, I've already told you that in a nonjury case I'm

9    probably going to hear everything.  And then the Fourth

10   Circuit in this area, and probably in this area alone, gives

11   us a little bit of leeway and gives us credit for knowing some

12   evidence and relying only on relevant evidence and admissible

13   evidence.  I'm telling you now, even though I'm going to hear

14   it, I think I ought to tell you in fairness, based on what

15   you've done so far, I don't think it's met the test of

16   admissibility.

17            MR. FELMLY:  Okay.

18            THE COURT:  I think it's hearsay.  Maybe not.  May

19   get around the hearsay, but this witness has said it's his

20   sole basis for knowing that that $883 was there, was what the

21   accountant put on the summary before the Public Service

22   Commission.  And the accountant's not here, and it's offered

23   for the truth of the matter.

24            MR. FELMLY:  Two things, Your Honor.  One, I do think

25   it's based on business records as part of that rate case.

THOMAS EFFINGER – DIRECT EXAMINATION

1          THE COURT:  May very well be, but you haven't shown

2     that.

3          MR. FELMLY:  The additional piece of it, and frankly,

4     I am quite surprised because I thought I had resolved this,

5     and obviously I haven't.  The additional piece of it, and the

6     only aspect of this is we will go back and find out who that

7     accountant was, and I --

8          THE COURT:  The invoice is a business record, in all

9     probability.  And through the custodian or some other

10    appropriate person, it can be admitted in evidence.  The

11    spread sheet that was offered before the Public Service

12    Commission arguably is not a business record of South Carolina

13    Electric and Gas, it's a business record of the accounting

14    firm.  They prepared it, the person that had knowledge of it

15    was in their employ and not in South Carolina Electric and

16    Gas.  So I think there's a gap in there that makes it

17    questionable.

18       Now, I'm going to take it in.  If I change my mind, that's

19    one thing, but I just don't see now to where you've met the

20    burden on that particular piece of evidence.

21         MR. FELMLY:  All I'm asking, and this is relevant to

22    what I do now, is I'm going to go back, re-examine this, and

23    may ask the Court for the opportunity to bring additional

24    evidence in.

25         THE COURT:  I don't -- wouldn't have any hesitation

THOMAS EFFINGER – DIRECT EXAMINATION

1   at all under the circumstances that he's explained, but I

2   don't know what the volume of these records are.  I assume

3   they're pretty hefty.  But still, this case has been going on

4   for awhile, and $883,000 may be pocket change to South

5   Carolina Electric and Gas, but most people would think that's

6   a substantial sum of money, enough to go looking for anyway.

7          MR. FELMLY:  Let me just say on that, and I'll be

8   very brief on it.  This chart or an earlier version of this

9   was produced at Mr. Effinger's deposition, which was many many

10  many many months ago.  Only in the last month or so did I

11  receive a request for the backup.  And I will tell you we have

12  turned ourselves inside out on that and produced, as you can

13  see, 20 some odd thousand dollars of backup.  As we speak,

14  there are people still working on that.

15         THE COURT:  The fact that those are the true facts

16  gives you more time.  But it doesn't make it admissible.

17         MR. FELMLY:  All I'm saying is I may want the

18  opportunity to try to see if I can resolve it.

19         THE COURT:  What we're trying to do is get to the

20  bottom of this and get to the truth, and if you have some

21  other evidence that will do that, provided the defendant has

22  an opportunity to respond to it in a fair way, we'll give it

23  consideration that it deserves.

24         MR. BARGREN:  Your Honor, if I could just say, the

25  issue of documentation came up at that deposition a year ago.

THOMAS EFFINGER – DIRECT EXAMINATION

1    THE COURT:  I don't care about all that.  I'm not

2  getting into that.

3    MR. FELMLY:  The next step is to put in the

4  information to lay the foundation with respect to the

5  $26 million payment.

6    THE COURT:  That's the City?

7    MR. FELMLY:  That's the City.

8    THE COURT:  Are there any records of that?  I thought

9  about that because we talked about it earlier, and of course

10  the first thought that came to my mind was the best evidence

11  rule.  Is there a document that sets forth the terms under

12  which that $26 million was paid?

13    MR. FELMLY:  Yes, there is.

14    THE COURT:  Okay.

15    MR. FELMLY:  And that's Exhibit No. 11, the

16  environmental agreement between the City of Charleston and

17  SCE&G.

18    And, Denise, if you could --

19  BY MR. FELMLY:

20  Q.  Mr. Effinger, what is this document that we're displaying

21  as Exhibit 11?

22  A.  This is the environmental agreement between us and the

23  City of Charleston to resolve monies that they spent

24  investigating and doing work at the Aquarium property.

25  Q.  And in terms of the arrangement between the City and the

THOMAS EFFINGER – DIRECT EXAMINATION

1   company, what is the relationship of this agreement to that

2   $26 million?

3   A.  This sets forth the area and the terms and conditions of

4   that $26 million, it talks about equal payments over four

5   years, so that was six and a half million dollars a year over

6   those four years.  It defines the area, and I believe it gives

7   us an indemnity on work on their property.

8        MR. FELMLY:  Denise, can you bring up page 58013.

9   And if could you enlarge the top paragraph, please.

10  Q.  Looking at this paragraph which is on page five of the

11  environmental agreement, is this the place where the City's

12  remedial work and the City's payment of $26 million is

13  reflected the environmental payment?

14  A.  Yes, it is.

15  Q.  The question has come up with regard to whether any

16  portion of the $26 million was for payment for other issues

17  such as the bus service in the City or the franchise between

18  the company and the City of Charleston.  Do you have knowledge

19  as to whether or not those items were in any way involved with

20  this?

21  A.  No, there were separate agreements for each of those other

22  issues.  The timing was in the same time frame, but this

23  exclusively deals with work that they did, and continuing work

24  that they might have to do on this property.

25  Q.  And, Mr. Effinger, did you provide testimony to the Public

THOMAS EFFINGER – DIRECT EXAMINATION

1  Service Commission in South Carolina with respect to the issue

2  of the $26 million payments made pursuant to the environmental

3  agreement?

4  A.  Yes, sir, I did discuss that in front of the Utility

5  Commission regarding my knowledge as to what the money was

6  spent for and why it was prudently incurred.

7  Q.  So you were the company's representative that was

8  describing to that agency the details of these payments and

9  had knowledge of it?

10  A.  Yes, sir.

11  Q.  And in Exhibit 33, Denise, if could you bring that up.  Is

12  this -- if we can highlight the top, is this your summary

13  testimony in connection with that docket before the Public

14  Service Commission?

15  A.  Yes, it is.

16  Q.  And if we -- it goes on for some number of pages, but do

17  you describe in your testimony the breakdown of how the monies

18  were actually spent, as you understood it?

19  A.  Yes, I can.  I talked about some of the studies that the

20  City had to conduct, especially in sediments.  There was

21  reports prepared by PSI, which was a name of a company, also

22  Killam, and those are referenced in the Record of Decision,

23  and then later used in OU-2.  But they did some work with the

24  sediments.

25      They also had to design a plan that would ensure that

THOMAS EFFINGER – DIRECT EXAMINATION

1    there was no further release from their site.  They had to

2    install sheet piling in the river, they had to put down sand

3    blanket, they had to install timber lagging wall.  So there

4    was a lot of work that they had to do on their property so

5    that contamination would not be released, and there would --

6    there would not be a continuing problems from the manufactured

7    gas plant on their property as they constructed those

8    facilities.

9        There was also work that the City did along Calhoun

10   Street.  The brick archway I talked about earlier that had

11   leaks in it and was acting like a French drain and taking the

12   groundwater that flowed towards it and discharging it to the

13   river, they had to install the sheet piling to block that flow

14   going onto the Ansonborough Field, south of our property.

15       They had to backfill the brick archway drain as it

16   discharged to the Cooper River.  So there was a lot of

17   mitigation work they had to do there.

18       In providing this testimony, what I looked at were their

19   records.  They provided us with their records and their

20   invoices and the sheets describing the work that was done, the

21   money that was spent with the contractors, the soil that was

22   shipped offsite.  All the work that they had to do in managing

23   environmental contamination on their property.

24       I believe they showed something in excess of $43 million,

25   or they said they had spent in excess of $43 million.

THOMAS EFFINGER – DIRECT EXAMINATION

1    I went through those records and assured myself that I

2    felt comfortable that if you sort out the stuff that was maybe

3    questionable, it was something in excess of $30 million.  And

4    so settling for $26 million to resolve the issues was

5    determined to be prudent.

6    MR. FELMLY:  Let me ask you, Denise, to bring up page

7    55272, which is part of this Exhibit 33.  And if you could

8    enlarge that.

9    Q.  This schedule that we're looking at here which is part of

10   your written testimony to the PUC, is what, sir?

11   A.  These are all the different items that I pulled out of

12   their submittal.  The original was $43 million or thereabouts.

13   I pulled this information out of it that I felt, all right,

14   well, this at least I feel comfortable is justifiable

15   environmental cleanup expenses, and work that they did not

16   only to allow them to build on this property, but a lot of it

17   potentially helps us later on in dealing with sediments and

18   those issues, where they had to put down a sand cap and that

19   kind of work.

20   So this adds that up.  You can see that there was some

21   monies that were backed out of it, to come up with the

22   $30 million number at the bottom.

23   Q.  Do we also have, Mr. Effinger, the actual agreements in

24   evidence marked as exhibits that are related to the bus

25   service issue and the franchise issue with the City?

THOMAS EFFINGER – DIRECT EXAMINATION

1   A.  Do we have those agreements?  Yes, we do.

2   Q.  Okay.

3       MR. FELMLY:  Let me ask, Denise, if you'd bring up

4   Exhibit 12, please.

5       THE COURT:  When did the bus transaction take place?

6   I remember reading about it in the paper, but I don't remember

7   when it took place.

8       MR. BARGREN:  It was within a couple weeks.

9   A.  About the same time frame.

10      THE COURT:  And under that, SCE&G paid the City?

11  A.  We gave them something on the order of I think nine or

12  $10 million.

13      THE COURT:  You gave them a headache plus something

14  else.

15  A.  Well, yes, sir.  But that was in the agreement to give

16  them money along with the property and the buses and that

17  facility.  And they took over the bus system.

18  BY MR. FELMLY:

19  Q.  At any rate, the development agreement between the City of

20  Charleston and SCE&G has been marked as Exhibit 12.  This

21  document relates to what, Mr. Effinger?  What is this

22  transaction between the City and your company?

23  A.  I would need to read through more of this.  One of them is

24  going to deal with the bus system, and the other one that

25  deals with the franchise agreement, I don't recall what it was

THOMAS EFFINGER – DIRECT EXAMINATION

1    titled.  So I would want to make sure that --

2    Q.  But this does not deal with the -- this particular

3    agreement does not deal with the environmental piece of this?

4    A.  No, sir, it does not.

5              MR. FELMLY:  If we can bring up the first page of

6    this, Denise, we'll identify what we're talking about here.

7              THE COURT:  If he wasn't involved in it and he

8    doesn't have any personal relationship to the transaction, it

9    seems to me he shouldn't be trying to explain it.  If you want

10   to publish it, you can.

11             MR. FELMLY:  The only reason I wanted to publish it

12   is to clearly identify to you that it is not the environmental

13   agreement.

14             THE COURT:  Obviously I'm going to have to read it.

15   But -- in the other agreements, in the other documents that

16   he's explained, normally you would say they speak for

17   themselves and no explanation is necessary.  But there were

18   terms used in there that I didn't know.  And to the extent

19   he's an expert, I think it's helpful for him to explain those

20   terms and to place those documents in a particular time

21   context.  But with these, apparently he had nothing to do with

22   these.

23        You had nothing --

24   A.  No, sir, I didn't have anything to do with the buses or

25   the franchise, that's correct.

THOMAS EFFINGER – DIRECT EXAMINATION

1         MR. FELMLY:  Well, I would then just offer this

2    document --

3         THE COURT:  Any objection to them?

4         MR. BARGREN:  Plaintiff's Exhibit 12, no.  No

5    objection.

6         THE COURT:  Without objection.

7       (Plaintiff's Exhibit 12 received.)

8         THE COURT:  And at some appropriate time in your

9    closing argument you can explain to me what's in there, and I

10   can also read it and ultimately make a decision on what it

11   says, based on my knowledge of what's in there.

12        MR. BARGREN:  I guess before I say no objection, I

13   should clarify which exhibits you're offering here, Bruce.

14        MR. FELMLY:  I'm going to do it with a bunch of them

15   here, because I think they'll fall in the same category.  The

16   one I just presented and I understand you don't have an

17   objection, is Exhibit 12, the draft development agreement

18   between City of Charleston and SCE&G.

19     I would also move the admission of the payment and

20   transfer agreement between the City of Charleston and SCE&G,

21   which is Exhibit 14.  It's August 22, 1996.  And also, as the

22   Court pointed out, you'll be able to review this.  This is the

23   matter that relates to the franchise in the City.  So I would

24   move the admission of that.

25        MR. BARGREN:  No objection.

THOMAS EFFINGER – DIRECT EXAMINATION

1        (Plaintiff's Exhibit No. 14 received.)

2        MR. FELMLY:  I would also move the admission of

3   Exhibit 13, which is the 1996 amended ordinance, and the

4   amended ordinance deals additionally with the franchise

5   agreement that I just marked.  And I'd offer that.

6        THE COURT:  You know, it hadn't occurred to me till

7   right now, but I live in downtown Charleston, and of course I

8   buy my power from South Carolina Electric and Gas, and I pay

9   my taxes to the City of Charleston.  It hadn't occurred to me

10  that that's any basis for disqualification, and I don't know

11  that it is, but I do think you ought to know that I'm sitting

12  here thinking, you know, who's paying for this?  But really it

13  has no bearing on any decision that I make, but it did occur

14  to me that I pay taxes and I pay a bill to this witness'

15  company every month.  And if that is some basis for

16  disqualification, I hope you'll raise it and we'll look at it.

17  But it just hadn't really occurred to me until we got into

18  this case.

19        MR. FELMLY:  Well --

20        THE COURT:  I dare say everybody in this courthouse

21  has got the same situation.

22        MR. FELMLY:  It's certainly not something that I

23  think we would complain about, but also don't expect that it

24  would be --

25        THE COURT:  I went to a seminar last week in

THOMAS EFFINGER – DIRECT EXAMINATION

1    Baltimore, we have one every year, and they bring us up to

2    date as far as what's going on in the law.  And one of the

3    aspects of it was ethics.  And I wish I'd have had this to

4    bring up to them then and ask them just what their feeling is.

5    I'm pretty sure, based on what I know, it's not a ground for

6    disqualification.  But if any of you know anything different,

7    you're not going to hurt my feelings, you let me know and

8    we'll look at it, and if it requires me to recuse myself, I'll

9    certainly do it.

10          MR. FELMLY:  I'd also move the admission of the

11   documents that Mr. Effinger did say he had familiarity with,

12   and I also understood there is no objection to, which is the

13   environmental agreement, which does deal with the 26 million,

14   and that's Exhibit 11, we'd ask that that be marked as a full

15   exhibit.

16          MR. BARGREN:  No objection.

17      (Plaintiff's Exhibit 11 received.)

18          MR. FELMLY:  And that I also mark Exhibit 33, which

19   is Mr. Effinger's personal testimony summary statement of his

20   testimony to the PSC that we were referencing a few moments

21   ago related to the City's payments and the $26 million

22   payment.

23          MR. BARGREN:  No objection.

24      (Plaintiff's Exhibit 33 received.)

25          MR. FELMLY:  There is, because of the status of the

THOMAS EFFINGER - DIRECT EXAMINATION

1    Effinger cost sheet, which at the moment requires further

2    information, I would like to move the admission of a document

3    which is Exhibit 242.  This shouldn't be in controversy

4    because these schedules are accounting records that support

5    the nondisputed portion of the summary sheet that I showed you

6    before, but -- and these were provided, and this comes off the

7    more modern computer records.  But as part of our effort to

8    make sure that it's clear that we are taking seriously the

9    effort to support and account for these claims, I would ask

10   that these supporting documents, which are Plaintiff's

11   Exhibit 242, be marked as a full exhibit.

12           THE COURT:  Any objection?

13           MR. BARGREN:  No objection to the exhibit.  I assume

14   I can still cross-examine on this, on particular items, but no

15   objection to the fact that these amounts were paid to these

16   people.

17       (Plaintiff's Exhibit 242 received.)

18           MR. FELMLY:  If I might just have a second, Your

19   Honor.

20           THE COURT:  Sure.

21       (Brief interruption in proceedings.)

22           MR. FELMLY:  Two quick things.

23   BY MR. FELMLY:

24   Q.  We talked about NCP compliance a number of times during

25   the course of the examination today, and we've referenced

THOMAS EFFINGER – DIRECT EXAMINATION

1    places in the exhibit where the EPA has made reference to NCP

2    compliance.

3        Based on your experience over the years, do you have

4    familiarity and personal knowledge about the NCP compliance

5    standards that apply, and the features that cause something to

6    be NCP compliant?

7    A.  Yes, sir.  We talked about that earlier on today.  And

8    there is a protocol that you need to follow.  And the

9    objective is to take immediate action to mitigate or abate any

10   imminent or threatened release.

11        THE COURT:  What does NCP stand for?

12   A.  National Contingency Plan.  And there's a fuller

13   description that's the National Oil and Hazardous Substances

14   Contingency Plan.

15   Q.  And in terms of the monies that you have paid and the part

16   of the remediation that you've done here, this cost that

17   you've described, what is your position, Mr. Effinger, based

18   on your experience and knowledge, as to whether those costs

19   are NCP compliant?

20   A.  I believe the protocol that we followed at the site, which

21   involved the money that was spent to accomplish it, has been

22   done fully in compliance with the National Contingency Plan.

23   Q.  There was questions raised about during the course of our

24   case by UGI about whether there was public participation.  Is

25   that one of the features, public information, one of the

THOMAS EFFINGER – DIRECT EXAMINATION

1  features of NCP compliance?

2  A.  Yes, it is.  And EPA made sure that we kept that component

3  in the forefront, that we continued to fulfill that

4  obligation, as well as others, in meeting National Contingency

5  Plan requirements.

6  Q.  In terms of health and worker safety, which I understand

7  is something that's NCP compliant specific, or a requirement

8  of it, can you tell the Court whether steps were taken in that

9  area as well?

10  A.  Each one of the work plans that I talked about earlier

11  that needed to be produced as part of the design and

12  describing to the agencies how we would conduct the work,

13  always had a health and safety plan component, not only for

14  worker protection but for management of the site.

15  Q.  And I think I may have asked you this before.  As all of

16  this work has gone on over all these years and all this story

17  of environmental work that I described, at any point did any

18  of the agencies ever indicate to you that they did not believe

19  your work was NCP compliant?

20  A.  Nobody ever raised that issue from either the State or EPA

21  or any other regulatory agency.

22          MR. FELMLY:  Your Honor, finally, there are a number

23  of other exhibits that I addressed today that I would move to

24  strike the I.D. on.  I believe they're all without objection.

25  I don't know if this is a convenient point to do it at the end

THOMAS EFFINGER – DIRECT EXAMINATION

1    of the day, or if you had --

2            THE COURT:  Why don't you just kind of when we take a

3    break, get your list together and look -- talk to other

4    counsel.  When we take a break, talk to counsel and see if

5    there is any objection.  If there's not, you can read the

6    numbers off.

7            MR. FELMLY:  Okay.  At some point later in the trial?

8    Or you mean right now?

9            THE COURT:  I would suggest -- we're going to break.

10   We're not going to run real long, because the

11   cross-examination of this witness is going last awhile, and

12   I'm probably going to break at 5:30.

13           MR. FELMLY:  That's fine.  I showed this list earlier

14   to Mr. Bargren.  I don't think there's any dispute on it.

15           THE COURT:  Have you seen it?

16           MR. BARGREN:  I saw it, but I didn't have a chance to

17   read it.

18           THE COURT:  Why don't you just at the first break

19   give it to him and come back in the morning, he can tell you

20   if he has any objection to it.

21           MR. FELMLY:  That's fine.  Subject to the issue of

22   developing further the foundation for the numbers as we've

23   discussed with the Court, I have no further questions of this

24   witness at this time.

25           THE COURT:  Let me say one thing before we get into

THOMAS EFFINGER – DIRECT EXAMINATION

1    the cross-examination.  As far as this business of the

2    $26 million to the City of Charleston, you didn't reoffer that

3    document.  Counsel objected to it on the grounds of improper

4    foundation had been laid for it, and you attempted to lay a

5    foundation of this witness and did not reoffer it.  And you

6    still object to it?

7              MR. BARGREN:  That's correct, Your Honor.

8              THE COURT:  So it's -- to the best of my knowledge,

9    it's not in evidence at this time.

10             MR. FELMLY:  I thought we had when we put the

11    environmental agreement in.

12             THE COURT:  I don't think you reoffered it, and he

13    objected to it and I sustained the objection to all of those

14    items that he objected to, subject to you laying an additional

15    foundation.  And I know we have a complicated case with a lot

16    of documents, and it's easy to slip up on them.  And the best

17    way not to slip up on it is to do it right now.

18        That being said, I'll treat that document just as I will

19    other documents.  But I have grave reservations about its

20    admissibility for the purposes that you offer it.  And the

21    reason is that no one from the City of Charleston has come in

22    here and said we actually performed these services.

23        Now, maybe when I get down to decision making, that won't

24    make any difference.  But right now logic dictates to me that

25    it does make a difference.

THOMAS EFFINGER – DIRECT EXAMINATION

1            MR. FELMLY:  But I have that witness coming in.

2    Steven Livingston, who is the representative of the City, who

3    has been deposed by the other side, and by myself --

4            THE COURT:  That answers my question.  That's the way

5    it comes in and you reoffer it.

6            MR. FELMLY:  Thank you.

7            THE COURT:  I want to let you try your case and --

8            MR. FELMLY:  Your Honor, I need all the help I can

9    get.

10           THE COURT:  I'm not giving you any help.

11           MR. FELMLY:  Mr. Livingston will be here later in the

12   week and he will further lay the foundation for that monies

13   and I'll reoffer it at that point, I assume.

14           THE COURT:  Okay.  You're through?

15           MR. FELMLY:  I'm through.

16           THE COURT:  Do you want to cross-examine him now or

17   wait till in the morning?

18           MR. BARGREN:  We could wait.  Do you want me to

19   start?

20           THE COURT:  Why don't we start.  Let's go till 5:30,

21   5:35, something like that.  You say you're going to take three

22   weeks on this case; you might take four if we don't get on the

23   ball.

24           MR. BARGREN:  I hope not.

25           THE COURT:  I don't know if I ever tried a case that

THOMAS EFFINGER – CROSS-EXAMINATION

1    lasted three weeks.  I was trying to think back.  That's a

2    long case, particularly nonjury.

3                        CROSS-EXAMINATION

4    BY MR. BARGREN:

5    Q.  Mr. Effinger, we've met before.  I wanted to talk, I'll

6    start by asking you about the $26 million payment and the

7    support for it that you mentioned, and some of the

8    documentation you received from the City.

9        One of the components of the $26 million payment was costs

10   of putting in this Calhoun Street sewer, correct?

11   A.  Yes, sir.

12   Q.  Replacing the old brick archway?

13   A.  Well, at least the environmental component of it, in

14   dealing -- we had to put in sheet piling, they had to put in

15   additional measures, flowable fill into the discharge into the

16   Cooper River.

17   Q.  And SCE&G decided they wanted to be a good citizen, help

18   pay for this, correct?

19   A.  I'm not sure what you're asking me, but we felt like it

20   did constitute environmental costs that deserved some

21   compensation for.

22   Q.  But whether those costs are recoverable under CERCLA is a

23   different question.  You'd agree with that, correct?

24   A.  That's a legal matter I'm not qualified to answer.

25   Q.  And I'm going to ask for Defendant's Exhibit 176.  This is

THOMAS EFFINGER - CROSS-EXAMINATION

1    a letter from -- is it Mr. Mahan?

2    A.  Randy Mahan.  Yes, sir.

3    Q.  And who is he?

4    A.  He works for SCE&G.  This is back when he worked in legal

5    counsel.  And he's responding to Harriet Deal, who was an

6    attorney working on behalf of the Department of the Interior.

7    Q.  Okay.  And if we go to page -- I think it's page three of

8    this letter, and we'll pull up an excerpt here.  Mr. Mahan

9    says that this interim action, referring to this sewer

10   replacement, is not anywhere required in the CERCLA process,

11   correct?

12   A.  This interim action -- He's referring to a different

13   interim action here.

14   Q.  Which one?

15   A.  Well, you need to look at the whole letter.  Can I see the

16   whole letter?

17   Q.  Sure.

18   A.  Which interim action are you referring to?

19   Q.  Whatever Mr. Mahan is referring to.

20   A.  Okay.

21           THE COURT:  Do you want a hard copy of it?

22   A.  Yeah, that would be helpful.

23           THE COURT:  Does anybody have one available?

24   A.  Which exhibit number am I looking for?  176.

25   Q.  176.

THOMAS EFFINGER – CROSS-EXAMINATION

1    A.  One what?

2    Q.  176.

3           THE COURT:  176 –– Or is it 170?

4           MR. BARGREN:  176.

5    A.  These have different numbers.  These don't go to 176.  I'm

6    sorry.  Okay.  I think in this document what Randy is doing is

7    saying that the Department of the Interior purchased this

8    property, knowing that it was contaminated.  And so they have

9    some potential liability as well in dealing with these issues.

10   Oh, all right.  In this case I think they're talking about the

11   interim action to mitigate the seep.  Because this is in ––

12   Q.  This is 1997, so it's ––

13   A.  So it's before that.

14   Q.  Can we agree on this and move on; whatever interim action

15   he's talking about here, and I think the document will speak

16   for itself, Mr. Mahan, the chief in-house corporate counsel at

17   SCE&G, did not think it was required by the CERCLA process,

18   right?

19   A.  Well, he seems to be talking here about a pump and treat

20   system.

21          THE COURT:  Let's give him a chance to look at it

22   overnight, then you can go on from there.

23   A.  I think what he's talking about is that pump and treat

24   system that folks were asking us to install.

25          THE COURT:  I'd rather have a more in-depth answer

THOMAS EFFINGER – CROSS-EXAMINATION

1    than that.  Let's go on to something else and give him a

2    chance to look at it overnight, and I think you should give

3    him a chance to look at the letter that this letter is in

4    response to.

5              MR. BARGREN:  Sure.

6    BY MR. BARGREN:

7    Q.  In general, overall, this $26 million payment by SCE&G to

8    the City was made to reimburse costs that the City had

9    incurred, correct?

10   A.  That's correct.

11   Q.  This was not a payment for any work that SCE&G performed

12   directly by itself, correct?

13   A.  It was not for any work that SCE&G had already performed.

14   Q.  It was a contribution to the City's costs.

15   A.  It was to repay -- reimburse the City for environmental

16   costs that they had expended.

17   Q.  Now, there was never an order to the City to do this work,

18   correct?

19   A.  They knew that there was work that they had to do in order

20   to remove their project -- in order to move their project

21   forward, they had to demonstrate to the agencies that by at

22   least for the City by constructing the Aquarium and other

23   development in the area, they weren't going to cause a release

24   or a potential release of the manufactured gas plant

25   constituents.

THOMAS EFFINGER – CROSS-EXAMINATION

1   Q.  But there was never an order by the EPA to the City for

2   this work, correct?

3   A.  I don't know the answer to that.

4   Q.  And there was never a Record of Decision, a ROD, issued by

5   the EPA to the City?

6   A.  That's correct, there was no ROD issued for the City's

7   work.

8   Q.  And the settlement between SCE&G and the City, that was --

9   that didn't go to court, for example, that was not a

10  judicially-approved settlement, correct?

11  A.  No, it did not go to court.  It was settled out of court.

12  Q.  It was not approved by the EPA, correct?

13  A.  The settlement would not be reviewed by the EPA.

14  Q.  It was a private agreement between the City and the

15  utility.

16  A.  I believe that would be fair.

17  Q.  And the date of the agreement was September 20th, 1996,

18  correct?

19  A.  I believe that's accurate.

20  Q.  So that was just shy of ten years before the complaint in

21  this action, right?

22  A.  Ten years -- I don't recall when we filed.  I don't know

23  the timing of that offhand.

24  Q.  Was there a public hearing conducted on this work?

25  A.  No, sir.  Not on the settlement agreement, there was no

THOMAS EFFINGER - CROSS-EXAMINATION

1   public hearing on that.

2   Q.  Was there a public hearing of the sort you described with

3   the EPA with a formal transcript and so on conducted by the

4   EPA for the work that the City did?

5   A.  There were public meetings that were held regarding the

6   City's work at the site, there were different agencies

7   involved, OCRM, I believe the Corps of Engineers may have been

8   the lead agency for them.  So they did go through some review

9   and approval process with those regulatory agencies.

10  Q.  But no hearing like the EPA conducted for your ROD.

11  A.  No hearing -- I don't know the answer to that.

12  Q.  And so you just described the number of factors that you

13  felt that SCE&G met to establish compliance with the NCP for

14  your ROD and your project, right?

15  A.  Yes, sir.

16  Q.  But not all of those elements were present with the City's

17  work, correct?

18  A.  I don't know if they were or not.  I believe under the

19  Corps of Engineers' process, there was some documents that

20  were created for some of the work that talked about the

21  reviews and the interagency meetings that were held for their

22  work, but I don't know all the details of the process that

23  they went through, no, sir.

24  Q.  Do you remember we saw the spread sheet that you did

25  before --

THOMAS EFFINGER – CROSS-EXAMINATION

1          MR. BARGREN:  And, Andrew, if we could have

2    Plaintiff's Exhibit 34?  Well, I thought I had them right

3    here.

4    Q.  If we go to Plaintiff's Exhibit 34, do you recognize this?

5    Or would it help to see the hard copy?

6    A.  Yeah, that helps.  This looks like some of the documents

7    or a section of the document that was submitted to us to

8    demonstrate the amount of money that the City spent in dealing

9    with environmental contamination.

10   Q.  Right.  And if we go to the sequential pages here, I think

11   one more.  We start to get into some backup that the City

12   provided to you, correct?

13   A.  Yes, sir.

14   Q.  This is information that you used to support your

15   testimony for the PSC in support of the $26 million?

16   A.  Yes, sir, this is part of it.  There was a lot more

17   attached to it, and I believe it was a pretty thick document

18   that was given.

19   Q.  And what you had collected were these items that the City

20   sent you to support their numbers, and then you eliminated a

21   lot of those categories, correct?

22   A.  Yes, sir.

23   Q.  And then you were left with a little chart that started

24   with item G that we saw earlier in your testimony as part of

25   Exhibit 11, I believe.  No -- in Exhibit 33, do you remember

THOMAS EFFINGER – CROSS-EXAMINATION

1   that, you had a little chart that said G, H and so on?

2   A.  The one that summed up the numbers to the 30 million, is

3   that what you're referring to?

4   Q.  Yes.

5   A.  Okay.

6   Q.  And that's what I can't find right now.

7   A.  Okay.

8   Q.  What I want to do is go to the detail in this exhibit for

9   Schedule G, it will be down a few pages.  And if you like, I

10  can get you the paper copy.

11          THE COURT:  Now, what is this?

12          MR. BARGREN:  This is some backup that the City sent

13  to SCE&G.

14  Q.  Correct, Mr. Effinger?

15          THE COURT:  Doesn't it speak for itself?

16          MR. BARGREN:  Well, there's some question about some

17  of the numbers, so --

18          THE COURT:  Well, he didn't prepare it, and they say

19  they're going to call the man from the City to come in here

20  and testify as to this document.

21          MR. BARGREN:  Okay.  He prepared some -- he offered

22  these numbers in support for the 26 million.

23          THE COURT:  He did, but he got them from the City,

24  and I've already voiced my feeling about that.

25          MR. BARGREN:  Then we can wait on those.

THOMAS EFFINGER – CROSS-EXAMINATION

1          THE COURT:  I don't see why not.  If you have to

2     recall him, he's not going anywhere, I don't think.

3          MR. BARGREN:  No, that's fine.

4          THE COURT:  I just don't see any reason to go through

5     them twice, when he doesn't know where they came from, except

6     they came from City Hall.

7          MR. BARGREN:  Okay.  I'm fine with that, Your Honor.

8          THE COURT:  This is a good time to break.

9          MR. BARGREN:  I think so.

10         THE COURT:  Let's take a recess till 10:00 in the

11    morning.  I'm going to run a little different schedule

12    tomorrow.  I've got somewhere I'd like to be before 5:30

13    tomorrow, so I'm going to cut lunch down from, say 1:00 to

14    2:00, then we'll recess about 4:00 or 4:15, okay?  See you in

15    the morning.

16         MR. VARON:  Your Honor, could I raise one procedural

17    issue for a second?

18         THE COURT:  Sure.

19         MR. VARON:  I beg your pardon.  It occurred to Mr.

20    Bargren and I, we've kind of divided our case, as you can see,

21    Mr. Bargren is doing the statute of limitations, the costs.

22         THE COURT:  I don't care how you divide it.

23         MR. VARON:  I'm doing the core liability stuff.  We

24    expect Dr. Shrifrin tomorrow to testify on a full range of

25    issues.  Many of the exhibits that we expect to be offered are

THOMAS EFFINGER – CROSS-EXAMINATION

1   somewhat duplicative with other exhibits that talk about

2   personnel and inspections and accounting that I would be

3   handling with Mr. Blake, and so I'm wondering if it would be

4   permissible for us to split the cross-examination of Dr.

5   Shrifrin with Mr. Bargren crossing him on the environmental

6   issues, the --

7           THE COURT:  I've never done that before, and I'll

8   have to look at our local rules.  There may be a rule against

9   it.  Usually if somebody attempts to do that, the objection is

10  one man at the stick.

11          MR. VARON:  I understand, Your Honor.

12          THE COURT:  That's the rule I've seen followed in

13  South Carolina my entire life.

14          MR. VARON:  Obviously it's up to your discretion.

15          THE COURT:  I don't know if it's discretionary or

16  not.  Any objection to that?

17          MR. FELMLY:  I do object to it, because I think it's

18  going to end up to tag team.  I think there was a rule that

19  said one witness -- one lawyer to examine one witness.

20          THE COURT:  It may be.  Everybody speaks of it as if

21  it's a rule, but let me look in our local rules and find out.

22          MR. VARON:  Your Honor, I think it will actually

23  streamline the matters based on knowledge.

24          THE COURT:  Just a minute.

25          MR. WALLINGER:  The rule is local Rule 26.01.

THOMAS EFFINGER - CROSS-EXAMINATION

1          THE COURT:  It says you can't do that?

2          MR. WALLINGER:  It says, and I'm quoting, "One

3     counsel for each party shall examine or cross-examine a

4     witness.  During examination in open court, examining counsel

5     shall stand."

6          THE COURT:  You know, that's the rule I've seen

7     followed all my life.  And as far as closing arguments, you

8     can split that up and that's generally done.  But as far as

9     examination of witnesses, because of this rule, we've applied

10    it, and there's another rule in it somewhere that says I can

11    overrule any rule I want to, but I haven't ever done it, and I

12    don't think it's wise to do it.

13         MR. VARON:  Thank you for the clarification.

14         THE COURT:  We'll be in recess.

15

16    (Court adjourned at 5:30 p.m.)

17

18

19

20

21

22

23

24

25

1                       REPORTER'S CERTIFICATION

2

3            I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4   Reporter for the United States District Court for the District

5   of South Carolina, hereby certify that the foregoing is a true

6   and correct transcript of the stenographically recorded above

7   proceedings.

8

9

10
    S/Debra L. Potocki
11  _____

12  Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25