1            IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
2                  CHARLESTON DIVISION

3    SOUTH CAROLINA ELECTRIC & GAS  :    VOLUME II
     COMPANY                        :
4                                   :
                vs.                 :
5                                   :
     UGI UTILITIES, INC.            :    2:06 CV 2627
6

7

          Trial in the above-captioned matter held on

8    Tuesday, March 17, 2009, commencing at 10:05 a.m., before

9    the Hon. C. Weston Houck, in Courtroom IV, United States

10   Courthouse, 85 Broad Street, Charleston, South Carolina.

11

12
     APPEARANCES:
13
                    BRUCE FELMLY, ESQ., BARRY NEEDLEMAN, ESQ., and
14                  CATHRYN E. VAUGHN, ESQ., P.O. Box 326,
                    Manchester, NH, appeared for plaintiff.
15
                    ELIZABETH PARTLOW, ESQ., 1320 Main Street,
16                  Columbia, SC, appeared for plaintiff.

17                  JAY N. VARON, ESQ., 3000 K Street NW,
                    Washington, DC, appeared for defendant.
18
                    PAUL BARGREN, ESQ., 777 E. Wisconsin Ave.,
19                  Milwaukee, WI, appeared for defendant.

20                  R. SCOTT WALLINGER, JR., ESQ., P.O. Box 12487,
                    Columbia, SC, appeared for defendant.
21

22

23        REPORTED BY DEBRA LEE POTOCKI, RMR, RDR, CRR
                      P.O. Box 835
24                Charleston, SC  29402
                     843/723-2208
25

1                                    I N D E X

2

3    WITNESS:   THOMAS EFFINGER (CONTINUED)

4    Cross-Examination by Mr. Bargren........................  203
     Redirect Examination by Mr. Felmly.....................  249

5

6    WITNESS:   NEIL SHIFRIN

7    Direct Examination by Mr. Felmly.......................  257

8

9

10   EXHIBITS:                          Received in Evidence

11   Plaintiff's Exhibit 36                      262
     Plaintiff's Exhibit 74-A                    266
12   Plaintiff's Exhibit 74-B                    269
     Plaintiff's Exhibit 160                     296
13   Plaintiff's Exhibit 75                      313
     Plaintiff's Exhibit 76                      334
14   Plaintiff's Exhibit 78                      348
     Plaintiff's Exhibit 98                      349
15   Plaintiff's Exhibit 100                     351

16

17

18

19

20

21

22

23

24

25

THOMAS EFFINGER – CROSS-EXAMINATION

1        THE COURT:  I believe you were on the stand.

2        MR. FELMLY:  Your Honor, there is two brief

3    housekeeping matters, if I could just address them for just a

4    moment.

5        Last night Mr. Bargren and I did go over those exhibits

6    that I had offered at the end of the day, and I've coordinated

7    with the clerk on those.  And there is one of the exhibits,

8    and it's the first one of several that we've had, the parties

9    entered into a stipulation that they could be marked as a full

10   exhibit, but they are summary exhibits that have various

11   tables and things and we agreed that characterizations of

12   counsel on those would not be conceding the accuracy or the

13   raising of it.

14       So as to all of the exhibits that I've given the clerk

15   this morning, other than Exhibit 78, they are unaffected by

16   that stipulation.  Exhibit 78 is the first of the

17   demonstrative or composite exhibits that are subject to the

18   parties' stipulation that are set forth in our objections.

19   And essentially it says that the cover materials, the

20   descriptions, the things that experts may have labeled,

21   various things for clarity which may be of aid to the Court,

22   that the parties are not waiving the ability to contest the

23   description of those clarifying points, essentially the work

24   product that's on them.  We came to that agreement so we would

25   have the ability to present you summary sheets and things that

THOMAS EFFINGER – CROSS-EXAMINATION

1   I think will be of assistance.

2       So 78 is --

3       THE COURT:  I'm not sure I understand.  You mean the

4   attorneys have made some notations in the margins or

5   something?

6       MR. FELMLY:  It's two different things.  Not so much

7   that, Your Honor.  Some of these exhibits, for example, on

8   minutes of the board, there are packets that may have 40 or 50

9   of those that are representative samples.  There is -- each

10  side has presented a summary sheet pursuant to the rule, that

11  sort of indexes it by date and indications, and then there is

12  a brief description of what it is.  That's one type of

13  document.

14      The other type of document is that some of the maps and

15  some of the plans that we have which have been labeled by

16  experts to show various things and have added materials to

17  those plans, what the stipulation says is that the parties

18  have agreed that --

19      MR. BARGREN:  Why don't we just read the language of

20  the stipulation?

21      MR. FELMLY:  The parties have jointly agreed that

22  this exhibit can be marked as a full exhibit, reflecting a

23  summary or abstract of expected testimony to be offered by

24  listed witnesses.  The parties do not necessarily accept or

25  concede, and, in fact, generally contest the accuracy or

THOMAS EFFINGER – CROSS-EXAMINATION

1    relevance of the characterizations contained in the exhibit,

2    but have agreed to their admission as possible assistance to

3    the Court in presenting complicated and detailed materials

4    during the testimony of the witness, so long as each party

5    does not waive, and, in fact, preserves its right to argue

6    that any such exhibit inaccurately represents or characterizes

7    the underlying evidence, testimony, facts or trial exhibits

8    actually received.

9        That's for the summary --

10        THE COURT:  You see, what you're doing is you're

11   stipulating these exhibits are coming into evidence, and

12   you're stipulating that you don't agree that they accurately

13   reflect the information contained therein, which puts me in a

14   position of not knowing what you contest and what you don't

15   contest.

16        MR. FELMLY:  No, actually not.

17        THE COURT:  Well, so here's the way we're going to do

18   it.  If there is something in these documents that the

19   stipulation you've read to me causes one or both of you to

20   question those documents, then you're going to have to

21   question them on this record and bring that questioning to my

22   attention.  Otherwise, I'm going to throw your stipulation out

23   and assume that all of these documents speak for themselves.

24   Otherwise, I'm standing on a rug and both of you have the rug

25   by the end and you can pull it out from under me any time you

THOMAS EFFINGER - CROSS-EXAMINATION

1    want to.

2        Do you understand what I'm saying?

3            MR. FELMLY:  I do understand, but --

4            THE COURT:  I'm not trying to be difficult, you've

5    just got to put up or shut up.  If you object to them, tell me

6    what your objection is.  If you don't, I'm going to assume you

7    have no objection, in spite of the stipulation.

8            MR. FELMLY:  That's fine.  I need to explain one

9    other thing.

10           THE COURT:  Yeah.

11           MR. FELMLY:  The documents, the underlying historic

12   documents are not the issue at all, and if I -- May I approach

13   bench, Your Honor?

14           THE COURT:  Yeah, sure.

15           MR. FELMLY:  This, for example, is Plaintiff's

16   Exhibit 158.  It is a composite of a very large number of

17   historic documents on waste handling.  All of those documents

18   nobody has any objection to, because they are historic

19   records, so all these.

20       The thing we're talking about is for your assistance,

21   rather than giving you a folder with a bunch of documents that

22   don't have any organization or outline, each side has

23   presented essentially a cover sheet, a summary that identifies

24   the Bates number, the date, and a very brief description of

25   what the subject of it is.  And the only thing we're saying is

THOMAS EFFINGER - CROSS-EXAMINATION

1    that the lawyers' characterizations about this are -- there's

2    no problem with this, but the issue is, I suppose you could

3    say those will be thrown out.  We thought they would be of

4    assistance to the Court.

5              THE COURT:  I think they would, provided I know which

6    ones are true and which ones are not.

7              MR. FELMLY:  Well, the issue will be things like

8    every time somebody says these evidence control, somebody is

9    going to complain.  So we felt this would be the way to

10   present it.  There are also --

11             THE COURT:  That's fine with me, I just want the

12   record to be clear what you're objecting to.  I don't want a

13   stipulation in this record that permits you to undermine

14   certain evidence that I might rely on, and then when you get

15   to the Fourth Circuit you decide to bring it to somebody's

16   attention that you object to that.  If you're going to object

17   to it, take issue with it, I expect you to do it in this

18   Court, whether by argument or whatever.

19        Is that clear?  Am I way off base?

20             MR. VARON:  I think it is clear, Your Honor, but it's

21   going to mean, as I tried to indicate --

22             THE COURT:  Say what?

23             MR. VARON:  I'm sorry, excuse me.  I think what it's

24   going to mean is that we're going to spend a lot of time going

25   entry by entry and saying this characterization isn't born out

THOMAS EFFINGER – CROSS–EXAMINATION

1    by the underlying documents.  And we're going to do that on

2    cross, and I believe that many of the plaintiff's exhibits,

3    the characterization isn't supported by the underlying

4    documents.  Mr. Felmly may believe that some of our summary

5    exhibits are the same way.  We were just trying to say that --

6              THE COURT:  Well, I appreciate your efforts, but by

7    the same token, I want to know what's in the record and what's

8    not in the record.  And if something is erroneous and it

9    doesn't reflect what's in the documents, then I would like to

10   note on that particular notation that there is a contest and

11   that you contend such and such, as opposed to what the

12   plaintiff contends, then I can look at that document closer

13   than the other documents and see which one of you is right.

14   At least that's the way it seems to me.

15             MR. VARON:  Understood, Your Honor.

16             THE COURT:  But I don't think it's going to be any

17   problem, I just think we need to lay the cards on the table

18   and see, you know, what you agree to and what you don't agree

19   to.

20             MR. VARON:  Okay.

21             MR. FELMLY:  I'm not sure where that leaves

22   Exhibit 78.  We're offering Exhibit 78, and have no objection

23   to, on cross, them going into the items that they want to

24   contest, but we offer Exhibit 78.

25             THE COURT:  Well, it would be very simple to, with

THOMAS EFFINGER - CROSS-EXAMINATION

1  the notations that you've made, summarize the documents to

2  include both sides, and say the plaintiff says this and

3  defendant says this.  Then I know what the disagreement is by

4  looking at what you've got written there.  That would be a

5  very simple way of doing it, and certainly it would be a clear

6  path for me to follow.

7          MR. FELMLY:  Some of these though, some of these

8  composites have scores and hundreds of exhibits.  It will take

9  us -- the purpose for doing it this way is we could not figure

10  out any way to present this in a way that would combine this

11  for you that would cut us down to a matter of a few weeks

12  rather than a very long period of time, and maybe we've just

13  got to get smarter at it.

14          THE COURT:  I don't know that you have, I just want

15  to make myself clear.  Let's move on.

16          MR. BARGREN:  Thank you, Your Honor.

17  BY MR. BARGREN:

18  Q.  Mr. Effinger, good morning.

19  A.  Good morning.

20  Q.  The parking garage that was built is a project that SCE&G

21  actually constructed, correct?

22  A.  Yes, sir.

23  Q.  Or arranged for the construction through a contractor.

24  And then the City is reimbursing SCE&G for those construction

25  costs, correct?

THOMAS EFFINGER – CROSS-EXAMINATION

1    A.  I believe that's part of the agreement, yes.

2    Q.  Yes.  And you're not claiming those garage construction

3    costs in this recovery, correct?

4    A.  No, sir.

5    Q.  And then we move on to -- oh, I just want to make clear,

6    too, that the work that the City did began in the mid 90s,

7    correct?  I'm talking now, for example, about the Calhoun

8    Street sewer project.

9    A.  Maybe even before that.  Late 80s.

10   Q.  And we talked a little bit about buses and so on.  And I

11   want to show you Defendant's Exhibit 108.

12          MR. BARGREN:  May I, Your Honor?

13          THE COURT:  Certainly.

14   BY MR. BARGREN:

15   Q.  And we'll call that up on the screen.  And just taking a

16   look at the heading on this document, can you identify this

17   document?

18   A.  This is an internal newsletter.

19   Q.  This is sent by SCE&G to employees?

20   A.  Yes, sir, I believe that's correct.

21   Q.  Okay.  And this describes, as it says in the headline, a

22   new service partnership between SCE&G, City of Charleston,

23   correct?

24   A.  Correct.

25   Q.  And it includes the gas and electric franchise, the first

THOMAS EFFINGER — CROSS-EXAMINATION

1  item there.  And it includes some cooperation to underground

2  service, correct?

3  A.  Yes.

4  Q.  Putting wires underground.  And then it includes

5  environmental settlement to support waterfront development.

6  Correct?

7  A.  Yes.

8  Q.  And then finally it includes regional transportation

9  system, and that would be the transfer of the bus franchise to

10  the City, correct?

11  A.  Yes.

12  Q.  Okay.  So we talked yesterday about --

13          THE COURT:  What are the terms of the electric and

14  gas franchise?  How do they pay the City?  Do you know?

15          MR. BARGREN:  I do.  They --

16          THE COURT:  Is it so much per kilowatt?

17          MR. BARGREN:  I believe so.  It's in that agreement

18  that was introduced yesterday, it's I think so much per

19  kilowatt, and I think there's a flat fee involved, too, it's

20  included in an ordinance.

21  A.  There was an upfront fee of $25 million, I believe, for

22  that.

23  BY MR. BARGREN:

24  Q.  So yesterday we talked, just to wrap up kind of here on

25  the City project and the $26 million issue, we talked about

THOMAS EFFINGER – CROSS-EXAMINATION

1   NCP issues, we talked about whether there was an order or not.

2   And so with all of that, the $26 million payment doesn't come

3   under the NCP, does it, Mr. Effinger?

4   A.  I'm not sure I agree with that.

5   Q.  Do you disagree with that?

6   A.  Yes, sir.

7           THE COURT:  Doesn't come under what now?

8           MR. BARGREN:  Under the NCP.

9           THE COURT:  What is the NCP?

10          MR. BARGREN:  National Contingency Plan.  That's the

11  set of regulations.

12  BY MR. BARGREN:

13  Q.  Do you remember I asked you about that at your deposition?

14  A.  Yes, sir, the reason I say that --

15  Q.  Well, can I --

16          THE COURT:  No, let him explain.

17          MR. BARGREN:  Okay.

18  A.  The reason I'm saying that is that the area that they were

19  working on was all part of the superfund site as shown in that

20  original map that was laid out before this Court.  And I

21  know -- I do recall that there were interagency meetings, I do

22  recall that EPA was involved in overseeing that project and

23  providing some approvals of the measures.  And I also recalled

24  that there were public meetings discussing the work that they

25  were going to do.

THOMAS EFFINGER – CROSS-EXAMINATION

1   Q.  Well, we talked about this at your deposition, correct?  I

2   took your deposition in May of 2008; do you remember that?

3   A.  Yes, sir.

4   Q.  I asked you this question.

5         MR. BARGREN:  I'd like to play the video clip, if

6   that's okay, Your Honor.

7       (Video deposition testimony was played as follows:)

8   Q.  "Does the general environmental cost that's reflected on

9   these various items on your spread sheet, do think any of

10  those items include work that was related to the parking

11  garage site --"

12      (Video stopped.)

13        MR. BARGREN:  I'm sorry, I think this is the wrong

14  clip.  I'm looking for page 200, line nine.  Thirteen.  I'm

15  sorry.

16      (Video deposition testimony was played as follows:)

17  Q.  "What about the payment to the City of $26 million?  Does

18  that come under the NCP?

19  A.  That's a tricky question.  I'd prefer to leave that to the

20  experts, Dr. Shrifrin or someone else on that one."

21      (Video stopped.)

22        MR. BARGREN:  Thank you.

23  BY MR. BARGREN:

24  Q.  I want to talk a little bit about work in the future.  We

25  talked -- you described some of this yesterday at your

THOMAS EFFINGER – CROSS-EXAMINATION

1    testimony.  And in your deposition.  There was an issue about

2    arsenic, correct?  Potentially having to deal with some

3    arsenic contamination?

4    A.  For our site?  Yes, sir.

5    Q.  Yes.  And that's been taken care of, correct?

6    A.  We're not exactly sure.  We had to write a tech memo about

7    that recently.  I think it's a closed issue, but we haven't

8    gotten a response letter back from the agencies yet on that

9    technical memo.

10   Q.  Okay.  Mr. Zeller, at his deposition last week which you

11   attended, indicated that arsenic was probably going to be off

12   the table, so to speak, correct?

13   A.  Yes, but we have not gotten any correspondence back from

14   EPA or the State saying that it is off the table.

15   Q.  Okay.  And as to vapor intrusion, which was discussed in

16   Plaintiff's Exhibit 16, let me show you that.

17   A.  Thank you.

18   Q.  If you turn to page 21 of that exhibit, conclusion.  Or

19   I'll bring it up on the screen, either way, Mr. Effinger.

20       This is the report prepared by your experts to deal with

21   vapor intrusion, correct?

22   A.  Yes, sir.

23   Q.  I believe you said it went in to the EPA just last month?

24   A.  Yes, sir, that's correct.  February of 2009.

25   Q.  Okay.  So SCE&G's consultant's conclusion here is in the

THOMAS EFFINGER – CROSS-EXAMINATION

1    last sentence; therefore, no further action is required with

2    respect to vapor intrusion at this site.  Correct?

3    A.  Yes, sir, that's their conclusion, but since this is a

4    draft, that's what we're submitting to the agencies.  We're

5    not sure that they'll accept that or accept our analysis that

6    it's in this document.

7        The other thing that's potentially for their consideration

8    is whether or not one times ten to the minus fourth is

9    acceptable.  Sometimes they prefer a one times ten to the

10   minus six risk, and that would be for cancer frequency.  One

11   times ten to the sixth means one incident within a million

12   people.  Sometimes they'll accept one in 10,000, but we're not

13   sure of that.  We have not gotten a response back on this

14   document yet.

15   Q.  But even though this is a draft, you and your consultants

16   have been working on this for at least several months, I

17   believe.

18   A.  Absolutely.

19   Q.  And you've been in contact with Mr. Zeller from the EPA

20   during that time, correct?

21   A.  But he has not reviewed this document yet.

22   Q.  But he's aware of your conclusions.

23   A.  He is aware of the conclusions, yes, sir.

24   Q.  He didn't say no, that's not going to work, you need to

25   come up with something else; he's on board with this.

THOMAS EFFINGER – CROSS-EXAMINATION

1          THE COURT:  I think he's answered your question.  He
2    said he thinks it's done but they haven't approved it.
3    BY MR. BARGREN:
4    Q.  Okay.  Let me just ask this question.  Is Mr. Zeller
5    someone that will have to approve this, or where does the
6    approval come from?
7    A.  It comes from EPA, but the State has to also concur with
8    it.  And for this document, we followed the State protocol,
9    and they were the ones most involved in telling us which
10   protocol to follow.  We are hopeful that it will be approved,
11   but we really -- until we get official approval, it's open.
12   We're hopeful.
13   Q.  I'll bring these up and set them up here.  So if you'd
14   take Plaintiff's Exhibit 15.
15   A.  Okay.
16   Q.  And this is a recent update on your shallow groundwater
17   treatment, correct?
18   A.  Yes, sir.
19   Q.  And if you go to page ten, the section on conclusions.  Or
20   it's on the screen, too, if you care to look there.
21   A.  Okay.
22   Q.  The last bullet -- I'm sorry.  Can you see that?
23   A.  Yes, sir.
24   Q.  Okay.  The last bullet point says that the routine site-
25   wide evaluation for the potential migration of DNAPL continues

THOMAS EFFINGER - CROSS-EXAMINATION

1    to be effective.  Correct?

2    A.   That's what it says, yes, sir.

3    Q.   Okay.  And this generally reflects the general idea that

4    you feel that the remedy is up and working pretty well,

5    correct?

6    A.   That's what we're saying to the agency, but if you look at

7    the map, like I talked about yesterday, that groundwater plume

8    is being drawn back to the site.  We still have areas on the

9    site, you can look at a benzene map in the back, for instance,

10   that shows where we still exceed the drinking water MCL.  And

11   we've not gotten approval to exceed that number, even though

12   we know that folks are not drinking that water, that is a

13   State requirement that all groundwater shall meet drinking

14   water maximum contaminant levels, and we're just not there

15   yet.  We're hopeful, but we still have to keep doing this

16   monitoring, providing the reports, and we're doing this now on

17   a nine-month frequency.

18   Q.   Okay.  That's actually less frequent than earlier,

19   correct?

20   A.   Yes, it is.

21   Q.   Because things seem to be moving in the right direction.

22   A.   Well, we wrote a tech memo and explained why it was

23   prudent for us to be doing that, because we have a long

24   history of data.  We're seeing the plumes draw back to the

25   site, so conditions are not getting any worse, and we're

THOMAS EFFINGER – CROSS-EXAMINATION

1   hopeful that it will continue to improve.

2   Q.  You mentioned benzene a minute ago, and I gather that's a

3   concern, isn't it, from the property to the north coming onto

4   the site?

5   A.  Yes, sir.

6   Q.  And the benzene from the north is not related to its --

7   it's a different source than the MGP.

8   A.  That has not been proven.  We -- we have not gotten relief

9   from that from the agencies.  We do believe that there may be

10  some commingling from another source, but in one of the wells,

11  the well at the dry cleaner, if you remember that area just

12  north of our site, I believe the well number is BMO3D.  As

13  that well was developed, there was some tar observed on the

14  tube that's put down to develop that well, so that we knew

15  there was some tar in there.  And it may have been from one of

16  the distribution lines.  So I think we've got the agencies to

17  agree that there might be some commingling of another source

18  that's even further upgradient towards Washington Street.  Or

19  towards East Bay Street, excuse me.

20  Q.  Mr. Zeller, at his deposition the other day, was

21  discussing, or there was reference to him discussing an exit

22  strategy, correct?  Do you remember that?

23  A.  Yes, sir.

24  Q.  And he seems to believe that you're in that sort of exit

25  strategy phase now, doesn't he?

THOMAS EFFINGER – CROSS-EXAMINATION

1   A.  Well, we were talking about the technical impracticability

2   waiver that was mentioned yesterday.  We're -- we are hopeful

3   that we're on the downhill slope of this 20-year project, yes,

4   sir.

5   Q.  You could put that exhibit away, and then let's go to

6   Plaintiff's Exhibit 4, which is the ROD for operable unit one.

7   And there's a copy there, if you prefer to look at the paper,

8   or otherwise it will be on the screen as well.

9       I'm going to start with page 002 up in the top there.  And

10  at the top where it says statement of basis and purpose, you

11  had said yesterday that this ROD selected the remedy that the

12  agencies decided needed to be implemented at the site, at

13  least as to OU-1.  Do you remember that?

14  A.  What question are you asking me again; I'm sorry?

15  Q.  Yesterday you described the ROD as the document that

16  selected the remedy that the agencies decided needed to be

17  implemented at OU-1.  Correct?

18  A.  Well, what I said yesterday is the ROD contains a lot of

19  information, it covers the history of the site, the remedial

20  investigation, the results of that.  And it talks about the

21  various contaminated media and different technologies that

22  could be applied to it.  And it had some objectives.  And in

23  this document it had those three objectives, and that's what

24  it generally describes.  It never gave us a final remedy, if

25  that's what you're asking me.

THOMAS EFFINGER - CROSS-EXAMINATION

1   Q.  The first sentence right there, the highlighted portion

2   says this decision presents the selected remedial action for

3   Calhoun Park.  That's correct, right?

4   A.  That's what the document says there, yes, sir.

5   Q.  Okay.  And the last couple of words in that paragraph say

6   that the State of South Carolina, acting as the support

7   agency, concurs with the selected remedy.  Correct?

8   A.  The document says that, yes, sir.

9   Q.  Okay.  Now, if we go to the next page, 003, in the last

10  paragraph of text there's a reference to a five-year review.

11  Do you see that?  It says, therefore, five-year reviews will

12  be conducted.

13  A.  Yes, sir.

14  Q.  After the initiation of the remedial action.  Correct?

15  A.  It says that, yes, sir.

16  Q.  Well, you say it says that.  You're not disputing what the

17  document stands for, are you?

18  A.  I'm saying there's other sections in the document that

19  talk a little bit differently than this, and that we never had

20  a final remedy.  The five-year review that came up and was

21  discussed at Mr. Zeller's deposition, he even said that it was

22  done prematurely.  So --

23  Q.  Well, let's go back to something you just --

24  A.  Okay.

25  Q.  -- you just said.  You said it doesn't select a final

THOMAS EFFINGER - CROSS-EXAMINATION

1  remedy, but it does select a remedy, doesn't it?

2  A.  It talks about objectives and a treatment technology to be

3  applied.  It reserves some things that need to be studied

4  further.  And it mentions it will have to be covered in OU-2.

5  Q.  So this doesn't select a remedy?  This doesn't select

6  remedial action, despite what it says in the first paragraph?

7  A.  Depends on how you're using the term remedial action and

8  remedy.

9  Q.  How do you use it?  How do you use it?

10  A.  Well, there was no final remedy that said this is what you

11  need to do at the site, and once you implement this, this is

12  done.  Typically they try to achieve that, but in order to get

13  there, you have to convince everybody about what all the

14  contingencies might be, the 'what ifs.'  All right, if this

15  happens, then we're going to implement this.  And to get

16  through all of those what ifs and to get consensus from a

17  group that we had going there, that's why it was actually

18  determined to go with a phased approach.  And I think the

19  phased approach is talked about in this document.  And so we

20  never felt like we had a final remedy.  And to this day we

21  still don't feel like we have a final remedy.

22  Q.  You don't have a final remedy perhaps, but you've been

23  working against this selected remedy.  This selected remedial

24  action.  You've been implementing at least this much of the

25  selected remedial action ever since 1998, correct?

THOMAS EFFINGER – CROSS-EXAMINATION

1    A.  And it's still ongoing, yes, sir.

2    Q.  Yes.  Is this final remedy a term that you're pulling out

3    of the statute or something?  It's not in the statute, is it?

4    A.  No, I'm just speaking from dealing with other sites and

5    what they typically try to do.  I know in North Carolina they

6    want a remedial action plan which says exactly what you're

7    going to do, and have everything laid out.  And but even then,

8    sometimes it's an iterative approach as you get out there.

9    And like I talked about yesterday, as you do your digging, you

10   see more what's in the ground, you have a better picture of

11   what's going on three-dimensionally below the ground, and you

12   can certainly come up with better solutions to clean it up.

13   Q.  Let's take a look at Plaintiff's Exhibit 10, which should

14   be in the next folder there, if you'd like the paper, or we'll

15   put it on the screen as well.  And if we go to page ten of

16   this exhibit, and actually let's go back to page one.  We

17   talked about this, or you talked about this document a little

18   bit yesterday.  This is a five-year review report in draft

19   form that was started, and then this document happens to

20   include the mark-up from Ed Hanlon, correct?

21   A.  Yes, sir.

22   Q.  So these are edits he made to the draft he was reviewing,

23   correct?

24   A.  I seem to believe he may be with the Corps of Engineers,

25   may have been the one that drafted it.

THOMAS EFFINGER – CROSS-EXAMINATION

1   Q.  Well, it says right there, 3/15/07 comments from Ed

2   Hanlon.  And who is he?

3   A.  To the best of my knowledge, and I'm trying to recall

4   here, I think he was with the Corps of Engineers.

5   Q.  Or was he with the EPA in Washington?

6   A.  I --

7   Q.  Okay.

8   A.  If you know, you tell me.  I don't know.

9   Q.  Let's go to page ten.  One of the comments Mr. Hanlon

10  inserted in the third paragraph suggesting this language for

11  inclusion in this document.  This is the first five-year

12  review of the Calhoun site.  And then he says in about the

13  third sentence, statutory reviews require that five-year

14  reviews occur within five years of initiation of the first

15  remedial action at the site.  You see that?

16  A.  Yes, sir.

17  Q.  And then the next sentence says the first remedial action

18  at the site commenced on March 12, 1999.  Correct?

19  A.  That's what it says, yes, sir.

20  Q.  Okay.  And he's referring to work that SCE&G did.

21  Isn't --

22  A.  I believe he is, yes.

23  Q.  -- in response to the ROD one.  Correct?

24  A.  Yes, sir.

25  Q.  Then let's go back to Plaintiff's Exhibit 4, and it will

THOMAS EFFINGER – CROSS-EXAMINATION

1    be page two again.  So we're back to the ROD now.  And on this

2    page this paragraph says description of selected remedy about

3    halfway down there.  And it says this remedial action --

4    Correct?

5    A.  Yes.

6    Q.  -- addresses NAPL source areas, shallow groundwater

7    contamination, contaminated soil as the principal threat at

8    this site.  And then it goes on to say that sediment and

9    surface water contamination and intermediate groundwater

10   contamination will be addressed in a separate ROD.  Correct?

11   A.  That's what the document says, yes, sir.

12   Q.  And that separate ROD turned out to be the ROD for

13   operable unit two that was issued in 2002.  Correct?

14   A.  Operable unit two was issued in 2002, yes, sir.

15   Q.  And that's the separate ROD that's referred to in this

16   document.

17   A.  Yes, sir.

18   Q.  Then if we go to page 51 of this exhibit, it's 0051.  And

19   here it does talk about intermediate groundwater which is what

20   is going to be addressed in the future ROD, correct?

21   A.  Yes.

22   Q.  And the last half of the paragraph down there says because

23   the extent of the dissolved groundwater contamination plume

24   within the immediate aquifer was not well defined during the

25   remedial investigation, additional investigation will be

THOMAS EFFINGER - CROSS-EXAMINATION

1    performed to characterize the extent of this contamination and

2    present it as operable unit two under a separate ROD.

3    Correct?  That's what it says.

4    A.  Yes, sir.  That's what it says.

5    Q.  And then it says this separate ROD will address the issue

6    of source removal and disposition of this source for the

7    intermediate aquifer within the selected remedy section of the

8    ROD.

9        And that's exactly what the ROD for OU-2 did, isn't it?

10   In part.

11   A.  The ROD for OU-2, again, documented the follow-up

12   investigations that were done for intermediate groundwater and

13   sediments, and then it addressed the issues of intermediate

14   groundwater, surface water and sediments, and hit the three

15   objectives just like they did here, and talked about different

16   potential applications of technologies to effect a cleanup for

17   those three media.  When they let the surface water one --

18   they took it off the table, saying that it was no longer a

19   threat.

20   Q.  Right.  So you didn't have to do that.

21   A.  Correct.

22   Q.  You mentioned a couple of times the three objectives, the

23   removal, containment and restoration of the aquifer, correct?

24   A.  Yes.

25   Q.  Okay.  When you use removal in that three-part list of

THOMAS EFFINGER – CROSS-EXAMINATION

1   objectives, you're talking about excavation of soil or tar

2   with a backhoe, correct?

3   A.  Removal.

4   Q.  In part.

5   A.  Yeah, removal can mean by any mechanism.

6   Q.  Right.

7   A.  It's just getting it out of the ground so it's no longer a

8   threat to groundwater.

9   Q.  Right.  So one way to remove is digging and another way to

10  remove is through extraction wells.

11  A.  It depends on what you're trying to remove.  One is going

12  to be more effective than the other.

13  Q.  But they're both -- they're both means of removal, right?

14  A.  Not for tar, no, sir.  You're not going to remove tar with

15  extraction wells.

16  Q.  No, but we're not talking about tar necessarily, we're

17  talking about NAPL and NAPL soil and NAPL water, and that can

18  be extracted through wells.

19  A.  Well, NAPL is tar in this situation.

20  Q.  They're called DNAPL recovery wells, right?  DRWs?

21  A.  Those are the ones we installed in the perimeter, yes,

22  sir, we are recovering tar with those extraction wells.

23  Q.  Right.  So that's part of your removal or extraction of

24  contaminants at the site.

25  A.  That is part of what we are have implemented to remove

THOMAS EFFINGER – CROSS-EXAMINATION

1    source material at the site.

2    Q.  Now, if we go to page 24 of this exhibit.  Let's try the

3    next page.  Or the previous page.  We'll let that one go.

4        You'd mentioned yesterday the importance of doing work in

5    response to work plans.  Do you remember that?

6    A.  Yes, sir.

7    Q.  And I'm going to hand you an exhibit that was marked at

8    your deposition.

9            MR. BARGREN:  And I handed a copy to the clerk

10   earlier, Your Honor.  This will be our next exhibit,

11   Defendant's 266.  I gave a copy to counsel yesterday.

12   Q.  And you've seen this letter before, Mr. Effinger, correct?

13   A.  I believe I have.

14   Q.  We discussed it at your deposition, among other things.

15   Do you remember that?

16   A.  Can I review it to refresh my memory?

17   Q.  Sure.

18   A.  Okay.

19   Q.  This letter is addressed from Kevin Bowick at the EPA to

20   Miss Partlow, who is counsel for SCE&G, correct?

21   A.  Yes.  She was in this matter at that time.

22   Q.  Right, handling remediation type things.  And in the

23   second paragraph of the letter seems to me Mr. Bowick is

24   appreciating the work that's been done, but he says a great

25   deal of work is presently being performed at the site, SCE&G

THOMAS EFFINGER – CROSS-EXAMINATION

1  has already performed work that is likely to become part of

2  the site remediation.  Do you see that?

3  A.  Yes, sir.

4  Q.  And this is just after the ROD came out, about six months

5  after the ROD came out.  And talks about wells, and then the

6  last sentence says, while EPA recognizes this effort, it must

7  be pointed out that none of this work has been performed

8  pursuant to an approved work plan.  Correct?

9  A.  Yes, sir.

10  Q.  And that was Mr. Bowick's opinion.

11  A.  Yeah, he's got it in this letter, yes, sir.

12  Q.  Okay.

13  A.  I'm not sure what he's referring to though.  I don't

14  recall what issue.  He seems to be talking about some wells

15  that may have been installed, and I honestly can't remember

16  what the issue was in this letter.

17  Q.  Let's move on to Plaintiff's Exhibit 5, which is the ROD

18  for OU-2.  And you can pull that.  I just wanted to go through

19  a couple of things in there, showing what work had been done.

20  And I think I'll ask Andrew to highlight these as we go.

21       MR. BARGREN:  If we go to the page with Section 2.3

22  on it.  It's page 14 in the exhibit.  We'll start with page

23  14.  Document page seven.  28518.

24  Q.  And the first -- I guess it's the second block of text

25  there at the top of the page, there it relates back to the ROD

THOMAS EFFINGER – CROSS-EXAMINATION

1  for OU-1, correct?

2  A.  Yes.

3  Q.  And it says the ROD for OU-1 stated that intermediate

4  groundwater, sediments and surface water would be addressed in

5  a separate ROD.  And goes on to say basically this is the ROD

6  that we talked about in the first ROD.  Correct?

7  A.  Yes.

8  Q.  And the OU-2 addresses the principal threat through

9  removal of DNAPL to the maximum extent practical.  Continues

10  the phased approach that you described earlier that started

11  with the ROD one, correct?

12  A.  Yes.

13  Q.  And will be followed by containment and so on.  And then

14  now if we go back to page four of the document, three pages

15  earlier, it describes previous response actions there, Section

16  2.3.  Do you see that?

17  A.  Yes, I see that.

18  Q.  Okay.  And again, if you prefer paper copy, it's up there.

19  A.  Okay.

20  Q.  Looks like you're doing okay.

21  A.  Yeah.

22  Q.  Previous response actions, it says significant remedial

23  efforts have been completed to date to address environmental

24  impacts from past MGP operations at the CPA site.  Those

25  actions are summarized below, correct?

THOMAS EFFINGER – CROSS-EXAMINATION

1   A.  Are you asking me --

2   Q.  That's what it says.

3   A.  -- to read it, or what it means?

4   Q.  I'm asking you, is that what it says?  That's what it

5   says, right?

6   A.  Yes, sir.  That's what it says.

7   Q.  All right.  And so let's go down to that list of actions,

8   the first one is sediment containment.  This is something the

9   City did, is that right?

10  A.  Sediment containment.  It talks about the containment

11  system that the City installed as part of their work putting

12  in the Aquarium, and then also over at the tour boat facility,

13  the work that I mentioned that EPA had to overview, and they

14  had to get permits from the Corps of Engineers and everybody,

15  and they had to -- they also had to do a demonstration project

16  on that in order for that work to be done, and that mentions

17  that demonstration program here.

18  Q.  This sediment containment work was started in the mid

19  1990s, correct?

20  A.  Yes, sir, it was.

21  Q.  Then the next item is the Calhoun Street drain project.

22  This is also work the City did, correct?  That's the work that

23  was referenced in the $26 million agreement we saw yesterday?

24  A.  This is work that the City did, yes, sir.

25  Q.  And it's the work that's referenced in that agreement,

1    correct?

2    A.  I believe it probably -- in the agreement between SCE&G

3    and the City for the 26 million?

4    Q.  Yes.

5    A.  I believe it probably is included.

6    Q.  And this work was also done -- well, at least before 1998,

7    correct?

8    A.  I don't know about that.  I don't recall the timing.

9    Q.  The next item is soil removal and seep remediation.  Here

10   it talks about remediation efforts at the CPA site have

11   included removal of impacted unsaturated zone soil and so on.

12   Do you see that?

13   A.  Yes, I see that.

14   Q.  Okay.  By the way, this report, was this drafted and sent

15   to the EPA by your consultants?

16   A.  Which one are we talking about?

17   Q.  This is the ROD --

18   A.  OU-2?

19   Q.  OU-2.

20   A.  I think you've got before me the final one from EPA.

21   Q.  Okay.

22   A.  Yeah, this is the final one back from EPA.  We did -- we

23   do often help them prepare sections of it, if that's what

24   you're asking me.

25   Q.  Yes.  This is the final EPA official document.  Right?

THOMAS EFFINGER - CROSS-EXAMINATION

1   A.  The one you have in front of me, yes, sir.  It's signed

2   and got all the attachments and all of that.

3   Q.  And this paragraph points out that this soil removal was

4   completed in 1998, that's referenced in this paragraph.  Do

5   you see that in about the middle of the paragraph?

6   A.  Here it's talking about the 6000 cubic yards that was for

7   the zero to three-foot soil, so that's surficial soil that

8   would not have any groundwater in it.  I believe that's what

9   it's talking about.

10  Q.  And then the next paragraph, which goes on -- is on page

11  five, talks about remediation efforts -- top of the page.

12  Talks about remediation efforts in '99, and what they focused

13  on, and that was work that SCE&G did, correct?

14  A.  The seep mitigation activities, and they mention the

15  sediment that was pulled out, and they used a long stick to do

16  that, installed a sheet pile wall.  That work was done under

17  that AOC that was issued for a rapid mitigation of the seep

18  they found late in the effort.

19  Q.  Right.  And that work was done by SCE&G, correct?

20  A.  Yes, that work was done by SCE&G.

21  Q.  Then the next paragraph talks about -- first sentence

22  there, remediation efforts focusing on source delineation,

23  removal at these other areas that you described yesterday.

24  And it says that work began in 1999, correct?

25  A.  It talks about removal that started in '99, yes, sir.

THOMAS EFFINGER – CROSS-EXAMINATION

1  These excavations began in '99.

2  Q.  And that again is work that SCE&G did.

3  A.  That was SCE&G's work, yes, sir.

4  Q.  And work that you're claiming costs for -- you've advanced

5  costs for in this action.

6  A.  That's part of that 63,000 tons of soil that was removed,

7  yes, sir.

8  Q.  Okay.  And then just a couple of more elements here.  The

9  next paragraph talks about shallow groundwater remediation,

10  and here we have the planting of the trees, the

11  phytoremediation.  Correct?

12  A.  Yes, it's talking about trees being used as remediation.

13  Q.  And the trees were first planted in November 1998, and I

14  believe some more were planted later, correct?

15  A.  Yes.

16  Q.  Okay.  By the way, excavating soil, extracting tar and

17  shipping it off site, shipping contaminated soil off site,

18  that's a pretty permanent remedy, isn't it?  That's not going

19  to come back.

20  A.  For the particular areas that you're working on, you are

21  getting a fair amount of source out.  The problem is you never

22  know whether you've gotten every molecule out, and you would

23  have to dig the entire area.  So we're waiting to see how it

24  responds to see if we have to implement those other measures.

25      Yesterday Judge Houck asked me if we would have to put in

THOMAS EFFINGER - CROSS-EXAMINATION

1    additional containment, what that might be.  Sheet piling or

2    grout curtain or whatever else, and we still don't know if

3    that's going to be required.

4    Q.  My point is --

5    A.  We're hopeful that it will not, but even after you do the

6    excavation, there's still going to be residual impacts at this

7    site that we'll continue to monitor.  And as the agencies ask

8    us to do additional work, we'll be obligated to comply with

9    that.

10   Q.  My point is that when you excavate a yard of soil or tar

11   or contaminated soil, and take it off site, that yard is not

12   coming back.  That yard is permanently gone.  Right?

13   A.  If you catch everything that's --

14   Q.  No, I'm talk --

15   A.   -- has the source material in it, then you're not going

16   to have residual impacts.

17   Q.  Let's move on to Plaintiff's Exhibit 7.  That should be up

18   there for you.  This is the IRA.  This is the one you said

19   yesterday that because of the time this work was implemented,

20   meaning in the mid 90s or late 90s, the EPA felt it was a good

21   idea to go ahead and capture or summarize work that had been

22   done to date, correct?

23   A.  Yes, sir.

24   Q.  And that's what this report does?  In part, at least?

25   A.  It captures it for OU-1, for that removal action, and

THOMAS EFFINGER – CROSS-EXAMINATION

1    that's primarily its focus.

2    Q.  Okay.  Let's go to page four of this document, 90356.  And

3    in Section 1.3.2, administrative order on consent, this

4    describes the AOC that was issued in May '98, correct?

5    A.  Yes, it does.

6    Q.  And this is the AOC under which you did the work at the

7    Charlotte Street seep, and then some of the work at the

8    parking garage, correct?

9    A.  Yes.

10    Q.  Okay.  And it -- now, this IRA was written by SCE&G or its

11    consultants, correct?

12    A.  Yes, it was written by our consultants, again, to capture

13    the work and kind of tie up the loose ends for things that had

14    been completed on the excavation.

15    Q.  And then it says in the middle of the paragraph there, it

16    is important to note that the AOC was approved and implemented

17    prior to EPA issuing the ROD for OU-1, and it goes on to say

18    this was done by mutual agreement between the regulatory

19    agencies and SCE&G to facilitate the source removal excavation

20    activities prior to the construction of the parking garage and

21    other redevelopment activities.  Correct?

22    A.  Yes, sir.  The reason they wrote that is they're trying to

23    capture the AOC work in with this IRA to, you know, kind of

24    tie it together, too.  So you have this removal report picking

25    up that AOC work as well as this -- the work that was done to

THOMAS EFFINGER – CROSS-EXAMINATION

1  date for OU-1.

2  Q.  And there were two items in the AOC, the Charlotte Street

3  seep and the parking garage work.  And the Charlotte Street

4  seep, I mean, that was a true emergency, right?

5  A.  Yes, it was.

6  Q.  That, I think, you said maybe at your deposition, gave you

7  some sleepless nights and people were concerned about that

8  because it appeared suddenly, kind of without warning?

9  A.  I -- did it give me sleepless nights?  I don't know about

10  that, but it was something that came onto us all of a sudden.

11  We had to take immediate actions with boom deployment, long

12  stick excavator and the storm drainage work.  We had to put in

13  an oil-water separator arrangement to kind of manage anything

14  that might come down that pipe.  And install some wells to

15  make sure that it didn't recur.

16  Q.  And you said yesterday you had to jump out there.  I mean,

17  this was an environmental emergency, correct?

18  A.  It was something that needed quick attention, yes, sir.

19  Q.  Now, that's different than the work under the parking

20  garage, where the emergency there, if there was an emergency,

21  had to do with pressure from the City to get this garage built

22  and opened in time for the Aquarium, right?

23  A.  Well, the urgency there, in discussion with the agencies,

24  was let's go ahead and get the soil out before the garage

25  covers it, and it would no longer be accessible.

THOMAS EFFINGER – CROSS-EXAMINATION

1  Q.  Right.  And if the garage, for whatever reason, had not

2  been built for, say another five years, you could have

3  addressed this soil differently, right?

4  A.  There would have been less of a sense of urgency.

5  Q.  Right.

6  A.  Yeah.

7  Q.  And that was true throughout the site, right?  That was

8  true throughout the site?

9  A.  Not site-wide, I wouldn't say.  There was some pressure

10  from the State and EPA to manage this site and get it taken

11  care of.  They had known about it for awhile, I suppose, but

12  it really came to the forefront in the late 80s when the City

13  determined they were going to build their -- redevelop that

14  area.  But then there's always a desire by the agencies to get

15  it cleaned up sooner rather than later.

16     I would tend to think that the redevelopment helped us a

17  little bit, because it helped move things forward, it got

18  quicker agreement from the agencies on how to manage things.

19  It helped us all focus on the matter at hand, instead of

20  discussing all the what ifs.  What if when we implement this

21  and this contingency happens, how are we going to capture

22  that.  So --

23  Q.  As different areas were disturbed around the site by

24  construction, either yours or somebody else's, then you would

25  go out to see if there was evidence of tar or contamination,

THOMAS EFFINGER – CROSS-EXAMINATION

1   right?

2   A.  We took that as an opportunity to manage that soil

3   ourselves, rather than somebody else managing it and then

4   filing a claim against us for their --

5   Q.  Right.

6   A.  -- for their increased costs.

7   Q.  But until the soil was disturbed, in many cases through

8   construction, you didn't go out and examine that particular

9   soil.

10  A.  Well, the majority of the soil that we removed, we needed

11  to go out and get anyway.  If there were opportunities where

12  they were working in the street, which you normally would not

13  be allowed access to, then we would move that soil out.  But

14  that was a -- probably a much smaller fraction than what the

15  main component of the 63,000 tons were.

16  Q.  And the soil that was removed related to construction

17  activities, that was done more or less on the schedule of the

18  construction workers, not on SCE&G's schedule.

19  A.  The -- there was construction over at the Aquarium

20  property and over at the Park Service, and that soil that was

21  removed was done by those folks.  And you'll see some of that

22  in those back charges or those description of increased

23  environmental expenses from the City.

24      So their construction, you know, and their workers, yeah,

25  they managed that soil at their schedule.  But there was a

THOMAS EFFINGER – CROSS-EXAMINATION

1  couple reasons we worked off site.  We went over to that

2  Luden's areas first when we were digging below the saturated

3  zone.  And part of that was because of their schedule and

4  wanting to get things done before they had to get in there and

5  do their construction.  The other part was working our way

6  back from the Cooper River.  Because the real harmed receptor

7  might be the Cooper River from those groundwater contaminants

8  discharging to the Cooper River.  So it really made sense for

9  us to hit those areas first, to capture the areas closer to

10  the Cooper River and work our way back to the substation.

11  Q.  We talked about this a little bit at your deposition, do

12  you remember, and I'd like to play that clip.  It's page 183

13  line 18 through 184, 13.

14      (Video deposition testimony was played as follows:)

15  Q.  "So the question there is if the construction had not been

16  underway anyway --

17  A.  Um-hum.

18  Q.  -- is that soil that you would have gone in to excavate?

19  A.  That was not soil that they were requiring us to go in and

20  excavate, because it was underneath that road, but as you go

21  in and disturb it, now you have to take it out and clean it

22  up.

23  Q.  So at least until it was disturbed, it was okay with the

24  agencies to leave it there?

25  A.  They had not required to us do anything with it on the

THOMAS EFFINGER – CROSS–EXAMINATION

1    Charlotte Street until that time.  But that's the case with

2    everything that happens in that area.  As different areas get

3    disturbed, our folks go out there to see if there's evidence

4    of tar.  And if there is, then we directly manage it and we

5    make sure that those workers are protection.  So in a sense,

6    it's part of the construction worker health and safety plan

7    that we're required to do that."

8        (Videotape stopped.)

9    BY MR. BARGREN:

10   Q.  Now, that talks in particular about the Charlotte Street

11   work, I think, that involved the tunneling of this cable

12   across the river, doesn't it?

13   A.  Yes, sir.

14   Q.  Yeah.  But there, the soil that was removed wasn't

15   hazardous, right?

16   A.  There was some contaminated soil in that area.  Are you

17   asking me if it's hazardous waste or -- what its constituents

18   were.

19   Q.  Let's go to page -- Exhibit 7, which is the IRA, and it's

20   page 30, SCANA 90382.  And should be Section 8.4.1.  Bates 82.

21   And that disposal section there.  This relates to phase eight,

22   right, because it's chapter eight.  Do you remember that?

23   Take time to look at the report, if you care to.

24   A.  This is out of the IRA?  Is that what you're talking

25   about?

THOMAS EFFINGER – CROSS-EXAMINATION

1  Q.  Yes.  The document page is 30, I believe?  Thirty-seven.

2  A.  Page 30.

3  Q.  Thirty-seven.

4  A.  Thirty-seven.  I'm sorry, which document are you in again?

5  Q.  It's the IRA, page 37.

6  A.  Page 37.

7  Q.  I'm sorry, it is page 30.  Page 37 of the exhibit, page 30

8  of the document.

9  A.  Okay.  I've got it now.  Thank you.

10  Q.  And that relates to the phase eight work, which was taking

11  soil that was excavated as part of this underground cable

12  tunneling process, right?

13          THE COURT:  What are you getting at?

14          MR. BARGREN:  One sentence here.

15          THE COURT:  I mean really, I don't understand where

16  you're going.  This is pretty clear.  I know what that means.

17          MR. BARGREN:  It says nonhazardous soil was removed

18  there.  Says in the document.

19          THE COURT:  Well, you used the word hazardous.  He

20  said he didn't know what you meant when you said hazardous.

21          MR. BARGREN:  I'm sorry if I did.

22  BY MR. BARGREN:

23  Q.  The document says that this was nonhazardous soil was

24  removed and transported, right?

25          THE COURT:  What's the importance of that?

THOMAS EFFINGER – CROSS-EXAMINATION

1          MR. BARGREN:  Nonhazardous isn't CERCLA waste.

2          THE COURT:  Okay.

3    A.   There was impacted material there, especially where we did

4    the -- there was a manhole for them to pull the cable through,

5    and I know there was tar in that area, so this may be a

6    misstatement where they were referring to it as either

7    hazardous or nonhazardous waste.  At the MGP site there is

8    a -- federal laws don't require it to be treated as hazardous

9    waste, unless it has underlying constituents which exceed

10   certain numbers.  So even if it has tar in it, it would not

11   necessarily be hazardous waste, if it comes from an MGP site,

12   because the courts have vacated TCLP testing.  So I think what

13   he's saying here is this is nonhazardous waste soil.  We

14   wouldn't send it to Pergo, unless it had tar in it and needed

15   to be thermally treated to remove tar.

16          THE COURT:  Where is Pergo?

17   A.   Pergo is in Virginia.

18          THE COURT:  You didn't give the name earlier.  That's

19   the second place it went to?

20   A.   First it was in Summerville with Banks Construction, and

21   when they shut down we started taking it to Pergo, yes, sir.

22          THE COURT:  How would you determine that something

23   did have -- Would you test it before you took it to Pergo?

24   A.   Well, it typically is pretty easy.  If it has the tar

25   there, you can smell it, but it's got -- it's thick and gooey

THOMAS EFFINGER – CROSS–EXAMINATION

1    sometimes, but normally you get that odor.  And the odor

2    coming off of it is from the naphthalene and the benzene, it

3    will smell like creosote.

4           THE COURT:  When you take something out of the ground

5    and it doesn't have any evidence of tar in it, what would you

6    do with that soil?

7    A.  Then we would send it to the Oakridge landfill that is

8    mentioned here, and it's taken there and it's put in a

9    Subtitle D landfill, so it's not hazardous waste, but you

10   still manage it at something on the order, you know, 20, $25 a

11   ton.  So it's much cheaper to do that.

12          THE COURT:  Okay.  Go ahead.

13   BY MR. BARGREN:

14   Q.  Let's go back to Plaintiff's Exhibit 4 again.  And the

15   page I'd like you to turn to is 0032.  And here is one of the

16   places that talks about something you mentioned a couple of

17   times, worker safety as being part of the remedy.  Correct?

18   A.  Worker safety is an important component and needs to be

19   followed at the site, yes, sir.

20   Q.  Right.  And this paragraph here that says the evaluation

21   of commercial workers, the second sentence of that actually

22   says, as evidenced in table one, risks under the construction

23   worker and long-term worker scenarios were largely driven by

24   incidental ingestion and/or dermal contact with surface and

25   subsurface soils.  Dermal contact means getting it on your

THOMAS EFFINGER - CROSS-EXAMINATION

1   skin, right?

2   A.  Yes, sir.

3   Q.  And you had precautions in place for workers and safety

4   programs and a health and safety plan and all of those things,

5   right?

6   A.  Yes, sir.

7   Q.  So let's look at a couple of pictures from Plaintiff's

8   Exhibit 35, which might take just a second to get up here.

9   And while that's coming up, I mean, you mentioned worker

10  safety a number of times and it's in the documents, right?

11  A.  Yes, sir.

12  Q.  Okay.

13          MR. BARGREN:  Let's take a look at the first picture

14  that we pulled out, Andrew.

15  Q.  The top right picture there, you described this yesterday.

16  I mean, these are workers wading in a superfund site, aren't

17  they?

18  A.  These are workers applying an armoring cap to a sand

19  blanket that is on top of contaminated sediments, yes, sir.

20  Q.  Yeah, I don't see safety equipment there.

21  A.  Well, they're not in a position to be in contact with

22  contaminated sediments.

23  Q.  They just waded right in?

24  A.  Yes, sir.

25  Q.  Okay.  By the way, they're putting down armor lock, is

THOMAS EFFINGER – CROSS-EXAMINATION

1  that right?

2  A.   They're putting down armor lock.  And here I think they're

3  putting down the oyster bags, increasing the -- that oyster

4  habitat that we were requested to do.

5  Q.   That armor lock, just to digress, the armor lock was not

6  required by the EPA, correct?

7  A.   The armor lock is required by our approved work plan, and

8  that was approved by EPA.

9  Q.   Okay.

10  A.   The reason it was required is that the commenting agencies

11  have an opportunity to not only direct EPA on what they can

12  approve, but they also have the ability to interact with the

13  Corps of Engineers in issues that deal with working in the

14  Cooper River.

15       MR. BARGREN:  Let's go to the next picture that we

16  pulled up.  Let's take the next page.  The top picture there,

17  actually get the title as well, Andrew.

18  Q.   This is phase two, this is one of the phases that's

19  described in the work papers and report paper, right?

20  A.   Yes, sir.

21  Q.   Okay.  This is part of the construction of the garage?

22  A.   The parking garage, yes, sir.

23  Q.   And that's contaminated soil these guys are in dermal

24  contact there with, right?

25  A.   No, this should have been after we removed the soil, that

THOMAS EFFINGER – CROSS-EXAMINATION

1   6000 yards that was mentioned, so -- so we should have gotten

2   the surface soil out before they're actually installing the

3   auger piles.

4   Q.  That wasn't one of the whole issues with these auger

5   piles, the reason it's claimed as part of the remediation,

6   because that augering soil had to be monitored?

7   A.  I don't -- I don't know about that right offhand, Paul.

8   Q.  Okay.  And let's take a look at one more picture.  The

9   bottom picture there, this is parking garage, and there are

10  your workers, right?  Or your contractor's workers.

11  A.  Yeah, the contractor's.

12  Q.  I don't see Tybek suits there, I don't see dermal

13  protection, do you?

14  A.  There was no -- to my knowledge, there was no need for it

15  there.  But I'd have to know exactly what area of the parking

16  garage you're dealing with.  Some of the areas had

17  contamination and some did not.  Our folks -- you would --

18  they're not in this picture, but they would be out there doing

19  air monitoring and checking to see if any of the soil that was

20  uncovered would have that black stained creosote or tar in it.

21  And so where you don't observe that, you're not at any more

22  risk than when you put gasoline in your car.  You know,

23  benzene is a component of gasoline that you put into your car,

24  and you're not as concerned about that getting on your hand.

25  So if they're not in contact with the tar soil, then we

THOMAS EFFINGER - CROSS-EXAMINATION

1  wouldn't normally require them to put on Tybek suits.

2  Q.  Okay.  Let's just talk a little bit about this site

3  overall then.  You said yesterday that gas making operations

4  at this site started in 1855, right?

5  A.  That's what I understand from the record.  I don't have

6  firsthand knowledge.

7  Q.  I understand.  But we can expect, at least based on your

8  understanding, you would expect that there was some tar in the

9  ground in 1855, right?  Maybe.

10  A.  I don't know the answer to that.

11  Q.  The plant continued to operate until 1957, right?

12  A.  Yes, sir.

13  Q.  Okay.  And then as early as the 1970s when the substation

14  was put in, SCE&G saw some tar at the site, right?

15  A.  Yes, there was some tar observed at the site.

16  Q.  So at least by then, and certainly probably earlier, when

17  SCE&G was operating the plant up through 1955, SCE&G saw some

18  tar at the site, right?

19  A.  Well, even in 1978 as they observed that tar, they were

20  unsure what to do with it.  And at the time, they contacted

21  the State agency, DHEC, and I believe there's even a letter,

22  we may have given you, that showed where DHEC said yeah, go

23  ahead and build your substation there.  So they really weren't

24  sure how to manage it then back in '78, manufactured gas

25  plants were just coming out into the environmental world as

THOMAS EFFINGER – CROSS-EXAMINATION

1   being a significant issue that folks needed to take care of.

2   Q.  But even during the process of building the substation,

3   you drilled some holes down through that went down to the

4   intermediate groundwater and formed a pathway for tar down to

5   the groundwater, right?

6   A.  That's what's been speculated, along with the fact that

7   there were other structures like the gas holder itself, you

8   know, setting down 30 feet, so it went through the clay layer.

9   But they did speculate that in building the substation, it may

10  have opened up a pathway.

11  Q.  And then problems were identified starting in about -- in

12  the 1980s with the Ansonborough Park, Ansonborough Homes

13  project issues, right?

14  A.  I believe that all started in the late 80s.

15  Q.  Then the investigations began, and the AOC came out in

16  1993, the remedial investigation followed in 1996; this was a

17  long process, wasn't it?

18  A.  Yes, sir, it was a long process, and still is.

19  Q.  And then the remedy was put into place and work began,

20  SCE&G began work in 1998.  And as you say, it continues today.

21  A.  Yes.  SCE&G began cleanup of this site in '98, and work

22  continues today.

23  Q.  And we've talked about the emergency at the Charlotte

24  Street seep area.

25  A.  The Charlotte Street seep was something that needed

THOMAS EFFINGER - CROSS-EXAMINATION

1    immediate attention, yes.

2    Q.  But the rest, it's a long-term process, it's a long-term

3    remedy.

4    A.  It was never intended to be on the front end.  As a matter

5    of fact, EPA was trying to implement a superfund accelerated

6    cleanup model.  I don't know if SACUM is even talked about

7    much these days, but the idea was to, you know, get the

8    cleanup going so that this area could be redeveloped.  It was

9    part of an initiative that was pervasive at the regulatory

10   areas to turn properties that had been contaminated, back into

11   productive use.  As a matter of fact, this site actually

12   received a Phoenix award, which is a Brownfield award for

13   revitalizing this whole area and doing the cleanup.  So it was

14   a -- to EPA and to the State, it was a model of success.

15   Q.  I understand that, but it was also understood from the

16   beginning that this would be a long-term project with

17   long-term monitoring.  You knew from the start when you became

18   involved that it would be decades, right?

19   A.  Well, we had a strong suspicion, yes, sir.

20   Q.  Okay.  And, in fact, we talked -- there was talk yesterday

21   about this technical impracticability waiver which would end

22   the project earlier, actually, right?

23   A.  Well, what it would do, what it would alleviate those

24   drinking water cleanup standards, at least from our electric

25   substation where there's no potential use, and we'll continue

THOMAS EFFINGER - CROSS-EXAMINATION

1    to own and control that property, but there would be no

2    ability for anyone to go install drinking water wells.

3    Q.  No, but I mean if you're granted a TI waiver, then you can

4    effectively, shorthand, say, stop work earlier than if you had

5    to go on and go for the MCLs.

6    A.  Even with a TI waiver, you don't walk away from the site.

7    You'll still be doing monitoring and we still have ongoing

8    obligations.  And even with OU-2, the -- or with the

9    intermediate groundwater, the letter from the State says that

10   we need to go back and do work on Ports Authority when they

11   get off.

12       So the agencies reserve the right to make us do additional

13   work to achieve those three objectives.  But what the TI

14   waiver would do is it would relieve us, it would give us some

15   relief on the drinking water standards for groundwater

16   underneath the electric substation.

17   Q.  My point is that when this work started and when the ROD

18   was issued in 1998, it reflected the TI waiver, and at that

19   time SCE&G knew that this would be a long process to try to

20   work toward a TI waiver, right?

21   A.  Yes, sir, we know it's a long process.

22   Q.  And none of the work that's been done so far --

23           MR. BARGREN:  Your Honor, I think I'll finish up

24   about 11:30, if that's okay.

25           THE COURT:  Okay.

THOMAS EFFINGER – CROSS-EXAMINATION

1    BY MR. BARGREN:

2    Q.  None of the work that's been done so far is wasted, right?

3    That SCE&G has done.  It you consider it all to be in

4    compliance with the ROD one or ROD two?

5    A.  I believe all the work that we have done has been helpful

6    towards cleaning up this site.

7    Q.  Is it in compliance with the RODs?

8    A.  I believe it's generally in compliance with the RODs.

9    Q.  Consistent with the RODs.

10   A.  Excuse me?

11   Q.  Consistent with the RODs?

12   A.  I believe it's consistent with the RODs, yes, sir.

13   Q.  And the work that was done, it goes both ways.  The work

14   that was done consistent with ROD one is also consistent with

15   ROD two, correct?

16           MR. FELMLY:  I'll object to the form of that

17   question, Your Honor.

18           THE COURT:  What's wrong with it?

19           MR. FELMLY:  It hadn't even existed at the time.

20           THE COURT:  Say what?

21           MR. FELMLY:  Pardon?  The work that he's describing

22   as consistent with it is with respect to a document that

23   didn't even exist and hadn't even created any of the

24   objectives yet.

25           THE COURT:  I'm not sure I follow you.  His question

THOMAS EFFINGER – CROSS-EXAMINATION

1    was, it was consistent with ROD one and ROD two.

2            MR. FELMLY:  Right.  And what I'm saying is work that

3    was done inconsistent with ROD one, and was undertaken at that

4    time back in 1998.  To try and argue that it's consistent with

5    a document that is going to be based on further studies,

6    investigations, and hasn't even been developed, I think, is an

7    improper question.

8            THE COURT:  I'll let him answer it.  Go ahead, sir.

9    If you can answer it.

10   A.  Okay.

11   BY MR. BARGREN:

12   Q.  I'll say as you sit here today looking back.  I'll

13   rephrase the question.

14   A.  Okay.

15   Q.  As you sit here today looking back at the work that was

16   done consistent with ROD one, that's been consistent with ROD

17   two, as well, right?

18   A.  Let me just answer it this way.  I believe both RODs have

19   the same objectives, and they deal with different media.  So

20   they're both aimed at removing that source material to the

21   maximum extent practicable, containment of the nonrestorable

22   source areas, and then restoration of the aqueous phase plume.

23       Sediments is a little bit different issue, because there

24   we ended up capping it.

25       So those three objectives are mentioned in both RODs, but

THOMAS EFFINGER - CROSS-EXAMINATION

1    it really discusses two different sets of media and talks

2    about different technology.  So that's the best way I know to

3    answer that question.  I'm sorry, Paul.

4    Q.  The -- Sorry, I lost my train of thought.

5        Some of the work you just described in describing through

6    your testimony, deals with this phased approach.  And the

7    phased approach was identified in the first ROD and continued

8    in the second ROD, right?

9    A.  Yes, sir.

10   Q.  So SCE&G knew from the time of the first ROD that this

11   would be a phased approach.

12   A.  We knew that we would be dealing with media in phases, and

13   seeing how they responded.  And then be asked to try different

14   things or go after different specific areas of the site.

15       We did see the site expand, you know, and we didn't expect

16   to be that far upgradient of the site when we started looking

17   at intermediate groundwater.  So in that phased approach it

18   had us look at additional areas and look at additional

19   accedences.

20   Q.  You learned in the mid 1990s by looking at some drawings

21   and maps and things, that a company called UGI, in your view,

22   might have some relationship to this site.  Right?

23   A.  I don't know that I learned that in the mid 90s, I think

24   it was much later on that I recognized that there was some UGI

25   involvement at this site.

THOMAS EFFINGER – CROSS–EXAMINATION

1   Q.  You told me at your deposition, I believe, that you had

2   looked at this large map and you said it said copied from UGI

3   or UGI equipment or something like that?

4   A.  We had some old maps that referenced various pieces of

5   equipment.  And I had noticed that at least for some of those

6   pieces of equipment, like a super heater and carburetor and

7   all of that, it referenced UGI, and I did not know what it

8   meant in the mid 90s.  So it wasn't until much later when it

9   was brought to my attention that UGI was a company that owned

10  and operated your site, that was the first that I realized

11  that there was somebody else that had operated the Charleston

12  MGP site.

13  Q.  When did that come to your attention?

14  A.  I don't remember the exact year, Paul.

15  Q.  Was it before the ROD?

16  A.  No, it was not before the ROD, it was after OU-2.

17  Q.  So UGI was never involved in the public input phase or the

18  community input phase of the ROD?

19  A.  Not to my knowledge, UGI was never involved in the

20  community participation.

21  Q.  They were never asked because nobody knew to ask them at

22  that point.

23  A.  Nobody knew to ask them, that's correct.

24          MR. BARGREN:  If I could have just a minute, Your

25  Honor.

THOMAS EFFINGER – CROSS-EXAMINATION

1          THE COURT:  Sure.

2          MR. BARGREN:  That's all I have on cross.  Subject

3    to, I guess, reserving any rights if Mr. Effinger is called

4    back later to talk about financial information.

5          THE COURT:  Say what now?

6          MR. BARGREN:  If Mr. Effinger is called back later to

7    talk about financial information and so on, I obviously would

8    reserve the right --

9          THE COURT:  I'm not going to let him call him back

10   and not let you ask him some questions.

11         MR. BARGREN:  Thanks very much.

12         THE COURT:  Let's take about 15 minutes.

13      (A recess was held at this time.)

14         THE COURT:  You know, you walk into the courtroom

15   when you've got a jury trial, and everybody is standing up,

16   and of course you come up here and sit down, and when you sit

17   down you realize they're not standing up for you, they're

18   standing up for the jury, because they keep standing.  So I

19   wondered why y'all were standing, and I realized that I'm the

20   jury.

21      Go ahead; redirect?

22                      REDIRECT EXAMINATION

23   BY MR. FELMLY:

24   Q.  Mr. Effinger, a few things that I want to talk with you

25   about.  Mr. Bargren was asking you about work plans and a

THOMAS EFFINGER – REDIRECT EXAMINATION

1    letter that Mr. Bowick had sent to Attorney Partlow asking

2    about a particular work plan and seemingly asking to get it or

3    get it more quickly.  Can you just explain to us, based on the

4    many years you've had on this site, the extent to which your

5    company has been compliant or not compliant in terms of

6    providing work plans to the EPA on the things you're going to

7    be doing on that site?

8    A.   Overall, our working relationship has been extremely

9    positive.  I think on the front end though there was a lot of

10   anxiety about what the City wanted to do, and just about how

11   to deal with manufactured gas plants in general.  So there was

12   a lot of uncertainty.  There was a lot of very vigorous

13   discussion about what would be the appropriate technology and

14   how to allow the City development to move forward.  But

15   overall, with EPA and even with -- even with their attorney,

16   Kevin Bowick, I think they've been very complimentary of the

17   work that SCE&G has done.  I didn't recall that specific

18   incident where he was referring to some wells.

19   Q.   Now, there was some pictures shown of the individuals that

20   were helping to install this cap on the sediments down along

21   the river near the Aquarium, and the issue was whether they

22   were unprotected.  And I know you explained that.  But what I

23   wanted you to do is to explain to the Court how far were those

24   workers removed from physical actual dermal contact with

25   sediments, contaminated sediments, when they are putting that

THOMAS EFFINGER – REDIRECT EXAMINATION

1    material down on top of the sand blanket.

2    A.  Well, you have to understand with sediments, we're dealing

3    with very very small concentrations, because the concern is

4    harm to those benthic organisms.  So they have a much lower

5    threshold of impact.  And the -- in this area where they were

6    working, and pretty much all of that area that was capped,

7    there was already sand there, so the sand is already on top of

8    the sediments, and you've got two-foot of sand separating this

9    very very lightly contaminated sediments.  And then they put

10   down the armor lock, another eight inches of material with the

11   geotextile underneath it.  So they're far removed from that.

12   And there's no risk of harm as they stand in the Cooper River,

13   other than what naturally exists in the Cooper River.

14   Q.  So the river bottom, the original river bottom has some

15   level of tar sediment in it, or tar --

16   A.  No tar, but just contaminated sediments that the benzene,

17   the polyaromatic hydrocarbons, those kinds of things.  There

18   was no free-flowing tar like we see back on our site.

19   Q.  So there's the dissolved phase that's in the sediments,

20   and is that at a high concentration or a low concentration?

21   A.  Well, it's not dissolved phase, but there are contaminants

22   attached to the particles.  So it's a very low concentration

23   compared to what would be considered source material.

24   Q.  And then two feet of sand had been put down as a bed, and

25   the issue was how to stabilize or better secure that

THOMAS EFFINGER – REDIRECT EXAMINATION

1  situation?

2  A.  Yes, sir.

3  Q.  And they were standing on top of that two feet of sand and

4  putting down that armor lock that would hold the sand down

5  better?  Is that a fair description?

6  A.  That's correct.  But even in putting the block in, they

7  would stand on top of the sand blanket itself, which is not a

8  risk.

9      And they typically had the neoprene booties on, it would

10  be really kind of impractical for them to wear Tybek suits in

11  that kind of environment.

12  Q.  Were there other actions where remediation was done on the

13  site where workers were more in contact with tar or impacted

14  soils where special suits or special clothing was worn?

15  A.  Yes.  We always had our contractors out there doing the

16  air monitoring, which was the key importance issue, and even

17  the breathing, that's considered a form of ingestion,

18  inhalation.  But they also carried rubber gloves with them,

19  and if folks were working in contaminated soil, then they made

20  sure that they -- if they got it on them, number one, you get

21  it off, and then they would have those neoprene gloves, nitro

22  gloves, usually those blue ones that folks use.

23      So if they would do anything where they would physically

24  touch the soil, then that would need to be contained.

25      But even with wearing boots, if you were to get tar on

THOMAS EFFINGER – REDIRECT EXAMINATION

1   your boots it would be no worse than, you know, getting tar

2   on, you know, that Tybek.  As long as you managed that.  And

3   it didn't touch your skin.

4   Q.  So in terms of this overall issue of the extent to which

5   SCE&G worked to run a site that did take account of worker

6   safety and comply with the various requirements, what's your

7   testimony as to whether or not you believe you were compliant

8   or not?

9   A.  We believe we were compliant.  The health and safety plan

10  was something that we wrote, and we took a lot of –- a lot of

11  measures to make sure that it was adequately implemented.

12  Q.  Mr. Bargren started to ask you yesterday some questions

13  relating to the $26 million payment that was made to the City,

14  and your testimony to the PUC, and he referenced an exhibit

15  which -– Plaintiff's Exhibit 34, which as I understand it -–

16  well, you're going to tell me.  Plaintiff's Exhibit 34 is, as

17  I understand it, materials that the City of Charleston

18  provided you that included various numbers in their

19  calculation of what they had spent.  Is that right?

20  A.  What they were representing were their increased costs of

21  construction due to environmental issues.  And so even at the

22  parking garage where we had done some work, they also did some

23  of the work that had some environmental measures that needed

24  to be implemented.

25            MR. FELMLY:  So if we go over, Denise, to page two on

THOMAS EFFINGER - REDIRECT EXAMINATION

1    this exhibit, which is Bates number 18091, and if you could

2    rotate that.  And then if you could highlight it, rather, zoom

3    it up, if you would, please.

4    Q.  You were indicating in your testimony yesterday, sir, that

5    I think you said originally their numbers were something like

6    $40 million, and you had worked with them, and when you

7    testified to the PUC you had determined that you felt

8    30,000 --

9    A.  30 million.

10   Q.  -- 30 million, rather, was appropriate?

11   A.  Yeah.

12   Q.  Is this the figures that you were examining and looking at

13   from the City where they had broken down the, as they call it,

14   the cost increases due to SCE&G contamination?

15   A.  They gave me a whole stack of papers, so I looked through

16   it a lot.  This does look familiar, I'm not sure if it's

17   exactly the same one.

18   Q.  But in terms of numbers that we're looking at here, you

19   got these or SCE&G got these from the City?

20          MR. BARGREN:  Objection, foundation.

21          THE COURT:  Say what?

22          MR. BARGREN:  Objection, foundation.

23          THE COURT:  Well, I think he's already testified to

24   it, first of all.  I don't think it's proper on redirect.  I

25   mean, he said he got these documents, I recall telling you at

THOMAS EFFINGER - REDIRECT EXAMINATION

1   that time that someone from the City had to come in and

2   testify, you said they were coming, so we're just rehashing

3   old evidence, and that's not appropriate on redirect.

4        MR. FELMLY:  I just wanted -- actually I thought Mr.

5   Bargren had opened that further when he had cross-examined,

6   which is why I went back in.

7        THE COURT:  I don't think so.

8        MR. FELMLY:  All right.  So you want me to hold

9   offering to mark these at this time until the City comes in?

10       THE COURT:  That's what I thought we decided.  I

11  mean, there's no reason to introduce them now, at a time when

12  the foundation is pretty sparse, when we have a man coming in

13  apparently that's going to be able to build that foundation

14  up.

15       MR. FELMLY:  That's fine, Your Honor.

16  BY MR. FELMLY:

17  Q.  Just a couple of final things then.  With regard to the

18  information that you had and the goals and the directions that

19  you had from the EPA, after the first ROD, when you started

20  work in connection with OU-1 at the time in 1998 when that ROD

21  was indicated, did you have any information as to what the

22  plan would be for intermediate groundwater in 1998?

23  A.  No, sir, I think it's pretty clear in there that we did

24  not.  It was something else that needed additional study.  It

25  was one of those issues that was -- that there was some

THOMAS EFFINGER – REDIRECT EXAMINATION

1    vigorous discussion on between the agencies and with us.  And

2    so there was no clear direction on intermediate groundwater.

3    Q.  And as to the sediments, was that also in the category

4    where at that time after the first ROD, it was not indicated

5    to you what was going to be required?

6    A.  Yes, it's pretty much the same answer there, they knew

7    that more study was required.  They knew that they would have

8    to write a second ROD to determine an appropriate fix for

9    sediments in the Cooper River.

10   Q.  And one last thing.  In terms of this site and the cleanup

11   of this area, did SCE&G receive an award from the Southern Gas

12   Association for the cleanup of this site?

13   A.  Yeah, the Southern Gas Association --

14            THE COURT:  Let's don't go into something like that.

15            MR. FELMLY:  Pardon?

16            THE COURT:  That's not relevant.

17            MR. FELMLY:  Well, I thought it was relevant because

18   I thought they were suggesting that my client was noncompliant

19   with respect to objectives and noncompliant --

20            THE COURT:  The purpose is to convey a thought that

21   these people had.  That's hearsay.  That award constitutes an

22   assertion under Rule 801, and it's hearsay --

23            MR. FELMLY:  I withdraw it.

24            THE COURT:  -- first, and it might come under one of

25   the rules that prohibit character evidence.  I often wondered

THOMAS EFFINGER - REDIRECT EXAMINATION

1    just how far you can go with a witness in bringing out

2    character evidence, and I think this may fall within the

3    prohibited category.

4            MR. FELMLY:  I'm not looking to test that then so

5    I'll withdraw it.

6            THE COURT:  Okay.

7            MR. FELMLY:  Thank you, I have nothing further.

8            MR. BARGREN:  Nothing further.

9            THE COURT:  Thank you, sir, you're excused.

10        Call your next witness.

11           MR. FELMLY:  Your Honor, our next witness on behalf

12   of the plaintiff is Dr. Neil Shifrin, and I'd ask Dr. Shrifrin

13   to be called.

14           THE CLERK:  State your full name.

15   A.  Neil S. Shifrin.

16     NEIL SHIFRIN, a witness called by the plaintiff, first

17   having been duly sworn, testified as follows:

18                     DIRECT EXAMINATION

19   BY MR. FELMLY:

20   Q.  Good morning, Dr. Shifrin, could you please state your

21   full name and your professional address?

22   A.  Neil S. Shifrin, Gradient Corporation, 20 University Road,

23   Cambridge, Massachusetts.

24   Q.  And by whom are you employed?

25   A.  Gradient Corporation.

NEIL SHIFRIN – DIRECT EXAMINATION

1   Q.  And can you describe what your position at Gradient
2   Corporation is?
3   A.  I'm a principal of the firm, focusing on environmental
4   engineering.
5   Q.  And what is the business or the professional activities of
6   Gradient Corporation?
7   A.  Gradient specializes in chemicals in the environment,
8   particularly the fate and transport of chemicals in the
9   environment, their transformations in the environment, and the
10  risks to people and ecosystems of chemicals in the
11  environment.
12  Q.  About how large a company in terms of personnel employed
13  by Gradient is there?
14  A.  About 85 people.
15  Q.  And when and what year was Gradient formed?
16  A.  1985.
17  Q.  And did you play some role or were you involved at the
18  time of the foundation of Gradient?
19  A.  I founded the company with one other person.
20  Q.  And the types of engagements that Gradient Corporation is
21  involved in, what does that consist of?
22  A.  Really anything involving exposure to chemicals in the
23  environment, and how chemicals move from point A to point B.
24  Some examples of that would be superfund sites, dump sites,
25  disposal sites, MGP sites, factories.  Other examples would be

NEIL SHIFRIN – DIRECT EXAMINATION

1   air exposures where a factory has a smoke stack and there

2   might be air exposures.  Product safety, chemical exposures

3   due to use of everyday household products or consumer

4   products.

5       The types of cases that we work on are both purely

6   environmental cases where we design studies, data are

7   collected, we interpret the data, we perform risk assessments,

8   we model, mathematically model how chemicals are transported

9   in the environment.

10      We also work on litigation cases where there's a dispute

11  about whether there was an exposure, such as in toxic tort

12  cases.  And we also work on a number of projects related to

13  historical operations; what were the waste releases, when did

14  they occur, and who might have been responsible for them.

15  Q.  And in terms of the types of personnel or the skills or

16  the specialties of the personnel that Gradient has to work on

17  these problems, can you briefly describe to the Court what

18  types of technical abilities and scientific abilities these

19  folks have?

20  A.  We have a number of toxicologists and health risk

21  assessment people.  These are people who might have a degree

22  in public health or something like that.  We have a number of

23  environmental engineers and environmental scientists, and we

24  have a number of chemists.  That's pretty much the type of

25  people.

NEIL SHIFRIN – DIRECT EXAMINATION

1    Q.  In your own case, what are -- what is your professional

2    training and background, which area or specialties do you have

3    training in, and then we'll discuss that some with the Court.

4    A.  I'm an environmental engineer.

5    Q.  And what is your educational background and what

6    educational degrees have you obtained in that regard?

7    A.  I have a bachelor of science in chemical engineering from

8    the University of Pennsylvania, and a Ph.D. in environmental

9    and civil engineering from MIT.

10   Q.  And in terms of your role with the company, what functions

11   or what types of activities do you personally have involvement

12   in on behalf of Gradient's clients or the people that hire

13   Gradient?

14   A.  My practice area ranges from basic environmental

15   engineering, meaning being hired to evaluate chemical

16   contamination and its sources and how it's transported, its

17   fate in the environment.  I also work on cases involving what

18   I call cost recovery, which might be insurance claims or PRP

19   disputes, potentially responsible party disputes within

20   superfund sites about costs, who shares the costs.  And that's

21   an area that often is called cost allocation.

22   Q.  Do you have any licenses or formal certifications in terms

23   of your areas of specialty?

24   A.  I have a -- in Massachusetts, the hazardous waste program

25   is privatized and voluntary.  And by privatization, what's

NEIL SHIFRIN – DIRECT EXAMINATION

1    meant is that some engineers are licensed to perform the

2    duties of the state in Massachusetts in terms of defining what

3    needs to be studied and what needs to be remediated.  And I

4    have one of those, called a Licensed Site Professional.

5    Q.  And in terms of your engineering experience, are you a --

6    are you an engineer?

7    A.  I'm an engineer.  I actually passed the eight-hour exam

8    for professional engineer license, but never took the oral

9    exam, because instead I went to graduate school and got my

10   Ph.D.

11   Q.  So in terms of your Ph.D., that is in environmental civil

12   engineering?

13   A.  The Ph.D. is in environmental engineering, and the

14   bachelor's degree is in chemical engineering.

15   Q.  Can you summarize for the Court -- actually, one other

16   thing.

17        MR. FELMLY:  Denise, if you could bring up Exhibit 36

18   just so we can identify this exhibit for the Court.

19   Q.  You have provided and we have marked as an exhibit, Dr.

20   Shrifrin, your curriculum vitae in this matter, is that right,

21   which is a rather detailed description and goes on for a

22   number of pages.  But this is the cover sheet of it, and is

23   this C.V. reasonably up to date and provide a summary of your

24   professional background and experience?

25   A.  I believe so, yes.

NEIL SHIFRIN – DIRECT EXAMINATION

1          MR. FELMLY:  Your Honor, we'd ask that the C.V. be

2     marked as a full exhibit.

3          THE COURT:  Any objection?

4          MR. VARON:  No objection.

5          THE COURT:  Okay.

6       (Plaintiff's Exhibit 36 received.)

7     BY MR. FELMLY:

8     Q.  What I'd like to do now, Dr. Shrifin, is have you

9     describe in summary fashion for the Court the environmental

10    experience that you have had since your training and founding

11    the company, and in particular, with regard to matters that

12    would bear on pollution and contamination that may have

13    relevance to this case.

14       What was the areas where you got started in this area of

15    environmental science and the engineering aspects of it?

16    A.  I have worked in -- as an environmental engineer for

17    almost 40 years now.  I think it's 38 years, since 1971 when I

18    graduated from college.  I started in the area of water

19    quality, and after graduate school I -- which was 1980, when I

20    graduated with my doctorate.  I almost immediately started

21    working on Love Canal, which was one of the first hazardous

22    waste sites in the United States that was dealt with under

23    CERCLA, which was just then passed.  I think CERCLA was passed

24    in December of 1979.  I worked for about ten years on Love

25    Canal and three other landfills associated with the same

NEIL SHIFRIN – DIRECT EXAMINATION

1    company in Niagara Falls, where we literally blazed the trail

2    in terms of inventing, developing how to study hazardous waste

3    sites and how to remediate hazardous waste sites.

4         Since then, and during that time in parallel I've probably

5    worked on a couple of hundred hazardous waste sites throughout

6    the United States; a couple in other countries as well.

7    Focusing primarily on how to study sites, how to interpret the

8    data, how to develop what we call a site conceptual model,

9    which is a matter of describing where the contamination is,

10   what its sources are, where it's going, how it's getting

11   there, how fast it's getting there, the timing of the

12   contamination and all of those kinds of things.  Sort of

13   getting to the psyche of the site in order to be in a position

14   to develop a remedy concept for the site.

15   Q.  For how long a period of time have you been involved as a

16   scientist and as an engineer in connection with studying and

17   working with what we've been referring to in this case as NAPL

18   or DNAPL?

19   A.  NAPL was one of the first things I worked on when I got

20   out of graduate school in 1981.  I actually performed some of

21   the initial experiments that later became the basic

22   understanding of NAPL migration.  So I've been working on NAPL

23   since probably 1981.

24   Q.  And in addition to NAPL, if you can just give the Court a

25   brief understanding of the other types of contaminants or the

NEIL SHIFRIN – DIRECT EXAMINATION

1    other major types of contaminants that you've worked with in

2    dealing with various industries or manufacturing operations?

3    A.  I've really worked with almost every kind of contaminant

4    that you can imagine.  If you break it down into the way EPA

5    breaks down chemical analysis of environmental samples, there

6    are volatile contaminants, there are semi-volatile

7    contaminants, those are organic chemicals such as benzene

8    would be a volatile contaminant, and polyaromatic hydrocarbons

9    would be a semi-volatile organic contaminant.

10        There are trace metals; I've worked with numerous

11   different trace metals.  And there are pesticides and special

12   chemicals, I'd call them, such as PCBs, dioxins, and some what

13   we call very highly bioaccumulative compounds.

14   Q.  And in all this work that you've worked on over the years,

15   to what extent have you had to interact with the various

16   agencies that regulate environmental matters, such as the EPA

17   or the state agencies in the various jurisdictions where

18   you've worked?

19   A.  I've worked with federal agencies and state agencies very

20   closely within the hazardous waste field since 1980.  Really

21   on both sides.  I was a consultant to the Justice Department

22   and the U.S. EPA, both headquarters in region two for the

23   Niagara Falls sites, Love Canal.  And after that and during

24   that I worked for various industries where we had to interact

25   with the agencies to get studies approved and work plans

NEIL SHIFRIN - DIRECT EXAMINATION

1  approved and remedy concepts approved.

2  Q.  Have you had experience, Dr. Shrifrin, in connection with

3  working on the environmental risks and the circumstances of

4  manufactured gas plants?

5  A.  Yes.  I've worked on about 130 MGPs.

6  Q.  Over what period of years has that body of work taken

7  place?

8  A.  I've worked on MGPs probably for about 20 years.

9      MR. FELMLY:  And, Denise, if you could bring up

10 Exhibit 74.

11 Q.  Have you prepared -- just under the issue of

12 qualifications, the -- a chart that shows the number of areas

13 of the country where you have worked on MGPs?

14 A.  Yes.

15 Q.  And if you could go to that.  What I'm showing on the

16 monitor here, just to get a sense as to, you know, the over --

17 I guess the breadth of your work in that area, does this

18 description showing your MGP experience identify the regions

19 and areas where you have had sites, and the approximate number

20 of sites that you've worked on in those places?

21 A.  Yes, I've worked at MGPs literally everywhere in the

22 country.

23      MR. FELMLY:  Your Honor, this is actually a portion

24 of another sort of composite exhibit.  As to this page I would

25 ask that the exhibit be marked as a full exhibit for the

NEIL SHIFRIN - DIRECT EXAMINATION

1   benefit of the Court, and we would submark it as 74(4) or (5)

2   or A or B.

3           THE COURT:  Any objection?

4           MR. VARON:  I don't have any objection to the page,

5   Your Honor; I might have objection to other parts of the

6   exhibit.  I'd have to look through.

7           MR. FELMLY:  As to this document you have no

8   objection?

9           MR. VARON:  No.

10          THE COURT:  This is the only one you're offering?

11          MR. FELMLY:  There are others that will be coming

12  along.

13          THE COURT:  Right now?

14          MR. FELMLY:  Right now.

15          THE COURT:  No objection to this?

16          MR. VARON:  Correct, Your Honor.

17          THE COURT:  Okay.

18     (Plaintiff's Exhibit 74-A received.)

19          MR. FELMLY:  Just on that, Your Honor, if I, may,

20  what I'm going to do is avoid the issue we had this morning,

21  is to pick areas where I think there is no objection and to

22  try to avoid the issues that we raised, and I'll be doing --

23  we'll catch up on the numbering.

24  BY MR. FELMLY:

25  Q.  In terms of the well over 100 sites that you've worked on,

NEIL SHIFRIN − DIRECT EXAMINATION

1    what types of roles or what types of tasks and

2    responsibilities, Dr. Shrifrin, have you had with regard to

3    those sites?

4    A.   I've had purely environmental roles, meaning I've helped

5    design studies and remedies, oversaw the risk assessments.

6    And then I have worked on insurance claims where utilities are

7    suing their insurance companies to reclaim their costs under

8    their general comprehensive liability policies.  And I've

9    worked on cost allocations where responsible parties have a

10   dispute about whether or how to share the costs of the studies

11   and cleanup.

12   Q.   And in terms of the areas where you actually were involved

13   in the cleanup or the remediation, as opposed to providing

14   consulting to people in an insurance dispute or some other

15   legal dispute, what types of roles have you played that dealt

16   with actual remediation of these sites?

17   A.   What types of roles?

18   Q.   Yes.

19   A.   I have designed studies where to put the soil borings and

20   the wells and what to sample for, what to look for, how many

21   to put in.  I have developed remedy concepts.  I and Gradient

22   don't actually perform remediation, so when I say remedy

23   concepts, I've developed how a site should be remediated, in

24   other words, a cap or a soil excavation and where the soil

25   should be excavated and things like that, but not actually the

NEIL SHIFRIN – DIRECT EXAMINATION

1    nuts and bolts design of how one would actually go and do

2    that.

3         I have overseen and designed the risk assessments for

4    sites.  That's pretty much soup to nuts, except for digging

5    the dirt.

6    Q.  In connection with your work as a consultant with regard

7    to the legal side of these cases, both on the insurance side

8    or cost recovery, have you had occasion to serve as an expert

9    and provide testimony in these cases in various court

10   proceedings?

11   A.  Yes.

12   Q.  And also in deposition?

13   A.  Right.

14   Q.  And have you provided both in your report and have we got

15   a listing of the cases where you have provided testimony in

16   connection with matters involving MGPs?

17   A.  Yes.

18        MR. FELMLY:  And, Denise, if you could bring up or

19   click further into this Exhibit 74 to that, keep going past

20   that and just --

21   Q.  What is now appearing on the monitor, is that a listing of

22   MGP or cases related to MGP where you have given either

23   deposition or court testimony?

24   A.  Yeah, I can't be absolutely certain that it's complete.  I

25   may have missed some, but this is pretty much complete.

NEIL SHIFRIN – DIRECT EXAMINATION

1    Q.  And as a consequence of that, it would appear that you've

2    given testimony in New Hampshire and in Massachusetts, Maine

3    and New York, is that correct?

4    A.  Right.

5        MR. FELMLY:  We would offer this summary chart as a

6    further subexhibit; we'll mark it as a portion of Exhibit 74.

7        MR. VARON:  No objection to the sheet, Your Honor.

8        THE COURT:  Without objection.

9      (Plaintiff's Exhibit 74-B received.)

10   BY MR. FELMLY:

11   Q.  What I'd like to do, Dr. Shrifrin, now, is ask you about

12   your exposure or prior dealings in connection with the

13   defendant in this case, UGI, and investigations you've made on

14   that.  Can you explain to the Court what work or research you

15   have done with regard to UGI, which is the defendant in this

16   case, and as we know, was a company involved with manufactured

17   gas plants.

18   A.  My initial experience with UGI started with my experience

19   with manufactured gas plants.  I've read probably over 1500

20   technical papers, historical papers about manufactured gas,

21   gas manufacturing, the various angles of that.  And through

22   all that research, which has occurred over maybe ten or 15

23   years, I came across UGI and UGI's activities often.

24       My first focus study of UGI was on the -- at the

25   Manchester Gas case in Manchester, New Hampshire, where then

NEIL SHIFRIN – DIRECT EXAMINATION

1    current owner was suing UGI as a responsible party to

2    participate in the costs of the response.

3        At that point I dove in pretty head first in terms of

4    reviewing UGI's background, their equipment, reading UGI's own

5    histories, their descriptions of themselves, their board of

6    directors' minutes and things like that.  And studied UGI very

7    intensively for that engagement.

8        Since then I have --

9    Q.  Before you move on from that, in that case did you

10   actually provide testimony in court in that trial?

11   A.  Yes, I did.

12   Q.  And since that case what other involvement have you had

13   where you've had forensic or legal cases where you have

14   provided opinions regarding UGI's role?

15   A.  Since that case, and in addition to this case, I've worked

16   on another case in Connecticut involving 13 manufactured gas

17   plants throughout the state, where UGI had various roles in

18   ownership positions.

19       I also peripherally worked on a case in St. Augustine,

20   Florida, where UGI had an ownership period.

21   Q.  What in the St. Augustine, Florida case, what was the

22   engagement or the role that you were involved in, what purpose

23   were you providing information for the benefit of the Court?

24   A.  Although I didn't perform it, the purpose was for cost

25   allocation between UGI and other -- among all the parties,

NEIL SHIFRIN – DIRECT EXAMINATION

1   actually.  What I was asked to do was to come up with a

2   reasonable basis for an allocation of just for time periods.

3   Q.  In terms of studying UGI and its role with respect to

4   MGPs, and in particular the role that it had or didn't have

5   with respect to controlling the operating activities of MGPs,

6   how has your experience or your training, in your view,

7   brought to bear or what is it about your training and

8   experience that you think is helpful in that application?

9   A.  Well, first I think you need to be an engineer to

10  understand the engineering aspects of plant like a

11  manufactured gas plant.  Because it really is a complex

12  chemical plant.  It's -- it might look simple on a map or a

13  Sanborn map or something like that, but it's -- it's both an

14  art and a science and an engineering element to it that's very

15  complex.  So having an engineering background allows me to

16  read about MGPs in the technical literature and understand

17  what the issues are for both gas making and by-product

18  management.

19      In addition to that, having a background in the

20  manufactured gas industry allows me to both understand the

21  nature of the Charleston plant in relation to the industry in

22  general, as well as the relationship of UGI to this plant.  I

23  don't think without an understanding of the manufactured gas

24  industry, one could understand properly UGI's role at this

25  plant and the operations at this plant.

NEIL SHIFRIN – DIRECT EXAMINATION

1   Q.  Well, what do you mean by that?  What is it about UGI and

2   its historic role with respect to that industry or those

3   plants that would be important in putting that in context, if

4   we were to go back to look at a period from, say 1910 to '26

5   that's involved here?

6   A.  I think you have to have a background on how a plant like

7   this operates, how the industry operated, to understand

8   whether or not UGI operated this plant.

9   Q.  And what was it about UGI's role or its position in that

10  industry that is important in that examination that you're

11  making?

12  A.  UGI had absolute understanding of gas making.  They were a

13  leader in the field, they were pervasive in the field.  They

14  held major patents for equipment, they had a construction

15  first division, then a construction company that built gas

16  plants.  Their people within their -- their executive

17  organization understood the gas business totally.  They had

18  departments and were organized such that they were able to

19  understand all elements of gas making, residuals management,

20  residuals generation, gas generation, raw materials

21  purchasing.

22       And they had a training program where they staffed plants

23  throughout the United States, their cadet program, where not

24  only did they staff plants -- people -- plants with people,

25  and not only did they bring people up in their careers by

NEIL SHIFRIN – DIRECT EXAMINATION

1   transferring them throughout plants, but they actually

2   participated in university programs that actually trained the

3   engineers in engineering school to then graduate and come into

4   the UGI program.

5       So their ability to run a plant was absolute and

6   pervasive.  They understood plants totally.

7   Q.  When you say they held patents, are you familiar in your

8   study and understanding, do you -- are you familiar with the

9   process which UGI acquired a patent interest in?

10  A.  The very founding of UGI in, I think it was 1882, was

11  around Lowe's invention of his version of the carbureted water

12  gas process, which is referred to still today as the Lowe

13  process.  That's L-O-W-E.

14      And I believe Lowe was one of the founders of UGI.  UGI, I

15  don't know the details of it, but UGI became the owner of

16  the -- of Lowe's patent for the carbureted water gas process,

17  and then proceeded to install several hundred carbureted water

18  gas site sets throughout the country.

19  Q.  And we'll get into what carbureted water gas is later in

20  your examination, but this was a new way of making gas?

21  A.  Yes.  Versions of it had been around for probably about

22  ten years earlier, but prior to this, gas was made by

23  pyrolizing coal, which means to heat coal at a very high temp

24  in the absence of oxygen, so it doesn't burn, and instead of

25  burning, it vaporizes and makes gas.

NEIL SHIFRIN – DIRECT EXAMINATION

1    And the carbureted water gas process diverged from that by

2  heating coke and spraying steam on it, and then spraying

3  petroleum on that to make a slightly different form of gas.

4  Q.  And again, not going into all of the details, but what was

5  the advantage of the -- in terms of the quality of the gas or

6  what it did when the consumer used it, what was the

7  achievement that came from the new process?

8  A.  There were really two advantages to the new process.

9  First, it could be started up and shut down very quickly.  And

10  so it was very useful in terms of supplementing coal gas

11  operations.

12    A coal retort, on the other hand, really should never be

13  shut down, because it would crack and break.  So once you

14  start up a coal gas retort, it -- basically you run it until

15  it's time to replace it.  Whereas a carbureted water gas

16  process you could really shut down and start up over maybe a

17  24, 48-hour period.  So that was a real advance and a very big

18  advantage in terms of peak loading and being able to add more

19  gas during the day when people were using it and during the

20  winter when people needed it more.

21    The other advantage of carbureted water gas was it had a

22  higher candlepower.  Initially in the manufactured gas

23  industry, lighting was a very big portion of gas sales.  After

24  the electric light became popular around 1905, 1910, it was

25  more gas was used for heat.  But initially gas was used

NEIL SHIFRIN – DIRECT EXAMINATION

1    primarily for light.  So candlepower was very important.

2        And carbureted water gas had slightly higher candlepower

3    in general than coal gas, and so it was preferred for

4    lighting.

5    Q.  Now, as a result of the work you had on these prior UGI

6    cases, can you describe for the Court the extent to which

7    you've become familiar with the UGI history and the structure

8    and the documents, what have you learned by reason before you

9    really even opened the first --

10            THE COURT:  Yes, sir?

11            MR. VARON:  Your Honor, I guess I have an objection

12   to -- I think Mr. Felmly is trying to qualify Mr. Shifrin as

13   an expert in UGI, because he has read corporate minutes,

14   looked at corporate records in the past, served as an expert

15   witness.  And I don't think that's a proper foundation for him

16   testifying about UGI's business methods and the way it

17   supposedly ran itself.  He's read some things, he's not versed

18   as a -- as somebody who has studied history, he's not a

19   corporate governance guy, he doesn't study parent-sub

20   relationships, doesn't know anything about human relations and

21   employees, so I think I object.

22            MR. FELMLY:  May I be heard?

23            THE COURT:  We discussed this testimony before, and I

24   view it a little differently in a nonjury case than I would in

25   a jury case.  If we had a jury sitting over there I would have

NEIL SHIFRIN – DIRECT EXAMINATION

1    certainly had a Daubert hearing, probably had the witness

2    testify at that hearing so I could hear his testimony and make

3    a ruling that I thought was appropriate under Daubert and

4    cases that followed it.  Nonjury I treat it a little

5    differently.

6        I have serious reservations about his qualifications.  If

7    he had an LLB degree or an MBA, then I think he'd be closer to

8    being in the area where he needs to evaluate this evidence

9    that he has.

10       He says that being a chemical engineer is important in

11   understanding the gas business.  I don't deny him that.  But

12   that's an entirely different thing, it seems to me, from

13   understanding and explaining and giving meaning to the

14   business operations of UGI.

15       But let me hear him, and I really don't think that -- not

16   only do I not think his qualifications are broad enough, that

17   deals with reliability under Kumho Tire and those cases.

18       I'm of the initial impression that his testimony is not

19   relevant under those cases, because it has to qualify under

20   Rule 702 as something that will assist the trier of fact.  And

21   it's fundamental that to assist the trier of fact, he has to

22   be in a better position to interpret these documents than the

23   trier of fact, and I do not concede that position to him yet.

24   But I'm going to hear his testimony.  I may rush it up a

25   little bit and not let it drag out for two or three days, but

277

NEIL SHIFRIN – DIRECT EXAMINATION

1    I want to hear it, but I hear it with the reservations that

2    I've expressed, and I hear it under the rule that the Fourth

3    Circuit has, I think, adopted in order to give us an

4    opportunity in nonjury cases to hear most of the evidence, and

5    then to make a ruling based thereon, make a ruling based on

6    what appropriately comes before the Court.

7            MR. VARON:  Understood.

8            THE COURT:  I think the reason for that ruling is not

9    only to give us a little bit of an advantage, but they don't

10   normally give us an advantage, so I don't think that's the

11   real basis of it.  The real basis is because of the scope of

12   their review in a nonjury case, they want to see all the

13   evidence themselves.  They basically want to retry the case.

14   And I think that's why the rule exists.  But be that as it

15   may, it's there, and I'm going to take advantage of it.  So

16   your objection is noted.  We can argue it again and probably

17   will argue it again and again and again, but I've stated my

18   reservations, now we'll hear it and see where we go.

19           MR. VARON:  Understood, Your Honor.  I'm going to

20   have a few other objections.

21           THE COURT:  You can object any time you want to.

22           MR. VARON:  I'll state them briefly and we can go on.

23   Thank you.

24           THE COURT:  I didn't call on you to argue, because I

25   really don't think it's necessary.  We discussed it, I've been

NEIL SHIFRIN - DIRECT EXAMINATION

1    into it enough to think I know what the plaintiff's position

2    is and what I think the defendant's position is.  But if you'd

3    like to state anything for the record, I'd be happy to let you

4    do it.

5            MR. FELMLY:  I don't need to do it now, Your Honor.

6    My approach will be to develop the evidence and hopefully set

7    it forth in a way that it is helpful for you.

8            THE COURT:  And it's a moving target.  I haven't made

9    up my mind.

10           MR. FELMLY:  I will say this.  I'm not trying to

11   qualify Dr. Shrifrin to make either legal decisions for you

12   or -- certainly not that, nor business decisions, but to focus

13   on the issue in Bestfoods of the operational day-to-day work

14   of the plant, how it works, and how UGI impacted and that's

15   going to be my focus.

16           THE COURT:  Let's see where it goes.

17           MR. FELMLY:  Thank you, Your Honor.

18   BY MR. FELMLY:

19   Q.  Let me move right to that, Dr. Shrifrin.  In terms of the

20   engagement or the job, if you will, that you were asked to

21   undertake in this case, can you describe for the Court the way

22   in which your background and expertise has been developed or

23   is being applied, and what it is that you are providing

24   information and opinions on.  What is the work and the

25   questions that you are examining?

NEIL SHIFRIN – DIRECT EXAMINATION

1   A.   I'm examining the plant operations in very distinctly not

2   the business element of the relationship between UGI and the

3   Charleston plant, but specifically the operational elements

4   between those two parties.

5        To do that, my methodology really had two steps.  First, I

6   elaborated the history of the plant itself, when the plant

7   existed, what it made, its production volume, its by-products,

8   its equipment, and how that evolved from time.

9        Now, this plant operated for a little over 100 years, so

10  it had -- has a tremendous history in that area.

11       As part of that historical element of the plant, I also

12  identified and elaborated the -- who operated the plant, more

13  so than the owners, although I'm aware of the ownership of the

14  plant.  Who operated the plant, how the plant was operated,

15  how the plant's operations were corrected through that period

16  of time.

17       That's the first part of my methodology.  And the outcome

18  of that is answering the question, which pieces of equipment

19  and which types of operations were related to which party

20  during the hundred so odd years of operations.

21       Putting that aside, then the second thing that I did in

22  this case was evaluate the environmental contamination.  The

23  tar contamination, the soil contamination, the groundwater

24  contamination, and related that contamination to the

25  operations of the plant.  And more specifically, to the

NEIL SHIFRIN – DIRECT EXAMINATION

1    specific equipment in the plant, such as the tar tanks, the

2    gas holders, generator house, the retort house, the tar

3    loading station and things like that.

4        Then creating the relationship between the type of

5    contamination and the location of the contamination, while

6    recognizing that some of this contamination can migrate, so

7    where we see it today might not be where it was a hundred

8    years ago.

9        I then related that contamination to the equipment, and

10   then brought the prior piece together and related the

11   contamination to the operations and to the parties who

12   operated the equipment.

13   Q.  And in terms of performing that inquiry, what is the types

14   of information and the data that you utilized in order to make

15   that assessment and to make those linkages or those

16   connections you've described?

17   A.  For the first part of the method, the elaboration of the

18   plant history, I evaluated a number of records that were local

19   to the plant, such as the CCR&L directors' minutes, accounting

20   ledgers, old Sanborn maps.  Mr. Effinger mentioned what those

21   were yesterday.  The Sanborn Fire Insurance Company mapped

22   literally the United States from the late 1800s to maybe even

23   currently, I don't know, but maybe every ten years they would

24   go back and visit the same site.  And so we've been able to

25   put together a number of Sanborn maps that indicate at that

NEIL SHIFRIN – DIRECT EXAMINATION

1    point in time what this plant looked like, such as in 1880 and

2    1905 and a few years beyond that.

3        We have engineering drawings where engineers drew

4    footprints of the plant, all the equipment, all the piping.

5    We have company histories.  There are company histories of the

6    Charleston plant, there are company histories of UGI.  I think

7    I mentioned accounting ledgers.  Newspaper, contemporaneous

8    newspaper articles.  And also MGP literature.  There were

9    several journals published at the time.  There was the

10   American Gas Association, a number of other trade associations

11   that had information about the plants, even this plant, but

12   other plants, of course.  All of that material was my source

13   material to cobble together the history of the plant.

14   Q.  And in terms of UGI's role or what UGI was doing at any

15   particular time or the role that it played on a particular

16   plant operation, to what extent were you able to glean or

17   identify that information in that body of data that you've

18   just described for the Court?

19   A.  There's quite a bit of information in the UGI material,

20   such as the UGI board minutes, the board maintained minutes

21   for its executive committee, its operations committee, its

22   management committee, its operations and management committee.

23   These were various board committees that existed through

24   various points in time within the period of time that UGI

25   owned the Charleston plant.

NEIL SHIFRIN - DIRECT EXAMINATION

1      And in those minutes are reflected very specific,

2   unbelievably specific detail in terms of operational control.

3   Such as authorizing staff transfers, authorizing budgets,

4   authorizing -- and I'm talking about not accounting budgets,

5   but I'm talking about budgets to buy equipment, to install

6   equipment and to run operations.

7          THE COURT:  Yes, sir.

8          MR. VARON:  Your Honor, just to preserve my

9   objection, another basis on which we object to

10  Mr. Shifrin's -- Dr. Shrifrin's testimony, and this is set out

11  in the Daubert motion, is that he appears to be using a

12  concept called operational control.  I don't think it's

13  defined anywhere, I don't think it's accepted anywhere, and I

14  think it is essentially a definition that he has made up to

15  include what he would like.  I think in all the cases I've

16  seen, it's mentioned once in passing without having been

17  defined.  Bestfoods has a standard of managing and conducting

18  disposal of waste.  This case is about different standard of

19  operational control that has no meaning.  So we have a -- I

20  guess a continuing objection to testimony that would say this

21  is operational control or that is operational control, both on

22  relevancy, foundation, reliability and improper expert

23  testimony, everything.  Thank you.

24          MR. FELMLY:  Do I need to respond to that, Your

25  Honor?  Or I can do it --

NEIL SHIFRIN - DIRECT EXAMINATION

1    THE COURT:  Well, the witness has talked in plain

2  English.  I mean, he hasn't used any technical terms that I

3  don't understand, I mean, he's just saying what he's found in

4  these minutes and all.

5    MR. FELMLY:  I'm going to move on then.

6  BY MR. FELMLY:

7  Q.  You understand, Dr. --

8    THE COURT:  I assume he's going to express an opinion

9  based upon that information.  You know, it's gotten to be

10  fashionable in presenting expert testimony to follow Rule 705,

11  and have witnesses express opinions before they give you the

12  data and facts upon which they rely.  But that rule also

13  provides that if the Court requires, then you have to give the

14  data up front.  I think in this particular case it would be

15  very helpful to me, and I think it would let us kind of sort

16  this thing out, and I say sort it out because there's such a

17  volume of documentation here, that it's going to be almost

18  impossible for me to do it by myself.  And if it's practicable

19  for him to express an opinion, and then to state the data and

20  information upon which he bases that opinion, he may be

21  talking about corporate control or whatever terminology he

22  used, but I'd like to know what he's talking about, and I'd

23  like to know what he relies on to do that.

24    And seems to me that kind of makes it easier for me.  And

25  one of the toughest jobs I ever learned as a trial lawyer was

NEIL SHIFRIN - DIRECT EXAMINATION

1    taking an expert's opinion and digesting it and put it down on

2    the level to where I could feed it to a jury.  And that's a

3    very difficult thing, in particular in a case as complicated

4    as this, and it seems like that framework that I've outlined

5    might do that for me.  But you try your case the way you want

6    to.

7            MR. FELMLY:  No, I will try to do that.  I will tell

8    you the next page says, can you give us a summary of your

9    opinions, and I'm going to take that page aside and hold it

10   and we'll do it more in the way I was doing it when I started.

11           THE COURT:  No, I'd like to hear his opinions, then

12   I'd like to hear what he bases them on.

13           MR. FELMLY:  What I was going to say is --

14           THE COURT:  If that doesn't disrupt --

15           MR. FELMLY:  Doesn't disrupt it, but I want you to

16   understand, Your Honor, what -- I mean, I have an outline that

17   will take us some time, and I will move through it as quickly.

18   But I think that in light of what you've said, and there's so

19   many different areas he's going to speak on, I think I will

20   develop the opinions and then present the detailed evidence as

21   I go along, rather than to give you an overview now.  He could

22   do that and give a sort of a preface to it as to where it's

23   going to go, but I'll do it more traditionally.

24           THE COURT:  Okay.

25   BY MR. FELMLY:

NEIL SHIFRIN – DIRECT EXAMINATION

1   Q.  What I want to be clear on and make sure though, Dr.

2   Shrifrin, when you talk about looking at board of directors'

3   minutes or various corporate documents of the company, of UGI

4   or of the subsidiary here, to what extent are you examining

5   matters that relate to how the manufactured gas plant is

6   operated and run on a day-to-day basis, as opposed to things

7   of a more general business nature, because frankly we're not

8   calling you as a business witness.

9   A.  That's right, it's the former.  I'm looking at the

10  minutes, the board minutes not in terms of business control.

11  And all I meant by this term, operational control or

12  engineering control, is not business control.  That's all I

13  meant by that term.  I didn't mean to coin a term, I didn't

14  mean to refer to an existing set of academic understanding.

15  All I meant was that my discussion is not business control.

16  So when I'm looking at board minutes, I'm looking for evidence

17  of operational control of issues that relate to the actual

18  operations of the plant, not an owner being an owner.

19      In other words, an analogy might be you can be an investor

20  in a race horse and know nothing about horses, and you can't

21  train that horse.  But if you understand horses and happen to

22  be an investor, you could actually participate in the training

23  of that horse.

24      That's what I'm talking about, is the training of the

25  horse.  The actual plant operations.  And I didn't mean to

NEIL SHIFRIN – DIRECT EXAMINATION

1    coin a term, and I'm not trying to coin a term, I just mean
2    not business.
3    Q.  Let me ask it this way.  In language that UGI has cited
4    and in language that Bestfoods does talk about, although
5    operations are mentioned in Bestfoods, issues of management,
6    direction or control of the actual processes that are related
7    to the pollutions discussed, is that a focus or the focus of
8    your work?
9    A.  That's right.  And actually that phrase in Bestfoods says
10   manage, direct or conduct operations related to the leakage or
11   disposal of pollution.
12   Q.  Is that the area that you're talking about?
13   A.  That's the area I'm talking about.
14   Q.  All right.  Let's start talking about the Charleston MGP,
15   and we'll develop the opinions as we go forward.
16        First of all, with respect to your area of inquiry and
17   trying to understand the way in which UGI's role in the plant,
18   from your perspective, is important --
19             MR. FELMLY:  Let's first of all, Denise, if you could
20   bring up the aerial photo of the plant so we can get the
21   description back up in front of us and understand what we're
22   exactly talking about.  And I'm particularly talking about the
23   ROD site photo.  That's a portion of Exhibit 78, and this has
24   been used previously yet with Mr. Effinger.
25   Q.  First of all, in terms of this aerial photo on which

NEIL SHIFRIN – DIRECT EXAMINATION

1    information has been superimposed, can you describe, Dr.

2    Shrifrin, what the relevance of this is in terms of coming to

3    an understanding of the site, particularly as it related to

4    UGI's operations?

5    A.  From an environmental standpoint first, the dark green and

6    the crosshatched green is the way the ROD defines the site.

7    So everything that you see outlined here down to here and

8    around here, that's the EPA's definition of this superfund

9    site.  So anything within this is either a source area or an

10   impact area, and any party that owns or operates anything

11   within this area is potentially liable under CERCLA.

12   Q.  In terms of which portion of that was actually the area

13   where the MGP work --

14   A.  The MGP was basically in this area here.  Now, currently

15   the electrical substation, and formerly mostly the MGP, there

16   was a steam plant that UGI built here that supplied steam to

17   the carbureted water gas process and other elements over here,

18   but basically the MGP was in this area here.

19   Q.  And in terms of the areas that are broader than that, how

20   have they been affected, or what's the general mechanism of

21   what happened in terms of the contamination, so that we end up

22   with an area larger than the original MGP site?

23   A.  The MGP had many pieces of equipment, such as tanks and

24   manufacturing areas and everything.  And it leaked tar through

25   a very long period of time.  The tar migrated as well as the

NEIL SHIFRIN – DIRECT EXAMINATION

1    tar contaminating the groundwater.  The tar migrated down into

2    this area, and in this area, and over to here to some extent.

3        In addition, the tar created groundwater contamination

4    which moved both in this area to the Calhoun Street drain

5    which discharged to the river, as well as to the river

6    directly.  I can draw an arrow there.

7        Then of course there's soil contamination as well.  So the

8    main problems from the MGP were tar contamination being a

9    source in itself, being a contaminant in itself, a -- really a

10   mixture of different chemicals, and then that being a source

11   to create groundwater contamination as well as soil

12   contamination, which is -- think of it as dirty soil that

13   doesn't quite have tar in it, but for various reasons became

14   contaminated.

15          MR. FELMLY:  If we get to -- can you go, Denise, to

16   the historic picture that you had up there.

17       These -- there are three photos we saw earlier.  Are you

18   familiar with these photographs that -- this photograph that

19   I'm displaying here?

20   A.  Yes.  I think Mr. Effinger showed these yesterday and said

21   these were taken in 1911, which is a year after UGI built

22   the -- rebuilt the plant.

23   Q.  And in terms of the labels on them, is that labeling that

24   you've placed on it based on your familiarity with

25   manufactured gas plants?

NEIL SHIFRIN – DIRECT EXAMINATION

1  A.  Yes.

2  Q.  And in terms of orienting the Court to the major

3  structures that are on an MGP, and their functions, can you

4  describe for us what some of these major portions that you've

5  labeled are, and generally how they are a part of the MGP

6  daily operation process?

7  A.  From 1910 onward, with a couple of exceptions, gas was

8  made in this building here called the generator house.  That

9  gas then went initially to the -- sorry -- to the relief

10  holder, which is this item here.  And then to a series of

11  processes which I will explain later, to purify the gas.  And

12  ultimately stored in this unit here, which is the -- what's

13  called the City holder or the gas holder, the main gas holder.

14  From there, gas was distributed to the City of Charleston.

15  Q.  And in terms of the area in the foreground, the coal shed

16  and the coke shed, they served the purpose of what, storing

17  the fuel?

18  A.  The fuel -- carbureted water gas was made from coke and

19  from oil.  And so the coke shed stored the primary fuel for

20  the generation of gas, and the oil tank, for example, stored

21  the secondary fuel for the generation of gas.

22      Coal, on the other hand, was used in coal gas

23  manufacturing.  And when the retort house was in operation,

24  that would be the main fuel raw material for the coal gas

25  manufacture.

NEIL SHIFRIN – DIRECT EXAMINATION

1    Q.   There's a reference to tar tanks in this photograph.

2    What, in the context of an operating manufactured gas plant do

3    the tar tanks, what purpose do they serve?

4    A.   You can't make gas without making tar.  Tar is an

5    intrinsic by-product of the gas manufacturing process.  And

6    was actually a very valuable commodity, even though it might

7    be viewed as waste in some cases, the value of tar through

8    early history, particularly was more valuable than coal.  So

9    gas plants typically went to great lengths to recover the tar

10   that was the by-product of gas manufacture.  And in any

11   manufactured gas plant you'll see tanks all over the plant

12   where they're storing the tar before they either distill it

13   themselves into products, or sell it to a distiller.  And you

14   often take it off by railroad train.

15   Q.   In this photograph in 1911 or thereabouts, are you able to

16   determine whether the plant has been rebuilt after UGI has

17   come on the scene in 1910?

18   A.   Yeah, but -- yes.  This is definitely after UGI, because

19   the generator house is present, which is something that UGI

20   built.  And the relief holder and the tar tanks are present.

21   All those are pieces of equipment that UGI built.

22   Q.   Now, what happened in terms of the construction or the

23   changes physically in the plant in 1910?  What was done with

24   the old plant, and at least in general terms, what was done in

25   terms of createing a new plant?

NEIL SHIFRIN – DIRECT EXAMINATION

1   A.   Parts of the old plant were demolished, and the new plant,

2   consisting of the generator house, the relief holder, the

3   tanks and some condensers and other pieces of equipment were

4   built by UGI in 1910.  And I believe started up in November of

5   1910 as a carbureted water gas plant.

6        MR. VARON:  Your Honor, again I beg your pardon, I

7   just want to make it clear that, you know, the assertion that

8   UGI built the plant is something that we contest.  I think

9   it's not necessarily an engineering issue, it's an issue of

10  corporate function.  There was a subsidiary here that built

11  the plant, UGI financed it, UGI owned the company that built

12  it, but we take exception with that and I just want to let you

13  know where we are on this.  I assume I'll have a full

14  opportunity to cross on this.  But these are the kinds of

15  questions I have concerns about, because this requires no

16  engineering expertise to determine who built the plant; it's a

17  matter of corporate responsibility.  Thank you.

18       MR. FELMLY:  Your Honor, I'm not going to respond to

19  all that, but just from the point of view of objections, and

20  however you want to do it, but it seems to me that if

21  Mr. Varon is going to make speaking argumentative objections

22  as we go through at every point, I mean, I can go back and

23  start getting the exhibit that will respond to him.  But it

24  does seem to me that it's not proper objection format for him

25  to punctuate the evidence.  If he has an objection to the

NEIL SHIFRIN − DIRECT EXAMINATION

1    evidence, he ought to make it, you can rule, but I don't -- I

2    mean, I could give him a rhetoric and we could go back and

3    forth.  I don't want to do that particularly.

4         THE COURT:  I didn't follow him 100 percent with his

5    objection, but it seemed to me that the vast majority, if not

6    everything he objected to, can be covered by

7    cross-examination.

8         MR. FELMLY:  That would be my point.

9         THE COURT:  Yes, sir.

10        MR. VARON:  That's fine, Your Honor.

11   BY MR. FELMLY:

12   Q.  What I'd like to do now is to --

13        THE COURT:  But, that being said, I alluded to

14   Rule 705, and of course I'm not sure that this is an opinion

15   that this witness has expressed.  But it seems to me he is

16   expressing an opinion that UGI built these various facilities.

17   And I think that the defendant, if they made this objection,

18   they could make an objection requiring or asking the Court to

19   require that the witness state the data and facts upon which

20   he bases that opinion.  And if they made that request, I would

21   make him do it.  And so it seems to me I can interpret the

22   objection as that and require you to show what facts and data,

23   under Rule 705, he relies in expressing that opinion.

24        MR. FELMLY:  And this box with these various

25   stickies, which I'm -- in this planned direct examination

NEIL SHIFRIN – DIRECT EXAMINATION

1    which will, you know, discuss these points, would go through

2    and put in the various statements that were made, the minutes,

3    the things that indicated that in 1910 when UGI came to town,

4    it was involved in the rebuilding of the plant, installing the

5    Lowe process.  If he's saying they hired --

6            THE COURT:  That's not what he said.  He didn't say

7    they were involved in it, he said they built it.

8            MR. FELMLY:  And we believe they built it.  We

9    believe they designed it, they built it.  Mr. Waring, who was

10   brought in from Omaha, we can debate whether Mr. Waring was --

11           THE COURT:  Let's just ask the witness what he bases

12   that upon.

13   BY MR. FELMLY:

14   Q.  You made the statement that the UGI company was the

15   company that rebuilt the plant in 1910.  What's the basis or

16   the factors that go into that opinion, Dr. Shrifrin?

17   A.  There's a number of bases.  First, UGI's express strategy,

18   by their own words, was that their strategy to install

19   carbureted water gas plants throughout the United States was

20   to first buy the company and then get the company to build

21   these plants.

22       But there's a layer deeper than that, and that layer is

23   reflected in the minutes of the UGI board, where the UGI

24   board, it's very clear the executive committee, that UGI

25   transferred George Waring from the Omaha plant, where he was

NEIL SHIFRIN – DIRECT EXAMINATION

1    working for UGI in the Omaha plant, transferred Waring to

2    Charleston in order to build this plant.

3                THE COURT:  Is he a native of Charleston?

4    A.  He was not a native of Charleston.

5                THE COURT:  That's a very prominent name in

6    Charleston, Waring.

7    A.  Is it?  But the newspaper in the Charleston newspaper at

8    the time, were very clear saying George Waring's coming to

9    town and UGI brought him to town and he's designing the plant.

10   And Waring is quoted as saying in the newspaper, we have

11   infinite resources to rebuild this plant.  Waring was a UGI

12   employee.  He was transferred by UGI.  There's UGI minutes,

13   board minutes that reflect that, that he was transferred

14   there.

15        The fact that he became a local employee doesn't matter,

16   because he was placed there by UGI, UGI's minutes reflect

17   that.  He was in charge of designing the plant and building

18   the plant.  And later, when he left in 1917, there are UGI

19   Circle monthly newsletters, there are newspaper articles that

20   reflect Waring as a UGI employee.

21        I think it's irrelevant or it's superficial that he was

22   actually a CCR&L employee, because that's how the parent dealt

23   with the subsidiary and their employees.

24        There's other evidence.  If it was just one person, I

25   would say that might be an exception and you can't really base

NEIL SHIFRIN - DIRECT EXAMINATION

1    it on that.  But there's a string of people, there's like

2    dozens of people where this same thing occurred.

3        For example, Waring --

4            THE COURT:  Working for UGI when he was transferred?

5    You said he came from Milwaukee?

6    A.  From Omaha.

7            THE COURT:  Was he working for UGI there?

8    A.  Yes.

9            THE COURT:  Not with the subsidiary, but directly

10    working for them.

11    A.  I believe so.

12            THE COURT:  It's 1:00 o'clock, let's break for lunch,

13    and we'll start back at 2:00 o'clock.

14        (A recess was held at this time.)

15            THE COURT:  All right, sir.

16    BY MR. FELMLY:

17    Q.  Dr. Shrifrin, just before we broke for lunch we were

18    discussing the circumstances in 1910 when Mr. Waring came to

19    be the general manager of the gas plant in Charleston.  And I

20    believe you had indicated that he had come from Omaha,

21    Nebraska, is that right?

22    A.  Right.

23    Q.  With regard to Mr. Waring --

24            MR. FELMLY:  Your Honor, we have a composite exhibit

25    of personnel records that include a great deal of information

NEIL SHIFRIN – DIRECT EXAMINATION

1    on Mr. Waring and other people here.  I have taken out of it

2    the portion that is the summary prepared by the counsel and

3    witness to which the stipulation related, and all of these

4    documents here have been part of the historic record and the

5    composite put together on personnel.  And at this point there

6    were no objections to any of those underlying documents.  I'd

7    move the admission of Exhibit 160.

8        MR. VARON:  Let me just take a quick look.  If you're

9    taking out the summary sheet and the underlying documents.

10       MR. FELMLY:  All of the underlying documents, there

11   the only thing I took out was the abstract as to which the

12   stipulation related.  So all of the underlying documents are

13   as you originally indicated you had no objection.

14       MR. VARON:  That's fine, Your Honor, no objection.

15       THE COURT:  All right.

16      (Plaintiff's Exhibit 160 received.)

17       MR. FELMLY:  Now, as to Exhibit 160, Denise, are you

18   able to bring up Bates number 7107.  And if you could

19   highlight the center paragraph, please.  First of all, I guess

20   do the top of the page, please, first, Denise, so we can

21   orient the Court to what the document is.  These are the

22   executive committee minutes of the United Gas Improvement

23   Company in July of 1910, which is a time proximate to the

24   coming of UGI to Charleston.  Now if you'd go down to the

25   middle paragraph that you were discussing.  That I was

NEIL SHIFRIN – DIRECT EXAMINATION

1    discussing.

2    Q.  This references obviously Mr. Waring, G.H. Waring, being

3    transferred from Omaha effective July 1, and that's the word

4    they use, to Charleston.

5        And you were familiar with this, Dr. Shrifrin?

6    A.  Right, yes.

7    Q.  Was your understanding that Mr. Waring had previously been

8    at that UGI facility or company in Omaha?

9    A.  Yes.

10        MR. FELMLY:  If you could bring up now from this same

11    exhibit, Bates 7421.  And at the bottom of the page please

12    highlight the section at the bottom.  Again, let's do the

13    minutes at the top.  I apologize for that, Your Honor.

14    BY MR. FELMLY:

15    Q.  These are minutes of the United Gas Improvement Company

16    executive committee, these are November of 1910, several

17    months later.  Now go to the bottom, please.

18        This relates to Mr. Waring's moving his family from Omaha,

19    does it, and the reimbursement of expenses?

20    A.  Yes, the UGI committee is approving the moving expenses

21    for the transfer of Waring to Charleston.

22    Q.  Let me ask you to -- as to Mr. Waring and the other

23    documents regarding him in this Exhibit 160.

24        MR. FELMLY:  Denise, if you could bring up exhibit

25    Bates 0936.  All right.  And at the top of the page if we can

NEIL SHIFRIN – DIRECT EXAMINATION

1    identify what this is.  This is an October 13th, 1917 article

2    in the American Gas Engineering Journal, and there's a segment

3    in there regarding personal notes on Mr. Waring that's in the

4    left column.  If you could come down and highlight that, it's

5    in the center of the left column, if you remove the section at

6    the top and move down.

7        In this publication in the industry it describes that he

8    has been the past seven years general manager for Charleston.

9    It indicates Mr. Waring was sent to Charleston by the United

10   Gas Improvement Company from Omaha, where he was the head of a

11   large gas plant.  It goes on to say he's been connected with

12   public service companies.

13   Q.  Mr. Waring became the general manager in Charleston for

14   the subsidiary company, CCR&L?

15   A.  Right.

16   Q.  And in that year of 1910, was there discussion in the

17   community and in the public press related to the fact that the

18   gas plant was going to be built?

19   A.  Yes, there were several newspaper articles in Charleston

20   at that time to that effect.

21   Q.  And with regard to that, was Mr. Waring the spokesperson

22   that was discussing what was occurring in Charleston?

23   A.  Several of the articles, if I recall, did quote Mr. Waring

24   about the construction of the new plant.

25        MR. FELMLY:  Your Honor, similarly, Exhibit 157 is a

NEIL SHIFRIN – DIRECT EXAMINATION

1   composite exhibit of historic information related to

2   equipment, design, installation, minutes or historic records,

3   excerpts from newspaper articles and the like.  I have removed

4   it from the summary sheet that was prepared, and as I

5   understood it previously, counsel had -- as we exchanged that,

6   had no objection to the underlying documents, as I understood

7   it.

8       I will offer this compilation of historic documents as a

9   full exhibit at this time, Exhibit 157.

10          MR. VARON:  So this is just a collection of historic

11  documents.

12          MR. FELMLY:  It's the same historic collection that

13  you exchanged and have seen, and except I've just taken out

14  the summary sheet or the abstract that we prepared to provide

15  an index.

16          MR. VARON:  No objection.

17          THE COURT:  Mr. Felmly, with the exhibit in that

18  condition, it's almost impossible for us to handle it.  I mean

19  it's got to be stapled, if it's coming in as one exhibit it's

20  got to be hooked together.  Otherwise the chance of losing a

21  page here or there is so great that we can't maintain the

22  integrity of the document.

23          MR. FELMLY:  Okay.

24          THE COURT:  So what I normally require when you have

25  a number of pages in a document is that they be stapled

NEIL SHIFRIN - DIRECT EXAMINATION

1    together.

2         MR. FELMLY:  Would you prefer a loose-leaf notebook

3    as opposed to stapling them?  There are different sizes and

4    shapes and some of them are small print.  I'll do it any way

5    you like, Your Honor, we can easily accomplish it.

6         THE COURT:  Well, obviously loose-leaf notebook is

7    easier for us to look at, but it takes up more room.  But

8    either one, I don't want you to go to the expense of that, I

9    know there are different sizes, but that doesn't make any

10   difference, they've all got a top left-hand corner, and if we

11   can line those up and put a staple through it, I think it will

12   serve the purpose.

13        MR. FELMLY:  I'm confident we can put it together so

14   they won't get lost.

15        THE COURT:  Let's just do that.  As I said, we're

16   going to break a little early today, and maybe y'all can look

17   at that and the clerk can assist you in assembling it and we

18   can determine first thing in the morning that there's no

19   objection to the exhibit in that form.

20        MR. FELMLY:  My understanding, you have no objection

21   to the substance of the exhibit.

22        THE COURT:  He said he has no objection.

23        MR. VARON:  No objection to the substance.

24        MR. FELMLY:  That's fine, Your Honor, I will do that.

25     Denise, you would bring up from Exhibit 157, Bates 1908.

NEIL SHIFRIN – DIRECT EXAMINATION

1    BY MR. FELMLY:

2    Q.  Now, this is a newspaper article exhibit, it's hard to

3    read, the date looks like stamped August 8, 1910, that's the

4    date up in the top portion of the page.  And the title of the

5    article is much better gas for Charleston, official statement

6    upon the building of the new plant here, Manager Waring

7    seeking the best.

8         MR. FELMLY:  What I wanted to call attention to, and

9    in particular over in the right-hand column, Denise, and it

10   will be in that vicinity right over here, if you would, and

11   you're going to have to bring it up a little bit more.  This

12   portion right in the center of that is what I'd like you to

13   bring up, is Waring makes the statement there that I want to

14   call to the attention of the witness.

15   Q.  Starting at this point right here, and this is quoting Mr.

16   Waring, we are going to spend -- we are going to spend all the

17   money that is needed to build an up-to-date gas plant, and we

18   plan to put in gas mains, pipes, meters into the best

19   condition possible.  Charleston should have more gas consumers

20   than are now on our books.

21      If you go down to the next paragraph just -- right below,

22   there will be no interruption of service.

23         MR. FELMLY:  Denise, if you could bring that down

24   further, into approximately this area right here.

25   Q.  Mr. Waring did not care to give the figure of the cost of

302

NEIL SHIFRIN - DIRECT EXAMINATION

1  building their new gas plant, and as a matter of fact, he

2  declared that he had yet as -- he had as yet attempted an --

3  no estimate, but he stated that the resources of the company

4  were practically unlimited, and that Charleston people might

5  be assured that they would get the finest gas plant in the

6  company of its size when this plan for water gas manufacture

7  had been completed and put into -- I'm not sure I can quite

8  see what that says -- current rate -- current -- into

9  construction.

10      Now, what I'd like to do at this point, Dr. Shrifrin, is

11  talk about what was built, what was the nature of the plant,

12  how it relates to UGI's involvement and operation of it.

13      First of all, the type of facility that was there prior to

14  1910 when UGI became involved was what type of a gas plant?

15  A.  It was a coal gas plant.

16  Q.  And what was built in 1910 in connection with the

17  description of the plant that Mr. Waring is talking about?

18  A.  A carbureted water gas plant.

19  Q.  Now, what I'd like to do is -- Let me go back one step.

20  What was UGI's relationship again to the technology or the

21  basis for building or going forward with a carbureted water

22  gas process?

23  A.  UGI held the patent for the Lowe process, which was by

24  this point in time the standard carbureted water gas plant

25  design.

NEIL SHIFRIN – DIRECT EXAMINATION

1           MR. FELMLY:  And if we can bring up Exhibit 75,

2    Denise.

3    Q.  Have you, Dr. Shrifrin, taken and created a demonstrative

4    that shows the various differences of these types of plants

5    and how a manufactured gas plant operates, so that the Court

6    would have an understanding of what this does and how tar is

7    generated?

8    A.  Yes.

9    Q.  And with regard to that, if we can go to the first

10   substantive slide after the title here, this is Plaintiff's

11   Exhibit 75.  What are we seeing in connection with this

12   depiction here, sir?

13   A.  These are all the major steps in the manufacture of coal

14   gas.  The shaded portion on the upper left is mainly the

15   difference between coal gas and carbureted water gas.

16   Everything outside of the shaded is almost identical between

17   the two.  So let me just focus on the first shaded part.  Coal

18   gas was made in what was called a retort, which was a

19   structure that had these long, usually ten- or 20-foot-long

20   tubes made out of either iron or clay brick, in which coal was

21   put.

22           These little doors that you see around here are the doors

23   that would open for the retorts.  And the doors would be

24   closed and fire would be put under the retorts, and it would

25   burn for about 24 hours.  And gas would rise up what was

NEIL SHIFRIN – DIRECT EXAMINATION

1    called the ascention tubes, those vertical tubes right here,

2    and go into the hydraulic main, which is this unit here which

3    was half filled with water and with tar.  And that gas would

4    then move over to what's called the purification step, the

5    scrubber, the condenser, the tar extractor, the final

6    scrubber, the purifier, and then finally stored in the gas

7    holder, from which it -- from which it was distributed to the

8    city.

9    Q.  Now, what are the principal by-products or contaminants or

10   impurities in this gas that have to be scrubbed out or dealt

11   with before it can get to the consumer and go into an

12   appliance?

13   A.  Tar was the main by-product, although ammonia dissolved in

14   water was another by-product that was often recovered.  But

15   tar was really the major by-product, mainly because it was so

16   valuable.  And in this drawing, every place you see a little

17   bit of red, and I have a close-up of this later, is where tar

18   would accumulate in the system.  But basically gas is made in

19   this part, and then in this part gas is purified, and then

20   here it's stored and distributed to the City.

21   Q.  Now, why would there be red, or you say is tar down in the

22   bottom of that gas holder?

23   A.  I have a close-up of that, but -- and you need to explain

24   the way a gas holder works.  But basically the lower portion

25   of a gas holder was filled with water originally, because the

NEIL SHIFRIN – DIRECT EXAMINATION

1  steel part, which is this part here, called the bell, would

2  move up and down as gas filled the holder.  And it needed a

3  seal at the bottom in order to prevent gas from escaping out

4  the bottom.  So that bell would fall into a layer of water.

5      However, as the gas cooled inside the holder, tar would

6  condense out of it and fall into that -- into that bottom of

7  water.  And that's the red accumulation at the bottom of the

8  water which is colored blue.

9  Q.  Now, it may be an obvious point, but in terms of this

10  production process, what approximately was the end of the

11  manufactured gas period, of either carbureted water gas or

12  coal gas in this part of the United States?

13  A.  More or less 1950.  Natural gas started being distributed

14  nationwide around 1950, and that replaced manufactured gas.

15  Q.  In terms of the production of tar, approximately what

16  amount of tar is produced in relation to volumes of gas?  And

17  does it vary from the type of production at all?

18  A.  It varies from production, and it varies from day to day

19  within production.  But as a rule of thumb, from the technical

20  literature and also from plants that I've studied in terms of

21  real data, real gas production and real tar production, in

22  general, the rule of thumb is that every thousand cubic feet

23  of coal gas produces a gallon of tar.  And every thousand

24  cubic feet of carbureted water gas produces about a half

25  gallon of tar.

NEIL SHIFRIN — DIRECT EXAMINATION

1    Q.  Now, if we can move to the next slide, this is called

2    carbureted water gas production, the other production that

3    you've been discussing, and if you could explain for us, how

4    does this operate, and in particular, where does it differ

5    specifically from the earlier coal gas type of production?

6    A.   The difference is in the shaded zone in the upper left,

7    again.  This area is identical to the prior slide.  The

8    purification step.  What's different is the gas making step

9    which is right here.  And then there's a temporary storage

10   step right here, which is called the relief holder.  And the

11   reason that a relief holder is needed is because the gas

12   making step here is a cyclical process, runs about six or

13   eight minutes off and on.  And the purifying step needs to be

14   a continuous process, so the relief holder serves as a damper

15   to take that cyclically produced gas and then feed it out into

16   the purifying step as a steady flow.

17       If you want to go to the next slide, I can show you a

18   close-up of the carbureted water gas plant.

19       This is what's called a water gas set.  And it always

20   comes in these three units.  And this is actually the Lowe

21   process.  It has three basic unit operations.  First is the

22   generator on the left, and in the middle is the carburator,

23   and at the right is the super heater.

24       In the generator, coke is loaded, typically coke, there

25   are some variations, coke is loaded into the generator, it's

NEIL SHIFRIN - DIRECT EXAMINATION

1    fired up, air is blown in, and it's burned so that it becomes

2    red hot.  And that part of the cycle is called the blow.  That

3    runs for approximately two to three minutes.

4        Once the coke is red hot, steam is injected in here to mix

5    into the coke.  And carbon monoxide and hydrogen is formed as

6    a chemical reaction with the carbon from the coke.  That's

7    called the run.

8        That material, that gas then runs into what's called the

9    carburetor.  And during the blow cycle, the bricks, there are

10   bricks that are cross-sectioned all the way up these last two

11   units, they're heated up from the heat generated from the

12   burning of the coke.  And that's called -- those are called

13   checker bricks.  And those are heated up to a couple thousand

14   degrees typically, or 1000 to 2000 degrees.  And as the gas

15   rises up into the carburetor, oil is sprayed down onto those

16   bricks.

17       The hot gas, the hot bricks with the oil spray causes the

18   oil to crack, break down from larger molecules to smaller

19   molecules, and then that mixture of gases, cracked petroleum

20   and hydrogen carbon monoxide, then move out this pipe into

21   what's called the super heater, which is nothing more than

22   more hot bricks that the gas passes up, and it's a process

23   which is called fixing the gas, where the molecules that have

24   been formed from the petroleum get fixed under -- under

25   prolonged heat so they don't revert back to larger molecules.

NEIL SHIFRIN – DIRECT EXAMINATION

1    At that point you have what's called manufactured gas

2    coming out here going into a series of steps that start

3    cooling the gas and storing the gas and purifying the gas.

4    Q.  Let's go to the next slide.  This is called tar collection

5    and separation.  You've indicated the quantities of tar that

6    can be manufactured.  What does this group of drawings tell us

7    in terms of the collection or separation of tar?

8    A.  This -- first of all, this shows how intrinsic tar is to

9    the gas making process.  In almost every step of gas making

10   and gas purifying, a little bit of tar is made.  And all --

11   every place you see red is where tar starts accumulating.  In

12   a carbureted water gas, the gas is first contacted by the wash

13   box, which is this unit here, which is simply a seal unit and

14   a cooling unit where gas bubbles through the wash box and

15   starts to cool from about 1500 degrees to about 200 degrees.

16   And that cooling process causes the tar to start condensing,

17   and it's accumulating a little bit right at the very bottom.

18   The equivalent of that in a coal gas process is the hydraulic

19   main.  It's basically serving the same purpose to do the

20   initial cooling of the gas and the sealing of the escaping

21   gas.  And in the hydraulic main and cross-section there you

22   can see the tar accumulating.

23       Gas then goes to a scrubber, which is more cooling and

24   also removal of ammonia.  And all of these units collect a

25   little bit of tar, but that tar is mixed with water.  All of

NEIL SHIFRIN – DIRECT EXAMINATION

1    those units, no matter what it is, what kind of plant, then

2    eventually goes into what's called a tar separator.  The

3    function of the tar separator is to separate the tar from the

4    water.  There's often also an oily phase which is a floating

5    phase which would collect on the very top of the -- the

6    separator.  And that also is collected.

7        In addition to these unit operations that I would call

8    contact, meaning the gas has contact with water, there are

9    some noncontact steps in the gas making process which serve to

10   continue to cool the gas and to separate out the impurities

11   from the gas.

12       The first is a condenser, which is different from a

13   scrubber in that there's no contact.  There's cold water that

14   runs through pipes and the gas runs up around the outside of

15   the pipes, all in a big can, and is collected while tar and

16   other impurities fall to the bottom.  And that's the red that

17   you see.

18       There's the exhauster and then a tar extractor, which

19   again is the exhauster is nothing more than a pump to move the

20   gas.  The tar extractor is aimed specifically to remove the --

21   hopefully the last drops of tar out of the gas before it goes

22   to the purifier steps.

23       It's a mechanical unit where gas is forced through small

24   holes, and blasts against an iron siding of the unit.  And

25   that physical force or the friction causes the tar to fall out

NEIL SHIFRIN - DIRECT EXAMINATION

1    of the gas and fall to the bottom.

2        These items here, the tar from these items don't

3    necessarily have to go to the tar separator, because they

4    don't have water in them.  But they may have a little bit of

5    water in them just because the gas itself has some water.  So

6    often these streams also were sent to the tar separator.

7        And then at the end the tar separator cleans everything

8    and collects the tar basically from the bottom, where the tar

9    goes to storage, and the water either goes to a discharge like

10   a nearby lake or river, or in many plants was recycled back to

11   the gas making process.

12   Q.  Let's go to the next slide.  You were just on the subject

13   of this, obviously just a vignette, what was tar used for at

14   the plant in this historic era?

15   A.  As I said earlier, tar was a very valuable commodity.  In

16   the plant, tar was used in boilers, just as oil or coal would

17   be used to generate steam.  So it was a fuel source.

18       In some plants they had even invented methods for putting

19   tar into the carburetor in a carbureted water gas plant to

20   actually make gas out of it.  And there are some UGI operating

21   notes that show how they were working on that process, along

22   with others in the literature.

23   Q.  Now, outside of the plant, if tar was accumulated, what

24   uses would tar commonly be put to in this historic period?

25   A.  Tar had very many common uses.  And one of the --

NEIL SHIFRIN – DIRECT EXAMINATION

1    something I'd like to emphasize with this drawing is that

2    today in 2009, we look at tar as a contaminant and it becomes

3    part of a superfund site.  But even in the 1950s when I grew

4    up, tar was used every day to cover roads as a dust

5    suppressant, it was used -- and you see it here, it's

6    indicated here in this truck where the oil -- the tar is being

7    spread on the road, it was used as roofing material, and in

8    fact, it's still used as roofing material, and that's this

9    little gang of guys up there.

10        It was also used for paint or in paint formulations.  It

11   was used to make creosote for wood preservatives.  It had many

12   many different uses.  And what I'm trying to depict here is

13   here we are in this illustration right next to a gas plant,

14   which is supposed to be indicated by the holders here, where

15   we're filling up tar and it's leaking on the ground here as we

16   fill it up, which is almost unavoidable.  We're spraying it on

17   the ground.  We're pouring it on top of the roof.  And in

18   fact, in other places we made tar -- used tar paper to put it

19   on the sides of a building.  And it was used every day and it

20   was a very common commodity.  It's only recently that we

21   understand the chemistry of it and the risks of it that

22   we're -- regulatory agencies turn it into superfund sites.

23   Q.  In connection with your study of many -- well over 100

24   manufactured gas plants, has much of the focus of that been on

25   situations involving the use or the leakage or issues with tar

NEIL SHIFRIN – DIRECT EXAMINATION

1    at plants?

2    A.  Yes.  There's a big focus on the historical leakage of

3    tar, because generally that's what has created the problems at

4    most MGPs, they're either state superfund sites or federal

5    superfund sites or just generally cleanup sites.

6    Q.  So what I would like to ask you is based on your

7    experience and your knowledge and working in all these sites,

8    can you tell the Court -- and we can go forward in these

9    slides -- what are the common ways in which we can go -- we

10   can go past the tar products -- He just talked about this.

11   What are the common ways in which tar finds itself into the

12   environment or gets into the environment from a manufactured

13   gas plant, what are the common media that are involved?  And

14   we'll relate them specifically to Charleston.

15   A.  Tar enters the environment at a manufactured gas plant

16   from leaks -- and I'll define what that means -- from spills,

17   and in some cases from direct discharges.  But most of the tar

18   at most of the plants that I've worked on are really from

19   leaks and/or spills, not from direct discharges or dumping.

20   Q.  And let me just ask you with respect to the Charleston

21   plant, and I'm talking about the history of the plant, to what

22   extent is there evidence that you've seen of intentional

23   discharge?  In other words, actual dumping, as opposed to a

24   source that is leakage or not intentional?

25   A.  There's very little evidence for direct discharge.  The

NEIL SHIFRIN - DIRECT EXAMINATION

1   only evidence that I'm aware of, I wouldn't -- I don't know if

2   it's evidence -- there's one of the environmental reports

3   describes the tar that it observed in the Imax area as being

4   more likely from deposition, meaning dumping, than from

5   migration.  And EPA recounted that also, I believe in its

6   first ROD.  And the reason that they described at this way was

7   because they described it as being patchy, as opposed to

8   continuous, and that indicated to them, the observers in the

9   field, that it was possible that it was dumped there as

10  opposed to migrated there.

11          MR. FELMLY:  Your Honor, before I move to the next

12  set of slides, although it is a demonstrative, I'd ask that

13  the exhibit that we just went through with Dr. Shrifrin,

14  Exhibit 75, be marked as a full exhibit.

15          MR. VARON:  That's fine, Your Honor.

16          THE COURT:  Okay, without objection.

17     (Plaintiff's Exhibit 75 received.)

18  BY MR. FELMLY:

19  Q.  What I'd like to do now is to talk about the way -- the

20  manner in which tar can get into the environment at a

21  manufactured gas plant.

22          MR. FELMLY:  And ask Denise to bring up Exhibit 76,

23  please.  And if you'd go to the first slide, please, Denise.

24  Q.  This obviously discusses groundwater, and we had a little

25  discussion of that yesterday, but why is that important in

NEIL SHIFRIN – DIRECT EXAMINATION

1   terms of analyzing or considering the way in which tar impacts
2   the environment?
3   A.   It's useful to understand what groundwater is.  I think
4   sometimes there are misconceptions, because some people think
5   that groundwater are rivers under the ground.  And although
6   they do exist that way sometimes, most often they do not, and
7   they don't in Charleston.  In Charleston, as in many areas,
8   the subsurface is a layer cake of sand and clay and silt, and
9   eventually you get deep enough, bedrock.  That would be this
10  layer here.
11       Within that, the upper portion above the bedrock up here
12  is what we call the overburden.  And the overburden is what --
13  we also call that porous media.  There are grains of sand or
14  clay or humus or whatever.  And in between those grains there
15  are voids.  And beneath the water table, which is this area
16  here, all of the intercedes, all of the pores between the
17  grains are filled with water.  And that's called groundwater.
18  That's called the water table -- the -- below the water table.
19       Above the water table, which is up here, we call the
20  vadose zone, which is an area where the pores are filled with
21  air as opposed to water.  And right at the interface here
22  there is an area here where some of the grains are filled with
23  water and some of the grains are not.  It's actually a very
24  complex area at the water table, because there's a gradation
25  of moisture, and it's not as clean cut as containing water or

315

NEIL SHIFRIN – DIRECT EXAMINATION

1    not.  But basically there is that interface area.

2        So when we talk about groundwater, we're talking about all

3    of this material that is below the water table where the pores

4    are filled with water.  And there's also a hydraulic, what we

5    call a hydraulic gradient, you can see that the level here is

6    higher than the level here, and that creates a pressure, that

7    creates a driving force, so that in this case the groundwater

8    would be flowing in this direction from high water to low

9    water.

10        And we see that in Charleston where we have water

11    elevations and they flow towards the river and it flows

12    towards the drain.

13   Q.  Let's go to the next slide.  Now, this is entitled NAPL at

14   former MGPs.  In the context of what various features or

15   mechanisms that relate to contamination here, what is this

16   depicting and how does it relate to the understanding of the

17   environmental situation at Charleston?

18   A.  Okay.  Just as a reminder, the acronym NAPL stands for

19   nonaqueous phase liquids, and in this case, an MGP case, such

20   liquids essentially are tar, sometimes they're oil, and -- but

21   in this case it's tar.  And the brown is meant to depict NAPL

22   at an MGP.  And what we distinguish further is a DNAPL, a

23   dense NAPL, meaning it sinks through water, doesn't float on

24   water.

25        And what this picture is meant to portray is the various

NEIL SHIFRIN – DIRECT EXAMINATION

1    sources and the type of fate of NAPL at an MGP.

2        Here on the left is my depiction of a former gas holder

3    bottom that was buried under the ground years ago, and you may

4    have a little bit of tar left in that, which is exactly the

5    case at Charleston.  There may be cracks, small cracks, there

6    may be large openings.  In any case, the general tendency of

7    NAPL, DNAPL, tar, at an MGP, is to move outward and downward.

8        Basically downward, because it's denser than water, so it

9    wants to sink straight down.  Sometimes outward, because the

10   subsurface is never one medium, sometimes there's little clay

11   lenses, little silt lenses, little impurities in the sand

12   grains.  And so in general, what happens is that you get

13   what's called fingering, these kinds of things here, as the

14   NAPL wants to move downward, it hits different kinds of pore

15   sizes and moves out and down some more and out.

16       The other important feature here, the clay tends to be

17   what we call a confining layer.  A confining layer is a

18   material in the subsurface that has pores so small that NAPL

19   can never penetrate.  And the reason it can't penetrate is

20   that it cannot displace the water that's already in the pores.

21   There's a competition for fluids in a pore.  And if tar is

22   competing with water, whether or not it succeeds in moving

23   into that pore depends on the pore size, the aperture of the

24   grain size.

25       Generally at MGPs, and for most NAPLs, clays are viewed as

NEIL SHIFRIN - DIRECT EXAMINATION

1    confining layers, which is depicted here, here and here.  When

2    a NAPL hits a clay layer, it won't move downward any further.

3    So it will move along the slope, or it might get trapped in a

4    bowl shape of the clay, and that's what happens out in the

5    field.  You see -- sometimes you see NAPL very far away,

6    because it's hit these lenses and keeps moving and migrating

7    downhill.  Sometimes you see it stuck right underneath a

8    source, because it's trapped in what we call a stratographic

9    trap, a bowl-shaped element of the natural layer.  And

10   sometimes you see it just in the material in the subsurface

11   stratigraphy itself, because it's leaving a trail behind

12   itself.  It's sticking to the pores of the grains.  And

13   sometimes that material is petered out, meaning we call that

14   residual NAPL that's stuck to the grains and there's no more

15   that can migrate.  Sometimes enough of it has been spilled or

16   filled so that it continues to migrate, continues to be a

17   source.

18   Q.  Now, to what extent, based on your experience in examining

19   many many many of these sites, and mindful of these

20   mechanisms, to what extent can you examine it with your

21   scientific and engineering background and draw conclusions as

22   to what may well have been the source, or what probably was

23   the source of the NAPL that is now seen in the subsurface near

24   or beneath the MGP?

25   A.  There's two things that we try to do.  The first is we try

NEIL SHIFRIN – DIRECT EXAMINATION

1    to understand the sources.  At an MGP, a typical source would

2    be a gas holder bottom.  So is there a source of NAPL, where

3    was the gas holder, where was the tar tank, where was the

4    condenser.  Those are the primary sources.

5        We might expect to see tar right within those areas or

6    right below those areas, because those were primary sources.

7    However, sometimes tar can migrate.  So we also look at the

8    stratigraphy in the subsurface and ask the question, are there

9    any elements of the subsurface that would enhance or allow for

10   the migration of the tar.

11       So in this case there are clay layers, so we look at

12   what's called soil borings that are recordings of the field

13   personnel who observe, write down what they observe in the

14   field.  And we look to see what kind of stratographic layers

15   there are in the soil, just in case when we're looking at tar

16   here, if we understand this clay layer and this lens and this

17   lens, we can deduce that this was the source, not this, for

18   example, or might be both, but putting the whole picture

19   together, understanding both the primary sources and the

20   stratigraphy of the subsurface, allows us to look at the

21   spacial relationships of both the primary sources and the

22   secondary migration patterns.

23   Q.  What is the -- if we're talking about tar, this dense

24   nonaqueous phase liquid, what is the area of life expectancy

25   or the period of time within which this product, if it is

NEIL SHIFRIN — DIRECT EXAMINATION

1   leaked down into the ground, will stay in the ground, or

2   what's the range of times that scientists like you understand

3   would commonly be involved?

4   A.   Thousands of years.  And let me elaborate on that answer a

5   little bit.  If it's just pure tar, the liquid tar in the

6   ground, that liquid tar will create groundwater contamination

7   for thousands of years.  Because it will take that long for

8   the fresh groundwater to flow through it and dissolve all the

9   constituents in it.

10      If you remove the liquid tar, and you're left with what we

11   call residual tar, which is tar stuck to soil but not enough

12   to migrate, it is likely still to be hundreds and thousands of

13   years to clean up the groundwater.  And that's why

14   Mr. Effinger earlier today said you're much better off

15   excavating and getting all the soil out, than you are to just

16   pump the DNAPL out of the ground.  Because if you pump the

17   DNAPL out of the ground, you're still left with soils with

18   residual NAPL.  And those soils with the residual NAPL will

19   still serve as a source of groundwater contamination for

20   likely thousands of years.

21          MR. FELMLY:  Let's go to the next slide, if you

22   would, Denise.

23          THE COURT:  Now, does the condition of the soil make

24   any difference?  If it's sandy soil as opposed to clay?

25   A.   A little bit of difference, but not a real lot.  If it's

NEIL SHIFRIN – DIRECT EXAMINATION

1    clay, it won't penetrate, so it will stay on the surface.  If

2    it's sandy soil it will release the contaminants a little

3    faster than if it was, say, humic soil.

4            THE COURT:  Because I live not too far from this

5    site, I live downtown Charleston, and I do a lot of gardening.

6    And I notice in Charleston, that the soil doesn't seem to hold

7    water.  I've always suspected it's sandy below the surface,

8    and the water just seems to run right through it.

9    A.  That's right.

10           THE COURT:  Which would make it conducive to cleaning

11   something like this up.

12   A.  That's right.

13           THE COURT:  More than if it were clay.

14   A.  And there's two mechanisms for that.  One would be it

15   allows more water to come through, so it flushes faster, but

16   the other, there's a process called adsorption, where the

17   molecules, through molecular forces, actually stick to the

18   soil.  And if you have humic soils that don't drain very well,

19   they bind the contaminants much better.  So it takes more

20   water to flush them out.  So if you have sandy soil, it will

21   flush a little bit faster, but it's still hundreds of years

22   and possibly thousands.

23   BY MR. FELMLY:

24   Q.  Looking at this slide that we're depicting now that you've

25   presented in this exhibit, what, in terms of the mechanisms by

321

NEIL SHIFRIN – DIRECT EXAMINATION

1    which tar at a manufactured gas plant can leak or find its way

2    into the environment, what does this show us or how does this

3    help that understanding?

4    A.  Well, first let me explain how a gas holder works.  A gas

5    holder, as I mentioned earlier, consists of two parts, the

6    bell and the bottom.  The bottom is actually a term of art,

7    and it really means the tank.  It's designed to be a tank that

8    holds water.  The bell often is telescoping.  It may have one,

9    two or three, sometimes even four telescoping parts.  For

10   simplicity here I just show one.  But at any rate, the bell

11   moves up and down.  As gas fills it up, it moves up, and as

12   the gas is depleted, it moves down.  But always with a little

13   layer of it sunk into the bottom, because the bottom is filled

14   with water, and that's how the gas is sealed from leaking out.

15       In the right-hand side is a cut-away view.  And it shows

16   that in the bottom, initially the bottom is filled with water.

17   But over time as the gas condenses and gas comes in from the

18   manufacturing in one pipe and then goes out in the other pipe

19   to either the rest of the processes or the City, the bottom

20   area is filled with fluid.  And the fluid starts as being

21   water, but over the years or months, weeks even, as the gas

22   cools and condenses, the tars fall out and the oils fall out

23   and the tars sink to the bottom and the oil floats on the top.

24       Periodically these tars and oils were emptied out and then

25   sent to the separator and reclaimed for sale.

NEIL SHIFRIN – DIRECT EXAMINATION

1   Q.   In terms of those tars that accumulate in the bottom, as

2   you call it, of the gas holder, and having in mind we're not

3   familiar with the exact dimensions of these structures, what

4   types of volumes can be stored or accumulate in the bottom of

5   a gas holder, comparable to the kind you've shown here?

6   A.   This volume here of fluid could be anywhere from a couple

7   hundred thousand gallons to over one million gallons.

8   Q.   And you indicated that there were methods to remove the

9   tar from the bottom of these holders?

10  A.   Yeah, sometimes the system was piped to be able to remove

11  it routinely.  Sometimes it was an opening where they would

12  drop in a line and pump it out.

13  Q.   And in the time period that we're talking about in the

14  historic period here in Charleston with the site here, what

15  type of construction or materials formulate the bottom of the

16  gas holder, this portion that is going below grade and is

17  going to be storing these liquids and possibly tar?

18  A.   From the early 1800s to the early 1900s, this material was

19  made of masonry, typically bricks, bordered bricks.  And it

20  was an important design element actually to design it so that

21  all of this soil around it was structurally sound so it would

22  tend to be part of the structure of the holder.  That was

23  called mudding.

24       Later on, the bottom material was made of concrete.  And

25  as reinforced concrete started being used in like maybe 1910

NEIL SHIFRIN – DIRECT EXAMINATION

1    or so, it -- they were able to design holders above the ground

2    with the bottom really up in this area, because you didn't

3    need the structural support of the soil any longer.

4    Q.  Now, how about the holder that is at the site?  And

5    indeed, I guess the bottom is still at the site, is that

6    right?

7    A.  Right.  There are two holders at the site.  There's a City

8    holder and the relief holder.  And the City holder has a

9    wooden bottom.  The actual bottom part of the holder is wood,

10   and the sides are masonry.

11       The relief holder, I believe, is concrete, I'm not sure,

12   might be brick, but the distinguishing feature of the relief

13   holder is it's built on pilings.  Perhaps hundreds of pilings.

14   In order to give structural support that go down through the

15   confining clay layer into the lower layers, through the

16   intermediate layer.  The intermediate aquifer.

17   Q.  When you say pilings, what would be the material that was

18   originally installed there to provide support?

19   A.  Like telephone poles.  The equivalent of telephone poles.

20   Not really telephone poles, but I believe the pilings are

21   wood.

22   Q.  And that structure was built when?

23   A.  In 1910.

24   Q.  When the plant was rebuilt?

25   A.  When the plant was rebuilt.

NEIL SHIFRIN – DIRECT EXAMINATION

1   Q.  And we had some discussion earlier today with Mr. Effinger

2   over whether the substation had some pilings, the electronic

3   or electrical substation had some pilings that went through

4   clay layer.  Have you determined whether or not these pilings

5   go through the clay layer?

6   A.  My understanding is that there are no pilings that went

7   through the clay layer in the substation, but there were

8   grounding rods that may have gone through the clay layer.

9   Q.  What about the relief holder that was built in 1910, are

10  there pilings that go through the clay layer there?

11  A.  Yeah, those pilings went through clay layer.

12  Q.  And I think I heard you say there were hundreds of them in

13  connection with this structure?

14  A.  I recall reading that they were spaced one foot apart.

15  Q.  So in terms of that process as they built that holder,

16  what's the significance in terms of the potential for

17  migration of contaminants with those many, if not hundreds of

18  pilings that go down deep and through the clay layer?

19  A.  Those pilings would have introduced migration pathways for

20  the tar to go into the intermediate aquifer.

21  Q.  Let's go to the next slide.  In terms of the structures at

22  a manufactured gas plant, based on your experience and your

23  work in reviewing many of these, we've been talking about the

24  gas holder.  How important are gas holders in your experience

25  and knowledge as significant sources for tar, DNAPL type

NEIL SHIFRIN – DIRECT EXAMINATION

1  pollution?

2  A.  Gas holders at MGPs are almost always a source of tar

3  contamination in the subsurface.  Of the 130 some odd sites

4  I've worked on, maybe averaging two gas holders per site, some

5  had three or four or five, so let's say I've looked at 250 gas

6  holders; maybe I've seen ten that don't have tar under them.

7  Q.  And you mentioned that the bottom of the -- was it the

8  relief holder or the City holder that had the wood bottom at

9  Charleston?

10  A.  The City holder.

11  Q.  I'm trying to frame the question in terms of a structure

12  that has got to be watertight and is going to not leak.  How

13  would wood or what issues would arise in using wood in

14  connection with that in terms of the potential for leakage?

15  A.  Wood, the wood bottom most likely leaked.  I mean, I would

16  be extremely surprised if it didn't leak.  They still make

17  wood tanks, water tanks.  In New York City on top of every

18  tall building is a wooden tank.  So they can be made not to

19  leak, but over a short period of time they will degrade and

20  leak at the seams.  So the fact that the City holder had a

21  wooden bottom gives it a higher likelihood that it leaked very

22  early and leaked fairly constantly.

23      I have 50 years on this drawing here as sort of the

24  outside time frame of the full effect of leakage.  But my

25  sense is that gas holders started leaking perhaps within the

NEIL SHIFRIN – DIRECT EXAMINATION

1    first decade that they were installed, particularly a gas

2    holder with a wooden floor would start leaking almost

3    immediately.

4    Q.  And in terms of the drawing you have here, what is the

5    mechanism or the ways in which you're depicting here that

6    commonly occurs?

7    A.  As you can see, the tar accumulates in the bottom of the

8    holder.  Masonry holders almost inevitably have cracks in

9    them.  They're not designed to have cracks in them.  Every gas

10   manufacturer hopes that they can install one that doesn't have

11   cracks in them.  But eventually they all spring cracks.  And

12   for a couple of reasons.  One is just the nature of brick

13   masonry, it's going to have cracks.  I don't think you can see

14   anything out in the street here that won't have cracks in the

15   masonry.  But there are natural forces that cause it to have

16   cracks, such as subsidence, vibrations, just mechanical wear

17   and tear and age.  Age of the mortar, for example.

18       So what I've depicted here are a few cracks that have

19   formed in the bottom of a holder.  They might also form in the

20   side of a holder.  And often we say that the bottom leaked,

21   but it's not the bottom of the bottom, it's the side of the

22   bottom.  But regardless, here just for simplicity I'm showing

23   leak cracks in the bottom of the bottom of the holder.  The

24   tar has leaked out, hit a clay layer, so that it takes a

25   little right turn here, and eventually cascades into the --

NEIL SHIFRIN – DIRECT EXAMINATION

1    into the water table, which is depicted by this dash line,

2    falls again onto another clay layer where it travels downhill

3    slightly as tar, while the pink is denoting the constituents

4    in the tar dissolving in the groundwater so it's forming a

5    groundwater contaminant plume.

6        But at the same time, the tar itself, the primary source,

7    is migrating down the clay layer, eventually into the bedrock,

8    pooling in the bedrock, where we now have from this source

9    here, a fairly wide, long and wide area of primary source

10   createing a groundwater plume.

11   Q.  Now, when we were looking at the aerial photo earlier in

12   your testimony and we had the various dimensions of the

13   superfund site in relation to where the historic gas plant

14   footprint was, to what extent does the process you're

15   describing here, this movement, in your opinion, relate to the

16   fact that there is contaminant outside the exact footprint of

17   where these structures were historically?

18   A.  My sense is that at the Charleston site you have some of

19   these lenses, like this here which is causing this downward

20   and outward migration.

21   Q.  And in terms of the area or direction of flow,

22   particularly of groundwater at the site, which direction does

23   it flow at the site?

24   A.  It flows in two directions.  It flows -- part of the

25   groundwater flows to the river, which is east.  And part of

328

NEIL SHIFRIN – DIRECT EXAMINATION

1    the groundwater flows south to the Calhoun Street sewer.  The

2    sewer serves as a sink to attract that groundwater.  So at

3    this site groundwater flows in two directions.

4    Q.  What is the significance, if any, of structures like

5    sewers or passageways or pipes, in terms of being conduits or

6    a means of conveyance for pollution?  How common is that?

7    A.  It's very common.  And, in fact, you always look for that.

8    We have a term for it, we call it preferential pathways.  And

9    there's really two types of preferential pathway that a sewer

10   can present.  One is the pipe itself that is almost always

11   cracked, and has an infiltration problem.  But the second is

12   the porous medium that typically the pipe is built in.

13   Usually pipes are put on a bed of gravel, and that gravel

14   outside of the pipe serves as a preferential pathway for

15   migration.

16   Q.  And is that an issue here at Charleston?

17   A.  This was an issue in Charleston, and that's why the City

18   put a barrier wall up along the new bedding as it replaced the

19   leaky pipe.

20   Q.  Let's go to the next slide.  Before I ask you about the

21   picture here, can you just describe to the Court the nature or

22   quantity of the piping that a manufactured gas plant would

23   have as these various structures you've described are

24   conveying these fluids and these gases across the span of the

25   site?

NEIL SHIFRIN – DIRECT EXAMINATION

1    A.  It, of course, varies tremendously by the plant, but if a

2    plant is typically five acres and has 30 pieces of equipment,

3    connecting gate, water, sewer and tar, it could have a mile of

4    pipe.

5    Q.  A mile of pipes?

6    A.  Most of them being buried in the ground, although that

7    varies, too.

8    Q.  And to what extent are the potential contaminants,

9    particularly tar, conveyed by these pipes or moved from one

10   location to another by these pipes?

11   A.  All plants had tar transfer piping to go from the holder

12   to the separator, from the separator to the storage tanks,

13   from the condensers to the separator, so there was tar

14   transfer piping all around these plants.

15   Q.  And based on your experience and your examination of these

16   many sites, to what extent have you found and experienced

17   situations where these pipes that were conveying tar in this

18   historic period, either leaked or had the ability to have the

19   tar come out of them?

20   A.  Well, we have seen, I've seen pipes uncovered in today's

21   time frame, that still have tar remaining in them, and when

22   the backhoe hit them, they started releasing their tar.

23       We also see, when we evaluate/interpret the environmental

24   data, most often we see the tar accumulated under the holders

25   and the tar tanks.  But every now and then we see tar that is

NEIL SHIFRIN - DIRECT EXAMINATION

1    in the -- sort of in the middle of no place, or in between two

2    tanks or the holder or tanks.  And from the boring data, it's

3    difficult to conclude that it was dumped there, because there

4    isn't a trail of tar all the way to the surface or the pattern

5    of tar is not for dumping.  And most often that will be from

6    tar transfer piping.  From a leak like this.

7    Q.  And is this drawing here demonstrative of the kind of

8    mechanism that may be involved when you have some break or

9    corrosion in the pipe that's carrying the tar?

10   A.  Yeah, what I've tried to do here is show two main

11   mechanisms.  One would be from a joint, which this is supposed

12   to depict, which is a flange, flanges have gaskets, the

13   gaskets over time wear out, or flanges are really pressure

14   points that are subject to a little wiggling or whatever.  So

15   flanges often leak.  That's one area.

16       And then this second area here is meant to denote a

17   corrosion break or a mechanical failure of the pipe.

18       In 1986 EPA did a study of underground pipes and tanking

19   and found that within 11 years steel piping corrodes enough to

20   spring a leak.  There are some contemporaneous MGP literature

21   that I have that indicate that almost instantly from

22   installation, various -- for various reasons, corrosion,

23   whatever, could occur within six months.

24           MR. FELMLY:  Let's take a look at the next slide,

25   please.

NEIL SHIFRIN – DIRECT EXAMINATION

1    Q.  This is reference spills.  Having in mind your knowledge

2    and experience as to how these plants were operated and the

3    various tasks that the people operating and managing the plant

4    on a day-to-day basis did and the things they did, how big an

5    issue were spills during this historic period as far as

6    targeting into the ground?

7    A.  Spills always occurred.  Nobody ever wanted them to occur.

8    They were -- I doubt that they were ever intentional.  I mean

9    there are -- I have seen some cases where dumping was

10   intentional, but spills are -- might be equivalent to when we

11   fill up our gas tank at the gas station, I would defy any of

12   us, I've been trying for years to not spill that last drop as

13   you pull the nozzle out of the filler cap.  Well, multiply

14   that times some multiple where you're filling up a 5000-gallon

15   tanker truck or railroad car or something like that, and

16   you're bound to spill some during the filling process.  You're

17   always bound to create some spills by knocking over barrels or

18   something like that.  All of these things are accidents, but

19   they occur in chemical factories where fluids are handled.

20       And this picture is -- I tried to denote what would happen

21   to a spill.  A spill would typically be near the surface of

22   the ground, the top of the ground.  This area here.  And if

23   enough material was spilled, it would actually migrate

24   downward as NAPL, while creating sort of a cloud of

25   contaminated percolation, as rain water percolates around it.

NEIL SHIFRIN – DIRECT EXAMINATION

1    But once it hit the water table it may hit clay, it may

2    continue to migrate downward, but that's where its

3    constituents would start dissolving and create a real

4    groundwater contaminant plume.

5    Q.  Now, in terms of what we've been seeing here, sort of in

6    the environmental slides and the spills and the leaks that

7    you've been showing, do you believe that the mechanisms that

8    the tank leak and the pipe lining leak and the spills in all

9    probability were involved in terms of the circumstances under

10   which the tar at the Charleston plant most likely than not was

11   deposited?

12   A.  I believe that the sources of tar at Charleston were the

13   major pieces of equipment that handled tar, the holders and

14   the tar tanks and the separators.

15        MR. FELMLY:  Your Honor, I would ask that the slides

16   that we've shown here, which is Plaintiff's Exhibit 76, the

17   environmental demonstratives, be marked.  I will say that

18   there's one additional slide that I didn't ask Dr. Shrifrin

19   about, I've taken out, which was oil leaks, because I don't

20   think we have an issue with oil leaks here.  But we're moving

21   that particular slide.  I'd ask that this demonstrative be

22   marked as a full exhibit.

23        MR. VARON:  One second.  Your Honor, I guess the only

24   thing we'd say is it should be clear that these are

25   illustrative and not necessarily representative of Charleston,

NEIL SHIFRIN – DIRECT EXAMINATION

1   and as illustrative ways that Dr. Shrifrin described targeting

2   into the ground and groundwater, we have no objection.

3          THE COURT:  Okay.  Well, if it doesn't have anything

4   to do with Charleston, how is it relevant?

5          MR. VARON:  Well, I think that's for them to

6   establish.

7          MR. FELMLY:  I just asked the foundation of whether

8   or not -- the last question before I moved it was, did these

9   three things that I've discussed in his opinion relate to what

10  happened in Charleston, and he indicated he believed they did.

11         THE COURT:  And he's shown the direction of the

12  contaminant.  He's directed it towards the river, towards

13  Calhoun Street, I mean he's talking about Charleston.  He's

14  not talking in the abstract.

15         MR. VARON:  I understand, but these pictures, Your

16  Honor, these pictures hypothesize that a flange broke, there's

17  no --

18         THE COURT:  I don't think the pictures are

19  necessarily drawn to scale, I don't think they necessarily

20  depict exactly what happened here.  He hasn't said that he dug

21  any holes in the ground.  I'm assuming that he's relying on

22  his general knowledge as to the composition of the soil.

23  A.  Right.

24         MR. VARON:  We have no objection to the exhibit

25  coming in.

334

NEIL SHIFRIN – DIRECT EXAMINATION

1          THE COURT:  Without objection.

2      (Plaintiff's Exhibit 76 received.)

3  BY MR. FELMLY:

4  Q.  In connection with the Charleston plant that was built in

5  1910 and I think into '11, the carbureted water gas process,

6  what is the relative level of complexity of operating a plant

7  like that from the point of view of a manufacturing process?

8  A.  These were chemical manufacturing plants, and they were

9  very complex.  They might seem simple because they might have

10  five or ten unit operations.  But I have seen operating

11  instructions, even UGI's operating and engineering notes, and

12  textbooks, many textbooks, several textbooks of several

13  volumes in terms of how to build and operate manufactured gas

14  plants.  These on the surface may seem like simple things to

15  operate, but they were as complex as any chemical plant to

16  operate.

17  Q.  And what would be, with respect to the making of the gas

18  and this -- these processes of either combustion or

19  pyrolization, what would be the reasons or the ways in which

20  the complexity of those would confront the operators?

21  A.  The operator would be confronted with two things, really.

22  One is the quality of the gas and the by-products.  For

23  example, if you heated the coal or coke poorly or didn't run

24  the carbureted water gas system poorly, you'd get a poor

25  quality gas.  If you got a poor quality gas, it might have

NEIL SHIFRIN – DIRECT EXAMINATION

1    poor candlepower.  And in the early days, if people were using

2    it for lighting, the customers would complain, you're selling

3    me poor quality gas.

4        It might have poor heating value, if you're using it for

5    heat.

6        If you're not operating all of your unit processes

7    properly, you might be creating too much tar and you might be

8    creating emulsions in your tar.

9    Q.  Let's stop there and find out what some of those words

10   mean.  First of all, what is an emulsion?

11   A.  An emulsion is a mixture of two liquids that will never

12   separate.  Or will never separate on their own.  Mayonnaise is

13   an emulsion, for example.

14   Q.  And how are emulsions, you mentioned you might create an

15   emulsion if you don't run it properly.  What, in the context

16   of a manufactured gas plant, creates an emulsion?  Because I'm

17   guessing it's not mayonnaise, so what happens?

18   A.  Carbureted water gas plants were very tricky things to

19   operate, because they tended to make emulsions.  And the

20   prevailing theory of emulsion formation in carbureted water

21   gas production was carbon black would be produced.  Usually

22   because the heat in the generator was too hot.  But sometimes

23   because the blow was too fast, or there could be other

24   factors, bitumen instead of coke being used could be a factor,

25   in other words, the generator fuel.  There were a number of

NEIL SHIFRIN - DIRECT EXAMINATION

1   factors that could generate excess carbon black, which is just

2   soot.

3       And the theory was that that soot, the carbon black,

4   served as a nucleus for attracting some of the tar into a

5   micelle, which means different charges, that would stabilize

6   within water.

7       And this is an example of both the art and the engineering

8   of gas production, that if you did it wrong, even slightly

9   wrong, you could start forming an emulsion.  And emulsions

10  were terrible problems at carbureted water gas plants.  If you

11  didn't deal with them, you created a tar that nobody wanted to

12  buy.

13  Q.  Why is that?

14  A.  Because typically contracts from tar distillers with gas

15  manufacturers required that the tar have no more than

16  three percent water in it, or they wouldn't buy it.  Or if

17  they did buy it, they would buy it for a cheaper price because

18  it would cost them more money to distill it.  And transport

19  it.  Because you're transporting a lot of water instead of

20  tar.

21      Typically what carbureted water gas plants did was they

22  would distill it themselves, or they would demulsify it.  And

23  typically -- and this plant had one, the Charleston plant had

24  one -- you would see a unit operation called a demulsifier.

25  And often what that was, was just a heating unit, sort of a

NEIL SHIFRIN – DIRECT EXAMINATION

1    condenser in reverse, where you were able to heat the tar and

2    the heat would break the emulsion, and then you would collect

3    the demulsified tar and you could sell it to a distiller.

4        But as you can imagine, that's more trouble, it's more

5    money, and if at all costs you could avoid creating the

6    emulsion at the generating step, you would try to do that.

7    And this was a constant struggle in these gas plants.  And

8    this is just another example of why these were not simple

9    things to operate.

10   Q.  Well, in terms of the individuals that were actually on

11   the ground working the dials and determining whether the blow

12   should go a particular distance or not, how did they obtain

13   the information as to how to operate them?

14   A.  Like I said, there were textbooks.  There were operating

15   manuals.  And there were policies and procedures that a

16   company would develop, you know, through its own development

17   of its own art.

18   Q.  And in terms of the issue of whether a particular plant

19   was going to have a higher potential of discharge of tar, to

20   what extent was the issue of formation of emulsions, I'm

21   really asking based on your experience, if you're talking

22   about what's the risk of a particular plant having tar

23   discharged, how do the formation of emulsions, in your

24   experience, factor into that?

25   A.  If you had a plant that was forming emulsions, you would

NEIL SHIFRIN – DIRECT EXAMINATION

1    be more likely to discharge that as waste water.  Or, you

2    would have to spend the money to buy new unit operations,

3    demulsifiers, centrifuges and things like that to manage your

4    emulsion so you didn't discharge the emulsions.

5    Q.  So in the big picture, if you're talking about the role of

6    the operator of the manufactured gas plant and its

7    relationship to tar, what is your opinion with respect to the

8    relative importance of the handling, storage and management of

9    this by-product as part of the gas manufacturing process?

10   A.  It goes hand in hand.  I doubt that there was ever a gas

11   plant operator that didn't have both gas and tar on his or her

12   mind.  When you make gas, you make tar.  When you make tar,

13   you have to manage that tar.  If you don't manage that tar,

14   first of all you're wasting money, and second of all, you're

15   forced to discharge it to the environment.

16   Q.  So as you looked at the history of the manufactured gas

17   plant in Charleston, and in particular during the era 1910 to

18   1926, have you looked to examine the extent to which the

19   operator of the plant was dealing with tar-handling structures

20   and tar-handling equipment?

21   A.  Within that time period there's clearly tar-handling

22   equipment present.

23   Q.  And are there also the tanks that you were describing, the

24   relief holder and the gas holder which you've indicated are

25   probable sources of leakage?

NEIL SHIFRIN – DIRECT EXAMINATION

1    A.  Absolutely.  I mean, those two structures are unavoidable

2    in a carbureted water gas plant.

3    Q.  And have you made an assessment of the equipment that was

4    available at various times, in order to better understand what

5    was there at various years and what was there during a

6    particular period of time when UGI was involved in the plant?

7    A.  I have, and I wrote a report where we chronicled

8    everything that we knew about the tar-handling equipment.

9    There are two ways that we know historically tar-handling

10   equipment.  One is static from inventories and/or maps,

11   engineering drawings.  That gives us the existence of

12   equipment at a certain point in time.

13       The other way we know and we reconstruct, is from

14   accounting information.  When there's an authorization to

15   purchase a new tar still, for example, we know the date of

16   that from the accounting record and assume that it happens,

17   you know, within that time frame.  So we might be off by six

18   months or something like that.

19       But so that's more of a dynamic piece of information where

20   we see that somebody is actively authorizing the installation

21   of something, and then we have the static information, which

22   is inventory information and/or engineering drawings.

23   Q.  In connection with this case, have you gone through the

24   historic information and the various indicators as to when

25   equipment was purchased, and other data that would identify

NEIL SHIFRIN – DIRECT EXAMINATION

1    what would have been on the scene at various points during the

2    plant's history, in order to formulate an inventory or an

3    assessment at various times that would identify where that

4    equipment was and when it was provided on the site?

5    A.  Yes, we've done that, and we've drawn that all on a map of

6    the site.

7    Q.  And have you -- and to what extent have you endeavored to

8    determine that in relation to UGI's period of ownership or

9    operation, as is claimed by us in this case?  In other words,

10   the period 1910 to 1926?

11   A.  We have chronicled all of the equipment at the site, and

12   then we have culled out the equipment that was installed

13   during that period 1910 to 1926.  And have noted that on a

14   map.

15        Let me just add onto that, we've also noted equipment that

16   was in existence and operated during that period.

17   Distinguished from being built during that period.

18   Q.  And in connection with that analysis, to what extent do

19   you believe you have a good historical understanding and

20   ability to determine or set forth what was UGI's equipment

21   that was connected with UGI operations, either by way of

22   building or purchase or there in the period of time when it

23   was being operated.

24        MR. VARON:  Objection to UGI operations.  There's no

25   evidence that UGI operated any of this equipment.  If you want

NEIL SHIFRIN – DIRECT EXAMINATION

1    to show it was in this time period, that's one thing.

2              THE COURT:  Let's see what his answer is.

3    A.  I have a high confidence that we've identified all of the

4    equipment that existed and/or was installed during that time

5    period.

6              MR. FELMLY:  What I would like to bring up now from

7    Exhibit 78, Denise, is the historical composite.  Now, the --

8    I'm going to get to that one in a moment, but the one before

9    that.  I don't have a Bates on this.  If it's a problem for

10   you, I can do it on the ELMO.  Yes, that's it.

11   BY MR. FELMLY:

12   Q.  First of all, Dr. Shrifrin, the diagram that is on the

13   monitor here is entitled UGI in Charleston.  Is this a

14   depiction or a demonstrative diagram that you've prepared

15   based on that process that you just described to the Court of

16   acquiring information about the various pieces of equipment

17   that were related to UGI, either in terms of the period of its

18   operation or identified in records by either purchase or

19   construction?

20   A.  Yes.

21   Q.  And if we could zoom in on the top key up in the left-hand

22   corner, maybe you can identify for us what the individual

23   colors are and explain what you mean by these various

24   categories.

25   A.  Blue in general is equipment that existed during the UGI

NEIL SHIFRIN – DIRECT EXAMINATION

1    period, the 1910 to 1926.  With a dark blue crosshatched it

2    was in my opinion operated by UGI.  With a light blue

3    crosshatched it was installed by UGI and operated by UGI.  And

4    with a red crosshatch it was in existence already, but UGI

5    modified it during their tenure.

6          MR. FELMLY:  And if we could now go to the drawing

7    itself, Denise.

8    Q.  And so, for example, let's take the relief holder which

9    you've been discussing and which is located down in this area

10   of the site there, you had testified earlier that was a

11   structure that was built in the 1910 rebuilding of the plant.

12   You categorized that in which of your categories?

13   A.  UGI installed and operated.

14   Q.  And the generator house, that is a little bit to the right

15   and up from the relief holder, is also seemingly crosshatched

16   in the same color.  Is that a structure that UGI was part of

17   the rebuild of the plant in 1910 and we're attributing to UGI?

18   A.  Yes.

19   Q.  And I think I understood you to say the generator had some

20   particular relationship to carbureted water gas.  Can you

21   explain that again so we understand why it's part of the new

22   process?

23   A.  The generator house was the building that contained the

24   carbureted water gas.

25   Q.  Now, the gas storage holder, which is over here on the

NEIL SHIFRIN – DIRECT EXAMINATION

1    left side of the plan right where you've circled it, what are
2    you categorizing that as in terms of UGI involvement?
3    A.  They operated it.  It was built originally in, I think
4    around 1860.  It was rebuilt in 1893, so that was obviously
5    before 1910.  And it was operated throughout the entire
6    periods of -- during the 1910 to 1926 period.
7    Q.  So is that the city holder?
8    A.  Yes.
9    Q.  And that's where the gas is stored before it gets
10   distributed throughout the City of Charleston?
11   A.  That's right.
12   Q.  And that was there for their entire tenure?
13   A.  Right.
14   Q.  The retort house seems to be shaded with something that
15   indicates it was UGI modified.  What was the circumstance of
16   that?
17   A.  Prior to 1910, the only form of gas manufacture was coal
18   gas, and it was made in the retort house.  When the carbureted
19   water gas system was put in, the retort house was abandoned.
20   But in 1917, I think it was, there was an extra demand for
21   gas, a cold winter, I think it was, and they fired up the
22   retort house again.  And in doing that, UGI improved the
23   construction of the retorts to be able to make coal gas as a
24   supplement to the carbureted water gas.
25   Q.  There are two tar tanks labeled over in this area where I

NEIL SHIFRIN - DIRECT EXAMINATION

1    put in the green dot at, next to the what's called the bus

2    lane.  It's a little hard to see one of them, but are they

3    colored in a way that can tell us what the role you're

4    attributing to UGI is?

5    A.  UGI installed and operated those.

6    Q.  The structure that is over here in this portion of the

7    drawing, the so-called steam power plant, what was that?

8    A.  That was a steam plant for -- basically for electric

9    generation, I believe, but there was a deal with the gas plant

10   to buy the steam or use the steam for the gas manufacturing

11   process.

12       So UGI built the steam plant starting in 1910, and the gas

13   plant used the steam, as well as that steam plant being used

14   for other purposes.

15   Q.  Was the steam plant a part of the gas plant per se?

16   A.  No.

17   Q.  But it drew energy from it?

18   A.  The gas plant drew steam from it, yes.

19       MR. FELMLY:  Let me ask you, Denise, to put up the

20   document that provides backup for this.

21   Q.  This document is entitled UGI control information sources,

22   and it's obviously very small reading, but we have provided

23   the Court a larger full-size map.  But conceptually and for

24   purposes of understanding how you have gone about this

25   process, what does this show?

345

NEIL SHIFRIN - DIRECT EXAMINATION

1   A.  This provides the information sources that we use to

2   devise the purple and blue shading.  Every box points to a --

3   an area or building or unit operation, and inside that box is

4   a listing of all the historical data information we have

5   relating to that piece of equipment.

6       And what I've done in here within the boxes, is I've

7   shaded in blue any information that we have during that period

8   1910 to 1920.  So --

9   Q.  1910 --

10  A.  1926, I'm sorry.  So any purple item here -- well, all the

11  purple items, I guess, are MGP.  No, they're not.  The purple

12  items are the UGI-related things, and then if you follow the

13  arrow to the box, the blue part of the box is the information

14  backup that we have for knowing whatever we know about that

15  time period.

16  Q.  And in terms of the data that you've looked at, you

17  mentioned that it includes things like minutes and documents

18  of UGI.  Have you also looked for information in the historic

19  record available in the community?

20  A.  In some cases we have.  We didn't have a lot of

21  information from community records, but we have some newspaper

22  articles, for example, and some histories of the plant, and

23  wherever we could get information from that source, we did.

24      Basically this represents all the sources of information

25  we could get our hands on.  The bulk of the information are

NEIL SHIFRIN – DIRECT EXAMINATION

1    either UGI records or CCR&L records.

2              THE COURT:  What's the number of that exhibit?

3              MR. FELMLY:  That is Exhibit 78, it's a portion of

4    Exhibit 78, and I was going to -- I've used two documents from

5    it.  I actually -- the document that I had moved earlier this

6    morning to have admitted and we got into the issue of the

7    abstract.  I would move the entirety of Exhibit 78.  I've

8    removed out the -- I guess there wasn't a summary sheet on

9    this one.  But I've gone through many of the exhibits in here

10   and the photos and the like, so I would move Exhibit 78 into

11   evidence at this time.

12             THE COURT:  Any objection?

13             MR. VARON:  Yes, Your Honor, we object to the entire

14   characterization of it.  We don't think that the -- hasn't

15   explained what the basis is for saying that UGI installed or

16   operated any of this equipment, and we will explore on cross

17   and otherwise, each source document and show that it has

18   nothing to do with UGI, that it's the subsidiary that is

19   engaged in this activity.

20             THE COURT:  Yes, sir?

21             MR. FELMLY:  Let me just respond to that.

22             THE COURT:  Sure.

23             MR. FELMLY:  The entire contention in the case is

24   that CCR&L was used by UGI and created as part of a both abuse

25   of the corporate forum, but also as a controlled entity, and

NEIL SHIFRIN – DIRECT EXAMINATION

1    it was UGI there.  It may well be that the documentation said

2    that, but going to -- if we frame it in terms of CCR&L during

3    that period, and I mean, I don't want to have Dr. Shrifrin try

4    to decide the ultimate question about whether or not as a

5    legal proposition UGI is the entity that should be

6    responsible.  But we're -- what we're saying is that

7    subsidiary on these papers indicated that it was buying it.

8    But it was during the period of time when UGI was there.  And

9    so in order to make the case that shows the relationship, I

10   really have to show, I believe, to you, the kind of periods of

11   time when these activities occurred.  So I don't mind it

12   being asked or said in terms of as alleged by the plaintiff.

13   I'm not trying to --

14        THE COURT:  Well, ultimately if it's important, and I

15   think it will be important, to determine what installation UGI

16   made, what operation they did, what they owned, then I'll have

17   to look at these documents and make that decision.  I have

18   seen nothing about this witness' expertise that would give him

19   a better ability to look at these documents and draw the

20   conclusions that he's made.

21      Now, I haven't studied them in detail.  I may apologize to

22   him and tell him I don't have any chance of reaching the

23   conclusions that he's reached.  But it seems to me now that

24   what he's done is lay out for the Court a roadmap, if you

25   please, of how to arrive at these conclusions that the

348

NEIL SHIFRIN – DIRECT EXAMINATION

1    plaintiff contends are important in this case.  And if we

2    determine that they are, which I think we will, then we have

3    to follow that roadmap, and conclude ourselves independently

4    whether or not his conclusions are supported, and whether or

5    not we can adopt those conclusions.

6        Now, it may be that in that process, as I become more

7    familiar with this exhibit and the appendages thereto, that

8    then I'll say, well, I'm going to yield to the expert and I'm

9    going to take his opinion because I think that it is a field,

10   and I look at it more closely, where he's qualified and better

11   qualified than I am to reach those decisions.  But I can't get

12   there right now.  All I can do right now is I'm going to

13   overrule your objection and I'm going to take it for whatever

14   it's worth.

15            MR. FELMLY:  So it is marked.

16            THE COURT:  Marked in evidence.

17       (Plaintiff's Exhibit 78 received.)

18            THE COURT:  There's just no way I can digest all that

19   in ten minutes, and I'm not going to take your time to digest

20   it.  Because I don't want you to know how long it takes me.

21   Might take me a week.

22            MR. VARON:  I think it might take awhile, Your Honor.

23            MR. FELMLY:  If I might just have a second, Your

24   Honor, to clarify one thing.

25       Your Honor, what I'm doing, in light of the Court's

NEIL SHIFRIN – DIRECT EXAMINATION

1  ruling, is pulling out the full-size version of this under the

2  proposition that I think it might be easier for the Court,

3  this is exact -- this is the identical document that I was

4  just displaying on the video screen.

5        THE COURT:  I'm hoping you've got something bigger

6  than that, because I can't read that.

7        MR. FELMLY:  So I'm thinking that -- then really, I

8  will promise you this is not only redundant, it's 100 percent

9  redundant, it's an exact copy, but a lot easier to work with.

10 And that document is Exhibit 98, the UGI control of MGP

11 equipment, and it's the document we used to create the

12 depiction that was part of the video presentation.  So on the

13 same basis I would ask that this larger copy be offered for

14 the benefit of the Court's review.

15       MR. VARON:  Same objection, but --

16       THE COURT:  Overruled.

17    (Plaintiff's Exhibit 98 received.)

18       MR. FELMLY:  Denise, are you able to bring up Exhibit

19 No. 100, please.

20 BY MR. FELMLY:

21 Q.  Dr. Shrifin, I'm bringing up on the screen Exhibit 100,

22 and I'm going to ask Denise to bring up the top fifth of the

23 page or so with the title so that we can see what it is, and

24 then ask you to identify what the purpose of this is.

25 Obviously we're bringing up a portion of the page.  This

NEIL SHIFRIN – DIRECT EXAMINATION

1   Exhibit 100 is what?

2   A.  This is a table out of the report that I wrote which

3   summarizes all of the equipment installation and modification

4   performed at the Charleston plant during UGI's tenure.

5   Q.  And how does this table or the information on here relate

6   to the drawing that contained, I guess a visual or drawn

7   depiction of information about equipment and how it was

8   installed and when it was installed?

9   A.  The information on the left -- on the middle column which

10  is next to the years, is -- should be the same as the

11  information on the map that had the equipment.

12      In addition, we've noted where there are director

13  authorizations for this on the right-hand side of this table.

14  Q.  So is this, in effect, a source document or a tab -- a

15  table that would track and be of assistance in the

16  interpretation of the diagram with the various indications of

17  sources that we just admitted into evidence?

18  A.  Yes, this is a little more elaboration on the content of

19  those sources.  It would be good to go to the sources

20  themselves as well.

21  Q.  And is this the product of the research and the

22  information that you brought forth in your report and as a

23  part of your historic analysis and review of the plant?

24  A.  Yes.

25          MR. FELMLY:  Your Honor, I'd also offer this as a

NEIL SHIFRIN – DIRECT EXAMINATION

1   further aid to the understanding of the visual exhibit, and it

2   would be the most convenient summary in sort of a narrative or

3   tabular form.  It's Exhibit No. 100, and on the same basis I

4   would offer it for the aid of the Court as a full exhibit.

5          THE COURT:  Now, where did you get this information

6   from?

7   A.  Prior to writing my report, which was written in, I think

8   about a year ago, so we did research perhaps for two months

9   prior to that.

10          THE COURT:  These are corporate minutes and that type

11   thing?

12   A.  Corporate minutes, some newspaper articles, historical

13   documents.

14          THE COURT:  Do you show here what the sources are?

15   A.  Yes, we list the Bates numbers for the information.

16          THE COURT:  Okay.  The SCANA 000736, that's a

17   document the defendants know about?

18   A.  That's right.

19          THE COURT:  Okay.  Any objection?

20          MR. VARON:  No, Your Honor.

21      (Plaintiff's Exhibit 100 received.)

22   BY MR. FELMLY:

23   Q.  One other identical housekeeping -- strike that, I don't

24   need to do this one.

25      In addition to examining the equipment and the pieces of

NEIL SHIFRIN – DIRECT EXAMINATION

1    the plants --

2            THE COURT:  Let me interrupt you just a minute.  If I

3    conclude that this testimony is outside of this witness'

4    expertise, then the question arises whether or not what value

5    the testimony has, and where it fits within our rules of

6    evidence.  And that's been something that's been running

7    through my head since we first started talking about this.

8        And it seems to me that pursuant to Federal Rule of

9    Evidence 1006, which has to do with summaries, that this falls

10   there.  I'm sorry, 1006.  Did I say six or seven?

11           MR. FELMLY:  It is six, Your Honor.

12           THE COURT:  It says, "The contents of voluminous

13   writings, recordings or photographs which cannot conveniently

14   be examined in court may be presented in the form of a chart,

15   summary or calculation.  The originals or duplicates shall be

16   made available for examination or copying or both by other

17   parties at reasonable time and place.  The Court may order

18   that they are produced in court."

19       So it seems to me that this evidence, if it's nonexpert,

20   then it falls within that category, and it can come into

21   evidence under Rule 1006 as lay -- well, I don't want to call

22   it lay, because usually an expert prepares summaries -- but as

23   summaries of very voluminous complicated data, that it's

24   difficult for the Court to review, and these summaries help me

25   do that.

NEIL SHIFRIN — DIRECT EXAMINATION

1    So I think in any event, it comes in either as under

2    Rule 703, something experts in his field reasonably rely upon,

3    or under Rule 1006 as a summary.  And just occurred to me as I

4    was thinking through this situation that that may be

5    important, and I want to put it in the record.

6    You may proceed.

7    MR. FELMLY:  Thank you.  I also want to make it

8    clear, although I'm sure it's obvious to the Court, all of

9    this information has been extensively exchanged through the

10   parties.

11   THE COURT:  The underlying documents are available.

12   MR. FELMLY:  Underlying documents in discovery, then

13   the exhibits have been, we've exchanged them, and again, as I

14   said this morning, we actually came to an agreement with

15   respect to them coming in.  And I understand the Court's

16   concern about the stipulation we had.  But I agree and pleased

17   with that ruling.  We intend them as a summary, Your Honor.

18   BY MR. FELMLY:

19   Q.  Dr. Shrifin, I want to turn our attention now to the site

20   environmental conditions in the area that we've been talking

21   about in regard to the plant.  And in particular, want to

22   address the Plaintiff's Exhibit 80, which deals with the site

23   conditions at the site.  And have you gone through and done --

24   you have to go back from that.  Take it down for a second,

25   because I want to lay more foundation before I bring it up.

NEIL SHIFRIN – DIRECT EXAMINATION

1    In terms of the process of trying to examine where the tar

2    is and how it may relate to the structures that you portrayed

3    in the exhibits that we've just gone through with the judge,

4    can you tell the Court what the process you've undertaken in

5    order to form an understanding of the nature of the

6    contamination, where it is and how it may relate to the

7    structures that are part of the plant in the 1910 to 1926

8    period?

9    A.  In a nutshell, we've reviewed -- I've reviewed all of the

10   environmental information.  Let me break that down into what

11   that is.

12       There's several different types of information.  One are

13   the studies reports.  There was a preliminary investigation,

14   there were fingerprinting reports, chemical fingerprinting

15   reports, there was a remedial investigation study, there was a

16   baseline risk assessment.  There were a number of documents

17   that I would call studies reports.  I reviewed all of those.

18       And I reviewed the underlying information from those,

19   which is a very important fact that when environmental samples

20   are collected, particularly subsurface samples.  Corresponding

21   with those samples usually is some kind of a field log of what

22   the field person saw as they installed the boring or well or a

23   trench or something like that.  There's a lot of information

24   that can be gained from that.  We studied those very

25   carefully.  Because it doesn't necessarily show up in the

NEIL SHIFRIN – DIRECT EXAMINATION

1    laboratory result as much as we would like.  So that's why you

2    see notations of NAPL or tar or oil or sheeting or all of

3    these other things.

4        So we studied the reports and we studied the underlying

5    information that stand behind the reports.

6        In addition to that, we reviewed all of the regulatory

7    information related to the environmental issues.  So that

8    would be the two rods, the explanation of significant

9    differences, some of the correspondence between the gas

10   company and the agencies.  Those not only display the

11   environmental conditions, but they also describe the plans for

12   the remediation and the responses.

13   Q.  Now -- I'm sorry, I cut you off.

14   A.  Then we took all that information, and to some degree

15   recompiled it in our own way so we could manage the

16   information ourselves and make views of the information in

17   ways that are helpful to us.  So we took data that were

18   collected by others and reconfigured it into information that

19   helps us interpret the data better.

20   Q.  Let me step back one small step, I hope.  In general on a

21   site like this where there's examinations of groundwater and

22   there's examinations of whether there's contaminants like NAPL

23   in the subsurface, what are the principal ways in which

24   investigators obtain data, what are the sampling or drilling

25   or what are the processes that take place, and then I'm going

NEIL SHIFRIN – DIRECT EXAMINATION

1  to ask you about the magnitude of that in connection with this

2  site.  But first of all, how is this done?

3  A.  Well, of course you start with a blank slate, you're

4  standing on the ground and you're wondering what went on in

5  history when you don't see anything in front of you that used

6  to exist.

7      So generally and EPA prescribes this, you do what's called

8  a preliminary investigation where you look up historical

9  records to the extent you can, to understand the historical

10  operations of the plant.

11      That then gives you a guide to where to install samples.

12  And having some information about what happened at this parcel

13  of land in history, you collect samples.  And there are

14  several kinds of samples.  The fundamental samples are soil

15  borings, groundwater samples and excavation trenches.  Which

16  can be a combination of visual observations as well as soil

17  samples.  Or water samples.

18      So typically you design where you're going to put these

19  holes in the ground, and there are machines that will drill

20  the borings where you pound sleeves into the ground, you pull

21  them out and open them up and you see cores of soil that

22  presumably are exactly like they were in ground.

23      You make those observations, you write those into logs,

24  and those are the boring logs or the core logs that you

25  mentioned before.  And in some cases you take scoops of those

NEIL SHIFRIN – DIRECT EXAMINATION

1  soils, put it in a bottle, send it to a laboratory and tell

2  them what analytical fractions you want analyzed.  And at a

3  site like this you might do what's called a full priority

4  pollutant scan, which means trace metals, semi-volatile

5  organics, organics and possibly PCB pesticides, although that

6  might be unusual at a site like this.

7      Sometimes you take samples at multiple depths.  These

8  problems are very three-dimensional, extremely three-

9  dimensional.  So you might drill a hole in the ground and take

10  a sample at, say a two- to four-foot interval, and then take

11  another sample at a ten- to 12-foot interval, and even another

12  sample at a deeper interval.  Sometimes the way you decide on

13  those intervals is from having done some preliminary studies

14  so that you understand the stratigraphy of the subsurface.

15  Where's the clay layer, where are the sandy layers, where's

16  the peaty layers and things like that.  So you use some

17  information about the site geology and stratigraphy to guide

18  your sampling depth.

19      Some of the holes that you drill, you complete as wells.

20  And a well is nothing more than a plastic or steel tube, and

21  at the very bottom of it usually a five-foot length of it or

22  ten-foot length of it, it's slotted, very thin slots which

23  allows water to come in, and there's either a pump in that

24  well or you put another tube inside that well to collect a

25  water sample.

NEIL SHIFRIN – DIRECT EXAMINATION

1    So you collect groundwater samples and you send those to

2    the labs for the same analytical fractions.

3        Now, at a site like this, every hole you put in the

4    ground, every trench you dig, every groundwater well you put

5    in the ground, you're also looking for NAPL.  And NAPL has its

6    own characteristics.  So, for example, if it's a groundwater

7    well, that NAPL is going to want to sink to the bottom of the

8    well.  So you have to be sure you're sampling at the very

9    bottom of the well or with a special device.  And there are

10   special devices specifically to look for NAPL.

11       At any rate, at the end, you've done one round of sampling

12   where you've collected some soil borings, possibly some

13   groundwater samples, possibly some test trenches where you've

14   taken samples and made visual observations.

15       You compile all that information, and that either gives

16   you a full picture of the site, or it gives you enough of a

17   picture of a site to understand where you have to collect more

18   data to fill data gaps.

19   Q.  Have you made an extensive intensive review of all of that

20   data that comes out of that process that you just described in

21   a general way for the Charleston MGP site?

22   A.  Yes.

23       MR. FELMLY:  And, Denise, if you could bring up the

24   first slide in Exhibit 80.  Second slide.

25   Q.  This particular drawing is –– I gather is a drawing that

NEIL SHIFRIN – DIRECT EXAMINATION

1    you and your staff prepared, is that correct?

2    A.   That's right.

3    Q.   And this is called all sampling locations.  And what I'd

4    like to do is to first ask you what all the dots are, not in

5    terms of the color, because I know they're differentiated, but

6    just in general terms there are a series of dots all over this

7    area near the site.  What are these?

8    A.   Each dot is a sampling location.  And that sample location

9    may be a groundwater sample, a soil sample or soil samples at

10   multiple depths.

11   Q.   And with regard to the layout of the structures that are

12   present here, do these conform, both in terms of color and

13   location, to your -- the drawings that you were discussing a

14   little while ago which depicted the structures that you were

15   attributing to UGI during the relevant period?

16   A.   Yes, the structures are noted here, as well as the

17   sampling locations.

18        MR. FELMLY:  Now, Denise, if you could enlarge the

19   top half of it so that we pick up both the table as well as

20   the -- that's fine.

21   Q.   If you could, Dr. Shrifrin, and in relation to this, let

22   me first ask you, as environmental superfund sites go, and I'm

23   sure they vary tremendously, is this an intensively studied or

24   examined site?

25   A.   That is a well-studied site.  This site has a lot of

NEIL SHIFRIN – DIRECT EXAMINATION

1    samples compared to others that I've worked on.  I mean, I've

2    worked on some that have as many, but I've worked on some that

3    have much fewer, too.

4    Q.  And at this point if you could orient us and the Court for

5    how the table works and how the various dots should be

6    understood to be reflected in relation to the key or the

7    database that you've provided on the drawing.

8    A.  This drawing first shows all the sampling locations as

9    dots, but then we added information, what was in those dots,

10   what was in those sampling locations.

11       Dots that are colored red have DNAPL in the sample

12   location.  DNAPL being tar.

13           THE COURT:  I don't see any red dots.

14   A.  Maybe there's different colors on the different screens.

15           THE COURT:  Is that the top color on the left there,

16   is that red?

17   A.  This one right here is red.

18           THE COURT:  Okay.

19           MR. FELMLY:  Let me ask it here, because it's brown

20   on my screen, I'm not sure --

21           THE COURT:  Brown on my screen, too.

22   A.  Because brown means something else.

23           MR. VARON:  It's red-brown.

24   A.  There's red, there's brown and there's green.  Hopefully

25   on the screens they're distinguishable.  The red is meant to

NEIL SHIFRIN - DIRECT EXAMINATION

1   be DNAPL.

2         THE COURT:  I think we have brown, green and dark

3   brown.

4   A.  So the light brown would be the red.  So the light brown

5   or red is meant to denote DNAPL, which in this case is tar.

6   And there are two shades of each of these colors.  The darker

7   shade means there's enough there to be mobile, dripping.  And

8   the lighter means that all that was observed in our

9   interpretation of the logs is what we call residual, which is

10  just enough to be stuck to the soil but not moveable, not

11  dripping.

12      So the green is the LNAPL, which would be an oil floating

13  on the water table.  And you can see there are some, but there

14  are very few of those.

15  Q.  Let me just see if we can find, is there --

16  A.  These two right here are green.

17        MR. FELMLY:  So, Denise, if you could zoom that up

18  just so we could see that area a little bit better right in

19  there.

20        THE COURT:  Do I really need to know that?

21        MR. FELMLY:  You don't.  Do what?

22        THE COURT:  I said do I really need to know that?

23        MR. FELMLY:  Yeah, that's green.  I'm not sure --

24  Again, we'll try to provide something that's easily read.

25  BY MR. FELMLY:

NEIL SHIFRIN - DIRECT EXAMINATION

1  Q.  All right.  Keep going, what -- talking about a --

2  A.  There's brown here, which is NAPL, which all that means to

3  us is that when you review the boring logs, they didn't give

4  enough information to tell whether it's an LNAPL or a DNAPL.

5  So to keep it honest, we just say it's NAPL.  In this site

6  it's most likely tar.

7      Now, the thing -- forgetting about the red, green and blue

8  and brown, the thing to really note about this diagram is how

9  many colored dots there are.  And what that means is that

10 there's a lot of tar at this site.

11     The final thing I want to point out on this is these three

12 little blue arrows are the direction of groundwater flow.  So

13 this shows you how towards the east groundwater is flowing

14 towards the river, but towards the south it's flowing down

15 towards the Calihan arch.

16 Q.  Calhoun?

17 A.  Calhoun arch.

18 Q.  Are there sites here where there are essentially no hits?

19 In other words, are there --

20 A.  Well, there's no tar over in this southern area, that's

21 been observed so far with the sampling.

22 Q.  Okay.

23 A.  So the tar, the tar really is concentrated at the gas

24 plant and the steam plant, and then there's been some

25 migration over here into the -- what's now called Liberty

NEIL SHIFRIN - DIRECT EXAMINATION

1    Park.

2            THE COURT:  Right at the bottom of that circle, if

3    I'm right, that's Calhoun Street.

4    A.   This is Calhoun street.  That's right.

5            THE COURT:  And you say there's some storm sewer

6    right down the middle there?

7    A.   That's right.  There was a --

8            THE COURT:  Would that deter the flow of the tar?

9    A.   It could.  It could intercept the tar, depending on the --

10           THE COURT:  Seems to me like --

11   A.   -- the depth of the pipe.  I don't really remember how

12   deep that pipe was, but I've seen that happen at sites.

13   BY MR. FELMLY:

14   Q.   Let me ask you about that sewer.

15           THE COURT:  I'm going to recess.  I promised you to

16   recess a little early today, and I apologize for depriving

17   y'all of another hour of court, but I've got somewhere I want

18   to go.  Since we're going to be here for three weeks, if it

19   was one week I'd switch my schedule around, but since we're

20   going to be here for that period of time, I'm going to recess

21   early.

22        So we'll pick back up in the morning at 10:00 o'clock and

23   run a normal day tomorrow.  Have a nice evening, I'll see you

24   back.  And try to fix those exhibits up and give them to the

25   clerk in the morning.

364

NEIL SHIFRIN - DIRECT EXAMINATION

1          MR. FELMLY:  I will.

2

3      (Court adjourned at 4:00 o'clock p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATION

2

3              I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4    Reporter for the United States District Court for the District

5    of South Carolina, hereby certify that the foregoing is a true

6    and correct transcript of the stenographically recorded above

7    proceedings.

8

9

10

11    _____

12    Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25