1        IN THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF SOUTH CAROLINA

2            CHARLESTON DIVISION

3  SOUTH CAROLINA ELECTRIC & GAS  :   VOLUME IV

    COMPANY                 :

4                    :

           vs.           :

5                    :

    UGI UTILITIES, INC.       :   2:06 CV 2627

6

7

8         Trial in the above-captioned matter held on

9  Thursday, March 19, 2009, commencing at 10:00 a.m., before

10  the Hon. C. Weston Houck, in Courtroom IV, United States

11  Courthouse, 85 Broad Street, Charleston, South Carolina.

12

13

   APPEARANCES:

14

               BRUCE FELMLY, ESQ., BARRY NEEDLEMAN, ESQ. and

15           CATHRYN E. VAUGHN, ESQ., P.O. Box 326,

               Manchester, NH, appeared for plaintiff.

16

               ELIZABETH PARTLOW, ESQ., 1320 Main Street,

17           Columbia, SC, appeared for plaintiff.

18           JAY N. VARON, ESQ., 3000 K Street NW,

               Washington, DC, appeared for defendant.

19

               PAUL BARGREN, ESQ., 777 E. Wisconsin Ave.,

20           Milwaukee, WI, appeared for defendant.

21           R. SCOTT WALLINGER, JR., ESQ., P.O. Box 12487,

               Columbia, SC, appeared for defendant.

22

23

       REPORTED BY DEBRA LEE POTOCKI, RMR, RDR, CRR

24                P.O. Box 835

            Charleston, SC  29402

25             843/723-2208

1                                  I N D E X

2

3     WITNESS:   NEIL SHIFRIN (CONTINUED)

4     Direct Examination by Mr. Felmly........................  558
      Cross-Examination by Mr. Varon.........................  596
5     Redirect Examination by Mr. Felmly.....................  696
      Recross-Examination by Mr. Varon.......................  699

6

7

8

9     EXHIBITS:                          Received in Evidence

10
      Plaintiff's Exhibit 101                      559
11    Plaintiff's Exhibit 66                       562
      Plaintiff's Exhibit 64                       564
12    Plaintiff's Exhibit 161                      574
      Plaintiff's Exhibit 49                       584
13    Plaintiff's Exhibit 211                      589

14

15

16

17

18

19

20

21

22

23

24

25

NEIL SHIFRIN – DIRECT EXAMINATION

1      THE COURT:  All right, sir.

2   BY MR. FELMLY:

3   Q.  Good morning, Dr. Shifrin.

4   A.  Good morning.

5   Q.  We went through a lot of material yesterday involving

6   various aspects of plant operation.  We're going to do a

7   little bit more of that today.  But there are several

8   documents that I want to show you right off the bat that

9   relate a little bit more to what we talked about yesterday.

10      The first is Exhibit 101.  This is entitled annual

11  authorizations for CCR&L's capital improvements and equipment

12  repairs, it's one of the tables from your report.  And would

13  ask you to, once it comes up on the screen, identify what --

14      (Brief interruption in proceedings.)

15  Q.  If you can -- what is the -- first of all, is this

16  something you prepared?

17  A.  Yes.

18  Q.  And what is it, sir?

19  A.  This is a year-by-year accounting of the authorizations

20  for repairs and capital expenses at the Charleston plant,

21  authorized both by UGS and later by CCR&L.

22  Q.  So these have been reviewed and had action taken on them

23  by UGI?

24  A.  That's right.

25  Q.  And they go through the entire -- essentially through the

NEIL SHIFRIN – DIRECT EXAMINATION

1   entire period?

2   A.  That's right.

3   Q.  So this would really be a summary, sir, of what you were

4   able to see and discern in many of the minutes we went through

5   yesterday?

6   A.  That's right.

7        MR. FELMLY:  Your Honor, I'd ask that Exhibit 101,

8   the summary of these capital improvements and repairs, be

9   marked as a full exhibit.

10       THE COURT:  Any objection?

11       MR. VARON:  No objection, Your Honor.

12    (Plaintiff's Exhibit 101 received.)

13  BY MR. FELMLY:

14  Q.  Now, Dr. Shrifrin, when I was asking you yesterday about

15  the inspections and you went through a number of the plant

16  inspection forms, we talked a bit about what types of things

17  at a plant would be inspected, what types of structures and

18  proper inspection would include.  As a consequence of your

19  work in UGI, have you actually seen in other UGI plant

20  locations, the UGI inspection forms that were used on those

21  plants?

22       MR. VARON:  Objection, Your Honor.  We've objected to

23  these exhibits.  Mr. Felmly, I believe, is going to try to

24  show an inspection report that UGI made at a New Hampshire

25  company, different time periods, all these plants are

NEIL SHIFRIN – DIRECT EXAMINATION

1    different.  We are objecting on relevance grounds --

2            THE COURT:  Well, it seems to me that any pattern or

3    any method by which they operate with their subsidiaries may

4    have some relevance.  I assume that's why you're offering it?

5            MR. FELMLY:  That's right, Your Honor, we have them

6    from Concord, New Hampshire and Meriden and Norwalk,

7    Connecticut.  They are different periods, and we're not saying

8    they were exactly what's here, but they do show, we believe,

9    relevance in types of things that were there.  And I'm going

10   to ask Dr. Shifrin whether he believes it was likely

11   comparable here.

12           THE COURT:  You never know how the facts are going to

13   look until you get to the end, but it may very well be that

14   how they treat different subsidiaries is an important

15   consideration in determining how they treated the Charleston

16   plant.  I mean, at least arguably it doesn't seem too logical

17   that unless some explanation for it is given, why they would

18   treat one plant differently from the others; seems like they

19   would treat them all the same.  At least that's a possible

20   inference to draw from the evidence.

21           MR. VARON:  I can take it on cross.

22           THE COURT:  At this time I'm going to hear the

23   evidence and see where it goes.

24   BY MR. FELMLY:

25   Q.  So, Dr. Shrifin --

NEIL SHIFRIN - DIRECT EXAMINATION

1          MR. FELMLY:  And, Denise, if you could bring up

2     Exhibit 66.

3          THE COURT:  But if he goes through too many plants, I

4     may hear a too much objection.

5          MR. VARON:  I think the problem is you're not going

6     to hear about very many.

7          MR. FELMLY:  There are four, Your Honor, I believe.

8     BY MR. FELMLY:

9     Q.  The document, Exhibit 66, is what, Dr. Shrifrin?

10    A.  This is an inspection report by UGI of the Concord, New

11    Hampshire gas plant, and it's on a form, a standardized form

12    that UGI used for these inspections.  And the significance of

13    it, in my opinion, is that it demonstrates the level of detail

14    and the level of gas plant knowledge that UGI had and pursued

15    during its inspections.

16         MR. FELMLY:  Do you have the intervening pages to

17    this?  Okay, if you could bring up the table of contents.

18    Q.  Dr. Shrifrin, this is the table of contents from the

19    Concord inspection, UGI inspection form for the Concord plant.

20    In terms of the issues of the operation of the plant on a

21    day-to-day basis and its, you know, management, control and

22    direction, what would be the areas here that you would think

23    would be most pertinent in terms of issues of pollution,

24    matters related to whether pollution's going to get in the

25    environment?

NEIL SHIFRIN – DIRECT EXAMINATION

1   A.   In this table of contents you can see they're inspecting

2   the tar handling system, which is on page three in the table

3   of contents.  Emulsion troubles they mention, because as I

4   said, carbureted water gas plant typically had emulsion

5   issues.  They often dealt with them, but it was often a pain

6   to deal with it, so they're looking at how the plant is

7   dealing with it.

8       Inspections of holders would include the condition of the

9   holders.  And holders historically have been a large source of

10  tar to -- in the form of leaks to the environment.  Those

11  would be three areas where this inspection would have

12  evaluated areas of the plant that involved tar handling, and

13  ultimately the releases tar to the environment.  Although they

14  weren't necessarily inspecting for that.

15          MR. FELMLY:  Your Honor, I'd offer Exhibit 66, which

16  is the Concord inspection that UGI conducted at that plant as

17  a full exhibit.

18          MR. VARON:  I object, Your Honor, but --

19          THE COURT:  Objection overruled for the reasons

20  previously stated.

21      (Plaintiff's Exhibit 66 received.)

22  BY MR. FELMLY:

23  Q.   We have two other Concord plant inspections, is that

24  correct, Dr. Shrifrin?

25  A.   Yes.

NEIL SHIFRIN - DIRECT EXAMINATION

1    MR. FELMLY:  I'm just going to reference these

2  briefly.  If you could bring up Exhibit 65, the cover sheet

3  for that, Denise, if you would, please.  Exhibit 65 is the

4  Concord inspection for September 28th, 1931.  In regard to

5  this, if you could, Denise, shift into the table of contents

6  or so-called index.

7  Q.  Now, this is referencing the distribution aspect of the

8  plant, primarily, is that correct?

9  A.  That's right.

10 Q.  Is there an area of this table of contents where they are

11 dealing with records of leaks?

12 A.  Yes.  There is a section on the leak record, and they're

13 inspecting in this report how records are kept on the leaks in

14 the distribution system.

15    MR. FELMLY:  And if you go over to the -- if you

16 could go, let's say, two pages in, if you would, please,

17 Denise.  I just want to show the Court the way in which this

18 particular form is kept.  And if you could zoom that up.

19 Q.  In terms of the way this information was obtained as part

20 of this inspection process, how would you describe, sir, what

21 we're looking at here in terms of whether this is done in a --

22 sort of predetermined way, or whether it's done more

23 narratively or spontaneously?

24 A.  It's not spontaneous.  This is about a 50 or 100 pages

25 document that is a form.  And you can see the nature of the

NEIL SHIFRIN – DIRECT EXAMINATION

1   form in the questions.  The questions are preprinted.  And the

2   typewritten entries are the inspector's response to questions.

3   So the inspector is guided by this form to inspect every

4   little detail that the form asks for.

5       And I should just say that the detail is minute in terms

6   of there are other pages, and maybe not this inspection, but

7   the works inspection, where the level of detail is, do you

8   turn -- does the operator turn the valve one and a half times

9   to open up the whatever.  It's that level of detail.

10          MR. FELMLY:  So, Your Honor, I'd offer this second

11  Concord Gas -- this is Exhibit 65, and we'd offer this as a

12  full exhibit.  And while I'm at it, I don't know that we need

13  to go through the third one.  Exhibit 64 is a third and my

14  last Concord Gas inspection report, and that one is dated

15  April of 1940.  And I'd offer Exhibit 64 and 65 for the same

16  reason.

17          MR. VARON:  Same objection.

18          THE COURT:  Okay.  Objection overruled.

19      (Plaintiff's Exhibits 64 and 65 received.)

20  BY MR. FELMLY:

21  Q.  I want to move to a different state, this is Connecticut,

22  and address a works inspection report that we have for

23  Norwalk, Connecticut.

24          MR. FELMLY:  And, Denise, if you could bring up 68.

25  Q.  Our Exhibit 68, Dr. Shrifin, deals with a UGI affiliated

NEIL SHIFRIN – DIRECT EXAMINATION

1  plant that is located where?

2  A.  In Norwalk, Connecticut.

3  Q.  And the date of this inspection is April of 1927?

4  A.  Right.

5       MR. FELMLY:  And in terms of the format, Denise, if

6  you could go to the table of contents, the outlines of the

7  work inspection, which is the next page, I believe.  It's

8  18856.  0018856.  And if you could highlight that for us.

9  Q.  Dr. Shrifin, in terms of the --

10       MR. FELMLY:  Maybe you should highlight it in half,

11  Denise, so we can actually see what we're looking at here.

12  Q.  In terms of the level of detail and the matters that are

13  looked at by the inspectors at the Norwalk plant, what's of

14  significance here in terms of the inspection process?

15  A.  This is an inspection of the entire works, which includes

16  the gas generation equipment, as well as the downstream

17  equipment.  And it's extremely detailed.  It's every single

18  aspect of operation of the plant was inspected by UGI.

19       MR. VARON:  Your Honor, I have to object.  We are

20  litigating a Connecticut case at the same time we're

21  litigating this one.  This inspection is being performed not

22  by UGI employees, but by employees of the subsidiary.  I guess

23  we can get there, but I think it's misleading to characterize

24  this as a UGI inspection.  These people work for --

25       THE COURT:  You're going to have an opportunity to

NEIL SHIFRIN - DIRECT EXAMINATION

1    cross-examine him.

2              MR. VARON:  Okay.

3              MR. FELMLY:  Denise, if could you go to page 18866,

4    please, and if you could enlarge the top half of the page.

5    BY MR. FELMLY:

6    Q.  What I'm interested in here, Doctor, is your comment about

7    the level of detail and the precision that was asked about.

8    And does this page assist in identifying information of that

9    sort?

10   A.  Yes.  In excruciating level of detail.  This also

11   reflects, by the way, how complex operating these plants are.

12   Q.  So when they are asking the question in question 32,

13   what's the difference in inlet and outlet water temperatures,

14   this should be between 15 and 18 degrees, and then down below

15   information about whether the exhaust products exceed the

16   temperature of the inlet water by more than three degrees, I

17   mean in terms of level of detail, how would you describe that?

18   A.  It's about as much detail as you could have for operating

19   the plant.  I mean, it's -- and this is only the calorimeter,

20   which is measuring the heat content of the gas.  The --

21   there's similar level of detail for every element of the plant

22   operation.

23             MR. FELMLY:  Denise, if we could go to Exhibit 67,

24   which is the last of these inspections, the Meriden works

25   inspection report for January of 1927, this is Meriden,

NEIL SHIFRIN — DIRECT EXAMINATION

1    Connecticut.  I'm going to be interested in having you bring

2    up the outline of the works inspection table of contents on

3    that one as well.  It's 0016695.  And this time let's enlarge

4    the bottom half of the page.  This looks like the same table

5    of contents.

6    Q.  As it relates, Dr. Shrifrin, to issues of tar and tar

7    removal, do they discuss that in connection with the

8    inspection process that they're going through?

9    A.  Yes.  Tar -- well, there's the oil tar entry on page 55,

10   the tar would be in the hydraulic main and other areas of the

11   plant.  Another element of this is even though this is a

12   different plant, this is the same form.  Or very similar form.

13        MR. FELMLY:  Your Honor, as to these two Connecticut

14   inspections, we offer the Exhibit 68 and 76 as full exhibits

15   for Meriden and Norwalk, Connecticut.

16        MR. VARON:  Your Honor, I object, and I just make the

17   following point as well.  There's a lot of evidence at issue

18   in the Connecticut case.  We're going to have a trial on this

19   in a little while.  But if these get admitted, I'm going to

20   want to come back in here, and I can't do it right at this

21   instant, and show you that this subsidiary, Connecticut Light

22   and Power, had its own form library, had its own inspection

23   procedures.  I will feel constrained to rebut the notion that

24   these --

25        THE COURT:  You have an opportunity to do that.

NEIL SHIFRIN – DIRECT EXAMINATION

 1    That's what cross is all about.

 2              MR. VARON:  I understand, but we'll end up litigating

 3    the second case in this one.

 4              THE COURT:  I don't think so.

 5              MR. VARON:  Okay.

 6              THE COURT:  I don't think I'll make any rulings that

 7    would have any bearing on that case.  Certainly the fact that

 8    I let certain evidence in, in this case, wouldn't affect how

 9    the judge in that case rules in any way whatsoever.

10              MR. VARON:  I'm not suggesting that, Your Honor, I'm

11    just suggesting that we're going to go pretty far afield.

12              THE COURT:  I would not think that I would make any

13    findings of fact as to what went on at that plant.  I will

14    make findings of fact about what went on at other plants, I

15    don't know that I'd specifically name a plant.  So I would

16    norm -- normally I'd be very careful not to do anything that

17    would interfere with that other trial, even though I didn't

18    know anything about it.

19              MR. VARON:  I don't want to belabor it.  I'm not

20    worried about the precedential aspects of it, the findings,

21    I'm worried about extending this case by virtue of arguing

22    that something happened in a different situation that has --

23              THE COURT:  What you're telling me right now can be

24    disposed of on cross-examination in less time than it took you

25    to tell it to me.

NEIL SHIFRIN - DIRECT EXAMINATION

1              MR. VARON:  I'm sorry.

2              THE COURT:  All you have to do is ask him those

3    questions, and if he's knowledgeable, he's going to tell you

4    yes, they have their own inspection crew; yes, they do this.

5    I mean --

6              MR. FELMLY:  Should I move on?

7              THE COURT:  Can you do what?

8              MR. FELMLY:  Should I go on?

9              THE COURT:  Sure.  I overrule the objection.

10             MR. FELMLY:  Okay.

11   BY MR. FELMLY:

12   Q.  New topic, Dr. Shrifrin.  The nature of the cleanup of

13   this site, the Charleston MGP that we've gone through and

14   you've gone through and Mr. Effinger has gone through in

15   substantial detail, involves both places where removal of

16   product is taking place, as well as remediation of product, is

17   that right?

18   A.  Right.

19   Q.  How would you categorize, in terms of your environmental

20   experience and the work you've done on these, the interplay or

21   the categorization, if you will, of the site in terms of the

22   terminology of remedial versus removal?

23   A.  EPA guidance and the NCP have very definite terms, removal

24   action and remedial action, and they mean very different

25   things.

NEIL SHIFRIN – DIRECT EXAMINATION

1          THE COURT:  We're in another area now.  There's no

2     objection to this, but we are definitely in an area of legal

3     opinion.  These words have a peculiar meaning in the law.  The

4     cases that I cited to you, which I'm sure you've read many

5     times, clearly say that where they have a different meaning in

6     law, then his testimony concerning the same will not assist

7     the jury.

8        You can go into them, but I have definitions that I found,

9     I just sent my clerk for them, I'll be glad to show you those

10     definitions and let you argue about them as to whether you

11     agree with them.  But I wanted to know the meaning of those

12     terms, because in your pretrial briefs you refer to them, and

13     I wanted to be sure that I understood what the correct meaning

14     was.  And here's a definition that I have.  Show that to your

15     counsel and see if that's an accurate definition, if you agree

16     with that.  I thought it was consistent with what was

17     contained in your brief.

18          MR. FELMLY:  Partially.  The issue of the --

19          THE COURT:  Show it to counsel.

20          MR. FELMLY:  I have some -- I would take, based on

21     the case law, some clarification, but that really wasn't where

22     I was going with him.

23          THE COURT:  You can go with him and that's fine.  I

24     just wanted to -- counsel didn't even object, but

25     parenthetically I want you to understand I think you're in an

NEIL SHIFRIN – DIRECT EXAMINATION

1    area that we have dealt with earlier in this witness'

2    testimony, and which if a jury was sitting there, I probably

3    wouldn't let him testify.

4         MR. FELMLY:  I understand.  I'll tell you one other

5    thing.  The reason I'm in part going there --

6         THE COURT:  This is just a starter, I'm not saying

7    we're not going to elaborate on that through case law.

8         MR. FELMLY:  The point that I was getting at really

9    is he was extensively examined by opposing counsel at his

10   deposition on this, and I'm -- I don't think I'm out on a limb

11   in guessing that he may be examined about it again.  And

12   that's why I brought this matter up, because I know that this

13   is a point that they intend to examine Dr. Shrifrin on, and I

14   wanted to, while I'm on my feet, have him explain what his

15   understanding on that was.  But certainly not from a, you

16   know, full-blown legal analysis, but from a practitioner in

17   the trade and his understanding.  I was going leave it at

18   that.

19        THE COURT:  You see, the point is this.  From a legal

20   point of view, he can't do it.  From a lay point of view, it's

21   irrelevant.  The terms have no meaning to me except in a legal

22   sense.  And he can't testify to a legal sense.  So you say

23   he's testifying to what they mean to him, well, I mean, if

24   they mean the same thing to him they mean to the average

25   layperson, then it doesn't come in under 702.  If it means

NEIL SHIFRIN - DIRECT EXAMINATION

1    something else, it doesn't come in under some other exception.

2         MR. FELMLY:  Well, let me just say this then, Your

3    Honor, and sort of what I recall the New Hampshire rule, which

4    is what's good for the goose is good for the gander.

5         I won't go into that if --

6         THE COURT:  If you're saying I've got to sit here and

7    listen to a lengthy cross-examination on it just because

8    you're going into it, I'm inclined not to let you go into it,

9    because I don't think it's going to make a particle of

10   difference.  I'm going to make my decision as to what I think

11   remediation means and what I think removal means, under the

12   law.

13        MR. FELMLY:  Under that --

14        THE COURT:  Any other basis is irrelevant.

15        MR. FELMLY:  Under that very helpful explanation, I'm

16   not -- I'm going to withdraw that question, I'm not going to

17   ask him what he thinks about it, because I agree it does get

18   to a legal issue.  And we'll presume that on cross -- well,

19   we'll see what they do.  But I'll be taking the position that

20   you just advanced and I won't ask that question.

21        THE COURT:  I was reading a case here a moment ago

22   and it was talking about Rule 403, and I never had heard it

23   before.  But it said Rule 403 can be used to shorten the

24   trial.  And so that's the rule I'm ruling under.

25        MR. FELMLY:  Shorten it.  Okay.  Thank you, Your

NEIL SHIFRIN – DIRECT EXAMINATION

1  Honor, shorten is good.

2  BY MR. FELMLY:

3  Q.  New topic, Dr. Shrifrin.  There are two other areas where

4  there are a number of different documents from the historic

5  record I want to address with you.  One is the purchasing of

6  raw materials that are used in the plant, and the other one is

7  some matters relating to the engineering and operating notes.

8  And let me direct you first to the Exhibit 161?

9        MR. FELMLY:  Your Honor, this is a composite exhibit

10  of historic information related to the purchase of raw

11  materials and the use of the raw materials in the plant, and

12  having removed the summary sheet and all of the source

13  materials having been out of the historic record or the

14  company records, I would offer 161 as a full exhibit in the

15  same fashion as the other composites.

16        THE COURT:  Any objection?

17        MR. VARON:  I'm just going to take a quick look, Your

18  Honor.

19        THE COURT:  I cited to you earlier the case of United

20  States of America versus Barile, and this is a statement from

21  that case.  Under Rule 701 and 702, opinions must be helpful

22  to the trier of fact, and Rule 403 provides for exclusion of

23  evidence which wastes time.  I never have heard that before,

24  but that's the basis for my ruling.

25        MR. VARON:  I have no objection to the underlying

NEIL SHIFRIN - DIRECT EXAMINATION

1   documents.

2       (Plaintiff's Exhibit 161 received.)

3   BY MR. FELMLY:

4   Q.  With regard to Exhibit 161, and there's a lot of material

5   in here, I'm going to talk just about oh, four or five of

6   them, I think, Dr. Shrifrin.  But before I do that, before we

7   identify the document, I'd like you to explain to the Court

8   from the point of view of the engineering and the day-to-day

9   operating and the running of the plant, why actions in terms

10  of selecting or purchasing or choosing particular types of raw

11  materials, such as particular coal or particular oil, how does

12  that bear on issues that go to the question of how much tar

13  was produced or the quality of the tar or things related to

14  the product that ends up being a pollution?  In other words,

15  what's the link between the raw material selection decisions

16  and what end up being a possible pollution problem for the

17  site?

18  A.  The nature of the raw materials in the plant, for example,

19  coal or coke or oil, has a direct bearing on the amount of tar

20  that's generated by the gas production.

21  Q.  And why is that?  What is it about the qualities of the

22  coal that -- the short version of why, from a coal pyrolysis

23  or combustion purpose that happens?

24  A.  Let me give you a couple examples to answer that question.

25  UGI embarked on a research program or -- in the 1920s, early

NEIL SHIFRIN – DIRECT EXAMINATION

1    1920s, because the price of coke was so expensive.  They

2    researched the use of coal in the carbureted water gas

3    generators.

4        This, at the time, was very unusual, because to date, the

5    generators had almost exclusively burned coke.  UGI at several

6    of its plants, including Charleston, decided to try bitumen

7    coal in the generators, and I would argue that this is a

8    purchasing department decision, or driven by a purchasing

9    department need to optimize purchasing costs.

10       As a result of the use of bitumen at Charleston in 1923,

11   tar production increased 150 percent.  So that's an example of

12   how a decision about purchasing, in this case purchasing coal

13   for the use in generators as opposed to coke, results in

14   having an impact in tar production.

15       Similarly, the type of oil that was used in the carburetor

16   could produce more or less tar.  The classic example is in the

17   early years of carbureted water gas production, naphtha and

18   light oils were used because they were cheap.

19       As the use of the automobile increased, there was a

20   competition between oils being refined for gasoline for cars

21   versus being bought by plants like coal gas carbureted water

22   gas plants, and heavier oils started being used, because as a

23   purchasing department decision, it was cheaper to buy heavier

24   oils.  Heavier oils make more tar in a carbureted water gas

25   process.

NEIL SHIFRIN - DIRECT EXAMINATION

1          MR. FELMLY:  Now, Denise, if you can bring up 00113.

2     And at the bottom -- this is a UGI minute of July 3rd, 1911.

3     And if you could bring up the bottom paragraph, let's just go

4     through a couple of these.

5          THE COURT:  How do you know -- in that last series of

6     questions, how do you know that the production of tar

7     increased 150 percent?  You see that from their records?

8     A.  From the Brown's Directory records.

9          THE COURT:  They sold 150 percent more?

10    A.  The Brown's Directory for that year, I believe, had just

11    production, and they produced 150 percent more.

12         THE COURT:  Okay.  And again, you don't know what the

13    leaking was?

14    A.  That's correct.

15    BY MR. FELMLY:

16    Q.  So looking at this photo from 1911, and just to establish

17    the role that UGI played, what is occurring here with respect

18    to the action of the UGI purchasing agent up in Philadelphia?

19    A.  The UGI board is directing the purchasing agent to buy

20    specifically this type of coke, and I believe elsewhere some

21    coal, anthracite coal.

22    Q.  Well, the way they phrased this is it's recommended that

23    the purchasing agent, that the purchasing agent is Mr. Pearson

24    up in Philadelphia, right?

25    A.  That's right.

NEIL SHIFRIN – DIRECT EXAMINATION

1    Q.  He's a UGI employee.

2    A.  That's right.

3    Q.  He's also the purchasing agent for the company in

4    Charleston.

5    A.  That's right.

6    Q.  And we're not going to go through very many of these, but

7    in Exhibit 161, are there a very very large number of these

8    types of transactions where there is a recommendation and/or a

9    direction that says that certain type of coal should be

10   purchased or coke at a certain price?

11   A.  There are.  And not only are there a large number of this

12   within UGI directors' minutes, but there are parallel --

13   identical parallel recommendations within the CCR&L minutes.

14   So you'll see something like this in the UGI minutes, and in

15   1911 of a certain month, and a month later you'll see the

16   identical direction in the CCR&L directors' minutes.

17   Q.  Well, let me just see if I understand what you're talking

18   about on that, and see if we can develop that.

19        MR. FELMLY:  Denise, if you could bring up the Bates

20   number 000677.  It's UGI-SC 000677.  First of all, if you can

21   go to the top of the page, we're going to try to see that

22   parallelism.  This note is from November of 1923, and let's go

23   down a little bit and see what the transaction involves.

24   Q.  So Mr. Pearson, the purchasing agent, has submitted an

25   estimate of steel pipe requirements for various companies, and

NEIL SHIFRIN – DIRECT EXAMINATION

1    is Charleston one of those?

2    A.  Yes.

3    Q.  And the amount of estimate that Mr. Pearson came up with

4    for this series of companies, and specifically as to

5    Charleston, was $3826.53 of steel pipe at the very specific

6    price that was set forth up above?

7    A.  Right.  This is Mr. Pearson at UGI making this purchasing

8    decision for Charleston.

9         MR. FELMLY:  Now, Denise, I have in my hand --

10   actually you've got it.  And then do you have the other -- see

11   if you can bring up the two other entries that relate to this

12   transaction.  Okay.  Let's look at the top and see first if we

13   can identify this parallelism that Dr. Shrifrin was just

14   mentioning.  Go to the top of the minutes first, I think, so

15   we know whose board minutes we're talking about.  On the right

16   side we have the subsidiary company, CCR&L, in a November 28,

17   1923 note of action of their board, and if you go to the top

18   of the other one, let's see if we can identify what that is.

19   Q.  So this is the UGI board minute --

20        MR. FELMLY:  I think you have the wrong one, Denise,

21   we need to have the January 1st minute in there.  It will be

22   UGI-SC 000718.

23   Q.  All right.  So there's a -- the first one we saw was in

24   November, Mr. Pearson estimated on the UGI minutes that need.

25   The next event in time is actually over on the right side, and

NEIL SHIFRIN – DIRECT EXAMINATION

1   that's the November 28 note, and if you go to the bottom of

2   the page, the subsidiary board on that date submitted an

3   estimate of Mr. Pearson in what amount, Dr. Shrifin?  Is it

4   the same amount?

5   A.  Right, it is the same amount.

6   Q.  Now then, Dr. Shrifrin, to illustrate the point you were

7   making, what happens next?  If we go back to the left side.

8   A.  Well, on the left side UGI is recommending that the local

9   company make this expenditure.  On the right side the local

10  company is authorizing to make the expenditure.

11  Q.  So in terms of the parallelism that you're describing,

12  what's your point?

13  A.  Philadelphia says buy this, and Charleston rubber stamps

14  it.

15  Q.  And are the amounts the same?

16  A.  Yes.

17  Q.  How often, in terms of your review of records involving

18  purchases and transactions involving money, have you seen that

19  sort of point counterpoint, same amount, two-step process?

20  How often is that?

21  A.  I've seen it for things like overall budgets, all repairs

22  and all capital expenses.  I've seen it for every year.  For

23  items like this, pipe, coal, pipe, oil, I found about a half

24  dozen of these exact examples, parallel decisions, and put

25  them in my report in table 8.4.  8.4.  There's about a half

NEIL SHIFRIN – DIRECT EXAMINATION

1    dozen specific examples of similar parallel decisions.

2         MR. FELMLY:  Denise, if you could bring up UGI-SC

3    000341.  And I think this will be the last one we'll look at

4    in this category.  What I'm interested in is the entry for

5    Charleston in the middle of the page.

6    Q.  This is UGI minutes, this is August of 1915.  Again, it's

7    an action initiated by the purchasing agent that he be

8    authorized to close.  Now, where is -- now, Mr. Pearson in

9    Philadelphia is buying coal located where?  Or where is the

10   company that he is dealing with in order to buy this coal?

11   A.  Well, it says Stonega Run of mined coal.

12   Q.  Says W. Johnson and Company, is it Charleston, South

13   Carolina?

14   A.  Right.

15   Q.  So in terms of the work of the purchasing agent, buying

16   coal for these various companies, he even does that when the

17   coal is local.

18   A.  Right.

19   Q.  Now, in terms of -- as I say, I'm not going to go through

20   all the rest of these, and there are very many similar ones in

21   this exhibit.  But in general terms, the information that's

22   contained here showing these kinds of transactions as they

23   relate to raw materials is important to you as part of your

24   opinions on control from an engineering and operational point

25   of view, in what way?

NEIL SHIFRIN – DIRECT EXAMINATION

1    A.  From an engineering standpoint, the management of raw

2    materials has a direct bearing on the generation of tar, or

3    the use of raw materials in the plant have direct bearing of

4    production of tar.

5              THE COURT:  Okay.  Now, that supposedly authorized

6    the purchase of coal.  What if they had authorized the

7    purchase of something else to run the plant?  Would it have

8    caused less tar?  What would that have been, coke?

9    A.  Coke would have been the standard fuel in the generator.

10   It's unclear to me that there are different qualities of coke.

11   Because coke is coal that's burned without oxygen, and it's

12   pretty much pure carbon.  So the quality of the coke would not

13   have a bearing on the tar production.  But the choice between

14   coal and coke would have a bearing on the tar production.

15             THE COURT:  And you testified to that difference just

16   a moment ago.  Which one produces the most tar?

17   A.  Coal.

18             THE COURT:  Coal.  Okay.

19   A.  Coal.  And then the choice of different carbureting oils

20   could have a bearing on the generation of tar.

21   BY MR. FELMLY:

22   Q.  Dr. Shrifrin, I'd now like to turn our attention to the

23   so-called engineering and operating notes.  We talked a little

24   bit about those yesterday, and we're not going to spend much

25   time on them, but there are several I want to draw attention

NEIL SHIFRIN – DIRECT EXAMINATION

1     to.

2          MR. VARON:  Could you give me a second please?  I

3     appreciate it, thank you.

4          MR. FELMLY:  Your Honor, Exhibit 49 are the -- I

5     believe they're the complete compendium or at least the ones

6     that were able to be obtained of the engineering and operating

7     notes.  And we would like to offer those as a complete

8     exhibit, again, as a composite, and removing the summary sheet

9     or the index or abstract to them.  And so at this point I

10    would offer them as a full exhibit.

11         MR. VARON:  I don't object.  It's just not clear to

12    me which notes are in there.  I know we have red printed

13    notes, but a lot of the notes are illegible.

14         MR. FELMLY:  Let me explain that, Your Honor.  There

15    is legible material available, but it is important to note

16    that some of these materials were -- the materials that we're

17    offering were found in the Philadelphia library.  Some of them

18    were photocopied some period of time ago when the Philadelphia

19    Library permitted these ancient or hundred-year-old documents

20    to be photocopied.  And somebody did that, and the ones that

21    are hard copied, indeed were done by photocopy.

22         When we discovered in preparation of this case that there

23    were a fuller set there, we were advised by the library

24    personnel and the library that under no circumstances would

25    they permit us to photocopy them or run them through a Xerox

NEIL SHIFRIN – DIRECT EXAMINATION

1    machine, and that we had to come down and do digital camera

2    photocopying of them.  And so a portion of them are

3    photocopied.  The printing of that digital camera is not

4    legible.  However, we provided the Court a disk, the digital

5    aspect of it where on a monitor screen they can be reviewed

6    and are legible.  So the exhibit that we've provided you has

7    the ability to do it.  Good news for today is I'm not going to

8    make reference to any of the ones that are digitally here, but

9    part of the complete set is there.  And you can, working off

10   the disk, read them from the digital camera image.  And it's

11   the only way we were able to get the entire set in there.

12   Apparently the end of this version is apparently one of the

13   people that worked for UGI as a manager took his book with the

14   legend that said don't remove it from the plant, had it, and

15   it became part of the permanent collection in the Philadelphia

16   Library, and that is a very fragile document.

17        And so I'd offer the whole set, although Mr. Varon is

18   probably right, I better be sure that my offer of proof is

19   broad enough to include --

20            MR. VARON:  Part of my concern, are you saying that

21   you're offering all the available engineering notes, or just

22   the ones that you have picked out pursuant to your composite

23   exhibit that you're taking the summary away from?

24            MR. FELMLY:  All the ones we have here, and we would

25   not object if you had others you wanted to supplement.  But

NEIL SHIFRIN – DIRECT EXAMINATION

1    everything I've got, I'm offering as a full exhibit, with the

2    disk that would enable them to be read by the Court.

3              MR. VARON:  I have no objection, Your Honor.  I'm not

4    positive, but I don't think it's everything, and we'll

5    probably put in the rest, if we determine that.

6              MR. FELMLY:  I'll have no objection.

7              THE COURT:  Without objection.

8         (Plaintiff's Exhibit No. 49 received.)

9    BY MR. FELMLY:

10   Q.  Dr. Shrifrin, I want to show you a portion of the notes.

11             MR. FELMLY:  And, Denise, if you could bring up RIPP

12   03453.  And I'm going to be interested in the portion at the

13   bottom of the page.  These are UGI notes from April of 1914,

14   and I'm particularly interested in the article that starts at

15   the bottom of the page and then goes over to the next page.

16   Q.  Are you familiar with this particular article, Dr.

17   Shrifrin?

18   A.  Yes.

19   Q.  And what does leaky holder pits refer to?

20   A.  The holder pit is another term for what I was calling the

21   other day, bottom.  It's the liquid-filled lower portion,

22   usually inground portion, and in this case specifically

23   inground portion of the gas holder.

24             MR. FELMLY:  And, Denise, if you could go to the next

25   page, please, and I guess highlight the top left side so we

NEIL SHIFRIN – DIRECT EXAMINATION

1    can understand the context of what's being said.

2    Q.   This is obviously dealing with that subject.  What -- as

3    you're familiar with it and as you're seeing it, what are they

4    describing in terms of the issue or problem of holder pits

5    that leak?

6    A.   They're giving instructions on how to attempt to seal

7    leaks in leaky holders.

8    Q.   And in terms of the relevance to your views of UGI's

9    control in terms of issues that bear on how pollution, and

10   particularly tar gets into the ground, what's the relevance of

11   this document in a UGI publication?

12   A.   It indicates that UGI was aware of leaky holders, and the

13   fact that leaks could occur from holders.

14   Q.   In terms of the types of -- Strike that.

15        In terms of the level of technological skill or ability or

16   engineering ability that you would need to do that, to

17   essentially stop leaks in the bottom of one of these big

18   holder tanks, in the day, how challenging or difficult was

19   that matter?

20   A.   It was very difficult to know even when you had a leak in

21   a holder.  In terms of repairing a leak, it would depend on

22   the nature of the leak, the crack, the size of the crack.

23   They're giving instructions in this operating note about how

24   to take plugging material like cotton or jute and stuff it

25   into the crack.  How well that works sort of depends on how

NEIL SHIFRIN – DIRECT EXAMINATION

1    well it's stuffed in and how big the crack is and whether or

2    not there are other cracks.

3        This would be a common technique for attempting to seal a

4    crack.  It's not highly sophisticated, but when -- once you

5    have that piece of masonry in the ground, this is a typical

6    thing that you might do if you observed a leak.

7            MR. FELMLY:  Denise, could you go to RIPP 03539.

8    Q.  These are notes from 1914, and on the right-hand side

9    there's a set of notes from Charleston, is the name of the

10   description.  It identifies Mr. Johns as the author.  But I

11   want to look at the first paragraph, if we can.

12       And this obviously notes that -- and this is in 1914,

13   Manager Waring and Mr. Kollock, who had come with him from

14   Omaha, are presenting papers at the superintendents' meeting?

15   A.  Right.

16   Q.  And doing so to a meeting of the employees in Charleston?

17   A.  Right.  So they -- my understanding of this is they went

18   to the superintendents' meeting at UGI in Philadelphia,

19   presented a paper about the operation of the Charleston plant,

20   and then went back to the Charleston plant, where they worked,

21   and gave that same presentation to the Charleston employees.

22   Q.  Do you understand the next sentence where they discussed

23   Charleston's relative standings?

24   A.  My interpretation of that is that had developed a

25   comparison of how their plant compared to the other UGI

587

NEIL SHIFRIN – DIRECT EXAMINATION

1    subsidiary plants.

2          MR. FELMLY:  Denise, if you could go to RIPP 03561.

3    Q.  This is in May of 1916, Dr. Shrifrin, and the document at

4    the top is entitled a manual of gas distribution.  This is

5    contained in the UGI operating notes.  Are you familiar with

6    what this document is or what the purposes of this document

7    was in the operating notes?

8    A.  The purpose was to standardize the gas distribution issues

9    throughout the UGI subsidiary organization.

10       I think there were other instructions on other topics in

11   addition to distribution similar to this.

12         MR. FELMLY:  And just in terms of the table of

13   contents, Denise, if we could blow up some portions of that.

14   Q.  Does this describe essentially how to run the gas

15   distribution business?

16   A.  Right.

17   Q.  If you could go over to the next page, obviously there's a

18   lot of material there.  But if you could, Doctor, in terms of

19   the context of the gas distribution business and how

20   comprehensive this appears, if you could give us an indication

21   of what you believe the scope of this to be in a general

22   sense.

23   A.  The scope was complete.  This was the entire soup-to-nuts

24   operation of the gas distribution manual.

25   Q.  Now, again, there's a tremendous wealth of material,

NEIL SHIFRIN – DIRECT EXAMINATION

1   there's many materials here.  In general, the importance of

2   the engineering and operating notes that UGI maintained as a

3   proprietary body of information with the caveats on how

4   they're to be retained and not circulated, the importance of

5   that in connection with your opinions relating to tar and

6   relating to operations that would impact on tar, is what?

7   A.  In my opinion the significance is twofold.  One is it

8   demonstrates the comprehensiveness of UGI's expertise.  And

9   two, it demonstrates the extent of their control in terms of

10  disseminating this information to all of their plants.

11  Q.  We were talking before about this gentleman, Mr. Pearson,

12  who was involved as the purchasing agent and had roles in

13  various companies.

14      MR. FELMLY:  Denise, could you bring up UGI Circle

15  008846.

16  Q.  What I'm showing you on the ELMO here is that article from

17  the April 1929 article, and this is announcing or discussing

18  vice president then Pearson's retirement, J.A. Pearson.  Is

19  that the gentleman who -- well, it says it does.  Vice

20  president in charge of purchasing.  That's the person we've

21  been talking about as the purchasing agent?

22  A.  Right.

23  Q.  And just in terms of the profile of his career, if you go

24  down to the middle part of the page, when does it look like he

25  joined UGI?

589

NEIL SHIFRIN – DIRECT EXAMINATION

1   A.  I believe it was 1899.

2   Q.  And in terms of his responsibilities, some of this is

3   quoting Mr. Pearson.  This is in the UGI bulletin.  When the

4   company needed an assistant purchasing agent, Mr. Pearson was

5   selected, and when the office of purchasing agent became

6   vacant in 1899, he had earned the appointment from which

7   position he was advanced to a vice presidency.  His

8   responsibilities, in addition to UGI purchasing, included also

9   the purchasing for UGI subsidiary companies.

10      Is that consistent with your understanding of

11  Mr. Pearson's role?

12  A.  Yes.

13      MR. FELMLY:  This is actually in an additional

14  compendium of documents, and it is part of Exhibit 211,

15  examples of UGI's control of expenditures, and I would also

16  offer that compendium on the same basis, which is that we

17  would remove the summary sheet, and that all the historic

18  documents, including that one that I just read, become a full

19  exhibit.

20      THE COURT:  Any objection?

21      MR. VARON:  Just take a quick look, Your Honor.  No

22  objection.

23    (Plaintiff's Exhibit 211 received.)

24      MR. FELMLY:  If you could go to the drawing that --

25  that we admitted the other day that shows the map.

NEIL SHIFRIN – DIRECT EXAMINATION

1    What I'm putting back up, and we're very familiar with it,

2    I know, from your discussion the other day, and I'm going to

3    conclude with this, Dr. Shrifin.

4        We've talked about a lot of different elements of issues

5    on control and you've given testimony.  And the reason I put

6    this back up here to remind us of the location of the plant

7    and the various pieces of equipment, as a summary or sort of

8    pulling this material together, can you explain to the Court

9    from the context of the engineering and operational side of

10   this case that you're here to talk about, as specifically as

11   you can, but in a brief way, tying together the points, how

12   the various things that we've talked about in terms of

13   control, the purchasing, the equipment design, the raw

14   materials purchasing, the inspections, the -- all of those

15   elements that we had been talking about over the last few

16   hours of your examination, how you believe they directly

17   relate to the issues of tar and its release into the

18   environment, and, therefore, that linkage or that connection

19   to UGI, in your opinion, is achieved.

20   A.  Let me start by saying that this case is really about tar

21   leakage more -- much more so than waste discharge.  And the

22   tar leaked from equipment that relates to the gas production.

23       The gas, as I've described earlier, was produced in the

24   carbureted water gas sets at the generator house, was sent to

25   the relief holder.  The tar was collected at various stages of

NEIL SHIFRIN – DIRECT EXAMINATION

1  that operation, and the tar was stored in tanks, as well as

2  inadvertently in the relief holder and in the city holder.

3      And UGI, in my opinion, controlled every aspect of gas

4  production at this plant; and, therefore, has a relationship

5  to the tar leakage that is intimately involved with the gas

6  production.

7      And the information that I base that opinion on is –– has

8  multiple dimensions.  There is support for that opinion in the

9  UGI directors' minutes.  And when I say the directors'

10  minutes, I understand that it's unusual to point to control of

11  operations in the board of directors.  In fact, I was chairman

12  of a board of directors for ten years, and actually had issues

13  saying that we don't talk about operational decisions.  It's

14  very unusual to talk about operations.  But that's the unusual

15  thing about UGI.  UGI's directors went down to minutia detail

16  of operations.  And there's evidence in there, and that's the

17  element of the directors' minutes that I base my opinions on.

18      The elements of the directors' minutes that deal with the

19  operations of the Charleston plant, not the business elements.

20      And there's a multitude of examples in those directors'

21  minutes, whether it be the executive committee, the management

22  committee, the operations committee, the works committee.

23  This was actually a board that was oriented with its

24  committees to manage operations of the subsidiary plants.  And

25  it indeed did manage the Charleston plant.

NEIL SHIFRIN – DIRECT EXAMINATION

1    The standard there is manage, direct or conduct.  Not and

2    conduct.  Or conduct.  They clearly managed and directed the

3    operations, and that's reflected in the board.

4    But more than that, and this also is reflected in the

5    board, but it pertains to operational issues, they staffed the

6    plant.  They transferred individuals from Omaha, from other

7    plants, their cadet program, they had a massive transfer and

8    training program where they staffed the Charleston plant.

9    Whether or not at some point the paychecks came from CCR&L, is

10   irrelevant.  The staffing was dictated, was controlled and

11   managed and directed by UGI in Philadelphia.

12   In addition to that, the inspections indicate that these

13   were not inspections of books, these were not inspections of

14   accounting records, these were inspections of operations.  And

15   when problems arose, UGI sent people from Philadelphia to help

16   the local plant fix those problems.  And believe me, the local

17   plant, the operation of a gas plant is not a simple matter.

18   And UGI had the expertise to operate and help troubleshoot all

19   aspects.

20   As we just mentioned, again, purchasing had a very

21   pertinent role in the issue here, which is the leakage of tar.

22   Because purchasing of raw materials had an impact on the types

23   of raw materials, which had an impact on the generation of

24   tar.  And the generation of tar was impacted on the

25   environment because of the leaks and the spills at the plant.

NEIL SHIFRIN – DIRECT EXAMINATION

1    And finally, in terms of the tar, UGI clearly had

2    knowledge of tar as a business, tar as a sub-business of the

3    gas business, and tar leakage.  And the issues of leakage,

4    such as the gas holder plugs that we talked about a moment

5    ago, as well as observation of tar at the Charleston plant.

6    When they installed the steam pipe, for example, they observed

7    tar in the foundations for the installation of that.

8    So my opinion overall, as supported by what I just

9    mentioned, all of which are aimed at the operational elements,

10   not the business elements, are that UGI had pervasive control

11   of this plant, of the operations of this plant.

12   Admittedly at some point -- and, in fact, the UGI Circle

13   admits this and notes this as a strategy, that they have local

14   people on the ground in Charleston, but they're controlling

15   them from Philadelphia.  They control them through general

16   superintendent, the local superintendent reports to the

17   general superintendent.  They control them by board of

18   directors control, because the board of directors focused on

19   operations instead of or in addition to general business

20   elements.

21   And so for that multitude of reasons, the -- the control

22   was pervasive.  And whether or not it was CCR&L employees on

23   the ground, UGI controlled those people, they actually

24   assigned those people, and they managed this plant.

25   MR. FELMLY:  Thank you very much.  You may inquire.

NEIL SHIFRIN - DIRECT EXAMINATION

1    THE COURT:  We're going to take a break in a minute.
2    I think I'll take it now, and then we won't have to interrupt
3    your cross-examination.  Let me ask the witness a couple
4    questions, however, before we do that.
5        How many total employees were at the Charleston plant?
6    A.  At any point in time?
7        THE COURT:  On average.
8    A.  I don't know exactly, but it would be about a dozen, maybe
9    15, maybe as high as 20.
10    THE COURT:  Based on your expertise, is that enough
11    to adequately run a plant such as that?
12    A.  It's typical, yes.
13    THE COURT:  And you've referred to the Philadelphia
14    plant as being one that's operated by MGP.
15    A.  UGI.
16    THE COURT:  What?
17    A.  By UGI.
18    THE COURT:  Excuse me.  What is the size of that
19    plant compared to Charleston?
20    A.  I don't know specifically, but I would -- I would venture
21    to guess that that plant was at least ten times larger.
22    THE COURT:  Ten times.  And how many employees did
23    they have at that plant?
24    A.  I'm not sure.  That was probably one of the largest plants
25    in the country.

NEIL SHIFRIN – DIRECT EXAMINATION

1           THE COURT:  How many employees did UGI have in

2    Philadelphia?

3    A.  I used to know that number, and I don't.  But it was

4    hundreds.

5           THE COURT:  Hundreds.

6    A.  Yeah.

7           THE COURT:  And those employees were made up of

8    the -- they fell into what category; engineers, accountants,

9    what?

10   A.  UGI had several departments.  They had -- of course they

11   had the executives in the board of directors and those people.

12   They had the construction division, which operated out of

13   Philadelphia for a period of time.  They had a laboratory and

14   a testing division.  They had an accounting division, of

15   course.  And they had the superintendent's office in the

16   general works office, which probably had many many engineers

17   in it.

18          THE COURT:  How many?

19   A.  I don't know offhand.

20          THE COURT:  Ten?

21   A.  I would venture more than that.  Much more than ten.

22          THE COURT:  But you're saying they had hundreds of

23   employees in Philadelphia?

24   A.  Yeah, the Broad and Arch building was probably 30 stories

25   tall, and they ran -- they filled the building.

NEIL SHIFRIN - CROSS-EXAMINATION

1          THE COURT:  And those hundreds would not include the
2      ones that were at the Philadelphia plant?
3      A.  That's correct.  I think they ran the Philadelphia plant
4      both from Broad and Arch and at the plant itself.  But there
5      were clearly employees at the Philadelphia plant.
6          THE COURT:  Let's take about 15 minutes.
7          (A recess was held at this time.)
8                      CROSS-EXAMINATION
9      BY MR. VARON:
10     Q.  Morning, Dr. Shifrin, actually almost afternoon, I guess.
11     A.  Good morning.
12     Q.  I believe you began your testimony two days ago by telling
13     the Court in a sense what operational control wasn't.  You
14     defined it as not business control, correct?
15     A.  Right.
16     Q.  Sticking with that vein for a second, and given that I've
17     told the judge I'm trying to prove a negative here, let's talk
18     about what you're not as well.  You're not a historian,
19     correct?
20     A.  I have actually published --
21         THE COURT:  He's been qualified.  You can ask a
22     thousand questions he's not; I'm not going into that.
23     Q.  Okay.  But you're not a licensed professional engineer,
24     correct?
25         THE COURT:  He's testified as to what he is.  He's

NEIL SHIFRIN - CROSS-EXAMINATION

1   not a lawyer, not a doctor, not an indian chief, and I just

2   don't permit that type question because it goes on and on and

3   on and doesn't accomplish anything.  It's argumentative.  Go

4   ahead.

5   BY MR. VARON:

6   Q.  You're a consultant, correct?

7   A.  Yes.

8   Q.  And obviously you've told the Court what you do, but I

9   want to make one thing clear.  You, as opposed to somebody who

10  actually does on-site remediation, you design studies, you

11  interpret other people's data, but you don't go on site to

12  these MGP sites and perform the remediation yourself, correct?

13  A.  That's right.

14  Q.  And on a litigation side, you testify both in insurance

15  recovery cases and in cost recovery cases, product liability

16  cases, different kinds of cases, correct?

17  A.  Right.

18  Q.  The insurance recovery claims are a little different than

19  the cost recovery claims, are they not?

20  A.  Meaning the cost allocation?  Are you asking if insurance

21  claims are different than cost allocation cases?

22  Q.  Yes.

23  A.  Yes.

24  Q.  And the insurance litigation, the idea is to show there

25  are leaks, but that they are always accidental, correct?

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.  Well, I call it as I see it.  It's the -- I talk about

2    leaks at MGPs in insurance cases, yes.  I talked about other

3    things, too, in insurance cases.

4    Q.  But the goal is, just like there's a goal in this case to

5    try to show that a party met the operator liability standard,

6    the goal in the insurance recovery case is to show that if

7    you're representing the noninsurer, that your client had leaks

8    at the plant but that they were accidental.

9    A.  In those kinds of cases my scope of work is to compare the

10   operations of the plant to the contemporaneous practices and

11   standards.

12   Q.  Okay.  You've testified about NCP compliance in cases,

13   correct?

14   A.  Right.

15   Q.  You've been on the plaintiff's side and the defendant's

16   side?

17   A.  Probably.

18   Q.  Do you have to take inconsistent positions in terms of

19   presenting allocation, NCP, cost recovery issues in your line

20   of work?

21   A.  I've never believed to take an inconsistent position.  I

22   think that the facts of the case dictate the position that I

23   take.  And I've never felt in that kind of a bind.

24   Q.  Okay.  And here, Dr. Shifrin, you've obviously expressed

25   some technical opinions about the sources of contamination and

NEIL SHIFRIN - CROSS-EXAMINATION

1   how they flowed at the site, correct?

2   A.  Yes.

3   Q.  You've also expressed your opinions on UGI and how it has

4   conducted itself not only at Charleston, but in lots of other

5   places.  Is that right?

6   A.  Focusing mostly on Charleston, right.

7   Q.  And that information is gathered from your and your

8   staff's reading of the various records, correct?

9   A.  The specific records to this case as well as the technical

10  literature on MGPs in general.

11  Q.  And you know you can, I gather, testify to fate and

12  transport issues, you have testified that you believe there's

13  a certain level of certainty to your opinions, you may have

14  even said it's to a scientific level, correct?

15  A.  Yes.

16  Q.  And when you talk about -- when Mr. Felmly asks you, so

17  what do you think this accounting journal entry means, you try

18  to give the best answer you can, but you are just trying to

19  infer something from an accounting journal entry.  Correct?

20  You don't know anything, you weren't there, you don't know.

21  A.  I disagree with that.  What I'm doing in reviewing

22  accounting journals is trying to denote their significance in

23  terms of operations.  And I feel confident that I can tell the

24  difference between an operation issue in a historical

25  document, or a business issue.

NEIL SHIFRIN - CROSS-EXAMINATION

1  Q.  And you know the purpose of why things were done back in

2  1915?

3  A.  I'm not -- that's too general a question, I can't answer

4  that.

5  Q.  Let's talk about your methodology.  I think we started

6  early on in your testimony, and I believe you said your

7  methodology was, in essence, to look at the history of the

8  plant, who operated it, who looked at what kind of production

9  volumes there were in different periods, which equipment was

10  identified with which parts of the history, and then trying to

11  tie it back.  Is that a good summary of the methodology that

12  you testified to?

13  A.  Tie it back to what?

14  Q.  I think tried to tie it back in your -- what you were

15  trying to do is to try to tie the contamination back to a

16  party who you believe was operating the plant at a particular

17  time.

18  A.  What I described earlier was that there were basically two

19  parts to the methodology.  One was to define the history of

20  the plant, including the equipment and the operators over the

21  100 years of operation.  And then the second part was to

22  define the environmental conditions, and then link those

23  conditions back to sources of contamination, which then linked

24  back to pieces of equipment and to parties.

25  Q.  Let's do the first part first.  Because we've been talking

NEIL SHIFRIN – CROSS-EXAMINATION

1    a lot about isolated instances in time, we've been talking

2    about the 1910 to 1926 period, we've wandered a little bit.

3    Let's talk about the history of the plant.

4        You have materials that have described the history of the

5    plant, correct?

6    A.  That's right.

7    Q.  And I think one of the -- certainly you described it in

8    your expert report, correct?

9    A.  Right.

10   Q.  And you, in a sense --

11           MR. VARON:  If you can pull up Defendant's 78,

12   Andrew, fourth page.

13           MR. BARGREN:  Plaintiff's.

14           MR. VARON:  Plaintiff's 78, I'm sorry.

15   BY MR. VARON:

16   Q.  Dr. Shifrin, this is actually a gas production chart, but

17   it also might help to orient us in terms of history.  The

18   plant, the Charleston gas plant operated from 1855, your chart

19   says 1955, correct?

20   A.  Right.

21   Q.  And I believe Mr. Effinger said that there might have been

22   gas production through 1957; what do you know about that?

23   A.  He said there was a transition period.  May have been some

24   propane distribution, I'm not sure.

25   Q.  And these little blue strips on the left of the chart

NEIL SHIFRIN - CROSS-EXAMINATION

1    are -- they're called claimed orphan shares, right?

2    A.   Right.

3    Q.   And what's an orphan share?

4    A.   In the CERCLA lingo, an orphan share is a portion that

5    there are no identifiable or surviving parties to claim

6    responsibility.

7    Q.   So then there's what you've labeled a UGI period from 1910

8    to 1926, correct?

9    A.   Right.

10   Q.   We're going to talk about that.  That's actually the

11   period during which Charleston Consolidated Railway and

12   Lighting operated the gas plant, correct?

13   A.   That was the name of the operator, that's right.

14   Q.   That was the name of the local subsidiary in Charleston

15   that literally operated the gas plant under the lease that it

16   had obtained from the prior Charleston owner, correct?

17   A.   Under the ownership of UGI, that's right.

18   Q.   I understand.  Your theory is that UGI was the parent of

19   the Charleston subsidiary, correct?

20   A.   That's my understanding.

21   Q.   Okay.  And the other block here, essentially from 1855 to

22   1955, minus the three orphan shares and the 16-year period,

23   that's all SCE&G, right?

24   A.   I don't know.

25   Q.   Sure you do.  Look at your expert report.

NEIL SHIFRIN - CROSS-EXAMINATION

1           MR. VARON:  Can we put up the expert report of Dr.
2   Shifrin on page 17.
3   Q.  This is the table, the original corporate timeline that
4   you prepared, correct?
5   A.  That's right.
6   Q.  So it starts with a company called Carolina Gas
7   building -- they were the one that built the Charleston MGP,
8   correct?
9   A.  The original plant, that's right.
10  Q.  And in 1858 they merged with a company called Charleston
11  Gas Light, right?
12  A.  Right.
13  Q.  And Charleston Gas Light was the owner and the operator of
14  the plant until about 1899, correct?
15  A.  I believe so, that's right.  That's what's listed here.
16  Q.  And don't you know, sir, that Charleston Gas Light is a
17  predecessor company of SCE&G?
18  A.  Not necessarily, no.
19  Q.  Not necessarily?  If you go back, if you go back to the
20  Charleston gas production thing.  You made everything but that
21  all the same color, right?  Wasn't that because this is all
22  SCE&G?
23  A.  That's not why I did -- that's not why I made it gray, no.
24          MR. VARON:  I don't think we need to belabor it,
25  because I think we have plaintiff's discovery responses in the

NEIL SHIFRIN - CROSS-EXAMINATION

1    case, Your Honor, and Mr. Felmly can correct me if I'm wrong,

2    otherwise I'll read them into the record, that indicate that

3    Charleston Gas Light is a predecessor of SCE&G.

4         THE COURT:  That may be the case.  And I don't know

5    why this witness would know that.  He's not a lawyer, he's not

6    called to know that.  And he says I don't know that.

7         MR. VARON:  Okay.

8         THE COURT:  I don't know why we belabor the point

9    with him.  He doesn't know, and you have other evidence to the

10   effect that that's the case.

11        MR. VARON:  I do.  And I'm just trying to lay out the

12   outline of the plant and what's here and what's in dispute

13   here in terms of the history.  So I don't know.  Will you

14   agree?

15        MR. FELMLY:  This witness has nothing to do with that

16   issue and I don't think he knows the history of it.  We have

17   provided very detailed discovery responses.  We've identified

18   where we think the orphan shares are.  I could testify about

19   it, I suppose, but -- and I don't think there's much

20   disagreement on this point.  But Dr. Shifrin, I don't think,

21   knows the corporate lineage, and it wasn't the person I relied

22   on for that.

23        So I think Mr. Varon's correct that we don't have the

24   dispute other than the areas of the two orphan shares on the

25   left, won during the Civil War, but I don't think this witness

605

NEIL SHIFRIN – CROSS-EXAMINATION

1  has any information to provide on it.

2  BY MR. VARON:

3  Q.  All I'm trying to establish is that what we're talking

4  about is the 16-year period essentially out of 100 year period

5  in the case, for UGI.  Correct?

6  A.  That's right.

7  Q.  And as I understand it from you, Dr. Shifrin, this gas

8  plant was operating the entire time and was probably leaking

9  tar the entire time.

10  A.  That's right.

11  Q.  Because you believe that it's kind of endemic to the

12  operation of a gas plant for there to be a tar disposal

13  problem.  Right?

14  A.  Not a disposal problem, leakage problem.

15  Q.  Tar leakage problem.  Those are -- okay.  Tar will leak,

16  and I gather that all gas plants will have to be concerned

17  about trying to dispose of tar as well from your testimony?

18  A.  No.

19  Q.  Some plants don't have to worry about tar disposal.

20  A.  Most plants sold their tar, they didn't dispose of their

21  tar.

22  Q.  And selling of tar is not -- or handling tar, that's not

23  involved in waste disposal?

24  A.  I don't believe so, no.  It's selling -- selling it as a

25  raw material for another stream of enterprise.

NEIL SHIFRIN – CROSS-EXAMINATION

1    Q.  And so the whole handling process of trying to get the tar

2    out of the separators and the extractors to get it together

3    and prepare it for sale, that has nothing to do with waste

4    disposal?

5    A.  That's correct.

6            THE COURT:  You're making a distinction between

7    disposal of a waste material, just throwing it away, and

8    refining it in such a way you can sell it.

9    A.  That's right.  A distinction between disposal and

10   recycling is another way to think of it.

11   BY MR. VARON:

12   Q.  And so the problem that you see is that there was, in

13   essence, inadvertent leaks throughout the period that this gas

14   plant operated.

15   A.  That's right.

16   Q.  And if I understand it, there was a coal gas -- coal gas

17   was being made essentially from the beginning of time until

18   beginning -- beginning 1855, until 1911 or so?

19   A.  Right.

20   Q.  And then basically for the balance of it, it was

21   carbureted water gas.

22   A.  With a few exceptions.

23   Q.  Right, with one exception, I guess, in 1918, and maybe

24   with the bituminous coal in '23, right?

25   A.  Right.

NEIL SHIFRIN - CROSS-EXAMINATION

1   Q.  And your last, I believe right before we broke you were

2   saying that you thought the injection of bituminous coal as a

3   fuel, affected the volume of tar that was produced at the

4   plant, right?

5   A.  I did say that, yes.

6   Q.  And didn't the introduction of the carbureted water gas

7   process also affect the volume of production of tar?

8   A.  Right.

9   Q.  Basically cut it in half?

10  A.  More or less, right.

11  Q.  And these other efforts to introduce coal in 1918 was --

12  do you have documents that show that that was -- Let me

13  withdraw that.

14      That was a brief period in 1918, I think we said, because

15  the winter was essentially heavy, and so they decided to go to

16  coal for a short period?

17  A.  It appears to be that, that's right.

18  Q.  And then the bituminous coal in 1923 was done essentially

19  because it was hard to find fuel.  Or economic --

20  A.  My understanding is that the price of coke was up, and UGI

21  was experimenting with the use of bitumen as a generator fuel.

22  Q.  So the degree to which the carbureted water gas process

23  and the degree to which coal might have influenced tar

24  production at the plant between 1910 and 1926, I take it, was

25  quite small?  Overall.

NEIL SHIFRIN – CROSS-EXAMINATION

1    A.   Could you repeat the question?

2    Q.   Yeah.  All I'm trying to say is that isolated instances of

3    coal use in 1918 and 1923 really didn't have much of an impact

4    on tar production at the plant between 1910 and 1926.

5    A.   They had an impact.  The significance of the impact was

6    not the point I was making.  I was making the point that

7    purchasing decisions of raw materials had an impact on tar

8    production.

9    Q.   And I guess the point I'm trying to make is that you can

10   use coal, you can use carbureted water gas, you can use oil or

11   whatever, and according to your theory, there's always going

12   to be these leaks of tar and everybody knows it.  Right?

13   A.   Everybody knows it today.  Everybody didn't know it then.

14   Q.   You don't think that the operators of the manufactured gas

15   plants during the time understood that there were leakages and

16   spills?

17   A.   It's hard to understand what the gas operators understood

18   at the time.  There was a knowledge of leakage.  I doubt that

19   there was any significance put on the fact that there may have

20   been tar leakage at the time.  Today, we think differently

21   about that.  In 1920, it was a whole different story for

22   environmental releases.

23   Q.   So there weren't discussions in the -- at the conferences

24   or at, you know, in the superintendent conferences or journals

25   about that kind of issue?

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.  There were constant discussions about leakage from

2    equipment.  Just as there would be under any condition,

3    that -- I mean, no tank is ever designed to leak.  So if you

4    have any kind of leakage, even if it's leakage of pure water,

5    you're going to try and stop that up, if you can.

6        So yes, in the literature there was a lot of discussion of

7    how to solve the leakage problems.

8    Q.  In your testimony you've really focused on this leakage

9    and you haven't really focused it all on other sources of tar

10   at the site.  I think you might have mentioned it very

11   briefly, and perhaps cryptically, that there was one aspect of

12   deliberate disposal at the site, correct?

13   A.  There may have been.

14            MR. VARON:  Can we pull up Defendant's 134.  This is

15   Defendant's Exhibit 134, SCANA 7687.

16   Q.  Have you seen this before, Dr. Shifrin?

17   A.  No.

18   Q.  Okay.

19            MR. VARON:  Go to the second page for a second.

20        I'm sorry, Your Honor, I may have the wrong document.

21   Q.  Let me turn to your expert report where I think you

22   discussed this incident on page 24.  In 1924 -- sorry -- 1947,

23   on page 24, isn't it true, Dr. Shifrin, that the South

24   Carolina environmental agency got a phone call from a former

25   employee, Norman Bowick, talking about waste disposal at the

NEIL SHIFRIN - CROSS-EXAMINATION

1    site?

2    A.  I'm not very familiar with that, but I do under -- I do

3    understand that that happened, yes.

4    Q.  And he said a couple of things.  I think they're listed

5    right here in your report.  One, that spent purifier box waste

6    was spread on the ground around the propane tanks near the

7    park, correct?

8    A.  In the report, yes.

9    Q.  And this is Calhoun Park, right?

10   A.  Yes.

11   Q.  The tar emulsions were treated and being transferred to

12   the railroad tank cars, two cars a week, and the transfer

13   pipes frequently ruptured and coal tar would spill onto what

14   is now Calhoun Park?  Correct?

15   A.  No, I believe that those ruptures were where the railroad

16   siding went up near the coal shed.  There was a tar loading

17   facility up there in the northern part of the site near the

18   coal shed.

19   Q.  Yeah, but this is what your report said at least, correct?

20   A.  Well, my report is quoting Mr. Bowick.

21   Q.  And it's quoting him from what?

22   A.  That --

23   Q.  The first memo I showed you.

24   A.  That -- I don't know if it's that first memo, because I've

25   never seen that first memo you showed me.  But it's the SDHEC

NEIL SHIFRIN - CROSS-EXAMINATION

1    1992 document.

2    Q.  Your report continues to go on, on the next page, 25.

3    A.  Yes, it does go over.

4    Q.  Spills of tar and water would occur from the relief

5    holder.  When the gas pressure was too great.  The inverted

6    tank would rise, tar and water would spill onto the adjacent

7    property.  Again, Calhoun Park, correct?

8    A.  Right.  Right.

9    Q.  And then finally the last point that you make is that the

10   tar was pumped into a 500- to 600-gallon tanker truck, and

11   spills occurred during pumping.  Right?

12   A.  I'm quoting him, that's right.

13          MR. VARON:  Let's find -- Andrew, go back to this

14   other document.

15   Q.  So this has been produced in the case, Dr. Shifrin, this

16   report, but you say you haven't seen it.  You can take --

17   let's look at the --

18          MR. VARON:  First of all, the first cover page,

19   Andrew.

20   Q.  So it's a site screening investigation, that's an EPA

21   document, correct?

22   A.  Right.

23   Q.  And if you go down to the next page, bottom of the first

24   paragraph, this is describing the same or similar incidents,

25   but in a little more detail than in your report.  Correct?

NEIL SHIFRIN - CROSS-EXAMINATION

1   A.  Right.  By the way, I have seen this report, I just hadn't

2   seen that cover sheet.

3   Q.  So you have seen the underlying report?

4   A.  Right.

5   Q.  Now, this -- if we go to the next top of page three.  Here

6   the guy, Norman Bowick, is telling the environmental folks

7   that the transfer pipe frequently ruptured and that coal tar

8   would spill onto what is now Calhoun Park.  Right?

9   A.  That's what he's saying, that's right.  That's what I

10  quoted in my report.

11  Q.  But you were saying earlier, I thought, that you thought

12  the pipes ruptured somewhere else.

13  A.  I'm telling you that the tar transfer place was not in

14  Calhoun Park, it was in the northern part of the MGP facility

15  near the coal shed.

16  Q.  But he's saying --

17  A.  So my sense is that he might not be accurate in his

18  description about Calhoun Park.

19  Q.  Well, the document, for what it's worth, is mentioning

20  Calhoun Park on several occasions, is it not?

21  A.  Yeah.

22  Q.  Okay.  And it also points out that the gas relief holder

23  used an emergency relief valve to vent off the excess gas and

24  was a source of spills.

25      Now, you're not supposed to use a gas relief holder to

NEIL SHIFRIN - CROSS-EXAMINATION

1   store tar, are you?
2   A.  Well, actually there is technical literature that shows
3   that some plants did deliberately use relief holders to store
4   tar.  There's also literature that advises against it, because
5   of the, quote, "churning action" of the up and down motion of
6   the bell.  But regardless of all of that, tar accumulated in
7   relief holders, whether it was intentional or not.
8   Intentional storage or not.  And I would -- reading this, as
9   an engineer, knowing 130 MGPs, I don't think their description
10  is being very accurate.
11  Q.  But the EPA is adopting it, is it not?
12  A.  I don't know if EPA adopted this or not.
13  Q.  In any event, this would explain a lot of the carbureted
14  water gas tar near Calhoun Park and near the Fernoline
15  property that you were testifying about in terms of the
16  fingerprinting analysis, wouldn't it?
17  A.  As I -- this would -- could explain some of it.  I have
18  never had an opinion that UGI was the only party that spilled
19  or leaked tar at this plant, and I've never said that.
20      But as I mentioned, I believe Mr. Bowick's description of
21  the tar loading is inaccurate, because I know for a fact that
22  the tar loading was in a different location of the plant.  I
23  think he may be mistaken about that particular incident.
24      As far as the relief holder blowing its seal from time to
25  time, it's a possibility.

NEIL SHIFRIN – CROSS-EXAMINATION

1   Q.  And --

2   A.  It's also a possibility that it happened during UGI's

3   tenure.  Because it was a common problem with relief holders.

4   Q.  Well, there's no evidence that it happened at UGI's

5   period, is there?

6   A.  That's right, this witness is talking about a time period

7   that's after UGI.  But the fact that he's observing it, does

8   not preclude the notion that if it happened then, it's also

9   likely to have happened throughout the operation.

10  Q.  But this witness is talking about a former employee of the

11  plant, in this time frame, 1947 to 1953, spreading the iron on

12  the ground near the propane tanks and having the problem with

13  the tar boiling and spilling, correct?

14  A.  Right.  I -- as far as I know, there is no remediation

15  about the spread iron around -- what he's referring to there.

16  So that's an irrelevant point.  But the tar is clearly a

17  relevant point.

18  Q.  The practice of spreading the spent iron, whether it was

19  significant enough to result in mediation or not, is certainly

20  not the recommended practice, is it?

21  A.  Oh, it is.  Most plants did it that way.  They buried

22  it --

23  Q.  Put it on the ground.

24  A.  Spread it around in the yard, if they had room.

25  Otherwise, they would send it to the local dump.

NEIL SHIFRIN - CROSS-EXAMINATION

1   Q.  And I guess -- Okay.  Talking about the Fernoline

2   fingerprinting, your point was that there was carbureted water

3   gas tar evidence on that property, and you were indicating

4   that that meant that it could have come during this 1910 to

5   1926 period, right?

6   A.  I -- that's right.  There's carbureted water gas tar on

7   the Fernoline property in the UGI period, manufactured

8   carbureted water gas tar.

9   Q.  But the carbureted water gas was also manufactured over

10  the next 1926 to 1955 period as well, and you can't tell which

11  one it is.

12  A.  It's not divisible, that's right.

13  Q.  And wouldn't these tar spills be a better explanation of

14  why there was tar on the Fernoline property?

15  A.  This would be a supplemental explanation.  As I said

16  earlier, it doesn't preclude it.  In fact, it makes it even

17  more possible, the fact that it was observed in one time

18  period, that it happened in other time periods, because

19  conditions hadn't really changed.  The relief holder was

20  operated as a relief holder for the carbureted water gas

21  process.

22      I've never said that UGI was the only releaser of

23  carbureted water gas tar.  This is one release, one reported

24  release.  There are likely, in my opinion, releases during the

25  UGI period.

NEIL SHIFRIN - CROSS-EXAMINATION

1    Q.  And again, when you say UGI, you're really talking about

2    the plant that was operated by CCR&L, but your contention is

3    UGI directed it, correct?

4    A.  I said during the UGI period.

5    Q.  Okay.  Isn't it possible that there were other sources of

6    carbureted water gas on that property?

7    A.  For however long carbureted water gas was manufactured at

8    the property, it's likely that there were leaks and spills.

9    Q.  Well, but I'm talking about sources of carbureted water

10   gas other than the Charleston gas plant.

11   A.  On which property?

12   Q.  On the Fernoline property.

13   A.  I doubt it.

14   Q.  Wasn't Fernoline -- wasn't Fernoline running a tar

15   distillery?

16   A.  I've actually read the history of the Fernoline plant, and

17   there is some dispute about that, or at least it's not very

18   clear.  But the general understanding is that Fernoline

19   distilled tar and treated wood.

20   Q.  And so would it have purchased carbureted tar from

21   carbureted water gas processes in order to run that operation?

22   A.  It's very unlikely.  It's extremely unlikely.  The reason

23   that a plant like Fernoline was located where it was, was

24   because it had a source of tar right next door and didn't have

25   to pay transportation costs.

NEIL SHIFRIN - CROSS-EXAMINATION

1    There wasn't a carbureted water gas plant within miles of
2    this area.  There's no reason that a plant like Fernoline
3    would pay for shipping costs from some remote carbureted water
4    gas plant, when it had a source of tar right next door.
5    Q.  Where were the closest carbureted water gas plants?
6    A.  I don't even know.  But we had a coal tar source right
7    next door.  No shipping costs.
8    Q.  Was there a carbureted water gas plant in Sumter?
9    A.  I told you I don't know.
10   Q.  So you say there wasn't one for miles, but you don't know,
11   you haven't looked.
12   A.  Well, I know there was not one in Charleston.
13       Now, the other thing is Fernoline closed in 1888.
14   Carbureted water gas didn't really become established as a
15   type of gas manufacturing until around maybe 1885.  So it's
16   very unlikely that -- and Fernoline was tuned to refine coal
17   tar.  So it's very unlikely that they switched gears at the
18   end of their history and paid transportation costs and
19   imported carbureted water gas, when they had a coal tar source
20   right next door.
21   Q.  But you haven't yourself conducted an investigation to
22   know if there were carbureted water gas tar plants in the area
23   from which they could have purchased.
24   A.  Carbureted water gas plants or tar plants?
25   Q.  Sorry, carbureted water gas plants from which they could

NEIL SHIFRIN - CROSS-EXAMINATION

1  have purchased tar.  You don't know.

2  A.  I have -- I have seen no evidence of that.

3  Q.  Having in mind the period of time again that the plant

4  operated from 1855 to 1955, we have this one disposal incident

5  in 1947 to 1953, I believe is the duration that this incident

6  supposedly occurred, correct?

7  A.  I would have to read Bowick's testimony again, but the

8  date in my report does give that range, '47 to '53.  I don't

9  know exactly how he worded what occurred during that time

10  period.

11  Q.  Well, obviously you wrote it down as '47 to '53; that's

12  what you must have concluded, right?

13  A.  I believe he reported releases during that time period.

14  That's right.

15  Q.  Now, going the other direction on the timeline, there was

16  a pretty significant earthquake in 1886, right?

17  A.  Right.

18  Q.  And the UGI Circle article describes it as wreaking

19  immense havoc to the mains and structures of the gas works,

20  the subsequent loss from leakage added greatly to the cost of

21  the damage sustained.  Right?

22  A.  Right.

23  Q.  And your report actually has a picture.

24          MR. VARON:  Can we show this, Andrew, on page 20 of

25  the expert report.

NEIL SHIFRIN - CROSS-EXAMINATION

1  Q.  This is a photo from your report, Dr. Shifrin, and it

2  looks as if it was a pretty severe earthquake; in fact, I

3  think it was 7.3 on the Richter scale, right?

4  A.  Right.

5  Q.  And so that would have certainly caused a fair amount of

6  tar that was being stored on the site to have spilled, would

7  it not have?

8  A.  It could have.

9  Q.  You think it's reasonably likely that a lot of tar spilled

10  as a result of that earthquake, or do you think it's just a

11  possibility?

12  A.  It's a probability, but the amount is unclear, because

13  there's no documentation.

14  Q.  Well, of course there isn't, but look at the picture.

15  A.  That's a picture of the retort, not tar storage.

16  Q.  But don't you think it's illustrative of the kind of

17  damage that was done at that property?

18  A.  I said it was probable that tar leaked, but there's no

19  documentation how much tar leaked.

20  Q.  Now, the old gas plant in 1910 was in pretty bad shape at

21  about that juncture, basically was operating on an

22  uneconomical basis, correct?

23  A.  It was in pretty bad shape, that's right.

24  Q.  And were there also statements in the Pogue corporate

25  history, for example, that it couldn't operate economically?

2:06-cv-02627-CWH     Date Filed 04/24/09     Entry Number 140     Page 65 of 145 620

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.  I don't remember that, but I remember Pogue saying that

2    the plant was in bad shape.

3    Q.  The company that owned the plant in 1910 was called

4    Charleston Consolidated Railway Gas and Electric Company,

5    correct?

6    A.  I don't remember, but I'll take your word for it.

7    Q.  Just to refresh your recollection, just look at your

8    history for a second.

9    A.  Right.

10   Q.  And that company not only had gas properties, but it had

11   railway property and electric property, correct?

12   A.  I believe so.

13   Q.  And everything was actually in pretty bad shape in 1910,

14   wasn't it, the electric utility was also being described as

15   having inadequate service, correct?

16   A.  I don't remember.

17        MR. VARON:  Andrew, why don't we put up the Pogue

18   book, DX 2.  PX 2, sorry, page 13.  I'm sorry.  Can you go to

19   the bottom of page 13 and make it a little bigger.  I'm sorry,

20   go to page 15.  And right in this area, Andrew, we'll

21   highlight that.  So let's highlight the sentence prior to

22   1910.

23   A.  I'm sorry, what's the question?

24   Q.  I'm just trying to set it up for you, Dr. Shifrin.  I'm

25   just trying to establish that in 1910, this thing was not --

NEIL SHIFRIN - CROSS-EXAMINATION

1    the gas plant was not only in bad operation, it couldn't be

2    operated economically, correct?

3    A.  That's what it says here, that's right.

4    Q.  And the CCRG&E Company was in financial strait, was it

5    not?

6    A.  I don't know.

7    Q.  You don't have any understanding of how it is that the

8    Charleston Consolidated Railway and Lighting Company formed,

9    and why UGI was involved in that transaction?

10   A.  I haven't paid any attention to that.

11   Q.  Is it at least clear that a new gas plant was needed?

12   A.  This would suggest it was.

13   Q.  And were other comments that President Gadsden made,

14   suggesting that the company needed an injection of capital in

15   order to run its utility service?

16   A.  I don't recall those comments.

17   Q.  Okay.  So you didn't pay any attention to the reasons that

18   UGI came onto the scene in terms of forming a new company?

19   That had no bearing on your analysis?

20   A.  Not in my expert analysis, no.  I -- these are business

21   issues, and I didn't pay attention to business issues.

22   Q.  Well, you talked about, for instance, the lease that was

23   entered into between UGI --

24            THE COURT:  Tell me why that's relevant.

25            MR. VARON:  The inquiry, Your Honor, is just to try

NEIL SHIFRIN – CROSS-EXAMINATION

1    to show that when Dr. Shifrin is calling things UGI leases,

2    UGI equipment, that they were CCR&L, and I'm trying to explain

3    why UGI would have --

4              THE COURT:  Why is that relevant?  What difference

5    does it make in this case?  I'm interested in knowing that.

6    Because I don't know.

7              MR. VARON:  I agree that --

8              THE COURT:  Just tell me why it's relevant.  You've

9    taken a lot of time asking those questions; I'm assuming you

10   think it's relevant, so you tell me why.

11             MR. VARON:  I do think it's relevant.  The relevance

12   here is that UGI was a holding company that invested in

13   different subsidiaries.  And the notion that Dr. Shifrin has

14   set out in part of his testimony was that UGI needed to

15   control companies so that it could mandate its carbureted

16   water gas process to be accepted, and that it would then come

17   in and control everything.  And that UGI would dictate what

18   would happen here, including the building of the gas plant.

19        And my point is, and I will try to show it, I guess,

20   through other witnesses, you know, Dr. Shifrin says he's an

21   environmental expert, but his report is littered with history,

22   his testimony yesterday is about UGI leases and so forth.  But

23   my point is that UGI basically injected capital into a badly

24   needed enterprise, the subsidiary then ran the plant with UGI

25   behind it as a financial backer, and with a monitoring

NEIL SHIFRIN - CROSS-EXAMINATION

1    mechanism.

2         THE COURT:  Okay.  Well, what difference does it make

3    that they were in bad financial shape?  I asked this witness

4    questions about capitalization.  I asked him, and he said, I

5    don't know anything about that.

6       You go ahead and ask your questions, I just -- Go ahead.

7         MR. VARON:  I'll move on.

8         THE COURT:  No, you don't have to move on, if you

9    think it's relevant, go ahead.

10         MR. VARON:  I will adjust and move, if you just give

11    me a second.  In part I was just trying to set out a broader

12    picture for you, but I will move on.

13    BY MR. VARON:

14    Q.  Going back to the plant itself, the judge was asking you

15    questions at the end of your direct testimony, I think, about

16    who was working at the Charleston plant and how many employees

17    there were and so forth.  Maybe you know this, Dr. Shifrin,

18    and maybe you don't.  But a pretty large work force at the

19    Charleston Gas, Charleston CCRG&E, Charleston Consolidated Gas

20    and Electric Company, and that work force was distributed out

21    over the gas plant, the electric plant and the railway

22    business, correct?  Or maybe you don't know.

23    A.  I only paid attention to the gas plant.

24    Q.  Have you seen this article, Dr. Shifrin?

25    A.  Is this the article about Charleston?

NEIL SHIFRIN – CROSS-EXAMINATION

1    Q.  Yeah, Charleston the Beautiful?

2    A.  Yes.

3    Q.  And so it describes really the history of Charleston and

4    the history of the gas plant, does it not?

5    A.  Right.

6    Q.  And it has, if you can go to twenty-four twelve, it

7    actually has pictures of some of the gas plant employees.  And

8    at least here there are about 12 of them.  Correct?

9    A.  I count nine.

10   Q.  Okay.  But there were more, right?  I mean, that aren't

11   pictured; there were gas makers and gas fitters and foremen?

12   A.  Yeah, a good way to count that up is there's an

13   organizational chart in the UGI minutes of 1910 that lay out

14   all of the employees of the plant.

15   Q.  Well, I think it has the upper management of it, but maybe

16   not all the employees.

17   A.  I think it goes down the whole tree actually.

18   Q.  My point is that many of the people that worked at the

19   CCR&L, at the plant while CCR&L was there, they used to work

20   at the gas plant while it was in CCRG&E's control during 1899

21   to 1910 period.  Do you know that?

22   A.  The laborers probably did, yeah.

23   Q.  Not only just the laborers, but the foremen, Walter

24   Connelly, the people who had foremen positions.  Are you aware

25   of that or not?

NEIL SHIFRIN – CROSS-EXAMINATION

1   A.  Yes.  Yes.

2   Q.  And so they were dealing with the same kinds of issues

3   that caused tar leaks, waste disposal practices, I mean, this

4   was going on in 1899 to 1910, was it not?

5   A.  Most likely, that's right.

6   Q.  And then CCR&L came in, took the plant, took the other

7   businesses, put in money, the employees transferred, and the

8   same problems were going on, correct?

9   A.  They were slightly different, because UGI rebuilt the

10  plant.  But essentially the same problems of leaks and spills

11  were occurring, yes.

12  Q.  And have you found any documents in the record,

13  correspondence, anything that would direct the new employees

14  of CCR&L to handle leaks in a different way, to handle waste

15  disposal in a different way, to change procedures from what

16  they were doing between 1899 and 1910 and 1910 and 1926?

17  A.  Oh, yeah, you can see, as we showed earlier this morning,

18  in the operating notes that were given to the plants, there

19  were instructions about how to seal leaks, there were

20  instructions about how to handle tar, there were instructions

21  how to run the gas distribution business.  There were lots of

22  instructions given by UGI to the Charleston plant.

23  Q.  Well, you say those are instructions, Dr. Shifrin, but

24  when I read them I just saw that they were articles.  And in

25  fact, yesterday I believe you said that the notes were there

NEIL SHIFRIN - CROSS-EXAMINATION

1  to make available technical information and technology for the
2  subsidiary companies to use.  But there were no mandates that
3  these procedures had to be followed, were there?
4  A.  Well, the mandates come elsewhere, when George Waring was
5  placed to run the plant by UGI, and when the inspectors came
6  to inspect how the plant was run, when you put all of those
7  things together, between the instructions and the operating
8  notes, the management and the operators of the plant coming
9  from UGI, it all adds up to --
10  Q.  Well, let's take one thing at a time, okay?  First of all,
11  there are no explicit directions, instructions, bulletins to
12  the employees of CCR&L from UGI about changing how to handle
13  leaks or waste disposal practices, right?
14  A.  First of all, my opinion is you can't take one thing at a
15  time, because it's the cumulative effect of all the evidence
16  that is really important here.  But I will go with you and
17  take one thing at a time.  And I agree -- I don't think that
18  there was any instructions to change anything related to leaks
19  per se.  There were instructions later about how to handle
20  leaks.  But I have not seen anything about changing the way
21  they did things.
22  Q.  Okay.  And then you say there were the operating notes,
23  and the operating notes were basically memorializing a lot of
24  the discussions at these annual superintendent conferences,
25  correct?

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.   Partly.

2    Q.   And then there were papers that were published that were

3    also put in the notes?

4    A.   Right.

5    Q.   And so your theory is that these were directives to the

6    various subsidiaries, correct?

7    A.   No, these were instructions on how to do certain things,

8    and the directives came from the management of the subsidiary.

9    Q.   Okay.  And do you have -- have you seen documents from

10   this time in which the directives of what to do are in the

11   record?  You have a directive from who?

12   A.   There are directives from the UGI board to the CCR&L

13   board, who established directives that were then implemented

14   by the management of the subsidiary.

15   Q.   With respect to waste disposal or the handling of leaks at

16   the plant, there were directives from the UGI board?

17   A.   With respect to the operations.  And --

18   Q.   But --

19   A.   With respect to the operations, and as I've said numerous

20   times, the operations were about gas making, and gas making

21   was intimately involved with tar, and leaks were intimately

22   involved with the storage of tar.

23   Q.   I understand the theory.  But I guess what I want to ask

24   you and make sure that the record is clear on, is that there's

25   nothing in the record about one UGI directing the employees at

NEIL SHIFRIN - CROSS-EXAMINATION

1   CCR&L about how to do leaks and how to handle waste disposal,

2   correct?  You didn't find anything --

3   A.  We're not talking about waste disposal, we're talking

4   about leaks.  And there are no specific directives that I've

5   seen from UGI about changing leaks.  Changing how leaks are

6   handled.

7   Q.  There's obviously a waste disposal issue here.  I mean, in

8   1947 tar is leaking all over Calhoun Park.  That's something

9   that companies worried about at the time, isn't it?  Isn't

10  that -- if UGI was really dictating all the practices that you

11  say, wouldn't you find something about this subject?

12          MR. FELMLY:  I'm going to object to the form of the

13  question, like four questions in that.  It's compound.

14  A.  First of all, you're mixing your time periods.  You're

15  referring to Bowick, which is 19 -- post-UGI, 1947, and then

16  you're trying to tie that back to UGI.

17      But, the -- I would argue that spills of tar, whether it's

18  during loading railroad cars or from the relief holder, is not

19  waste disposal.  They didn't view it as waste disposal; it was

20  an accident.  It was an accident releasing material that was

21  very valuable to them.  It was -- this was not waste disposal.

22  Q.  Okay.  But whether it was waste disposal or whether it

23  caused a problem that had to be dealt with, there's no record

24  of UGI giving directives to the Charleston plant or giving

25  directives to Mr. Waring on what to do, correct?

629

NEIL SHIFRIN - CROSS-EXAMINATION

1   A.  I have not seen any specifically related to that topic.

2   Q.  And you say that there may have been communications from

3   the UGI general superintendent to people at the Charleston gas

4   plant.  But again, there's no documentation of any of that, is

5   there?

6   A.  There is.  There -- in the UGI Circles and the UGI

7   history, it's made very clear that the general superintendent

8   ran all the other superintendents with an iron fist.

9   Q.  I disagree.  The documents will speak for itself, I guess,

10  when we look at them.  I'm asking you for specifics.

11  A.  Well, that's very clear to me.  There is nothing specific

12  in terms of surviving documentation that Norris told Waring to

13  do something, or told the superintendent at the Charleston

14  plant to do something.  But it's very clear from the UGI

15  documentation that Norris had control over all of these

16  superintendents, and paid extreme detail to all this.  He ran

17  these plants.  He ran these superintendents.  They reported to

18  him.  Even though they were local plant employees.

19  Q.  And perhaps you'll show me the documents that reflect

20  that.

21  A.  Okay.

22  Q.  We can do it on break, recross, whatever.  I'll move on.

23      Let's talk about Mr. Waring for a second.  Your position

24  is that Waring was a superintendent in another UGI plant

25  first, in Omaha, correct?

NEIL SHIFRIN – CROSS-EXAMINATION

1    A.  Right.

2    Q.  And he also worked at -- in other places, he worked in

3    Atlanta and one or two other places before Omaha, correct?

4    A.  I believe so, that's right.

5    Q.  And then when UGI was going to invest capital in this new

6    company that was going to run the three businesses, they

7    appointed Mr. Waring not as superintendent of the gas plant,

8    they elected him a board of -- a member of the board of

9    directors, correct?

10    A.  And the manager of the plant.

11    Q.  Well, UGI didn't elect him.  First of all, do you know,

12    Dr. Shifrin, and I think maybe you disregard this, but CCR&L

13    was a duly incorporated company, was it not?

14    A.  I don't know.

15    Q.  Do you know that when it was incorporated, it had a board

16    of directors meeting and elected a board of directors?

17    A.  I know that it had a board of directors, yeah.

18    Q.  And was Mr. Waring elected to the board of directors?

19    A.  He was.

20    Q.  Okay.  And did the board elect Mr. Waring to be vice

21    president and general manager?

22    A.  Not originally.  That organization with him as general

23    manager is in the UGI board minutes.

24    Q.  Well, I think what you may be referring to is that UGI

25    told its board how it expected its new subsidiary to be

NEIL SHIFRIN - CROSS-EXAMINATION

1    staffed, and Mr. Waring was expected to be vice president and

2    general manager.  But my point is, is that CCR&L board of

3    directors duly appointed him to be vice president and general

4    manager, did it not?

5    A.  After UGI told them to.

6    Q.  UGI may well have said we'd like Mr. Waring to be an

7    officer.

8    A.  I think it was more than casual, as you imply.  I think it

9    was deliberate and it was ironclad.

10   Q.  And couldn't UGI have said, we own this company, and what

11   we're going to do is we're going to elect a board of all our

12   people, and we're going to appoint ourselves to be officers of

13   that company?

14   A.  What's your question?

15   Q.  Anything impermissible about that, that you know of?

16   A.  Not that I know of, no.

17   Q.  But they didn't do that; they had a board of directors

18   that, in fact, was never majority oriented, majority

19   controlled by UGI people.  Correct?

20   A.  That's not true.  That's incorrect.  There were times when

21   there were five people on the CCR&L board that were from UGI.

22   Q.  Would that count Mr. Waring as one of those UGI people?

23   A.  I don't know.

24   Q.  We'll look more closely as we get into it.  But also,

25   while we're on the subject, didn't the board of directors of

NEIL SHIFRIN - CROSS-EXAMINATION

1    CCR&L also appoint Mr. Pearson as their purchasing agent?

2    A.  It was all a rubber stamp of UGI's directives.

3    Q.  I understand that's your view, but the board met, the

4    board had elected positions, and the board appointed

5    Mr. Pearson to be its purchasing agent, did it not?

6    A.  After these things were decided at UGI, which is

7    documented in UGI minutes.  It dates prior to the action taken

8    by the CCR&L directors.

9    Q.  Again, I guess your point, Dr. Shifrin, is that UGI, as

10   the parent company, had the ability to put who it wanted on

11   the board.  My point is that they went through a corporate

12   system, the board of directors of CCR&L met, and they

13   appointed Mr. Pearson to be the purchasing agent of the

14   company, correct?

15   A.  After they were told by UGI to do so.  UGI had the power

16   to compel.

17   Q.  Does a parent company always have the power to compel?

18   A.  I don't know.

19   Q.  Okay.  If it has control of the subsidiary, wouldn't it?

20   A.  I don't know.  That's a business issue.  I don't have an

21   opinion on that.

22   Q.  Okay.  So Pearson was the purchasing agent of CCR&L,

23   correct?

24   A.  As well as UGI.  That's right.

25   Q.  And of other subs.  And one of the UGI models was to use

NEIL SHIFRIN - CROSS-EXAMINATION

1  centralized purchasing, was it not?

2  A.  Right.

3  Q.  And are you familiar with centralized purchasing today?

4  A.  Yes.

5  Q.  What does centralized purchasing do?

6  A.  It's a fairly -- it's usually a more efficient process.

7  Q.  And that's because UGI had subsidiaries -- first of all,

8  UGI ran the Philadelphia Gas Works, did it not?

9  A.  Right.

10  Q.  And as you were discussing with the judge, it actually

11  entered into a direct lease to run the Philadelphia Gas Works

12  for 30 years, beginning in late 1800s, 1897, right?

13  A.  I thought they had a 99-year lease, but I don't remember.

14  Q.  And UGI not only ran the Philadelphia Gas Works, but it

15  started by inventing this Lowe process and selling gas plant

16  equipment and licensing gas plant equipment, did it not?

17  A.  Right, they were leaders in the field.

18  Q.  And so one of the things they would do is sometimes they

19  would lease a plant and run it directly, correct?

20  A.  Right.

21  Q.  And sometimes they would construct gas plants and sell

22  them to other companies.  In which they had no ownership

23  interest whatsoever.

24  A.  Possibly.  I don't remember.

25  Q.  You don't remember from the Connecticut case that of the

NEIL SHIFRIN - CROSS-EXAMINATION

1    13 gas plants, seven of them bought UGI equipment with no

2    ownership relationship whatsoever?

3    A.  I don't remember.

4    Q.  And sometimes UGI would invest in other utility companies,

5    because it knew good investments, did it not?

6    A.  I won't answer the second part, because I don't know the

7    answer to that, but the first part is I know that UGI did have

8    partial ownership of other companies.  And I assume that's

9    what you mean by investment.

10   Q.  And those other companies had electric plants,

11   transportation businesses, gas plants, did they not?

12   A.  My understanding is that UGI had interests in all three

13   types of utilities, that's right.

14   Q.  And one of the models of the company was to bring

15   efficiencies to the process by, for example, doing purchasing

16   on a centralized basis, right?

17   A.  That was one of their methods, that's right.

18   Q.  And UGI also, because as you said, they were a technical

19   leader, they also provided advice and consulting services just

20   like you do, to companies that they had no ownership

21   relationship with, right?

22   A.  I don't know anything about their advice to companies they

23   didn't have ownership relationships with.

24   Q.  You don't know that UGI's engineering department, and

25   later the Contracting Company, would provide services to

NEIL SHIFRIN - CROSS-EXAMINATION

1    others in the electric utility field and the gas plant field?

2    A.  I wouldn't categorize that as advice, I would categorize

3    that as you just said, services.  They built things for

4    outside companies.

5    Q.  Okay.

6    A.  They didn't -- consulting advice is something different.

7    Q.  I agree.  So they would provide services to other

8    companies; they would sell gas plants to them and then they

9    would consult with them, correct?

10   A.  They expanded their construction business outside the

11   domain of UGI subsidiaries.

12   Q.  And with respect to the subsidiaries that they had, they

13   would also try to bring their knowledge and make it available

14   to the subsidiaries.  Doesn't UGI -- wasn't one of the

15   hallmarks of UGI saying that we are a technical leader, you

16   can call upon us for advice, but it's your company, you are

17   the ones that are controlling it.

18   A.  That's where I disagree with you.  I agree they provided

19   advice, but with the companies that they owned, this was

20   advice with the power to compel.  And there's examples of that

21   in the documentation that I discussed over the last two days.

22             THE COURT:  I'm going to recess for lunch now.  Let's

23   recess until 2:00 o'clock, not 2:30, 2:00 o'clock.

24       (A recess was held at this time.)

25             THE COURT:  All right, sir, you may proceed.

NEIL SHIFRIN – CROSS-EXAMINATION

1          MR. VARON:  Thank you, Your Honor.

2     BY MR. VARON:

3     Q.  Dr. Shifrin, we were talking about UGI's system before,

4     but I'm going to change subjects on you and go through some of

5     the testimony you have given over the last day or so, and then

6     we'll come back to UGI's system.

7          I wanted to talk to you about the inspections that you

8     testified about.  And I believe you compiled a set of records

9     that showed, in your mind, the manner in which UGI inspected

10    at Charleston during this time frame, and that was

11    Exhibit 159, correct?

12    A.  To the extent the documents have survived, right.

13    Q.  Isn't it true that most of those inspections had virtually

14    nothing to do with the gas plant and were of entirely

15    different operations, like the power plant or the new business

16    department or something else?

17    A.  Some of them were, yeah.

18    Q.  Not the clear majority?

19    A.  I don't know if it was a majority or not.

20    Q.  Well, let's look at a few of the things that you talked

21    about.

22          MR. VARON:  Andrew, you can pull up Exhibit 159, I

23    think it's maybe the second entry, SCANA 32524.  Highlight the

24    bottom part there.

25    Q.  I believe the point you were making was that John Wholey,

NEIL SHIFRIN – CROSS-EXAMINATION

1    a travel representative of the new business department, was in

2    Philadelphia and Charleston investigating the field for

3    industrial gas and examining installations of rector systems,

4    correct?

5    A.  Right.

6    Q.  And just to be clear, the new business department is

7    sales, right?

8    A.  Right.

9    Q.  And occasionally -- I mean UGI had a new business

10   department, correct?

11   A.  Right.

12   Q.  And they would occasionally go to the subsidiaries and

13   help them create new markets, demonstrate how products worked

14   to try and build the sales of the subsidiaries, correct?

15   A.  Probably.

16   Q.  Okay.  So this is what this relates to; has nothing to do

17   with the gas plant, right?

18   A.  Well, it's sales of gas-related equipment, but it doesn't

19   have anything to do with the plant itself, right.

20        MR. VARON:  Let's look at SCANA 32869, which is a

21   couple of pages forward.  And, Andrew, if you can highlight

22   the first couple of entries under details as follows.

23   Q.  Here again I think we focused on the fact that somebody

24   named Bruff, C.L. Bruff, a combustion engineer, was coming to

25   the plant and testing the power plant and testing power

NEIL SHIFRIN – CROSS-EXAMINATION

1   apparatus, correct?

2   A.  Right.

3   Q.  And my question is, isn't it clear that this, too, was not

4   at the gas plant, but was at the electric plant?

5   A.  Right.

6   Q.  Okay.  And we had a conversation on the third entry there

7   about O.S. Carter and N. Jackson, inspection and testing of

8   the plant apparatus.  And I believe you said you couldn't tell

9   whether that was the electric plant or the gas plant.  But

10  isn't it clear that it's the electric plant?

11  A.  I don't think it's clear, no.

12  Q.  Well, if you look up to the top of the page --

13          MR. VARON:  Highlight that first part, Andrew.

14  Q.  -- you have power plant and inspection is taken up $1150.

15  Right?  So as you go down then to the second half of the page

16  where details as follows, virtually all of this is plant and

17  inspection of the electric plant, is it not?

18  A.  What's the sum at the bottom of this column?

19  Q.  There's a sum that says 1271.93.

20  A.  Is that the same as the sum that you pointed out at the

21  top?

22  Q.  No, but don't you know who Carter is?  Let me do it that

23  way.  Isn't Carter somebody who was on the electric side of

24  the business?

25  A.  I don't know.

NEIL SHIFRIN – CROSS-EXAMINATION

1          MR. VARON:  Let's look at the next page.  Maybe not

2     the next one, Andrew.  UGI Circle 04 –– 004326.  And can you

3     highlight the top paragraph on the right-hand column.

4     Q.  Says O.S. Carter is spending some time in the Lafayette

5     electric station, will later visit the Chicago station in the

6     Hammond district.

7          The fact that he's dealing with the electric station, does

8     that maybe refresh your recollection that he was on the

9     electric side?

10    A.  Doesn't mean necessarily that that's all he did

11    exclusively.  Clearly he did work on the electric side.

12    Q.  Okay.  Do you have any recollection or any documents that

13    would show him working on the gas side?

14    A.  I don't think so.

15    Q.  Let's look at the next one, which is SCANA 32919, I'm

16    sorry, and under details, the third one.  Again, you see O.S.

17    Carter, we talked about efficiency, but it's the power plant

18    again, correct?

19    A.  This is the power plant, yep.

20          MR. VARON:  Okay.  Next one, SCANA 32964.  Details as

21    follows.  The fifth one with Bruff.

22    Q.  Now, Bruff has been the one that's been inspecting the

23    electric plant constantly.  Do you think this is the gas

24    plant?

25    A.  It's unclear.  It's possible that it's the electric plant.

NEIL SHIFRIN - CROSS-EXAMINATION

1  Q.  Isn't much more likely, given the fact that he's been

2  spending all his time at the electric plant, that this is

3  another inspection of the electric plant?

4  A.  It's not clear from this.

5  Q.  Well, I would suggest to you that Carter and Bruff were on

6  the electric side, but I'm not going to keep going through it.

7       Basically you have --

8            MR. VARON:  I'm sorry, let's go to SCANA 2661.  I

9  think it's this 161, it's --

10  Q.  Remember, Dr. Shifrin, that you testified that there was a

11  force of engineers present at the Charleston plant for like

12  weeks at a time?

13  A.  Right.

14  Q.  This is the document that -- at least one of the documents

15  that reflects it on the CCR&L minutes.  These are March 23,

16  1921 minutes, correct?

17  A.  Right.

18  Q.  And the reason that there's a force of engineers on the

19  plant, again, has nothing to do with the operation of the gas

20  plant, right?

21  A.  It's inspecting the operation of the gas plant.

22  Q.  Isn't its purpose, as it says on the document, to make a

23  complete inventory and valuation of the company's property?

24  A.  First to understand the operation of the plant.  If it was

25  simply an inventory, it would be accountants.  This is

NEIL SHIFRIN – CROSS-EXAMINATION

1    engineers.

2    Q.  Well, because you have to value it, right?  This is a rate

3    making exercise, is it not?

4    A.  You have to understand the operation of the plant.  This

5    is an assessment, this force of engineers is there to inspect

6    the operation of the plant.

7    Q.  Well, it says to complete the inventory and value the

8    company's property, right?

9    A.  But first, to inspect the operation of the plant.

10   Q.  It doesn't say it, does it?

11   A.  Engineers would not do an inventory or an accounting, so

12   this was the prelude to the inventory and the valuation.

13   Q.  The whole exercise --

14       MR. VARON:  Let's look at the next page, SCANA 2662.

15   If you can blow up, Andrew, the big bottom paragraph,

16   inventory valuation of property.

17   Q.  At this meeting CCR&L apparently had a guy named E.L.

18   Heyser of Philadelphia come down, who had charge of the

19   inventory and valuation of the property being made.  And to

20   explain to the board the way in which the -- the way in which

21   it was going to work, correct?

22   A.  Right.

23   Q.  And Heyser introduced and gave a clear account in which

24   inventory was being taken, and when completed, the various

25   methods and using a fair valuation of the property.  Right?

NEIL SHIFRIN – CROSS-EXAMINATION

1   A.   Right.

2   Q.   None of these documents mention any inspection of the

3   operation of the plant, do they?

4   A.   The engineers would only be involved with the operations,

5   not with the valuation.

6   Q.   Your idea is that engineers from UGI were there to affect

7   the manner in which the plant was operating.  Isn't it clear

8   that this force of engineers that were there for weeks were

9   there to value the property and not to affect operations?

10  A.   They were there to understand the operations and to

11  provide opinions in the operations, so that the accountants

12  could value the plant.

13  Q.   There are no accountants.

14  A.   In this phase, that's right.

15  Q.   Okay.  But you gather that it was an intensive month-long

16  evaluation by the engineers on the operational side from an

17  entry that says they were there to inventory and value?

18  A.   My understanding it was actually three months, not a

19  month.

20  Q.   Okay.  So the other thing that we have in the way of

21  inspection is you have this guy Cooke, H.R. Cooke, coming down

22  from the works department, probably two or three times in the

23  1910 to 1926 period that you've talked about, and making an

24  inspection of the property, of the works, correct?

25  A.   We were just talking about Heyser --

NEIL SHIFRIN - CROSS-EXAMINATION

1   Q.  We were talking about Heyser.

2   A.  Right.

3   Q.  I'm saying we've talked about the electric inspections,

4   we've talked about the power plant, we've talked about the

5   valuation at the property, we've talked about the new sales

6   department, there were also inspections by -- of the

7   distribution department, right?

8   A.  Right.

9   Q.  And the distribution department wouldn't be involved in

10  leakage of tar, would it?  We're talking about the mains

11  distributing out gas to the property.

12  A.  Not at this plant, that's right.

13  Q.  Okay.  So what you have in the way of inspections, then,

14  of the works, is this guy Cooke coming down the three times

15  and, quote, "inspecting the works," right?

16  A.  And the comprehensive inspection in 1910 when UGI took

17  over the plant.

18  Q.  Okay.  You may have me on that, but at least from the --

19  when they took it over, you're saying they came down?

20  A.  And created an inch thick document that itemized every nut

21  and bolt at the plant.

22  Q.  Okay.  Are you talking about the inventory?

23  A.  Right.

24  Q.  You have documents that suggest UGI created that

25  inventory?

644

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.  UGI hired somebody to create that.

2    Q.  Wait a second.  There's a difference, right, between UGI

3    coming down and doing it itself, and UGI hiring somebody to do

4    it?

5    A.  Well, it was UGI's agent to do it.  I mean just like

6    somebody hires a consultant to do some work for them.

7    Q.  So in other words, in connection with the purchase, they

8    looked -- they inspected the plant, is what you're saying.

9    A.  Right.  And inventoried it.

10   Q.  And the only evidence you have that UGI put this in

11   motion, is that there is this inventory of products at --

12   we'll show you that document.  I mean, we saw it earlier, but

13   you're talking about the inventory and valuation that

14   accompanied the lease?

15   A.  Right.

16   Q.  And you think that was done by UGI and at UGI's behest?

17   A.  Absolutely.

18   Q.  Okay.  Are there documents that show that?

19   A.  The document -- the front cover of that document shows

20   that the lessee and the lessor each hired some individual to

21   co-produce that document.

22   Q.  You have no information, do you, about what, if anything,

23   UGI -- UGI's Mr. Cooke, uncovered on any of these inspections

24   that he may have made of the works, I guess three times we

25   know he was down, do you?

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.  That's right.

2    Q.  Let's talk about your --

3         MR. VARON:  I'm sorry.  Before we leave inspections,

4    Your Honor, may I just have one word?

5         (Brief interruption in proceedings.)

6         MR. VARON:  Andrew, could you put up 091324.

7    Q.  Dr. Shifrin, are you also aware that the Charleston

8    personnel had a system of daily inspecting the gas plant

9    apparatus, and that that was instituted in -- at least by 1913

10   by Mr. Kollock, the superintendent of the gas department?

11   A.  I wouldn't be surprised.

12   Q.  If you -- I mean, were you aware of it, I guess?  Let me

13   ask that.

14   A.  I don't remember specifically, but I wouldn't be

15   surprised, because the engineering and operating notes

16   actually recommended that.

17   Q.  Well, Kollock is in this article, Kollock is the

18   Charleston gas superintendent, correct?  And he is writing

19   about when to increase the storage capacity of the gas plant,

20   right?

21   A.  I thought it was with a K, but --

22   Q.  I think -- I think it is a typo, you're absolutely right,

23   it says Pollock, but it should be E.C. Kollock, I think we've

24   seen from the records.  So isn't this an example where Kollock

25   is writing about a Charleston engineering issue that basically

NEIL SHIFRIN – CROSS-EXAMINATION

1    he's resolved?

2    A.  Yeah, he was a UGI cadet.

3    Q.  Well, we're going to come to that, but you're right, he

4    was a cadet engineer briefly, and actually he was a cadet

5    engineer at Charleston, right?

6    A.  That's right.

7    Q.  And then he got promoted to gas superintendent.

8    A.  Right.

9    Q.  So Kollock is writing about how Charleston solved this

10   particular storage capacity problem, and in the course of it,

11   if you turn to the next page, is describing the daily

12   apparatus inspection system, correct?

13   A.  Right.

14   Q.  And that is an inspection system where one of the CCR&L

15   workers makes out a report every morning showing which pieces

16   of machinery are running, the condition of the idle apparatus,

17   and then they know whether any repairs need to be brought to

18   the attention of the superintendent.  Correct?

19   A.  That's what this says.

20   Q.  And this is being presented as a Charleston program, is it

21   not?

22   A.  It's being performed in Charleston, but Kollock was a UGI

23   employee.  He was a cadet, a UGI cadet.

24   Q.  I'm not going to argue about --

25   A.  Well, this is the whole point.  That yes, indeed, there

NEIL SHIFRIN - CROSS-EXAMINATION

1  were people that lived in Charleston that ran the Charleston

2  plant.  But the people that ran the Charleston plant were

3  placed there by UGI and transferred in and out by UGI.  They

4  were UGI people.

5  Q.  And so in your analysis of this situation, Dr. Shifrin,

6  when a Charleston gas superintendent like Kollock creates an

7  independent inspection system at Charleston, then goes to the

8  superintendent's conference and says, you know, we had this

9  problem and we solved this storage capacity and we developed

10  this inspection procedure, you don't take that as independent

11  Charleston conduct, you attribute it to UGI, because Kollock

12  was trained, supposedly, in Omaha, for three months before he

13  went to Charleston?

14  A.  Well, that's right.  These individuals had their own

15  initiative, for sure.  And actually there are a number of UGI

16  documents that show that that was UGI's strategy, to try to

17  put the initiative in the local people.  But in the same UGI

18  documents, they say, but we -- we're controlling these people,

19  and we have to make them feel like they have some autonomy.

20  But we're in charge.

21      And Kollock here, by the way, reported to Norris.  He

22  reported to Norris in Philadelphia.  He might have been the

23  superintendent at Charleston, and he might have devised this

24  daily inspection program, but he reported to Norris.

25  Q.  Kollock was the superintendent of the gas department.

NEIL SHIFRIN - CROSS-EXAMINATION

1  Wouldn't he have reported to Mr. Waring, who was the general
2  manager, or wouldn't he have reported to Mr. Benedict, who
3  replaced Mr. Waring?
4  A.  He reported to them, too, but it was clear -- it's clear
5  from UGI documentation that the general superintendent in
6  Philadelphia had all of the superintendents of the
7  subsidiaries report to him.
8  Q.  I don't agree with you; you can show me the documents.
9  And again, I guess I would ask you, is there any
10  correspondence, any discussion in the minutes, any discussion
11  in the operating notes, anywhere in the record where the
12  general superintendent is corresponding with Kollock or Waring
13  or any of the CCR&L employees about this?
14  A.  I have not seen such correspondence.
15  Q.  Or references in the minutes?
16  A.  Not direct.  I've seen UGI descriptions of their method of
17  operation involving the general superintendent having all the
18  plant superintendents be responsible to him.  And that's the
19  limit -- that's the limit of the relationship, as I understand
20  it.
21  Q.  Are you aware that in 1910, when CCR&L was formed, UGI
22  didn't even have a general superintendent?
23  A.  I don't know when Norris started that position.  But they
24  had -- they had the management committee and they had other
25  mechanisms for the same function.

NEIL SHIFRIN – CROSS-EXAMINATION

1    Q.  Management committee operated in 1927 forward, right?

2    A.  Or the operations committee or the works committee or the

3    executive committee.  They all did the same thing in sequence.

4    Q.  And that's my point, Dr. Shifrin, because the executive

5    committee operated from 1904 to 1923, and we have their

6    minutes.  And my point is, is that if you can show me any

7    references in those minutes that talk about the

8    superintendent's controlling the gas superintendents in the

9    subsidiaries, that would be interesting, and more interesting

10   would be any particular direction or control that they were

11   given.

12   A.  Okay.  Well, I definitely have seen that documentation,

13   and I'll try to produce it in the break.

14   Q.  And are you also aware that the CCR&L board of directors

15   would inspect the properties on, I guess at least an annual

16   basis?

17   A.  I have seen two references in the CCR&L minutes where

18   Waring said he was going to take the directors on a tour of

19   the plant works, yes.

20   Q.  And it really wasn't described as a tour, was it?

21   A.  It was an inspection.

22   Q.  Described as an inspection.

23   A.  That's right.

24   Q.  Let's talk about Exhibit 157, which is, as I understand

25   it, again a compilation of documents that go to what's been

NEIL SHIFRIN – CROSS-EXAMINATION

1    described, I guess, as design and equipment.  Or something to

2    those words.  Is that what you understand that exhibit to be?

3    A.  I don't remember the numbers.

4    Q.  Let's go through a few things.

5         MR. VARON:  Andrew, you can pull up SCANA 37018.

6    Q.  This is, I think, the inventory of the property that you

7    were referring to earlier, correct?

8    A.  Right.

9    Q.  And as I understand it, this is a document that

10    inventories, at a minimum, I guess, things at the gas plant

11    from Charleston Gas Light Company.  Is that right?

12    A.   It inventories the entire gas plant, that's right.

13    Q.  And the cover indicates that it's pursuant to a lease

14    between Charleston Consolidated Railway Gas and Electric

15    Company, which was the owner, and CCR&L, the new company that

16    UGI formed, which is the subsidiary and the lessee, correct?

17    A.  Right.

18    Q.  And it says that the inventory's being performed pursuant

19    to a provision in the lease, right?

20    A.  Right.

21    Q.  And it said that it's being performed, I guess, by Charles

22    Bendt of the lessor, and Thomas Genay of the lessee.  Right?

23    A.  Right.

24    Q.  And this is the -- and this is the inspection that you

25    referred to earlier in your testimony about UGI doing a

NEIL SHIFRIN - CROSS-EXAMINATION

1    comprehensive inspection of the plant in 1910?

2    A.  Right.

3    Q.  And do you know who Thomas Genay is?

4    A.  No.

5    Q.  For all you know, he could have no connection with UGI and

6    just be a local Charleston person that they hired to look at

7    the property and the lease.

8    A.  Well, in that case he would be an agent of UGI.

9    Q.  Do you even know if he's an engineer?

10   A.  It's unclear, no.

11   Q.  Is Bendt an engineer?

12   A.  Don't know.

13   Q.  Bendt is an auditor, isn't he?

14   A.  I don't know.

15   Q.  Sure you do; Charles Bendt was right on the organization

16   chart.

17   A.  Oh, Bendt --

18   Q.  B-E-N-D-T.  We'll come back and I'll show you -- well, let

19   me show you in the autobiography.

20           MR. VARON:  Put up 225.

21   Q.  This is --

22           MR. FELMLY:  Your Honor, can I just interpose an

23   objection?

24           THE COURT:  Sure.

25           MR. FELMLY:  This raises exactly the problem that

NEIL SHIFRIN - CROSS-EXAMINATION

1    I've been dealing with for two days, which is we don't have

2    the stipulation with respect to Mr. Varon's summary.  All of

3    the underlying documents that support it, I have no problem

4    with.  I have taken out all of the characterizations that we

5    had in our summary materials after our colloquy, and I would

6    just ask Mr. Varon to follow the same course and to use the

7    underlying source document rather than the materials that his

8    law firm has put together to summarize the details of it.  I

9    don't -- we tried to do that by stipulation, I thought that

10   the Court's ruling was clear, and so I would just ask that he

11   use the underlying source materials just like I did.

12        MR. VARON:  Your Honor, let me say this, if I could.

13   I think I'm happy not to put the summary into evidence, but

14   it's going to be a lot quicker if I can use it to show Dr.

15   Shifrin what I think the situation is and get his reaction to

16   it.  If I have to show document by document -- the reason we

17   compiled it is that it's biographical information that's --

18   the backup is right here in the exhibit.  So I guess I would

19   like to at least tell him what I think my understanding is,

20   see if he has an opinion on it, disagrees.  If I have to go

21   source by source, I will.  But certainly be a lot quicker to

22   do it this way.

23        THE COURT:  Well, the summaries are not in evidence.

24   You kind of halfway stipulated them in evidence, but reserved

25   the right to object to them, and I wasn't particularly fond of

NEIL SHIFRIN - CROSS-EXAMINATION

1    that stipulation.  And so counsel for the plaintiff

2    unilaterally thought the best approach was to not submit his

3    summaries, and he didn't do it.  And in hindsight, that's

4    probably the best way to proceed.

5                MR. VARON:  Okay.

6                THE COURT:  The same thing applies to any summaries

7    that the defendant has made.  They're not admissible in

8    evidence.

9                MR. VARON:  I'll just ask questions.

10               THE COURT:  I guess you can use them in

11   cross-examination, but then you run into the hurdle, and in

12   doing it the way you're doing it, of --

13               MR. VARON:  I'll do it another way.

14               THE COURT:  -- of testifying --

15               MR. VARON:  I'll do it another way.

16               THE COURT:  Well, I mean -- Okay.  It's not

17   complicated.  I mean really not that hard to do it.

18               MR. VARON:  You're right.

19               THE COURT:  I don't know why you can't show him a

20   document and --

21               MR. VARON:  I will.

22               THE COURT:  Of course when you start arguing with

23   somebody's interpretation of a document, you get into the best

24   evidence rule.  And --

25               MR. VARON:  Your Honor, I understand completely.

NEIL SHIFRIN – CROSS-EXAMINATION

1   Just so you can appreciate --

2           THE COURT:  Don't you have an expert that's going to

3   do this same thing?

4           MR. VARON:  You know, as Your Honor knows, we've been

5   eschewing the need for experts from the beginning of the

6   trial.

7           THE COURT:  I'm asking the question because I'm real

8   serious with you, we're not going through this thing twice.

9   If you have an expert that's going to do all of this and

10  contradict what this witness says about the documents, it

11  seems to me in a nonjury trial that's the best way to approach

12  it, rather than trying to get him to admit something that he's

13  not going to admit.

14          MR. VARON:  It's very clear that this guy Bendt is a

15  long-time Charleston guy and he's an auditor.  That's all I

16  want to show him.  But just to answer your question, Your

17  Honor, we have two experts.

18          THE COURT:  What difference does it make whether he's

19  a long-time Charleston guy or not?

20          MR. VARON:  Because --

21          THE COURT:  He claims he was the agent of your

22  client.

23          MR. VARON:  Yes --

24          THE COURT:  Could have been in Philadelphia, for that

25  matter.

NEIL SHIFRIN - CROSS-EXAMINATION

1          MR. VARON:  But he claimed that UGI came down and

2    inspected this plant in detail and wrote a big long memorandum

3    about it.

4          THE COURT:  I thought he said they hired somebody to

5    do that.

6          MR. VARON:  Well, they hired somebody, but it wasn't

7    even an engineer.  All I'm trying to do is rebut the inference

8    that UGI is taking engineering people and constantly bringing

9    them to the plant to inspect it.  This is one situation in

10   which that didn't happen.  There were only two or three --

11         THE COURT:  You go ahead.

12   BY MR. VARON:

13   Q.  Let me ask you this, Dr. Shifrin.  Does it refresh your

14   recollection at all to know that Bendt was a CCRG&E employee

15   and later an auditor of CCR&L?  Does that ring a bell?

16   A.  It doesn't ring a bell, but --

17   Q.  All right, I'll move on.

18       We also, in your testimony you cited several documents,

19   I'll just pull up a couple.

20         MR. VARON:  SCANA 1680.  The bottom part, Andrew.

21   Q.  These are Charleston Gas Light minutes, and I think you

22   pointed to the fact that the Charleston Gas Light Company

23   authorized expenditures for improvements at the plant,

24   correct?

25   A.  Right.

NEIL SHIFRIN – CROSS-EXAMINATION

1    Q.  And what's the significance of the fact that the

2    Charleston Gas Light Company authorized expenditures in terms

3    of UGI control?

4    A.  They were rubber stamping UGI's instructions.

5    Q.  In other words, UGI recommended that the Charleston

6    company could spend this money, and then the Charleston

7    company spent it.

8    A.  Right.

9    Q.  Okay.  And as a parent company, does a parent company have

10   the right to look at budgets and approve budgets and send

11   spending authorizations for the construction of a plant?

12   A.  I think you're referring to a business sense, but my point

13   is that UGI's involvement went down to the operation and

14   equipment of the plant.  And this is a good example.  That UGI

15   just didn't, say, get a budget of $2000, they focused on the

16   tar still.

17   Q.  Well, they were building -- subsidiary was building a

18   plant, correct?

19   A.  UGI was building the plant, and had the subsidiary build

20   it.  Had George Waring build it.

21   Q.  I'm not going to argue with you.

22        MR. VARON:  Let's go to SCANA 328 -- 32822.

23   Q.  We talked earlier, Dr. Shifrin, about the fact that UGI

24   would sometimes provide services to other companies and charge

25   for those services in connection with its engineering work,

NEIL SHIFRIN – CROSS-EXAMINATION

1    correct?

2    A.  We –– you and I talked about that?

3    Q.  Before lunch.

4    A.  Probably.

5    Q.  Okay.  Well, in this example you –– I believe you pointed

6    to the fact that on August 21st ––

7         MR. VARON:  You can highlight that, August 31st,

8    Andrew ––

9    Q.  –– that this guy Hopper was in Charleston in connection

10   with the operating set and coke and expenses, and there was

11   $184 paid to him, correct?

12   A.  Right.

13   Q.  Okay.  And so is that not like UGI sent somebody to assist

14   with an issue at the plant and was paid for it like any third-

15   party contractor would be?

16   A.  If UGI didn't have the power to compel, it would be.  If

17   they were just hiring an outside person to come in, that might

18   be the case.  But in this case, this is advice with the power

19   to compel.

20   Q.  So the difference is, is that CCR&L could have gone to any

21   third-party contractor and paid them $184 to do this, but even

22   though their corporate parent was knowledgeable and a

23   technical leader and would be able to give them good service,

24   they couldn't go and have that service done, because UGI had

25   the power to control?

NEIL SHIFRIN – CROSS-EXAMINATION

1   A.  That's right.

2            MR. VARON:  Andrew, can you go to UGI minutes 08767.

3   Actually why don't you go to 8763 through 766.

4   Q.  Dr. Shifrin, this is another document that you talked

5   about, it has to do with the establishment of the UGI

6   Contracting Company.  We'll see it in a second.

7            MR. VARON:  Don't have it?  Do you have 65, 64?

8   Maybe you can blow up the bottom part.

9   Q.  So this is where the UGI Contracting Company is forming,

10  Dr. Shifrin, and your point, I guess, was to look at the fact

11  that it had certain operations in house before the Contracting

12  Company was formed.  And I guess one of the things that you

13  pointed to in your testimony was the fact that it had a

14  residuals operation, right?

15  A.  Right.

16  Q.  And if you look down the last sentence that begins with

17  also, it says that the United Gas Improvement Company has

18  worked up a market for and handled the sale of residuals for

19  the Philadelphia Gas Works, correct?

20  A.  Right.

21  Q.  And that's the Philadelphia Gas Works is the big plant in

22  Philadelphia that UGI had been running for 30 years, or 20

23  years, I guess, at this time?

24  A.  Right.

25  Q.  As one of the main parts of their business, correct?

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.    It was a part of their business.

2    Q.    Well, pretty large part, was it not?

3    A.    I don't actually know how it fits into their finances.

4    Q.    Okay.  And then in parentheses it says, and though not to

5    such a large extent, other gas works in which this company is

6    interested as a stockholder.  Right?

7    A.    Right.

8    Q.    So that means that it was doing a little bit of residuals

9    work for some of the subsidiaries that it had, correct?

10   A.    That's your interpretation.  That wouldn't necessarily be

11   my interpretation.

12   Q.    Okay.  So you don't agree with that?  You don't agree --

13   A.    Not the way you're saying it, no.

14   Q.    And wasn't one of the reasons that the UGI Contracting

15   Company was forming -- I mean, there were several, but if you

16   go over to the next page, 8766, and you highlight this

17   paragraph, for the purpose of, it says for the purpose of, and

18   skipping to two, to separate and reorganize the force so that

19   it may be competent to handle not only the work it has handled

20   in the past, but be able to take on additional volume of work

21   and enlarge its sphere of activities in the construction line,

22   also the residual products.

23        So it was looking to expand the residual products business

24   that it had done not so much work for with respect to its

25   subsidiaries, correct?

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.  I disagree with your characterization.  I think that the

2    prior statement could be interpreted to mean that they did

3    full residuals management for some of the sites.  Your

4    interpretation is they did a little bit of residuals

5    management for all of the sites.  You can interpret it either

6    way.

7    Q.  Either way, do you have any evidence, have you seen any

8    documents that UGI performed tar sales for Charleston?

9    A.  It's interesting in my opinion that the only years that

10   there are tar sales data for the Charleston plant, are during

11   the UGI tenure.

12   Q.  I guess that's a no, right?

13   A.  That's not a no.  It's -- we don't know one way or

14   another, really, but what -- all we do know is that the only

15   years we have tar sales data, are the years that UGI ran the

16   plant.

17   Q.  Okay.  And this is in the environment that you've observed

18   where UGI's committees, its executive committee and its

19   operating committee monitor carefully every purchasing

20   contract, every expenditure for a charitable donation, every

21   salary increase, and yet there's no records in any of the

22   minutes or anywhere else about UGI approving or being involved

23   in the Charleston's tar sales activity.  Right?

24   A.  I don't recall seeing anything specific in UGI records

25   about tar sales at Charleston.

NEIL SHIFRIN - CROSS-EXAMINATION

1          MR. VARON:  Let's go to UGI-SC 211.  Or actually, I'm

2    sorry, UGI-SC 18 first.  And if you can put up the Charleston

3    reference.

4    Q.  We talked about this in your testimony, or you did, Dr.

5    Shifrin, I'm sorry, this is -- this you used as an example of

6    UGI recommending that there be a limit for making ordinary

7    repairs at the works without first obtaining formal

8    authorization for $50.  Right?

9    A.  Right.

10   Q.  And you thought this was a pretty Draconian measure, as I

11   recall, correct?

12   A.  I didn't use that word, but that word applies.

13   Q.  Okay.  The way this worked is --

14          MR. VARON:  If you look at the full document for a

15   second, Andrew.

16   Q.  -- these are UGI executive committee minutes, and they're

17   recommending to Charleston that this limit be imposed,

18   correct?

19   A.  Well, the word recommend is a very loaded word in UGI's

20   history.  Because my interpretation from all of the

21   documentation that I've seen is when UGI recommends, it's an

22   instruction, it's not simply a suggestion.

23   Q.  And I gather that what you've said before is that, for

24   instance, on authorizations UGI would recommend an

25   authorization and Charleston would note it in its minutes,

NEIL SHIFRIN - CROSS-EXAMINATION

1   correct?

2   A.   That's right.  And there's other -- there's other

3   documentation in UGI's minutes where it talks about the

4   function of the executive committee, and then later the

5   function of the management committee.  And it talks about how

6   recommendations lead to unanimous approval of actions.

7       So I believe that recommendation means instruction in UGI

8   documentation.

9   Q.   Let me ask you this.  Are you aware of any place in the

10  Charleston board minutes where this policy is adopted?

11  A.   I don't remember.

12  Q.   I'll just tell you, and if you -- why don't I just put it

13  up.  I have Mr. Blake's report here.  Mr. Blake did a report

14  in which he tracked various recommendations that UGI made and

15  that CCR&L followed.  And this is an excerpt from the report,

16  and he's saying that of the many recommendations, that that

17  pattern -- that he observed that pattern, there was no record

18  of CCR&L ever adopting this $50 policy.  And indeed, as you

19  noted the other day, it got raised to 75, and no record of

20  CCR&L adopting that one either.

21      I don't know if that refreshes your recollection one way

22  or the other.  Does it?

23  A.   No, it doesn't.  But he -- if I understand it right, he's

24  saying that this is one of four recommendations, UGI

25  recommendations that he couldn't find parallel approval within

NEIL SHIFRIN – CROSS-EXAMINATION

1    the CCR&L minutes?

2    Q.  Right.  And my next question to you is, do you know

3    whether this policy was followed?

4    A.  I'm sure it was.

5    Q.  You're sure that this $50 repair policy was followed at

6    CCR&L?

7    A.  Yes, in the UGI minutes it doesn't just single out

8    Charleston, it lists a whole litany of its subsidiary

9    companies.  It's clearly a defined policy of UGI.

10   Q.  I'm not saying it's not a defined policy, I'm asking you,

11   are you sure that CCR&L employees followed it?

12   A.  There's no documentation surviving.

13   Q.  Okay.  So you don't know if they rejected it.

14   A.  There's no documentation surviving to confirm it.

15   Q.  We'll deal with it later.  Thank you.

16       Would the accounting journals be some indication of

17   whether the policy was followed?

18   A.  It's -- that's sort of a complicated question, because

19   year by year, we do have documentation that UGI authorized a

20   repair budget or a maintenance budget and a capital budget.

21   So -- and then we do have corresponding accounting journals of

22   CCR&L where detailed maintenance and repair items were

23   delineated.

24       It's a complicated question, because within the policy of

25   $50 specific approvals, overarching that is the annual

NEIL SHIFRIN – CROSS-EXAMINATION

1    authorization of a maintenance budget by UGI.  So there is a

2    question in my mind, as long as CCR&L was within that

3    maintenance budget, they could be following not only the $50

4    rule, but also the overall budget that UGI was giving them.

5    And UGI was giving them an overall budget for maintenance.

6            MR. VARON:  Okay.  Can we put up Defendant's

7    Exhibit 62.  And, Andrew, show the first page first and then

8    we'll go forward.  Good.

9    Q.  Dr. Shifrin, this is what I think has been referred to

10   during discovery and so forth as the Dolan letter, the Dolan

11   annual report for 1902 that's dated 1903.  And is it your

12   understanding that UGI's presidents would make annual reports

13   and sometimes describe the state of the business and how it

14   was operating?

15   A.  I believe so.

16           MR. VARON:  Okay.  And if you turn to page 2584 and

17   maybe highlight the sentence beginning with the direct control

18   and active management.

19   Q.  We were talking about the UGI system earlier, Dr. Shifrin.

20   And this is how UGI's president described their operations at

21   this point, saying that the direct control and active

22   management of the various companies in which your company is a

23   shareholder are vested in their respective boards of

24   directors, and each company has a complete official

25   organization of its own.  See that?

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.  Yes.

2    Q.  And then it describes the committee structure which we've

3    talked about, in which the committees review contracts for

4    supplies, improvements and extensions, has a composition of

5    various UGI executives.  They have a slight overlap of

6    officers.

7            MR. VARON:  And if you go down farther on the next

8    page, Andrew, and pick up with through such a system, maybe

9    you can highlight that.

10   Q.  Through such a system as outlined above, there can be and

11   is cooperation in improving the details of management.

12       Do you see that?

13   A.  Yes.

14   Q.  Each company in which the United Gas Improvement Company

15   is a shareholder has the benefit of the advice of that

16   company's experts in the purchase of supplies, in the laying

17   out, construction and operation of plants, in solving legal

18   and financial problems, and in canvassing for new business,

19   and in all the details that make for success.

20       Correct?

21   A.  You read it well.

22   Q.  Okay.  And that is the model, according to UGI in 1902,

23   this is what they were doing.  They had subsidiaries with

24   official organizations of their own, they managed them, UGI

25   would provide centralized purchasing and advice.  And I know

NEIL SHIFRIN - CROSS-EXAMINATION

1    that you quarrel with that description, but the issue is, I

2    think, whether you're right that UGI is directing them to do

3    everything, or whether they're providing consulting services

4    and advice.  Correct?

5    A.  Well, you make it sound very simple.  But let's stay

6    within this document and tell you why I have the opinion that

7    I have.

8        If you go a little further up in this document, you get a

9    sense of UGI's method of operation in terms of being very

10   careful not to be accused of being an unfair trust.

11       For example, on the sentence that starts we are, about

12   three lines down, we are, therefore, in constant and close

13   touch with their management without in any sense making our

14   company liable to the name of Trust, in quotes, capital T.

15   Q.  Right.

16   A.  They're putting up a semblance of local control in order

17   to be avoided -- in order to avoid trust regulation.  If you

18   go to the prior page that you showed me, on the lower last

19   paragraph, yes, indeed, they do say that they set up a local

20   company with its own board and its own directors and official

21   organization of its own, but look at the next sentence.  The

22   next sentence starts with the word 'but.'  Doesn't start with

23   the word 'and.'  And it says, but the works committee of your

24   company, being UGI, passes favorably upon all blah blah blah,

25   which includes operations.  Passes favorably.  That's code for

567

NEIL SHIFRIN – CROSS-EXAMINATION

1  instruction.  Advice with the power to compel.

2  Q.  I understand your theory.  And in any event though, this

3  is what -- this is the model that you have one company in

4  Philadelphia, lots of subsidiaries elsewhere, each one has an

5  official organization, some overlapping management, and UGI

6  performs certain services for money and provides advice

7  according to this letter.  You believe that everything they do

8  is rammed down the throats of the subsidiaries, right?

9  A.  Well, it's not quite as nefarious as that, because I agree

10  that UGI was a very efficient organization, and there were

11  clear advantages to the subsidiaries for the services that UGI

12  provided.  And the subsidiaries definitely benefit from UGI's

13  knowledge and their abilities.  And they benefited from things

14  like centralized purchasing and all that stuff.  I'm not

15  questioning that at all.  But the point is, the

16  subsidiaries -- it gained advantage from the goodness of UGI's

17  organization, but that doesn't change the fact that UGI ran

18  those subsidiaries.

19  Q.  Well, let me focus you on the last sentence, which is

20  where we're going to go to the next subject.  It says, in

21  furtherance of this theory, the superintendents, agents of all

22  the companies in which we're interested, assemble in

23  Philadelphia to read and discuss carefully prepared papers

24  upon the technical and commercial problems of the business in

25  which they're engaged.

NEIL SHIFRIN - CROSS-EXAMINATION

1    Those are the superintendent conferences, right?

2  A.  Right.

3  Q.  Okay.  And let's turn to those.  Before I do, Dr. Shifrin,

4  do you dispute the -- that the purpose of these conferences

5  was to facilitate an exchange of ideas of all the various

6  people who worked for the different companies in which UGI was

7  interested in, so they could share knowledge and react to each

8  other and kind of have a conference and develop ideas and

9  solutions?

10  A.  I don't dispute that.  It was proprietary.  And the kick

11  off of these conferences, I think it was Bodine that noted

12  that we can talk frankly because we're not being viewed by the

13  outside world.  Which, of course, was very unique in the gas

14  industry.

15    Because the gas industry, which was generally a public

16  utility organization, freely shared information from company

17  to company, regardless of ownership of the company.  Because

18  everybody had their own monopoly in their cities.  Here, UGI

19  is sharing information and for the purposes that I mentioned

20  before, to the benefit of all the subsidiaries.  No question

21  about that.  But they are keeping it proprietary.

22  Q.  Okay.  Well, we'll, I think, go into that in some detail

23  as well.  But again, to just try to see where we are, is it

24  your view that when they published these papers and have

25  discussions about whether tar should be burned under the bench

NEIL SHIFRIN - CROSS-EXAMINATION

1   or whatever the topic is, and there was certainly lots of

2   other business topics at these conferences, weren't there?

3   A.  Yes.

4   Q.  Is it your view in reading these papers that the

5   subsidiaries were being directed to do what was in each of

6   these papers?

7   A.  No.  They weren't being directed, they were being informed

8   of state-of-the-art technology.  So that they could -- so the

9   plants could run better.

10  Q.  State-of-the-art technology or, you know, the thinkings of

11  a person in Savannah who created a tar still in an

12  unconventional way, whether it was state-of-the-art or whether

13  it was a new idea, it was being put on display for them to

14  share and possibly use, if they thought it was advisable?

15  A.  That's right.  Nothing wrong with that.

16  Q.  And so then the superintendents' meetings were not a

17  vehicle for instructing gas superintendents or employees how

18  to run a gas plant, it was to provide them with information so

19  that they could be informed and make the best decisions

20  possible.

21  A.  That's probably true to a large extent.  The

22  superintendents' meetings are a good example of how and why

23  UGI was a leader in the field.  UGI, with its subsidiaries and

24  its exchange of technical information, understood the gas

25  business inside and out.

NEIL SHIFRIN – CROSS-EXAMINATION

1   Q.  And I guess you'd agree also that the problems that

2   different subsidiaries faced, varied tremendously because of

3   local conditions; even tar issues, for example, were impacted

4   by local market conditions, and what might be good for one

5   company wouldn't necessarily be good for another, correct?

6   A.  I would agree with that.

7   Q.  That may save me a lot of time.

8        MR. VARON:  Can you give me a second?  Andrew, we're

9   in Exhibit 161.  We don't want the summary sheet, which has

10  been abandoned, but if you go to UGI-SC 257.  This is --

11  sorry, Dr. Shifrin.  Your Honor, I apologize.

12  Q.  Exhibit 161 is the composite exhibit that you put up for

13  purchasing.  And I wanted to explore a few of these documents

14  with you.  We were talking about purchasing a little bit

15  before lunch.  The first one is UGI-SC 257.  It's maybe a

16  little bit way into the pile.

17       So, Dr. Shifrin, we were discussing earlier this morning

18  the purchasing function, and we touched on it just now as

19  well.  And I guess this first piece on 257 is an example where

20  the executive committee is recommending that the purchasing

21  agent be authorized to enter into a particular transaction for

22  700,000 gallons of gas oil, correct?

23  A.  Right.

24  Q.  And the material that follows indicates that it's been

25  shopped pretty carefully, right?  That there was a prior

571

NEIL SHIFRIN - CROSS-EXAMINATION

1    contract that expired, it tells the price of what the expiring

2    contract is, it notes that bids were received by different

3    Charleston -- by different companies, and it list the bids,

4    correct?

5    A.  Right.

6    Q.  And I know on some of these it even lists people who were

7    asked to bid and didn't make a reply, and I think it does that

8    as well, correct?

9    A.  Right.

10   Q.  Says the following companies were asked to bid and made no

11   reply.  So when UGI is going -- when the purchasing agent is

12   going to make this transaction, it is using the resources that

13   it has to invite bids from lots of different people trying to

14   get the best price, the best product, reports, what the

15   competitive bidding is, and makes a decision on what product

16   to use.  Correct?

17   A.  Right.

18   Q.  And you were commenting earlier that the parentheses at

19   the bottom of these entries indicates kind of what happens

20   first.  And so on this one it says letter 11/12/13, purchasing

21   agent to board, right?

22   A.  Right.

23   Q.  So the purchasing agent is Mr. Pearson, right?

24   A.  Right.

25   Q.  And he's the purchasing agent for CCR&L, correct?

NEIL SHIFRIN - CROSS-EXAMINATION

1   A.  Among others, right.

2   Q.  And he's also the purchasing agent for UGI.

3   A.  Right.

4   Q.  So that's what we call a dual officer, right?  He's

5   officer of the parent and the sub simultaneously.

6   A.  That was another role.  He was the purchasing agent here.

7   Q.  Okay.  And he -- do you have -- would you agree with me

8   when -- if I said that I believe the letter written to the

9   board is in his capacity as purchasing agent for CCR&L, asking

10  or recommending to the board that this contract be entered

11  into?

12  A.  Well, it's unclear if he's submitting that letter as an

13  agent of the board of CCR&L, or as the purchasing agent of

14  UGI.

15  Q.  And in any event, the board gets it, it reviews it, and it

16  recommends to Charleston that the purchasing agent actually go

17  forward with the contract.  Right?

18  A.  Right.

19  Q.  So it starts with the purchasing agent, it goes to the

20  board, comes back to Charleston saying get your purchasing

21  agent to do what he recommended in the first place.  Right?

22  A.  The purchasing agent shopped for the oil, made the

23  recommendation, sent the letter to the board.  The UGI board

24  said Charleston's going to buy this 780,000 gallons of oil

25  from this guy at this price.

NEIL SHIFRIN - CROSS-EXAMINATION

1   Q.  Because the Charleston purchasing agent was the one that

2   figured it out.  Right?

3   A.  Right.  The Charleston UGI purchasing agent.

4   Q.  The dual person.

5   A.  Right.

6   Q.  Okay.  And sometimes in the minutes we find that the

7   purchasing agent is not doing this for one UGI subsidiary,

8   he's doing it, he's entering into an annual contract and he's

9   going to buy 7 million tons -- gallons of gas oil for lots of

10  different companies that need it, but the same kind of

11  competitive process is utilized, right?

12  A.  Right.

13  Q.  And do you know of any instances in which the purchasing

14  agent acting -- Mr. Pearson acting for CCR&L, entered into

15  some kind of decision that was bad for CCR&L, but benefited

16  UGI?

17  A.  I don't, and I never made such a claim.

18          MR. VARON:  I'm sorry, Your Honor, I need a moment.

19      (Brief interruption in proceedings.)

20  BY MR. VARON:

21  Q.  Let's talk about cadet engineering.  Isn't it true, Dr.

22  Shifrin, that the term cadet engineer is just a name that's

23  given to apprentice engineers coming out of college or high

24  school, and that's what they're called when they get their

25  first job?

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.   I was never called that.  This is a UGI term.

2    Q.   Okay.  How about in the era 1900, 1890, 1910, isn't this

3    just a description of, you know, like a first-year law

4    associate, a cadet engineer?

5    A.   I don't know.

6    Q.   Have you looked to see whether other companies, other

7    engineering companies used that term?

8    A.   I have done a lot of historical research on many different

9    companies, and I don't recall ever seeing that term.

10   Q.   But so you've seen the term and you've seen the fact that

11   UGI has boasted about the training of its people, and you've

12   inferred that there is some formal curriculum and education

13   that they go through, is that right?

14   A.   I never said that.

15   Q.   It's true that there is no formal training and curriculum

16   that they go through.

17   A.   I described the cadet program earlier.  Would you like me

18   to describe it again?

19   Q.   No.  I'm trying to test what it is and what it isn't.  And

20   I guess the first parameter I'm trying to establish is that

21   they're not sent to a campus somewhere, correct?

22   A.   UGI did have roles in development of engineering programs

23   on campuses.

24   Q.   That's not what I'm asking you.  I mean, I know that lots

25   of companies do charitable and civic things and teach at

NEIL SHIFRIN - CROSS-EXAMINATION

1   universities and teach at law schools and teach in engineering

2   schools and use it for recruiting.  But we're talking about

3   the hiring of new engineers out of college, and calling them

4   cadet engineers and training them.  And I'm just trying to

5   make sure that we can come to some understanding about what

6   truly was involved here, if possible.  And I'm saying to you

7   that as the first blush issue, there was no centralized

8   campus, school, with a formal curriculum.  Correct?

9   A.  Run by UGI --

10          THE COURT:  He's already testified what they were.

11  And as I told you before, you can go down the line, there's no

12  school, there's no -- I mean, you can ask all kind of negative

13  questions.  And I just don't think that's a part of

14  cross-examination.

15          MR. VARON:  Okay, Your Honor.

16          THE COURT:  The record is what it is.  He said what

17  he said.  If he left something out, he's got to pay the price

18  for not saying it.  I mean, if there is a school and he didn't

19  testify about it, then he didn't testify.

20          MR. VARON:  It's not a school, Your Honor.

21          THE COURT:  Well, nobody said there was.  We just

22  can't go down and ask it wasn't this, it wasn't this, it

23  wasn't this.  I don't like that.

24          MR. VARON:  Okay.

25          THE COURT:  And I told you that one time before.

NEIL SHIFRIN - CROSS-EXAMINATION

1  Because it can go on ad infinitum.  Any lawyer can do that.

2          MR. VARON:  I apologize, Your Honor.

3          THE COURT:  You don't need to apologize.  Let's just

4  keep asking questions.

5          MR. VARON:  I will.  Again, I'm concerned, in a

6  sense, because in a lot of situations here, I think the

7  plaintiff is positing that things are occurring in a

8  particular way, and --

9          THE COURT:  He may be, but this is not good

10 cross-examination.

11         MR. VARON:  Could I have a five-minute break?  I need

12 to look for one exhibit that I --

13         THE COURT:  Take your time, go ahead.

14    (Brief interruption in proceedings.)

15         MR. VARON:  Thank you, Your Honor.

16 BY MR. VARON:

17 Q.  Dr. Shifrin, you talked yesterday about the fact that UGI

18 had designed the Charleston plant that got put up in 1910, and

19 I believe you showed a set of plans that a subsequent South

20 Carolina company had traced from UGI plans, how the gas plant

21 was going to be organized.  Correct?

22 A.  Right.

23 Q.  And I guess that's a part of your operational control

24 theory here, that UGI designed the gas plant, and so that is

25 some indicia of control, I guess.  Is that the theory?

677

NEIL SHIFRIN - CROSS-EXAMINATION

1    A.  It's one example of many elements from different angles of

2    control.  They designed it, they built it, they operated it,

3    they staffed it.

4    Q.  You keep saying that they built it.  But isn't it true

5    that local contractors, I mean actually let's be clear, if

6    possible.  The water gas sets that comprise the guts of the

7    plant, those were -- that was UGI equipment, they built, they

8    probably sent it down to Charleston to have it serve as the

9    plant.  Correct?  Have it serve as the plant equipment?

10   A.  Well, there were local contractors that installed it, yes.

11   Q.  So is that all you mean by that they built the plant, that

12   they manufactured the gas sets and shipped them down to

13   Charleston?

14   A.  No.

15   Q.  Okay.  You mean that they actually came and put up the

16   plant?

17   A.  Well, they sent George Waring to do that.

18   Q.  And George Waring, we've talked about, he was the general

19   manager of CCR&L, correct?

20   A.  Right.

21   Q.  Okay.  And UGI, he used to be at Omaha, correct?

22   A.  Right.

23   Q.  And your position is, is that UGI built the plant because

24   they made Waring general manager at CCR&L.

25   A.  Well, they used George Waring to implement their

NEIL SHIFRIN – CROSS-EXAMINATION

1    construction plan.

2    Q.  Okay.

3    A.  To oversee it.

4    Q.  And had they hired -- had CCR&L hired someone who hadn't

5    been in the UGI organization to oversee the construction of

6    the plant, but UGI approved it or recommended it, would UGI

7    have built the plant in the same way?

8    A.  I don't really understand your hypothetical.  I mean

9    that's not what happened.

10   Q.  Well, I'm just trying to explore the contours of it, so

11   humor me for a second.  Let's say they didn't take Waring from

12   Omaha, and they said, you know, we have this new company, the

13   new company's going to build a gas plant, we have certain gas

14   plant people that can run it from CCRG&E, but we -- company

15   needs an experienced person to oversee not just the gas plant,

16   but the railway business, the electric business, let's go get

17   someone.  And someone from ConEd is chosen, CCR&L finds them.

18   They go to UGI and say we want to hire this guy from ConEd,

19   and UGI says I recommend that you hire the guy from ConEd.  Is

20   that the same, in your view?

21   A.  It would depend on the person and the facts and the role

22   of UGI.  In the hypothetical you pose, UGI is still making the

23   decision.

24   Q.  So because UGI approves the employment, in essence, of a

25   CCR&L employee, in essence that employee's conduct becomes

NEIL SHIFRIN – CROSS-EXAMINATION

1    UGI's?

2    A.  I'm not sure of that.  But in this case, that's not the

3    case.  They took a UGI person and they placed him at the

4    Charleston plant.  That's the fact.

5    Q.  Okay.  I think you said at the end of your testimony

6    yesterday that, you know, you were impressed by the longevity

7    of so many, you know, UGI people, that they would work from

8    one subsidiary to another and back to UGI and never leave the

9    company.  Is that right?

10   A.  Right.

11   Q.  Okay.  Now, Waring was at Charleston, at CCR&L in the

12   general manager post from 1910 to 1917, right?

13   A.  Right.

14   Q.  And in 1917 he resigned.

15         MR. VARON:  Andrew, maybe you could pull up Exhibit

16   161.  I think it's SCANA 1737.

17   Q.  In any event, while we're waiting for it to come up, Dr.

18   Shifrin, do you remember Waring resigned in 1917?

19   A.  Yes.

20   Q.  And he resigned to go to a completely different company,

21   did he not?

22   A.  Yeah, I believe so.  I believe he became a consultant.

23   Q.  Well, first he went to work for the American Power Company

24   in Salt Lake, right?

25   A.  Right.

NEIL SHIFRIN – CROSS-EXAMINATION

1   Q.  And that was not a company that UGI had any ownership in?

2   A.  I don't think so.

3   Q.  Okay.  So he may have, you know, had worked at a UGI

4   company previously, but for whatever reason in 1917 he left of

5   his own free will to do something else, right?

6   A.  Right.

7   Q.  Okay.  Does that impact the analysis one way or the other

8   as to whether he, you know, he was a UGI guy whose conduct

9   should be attributed to UGI?

10  A.  No.

11  Q.  These are the minutes from October 3rd, 1917.  These are

12  actually CCR&L minutes.  And I guess they reflect Waring's

13  resignation.  They do show that in the bottom of the first

14  paragraph that he accepted a position with the American Public

15  Utilities Company in Salt Lake City.  Right?

16  A.  Right.

17  Q.  And in the second paragraph President Gadsden is making a

18  very nice speech about how valuable he was, since he assumed

19  the duties of vice president/general manager in 1910, and the

20  kind of service that he gave of the highest order to the

21  company.  Correct?

22  A.  Right.

23  Q.  And he's apparently received an offer from the new company

24  that's of a financial nature, and a nature that's superior to

25  what he can get at UGI, correct?

581

NEIL SHIFRIN - CROSS-EXAMINATION

1          MR. VARON:  If you want to highlight, Andrew.

2    Q.  He realized that the offer which Mr. Waring had received

3    from American Public Utilities Company, not only from a

4    financial and a professional standpoint, was in the nature

5    that Waring was, I guess, right in not declining it.  Correct?

6    A.  Right.

7    Q.  Does this suggest at all that Waring was his own man?

8    A.  In 1917, he appeared to resign.

9          THE COURT:  It says since 1910, when he assumed the

10   duties of vice president and general manager, he had given to

11   the company, I guess that's UGI --

12         MR. VARON:  No, these are CCR&L minutes.  These are

13   Charleston --

14         THE COURT:  You didn't show that part of it.

15         MR. VARON:  I'm sorry.  Can you go up?

16         THE COURT:  That's all right, I'll take your word for

17   it.

18         MR. VARON:  There it is, Your Honor.  That was the

19   point, that Mr. Gadsden, president of CCR&L, is extolling the

20   services that Mr. Waring made to the company.

21   BY MR. VARON:

22   Q.  Okay.  Let's talk about Stuart Cooper.  Stuart Cooper was

23   another manager at CCR&L, correct?

24   A.  Right.

25   Q.  And Cooper was another person who had worked at different

NEIL SHIFRIN – CROSS-EXAMINATION

1    UGI subsidiaries and worked a short time at UGI, I believe,

2    before he came to Charleston.  Does that accord with your

3    recollection?

4    A.  Right.

5    Q.  And then Cooper came in 1919, if my recollection is right,

6    and was working as a manager under Mr. Bendt, who had assumed

7    Waring's duties.  Correct?

8    A.  Benedict, I think?

9    Q.  Benedict, you're right.  Sorry.  Bendt was the auditor.

10   So Cooper was manager of the company, but was reporting to

11   Benedict, who was vice president.  Is that right?

12   A.  I believe so.

13   Q.  Okay.  And then Benedict left and Cooper took over.  Had

14   complete charge of CCR&L?

15   A.  He was the general manager and a vice president, right.

16   Q.  And as I understand it, Dr. Shifrin, in your analysis and

17   probably in others, again, you think that because Mr. Cooper

18   had previously worked at other subsidiaries of UGI, and had

19   also worked at UGI for a brief while, when he was vice

20   president and general manager of CCR&L, he was somehow working

21   under the direction of UGI rather than CCR&L.  Correct?

22   A.  He was assigned the position at CCR&L by UGI.

23   Q.  So -- and the consequence of that, in your view, is that

24   CCR&L's subsequent operation, the decisions that Cooper made

25   at the plant, the decisions that occurred, those are really

NEIL SHIFRIN - CROSS-EXAMINATION

1    UGI decisions, in your view?

2    A.  He was placed there by UGI, he did the best he could to

3    run the Charleston plant, and probably did a good job.  And

4    then worked for a couple of years for the Carolina Power

5    Company after the plant was sold by UGI.  And then went back

6    to work for UGI.  He was a UGI employee.

7    Q.  Let's review that for a second, because I think that's an

8    interesting point, too.

9        The UGI period, as you've described it, ended in 1926,

10   right?

11   A.  Correct.

12   Q.  And it ended when CCR&L, the subsidiary, Charleston

13   Consolidated Railway Gas and Electric, the lessor and owner of

14   the plant, Charleston Gas Light, and a bunch of other

15   companies all combined and merged together, correct?

16   A.  I'm not -- I don't know the details of that.

17   Q.  Okay.  They were -- the companies combined, and basically

18   South Carolina Power bought them, correct?  That's the company

19   you just referred to?

20   A.  After 1926 the plant was owned and run by South Carolina

21   Power.

22   Q.  Okay.  And South Carolina Power is a -- merged later with

23   SCE&G?  It's all one, right?

24   A.  I don't know.

25   Q.  Okay.  Cooper, when the plant was sold, he didn't leave

NEIL SHIFRIN - CROSS-EXAMINATION

1    and go back to UGI, he went to the company that bought CCR&L,

2    CCRG&E, all the properties.  In fact, he became a vice

3    president and president, at least a vice president of South

4    Carolina Power, the new company.  Right?

5            THE COURT:  He just said that.

6            MR. VARON:  Okay.

7            THE COURT:  He said he worked there and he went back

8    with UGI.

9    BY MR. VARON:

10   Q.  But he worked -- he went back when South Carolina Power

11   sold the plant, didn't it, in 1929?

12   A.  I don't know what the conditions were, but by 1929 he was

13   working back at UGI in Philadelphia.

14   Q.  But by 1929, South Carolina Power had sold the plant, we

15   can put your orphan share back up, but they had sold it to

16   somebody else, hadn't they?

17   A.  I haven't paid attention to that.

18   Q.  Okay.  So again, this is an instance of another manager

19   leaving.

20       Let's talk about Benedict for a second.  Benedict also had

21   worked at other UGI subsidiaries, correct?

22   A.  Right.

23   Q.  He had been slotted in as an assistant treasurer in 1910?

24   A.  Right.

25   Q.  And basically was in charge of the new business

NEIL SHIFRIN - CROSS-EXAMINATION

1    department?

2    A.  I don't remember, but I'll take your word for it.

3    Q.  When Waring resigned to go to Salt Lake, Benedict was put

4    in charge of the company.

5    A.  That's right.

6    Q.  Okay.  And again, I guess it is your view that because UGI

7    suggested in the first place that Benedict be, you know, an

8    assistant treasurer in 1910, that when he was promoted in 1917

9    or whatever, that this was a UGI decision, and Benedict was

10   just running it for UGI.

11   A.  Well, that's right.  And a good way to understand that is

12   when Benedict resigned -- retired, UGI honored him for 35

13   years of service, which includes his period of time at the

14   Charleston plant.  So that shows you how UGI viewed it.

15   Q.  Well, you know, there's no doubt, Mr. Shifrin, that UGI

16   and all its subsidiaries had a newspaper for everybody, and

17   they went to the American Gas Association, and saw each other

18   and wrote up a little alumni thing, but that doesn't mean

19   that --

20             THE COURT:  Ask him a question.  You're testifying.

21             MR. VARON:  You're right, Your Honor.

22   BY MR. VARON:

23   Q.  During the time period that Mr. Waring was in charge of

24   CCR&L, and I'll just do all the people at once, Mr. Benedict,

25   Mr. Cooper, are you aware of any actions that they took that

NEIL SHIFRIN - CROSS-EXAMINATION

1    would have hurt CCR&L, while benefiting UGI?

2    A.  I don't think so.

3         MR. VARON:  Andrew, maybe you could put up

4    Plaintiff's Exhibit --

5    Q.  Dr. Shifrin, this is one of the works inspection reports

6    that you testified about this morning, correct?

7    A.  Right.

8    Q.  And it says that the inspection's being conducted by D.W.

9    Price per J.D. Milne, correct?

10   A.  Right.

11   Q.  Now, these are characters that are at issue in our

12   Connecticut case, am I right?

13   A.  Right.

14   Q.  And isn't it true that both Milne and Price are CL&P,

15   Connecticut Light and Power employees at this point?

16   A.  I don't remember.

17        MR. VARON:  Can I approach, Your Honor?

18        THE COURT:  Yes, sir.

19        MR. VARON:  His problem, Your Honor, again, we've got

20   documents that would do this; I'm not sure whether we have

21   enough copies for counsel.

22        MR. FELMLY:  Your Honor, if I could just note an

23   objection on this.  And I know Mr. Varon said this morning

24   that he felt compelled, as a result of this inspection, to try

25   the Connecticut case.  You should know that in Connecticut it

NEIL SHIFRIN - CROSS-EXAMINATION

1    is alleged that UGI had an intermediate holding company called

2    Connecticut Light and Power.  And the issues in that case

3    involve our allegations that UGI controlled some

4    sub-subsidiaries through that intermediate holding company.

5        So for purposes of this exercise, I mean, I don't think we

6    need to try the Connecticut case here --

7              THE COURT:  We're not going to try it here.

8              MR. FELMLY:  But if he were here to show, for

9    example, that Mr. Milne and Price were employees of

10   Connecticut Light and Power, in that litigation, as he well

11   knows, that issue is joined that they are still UGI

12   controlled, and it's a complicated issue, I could talk about

13   it all day.  But it doesn't change anything in terms of this

14   case.

15             THE COURT:  Okay.  I'm not getting into the -- if

16   this witness testified in some other case, obviously that

17   testimony may be used in this case.  But I'm not getting

18   tangled up in the issues in a Connecticut case.

19             MR. VARON:  I applaud that, Your Honor, but --

20             THE COURT:  Go on, ask him some questions that relate

21   to this case.

22             MR. VARON:  Well, but he's trying to introduce a

23   form --

24             THE COURT:  Say what now?

25             MR. VARON:  He is trying to introduce an inspection

588

NEIL SHIFRIN - CROSS-EXAMINATION

1    form that this company, Connecticut Light and Power, utilized.

2            THE COURT:  Go ahead and ask him that.

3    BY MR. VARON:

4    Q.  Dr. Shifrin, isn't this a Connecticut Light and Power

5    inspection form?

6    A.  They used it, that's right.  I believe they adopted it

7    from UGI.

8    Q.  Didn't Connecticut Light and Power have its very own set

9    of forms, procedures, and in particular, inspection

10   procedures?

11   A.  I don't remember offhand.

12   Q.  Didn't it have a huge staff of its own engineers at the

13   Connecticut Light and Power level, at district superintendent

14   levels, and didn't these personnel perform the kinds of

15   inspection that this report represents?

16   A.  I believe that it had engineers in its employment.

17   Q.  And you can't remember that D.W. Price or Milne were CLP

18   employees?

19   A.  That's next week's work.

20           MR. VARON:  I'll leave it alone, Your Honor.  It

21   would take me too long to go in another direction.

22   BY MR. VARON:

23   Q.  Let's look at Plaintiff's Exhibit 64.  This is an

24   inspection that UGI made in 1940 at Concord?

25   A.  Right.

NEIL SHIFRIN - CROSS-EXAMINATION

1   Q.  Have you seen UGI use this inspection form at any other
2   subsidiary?
3   A.  Not this form precisely, but the same gist of the
4   questions and things like that.
5   Q.  Where have you seen UGI use it elsewhere?
6   A.  Not this form, I just told you I haven't seen this form
7   used elsewhere.
8   Q.  Where have you seen them use a similar form?
9   A.  I've seen questions and answers in the Connecticut plant
10  inspections.
11  Q.  Well, that's the ones we just looked at.
12  A.  That's right.  That's right.  And I agree with you that
13  it's not this form.
14  Q.  It's also a CLP form, isn't it?
15  A.  I think that's unclear.
16  Q.  Have you seen it at any other subsidiaries in any kind of
17  time frame like 1910 to 1926?
18  A.  No.
19  Q.  And have you seen it at any other subsidiaries other than
20  CLP, which you mentioned, and Concord, at any time?
21  A.  I haven't looked for it in other subsidiaries.
22  Q.  Let's look at Plaintiff's Exhibit 65.  That's what you say
23  is an inspection report that UGI made at Concord in 1931.
24  A.  I believe so, that's right.
25  Q.  And it's a distribution inspection, so that's of the gas

NEIL SHIFRIN – CROSS-EXAMINATION

1  mains?

2  A.  Right.

3  Q.  Have you seen this report used at any other UGI

4  subsidiary?

5  A.  No.

6         MR. VARON:  And Defendant's Exhibit 67, Andrew.  Can

7  you maybe go to the next page.

8  Q.  This is another CLP inspection report that you talked

9  about this morning, right?

10  A.  It's an inspection of the Meriden plant.

11  Q.  CLP form?

12  A.  It's unclear to me sitting here whose form it is.

13  Q.  It's identical to the one we just looked at, at Norwalk

14  two minutes ago, correct?

15  A.  Right.

16  Q.  We talked earlier before lunch about whether there were

17  documents showing that Norris actually directed

18  superintendents.  I gather that you haven't had a chance to

19  really look for those in the intervening period?

20  A.  Right.

21         MR. VARON:  I need a minute, Your Honor.

22     (Brief interruption in proceedings.)

23  BY MR. VARON:

24  Q.  Dr. Shifrin, the assertion, I guess, has been made that

25  UGI basically ran this plant, right?  They were doing this,

NEIL SHIFRIN - CROSS-EXAMINATION

1    according to your theory, from Philadelphia, 700 miles away;

2    am I right?

3    A.  Right.

4    Q.  And they were not only doing it in Charleston, but they

5    were doing -- running the day-to-day operations of the

6    Charleston plant and 37 other plants that they owned around

7    the country on a day-to-day basis, right?

8    A.  Right.

9    Q.  And there's no documents or paper that show any

10   instructions that are flowing from anyone at UGI to anybody at

11   Charleston, about leaks or waste disposal, correct?

12   A.  Not specific instructions to Charleston, that's right.

13   Q.  And Charleston not only had a gas plant, but it had an

14   electric utility and it had a railway business, right?

15   A.  Right.

16   Q.  And the same kinds of recommendations that UGI would make

17   about an expenditure, a salary, professional donation, they'd

18   make on the electric side, the railway side and the gas side,

19   they ran it the same way, correct?

20   A.  I really haven't paid attention to the electric side or

21   the railway side, so I haven't done that comparison.

22   Q.  Then let's just talk about the gas side.  The gas side had

23   a general manager overseeing the company; Waring was a general

24   manager of the entire company, for example, wasn't he?

25   A.  For the Charleston plant, that's right.

NEIL SHIFRIN – CROSS-EXAMINATION

1    Q.  No, actually for the CCR&L.  Wasn't his title vice

2    president and general manager of the company, and didn't he

3    have responsibilities on the railway and electric side?

4    A.  I really didn't pay any attention to his responsibilities

5    on the others.  He may have.

6    Q.  And then there was a gas superintendent underneath that,

7    right?

8    A.  Right.

9    Q.  And the gas superintendent is probably the same guy that

10   worked at the plant before it was transferred to CCR&L.

11   A.  At some points that's not true.  It might have been at the

12   beginning.  I don't remember.

13   Q.  And underneath the gas superintendent there are staff of,

14   I guess you've said anywhere from nine to 12, 13 people.

15   A.  Could be.  Right.

16   Q.  And on top of that, all kinds of gas makers and helpers

17   and salespeople and bookkeepers and so forth, right?

18   A.  My understanding of a carbureted water gas plant is the

19   grand total employees may have been like 15, 20 people.

20   Q.  Well, then maybe the other people were more -- I guess is

21   it possible that the company employees, people that you

22   wouldn't consider working for the plant, had things to do with

23   new business and distribution and so forth?

24   A.  It's possible.

25   Q.  And basically Waring and Cooper and Benedict all had

NEIL SHIFRIN - CROSS-EXAMINATION

1  oversight and responsibility for the day-to-day runnings of

2  the CCR&L businesses, including the gas plant, right?

3  A.  Right.

4  Q.  And people like Kollock, who was a gas cadet engineer and

5  a gas superintendent, and I think there were references to

6  somebody called Kingsley Patterson, they were said to have

7  charge of the plant, right?

8  A.  Right.

9  Q.  And these were CCR&L employees, correct?

10  A.  They were UGI employees placed there by UGI.  And then

11  worked for the Charleston plant.

12  Q.  When you say they were UGI employees, they really never

13  worked at UGI, did they?

14  A.  UGI moved them around their organization.  I don't know if

15  they got their paycheck from UGI at any time.

16  Q.  So you're not using employee in a technical sense, I

17  guess?

18  A.  They were transferred and placed by UGI.

19  Q.  But they -- first of all, they got a paycheck from CCR&L,

20  correct?

21  A.  Probably.

22  Q.  And they report within the CCR&L organization, correct?

23  A.  To some degree, that's right.

24  Q.  Well, again, is there any documents you can point to in

25  which any of these people, Kollock, Patterson, are reporting

NEIL SHIFRIN - CROSS-EXAMINATION

1   directly to people at UGI, wearing UGI hats?

2   A.  As I mentioned earlier, there are UGI Circle documents and

3   other documents such as the history that describes the general

4   superintendent in Philadelphia as having absolute reign over

5   all the superintendents in the subsidiary companies.

6   Q.  And your theory is that the CCR&L employees, when they

7   made decisions at the plant, how to make gas, what to do with

8   leaks, whether to sell tar, all that conduct has essentially

9   being charged to UGI because they were placed there by UGI?

10  A.  That's right.  UGI made the operational decisions.  They

11  decided the staffing, they decided the equipment, they decided

12  the raw materials.

13  Q.  Well --

14  A.  They made all the operations decisions.

15  Q.  Again, that's predicated on this view that a

16  recommendation isn't a recommendation, that it gets

17  recommended to CCR&L, CCR&L in at least the instances where

18  they want to, adopts UGI's recommendations and moves forward

19  with them, correct?

20  A.  I don't believe that it was voluntary on CCR&L's part.

21  Q.  And, you know, did you look to see whether CCR&L did

22  things independently of UGI?

23  A.  Well, to some degree they had latitude to run the plant.

24  But they reported to UGI.  And UGI dictated the budgets, they

25  dictated the repairs, they dictated the upgrades of the plant,

NEIL SHIFRIN – CROSS-EXAMINATION

1    installation of new equipment.  They had responsibility, UGI

2    had authority over all of the operational elements of the

3    Charleston plant.

4    Q.  And I guess --

5    A.  Within that context, there were local people that had some

6    latitude to actually perform that work.  Just as in my

7    organization, there are plenty of engineers who I don't

8    question their detailed activity, but clearly they report to

9    my company.

10    Q.  And I gather you think that the reporting obligation is

11    unusual in some way?

12    A.  Which reporting obligation?

13          MR. VARON:  Never mind, I'll withdraw it.

14       Thank you, Dr. Shifrin, I think I understand your views

15    and appreciate your cooperation.  I have no further questions.

16          MR. FELMLY:  Your Honor, I know you're leaving early.

17    I have -- probably could do this in ten minutes, and if --

18          THE COURT:  Let's recess.  We'll pick it up in the

19    morning.

20          MR. FELMLY:  The only concern is I know Dr. Shifrin

21    had a flight and was trying to get out.  That was --

22          THE COURT:  Okay.  I'll give you five minutes.

23          MR. FELMLY:  Five minutes.

24                     REDIRECT EXAMINATION

25    BY MR. FELMLY:

NEIL SHIFRIN – REDIRECT EXAMINATION

1    Q.  We won't put it up on the screen, but in the Dolan letter

2    where it talks about the works committee handling all those

3    things that were described, the next sentence indicates, does

4    it not, Dr. Shifrin, that that committee meets every day?

5    A.  Every day, that's right.

6    Q.  And that committee is the president of the company --

7           THE COURT:  I saw that.  Meets every day.  I couldn't

8    believe it, but it does.

9    BY MR. FELMLY:

10   Q.  My point is, and the people who meet are all the executive

11   officers of the company got together every day to decide, as a

12   works committee, on what was going to be the case for these

13   subsidiary companies.

14   A.  Every day.

15   Q.  With respect to the issues of carbureted water gas, the

16   earthquake in 1886 would not have put any -- in all

17   likelihood, would not have put any carbureted water gas on

18   this site, because carbureted water gas was something that was

19   only about two or three years old at that point in terms of

20   going into the world, is that true?

21   A.  That's right, and this plant did not have a carbureted

22   water gas plant at that time.

23   Q.  The -- you know, in all of your looking at these

24   authorizations for work and all the construction that was done

25   and all the various items that were done and all these minutes

NEIL SHIFRIN – REDIRECT EXAMINATION

1    we've seen, and Mr. Varon was saying it's just like going out

2    and hiring a consultant to do it.  With respect to work on

3    that plant, how often do you see a third party coming in, not

4    a UGI entity, a non-UGI outsider coming in to work on that

5    plant, to adjust the equipment?  Does Joe's Plumbing or Fred's

6    Gas Service come in there to work on that, or what's the

7    situation in terms of who works on that plant?

8    A.  I don't recall any documentation for the entire history of

9    the Charleston plant that period, where there was anybody

10   other than UGI people or local people working on that plant.

11   Q.  And in all this -- all these entries, one after another,

12   where it says recommended, recommended, recommended, and they

13   go on forever and ever and ever, in all of that paper that you

14   looked at, did you see anything where this local company

15   that's supposedly independent said, no, recommendation

16   rejected, we're not going to do it, we're doing it our way.

17   Any indication in what you saw of an outright rejection,

18   dissent, exercise of independence?

19   A.  No, there's no documentation of that.

20   Q.  Last thing.  On this Connecticut form which has been

21   discussed, and I'll do this on the ELMO, and I'll do it in a

22   moment, this is Exhibit 68.  On page 43 of that detailed form,

23   there is a reference to this question.  Are there any small

24   leaks in the holder tanks?  Any leaks in the masonry tanks?

25   Can they be stopped?  Cost of makeup water.  Leaks can be

NEIL SHIFRIN - REDIRECT EXAMINATION

1    stopped by using wood pulp.  See operating notes for

2    June 1914.

3        What are those operating notes?

4    A.  Those are the UGI operating notes.  In fact, we looked at

5    that article earlier today about stopping leaks with caulking

6    type material like this.

7    Q.  So this set of documents, this form that supposedly

8    according to Mr. Varon's position today is some separate

9    independent company's form, is referencing that same article

10   in the UGI engineering and operating notes that we had up on

11   the screen today, the one called leaky holder?

12   A.  In my opinion, yes.

13   Q.  Let's not do it on your opinion.

14       MR. FELMLY:  Denise, can you bring that up?  The --

15   from the operating notes.  Denise, if you can bring up that

16   article from June 1914.

17   Q.  So that is the article that in this very inspection report

18   is cited, and it's supposed to be an independent document?

19   A.  I believe so, yes.

20       MR. FELMLY:  Thank you, I have nothing further, I

21   appreciate it.

22       THE COURT:  Any recross?

23       MR. VARON:  One question or two, Your Honor.

24                   RECROSS-EXAMINATION

25   BY MR. VARON:

NEIL SHIFRIN – RECROSS-EXAMINATION

1    Q.  Did CL&P and its subsidiaries get the operating notes?

2    A.  They did, because they were subsidiaries ultimately of

3    UGI.

4    Q.  And as you said, the operating notes were there to provide

5    a list of resources to use, and this is a reflection that

6    somebody said if you have a leak, let's do something, and in

7    fact, the people that are saying it are CL&P employees, are

8    they not?

9    A.  I think that that's not pertinent to the issue.  The issue

10   is whether or not this was a UGI form, and reference of the

11   UGI operating minutes confirms in my mind that it's a UGI form

12   ultimately, whether or not Connecticut Power adopted or it

13   adapted it.

14           MR. VARON:  I won't debate you.  Thank you.

15           THE COURT:  Okay.  We'll be in recess till

16   10:00 o'clock in the morning.

17       You're excused, sir.

18

19       (Court adjourned at 4:07 p.m.)

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATION

2

3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4     Reporter for the United States District Court for the District

5     of South Carolina, hereby certify that the foregoing is a true

6     and correct transcript of the stenographically recorded above

7     proceedings.

8

9

10

      S/Debra L. Potocki

11    _____

12    Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25